UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAJAN CHAHAL, Individually and on Behalf of All Others Similarly Situated,<br><br>         Plaintiff,<br><br>v.<br><br>CREDIT SUISSE GROUP AG, DAVID R. MATHERS and TIDJANE THIAM,<br><br>         Defendants. | Case No. _____<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Rajan Chahal ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Credit Suisse Group AG ("Credit Suisse" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1.   This is a federa1 securities class action on behalf of all investors who purchased or otherwise acquired Credit Suisse VelocityShares Daily Inverse VIX Short Term exchange traded notes ("Inverse VIX Short ETNs") between January 29, 2018 and February 5, 2018 (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

## PARTIES

5.      Plaintiff purchased Inverse VIX Short ETNs within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

6.      Defendant Credit Suisse Group AG is a corporation with its principal executive offices located at Paradeplatz 8, CH 8001 Zurich, Switzerland. Credit Suisse AG is the direct bank subsidiary of Credit Suisse. Credit Suisse issued and offered the Inverse VIX Short ETNs to investors through Credit Suisse AG and its Nassau Branch located at Shirley & Charlotte Streets,

Bahamas Financial Centre, 4th Floor, P.O. Box N-4928, Nassau, Bahamas. Inverse VIX Short ETNs were listed and actively traded on the Nasdaq Stock Market under the ticker symbol "XIV."

7.     Defendant, Tidjane Thiam ("Thiam") was the Chief Executive Officer ("CEO") of the Company and the direct bank subsidiary Credit Suisse AG at all relevant times.

8.     Defendant David R. Mathers ("Mathers") was the Chief Financial Officer ("CFO") of the Company and the direct bank subsidiary Credit Suisse AG at all relevant times.

9.     Defendants in paragraphs 7-8 are collectively referred to herein as the "Individual Defendants."

10.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or deliberately and recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)     approved or ratified these statements in violation of federal securities laws.

11.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about Credit Suisse's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, trading activities, and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

12.     The Inverse VIX Short ETNs were, and are, registered with the SEC pursuant to the federal securities laws of the United States. As officers of the publicly-held company which issued those securities, the Individual Defendants each had a duty not only to disseminate prompt, accurate, and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, but also to correct any previously-issued statements that had become materially misleading or untrue, so that the market price Inverse VIX Short ETNs would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Credit Suisse's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of those Company reports and press

releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to either prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public and that, therefore, the positive representations being made were materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were "group-published" information, the result of the collective actions of the Individual Defendants.

14.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Inverse VIX Short ETNs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the Inverse VIX Short ETNs, the Company's operations, management and the intrinsic value of its securities and (ii) caused Plaintiff and other shareholders to purchase the Inverse VIX Short ETNs at artificially inflated prices.

<u>**SUBSTANTIVE ALLEGATIONS**</u>

A.     <u>**Background**</u>

15.     The Standard & Poor's 500 Index ("S&P 500 Index") is a capitalization-weighted index tracking the performance of 500 large market capitalization companies based on the total market value of their outstanding shares.

16.     Put and call options on the S&P 500 Index are financial derivatives created and made available to investors on the Chicago Board Options Exchange, Incorporated ("CBOE") to bet on a downward or upward move in the level of the S&P 500 Index.

5

17.     In 1993, the CBOE created a measurement of the market expectations of near-term volatility conveyed by the S&P 500 Index options prices, the CBOE Volatility Index ("VIX Index"). CBOE calculates the VIX Index based on the real time pricing of S&P 500 Index put and call option contracts by averaging the weighted prices of such options over a wide range of strike prices.

18.     Futures contract on the VIX Index ("VIX Futures") were created and made available to investors for them to invest in forward volatility based on their assessment of the future movements of the VIX Index.

19.     The S&P 500 VIX Short-Term Futures Index ER (ticker "SPVXSP") created by S&P Dow Jones Indices LLC, seeks to model the outcome of holding long positions in VIX Futures ("S&P 500 SPVXSP Index"). The S&P 500 SPVXSP Index utilizes prices of the next two near-term VIX Futures to replicate a position that rolls the nearest month VIX futures to the next month on a daily basis in equal fractional amounts, resulting in a constant one-month rolling long position in first and second month VIX futures contracts. The S&P 500 SPVXSP Index is an indicator of investors' exposure to the maturity of future contracts on the VIX Index.

20.     Exchange traded notes ("ETNs") are unsecured debt obligations of financial institutions with return based on the performance of an underlying index. Inverse ETNs are similar instruments, but their value is calculated using the inverse of the performance of the underlying index.

21.     The Inverse VIX Short ETNs are inverse ETNs based on the performance of the underlying S&P 500 SPVXSP Index. Simply speaking, the Inverse VIX Short ETNs track the inverse of the daily performance of the S&P 500 SPVXSP Index.

22.     Credit Suisse issued Inverse VIX Short ETNs through multiple offerings. The Inverse VIX Short ETNs were last issued by Credit Suisse through a January 29, 2018 pricing supplement.

23.     At all relevant times, Credit Suisse held a significant amount of short volatility financial products, including, but not limited to the VIX Futures.

**B.      Material Misstatements and Omissions during the Class Period**

24.     The Class Period begins on January 29, 2018, when Credit Suisse filed a pricing supplement (No. VLS ETN-1/A48) with the SEC pursuant to Rule 424(b)(2) and in conjunction with (i) the Registration Statement No. 333-218604-02, (ii) a prospectus supplement dated June 30, 2017 and (iii) a prospectus dated June 30, 2017 (altogether the "Prospectus"), to offer 16,275,000 Inverse VIX Short ETNs at a denomination and stated principal amount of $10 each.

25.     The Prospectus' risk section discloses the following with regards to Credit Suisse's trading activity:

> **Trading and other transactions by us, our affiliates, or third parties with whom we transact, in securities or financial instruments related to the ETNs and the applicable underlying Index may impair the value of your ETNs**
>
> We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or other instruments linked to the applicable underlying Index, certain exchange traded notes issued by Credit

7

Suisse, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing, perhaps on or before the applicable Valuation Date. We, our affiliates, or third parties with whom we transact, may also enter into, adjust and unwind hedging transactions relating to other securities whose returns are linked to the applicable underlying Index. Any of these hedging activities may adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero. Any profit in connection with such hedging activities will be in addition to any other compensation that and our affiliates receive for the sale of the ETNs, which may create an additional incentive to sell the ETNs to you.

We, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures, or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or instruments whose returns are linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers. Any of these activities could adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-thecounter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. We may also issue, and we, our affiliates, or third parties with whom we transact may also issue or underwrite, other ETNs or financial or

derivative instruments with returns linked to changes in the level of the applicable underlying Index or the underlying futures or listed or over-thecounter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. By introducing competing products into the marketplace in this manner, we, our affiliates, or third parties with whom we transact could adversely affect the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

26.     In the Prospectus, Credit Suisse discloses situations where it will have the option or the obligation to "accelerate" the Inverse VIX Short ETNs, in relevant part:

**Acceleration at Our Option or Upon an Acceleration Event**

We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day, occurring on or after the Inception Date (an "**Optional Acceleration"**). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration"**). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date. In the case of an Optional Acceleration, the "Accelerated Valuation Date" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration. In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give you notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day). The Accelerated Redemption Amount will be payable on the third Business Day following the Accelerated Valuation Date (such third Business Day the "Acceleration Date").* We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes.

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become due.

An "**Acceleration Event**" means:

9

\*       \*       \*

(d) if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value;

27.     The statements in paragraphs ¶25-26 above were materially false and/or misleading because they misrepresented and failed to disclose that (i) Credit Suisse was actively manipulating the Inverse VIX Short ETNs by liquidating its holdings in various financial products to avoid a loss; (ii) Credit Suisse was manipulating the Inverse VIX Short ETNs to the detriment of investors; and (iii) as a result of the foregoing, Defendants' statements about Credit Suisse's Inverse VIX Short ETNs were false and misleading and/or lacked a reasonable basis.

**C.     The Truth Emerges**

28.     On February 5, 2018, at 4:00 pm EST, the regular-hours market for the trading of the Inverse VIX Short ETNs closed. The Inverse VIX Short ETNs' last trading price was $99. Less than 30 minutes later, during the after-hours market, the price per Inverse VIX Short ETN had dropped to $70.01. By 4:45 pm, the price had dropped to $42.81 per Inverse VIX Short ETN and then by 6:28 pm the price per Inverse VIX Short ETN had declined to a low of $10.16 per Inverse VIX Short ETN, a ***drop of approximately 89.74%*** from its closing value.

29.     On February 6, 2018, Credit Suisse issued a press release announcing that an Acceleration Event took place intraday on February 5, 2018 ("Feb 6, 2018 Acceleration Event Press Release"). In relevant part:

> Credit Suisse AG ("Credit Suisse") today announced the event acceleration of its VelocityShares™ Daily Inverse VIX Short Term ETNs ("XIV") due to an acceleration event. The acceleration date is expected to be February 21, 2018.

10

*Since the intraday indicative value of XIV on February 5, 2018 was equal to or less than 20% of the prior day's closing indicative value, an acceleration event has occurred.* Credit Suisse expects to deliver an irrevocable call notice with respect to the event acceleration of XIV to The Depository Trust Company by no later than February 15, 2018. The date of the delivery of the irrevocable call notice, which is expected to be February 15, 2018, will constitute the accelerated valuation date, subject to postponement due to certain events. The acceleration date for XIV is expected to be February 21, 2018, which is three business days after the accelerated valuation date. On the acceleration date, investors will receive a cash payment per ETN in an amount equal to the closing indicative value of XIV on the accelerated valuation date. *The last day of trading for XIV is expected to be February 20, 2018.* As of the date hereof, Credit Suisse will no longer issue new units of XIV ETNs.

On February 2, 2018, the closing indicative value was USD 108.3681. None of the other ETNs offered by Credit Suisse are affected by this announcement.

Emphasis added.

30.     Later on February 6, 2018, Credit Suisse issued a press release disclosing that it had experienced "no trading losses" from the Inverse VIX Short ETNs even though, as stated above, Credit Suisse held a significant amount of short volatility financial products, including, but not limited to the VIX Futures.

## ADDITIONAL SCIENTER ALLEGATIONS

31.     On March 12, 2018, Securities Litigation and Consulting Group, Inc. ("SLCG") released a report entiltled "Material Misrepresentations in XIV's Prospectus Led to $700 Million in Losses" ("March 2018 Report") providing further evidence of Credit Suisse's material misrepresentations. In relevant part:

**Material Misrepresentations in XIV's Prospectus Led to $700 Million in Losses**

**By Craig McCann, Regina Meng, Edward O'Neal and Mike Yan**

11

**Executive Summary**

Credit Suisse's XIV Exchange Traded Note (ETN) linked to the inverse of short term VIX futures prices lost 97% of its value or ap-proximately $2 billion in a single day on February 5, 2018. Credit Suisse announced the following morning that it would redeem all outstanding XIV shares at the Closing Indicative Value on February 15, 2018.₁

Figure 1 reports the daily closing price for XIV from its inception in November 2010 to its demise in February 2018. The run-up in 2017 corresponds to a lengthy period of low stock market volatility.

Credit Suisse's latest Pricing Supplement for the XIV can be accessed by clicking here. Credit Suisse represented in the Pricing Supplement that it would pub-lish an estimate of the current economic value of XIV shares every 15 seconds based on real time VIX futures prices but, in fact, did not. On February 5, 2018 the difference between what Credit Suisse said it would do and what is actually did was enormous because Credit Suisse effectively stopped updating its estimate of the current economic value of XIV shares at 4:10 pm when VIX futures prices were changing significantly.

From 4:10 pm to 5:09 pm on February 5, 2018 Credit Suisse was materially misrepresent-ing the true economic value of XIV. Investors were buying XIV between 4:15 pm and 5:08 pm at prices as high as in the $80s when Credit Suisse was representing to the public that the economic value of the notes was $24.6961 but had to know that the true economic value was aready between $4.22 and $4.40.

**Figure 1:** XIV from November 29, 2010 to February 15, 2015



By 4:13 pm or shortly thereafter sophisticated market partici-pants would know that Credit Suisse was certain to redeem XIV for $4.22 or a little more per share. Investors paid $823.6 million to purchase 28.8 million shares after 4:15 pm at an aver-age price of $28.60. Those af-termarket purchases at inflated prices transferred $700 million from unsophisticated, poorly-in - formed buyers to sophisticated, well-informed sellers.

In addition to the problem with Credit Suisse's Pricing Supple-ment prospectus we identify, we find that extraordinary trading in two critical futures contracts in the last minutes of trading before 4:15 pm on February 5, 2018 pushed up the futures' prices and triggered the XIV liquidation. The primary ben-eficiaries of this manufactured liquidation of XIV are Credit Suisse and the traders who had previously sold XIV short.

The problems we identify herein are not unique to XIV but are found in other ETNs tied to the S&P VIX futures indices.

### Intraday Indicative Value and Closing Indicative Value

XIV trades at prices that are de-termined by supply and demand just like other exchange-traded securities. However, Credit Suisse also calculates and pub - lishes an estimate of the value of XIV called the "Intraday Indic-ative Value" throughout the day and once a day a "Closing Indic-ative Value". [2]

On page 5, XIV's Pricing Sup-plement states "The "Intraday Indicative Value" for each series of ETNs is designed to approx-imate the economic value of such series of ETNs at a given time.… the calculation is based on the most recent intraday level of such Index at the particular time. The Intraday Indicative Value of the ETNs will be calcu-lated every 15 seconds …"

On page PS-30, the Pricing Supplement says "The value of each [S&P VIX futures] Index will be published by Bloomberg in real time and after the close of trading on each Index Business Day under the following ticker symbols: …" and "The intraday level of each of the Indices is calculated in real time by S&P … applying real time prices of the relevant VIX futures contracts."

Credit Suisse's representations in the Pricing Supplement that the Intraday Indicative Value 1)approximates the economic value of the ETNs, 2) is updated every 15 seconds based on the most recent levels of the Indices which are 3) calculated by S&P in real time from 4) real time prices of VIX futures contracts were false.

13

Credit Suisse was using a Stan-dard & Poor's Index it knew or should have known was not being updated every 15 seconds "applying real time prices of the relevant VIX futures contracts."

Credit Suisse's misrepresenta-tions are not trivial. The XIV Pricing Supplement includes the following.

> …Paying a premium purchase price over the Indicative Value of the ETNs could lead to significant losses in the event the investor sells such ETNs at a time when such premium is no longer present in the market place or such ETNs are accelerated (including at our option, which we have the discretion to do at any time), in which case investors will receive a cash payment in an amount equal to the Closing Indicative Value on the Accel-erated Valuation Date (each as defined herein). Investors should consult their financial advisors before purchasing or selling the ETNs, especially for ETNs trading at a premium over their indicative value. …[January 29, 2018 Pricing Supplement, p.2]

Credit Suisse also describes potential early redemption of XIV if the daily Indicative Value decline exceeds 80%:

> …If **the price of the un-derlying futures contracts** increases by more than 80% in a day, it is extremely likely that the Inverse ETNs will depre-ciate to an Intraday Indicative Value or Closing Indicative Value equal to or less than 20% of the prior day's Closing Indicative Value and will be subject to acceleration if we choose to exercise our right to effect an Event Acceleration of the ETNs. …[January 29, 2018 Pricing Supplement, PS-28; emphasis added]

This excerpt from the Pricing Supplement demonstrates that Credit Suisse knew, inde-pendent of any calculation by Standard and Poor's, that an 80% or slightly greater increase in the price of the February and March VIX futures contracts would cause the Indicative Value to breach the threshold which would give Credit Suisse the op-tion to redeem all XIV shares.3

**VIX Futures Prices Up 96% by 4:15 PM, Ensured Credit Suisse Would Liquidate XIV**

XIV's Closing Indicative Value is found by applying the nega-tive % change in the closing VIX futures' settlement values from the previous days' VIX futures' settlement values (with a minor adjustment for fees and interest) to the previous day's Closing In-dicative Value. The VIX futures' settlement values are

calculated by the CBOE as an average of the inside bid and ask quotes for each futures contract at 4:15 pm. The difference between the VIX futures' settlement values and the most recent futures trade prices at 4:15 pm is de mini-mis because bid-ask spreads are small in near-to-expiration VIX futures contracts. Thus, even if bid and ask quotes for VIX futures contracts were not observable in real time – they are – VIX futures trade prices at 4:15 pm are an excellent indica-tor of the VIX futures settlement values.

The last trade by 4:15 pm on February 5, 2018 in the February contract was at $33.20 and the last trade in the March contract was at $27.95. These prices were 112.5% and 86.8% higher than the previous day's settlement values for the February and March contracts. The weights to be applied on February 5, 2018 to these two daily changes were known to be 0.35 and 0.65 so the weighted average increase in the relevant futures settlement values was certain to be 95.77% give or take a trivial amount as a result of using the average of bid and ask quotes at 4:15 pm instead of last trade prices and because of the very tiny daily accrual of interest and fees. See Table 1.

It was thus known to Credit Suisse and other sophisticated market participants by 4:15 pm that XIV's Closing Indicative Value would decline by 96% from the previous day's Closing Indicative Value and that Credit Suisse would redeem the notes for pennies on the dollar.

Investors paid approximately $823 million at an average price of $28.60 after 4:15 pm when the true Indicative Value was between $4.2217 (Credit Suisse's revised calculation) and $4.4064 (our calculation as of 4:15pm) although Credit Suisse was reporting the Indicative Value as approximately $24.8933 until 5:08 pm. Credit Suisse knew or should have known that these unfortunate purchasers were certain – not just likely, certain – to lose virtually everything they were paying the instant they were buying the securities.

If the true Indicative Value, updated every 15 seconds based on the most recent Index levels calculated from real time futures prices as represented by Credit Suisse in XIV Pricing Supplement, at 4:15 pm was $24.8933 XIV would not have been liqui-dated because that would have only been a 77% decline from the previous day's Closing Indicative Value. The February and March VIX futures prices have declined since February 5, 2018 and so XIV shares would have increased in value if XIV had survived the events of February 5, 2018. In that case, they would be worth approximately $30.88 as of March 6, 2018. Instead, Credit Suisse paid investors $5.99 per share based on XIV's Closing Indicative Value on February 15, 2018. [4]

15

| Table 1: By 4:15 pm, XIV's Closing Indicative Value Was Certain to Decline More Than 95% | | | | |
|---|---|---|---|---|
| **Settlement Value Summary** | | | | |
| | **February** | **March** | **Weighted Average** | **XIVIV** |
| 2/2/2018 | $15.625 | $14.975 | $15.2025 | $108.3681 |
| 2/5/2018 | $33.225 | $27.975 | $29.8125 | $4.2217 |
| | | | 96.1% | 3.90% |
| | | | | |
| **Based on Last Trade Prices** | | | | |
| 4:15pm | $33.200 | $27.950 | $29.7875 | $4.415 |
| | | | 95.94% | 4.07% |

### XIV Indicative Value Did Not Track Relevant VIX Futures Prices in Real Time

Table 2 lists the spot VIX, the February and March VIX fu-tures trade prices, the S&P Index (SPVXSPID) Credit Suisse used to calculated XIV's Indicative Value and XIV's Indicative Value. The first row in Table 2 labeled "February 2, 2018" con-tains the closing values for the VIX, settlement values for the February and March VIX futures contracts and a weighted-average of those two futures contracts' settlement values and Credit Suisse's Closing Indicative Value on February 2, 2018. The rest of the rows in Table 2 summarize our recreation of XIV's Indica-tive Value from 4:00 pm to 5:11 pm.

The Last February Futures Trade is the most recent trade price each second. For example, there was a February futures trade at $23.10 and a March futures trade at $18.90, both at 3:59:59 pm. S&P's Short-term VIX Futures Index assigned a .35 weight to the February contract and a 0.65 weight to the March contract on February 5, 2018 because 65% of the current roll period had elapsed. Applying those weights to the last trade price each second, we derive a weighted average futures price; $20.37 at 4:00 pm.

Credit Suisse reported the same $27.0855 Intraday Indicative Value at 4:10, 4:11 and 4:12 pm. There were significant changes in the real-time prices of the relevant futures contracts and so it is clear Credit Suisse was not updating the Intraday Indicative Value every 15 seconds, based on an Index which was being recalculated in real-time based on the most recent trade prices in therelevant futures contracts. Credit Suisse did not report the Closing Indicative Value of XIV

16

until 5:09:05 pm on February 5, 2018, 7 seconds after S&P set the daily close level of SPVXSP which XIV tracks at 5:08:58 pm. The Intraday Indicative Value dropped from $24.6961 to the Closing Indicative Value of $4.2217 at the same time, i.e. 5:09:05 pm.

Credit Suisse reported the $24.6961 Indicative Value until 5:08 pm despite the fact that futures trades at 4:15 pm sup-port a $4.40 Intraday Indicative Value and futures quotes sup-port a Closing Indicative Value of $4.22. Credit Suisse was posting Intraday Indicative Val-ues but they were not based on indices "calculated in real time by S&P … applying real time prices of the relevant VIX fu-tures contracts" as Credit Suisse represented in XIV's Pricing Supplement.

**By 4:10 pm XIV's True Intraday Indicative Value Had Declined More Than 80%.**

At 4:10, 4:11 and 4:12 pm, we estimate the Intraday Indicative Value to be $21.8523, $2.2146 and $18.9655. Such low Intra-day Indicative Values and the true Intraday Indicative Values at 4:12, 4:13, 4:14 and 4:15 pm as well would have triggered an unwind of XIV if they had been the Closing Indicative Value that day since they are all more than 80% less than the previous days' $108.3681 Closing Indicative Value.

Our recreated Intraday Indic-ative Value matches Credit Su-isse's Intraday Indicative Value closely throughout the day but at 4:09 pm Credit Suisse's reported Intraday Indicative Value began to deviate significantly from the true Indicative Value which might have put investors on no-tice that XIV was failing. Figure 2 plots XIV bid and ask quotes with Credit Suisse's reported Intraday Indicative Values and corrected Intraday Indicative Values based on the latest trade prices in the relevant futures contracts.

| | VIX | Last February Futures Trades | Last March Futures Trades | Weighted Futures Price | SPVXSPID | XIV Indicative Value | SLCG XIV Indicative Value |
|---|---|---|---|---|---|---|---|
| **Table 2: Recreation of XIV's Indicative Value from 4:00 pm to 5:011 pm** | | | | | | | |
| February 2, 2018 | 17.31 | 15.63 | 14.98 | 15.2025 | 49.4322 | 108.3681 | 108.3681 |
| 16:00:00 | 32.98 | 23.10 | 18.90 | 20.37 | 65.7900 | 72.5937 | 71.5348 |
| 16:01:00 | 35.02 | 24.75 | 19.67 | 21.45 | 69.1000 | 65.2501 | 63.8508 |
| 16:02:00 | 35.02 | 25.00 | 20.10 | 21.82 | 70.4400 | 62.3127 | 61.2348 |
| 16:03:00 | 34.55 | 26.60 | 22.05 | 23.64 | 73.8400 | 54.8594 | 48.2083 |
| 16:04:00 | 35.31 | 26.50 | 21.70 | 23.38 | 76.1300 | 49.8396 | 50.0794 |
| 16:05:00 | 35.31 | 25.82 | 21.13 | 22.77 | 74.4900 | 53.4346 | 54.4168 |
| 16:06:00 | 35.31 | 26.75 | 21.66 | 23.44 | 74.7300 | 52.9085 | 49.6410 |
| 16:07:00 | 38.24 | 26.90 | 22.06 | 23.75 | 76.9500 | 48.0420 | 47.4135 |
| 16:08:00 | 38.80 | 27.17 | 21.99 | 23.80 | 77.1200 | 47.6604 | 47.0642 |
| 16:09:00 | 38.80 | 29.20 | 22.69 | 24.97 | 79.6600 | 42.1014 | 38.7505 |
| 16:10:00 | 37.32 | 32.15 | 24.75 | 27.34 | 86.5100 | 27.0855 | 21.8523 |
| 16:11:00 | 37.32 | 32.50 | 28.80 | 30.10 | 86.5100 | 27.0855 | 2.2146 |
| 16:12:00 | 37.32 | 30.80 | 26.10 | 27.75 | 86.5100 | 27.0855 | 18.9655 |
| 16:13:00 | 37.32 | 30.00 | 26.00 | 27.40 | 86.8600 | 26.3182 | 21.4246 |
| 16:14:00 | 37.32 | 31.45 | 27.10 | 28.62 | 87.5100 | 24.8933 | 12.7106 |
| 16:15:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:16:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:17:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:18:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:19:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:20:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:21:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:22:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:23:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:24:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:25:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:26:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:27:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:28:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:29:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:30:00 | 37.32 | 33.20 | 27.95 | 29.79 | 87.5100 | 24.8933 | 4.4064 |
| 16:31:00 | 37.32 | 33.10 | 27.55 | 29.49 | 87.5100 | 24.8933 | 4.2299 |
| 16:32:00 | 37.32 | 32.55 | 27.59 | 29.33 | 87.5100 | 24.8933 | 4.2537 |
| 16:33:00 | 37.32 | 33.00 | 26.55 | 29.46 | 87.5100 | 24.8933 | 4.2349 |
| 16:34:00 | 37.32 | 32.55 | 27.00 | 28.94 | 87.5100 | 24.8933 | 4.3085 |
| 16:35:00 | 37.32 | 31.20 | 26.75 | 28.31 | 87.5100 | 24.8933 | 4.3992 |
| 16:36:00 | 37.32 | 30.25 | 25.00 | 26.84 | 87.26 | 25.4414 | 4.6092 |
| 16:37:00 | 37.32 | 30.00 | 25.30 | 26.95 | 87.09 | 25.8140 | 4.5939 |
| 16:38:00 | 37.32 | 29.75 | 25.05 | 26.70 | 87.44 | 25.0468 | 4.6296 |
| 16:39:00 | 37.32 | 30.00 | 25.85 | 27.30 | 87.60 | 24.6661 | 4.5428 |
| 16:40:00 | 37.32 | 30.30 | 26.30 | 27.70 | 87.60 | 24.6661 | 4.4860 |
| 16:41:00 | 37.32 | 30.65 | 26.95 | 28.25 | 87.60 | 24.6661 | 4.4082 |
| 16:42:00 | 37.32 | 30.55 | 27.25 | 28.41 | 87.60 | 24.6661 | 4.3853 |
| 16:43:00 | 37.32 | 30.90 | 27.17 | 28.48 | 87.60 | 24.6661 | 4.3752 |
| 16:44:00 | 37.32 | 31.65 | 27.40 | 28.89 | 87.60 | 24.6661 | 4.3164 |
| 16:45:00 | 37.32 | 32.15 | 27.95 | 29.42 | 87.60 | 24.6661 | 4.2403 |
| 16:46:00 | 37.32 | 32.00 | 27.65 | 29.17 | 87.60 | 24.6661 | 4.2757 |
| 16:47:00 | 37.32 | 32.10 | 27.50 | 29.11 | 87.60 | 24.6661 | 4.2846 |
| 16:48:00 | 37.32 | 31.90 | 27.40 | 28.98 | 87.60 | 24.6661 | 4.3039 |
| 16:49:00 | 37.32 | 32.25 | 27.45 | 29.13 | 87.60 | 24.6661 | 4.2817 |
| 16:50:00 | 37.32 | 32.35 | 27.45 | 29.17 | 87.60 | 24.6661 | 4.2767 |
| 16:51:00 | 37.32 | 32.00 | 27.50 | 29.08 | 87.60 | 24.6661 | 4.2896 |
| 16:52:00 | 37.32 | 31.80 | 27.25 | 28.84 | 87.60 | 24.6661 | 4.3228 |
| 16:53:00 | 37.32 | 31.45 | 27.15 | 28.66 | 87.60 | 24.6661 | 4.3496 |
| 16:54:00 | 37.32 | 31.15 | 26.55 | 28.16 | 87.60 | 24.6661 | 4.4203 |
| 16:55:00 | 37.32 | 30.55 | 26.75 | 27.43 | 87.60 | 24.6661 | 4.5246 |
| 16:56:00 | 37.32 | 30.05 | 25.00 | 26.77 | 87.60 | 24.6661 | 4.6192 |
| 16:57:00 | 37.32 | 28.95 | 24.70 | 26.19 | 87.60 | 24.6661 | 4.7021 |
| 16:58:00 | 37.32 | 29.00 | 24.65 | 26.17 | 87.60 | 24.6661 | 4.7042 |
| 16:59:00 | 37.32 | 28.75 | 24.60 | 26.05 | 87.60 | 24.6661 | 4.7214 |
| 17:00:00 | 37.32 | 28.60 | 24.75 | 26.10 | 87.60 | 24.6661 | 4.7149 |
| 17:01:00 | 37.32 | 28.70 | 25.00 | 26.30 | 87.60 | 24.6661 | 4.6867 |
| 17:02:00 | 37.32 | 28.60 | 25.00 | 26.26 | 87.60 | 24.6661 | 4.6917 |
| 17:03:00 | 37.32 | 28.25 | 25.00 | 26.14 | 87.60 | 24.6661 | 4.7092 |
| 17:04:00 | 37.32 | 28.55 | 25.00 | 26.24 | 87.60 | 24.6661 | 4.6942 |
| 17:05:00 | 37.32 | 28.40 | 24.75 | 26.03 | 87.60 | 24.6661 | 4.7249 |
| 17:06:00 | 37.32 | 28.10 | 24.55 | 25.79 | 87.60 | 24.6661 | 4.7586 |
| 17:07:00 | 37.32 | 27.90 | 24.50 | 25.69 | 87.60 | 24.6661 | 4.7732 |
| 17:08:00 | 37.32 | 27.81 | 24.20 | 25.46 | 87.60 | 24.6661 | 4.8055 |
| 17:09:00 | 37.32 | 27.90 | 24.25 | 25.53 | 87.60 | **24.6961** | 4.7964 |
| 17:10:00 | 37.32 | 27.75 | 24.05 | 25.35 | 96.9378 | 4.2217 | 4.8225 |
| 17:11:00 | 37.32 | 28.10 | 24.10 | 25.50 | 96.9378 | 4.2217 | 4.8003 |

**Late VIX Futures Trades Appear to Have Inten-tionally Triggered XIV Unwind**

The spot VIX in Table 2 was 90% higher at 4:10 pm on February 5, 2018 than it had closed the previous day. Consistent with the general observations that VIX futures prices move with the spot VIX but with less dramatic swings, the weighted average last futures trade price at 4:10 pm had increased 34% from the previous day's closing average futures trade price. Between 4:10 pm and 4:15 pm something extraordinary happened; the spot VIX increased 13% but the weighted average futures price increased 46% or 3.5 times as much as the increase in the VIX and 8 or 10 times as much as we would have expected given the 13% increase in the VIX.



Figure 2: Investors Bought XIV at Inflated Prices While Credit Suisse Delayed Reducing Reported Indicative Value

Heavy trading in the February and March VIX futures contracts in the last few minutes before 4:15 pm drove their prices up and beyond the threshold at which XIV would be liquidated. Figure 3 plots the % increase in the weighted average VIX futures trade prices from their previous day's closing levels and the 80% level at which Credit Suisse would be entitled to liquidate XIV. The average futures price had increased from the previous close only 34.5% by 4:00 pm on February 5, 2018. By 4:09:44 pm average futures price had increased from the previous close by over 80%. In fact, it ap-pears that the Intraday Indicative Value hit $0 at 4:10:56 pm.

It is unlikely that the heavy VIX futures trading shortly before the setting of the VIX futures settlement value at 4:15 pm resulted from benign hedging activity by Credit Suisse. Credit Suisse could alter its hedging position well before or after

the critical 4:15 pm marker and not impact the likelihood XIV would be unwound and the price Credit Suisse would pay investors for the outstanding notes.

The extraordinary increase in the February and March VIX fu - tures prices late on February 5, 2018 did not result from manip-ulation of the spot VIX calcula-tion by placement of quotes or trades in deep out of the money put options on the S&P 500. There has been some evidence of manipulation of the VIX for a few seconds surrounding the fixing of VIX levels for settling futures and options.5 There were no VIX futures settling on Feb - ruary 5, 2018. The increase in VIX was large and not fleeting. The increase in futures prices in the last few minutes preceding 4:15 pm was far greater than the increase in the VIX. Other than provoking a liquidation of XIV the potential payoffs to VIX manipulation was no higher on February 5, 2018 than on other days and much less than on days when VIX futures and options settle.

Futures prices change substan-tially less than one-for-one with changes in the spot price so it would be nearly impossible to move the VIX futures price by manipulating quotes on S&P 500 options. Direct purchas-es of the February and March VIX futures by Credit Suisse or Barclays or some large investors with short XIV positions account for VIX futures prices increasing much more dramatically than spot VIX levels in the last few minutes before 4:15 pm. XIV had a contingent settlement trig-gered if the February and March futures prices could be held 80% above their February 2, 2018 settlement values. It appears someone who would benefit from XIV being liquidated on February 5, 2018 was in the market heavily buying February and March contracts between 4:10 and 4:15 pm.

*      *      *



32.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Credit Suisse, their control over and/or receipt and/or modification of Credit Suisse's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Credit Suisse, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

33.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's Inverse VIX

Short ETNs, and operated as a fraud or deceit on acquirers of the Company's Inverse VIX Short ETNs. As detailed above, when the truth was revealed about Credit Suisse's misconduct and its lack of operational and financial controls, the value of the Company's Inverse VIX Short ETNs declined precipitously the prior artificial inflation no longer propped up its price. The decline in Credit Suisse's Inverse VIX Short ETNs' price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the Inverse VIX Short ETNs' price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss i.e., damages suffered by Plaintiff and other Class members is the direct result of Defendants' fraudulent scheme to artificially inflate the Company's Inverse VIX Short ETNs and the subsequent significant decline in the value of the Company's Inverse VIX Short ETNs, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

34.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Credit Suisse's business, operations, and financial condition as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Credit Suisse's Inverse VIX Short ETNs to be artificially inflated. Plaintiff and other Class members purchased Credit Suisse's Inverse VIX

22

Short ETNs at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

35.     At all relevant times, the market for Credit Suisse Inverse VIX Short ETNs was an efficient market for the following reasons, among others:

(a) Credit Suisse Inverse VIX Short ETNs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b) During the Class Period, Credit Suisse Inverse VIX Short ETNs were actively traded, demonstrating a strong presumption of an efficient market;

(c) Credit Suisse regularly communicated with public investors via established market communication mechanisms;

(d) Credit Suisse was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed during the Class Period to the sales force and certain customers of brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

(e) Unexpected material news about Credit Suisse was rapidly reflected in and incorporated into the Company's Inverse VIX Short ETNs during the Class Period.

36.     As a result of the foregoing, the market for Credit Suisse Inverse VIX Short ETNs promptly digested current information regarding Credit Suisse from all publicly available sources and reflected such information in the price of Credit Suisse's Inverse VIX Short ETNs. Under these

circumstances, all purchasers of Credit Suisse Inverse VIX Short ETNs during the Class Period

suffered similar injury through their purchase of Credit Suisse's Inverse VIX Short ETNs at artificially

inflated prices, and a presumption of reliance applies.

37.     Alternatively, reliance need not be proven in this action because the action involves

omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant

to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406

U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered the omitted information important in deciding whether to buy or sell

the subject security. Here, the facts withheld are material because an investor would have considered

the Company's financials and adequacy of internal controls over financial reporting when deciding

whether to purchase and/or sell Credit Suisse's Inverse VIX Short ETNs.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

38.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the material misrepresentations and omissions alleged in this

Complaint.

39.     To the extent that certain of the statements alleged to be misleading or inaccurate may

be characterized as forward-looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.

40.     Defendants are also liable for any false or misleading "forward-looking statements"

pleaded because, at the time each "forward-looking statement" was made, the speaker knew the

"forward-looking statement" was false or misleading, and the "forward-looking statement" was authorized and/or approved by an executive officer of Credit Suisse who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Credit Suisse Inverse VIX Short ETNs on the public market during the Class Period and were damaged, excluding the Company, the Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest (the "Class").

42.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Credit Suisse securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Credit Suisse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

securities class actions. Upon information and belief, the Inverse VIX Short ETNs are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

43.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

44.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)     whether the price of Credit Suisse securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I
### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Credit Suisse Inverse VIX Short ETNs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

49.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's Inverse VIX Short ETNs in an effort to maintain artificially high market prices for Credit Suisse securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Credit Suisse as specified herein.

51.     These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Credit Suisse's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Credit Suisse and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Credit Suisse Inverse VIX Short ETNs during the Class Period.

52.     Individual Defendants' primary liability, and controlling person liability arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was

advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

53.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions by Defendants were made knowingly or recklessly and for the purpose and effect of concealing Credit Suisse's operating condition and future business prospects from the investing public in order to support the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

54.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Credit Suisse's Inverse VIX Short ETNs was artificially inflated during the Class Period. In ignorance of the fact that market prices of Credit Suisse's Inverse VIX Short ETNs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the

integrity of the market on which the Inverse VIX Short ETNs trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Credit Suisse's Inverse VIX Short ETNs during the Class Period at artificially high prices and were or will be damaged thereby.

55.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Credit Suisse's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Credit Suisse securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

56.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's Inverse VIX Short ETNs during the Class Period.

58.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of Inverse VIX Short ETNs giving rise to the cause of action.

## COUNT II
### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

59.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of Credit Suisse within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

61.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

62.     As set forth above, Credit Suisse, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

63.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

64.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law;

and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: March 14, 2018                         /s/ Eduard Korsinsky
                                              **LEVI & KORSINSKY, LLP**
                                              Eduard Korsinsky
                                              30 Broad Street, 24th Floor
                                              New York, NY 10004
                                              Tel: (212) 363-7500
                                              Fax: (212) 363-7171
                                              Email:ek@zlk.com