UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAJAN CHAHAL, Individually and on Behalf of All Others Similarly Situated,<br><br>        **Plaintiff,**<br><br>v.<br><br>CREDIT SUISSE GROUP AG, DAVID R. MATHERS and TIDJANE THIAM,<br><br>        **Defendants.** | Case No. 1:18-cv-02268-AT<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rajan Chahal ("Plaintiff"), by his attorneys, except for his own acts, which are based on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Credit Suisse Group AG ("Credit Suisse"), as well as regulatory filings and reports, securities analyst reports about the Inverse VIX Short ETNs (defined herein) and Credit Suisse press releases. Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery:

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Credit Suisse VelocityShares Daily Inverse VIX Short Term exchange traded notes ("Inverse VIX Short ETNs") between January 29, 2018 and February 5, 2018 (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated

thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

## **PARTIES**

5.      Plaintiff purchased Inverse VIX Short ETNs within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing his transactions is attached hereto as Exhibit A.

6.      Defendant Credit Suisse Group AG is a corporation with its principal executive offices located at Paradeplatz 8, CH 8001 Zurich, Switzerland. Credit Suisse AG is the direct bank subsidiary of Credit Suisse. Credit Suisse issued and offered the Inverse VIX Short ETNs to investors through Credit Suisse AG and its Nassau Branch located at Shirley & Charlotte Streets, Bahamas Financial Centre, 4th Floor, P.O. Box N-4928, Nassau, Bahamas. Inverse VIX Short ETNs were listed and actively traded on the Nasdaq Stock Market under the ticker symbol "XIV."

7.      Defendant, Tidjane Thiam ("Thiam") was the Chief Executive Officer ("CEO") of Credit Suisse and the direct bank subsidiary Credit Suisse AG at all relevant times.

8.     Defendant David R. Mathers ("Mathers") was the Chief Financial Officer ("CFO") of Credit Suisse and the direct bank subsidiary Credit Suisse AG at all relevant times.

9.     Defendants in paragraphs 7-8 are collectively referred to herein as the "Individual Defendants."

10.     Each of the Individual Defendants:

(a)     directly participated in the management of Credit Suisse;

(b)     was directly involved in the day-to-day operations of Credit Suisse at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of Credit Suisse's internal controls;

(e)     was aware of or deliberately and recklessly disregarded the fact that the false and misleading statements were being issued concerning Credit Suisse; and/or

(f)     approved or ratified these statements in violation of federal securities laws.

11.     Because of the Individual Defendants' positions within Credit Suisse, they had access to undisclosed information about Credit Suisse's business, operations, operational trends, financial statements and trading activity via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and

Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

12.     The Inverse VIX Short ETNs were, and are, registered with the SEC pursuant to the federal securities laws of the United States. As officers of the publicly-held company which issued those securities, the Individual Defendants each had a duty not only to disseminate prompt, accurate, and truthful information, but also to correct any previously-issued statements that had become materially misleading or untrue, so that the market price Inverse VIX Short ETNs would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.     The Individual Defendants, because of their positions with Credit Suisse, possessed the power and authority to control the contents of Credit Suisse's reports to the SEC. Each Individual Defendant was provided with copies of those Credit Suisse filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to either prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public and that, therefore, the positive representations being made were materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were "group-published" information, the result of the collective actions of the Individual Defendants.

14.     Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Inverse VIX Short ETNs

by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the Inverse VIX Short ETNs, the true economic value of Inverse VIX Short ETNs and (ii) caused Plaintiff and other shareholders to purchase the Inverse VIX Short ETNs at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

15.    The Standard & Poor's 500 Index ("S&P 500 Index") is a capitalization-weighted index tracking the performance of 500 large market capitalization companies based on the total market value of their outstanding shares.

16.    Put and call options on the S&P 500 Index are financial derivatives created and made available to investors on the Chicago Board Options Exchange, Incorporated ("CBOE") to bet on a downward or upward move in the level of the S&P 500 Index.

17.    In 1993, the CBOE created a measurement of the market expectations of near-term volatility conveyed by the S&P 500 Index options prices, the CBOE Volatility Index ("VIX Index"). CBOE calculates the VIX Index based on the real-time pricing of S&P 500 Index put and call option contracts by averaging the weighted prices of such options over a wide range of strike prices.

18.    Futures contract on the VIX Index ("VIX Futures") were created and made available to investors for them to invest in forward volatility based on their assessment of the future movements of the VIX Index.

19.     The S&P 500 VIX Short-Term Futures Index ER (ticker "SPVXSP") created by S&P Dow Jones Indices LLC, seeks to model the outcome of holding long positions in VIX Futures ("S&P 500 SPVXSP Index"). The S&P 500 SPVXSP Index utilizes prices of the next two near-term VIX Futures to replicate a position that rolls the nearest month VIX Futures to the next month on a daily basis in equal fractional amounts, resulting in a constant one-month rolling long position in first and second-month VIX Futures contracts. The S&P 500 SPVXSP Index is an indicator of investors' exposure to the maturity of future contracts on the VIX Index.

20.     Exchange traded notes ("ETNs") are unsecured debt obligations of financial institutions with return based on the performance of an underlying index. Inverse ETNs are similar instruments, but their value is calculated using the inverse of the performance of the underlying index.

21.     The Inverse VIX Short ETNs are inverse ETNs based on the performance of the underlying S&P 500 SPVXSP Index. Simply speaking, the Inverse VIX Short ETNs track the inverse of the daily performance of the S&P 500 SPVXSP Index.

22.     Credit Suisse first announced the launch of Inverse VIX Short ETNs in a press release dated November 22, 2010; Credit Suisse subsequently issued Inverse VIX Short ETNs through various offerings starting in 2010. The Inverse VIX Short ETNs were last issued by Credit Suisse through a January 29, 2018 pricing supplement.

23.     At all relevant times, Credit Suisse held a significant amount of short volatility financial products, including, but not limited to the VIX Futures.

**B.**     **Material Misstatements and Omissions during the Class Period**

24.     The Class Period begins on January 29, 2018, when Credit Suisse filed a pricing supplement (No. VLS ETN-1/A48) with the SEC pursuant to Rule 424(b)(2) and in conjunction with (i) the Registration Statement No. 333-218604-02, (ii) a prospectus supplement dated June 30, 2017 and (iii) a prospectus dated June 30, 2017 (altogether the "Prospectus"), to offer 16,275,000 Inverse VIX Short ETNs at a denomination and stated principal amount of $10 each.

25.     The Prospectus' risk section discloses the following with regards to Credit Suisse's trading activity:

> **Trading and other transactions by us, our affiliates, or third parties with whom we transact, in securities or financial instruments related to the ETNs and the applicable underlying Index may impair the value of your ETNs**
>
> We expect to hedge our obligations relating to the ETNs by purchasing or selling short the underlying futures, listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or other instruments linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, and adjust the hedge by, among other things, purchasing or selling any of the foregoing, at any time and from time to time, and to unwind the hedge by selling any of the foregoing, perhaps on or before the applicable Valuation Date. We, our affiliates, or third parties with whom we transact, may also enter into, adjust and unwind hedging transactions relating to other securities whose returns are linked to the applicable underlying Index. Any of these hedging activities may adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and therefore the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. It is possible that we, our affiliates, or third parties with whom we transact could receive substantial returns with

respect to these hedging activities while the value of your ETNs decline or become zero. Any profit in connection with such hedging activities will be in addition to any other compensation that and our affiliates receive for the sale of the ETNs, which may create an additional incentive to sell the ETNs to you.

We, our affiliates, or third parties with whom we transact may also engage in trading in the underlying futures, or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures, or instruments whose returns are linked to the applicable underlying Index, certain exchange traded notes issued by Credit Suisse, or the underlying futures or listed or over-the-counter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures for our or their proprietary accounts, for other accounts under our or their management or to facilitate transactions, including block transactions, on behalf of customers. Any of these activities could adversely affect the level of the applicable underlying Index — directly or indirectly by affecting the price of the underlying futures or listed or over-thecounter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures — and, therefore, the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date. We may also issue, and we, our affiliates, or third parties with whom we transact may also issue or underwrite, other ETNs or financial or derivative instruments with returns linked to changes in the level of the applicable underlying Index or the underlying futures or listed or over-thecounter options, futures contracts, swaps, or other derivative instruments relating to the applicable underlying Index, the VIX Index, the S&P 500® Index, the component securities of the S&P 500® Index, or the underlying futures. By introducing competing products into the marketplace in this manner, we, our affiliates, or third parties with whom we transact could adversely affect the market value of your ETNs and the amount we will pay on your ETNs on the relevant Early Redemption Date, Acceleration Date or the Maturity Date.

26.    In the Prospectus, Credit Suisse discloses situations where it will have the option

or the obligation to "accelerate" the Inverse VIX Short ETNs, in relevant part:

**Acceleration at Our Option or Upon an Acceleration Event**

We will have the right to accelerate the ETNs of any series in whole but not in part on any Business Day, occurring on or after the Inception Date (an "**Optional Acceleration**"). In addition, if an Acceleration Event (as defined herein) occurs at any time with respect to any series of the ETNs, we will have the right, and under certain circumstances as described herein the obligation, to accelerate all of the outstanding ETNs of such series (an "**Event Acceleration**"). In either case, upon acceleration you will receive a cash payment in an amount (the "**Accelerated Redemption Amount**") equal to the Closing Indicative Value on the Accelerated Valuation Date. In the case of an Optional Acceleration, the "Accelerated Valuation Date" shall be an Index Business Day specified in our notice of Optional Acceleration, which Index Business Day shall be at least 5 Business Days after the date on which we give you notice of such Optional Acceleration. In the case of an Event Acceleration, the Accelerated Valuation Date shall be the day on which we give notice of such Event Acceleration (or, if such day is not an Index Business Day, the next following Index Business Day). The Accelerated Redemption Amount will be payable on the third Business Day following the Accelerated Valuation Date (such third Business Day the "Acceleration Date").* We will give you notice of any acceleration of the ETNs through customary channels used to deliver notices to holders of exchange traded notes.

Any payment you will be entitled to receive is subject to our ability to pay our obligations as they become
due.

An "**Acceleration Event**" means:

$$* \qquad * \qquad *$$

(d) if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value;

27.     The statements in paragraphs ¶25-26 above were materially false and/or misleading because they misrepresented and failed to disclose that (i) Credit Suisse was actively manipulating the Inverse VIX Short ETNs by liquidating its holdings in various financial products to avoid a loss; (ii) Credit Suisse was manipulating the Inverse VIX Short ETNs to the detriment of investors; and (iii) as a result of the foregoing, Defendants' statements about Credit Suisse's Inverse VIX Short ETNs were false and misleading and/or lacked a reasonable basis.

C.    **The Truth Emerges**

28.    On February 5, 2018, at 4:00 pm EST, the regular-hours market for the trading of the Inverse VIX Short ETNs closed. The Inverse VIX Short ETNs' last trading price was $99. Less than 30 minutes later, during the after-hours market, the price per Inverse VIX Short ETN had dropped to $70.01. By 4:45 pm, the price had dropped to $42.81 per Inverse VIX Short ETN and then by 6:28 pm the price per Inverse VIX Short ETN had declined to a low of $10.16 per Inverse VIX Short ETN, a ***drop of approximately 89.74%*** from its closing value.

29.    On February 6, 2018, Credit Suisse issued a press release announcing that an Acceleration Event took place intraday on February 5, 2018 (the "Feb 6, 2018 Acceleration Event Press Release"). In relevant part:

> Credit Suisse AG ("Credit Suisse") today announced the event acceleration of its VelocityShares™ Daily Inverse VIX Short Term ETNs ("XIV") due to an acceleration event. The acceleration date is expected to be February 21, 2018.
>
> ***Since the intraday indicative value of XIV on February 5, 2018 was equal to or less than 20% of the prior day's closing indicative value, an acceleration event has occurred.*** Credit Suisse expects to deliver an irrevocable call notice with respect to the event acceleration of XIV to The Depository Trust Company by no later than February 15, 2018. The date of the delivery of the irrevocable call notice, which is expected to be February 15, 2018, will constitute the accelerated valuation date, subject to postponement due to certain events. The acceleration date for XIV is expected to be February 21, 2018, which is three business days after the accelerated valuation date. On the acceleration date, investors will receive a cash payment per ETN in an amount equal to the closing indicative value of XIV on the accelerated valuation date. ***The last day of trading for XIV is expected to be February 20, 2018.*** As of the date hereof, Credit Suisse will no longer issue new units of XIV ETNs.
>
> On February 2, 2018, the closing indicative value was USD 108.3681. None of the other ETNs offered by Credit Suisse are affected by this announcement.

Emphasis added.

30.    Later on February 6, 2018, Credit Suisse issued another press release disclosing that it had experienced "no trading losses" from the Inverse VIX Short ETNs even though, as stated above, Credit Suisse held a significant amount of short volatility financial products, including, but not limited to the VIX Futures.

## ADDITIONAL SCIENTER ALLEGATIONS

31.    A reproduction of the Intraday Indicative Value calculation shows that, upon information and belief, the Intraday Indicative Value may have equaled 20% of the prior's day Closing Indicative Value for the first time between 4:08 PM and 4:09 PM.

32.    However, as stated above, Credit Suisse did not disclose the February 5, 2018 Acceleration Event until the Feb 6, 2018 Acceleration Event Press Release.

33.    Instead, Credit Suisse began disseminating an inaccurate Intraday Indicative Value and failed to disseminate accurate Closing Indicative Value. For instance, Credit Suisse disclosed an inaccurate Intraday Indicative Value of $27.0855 between 4:09 pm and 4:11 pm, $26.3182 at 4:12 pm, $24.8933 between 4:13 pm and 5:08 pm; as opposed to an Intraday Indicative Value of $4.22 between 5:09 pm and the close of the after-hours market and a February 5, 2018, Closing Indicative Value of $4.22.

34.    By disseminating inaccurate Intraday Indicative Value and suspending diffusion of the Closing Indicative Value, Credit Suisse left investors (i) unable to estimate the true economic value of the Inverse VIX Short ETNs, (ii) unable to estimate the impact of the daily rebalancing mechanisms on the true economic value of the Inverse VIX Short ETNs, and (iii) unaware that the

acceleration event for early redemption of the Inverse VIX Short ETNs had already effectively occurred.

35.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated were materially false and misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Credit Suisse, their control over and/or receipt and/or modification of Credit Suisse's allegedly materially misleading statements and/or their associations with Credit Suisse which made them privy to confidential proprietary information concerning Credit Suisse, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

36.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Credit Suisse's Inverse VIX Short ETNs, and operated as a fraud or deceit on acquirers of Credit Suisse's Inverse VIX Short ETNs. As detailed above, Credit Suisse's misconduct directly caused the value of its Inverse VIX Short ETNs to decline precipitously and/or become mispriced. The decline in Credit Suisse's Inverse VIX Short ETNs' price was a direct result of the nature and extent of Defendants' fraud. The economic loss i.e., damages suffered by Plaintiff and other Class members is the direct result of Defendants' fraudulent scheme (i) to artificially inflate Credit Suisse's Inverse VIX Short ETNs

price and (ii) to cause the subsequent significant decline in its value when Defendants' fraudulent conduct occurred and prior misrepresentations were revealed.

37.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Credit Suisse's Inverse VIX Short ETNs to be artificially inflated. Plaintiff and other Class members purchased Credit Suisse's Inverse VIX Short ETNs at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

38.     At all relevant times, the market for Credit Suisse Inverse VIX Short ETNs was an efficient market for the following reasons, among others:

(a) Credit Suisse Inverse VIX Short ETNs met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b) During the Class Period, Credit Suisse Inverse VIX Short ETNs were actively traded, demonstrating a strong presumption of an efficient market;

(c) Credit Suisse regularly communicated with public investors via established market communication mechanisms;

39.     As a result of the foregoing, the market for Credit Suisse Inverse VIX Short ETNs promptly digested current information regarding Credit Suisse from all publicly available sources

13

and reflected such information in the price of Credit Suisse's Inverse VIX Short ETNs. Under these circumstances, all purchasers of Credit Suisse Inverse VIX Short ETNs during the Class Period suffered similar injury through their purchase of Credit Suisse's Inverse VIX Short ETNs at artificially inflated prices, and a presumption of reliance applies.

40.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered Credit Suisse's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell Credit Suisse's Inverse VIX Short ETNs.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

41.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

42.    To the extent that certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

14

43.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading, and the "forward-looking statement" was authorized and/or approved by an executive officer of Credit Suisse who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired Credit Suisse Inverse VIX Short ETNs on the public market during the Class Period and were damaged, excluding Credit Suisse, the Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest (the "Class").

45.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Credit Suisse Inverse VIX Short ETNs were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Upon information and belief, the Inverse

VIX Short ETNs are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

46.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

47.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

        (b)     whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

        (c)     whether the price of Credit Suisse securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

        (d)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### COUNT I
#### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

50.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Credit Suisse Inverse VIX Short ETNs at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, each of the Defendants took the actions set forth herein.

52.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Credit Suisse's Inverse VIX Short ETNs in an effort to maintain artificially high market prices for Credit Suisse securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53.   Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Inverse VIX Short ETNs.

54.   Individual Defendants' primary liability, and controlling person liability arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at Credit Suisse during the Class Period and members of Credit Suisse's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of Credit Suisse, was privy to and participated in the creation of Credit Suisse's filings; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of and had access to other members of Credit Suisse's management team, internal reports and other data and information about Credit Suisse; and (4) each Individual Defendant was aware of Credit Suisse's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

55.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

56.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Credit Suisse's Inverse VIX Short ETNs was artificially inflated during the Class Period. In ignorance of the fact that

market prices of Credit Suisse's Inverse VIX Short ETNs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market on which the Inverse VIX Short ETNs trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Credit Suisse's Inverse VIX Short ETNs during the Class Period at artificially high prices and were or will be damaged thereby.

57.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Credit Suisse securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

58.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

59.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Credit Suisse's Inverse VIX Short ETNs during the Class Period.

60.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of Inverse VIX Short ETNs giving rise to the cause of action.

## COUNT II
### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     The Individual Defendants acted as controlling persons of Credit Suisse within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Credit Suisse's operations and/or intimate knowledge of the false statements filed by Credit Suisse with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Credit Suisse, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of Credit Suisse's reports, press releases, public filings, and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

63.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of Credit Suisse and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

20

64.     As set forth above, Credit Suisse, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

65.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Credit Suisse's common stock during the Class Period.

66.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of common stock giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by

law; and

(e)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: March 23, 2018                         /s/ Eduard Korsinsky
                                              **LEVI & KORSINSKY, LLP**
                                              Eduard Korsinsky
                                              30 Broad Street, 24th Floor
                                              New York, NY 10004
                                              Tel: (212) 363-7500
                                              Fax: (212) 363-7171
                                              Email: ek@zlk.com

22