**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAJAN CHAHAL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFF, <br><br> v. <br><br> CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS, JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, AND JANUS DISTRIBUTORS LLC D/B/A JANUS HENDERSON DISTRIBUTORS, <br><br> DEFENDANTS. | 1:18-cv-02268 (AT) (SN) <br> 1:18-cv-02319 (AT) (SN) <br> 1:18-cv-04045 (AT) (SN) |
| GLENN EISENBERG, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFF, <br><br> v. <br><br> CREDIT SUISSE AG AND JANUS INDEX & CALCULATION SERVICES LLC, <br><br> DEFENDANTS. | |
| SHAOLEI QIU, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED, <br><br> PLAINTIFF, <br><br> v. <br><br> CREDIT SUISSE GROUP AG AND JANUS INDEX & CALCULATION SERVICES LLC, <br><br> DEFENDANTS. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE CREDIT SUISSE DEFENDANTS' MOTION TO DISMISS THE CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM**

CAHILL GORDON & REINDEL LLP
 Herbert S. Washer
 David G. Januszewski
 Sheila C. Ramesh
 Peter J. Linken
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 259-5420
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
plinken@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam and David R. Mathers*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND .......................................................................................................2

LEGAL STANDARDS ................................................................................................................9

ARGUMENT ...............................................................................................................................9

I.  PLAINTIFFS FAIL TO ADEQUATELY ALLEGE ANY MATERIAL
    MISSTATEMENT OR OMISSION WITH THE REQUIRED
    SPECIFICITY ................................................................................................................9

    A.  Plaintiffs' Section 10 and 11 Claims Fail to Satisfy Rule 9(b)'s
        Heightened Pleading Standard ..........................................................................10

    B.  The Pricing Supplement Accurately and Adequately Disclosed the
        Risks ..................................................................................................................11

    C.  The Credit Suisse Defendants Cannot Be Responsible for
        Statements They Did Not Make .........................................................................15

II.  PLAINTIFFS FAIL TO ALLEGE WITH PARTICULARITY FACTS
     GIVING RISE TO A STRONG INFERENCE OF SCIENTER ...................................17

    A.  Plaintiffs' Motive and Opportunity Allegations Fail .........................................18

    B.  Plaintiffs' Allegations of Recklessness Are Neither Plausible Nor
        Well Pleaded ......................................................................................................20

    C.  Inferences of Non-Fraudulent Intent Are More Cogent and
        Compelling .........................................................................................................22

III.  PLAINTIFFS FAIL TO ADEQUATELY ALLEGE LOSS CAUSATION .....................23

IV.  PLAINTIFFS' CONTROL PERSON CLAIMS FAIL AS A MATTER OF
     LAW .............................................................................................................................25

V.  PLAINTIFFS' FAILURE TO ADEQUATELY PLEAD THEIR
    SECTION 10(B) CLAIM DOOMS THEIR SECTION 9 CLAIMS AS
    WELL ............................................................................................................................26

CONCLUSION ...........................................................................................................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aegon N.V. Sec. Litig.*,
  2004 WL 1415973 (S.D.N.Y. June 23, 2004) ........................................................................23

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) .................................................................................................................9

*Atlantic Gypsum Co., Inc.* v. *Lloyds Intern. Corp.*,
  753 F. Supp. 505 (S.D.N.Y. 1990) ......................................................................................19n

*ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .....................................................................................................18

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ....................................................................................16

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007) .................................................................................................................9

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009) ..................................................................................16n

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ...................................................................................................17

*Denny* v. *Barber*,
  576 F.2d 465 (2d Cir. 1978) ...................................................................................................23

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  2017 WL 4049253 (S.D.N.Y. June 28, 2017) ........................................................................20

*Dresner* v. *Utility.com, Inc.*,
  371 F. Supp. 2d 476 (S.D.N.Y. 2005) ............................................................................... 16-17

*Dura Pharm., Inc.* v. *Broudo*,
  544 U.S. 336 (2005) ...............................................................................................................24

*ECA and Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009) ..............................................................................................17, 20

*Elite Aviation LLC* v. *Credit Suisse AG*,
  588 F. App'x 37 (2d Cir. 2014) ........................................................................................ 11-12

*First Nationwide Bank* v. *Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)............................................................................23, 24

*In re Francesca's Holding Corp. Sec. Litig.*,
    2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) .........................................................24

*Ganino* v. *Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000).................................................................................19

*Goplen* v. *51job, Inc.*,
    453 F. Supp. 2d 759 (S.D.N.Y. 2006)............................................................... 21-22

*Halperin* v. *eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002)................................................................................13

*Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l Inc.*,
    309 F. Supp. 3d 100 (S.D.N.Y. 2018)................................................................ 22-23

*Janus Capital Group, Inc.* v. *First Derivative Traders*,
    564 U.S. 135 (2011)...........................................................................................15

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)...............................................................11, 21

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................18, 20

*Kinsey* v. *Cendant Corp.*,
    2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005).........................................................21

*Lentell* v. *Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)......................................................................... 23, 25-26

*Mills* v. *Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993)................................................................................16

*In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*,
    2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)........................................................18n

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)................................................................................10

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n* v.
    *MDC Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)................................................... 20-21

*Nicosia* v. *Amazon.com, Inc.*,
    834 F.3d 220 (2d Cir. 2016)..................................................................................4n

*O & G Carriers, Inc.* v. *Smith*,
  799 F. Supp. 1528 (S.D.N.Y. 1992).............................................................15n

*Olkey* v. *Hyperion 1999 Term Trust, Inc.*,
  98 F.3d 2 (2d Cir. 1996)..................................................................10, 13

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008)............................................................16

*Panfil* v. *ACC Corp.*,
  768 F. Supp. 54 (W.D.N.Y. 1991).................................................................27

*In re Platinum & Palladium Commodities Litig.*,
  828 F. Supp. 2d 588 (S.D.N.Y. 2011)............................................................20

*In re ProShares Trust Sec. Litig.*,
  889 F. Supp. 2d 644 (S.D.N.Y. 2012)............................................................13

*In re ProShares Trust Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)..................................................................10

*Public Emps.' Ret. Sys. of Miss.* v. *Merrill Lynch & Co. Inc.*,
  714 F. Supp. 2d 475 (S.D.N.Y. 2010)............................................................26

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004).......................................................... *passim*

*Rothman* v. *Gregor*,
  220 F.3d 81 (2d Cir. 2000)..................................................................4n

*Salvani* v. *ADVFN PLC*,
  50 F. Supp. 3d 459 (S.D.N.Y. 2014).............................................................27

*Shields* v. *Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994)..............................................................19, 23

*In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
  774 F. Supp. 2d 584 (S.D.N.Y. 2011)............................................................23

*South Cherry Street, LLC* v. *Hennessee Group LLC*,
  573 F.3d 98 (2d Cir. 2009)............................................................... 18-19

*Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta*,
  552 U.S. 148 (2008)...................................................................9-10, 17

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................26

*Teamsters Local 445 Freight Division Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008). ...................................................................................18, 21, 23

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................................17

*In re Tower Grp. Intern., Ltd. Sec. Litig.*,
    2015 WL 5813393 (S.D.N.Y. Sept. 18, 2015).................................................................17

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014)............................................................ 4n, 12-13, 12n, 14

**Statutes**

15 U.S.C.
    § 77k(a) ...........................................................................................................................16n
    § 78i(a)(4) .........................................................................................................................27
    § 78u–4(b)(1)(B) ...........................................................................................................9, 11
    § 78u–4(b)(2)(A)...............................................................................................................17

Defendants Credit Suisse Group AG and Credit Suisse AG ("Credit Suisse"), Credit Suisse International ("CSI"), Tidjane Thiam ("Thiam") and David R. Mathers ("Mathers" and with Thiam, the "Individual Defendants") (collectively the "Credit Suisse Defendants") respectfully submit this Memorandum of Law In Support of Their Motion to Dismiss the Class Action Complaint (the "Complaint") for Failure to State a Claim.

## PRELIMINARY STATEMENT

This case is an example of disappointed investors seeking to recoup losses resulting from their own, fully informed investment decisions to take on significant risks in search of outsized returns.  Specifically at issue here are Plaintiffs' investments in VelocityShares Inverse VIX Short Term ETNs (the "XIV Notes").  Plaintiffs purchased the XIV Notes pursuant to robust disclosures that warned, among other things, that the XIV Notes were "intended to be trading tools for sophisticated investors to manage daily trading risks . . . and may not be suitable for investors who plan to hold them for longer than one day."  November 2, 2018 Declaration of Peter J. Linken ("Linken Decl."), Ex. A (Pricing Supplement, dated January 29, 2018 (the "Pricing Supplement" or "PS")), Cover at 1).  Plaintiffs were further warned that "**[t]he long term expected value of your ETNs is zero.  If you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment**." Linken Decl. Ex. A at PS-15 – PS-16 (emphasis in original).

On February 5, 2018, amidst market volatility, certain of the expressly disclosed risks associated with investing in the XIV Notes came to pass, and their value declined.  Plaintiffs now seek to shift their investment losses to Defendants by alleging a variety of securities claims based on these events.  In an effort to support these claims, Plaintiffs paint a picture of a sweeping fraud that Credit Suisse allegedly perpetrated by manipulating the value of XIV Notes through

impermissible hedging activity.  Plaintiffs' claims ignore comprehensive disclosures made to investors, which explicitly warned that Credit Suisse "expect[ed] to hedge [its] obligations relating to the ETNs by purchasing or selling short the underlying futures . . . . Any of these hedging activities may adversely affect . . . the market value of your ETNs . . . ."  *Id*. at PS-24.

Plaintiffs also complain that the Credit Suisse Defendants failed to publish timely and accurate Intraday Indicative Values for the XIV Notes.  But, again, Plaintiffs ignore specific disclosures explaining that the Credit Suisse Defendants were not responsible for calculating or publishing the Intraday Indicative Value.  Those disclosures also warned investors that the Intraday Indicative Value was "not intended as a price or quotation" to be relied upon by investors, and that its calculation "may occasionally be subject to delay or postponement" that could impact the timeliness of the reported value.  *Id.* at PS-39.

Plaintiffs do not, and cannot, dispute that these disclosures were made, or that they purchased the XIV Notes pursuant to the disclosures.  In fact, they acknowledge the disclosures throughout the Complaint.  *See, e.g.*, Compl. ¶¶ 6, 131, 137, 145, 149, 217, 219, 223-24, 226, 242, 299-304.  In light of these extensive warnings, Plaintiffs cannot plausibly claim to have been misled concerning their investments.  The Complaint should be dismissed in its entirety.

## **FACTUAL BACKGROUND**[1]

### A.  Overview of the XIV Notes

The XIV Notes were a series of exchange-traded notes ("ETNs") issued by Credit Suisse, marketed by Janus Henderson Distributors ("JHD") (*see* Compl. ¶ 2), and actively traded on the NASDAQ exchange.  *See* Compl. ¶ 265.  ETNs are debt securities, the value of which is derived from other securities or assets.  The XIV Notes tracked the inverse of the S&P 500 VIX Short-

---

[1]     The facts alleged by Plaintiffs are taken as true for purposes of this motion only.

Term Futures Index ("VIX Futures Index")—as the value of the VIX Futures Index rose, the value of the XIV Notes fell, and *vice versa*.  *See* Compl. ¶¶ 2, 50-56.  An independent entity, the S&P 500 VIX Futures Index Committee ("S&P"), calculated the VIX Futures Index using the price of a rolling composite of futures contracts on a third index: the Chicago Board Options Exchange ("CBOE") Volatility Index (the "VIX").  *See* Linken Decl. Ex. A at PS-32 – PS-33, PS-36.  The CBOE calculated the VIX using the prices of put and call options on the S&P 500 Index.  *Id.* at PS-31.

As a Calculation Agent for the XIV Notes, Janus was responsible for computing and disseminating the indicative value of the XIV Notes every 15 seconds throughout the business day and again at the close of business (respectively the "Intraday Indicative Value" and "Closing Indicative Value").  Compl. ¶ 10; Linken Decl. Ex. A at PS-25.  The Intraday Indicative Value calculation was "[d]esigned to reflect the economic value [of the ETNs] at a given time" (Linken Decl. Ex. A at PS-7) and relied upon data from S&P reflecting the level of the VIX Futures Index.  *Id*. at PS-32 – PS-33, PS-36.  Movements in either the VIX Futures Index or the VIX generally resulted in corresponding fluctuations in the indicative value of the XIV Notes, as disclosed in the Pricing Supplement.  *Id*. at PS-30 – PS-31.

NASDAQ was the "official disseminator" of the XIV Intraday Indicative Value, which "was published under its own Bloomberg ticker."  Compl. ¶ 148.  At any time, the Intraday Indicative Value could differ from the actual trading price on NASDAQ.  *See* Linken Decl. Ex. A at PS-39 ("The Intraday Indicative Value calculation is not intended as a price or quotation, or as an offer or solicitation for the purchase, sale, redemption, acceleration or termination of your ETNs . . . . The actual trading price of the ETNs of any series may be different from their Intraday Indicative Value.");  *Id.* at PS-Cover at 6 ("The actual trading price of the ETNs in the

secondary market may vary significantly from their Intraday Indicative Value.").

**B.  The Risk Disclosures**

The XIV Notes were issued pursuant to a registration statement, prospectus, prospectus supplement, and a January 29, 2018 pricing supplement (collectively, the "Offering Documents"), each of which was filed with the SEC.  *See* Compl. ¶¶ 216, 296.  The Pricing Supplement set forth the various terms, conditions, and risk disclosures applicable to the XIV Notes (*see* Compl. ¶ 296), many of which are excerpted by Plaintiffs throughout the Complaint. *See, e.g.*, Compl. ¶¶ 137, 141, 145-47, 149, 152, 217, 219, 223-24, 226, 242, 299-304.[2]

The Pricing Supplement contained fulsome disclosures concerning the risks of investing in and holding the XIV Notes, particularly for a period longer than one day; the constraints affecting the timing or accuracy of the Intraday Indicative Value; Credit Suisse's intent to hedge its exposure to the XIV Notes; Credit Suisse's unfettered right to accelerate the XIV Notes; and various pricing risks.

1.  <u>The XIV Notes Were Trading Tools for Sophisticated Investors</u>

The Pricing Supplement repeatedly emphasized that the XIV Notes were intended to be a risk management tool for sophisticated investors to use on a daily basis and that investors, including Plaintiffs, faced significant risks, such as the risk of losing their entire investment, if

---

[2]    The Court may consider the Pricing Supplement, the other Offering Materials, and required SEC filings on the Credit Suisse Defendants' motion.  *See Nicosia* v. *Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.") (quotation marks and citations omitted); *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (recognizing that courts may consider "public disclosure documents required by law to be, and that have been, filed with the SEC"); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 449 (S.D.N.Y. 2014) (considering "the Offering Documents, as well as the Press Releases, in evaluating" allegations regarding Velocity Shares Daily 2x VIX Short Term ETNs), *aff'd sub nom. Elite Aviation LLC* v. *Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).

they held the XIV Notes for longer than one day.  In numerous places, the Pricing Supplement

disclosed this fundamental risk.  For example, it stated, in boldface type on its cover:

> **The ETNs . . . are intended to be trading tools for sophisticated investors to manage daily trading risks.  They are designed to achieve their stated investment objectives on a daily basis . . . . The ETNs are riskier than securities that have intermediate or long-term investment objectives and may not be suitable for investors who plan to hold them longer than one day.  Accordingly, the ETNs should be purchased only by knowledgeable investors who understand the potential consequences of investing in volatility indices and seeking inverse or leveraged investment results, as applicable.**

Linken Decl. Ex. A at PS-Cover at 1.  These warnings were repeated on the first page of the

Pricing Supplement, and again at page 10.  Under the heading "Is this the right investment for

you?" the Pricing Supplement again cautioned that the XIV Notes would not be appropriate for

investors seeking "a guaranteed return" on their initial investment or investors "not willing to be

exposed to fluctuations in volatility in general and in the level of the applicable underlying Index

in particular."  *Id*. at PS-11; *see id.* at PS-12 (because the return on the ETNs varies based on the

movements in the underlying index, the Pricing Supplement notes that the inverse ETNs are not

suitable for investors who believe the value of the underlying index will *increase*).

    2.  <u>Volatile Markets Would Affect the Return on the XIV Notes</u>

In a lengthy section entitled "Risk Factors," the Pricing Supplement described the effect

that market volatility could have on the XIV Notes' returns, noting that "*[b]ecause of the large*

*and sudden price movement associated with futures on the VIX Index, and the daily objective*

*of the ETNs (including inverse . . . exposure), the ETNs are intended specifically for short*

*term trading*."  *Id.* at PS-14 (emphasis in original).  Further to this point, the Pricing Supplement

warned that "**[t]he long term expected value of your [XIV] ETNs is zero.  If you hold your**

**[XIV] ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment**." *Id.* at PS-16 (emphasis in original).

3.   Limitations on the Intraday Indicative Value

The Pricing Supplement explained that any number of factors could cause the XIV Notes' Intraday Indicative Value to deviate from the price at which they would trade in the secondary market.

> The Intraday Indicative Value calculation is ***not intended as a price or quotation***, or as an offer or solicitation for the purchase, sale, redemption, acceleration or termination of your ETNs, ***nor will it reflect hedging or transaction costs, credit considerations, market liquidity or bid-offer spreads***.

*Id.* at PS-39 (emphasis added); *see also id.* at PS-22 (**"The Intraday Indicative Value . . . [is] not the same as the closing price or any other trading price of the ETNs in the secondary market."**) (emphasis in original).  The Pricing Supplement cautioned that the calculation of the Intraday Indicative Value would depend on, and could be affected by, the availability of third-party data on the value of the underlying Index:

> Published underlying Index levels from the Index Sponsor [S&P] may occasionally be subject to ***delay or postponement***.  Any such delays or postponements will affect the current underlying Index level and therefore the Intraday Indicative Value of your ETNs. ***The actual trading price of the ETNs of any series may be different from their Intraday Indicative Value***.

*Id.* at PS-39 (emphasis added).

4.   Credit Suisse's Intent to Hedge its Exposure

The Pricing Supplement also contained comprehensive disclosures concerning Credit Suisse's intention to engage in trading designed to offset its own exposure to the XIV Notes in order to manage the risks associated with paying off the ETNs at maturity or redemption.

> We expect to hedge our obligations under the ETNs through one or more of our affiliates. . . . The costs of maintaining or adjusting

> *this hedging activity could affect the value of the Index, and accordingly the value of the ETNs*.  Moreover, *this hedging activity may result in our or our affiliates' receipt of a profit, even if the market value of the ETNs declines*. . . . There may be conflicts of interest between you, us, the Redemption Agent, and the Calculation Agents . . . .

*Id*. at PS-13 (emphasis added); *see also id.* at PS-16 – PS-17 ("[H]edging transactions will contribute to the trading volume of the underlying futures contracts and may adversely affect the market price of such underlying futures contracts and in turn the level of the applicable underlying Index."); *id.* at PS-50 ("The hedging activity discussed above may adversely affect the level of the applicable underlying Index and, as a consequence, the market value of the ETNs and the amount payable at maturity, upon redemption or upon acceleration.").  The Pricing Supplement explained that Credit Suisse's hedging could affect the value of the XIV Notes and that under certain circumstances, Credit Suisse or its affiliates "could receive substantial returns with respect to these hedging activities while the value of your ETNs decline[s] or become[s] zero."  *Id.* at PS-24.

5.  <u>Credit Suisse's Discretion to Accelerate the XIV Notes</u>

Credit Suisse also maintained an unfettered right to redeem the XIV Notes upon an Acceleration Event, including if the Closing Indicative Value decreased to 20% or less of the prior day's Closing Indicative Value.  *Id*. at PS-Cover at 7, PS-16, PS-17, PS-18, PS-45 – PS-47.  As the Pricing Supplement explained, upon such acceleration, the outstanding XIV Notes would be liquidated and investors would receive a cash payment based on the XIV Notes' most recent value.  *Id*. at PS-Cover at 2.  As to what cash payment investors might receive upon acceleration, the Pricing Supplement was clear: "**because of the way in which the underlying Indices are calculated, the amount payable at maturity or upon redemption or acceleration is likely to be less than the amount of your initial investment in the [XIV] ETNs, and you are likely to**

**lose part or all of your initial investment**." *Id*. at PS-Cover at 1 (emphasis in original).

### C.  The Plaintiffs' Claims

Named Plaintiffs purport to bring this case on behalf of two groups of investors:  (1) those who purchased XIV Notes between January 29, 2018 and February 5, 2018, and (2) those who purchased the XIV Notes pursuant to or traceable to the Offering Documents.  Compl. ¶¶ 41, 42.  On February 5, 2018, markets turned volatile, and the Intraday Indicative Value of the XIV Notes declined sharply, ultimately falling to a value that was less than 20% of the prior day's Closing Indicative Value.  Linken Decl. Ex. B (Feb. 6, 2018 Press Release).  The February 5 XIV decline was caused by a spike in the VIX index, which dramatically affected all VIX-linked products.  *See* Linken Decl. Ex. C (April 30, 2018, Reuters, *February volatility 'hurricane' upended VIX-linked trading*).  On February 6, 2018, pursuant to the terms of the Offering Documents, Credit Suisse exercised its right to accelerate the XIV Notes (*i.e.*, redeem the ETNs prior to their stated maturity date).  Linken Decl. Ex. B.  On February 13, 2018, NASDAQ notified Credit Suisse that it intended to suspend trading of the XIV Notes, given Credit Suisse's decision to accelerate.  Linken Decl. Ex. D (Feb. 14, 2018 Press Release).  Investors still holding the XIV Notes ultimately received a cash payment based on the ETNs' value as of February 15, 2018.  *Id*.

Plaintiffs seek to recover the losses they incurred as a result of the decline of the XIV Notes.  They assert eight claims for violations of: Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") against the Credit Suisse Defendants, Janus Henderson Group plc ("Janus"), and Janus Index & Calculation Services LLC ("JIC"); Section 20(a) of the Exchange Act against the Individual Defendants, Credit Suisse, and Janus; Section 9(a)(4) of the Exchange Act against the Credit Suisse Defendants, Janus, and JIC; Section 9(f) of the Exchange Act

against all Defendants; Section 11 of the Securities Act of 1933 (the "Securities Act") against the Credit Suisse Defendants; and Section 15 of the Securities Act against the Individual Defendants and Janus.  Plaintiffs rely on two theories of liability to support these claims:  (1) the Credit Suisse Defendants "actively bet[] against XIV, knowing it was designed to fail;" and (2) Defendants "issu[ed] materially false and misleading pricing information regarding XIV that led investors to buy even more XIV notes at drastically inflated values."  Compl. ¶ 1.  Neither of these supports a claim for any violation of the federal securities laws.

## LEGAL STANDARDS

A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief".'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

Securities fraud claims are subject to the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").  Rule 9(b) requires Plaintiffs to set forth "with particularity the circumstances constituting [the] fraud."  The PSLRA makes a similar demand, compelling Plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B).

## ARGUMENT

## I.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE ANY MATERIAL MISSTATEMENT OR OMISSION WITH THE REQUIRED SPECIFICITY

Claims brought pursuant to Section 10(b) of the Exchange Act and Section 11 of the Securities Act require a material misstatement or omission of fact.  *See Stoneridge Inv. Partners,*

*LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358-59 (2d Cir. 2010).  Materiality is analyzed under the same standard for both claims: "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor."  *In re Morgan Stanley*, 592 F.3d at 360 (citations omitted).  "[W]hen a registration statement warns of the exact risk that later materialized, a [s]ection 11 claim will not lie as a matter of law."  *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (citation omitted).  Similarly, a Section 10(b) claim fails when "[t]he prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed."  *Olkey* v. *Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).

Recognizing that the XIV Notes' robust disclosures defeat their claims here, Plaintiffs attempt to reframe those claims by suggesting that the Credit Suisse Defendants manipulated the ETNs and the market for the ETNs to their benefit and Plaintiffs' detriment.   But Plaintiffs cannot escape the reach and relevance of the disclosures, which specifically warned of the very circumstances about which Plaintiffs now complain.  Indeed, a review of the Complaint confirms that the Credit Suisse Defendants are alleged to have done precisely what the Offering Documents said they may do.

### A.     Plaintiffs' Section 10 and 11 Claims Fail to Satisfy Rule 9(b)'s Heightened Pleading Standard

Plaintiffs' conclusory allegations fail to satisfy Rule 8's basic pleading bar for non-fraud claims.  As a result, they fall woefully short of the higher pleading requirements imposed by both Federal Rule of Civil Procedure 9(b) and the PSLRA, which apply here because Plaintiffs' claims sound in fraud.  Rule 9(b) requires Plaintiffs to set forth "with particularity the circumstances constituting fraud."  The PSLRA makes a similar demand, compelling Plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the

-10-

statement is misleading." *See, e.g.,* 15 U.S.C. § 78u–4(b)(1)(B).  Where, as here, a Section 11 claim is "premised on allegations of fraud," Rule 9(b)'s stringent particularity requirement applies to that claim as well.  *Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004) ("We hold that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud.").

The Court should disregard Plaintiffs' transparent attempt to avoid the application of Rule 9(b)'s heightened standard to their Section 11 claim by including a boilerplate sentence "specifically disclaim[ing] any reference to or reliance upon allegations of fraud."  *See* Compl. ¶¶ 294-95, 306; *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005) ("Plaintiffs cannot evade the Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness.") (citation omitted).  The allegations and theory of liability underlying Plaintiffs' Section 11 claim all sound in fraud and are the same as those underlying the Section 10 fraud claims: "[t]he January Supplement statements . . . were materially misleading, contained untrue statements of fact, and omitted to state facts necessary to make the January Supplement not misleading."  Compl. ¶ 305; *see also* Compl. ¶ 227-28; *Rombach*, 355 F.3d at 172 (characterizing allegations "that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued" to be "wording and imputations . . . classically associated with fraud").  As set forth below, Plaintiffs fail to satisfy this high standard.

### B.    The Pricing Supplement Accurately and Adequately Disclosed the Risks

Plaintiffs base their Section 10 and 11 claims upon alleged misstatements in the Pricing Supplement.   But in making these claims, Plaintiffs ignore the robust, bold-type, and directly relevant disclosures repeated throughout the Pricing Supplement, described in detail above.  *See Elite Aviation LLC* v. *Credit Suisse AG*, 588 F. App'x 37, 38 (2d Cir. 2014) (affirming dismissal

of claims concerning Velocity Shares Daily 2x VIX Short Term ETNs because "the Pricing Supplement clearly disclosed in numerous, repeated, sometimes boldfaced warnings" the very risk that materialized).  Although they acknowledge these disclosures throughout the Complaint (*see, e.g.*, Compl. ¶¶ 58, 73, 129, 131-32, 134, 136-37, 141-42, 145-47, 149, 152, 154, 182, 197, 217, 219, 221, 223-24, 226, 238, 242, 299-304), Plaintiffs nonetheless claim that the Pricing Supplement failed to adequately disclose the risks of investing in the XIV Notes.  *See, e.g.*, Compl. ¶¶ 6, 228.  Plaintiffs' theory of liability cannot be reconciled with the Pricing Supplement's voluminous disclosures.

Indeed, an earlier case against Credit Suisse arising out of similar Credit Suisse-issued instruments ends any possible debate on the subject.  *See In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444.  The instruments at issue in *TVIX* were sold pursuant to offering materials that covered a suite of Credit Suisse-issued products, including TVIX and XIV.  Therefore, the Court in *TVIX* was evaluating the sufficiency of the *exact same* materials that were provided to XIV Note investors.  Much like Plaintiffs in the instant case, the *TVIX* plaintiffs alleged that the Pricing Supplement disclaimers did not adequately disclose all relevant risks, including material information about the risks of holding the ETNs for longer than one day and potential liquidity shortages in the market.[3]  In dismissing the claims, the Court determined that Plaintiffs' allegations were "rendered untenable by the more than 25 plain English warnings concerning the risks of prolonged investments that are provided throughout the Pricing Supplement."  *Id.* at 450.  Judge Swain went on to find that the "[t]he Offering Documents thus explicitly warned Class

---

[3]     The *TVIX* plaintiffs also alleged that "the statement in the Offering Documents that '[d]aily rebalancing will impair the performance of each ETN if the underlying Index experiences volatility' was insufficient to cover the virtual certainty and magnitude of the daily decay of the notes."  *In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 451.  This allegation was roundly rejected by Judge Swain.  *Id.* at 451-52.

Members that the TVIX ETNs were complex, volatile financial products designed for sophisticated investors' use in daily hedging, and that significant losses would likely attend longer-term holding strategies." *Id.* at 451. Judge Swain also rejected "Class Plaintiffs' contentions that Defendants knew at the time of their issuance that TVIX ETNs would become worthless in two years and that this knowledge should have been disclosed to investors." *Id.* at 452; *see also In re ProShares Trust Sec. Litig.*, 889 F. Supp. 2d 644, 656 (S.D.N.Y. 2012) ("It is not a material omission to fail to predict future market performance.") (citation omitted).

The Pricing Supplement's disclosures are similarly fatal to Plaintiffs' claims here. *See Olkey*, 98 F.3d at 5 (affirming dismissal of Section 10 and Section 11 claims where "[t]he prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed"); *see also Halperin* v. *eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Certain alleged misrepresentations in a stock offering are immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering.") (citations omitted).

Recognizing the weakness of their claims, Plaintiffs attempt to manufacture a separate theory of liability based on Credit Suisse's hedging of its investment in the XIV Notes. Specifically, Plaintiffs allege that the Credit Suisse Defendants misrepresented the effect that their hedging activity would have on the XIV Notes and the market for the ETNs, and concealed the fact that they would profit while XIV Note investors suffered losses. Compl. ¶¶ 218, 220. Although Plaintiffs now claim that they were unaware that Credit Suisse engaged in hedging transactions, the Pricing Supplement in fact disclosed every element of their claim: that Credit Suisse would actively hedge its XIV exposure; that hedging could affect the value of the underlying indices (and, therefore, the XIV Notes); that hedging could create a conflict between

Credit Suisse's interests and those of investors; that such a conflict could be adverse to investors'

interests; and that an investor could lose all principal if an Acceleration Event occurred.  Linken

Decl. Ex. A at PS-24 – PS-25.  For example:

> "We [Credit Suisse] expect to hedge our obligations under the [XIV Notes] through one or more affiliates. . . . The costs of maintaining or adjusting this hedging activity could affect the value of the Index, and accordingly the value of the [XIV Notes]. Moreover, this hedging activity may result in our or our affiliates' receipt of a profit, even if the market value of the [XIV Notes] declines."  *Id.* at PS-13.

> "As noted above, we [Credit Suisse], our affiliates, or third parties with whom we transact, including JHD, may engage in trading activities related to the applicable underlying Index, [or] the VIX Index . . . . These trading activities may present a conflict between your interest in your [XIV Notes] and the interests we, our affiliates, or third parties with whom we transact, including JHD, will have in our or their proprietary accounts . . . . These trading activities, if they influence the level of the applicable underlying Index, could be adverse to your interests as a beneficial owner of your [XIV Notes]."  *Id.* at PS-25.

> "[O]ver a longer holding period, the applicable underlying Index is more likely to experience a dramatic price movement that may result in the Intraday Indicative Value becoming equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value.  Upon such an event, your [XIV Notes] would be subject to acceleration and you will likely lose all or a substantial portion of your investment.  **The long term expected value of your [XIV Notes] is zero.  If you hold your [XIV Notes] as a long term investment, it is likely that you will lost all or a substantial portion of your investment.**"  *Id.* at PS-15 – PS-16 (emphasis in original).

No reasonable investor can be heard now to complain that the Pricing Supplement was materially

misleading.  *See In re TVIX Sec. Litig.*, 25 F. Supp. 3d at 458 (finding no material omission

where "[t]he Pricing Supplement includes extensive disclosures . . . and it explains in detail the

risks to the TVIX ETN investors from Credit Suisse's hedging activities and how those activities

could affect both the Index and the Indicative Value of the TVIX ETNs").

### C.     The Credit Suisse Defendants Cannot Be Responsible for Statements They Did Not Make

Plaintiffs further allege in support of the Section 10(b) claim that, during the afternoon of

February 5, 2018, "Defendants falsely represented to investors that XIV's Intraday Indicative

Value was between about $24 and $27 per note, thus concealing that XIV had suffered an

Acceleration Event, and thereby leading investors to purchase approximately $700 million more

in XIV notes at artificially inflated prices."[4]  Compl. ¶ 11 (emphasis omitted).  This claim cannot

apply to Credit Suisse, which neither calculated nor disseminated the XIV Notes' Intraday

Indicative Value.  Credit Suisse cannot be responsible for statements it did not make.  *Janus

Capital Group, Inc.* v. *First Derivative Traders*, 564 U.S. 135, 148 (2011) ("The statements in

the Janus Investment Fund prospectuses were made by Janus Investment Fund, not by JCM.

Accordingly, First Derivative has not stated a claim against JCM under Rule 10b-5.").  Although

CSI was identified as a Calculation Agent in the Offering Documents, the Pricing Supplement

explicitly defined its role as *excluding* the matters at issue here.  Indeed, the plain language of the

Offering Documents repeatedly explained that "[Janus] or its affiliate"—not the Credit Suisse

Defendants—"is responsible for computing and disseminating the Intraday Indicative Value."

Linken Decl. Ex. A at PS-7; *id.* at PS-57 ("JIC or its affiliates are responsible for computing and

---

[4]     Because Plaintiffs do not allege that any Named Plaintiff purchased XIV Notes during the one-hour window when Defendants purportedly misrepresented the value of the XIV Notes, and the XIV Notes thereafter ceased trading, Plaintiffs lack standing to assert a Section 10 claim based on that theory.  *See O & G Carriers, Inc.* v. *Smith*, 799 F. Supp. 1528, 1539 (S.D.N.Y. 1992) (finding that plaintiff failed to state a claim under § 10(b) where transaction occurred prior to the alleged fraud).  Plaintiffs cannot have relied upon a misrepresentation that occurred after their transactions.  Presumably, if any Named Plaintiff transacted during that one hour, in reliance on the alleged misrepresentation of the Intraday Indicative Value, Plaintiffs would have alleged it.  The Credit Suisse Defendants adopt the arguments made in Section I.A of Defendants Janus Henderson Group plc, Janus Index & Calculation Services LLC, and Janus Distributors LLC d/b/a Janus Henderson Distributors' Supplemental Memorandum of Law In Support of Their Motion to Dismiss the Consolidated Class Action Complaint (the "Janus Brief") filed contemporaneously herewith, which demonstrates Plaintiffs' lack of standing to bring their claims.

disseminating the Closing Indicative Value and Intraday Indicative Value."); *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) ("If . . . allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true.") (citation omitted).

Plaintiffs attempt to sidestep this issue by repeatedly conflating Credit Suisse's role with Janus's role as the party responsible for calculating the Intraday Indicative Value, alleging that "***Defendants***" made statements about the Intraday Indicative Value.  Such impermissible group pleading cannot sustain Plaintiffs' Section 10(b) and 11 claims against the Credit Suisse Defendants.  *See Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 640-41 (S.D.N.Y. 2017) ("[I]n light of the particularity requirements imposed on securities fraud pleadings by Rule 9(b) and the PSLRA, the Court concludes that the group-pleading/group-published documents doctrine is insufficient to meet the requirements of *Janus*, and is thus no longer viable."); *Dresner* v. *Utility.com, Inc.*, 371 F. Supp. 2d 476, 493-94 (S.D.N.Y. 2005) ("[W]hen fraud is alleged against multiple defendants, a plaintiff must set forth separately the acts complain[ed] of by each defendant.  A complaint may not simply clump defendants together in vague allegations to meet the pleading requirements of Rule 9(b).") (citation omitted). [5]  Because Plaintiffs do not,

---

[5]      In addition, allegations concerning the February 5, 2018 Intraday Indicative Value (Compl. ¶ 305(f)) cannot sustain a claim under Section 11 of the Securities Act, which only attaches liability to an issuer on the date that the registration statement "became effective."  15 U.S.C. § 77k(a); *see also In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009) (rejecting claims for lack of allegations that "the Offering Documents were materially misleading 'when made,' which is the relevant time for Section 11 and 12(a)(2) purposes") (citing *Rombach*, 355 F.3d at 175).  Because the registration statement here became effective on January 29, 2018 (Compl. ¶ 42), any alleged misstatements on February 5 are irrelevant to Plaintiffs' Section 11 claims.

and cannot, attribute any of the purported misrepresentations to the Individual Defendants, their

claims against them fail. *Dresner*, 371 F. Supp. 2d at 493-94. Similarly, Plaintiffs' bald

references to "Defendants' fraudulent scheme" (Compl. ¶¶ 257, 260) cannot create liability for

the Credit Suisse Defendants for statements allegedly made by Janus. *See Stoneridge*, 552 U.S.

148 at 166-67.[6]

## II. PLAINTIFFS FAIL TO ALLEGE WITH PARTICULARITY FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

Plaintiffs' § 10(b) claim fails for the additional and independent reason that Plaintiffs do

not "state with particularity facts giving rise to a strong inference that the [Defendants] acted

with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A); *see also ECA and Local 134

IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir.

2009); *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 194

(2d Cir. 2008). That requisite state of mind is one "embracing intent to deceive, manipulate or

defraud." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation

omitted). For an inference of scienter to qualify as "strong" under the PSLRA, it "must be more

than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light

of other explanations." *Id.* at 324. This is an inherently comparative inquiry, requiring the court

to "consider plausible nonculpable explanations for the defendant's conduct." *Id.* at 323-24.

The Court must conduct this analysis on a statement-by-statement (*In re Tower Grp.

Intern., Ltd. Sec. Litig.*, 2015 WL 5813393, at *4 (S.D.N.Y. Sept. 18, 2015)) and defendant-by-

defendant basis. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir.

2009) ("In a case involving multiple defendants, plaintiffs must plead circumstances providing a

---

[6]     Regardless, Plaintiffs fail to allege that the Intraday Indicative Value was false or misleading, as discussed in detail at Section I.D of the Janus Brief, which Credit Suisse adopts and incorporates.

factual basis for scienter for each defendant; guilt by association is impermissible.").[7]  "The plaintiff may satisfy this requirement by alleging facts [with regard to each challenged statement and each Defendant] (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *ATSI Communications, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted).  Where, as here, a defendant is a corporate entity, plaintiffs must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Dynex*, 531 F.3d at 195.  Plaintiffs fall far short of clearing these high hurdles.

### A.  Plaintiffs' Motive and Opportunity Allegations Fail

To properly plead scienter under the "motive and opportunity" prong, Plaintiffs must allege that each Defendant received a "concrete and personal benefit" from the alleged fraud. *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  Plaintiffs' theory of scienter focuses almost exclusively on allegations that the prospect of profits incentivized the Credit Suisse Defendants to capitalize on volatility spikes at the expense of investors.  Compl. ¶¶ 91, 117, 125.  It is well-established that generic claims of motivation to earn profits, such as these, "which could be imputed to any publicly-owned, for-profit endeavor, [are] not sufficiently concrete for the purposes of inferring scienter."  *Kalnit*, 264 F.3d at 140 (citation omitted); *see also South Cherry Street, LLC* v. *Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("[I]n attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are 'possessed by

---

[7]      Plaintiffs must also plead scienter in support of their Section 11 claims since those claims sound in fraud.  *See* Section I.A., *supra*; *Rombach*, 355 F.3d at 171 (2d Cir. 2004) ("We hold that the heightened pleading standard of Rule 9(b) applies to Section 11 and Section 12(a)(2) claims insofar as the claims are premised on allegations of fraud."); *In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *6 n.12 (S.D.N.Y. Apr. 18, 2006) ("When Section 11 and 12(a)(2) claims sound in fraud, however, the scienter requirements of Rule 9(b) of the Federal Rules of Civil Procedure apply.") (citation omitted).

virtually all corporate insiders,' such as the desire to . . . sustain the appearance of corporate profitability . . . ."); *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("General allegations that the defendants acted in their economic self-interest are not enough.") (citations omitted).

Plaintiffs' profit motive claims here are similar to those rejected by the Second Circuit in *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994), *superseded by statute on other grounds,* PSLRA, 15 U.S.C. § 78u–4. In *Shields*, the Second Circuit found that plaintiffs failed to allege a sufficient motive and opportunity where they "merely charge[d] that executives aim[ed] to prolong the benefits of the positions they h[e]ld," but lacked any allegations of "false statements [that] were made in an effort to sell off shares held by management, or to delay a criminal prosecution." *Id*. Here, Plaintiffs make nearly identical claims, asserting that a statement by Defendant Tidjane Thiam, Credit Suisse's Chief Executive Officer, concerning Credit Suisse's goal to generate profits for shareholders somehow bolsters their scienter allegations. Compl. ¶ 124 ( "The shareholders have been through a lot. . . . As we generate more profit and the bank does better . . . the goal of all this is to return capital to shareholders."). It does not. Allegations that Mr. Thiam was motivated to earn profits for Credit Suisse are wholly insufficient to establish scienter on behalf of Credit Suisse or the Individual Defendants. *See Rombach*, 355 F.3d at 177 (motive was not established where plaintiff did "not allege that defendants sold stock or profited in any way during the relevant period").[8]

---

[8]     Further undermining any plausible inference of motive is Plaintiffs' admission that "[i]n July 2018, Credit Suisse made good on Thiam's promise to continue cuts when it announced the closing of two other VIX-related ETNs" without any alleged fraud. It defies logic to infer a massive fraud with regard to the XIV Notes when Credit Suisse could (and actually did) close similar investments as part of normal business operations. *Cf. Atlantic Gypsum Co., Inc.* v. *Lloyds Intern. Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent.").

Similarly unpersuasive is Plaintiffs' reference to separate and unrelated regulatory investigations of Credit Suisse concerning residential mortgage-backed securities. *See* Compl. ¶ 256. Plaintiffs argue that those matters are evidence of "Credit Suisse's long history of placing its own profits ahead of its investors" (*id.*), but the referenced investigations concern different time periods, different types of securities and vastly different allegations, and are thus irrelevant here. *See In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *8 (S.D.N.Y. June 28, 2017) ("However, [p]laintiffs' citation to a number of lawsuits and government investigations involving [the defendants] provides no evidence of scienter.") (internal quotation marks and citation omitted), *aff'd sub nom. Sfiraiala* v. *Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018); *cf. In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 594 (S.D.N.Y. 2011) ("Although the CFTC Order included certain factual findings, it nevertheless was the product of a settlement between the CFTC and the Respondents, not an adjudication of the underlying issues in the CFTC proceeding. Plaintiffs are therefore prohibited from relying on the CFTC Order to plead the 'underlying facts of liability.'").

## B.     Plaintiffs' Allegations of Recklessness Are Neither Plausible Nor Well Pleaded

Lacking sufficient motive allegations, Plaintiffs must meet the even more onerous burden of pleading with particularity facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness."[9] *ECA*, 553 F.3d at 198; *Kalnit*, 264 F.3d at 142 (absent any plausible motive, the "strength of the circumstantial allegations must be correspondingly greater"). To plead recklessness, a plaintiff must allege that defendants engaged in "highly unreasonable" conduct that represents "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant

---

[9]     Plaintiffs do not, and cannot, plead conscious misbehavior on behalf of any Defendant.

must have been aware of it." *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n* v. *MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (citation omitted).  To avoid dismissal, a plaintiff's allegations thus must transcend "merely enhanced negligence" and "specifically alleg[e] defendants' knowledge of the facts or access to information contradicting their public statements." *JP Morgan*, 363 F. Supp. 2d at 624 (citation omitted).  Where a plaintiff contends that defendants had access to contrary facts, it "must specifically identify the reports or statements containing this information." *Dynex*, 531 F.3d at 196 (citation omitted); *see also Kinsey* v. *Cendant Corp.*, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) ("[C]onclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness.").  Plaintiffs must further show that Defendants had this knowledge contradicting their statements at the time each statement was made.  *See Dynex*, 531 F.3d at 196.

Plaintiffs fail to satisfy this stringent standard, as they do not, and cannot, raise any inference that any Defendant knew or had access to information contradicting Defendants' public statements.  Compl. ¶¶ 229, 243.  Plaintiffs' attempts to plead recklessness by claiming that the Credit Suisse Defendants were somehow aware that the Intraday Indicative Value was false "within seconds after its issuance" (Compl. ¶ 229), or that they simply knew the "next VIX spike . . . was certain to occur" (Compl. ¶ 218) fail on their face.  Plaintiffs' inability to allege that any Defendant had any knowledge or access to information contrary to any purported misrepresentation precludes them from establishing recklessness.  *See Goplen* v. *51job, Inc.*, 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006) ("[B]are assertions" that defendants "had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports . . . without any further facts or details, do not adequately demonstrate defendants'

knowledge of facts or access to information contradicting their public statements.").

Plaintiffs' additional allegation that "Defendants [] knew, or at the very least recklessly disregarded, that statements set forth [] in the January Supplement were materially false" is as confusing as it is legally deficient.  Compl. ¶ 243.  Plaintiffs claim that these disclosures concealed that "the Credit Suisse Defendants planned to hedge their significant exposure in XIV notes, resulting in a liquidity squeeze in the VIX futures market."  Compl. ¶ 225.  As detailed above, however, the Pricing Supplement contained numerous disclosures about Credit Suisse's hedging activity and the impact that activity could have on the XIV Notes' value.  *See* Section I.B, *supra*; *see also* Compl. ¶ 238 ("In the January Supplement, Credit Suisse repeatedly stated that it may hedge its exposure to XIV.").  Absent a false statement, there is no occasion to analyze recklessness.

### C.      Inferences of Non-Fraudulent Intent Are More Cogent and Compelling

At its core, the theory of Plaintiffs' case is that Defendants intentionally manipulated and misrepresented the value of the XIV Notes in order to benefit from an unforeseen market-wide disruption.  Plaintiffs attempt to make this argument despite the undisputed fact that the Intraday Indicative Value was based on public information calculated by a third party and despite the multiple, unambiguous disclosures included in the Pricing Supplement, which address the very matters at issue in this dispute.  The implausibility of this alleged scheme is plain, and Plaintiffs offer no explanation that even attempts to make sense of it.  The far more compelling inference to be drawn from the alleged facts, and matters subject to judicial notice, is that Defendants, without any motive to defraud, abided by the precise guidelines in the Offering Documents following an unprecedented market event, and that Credit Suisse's trading activity was legitimate hedging that was fully disclosed to investors.  *See Hudson Bay Master Fund Ltd.* v. *Patriot Nat'l Inc.*, 309 F. Supp. 3d 100, 120 (S.D.N.Y. 2018) (holding that a fund's need to engage in

legitimate hedging activities was a "plausible nonculpable explanation" and recognizing that "[a] strong inference of scienter is not raised by alleging that a legitimate investment vehicle . . . creates an opportunity for profit through manipulation") (citation omitted). Courts in the Second Circuit have routinely rejected claims that investment losses suffered following market-wide downturns may be attributed to fraud. *See Denny* v. *Barber*, 576 F.2d 465, 470 (2d Cir. 1978); *Shields*, 25 F.3d at 1129; *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *6-11, *16-19 (S.D.N.Y. June 23, 2004); *Dynex*, 531 F.3d at 197. This Court should apply the same reasoning here to reject Plaintiffs' "fraud by hindsight" claims.

## III.   PLAINTIFFS FAIL TO ADEQUATELY ALLEGE LOSS CAUSATION

Plaintiffs also fail to adequately plead the required element of loss causation. "[T]o establish loss causation [in a securities case brought pursuant to Section 10(b)], 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered', *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). "[W]hen the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately [pled] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." *First Nationwide Bank* v. *Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (citation omitted). While the issue of loss causation is generally an affirmative defense to Section 11 claims, (*see In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 593 (S.D.N.Y. 2011)), here, where the lack of loss causation is established on the face of the complaint, dismissal on this basis is proper in the context of a Rule 12(b)(6) motion to dismiss. *Id.* at 588.

Plaintiffs rely on two potential theories of fraud: (i) the alleged misstatement of the XIV Notes' Intraday Indicative Value; and (ii) Credit Suisse's purportedly undisclosed hedging activity.  Plaintiffs, however, are unable to establish (as is required) "either that (i) a corrective disclosure informed the market of the fraud, and the market reacted negatively; or (ii) the risk concealed from investors materialized and caused a foreseeable loss." *In re Francesca's Holding Corp. Sec. Litig.*, 2015 WL 1600464, at *18 (S.D.N.Y. Mar. 31, 2015).

First, Plaintiffs effectively concede that their losses were caused by a spike in market-wide volatility (which necessarily resulted in a decline in XIV's Intraday Indicative Value), rather than any misstatement by the Credit Suisse Defendants. Compl. ¶ 8 ("[V]olatility returned, driving up the price of VIX futures with it."); Compl. ¶ 159 ("On this day, the stock market pulled back, with the S&P 500 dropping 4.1% 'amid concerns about rising bond yields and higher inflation,' reinforced by the January 2018 U.S. jobs report "that prompted worries the Federal Reserve w[ould] raise rates at a faster pace than expected' in 2018."); *id.* ¶ 160-61 ("As the stock market dropped, the VIX Index spiked.  The SPVXSP, which tracked the return on first- and second-month VIX futures contracts, also rose sharply …. XIV's Intraday Indicative Value, the XIVIV, which inversely tracked the SPVXSP, dropped precipitously during the day.").  This fact alone defeats any effort to establish the requisite loss causation.  *See First Nationwide Bank*, 27 F.3d at 772 ("[W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the [alleged] fraud decreases.") (citation omitted); *cf. Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005) (observing the securities laws are not meant "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause") (citation omitted).

Second, Plaintiffs allege that Credit Suisse embarked upon a scheme by "actively betting against XIV" (Compl. ¶ 1), including by buying "thousands of February and March VIX futures contracts, drastically reducing their supply, and as a result drastically driving up the price of the contracts."  Compl. ¶ 162.  The problem with this theory of loss causation is that the buying activity alleged by Plaintiffs was, as they acknowledge, nothing more than the hedging necessary to rebalance Credit Suisse's portfolio.  *See* Compl. ¶ 164 ("A fully hedged portfolio had a short exposure to VIX futures contracts of $1.6 billion, taking into account Credit Suisse's two other short-term VIX ETNs.  To have fully hedged its risk on February 5, Credit Suisse needed to buy a combined 105,474 VIX futures contracts by 4:15 p.m., when the daily VIX futures' settlement values are calculated by the CBOE.").  Even if Credit Suisse actually engaged in such activity, Plaintiffs cannot complain that it was somehow misrepresented or concealed, as the Pricing Supplement clearly and repeatedly disclosed that Credit Suisse may undertake such activity.

For example, Credit Suisse disclosed that "[w]e expect to hedge our obligations under the ETNs through one or more affiliates … The costs of maintaining or adjusting this hedging activity could affect the value of the Index, and accordingly the value of the ETNs.  Moreover, this hedging activity may result in our or our affiliates' receipt of a profit, even if the market value of the ETNs declines."  Linken Decl. Ex. A at PS-13.  Equally relevant is Credit Suisse's disclosure that "we, our affiliates, or third parties with whom we transact, including JHD, may engage in trading activities related to the applicable underlying Index, [or] the VIX Index …. These trading activities, ***if they influence the level of the applicable underlying Index, could be adverse to your interests as a beneficial owner of your ETNs.***"  Linken Decl. Ex. A at PS-25 (emphasis added).  There simply was no "misstatement or omission [that] concealed something

from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173. Plaintiffs have failed to plead loss causation.

## IV.   PLAINTIFFS' CONTROL PERSON CLAIMS FAIL AS A MATTER OF LAW

Plaintiffs advance various theories of control person liability, including that the Individual Defendants controlled Credit Suisse and Credit Suisse controlled CSI. These claims fail as a matter of law because Plaintiffs do not allege any actionable primary violation. *See* Sections I-III, *supra*; *Rombach*, 355 F.3d at 177-78 (affirming dismissal of claims pursuant to Sections 15 and 20(a) because "the district court properly dismissed the primary securities claims against the individual defendants, [therefore] these secondary claims must also be dismissed").

Regardless, Plaintiffs' control person claims fail for an additional reason: the total absence of any particularized allegations of culpable conduct by the allegedly controlling persons in the particular transaction at issue. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 307-08 (S.D.N.Y. 2008) ("[P]laintiffs must plead culpable participation with particularity, as required by the PSLRA.") (citations omitted). The culpability requirement applies equally to the Section 15 claim. *See Public Emps.' Ret. Sys. of Miss.* v. *Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) ("As to the Section 15 claims . . . , it [is] not sufficient, in the Court's view, to simply allege, as the Complaint does allege, that they were all either officers or directors of Merrill Depositor at relevant times. Rather, to make out a Section 15 'control person' claim . . . plaintiffs must also allege . . . meaningful culpable conduct [by an individual defendant] beyond mere status as a director or officer.") (internal quotation marks and citations omitted).

Unable to satisfy these requirements, Plaintiffs ignore them, and instead allege almost exclusively that because of "their positions as officers of Credit Suisse," including on risk committees, and Credit Suisse's risk management structure, the Individual Defendants had

influence over the activity of Credit Suisse and CSI and knew or recklessly disregarded liquidity issues in the VIX futures market.  Compl. ¶¶ 93-109, 280, 297; *see also* Compl. ¶ 245.  Nowhere, however, does the Complaint tie the Individual Defendants to the setting, calculation, or dissemination of the Intraday Indicative Value, to Credit Suisse's hedging activities, or to any other purportedly false or misleading statement.  In fact, the section of the Complaint devoted to the Individual Defendants does not even mention any of the allegedly fraudulent statements or suggest how the Individual Defendants were involved with the publication of those statements. *See* Compl. ¶¶ 93-110.  Similarly, Plaintiffs offer no allegations to support the idea that Credit Suisse knew or should have known of any allegedly fraudulent misrepresentations by CSI, which it is alleged to have controlled.

## V.   PLAINTIFFS' FAILURE TO ADEQUATELY PLEAD THEIR SECTION 10(B) CLAIM DOOMS THEIR SECTION 9 CLAIMS AS WELL

Plaintiffs assert two claims pursuant to Section 9 of the Exchange Act, which prohibits the making of "any statement which was at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact."  15 U.S.C. § 78i(a)(4).  Because "Section 9(a)(4) closely parallels Section 10(b)," Plaintiffs' failure to plead an actionable claim pursuant to Section 10(b) is fatal to their Section 9 claims.  *Salvani* v. *ADVFN PLC*, 50 F. Supp. 3d 459, 476 (S.D.N.Y. 2014), *aff'd sub nom.*, *Salvani* v. *InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015); *see also Panfil* v. *ACC Corp.*, 768 F. Supp. 54, 59 (W.D.N.Y. 1991) ("Given the parallel requirements of these statutes, plaintiff's failure to show the omission of a material fact under rule 10b-5 . . . also defeats his claim under § 9(a)(4)."), *aff'd*, 952 F.2d 394 (2d Cir. 1991).[10]

---

[10]   Section 9(f) merely creates a private right of action for alleged violations of Section 9(a), 9(b) or 9(c), and, therefore, Plaintiffs' purportedly separate claim pursuant to Section 9(f) (Count Six) must be dismissed.

## **CONCLUSION**

The Complaint should be dismissed with prejudice.

Dated:  November 2, 2018
       New York, New York

Respectfully submitted,

CAHILL GORDON & REINDEL LLP

By: /s/ David G. Januszewski
    Herbert S. Washer
    David G. Januszewski
    Sheila C. Ramesh
    Peter J. Linken
Eighty Pine Street
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 259-5420
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
plinken@cahill.com

*Attorneys for Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam and David R. Mathers*

-28-