**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAJAN CHAHAL, *individually and on behalf of all others similarly situated*, | Case No. 1:18-cv-02268-AT-SN |
| Plaintiff, | **<u>Oral Argument Requested</u>** |
| v. | |
| CREDIT SUISSE GROUP AG; CREDIT SUISSE AG; CREDIT SUISSE INTERNATIONAL; TIDJANE THIAM; DAVID R. MATHERS; JANUS HENDERSON GROUP PLC; JANUS INDEX & CALCULATION SERVICES LLC; and JANUS DISTRIBUTORS LLC d/b/a JANUS HENDERSON DISTRIBUTORS, | |
| Defendants. | |
| GLENN EISENBERG, *on behalf of himself and all others similarly situated*, | Case No. 1:18-cv-02319-AT-SN |
| Plaintiff, | |
| v. | |
| CREDIT SUISSE AG and JANUS INDEX & CALCULATION SERVICES LLC, | |
| Defendants. | |
| SHAOLEI QUI, *on behalf of himself and all others similarly situated*, | Case No. 1:18-cv-04045-AT-SN |
| Plaintiff, | |
| v. | |
| CREDIT SUISSE GROUP AG and JANUS INDEX & CALCULATION SERVICES LLC, | |
| Defendants. | |

**DEFENDANTS JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, AND JANUS DISTRIBUTORS LLC D/B/A JANUS HENDERSON DISTRIBUTORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY  10281
(212) 504-6000

*Attorneys for Janus Henderson Group plc, Janus Index & Calculation Services LLC*, and *Janus Distributors LLC d/b/a Janus Henderson Distributors*

Dated:      November 2, 2018

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND ........................................................................................................... 6

    A.    The XIV ETNs and the Janus Defendants' Roles ....................................... 6

    B.    The Risk Disclosures ................................................................................. 7

    C.    Plaintiffs' Claims Against the Janus Defendants ....................................... 8

ARGUMENT ................................................................................................................. 9

POINT I    THE COMPLAINT FAILS TO STATE A CLAIM AGAINST JIC OR
JANUS HENDERSON FOR SECURITIES FRAUD ......................................... 10

    A.    The Named Plaintiffs Lack Standing To Assert Their Section 10(b)
Claim .................................................................................................... 10

    B.    The Complaint Does Not Assert Any Allegation Of Wrongdoing
Against The Janus Defendants With Respect To Credit Suisse's
Alleged Hedging Activities Or Acceleration Of The XIV ETNs ............. 12

    C.    The Complaint Does Not Adequately Plead Scienter As To Janus
Henderson Or JIC .................................................................................. 12

    D.    Plaintiffs Have Not Adequately Alleged A Material Misstatement
by JIC or Janus Henderson ..................................................................... 18

    E.    Plaintiffs Have Not Sufficiently Alleged Loss Causation ......................... 20

    F.    Plaintiffs Have Not Adequately Alleged Their Control Person
Claim .................................................................................................... 24

POINT II    PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THEIR CLAIM
FOR VIOLATION OF SECTION 15 BY JANUS HENDERSON ...................... 25

POINT III    PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED THEIR
CLAIMS FOR VIOLATION OF SECTIONS 9(a)(4) OR 9(f) ........................... 28

CONCLUSION ........................................................................................................... 30

# TABLE OF AUTHORITIES

**PAGE(S)**

*Alki Partners LP v. Windhorst,*
   472 F. App'x 7 (2d Cir. 2010) (summary order) ................................................................15

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
   671 F.3d 140 (2d Cir. 2011) (per curiam).........................................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007)..........................................................................................4, 10, 24

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................................................9, 24

*Blue Chip Stamps v. Manor Drug Stores,*
   421 U.S. 723 (1975)............................................................................................................1, 11

*Catton v. Def. Tech. Sys., Inc.,*
   2006 WL 27470 (S.D.N.Y. Jan. 3, 2006) ...............................................................................23

*Chavis v. Chappius,*
   618 F.3d 162 (2d Cir. 2010)........................................................................................................9

*Cohen v. Stevanovich,*
   722 F. Supp. 2d 416 (S.D.N.Y. 2010).............................................................................15, 29

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   395 F.3d 25 (2d Cir. 2005), *vacated on other grounds,*
   547 U.S. 71 (2006)........................................................................................................................11

*Dimensional Emerging Mkts. Value Fund v. Petróleo Brasileiro S.A.-Petrobras*
   (*In re Petrobras Sec. Litig.*),
   152 F. Supp. 3d 186 (S.D.N.Y. 2016)........................................................................................28

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.,*
   323 F. Supp. 3d 393 (S.D.N.Y. 2018).................................................................................25, 28

*ECA, Local 134 IBEW Jt. Pension Tr. of Chi. v. JP Morgan Chase Co.,*
   553 F.3d 187 (2d Cir. 2009).........................................................................................................13

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.,*
   343 F.3d 189 (2d Cir. 2003).........................................................................................................23

*Fezzani v. Bear, Stearns & Co.,*
   384 F. Supp. 2d 618 (S.D.N.Y. 2004)...............................................................................27, 28

**PAGE(S)**

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994)...................................................................................21, 23

*Ganino* v. *Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)...........................................................................................19

*I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*,
    280 F. Supp. 3d 524 (S.D.N.Y. 2017)...........................................................................29

*In re Am. Realty Cap. Props., Inc. Litig.*,
    2015 WL 6869337 (S.D.N.Y. Nov. 6, 2015)..................................................................28

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)...........................................................................15

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    2017 WL 4049253 (S.D.N.Y. June 6, 2017) (Torres, J.), *aff'd*,
    729 F. App'x 55 (2d Cir. 2018) (summary order) .............................................5, 24

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ..........................................................................17

*In re Longwei Petrol. Inv. Holding Ltd. Sec. Litig.*,
    2014 WL 2851037 (S.D.N.Y. Jan. 27, 2014) .........................................................25

*In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*,
    604 F. App'x 62 (2d Cir. 2015) (summary order) ....................................................14, 15

*In re Merrill Lynch & Co. Res. Rpts. Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003)...........................................................................23

*In re Sec. Cap. Assur. Ltd. Sec. Litig.*,
    729 F. Supp. 2d 569 (S.D.N.Y. 2010)...........................................................................16

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd sub nom.*
    *Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2017)
    (summary order)..............................................................................................................4

*In re Ultrafem Inc. Sec. Litig.*,
    91 F. Supp. 2d 678  (S.D.N.Y. 2000)............................................................................26

*In re Yukos Oil Co. Sec. Litig.,*
    2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ................................................................9

**PAGE(S)**

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005).................................................................................3, 21, 23

*Lipow v. Net1 UEPS Techs., Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2015)...............................................................................17

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006).......................................................................................................1, 11

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp.*,
709 F.3d 109 (2d Cir. 2013).................................................................................................6

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...............................................................................................13

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
874 F. Supp. 2d 341 (S.D.N.Y. 2012)...............................................................................28

*Panfil* v. *ACC Corp.*,
768 F. Supp. 54 (W.D.N.Y. 1991), *aff'd*,
952 F.2d 394 (2d Cir. 1991)...............................................................................................29

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010).................................................................................14

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)...............................................................................................26

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007).................................................................................................9

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000)...................................................................................................9

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009).................................................................................................10

*Salvani* v. *ADVFN PLC*, 50 F. Supp. 3d 4596 (S.D.N.Y. 2014), *aff'd sub nom.*
*Salvani* v. *InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015)
(summary order)..............................................................................................................5, 28

*SEC v. First Jersey Sec., Inc.*,
101 F.3d 1450 (2d Cir. 1996).............................................................................................27

*Sharette v. Credit Suisse Int'l*,
127 F. Supp. 3d 60 (S.D.N.Y. 2015)..................................................................................21

**PAGE(S)**

*Silsby v. Icahn*,
    17 F. Supp. 3d 348 (S.D.N.Y. 2014), *aff'd*,
    616 F. App'x 448 (2d Cir. 2015) (summary order) .................................................................15

*SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*,
    2010 WL 2473595 (S.D.N.Y. June 17, 2010), *aff'd*,
    448 F. App'x 116 (2d Cir. 2011) (summary order) ..........................................................13, 16

*Stark Trading & Shepherd Inv. Int'l v. Falconbridge Ltd.*,
    2008 WL 153542 (E.D. Wis. Jan. 14, 2008), *aff'd*,
    552 F.3d 568 (7th Cir. 2009) ...................................................................................................29

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008)...............................................................................................................1, 10

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)..................................................................................................13, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................1, 4, 10, 13, 16

*Town of Mamakating, N.Y. v. Lamm*,
    2015 WL 5311265 (S.D.N.Y. Sept. 11, 2015), *aff'd*,
    651 F. App'x 51 (2d Cir. 2016) (summary order) .....................................................................6

*Van Buskirk v. N.Y. Times Co.*,
    325 F.3d 87 (2d Cir. 2003)........................................................................................................30

*Vining v. Oppenheimer Holdings Inc.*,
    2010 WL 3825722 (S.D.N.Y. Sept. 29, 2010)..........................................................................17

*Wyo. State Treasurer v. Moody's Inv'rs Serv., Inc.*
    (*In re Lehman Bros. Mort.-Backed Sec. Litig.*),
    650 F.3d 167 (2d Cir. 2011)......................................................................................................25

**STATUTES & OTHER AUTHORITIES:**

15 U.S.C.:
    § 77*o*(a) ......................................................................................................................................27
    § 78i(a)(4) ....................................................................................................................................28
    § 78u-4(b)(1) ...............................................................................................................................10
    § 78u-4(b)(2) .................................................................................................................................1

Defendants Janus Henderson Group plc ("Janus Henderson"), Janus Index & Calculation Services LLC ("JIC"), and Janus Distributors LLC d/b/a Janus Henderson Distributors ("JHD," and together with Janus Henderson and JIC, "the Janus Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Class Action Complaint pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  For the reasons set forth herein, as well as in the portions of the Memorandum of Law in Support of the Credit Suisse Defendants' Motion to Dismiss the Class Action Complaint for Failure to State a Claim (the "Credit Suisse Memorandum") incorporated by reference,[1] Counts One, Four, Five, Six, and Eight should be dismissed against the Janus Defendants.

## PRELIMINARY STATEMENT

Plaintiffs' case boils down to a classic fraud-by-hindsight theory, whereby they seek to convert extreme adverse market movements on a single day in February 2018, over which Defendants[2] had no control, into actionable securities fraud claims premised entirely on losses caused by alleged risks that were repeatedly and specifically disclosed in the offering documents for these securities.  As explained below, however, Plaintiffs' claims relating to their investment in a complex financial product, VelocityShares Daily Inverse VIX Short Term Exchange Traded Notes (the "XIV ETNs" or the "Notes") must be dismissed as a matter of law.

The XIV ETNs were issued by Credit Suisse, which made extensive disclosures of the risks related to Plaintiffs' investment in the XIV ETNs in the offering documents accompanying their issuance.  Then, on February 5, 2018, a day of heightened market volatility, certain of those disclosed risks materialized, and the value of Plaintiffs' Notes declined, just as the

---

[1]   Namely, Sections I(A)-(B) and III.

[2]   "Defendants" collectively refers to the Janus Defendants, Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam, and David R. Mathers.

offering documents indicated they might in such a situation.  Plaintiffs now seek to shift their losses to Defendants by contending that they were misled in connection with their purchase of the XIV ETNs in violation of Sections 10(b), 9(a), 9(f), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

To state a violation of Section 10(b), the Complaint must plead that Defendants made one or more material misstatements, with scienter, and that these misstatements caused their losses.  *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).  Moreover, because Section 10(b) claims sound in fraud, a complaint asserting such a claim must also satisfy Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which requires plaintiffs like these to plead, with particularity, a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).  What is required are facts, not mere conclusory allegations, establishing the requisite intent.  *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007) (recognizing that the PSLRA imposes "[e]xacting pleading requirements").

As a threshold matter, these Plaintiffs lack standing to raise the Section 10(b) claim they have pleaded against the Janus Defendants.  The nub of their claim, as it pertains to the Janus Defendants, is that JIC, which acted as an administrative "Calculation Agent" for the XIV ETNs, published false or misleading values for the XIV ETNs during a one-hour period on February 5, 2018.  But none of the Plaintiffs allege that they purchased or sold any XIV ETNs during that period.  It is well established that relief under Section 10(b) is available only "to purchasers and sellers," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975), not "holders," *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit* ("*Dabit II*"), 547 U.S. 71, 86 (2006), which means that these Plaintiffs lack standing to bring claims against the Janus Defendants or anyone else for any alleged misstatements made during that one-hour window.

Even if the Court were to reach the merits of Plaintiffs' allegations, they fail to state a plausible misrepresentation claim under Section 10(b). As explained in the Credit Suisse Memorandum, the offering documents contain abundant disclosures of the risks that allegedly materialized and caused Plaintiffs' losses. Because the alleged risks leading to Plaintiffs' losses were in fact disclosed, there is no misstatement, material or otherwise, and as a result Plaintiffs' claims must be dismissed as a matter of law. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) (affirming dismissal of fraud claims brought by plaintiffs who had invested in "volatile, devaluation-prone investments" because "substantial indicia of the risk that materialized [were] unambiguously apparent on the face of the disclosures alleged to conceal the very same risk"); Credit Suisse Memorandum, Section I(B).

The Complaint's allegations with respect to the Janus Defendants are particularly bare bones. Plaintiffs themselves recognize that the Janus Defendants did not issue the XIV ETNs or have responsibility for the statements in the offering documents, and the Janus Defendants are not alleged to have hedged positions in the XIV ETNs, called the Acceleration Event that redeemed the XIV ETNs, or otherwise traded in these securities or any VIX Futures contracts. Janus Henderson in particular did not have, and is not alleged to have had, any role in connection with the statements or events at issue, but is sued solely because it is the parent of JIC and JHD. In all, the allegations levied at the Janus Defendants consist only of the fact that JIC—the entity which functioned as a "Calculation Agent" for the XIV ETNs—participated in a "fraud" to "falsely represent[]"the value of the XIV ETNs during a one-hour period on Feburary 5, 2018. Compl. ¶¶ 10-11. But there are no plausible allegations that JIC or any of the Janus Defendants materially misrepresented the value of the XIV ETNs during that one-hour period (or any other period).

Plaintiffs' Exchange Act claims against the Janus Defendants must be dismissed on the additional ground that the Complaint does not plead scienter with the requisite particularity required by Rule 9(b) and the PSLRA.  In order to plead scienter, a complaint must plead facts demonstrating either that the defendants ''had both motive and opportunity to commit fraud''' or that there is "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  Critically, the inference of scienter must be more than merely plausible—it must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  In this case, the Complaint is devoid of any allegations remotely sufficient to meet this test.  Instead, it relies on conclusory allegations of knowledge or recklessness unadorned by any specific facts.  In addition, it fails to specify how the Janus Defendants knew the statements regarding the value of the XIV ETNs were false or misleading, or that they possessed a motive or opportunity that would have incentivized them to make the alleged misstatements.  Indeed, the robust disclosures contained in the XIV ETN offering documents, which repeatedly warned investors of the significant risks associated with investing in and holding the XIV ETNs, also are fatal to Plaintiffs' conclusory assertion that the Janus Defendants acted intentionally to mislead them.

Tellingly, this is not the first time a putative class action has been filed involving a volatility-linked exchange-traded note issued by Credit Suisse that was marketed, placed and calculated by the Janus Defendants (or their predecessor entities VelocityShares LLC, VLS Securities LLC, and Velocity Index and Calculation Services).  In *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2017) (summary order), Judge Swain dismissed a similar securities complaint on behalf of purchasers of TVIX ETNs premised on allegedly inadequate disclosures.  Notably, the lead plaintiffs in *TVIX* declined to name the Janus Defendants' predecessor entities as

defendants in their consolidated class action complaint despite the fact that the entities had been named as defendants in one of the first-filed complaints.  The TVIX lead plaintiffs explained that the predecessor Janus entities were not, in their view, proper defendants because the "TVIX ETNs [were] not sponsored, endorsed, sold or promoted by VelocityShares, nor did VelocityShares make any representation regarding the advisability of investing in any of the TVIX ETNs." Consol. & Am. Class Action Compl. ¶ 36, *In re TVIX*, No. 12-cv-4191 (S.D.N.Y. Oct. 9, 2012), ECF No. 36. As explained below, the same rationale supports dismissal of the Janus Defendants in the instant action.

The flaws in Plaintiffs' Section 10(b) claims are equally fatal to their claims under Section 9 of the Exchange Act.  *See Salvani* v. *ADVFN PLC*, 50 F. Supp. 3d 459, 476 (S.D.N.Y. 2014), (recognizing that Section 9(a)(4) "closely parallels" Section 10(b)), *aff'd sub nom. Salvani* v. *InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015) (summary order).  Likewise, Plaintiffs' control person liability claims under Section 20(a) must be dismissed both because the underlying Exchange Act claims are not actionable and because there are no allegations in the Complaint that plausibly suggest that Janus Henderson, the ultimate parent, "was, in some meaningful sense, a culpable participant in [any supposed underlying] fraud." *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *9 (S.D.N.Y. June 6, 2017) (Torres, J.), *aff'd*, 729 F. App'x 55 (2d Cir. 2018) (summary order).  So too must Plaintiffs' Section 15 claim against Janus Henderson be dismissed, both because, as explained in the Credit Suisse Memorandum, Plaintiffs have failed to plausibly allege an underlying violation of Section 11 of the Securities Act, and because Plaintiffs have failed to allege any plausible basis to conclude that Janus Henderson had actual control over the alleged primary violators, the Credit Suisse Defendants, which are completely separate companies not alleged to have any common ownership with Janus Henderson.

In short, Plaintiffs' conclusory and implausible allegations against the Janus Defendants are the kind that courts time and again have held are insufficient to satisfy the rigorous pleading standards that govern these claims. The same result should be reached here.

## BACKGROUND[3]

### A.   The XIV ETNs and the Janus Defendants' Roles

The XIV ETNs were issued by Credit Suisse pursuant to a registration statement, prospectus, prospectus supplement, and various pricing supplements, each of which was filed with the SEC pursuant to Rule 424(b)(2) (together, the "Offering Documents"). The XIV ETN-specific disclosures appear in the pricing supplement dated January 29, 2018 (the "Pricing Supplement" or "PS"). *See* Halper Decl. Ex. 1. The value of the XIV ETNs was inversely related to the value of another index:  the S&P 500 VIX Short-Term Futures Index ("VIX Futures Index"). As the value of the VIX Futures Index moved in a certain direction, the value of the XIV ETNs would move in the opposite direction. *See* PS Cover at 1. The XIV ETNs were designed as "trading tools for sophisticated investors to manage daily trading risks" by offering investors "exposure to . . . [the] volatility of the S&P 500 Index at various points along the volatility forward curve." PS Cover at 1, 6. The underlying VIX Futures Index, from which the value of the XIV ETNs was derived, is an index calculated by the S&P 500 VIX Futures Index Committee ("S&P") using the prices of a portfolio of futures contracts on a third index:  the Chicago Board Options Exchange ("CBOE") Volatility Index (the "VIX"). PS-32 to -33, -36. The CBOE calculates the VIX using the prices of put and call options on the S&P 500 Index. PS-31.

---

[3]   The facts alleged by Plaintiffs are taken as true for purposes of this motion only. *See Town of Mamakating, N.Y. v. Lamm*, 2015 WL 5311265, at *4 (S.D.N.Y. Sept. 11, 2015) ("The Court must accept as true—for purposes of this motion only—the facts as alleged in the pleadings."), *aff'd*, 651 F. App'x 51 (2d Cir. 2016) (summary order); *see also N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp.*, 709 F.3d 109, 119 (2d Cir. 2013).

In its role as one of the Co-Calculation Agents, JIC was responsible for computing and disseminating the indicative value of the XIV ETNs, referred to as the "Intraday Indicative Value," every 15 seconds throughout a business day.  PS-39, -49; Compl. at ii.  The Intraday Indicative Value (and a once-a-day "Closing Indicative Value") were calculated using a formula that relied upon the value of the underlying VIX Futures Index, which, as mentioned, was calculated and disseminated by S&P.  Compl. ¶¶ 140-41; PS-32, -33, -36.  After calculation, the Intraday Indicative Value was published "under its own Bloomberg ticker" by NASDAQ, which acted as the "official disseminator" of the Intraday Indicative Value.  Compl. ¶ 148.

## B.    The Risk Disclosures

The Credit Suisse Memorandum sets forth in detail the extensive risk disclosures in the Offering Documents.  *See* Credit Suisse Memorandum, Section I(B).  Most relevant to the Janus Defendants, the Pricing Supplement contained fulsome disclosures concerning the risks of investing in and holding the XIV ETNs and the constraints that could affect the timing or accuracy of the Intraday Indicative Value calculation.

Because the Intraday Indicative Value was a formulaically-driven calculation based on the underlying VIX Futures Index—not the market value of the Notes—the Pricing Supplement explained that any number of factors could cause the XIV ETNs' Intraday Indicative Value to deviate from the price at which the ETNs would trade in the secondary market:

> The Intraday Indicative Value calculation is ***not intended as a price or quotation***, or as an offer or solicitation for the purchase, sale, redemption, acceleration or termination of your ETNs, ***nor will it reflect hedging or transaction costs, credit considerations, market liquidity or bid-offer spreads***.

PS-39 (emphasis added); *see* PS-22 (**"The Intraday Indicative Value . . . [is] not the same as the closing price or any other trading price of the ETNs in the secondary market."**) (emphasis in original).

The Pricing Supplement cautioned that the calculation of the Intraday Indicative Value necessarily depended on the availability (or lack thereof) of data from third parties relating to the value of the underlying Index:

> Published underlying Index levels from the Index Sponsor[4] may occasionally be subject to ***delay or postponement***. Any such delays or postponements will affect the current underlying Index level and therefore the Intraday Indicative Value of your ETNs. ***The actual trading price of the ETNs of any series may be different from their Intraday Indicative Value.***

PS-39 (emphasis added).   The Pricing Supplement also warned that JIC does not "guarantee[] the accuracy and/or the completeness of . . .  any calculations made with respect to [XIV]." PS-49.

## C.    Plaintiffs' Claims Against the Janus Defendants

Plaintiffs allege that they purchased XIV ETNs during the one-week class period of January 29, 2018, through February 5, 2018.   Compl. ¶¶ 23-27.   The primary allegations pertaining to the Janus Defendants focus on JIC's role as one of the Calculation Agents for the XIV ETNs.  In this role, JIC calculated and published the indicative value of the XIV ETNs.  The Complaint alleges that the Calculation Agents misstated the published Intraday Indicative Value of the XIV ETNs by failing to update it for a one-hour period between 4:09 p.m. and 5:09 p.m. on February 5, 2018.  Compl. ¶ 191.  However, as discussed, disclosures in the Offering Documents warned that the Intraday Indicative Value is calculated using third-party data that could be either delayed or inaccurate, which could impact the published indicative value of the XIV ETNs.  PS-39, -49.  The Plaintiffs allege, in conclusory fashion, that the Intraday Indicative Value during that one-hour period "no longer represent[ed] the actual current value of the Intraday Indicative Value." Compl. ¶ 176.   Critically, and fatally, they do not claim that during the one-hour period, the

---

[4]    *I.e*., S&P. PS-8.

Indicative Value was not faithful to the underlying value of the VIX Futures Index, which, as investors were told, was the driver of the Intraday Indicative Value.

The Complaint asserts five of its eight counts against at least one of the Janus entities:  violation of (i) Section 10(b) of the Exchange Act against Janus Henderson and JIC; (ii) Section 20(a) of the Exchange Act against Janus Henderson; (iii) Section 9(a)(4) of the Exchange Act against Janus Henderson and JIC; (iv) Section 9(f) of the Exchange Act against Janus Henderson, JIC and JHD; and (v) Section 15 of the Securities Act against Janus Henderson.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff's factual allegations must be sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 547 (2007).  While a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, this requirement does not apply to "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).  Nor must a court accept as true allegations in a complaint that contradict or are inconsistent with judicially-noticed facts. *See In re Yukos Oil Co. Sec. Litig.,* 2006 WL 3026024, at *12 (S.D.N.Y. Oct. 25, 2006).[5]

---

[5]   A court may consider documents attached to a motion to dismiss without converting it to a motion for summary judgment where the attached documents are central to the plaintiff's claim and their authenticity is not challenged. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007).  So too may a court consider "public disclosure documents required by law to be, and that have been, filed with the SEC," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000), such as the Offering Documents in this case.

## POINT I
## THE COMPLAINT FAILS TO STATE A CLAIM AGAINST
## JIC OR JANUS HENDERSON FOR SECURITIES FRAUD

The Complaint fails to adequately allege a claim for a violation of Section 10(b).

To state a claim under Section 10(b), a plaintiff must allege "(1) a material misrepresentation or

omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or

omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or

omission; (5) economic loss; and (6) loss causation." *Stoneridge,* 552 U.S. at 157.  In addition to

Rule 9(b)'s requirement that fraud be pleaded with particularity, securities fraud cases must

comply with the PSLRA.  *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 110 (2d

Cir. 2009).  Motivated by Congress's concerns over "abusive litigation," the PSLRA imposes

"[e]xacting pleading requirements."  *Tellabs*, 551 U.S. at 313, 321.  Under that framework, a

securities fraud plaintiff "must do more" than merely raise a plausible claim for relief that would

satisfy *Twombly* and *Iqbal*.  *See S. Cherry St.*, 573 F.3d at 110.  A plaintiff alleging that a defendant

made a false or misleading statement must, under the PSLRA, "specify each statement" and

identify "the reason or reasons why the statement is misleading." *ATSI,* 493 F.3d at 99 (quoting 15

U.S.C. § 78u-4(b)(1)).  Allegations of scienter are subject to a particularly stringent pleading bar:

they must raise a "strong inference" of wrongdoing that is "at least as compelling as any opposing

inference." *Id.*

A.      <u>The Named Plaintiffs Lack Standing To Assert Their Section 10(b) Claim</u>

As a threshold matter, the Complaint fails to plead facts adequate to establish that

any of the named Plaintiffs have standing to raise the Section 10(b) claim they have pleaded against

JIC and Janus Henderson.  That claim, as mentioned, alleges that JIC and Janus Henderson

reported a false or misleading Intraday Indicative Value for the Notes between 4:09 p.m. and 5:09

p.m. on February 5, 2018. *See* Compl. ¶¶ 174-90.  But while the Complaint alleges that unnamed

and unidentified "investors" bought "hundreds of millions worth of XIV notes" in reliance upon the allegedly misstated Intraday Indicative Value during that hour-long period, Compl. ¶¶ 177, 180, it does not allege that any of the five named Plaintiffs were among them.  Instead, the Complaint alleges only that each of the five named Plaintiffs purchased Notes "during the Class Period"—a seven-day period from January 29 to February 5, 2018.  *See* Compl. ¶¶ 23-27 (containing lead plaintiff allegations); Compl. at 1 (defining the "Class Period").

It is well-established that the private right of action conferred by Section 10(b) and Rule 10b-5 "is limited to purchasers and sellers." *Blue Chip Stamps*, 421 U.S. at 731.  This limitation bars claims by both "nonpurchasers"—that is, "potential purchasers" claiming that a misrepresentation "caused them to allow retrospectively golden opportunities to pass"—and "nonsellers"—that is, "actual shareholders . . . who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material." *Id.* at 737-38, 747 & 738 n.9.  Section 10(b) and Rule 10b-5, therefore, offer no relief for claims "brought by holders instead of purchasers or sellers," *Dabit II*, 547 U.S. at 87-89, including claims alleging that a defendant's misstatements "induced retention or delayed sales." *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* ("*Dabit I*"), 395 F.3d 25, 38 (2d Cir. 2005), *vacated on other grounds*, 547 U.S. 71 (2006).

Under the rule of *Blue Chip Stamps*, Plaintiffs lack standing to challenge any alleged misstatement of the Intraday Indicative Value made between 4:09 p.m. and 5:09 p.m. on February 5 unless "they . . . themselves" were "purchasers or sellers of the securities" "during the period of allegedly fraudulent conduct." *Dabit I*, 395 F.3d at 37.  But the named Plaintiffs have alleged only that they acquired Notes at some unspecified time during a seven-day period, and it is their burden to "allege facts that affirmatively and plausibly suggest that [they have] standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam).

For this reason alone, Plaintiffs' claim against Janus Henderson and JIC under Section 10(b) and Rule 10b-5 should be dismissed.

**B.      The Complaint Does Not Assert Any Allegation Of Wrongdoing Against The Janus Defendants With Respect To Credit Suisse's Alleged Hedging Activities Or Acceleration Of The XIV ETNs**

Plaintiffs center their theory of wrongdoing around Credit Suisse's allegedly undisclosed hedging activities.  For example, Plaintiffs allege that Credit Suisse relied on its hedging activity in the futures underlying the VIX futures market to create a liquidity squeeze that would drive up the value of VIX futures while destroying the value of the XIV ETNs.  Compl. ¶¶ 162, 218, 305.  Plaintiffs also point to the profits earned by Credit Suisse from its hedging activities as creating a financial incentive for engaging in the alleged fraud.  *E.g.*, Compl. ¶ 166.  None of these allegations involved any of the Janus Defendants, nor could they, as Plaintiffs do not allege any of the Janus Defendants traded in the underlying VIX futures.

Similarly, the Complaint frequently points to Credit Suisse's decision to call an Acceleration Event on February 6, 2018, which had the effect of redeeming the XIV ETNs.  According to Plaintiffs, this was a preordained decision designed to pay investors pennies on the dollar while Credit Suisse made a windfall.   Compl. ¶¶ 7, 18, 166, 201-02, 209.   Again, without commenting on the adequacy of Plaintiffs' pleading with respect to this theory, the Janus Defendants are completely absent from any of the Complaint's Acceleration Event-related allegations.

**C.      The Complaint Does Not Adequately Plead Scienter As To Janus Henderson Or JIC**

As to the Janus Defendants' publication of the Intraday Indicative Value, the Complaint does not come close to pleading that Janus Henderson or JIC acted with fraudulent intent, as required for Plaintiffs' Section 10(b) claim.  The PSLRA requires a "strong inference"

of scienter, which means that the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314.  To overcome that bar, a plaintiff must plead, with particularity, either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Jt. Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  To raise a strong inference of scienter through motive and opportunity to defraud, Plaintiffs must allege that Janus Henderson or JIC "benefitted in some concrete and personal way from the purported fraud." *Id.* (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).  Alternatively, if Plaintiffs seek to establish scienter through allegations of conscious misbehavior or recklessness, "the strength of those circumstantial allegations must be correspondingly greater."  *Id.* at 199.  The Second Circuit has explained that conscious misbehavior generally consists of deliberate, illegal behavior.  *Novak*, 216 F.3d at 308.

The Complaint does not adequately allege conscious misbehavior or recklessness by Janus Henderson or JIC sufficient to satisfy the scienter requirement.  Instead, it improperly relies on generic conclusions that Janus Henderson and JIC "knew or recklessly disregarded" that the Intraday Indicative Value was false or misleading during the one hour period in question.  *See* Compl. ¶ 229; *id.* ¶ 233 ("Janus knew or recklessly disregarded the falsity or misleading nature of the Flatline Value").  When a plaintiff contends that defendants had access to contrary facts, it "must specifically identify the reports or statements containing this information." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *see also SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*, 2010 WL 2473595, at *10 (S.D.N.Y. June 17, 2010) ("It is not sufficient for Plaintiff to contend that the . . . Defendants (must have) had access to contrary facts."), *aff'd*, 448 F. App'x 116 (2d Cir. 2011) (summary order).

Here, Plaintiffs correctly acknowledge that in order to calculate the Intraday Indicative Value, JIC relied on the values of the VIX Futures Index, Compl. ¶ 140, and that those values were calculated by S&P and published by Bloomberg in real time, Compl. ¶ 141. They do not, however, allege that JIC or Janus Henderson recklessly disregarded any change in that underlying data in calculating the Intraday Indicative Value. *See Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299-300 (S.D.N.Y. 2010) (recognizing that a plaintiff must "provide specific instances in which [a defendant] received information that was contrary to [its] public declarations" and "specifically identif[y]" the reports or statements where that information was located).

Plaintiffs further allege that JIC, as a Calculation Agent, knew the Intraday Indicative Value was false or misleading because it had access to the inputs underlying the calculation. Compl. ¶¶ 229-33. These allegations fail to allege any facts specifying how JIC knew the Intraday Indicative Value, or its underlying inputs, were false. *See Plumbers & Steamfitters Local* 773, 694 F. Supp. 2d at 300 (observing that a "broad reference to raw data" the defendant could have accessed that would have contradicted the defendant's public statements will not do). At most, Plaintiffs are asserting that JIC *should have known* that the Intraday Indicative Value was false during the time period from 4:09:48 p.m. until 5:09:05 p.m. *Id.* This is insufficient to state a claim under the PSLRA or Rule 9(b). *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014) (dismissing Section 10(b) claim because allegations that defendant "ought to have known" are not sufficient to allege recklessness), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) (summary order). In any event, the Offering Documents carefully disclosed that the Intraday Indicative Value was dependent upon "[p]ublished underlying Index values from the Index Sponsor [i.e., S&P]" and that "[a]ny . . . delays or postponements" in that underlying data "will affect the . . . Intraday Indicative Value." PS-39, and the Complaint is devoid of any allegations suggesting that the

Intraday Indicative Value was false in relation to that underlying information.  Nor could Plaintiffs

offer such allegations, given that JIC is not to alleged to have had any information contradicting

the accuracy of data provided by those sources.[6]

            In addition, Plaintiffs cannot establish scienter through allegations of motive and

opportunity by JIC or Janus Henderson to defraud investors.  Plaintiffs weakly assert that JHD, an

affiliate of JIC and Janus Henderson, earned a "daily investor fee" for the marketing and placement

of XIV ETNs.  Compl. ¶¶ 58-59.  But it is well-settled that the motivation to earn fees does not

serve as a basis for inferring scienter.  *See, e.g.*, *Alki Partners LP v. Windhorst*, 472 F. App'x 7,

10 (2d Cir. 2010) (summary order) (granting motion to dismiss); *In re Lululemon*, 14 F. Supp. 3d

at 573 (recognizing that ordinary corporate profit motives do not suffice to allege scienter).

Plaintiffs' reference to this fee is exactly the kind of generalized profit seeking motive that is

repeatedly rejected as a basis to plead scienter.  *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416,

429 (S.D.N.Y. 2010) (rejecting an allegation that defendants were motivated to earn more money

by charging fees as a basis for pleading scienter); *In re Citigroup Auction Rate Sec. Litig.*, 700 F.

Supp. 2d 294, 305 (S.D.N.Y. 2009) (observing that "[c]ourts have repeatedly rejected conclusory

allegations regarding the motivation to earn unspecified fees as a basis for inferring scienter").

Moreover, the Complaint is devoid of allegations that their "daily investor fee" actually increased

due to the Janus Defendants' alleged misconduct.  In fact, it pleads the opposite.  The Complaint

states that if XIV "increased in value, Credit Suisse and Janus collected a commensurately larger

---

[6]   As discussed in greater detail under Point I(D), there are absolutely no facts pleaded in support
of Plaintiffs' contention that JIC made an affirmative decision not to update the Intraday Indicative
Value.  Conclusory allegations unadorned by particular facts are insufficient to plead scienter.
*See Silsby v. Icahn*, 17 F. Supp. 3d 348, 367 (S.D.N.Y. 2014) (finding scienter allegations
inadequate where "plaintiffs have pleaded no facts in support of . . . conclusory allegation[s]"),
*aff'd*, 616 F. App'x 448 (2d Cir. 2015) (summary order).

daily fee," Compl. ¶ 59, and then acknowledges that on February 5, 2018, the value of XIV plummeted, Compl. ¶ 167.

In any event, Plaintiffs' allegation that JIC or Janus Henderson knowingly failed to update the Intraday Indicative Value from 4:09:48 p.m. until 5:09:05 p.m. is undercut by a far more plausible alternative explanation of non-fraudulent intent. *See Tellabs*, 551 U.S. at 328 (explaining that the inference of scienter must be "at least as likely as any plausible opposing inference") (emphasis omitted). Neither JIC nor Janus Henderson was responsible for the inputs used to compute the Intraday Indicative Value. As the Offering Documents explained, the Intraday Indicative Value was derived from the VIX Futures Index. PS-16. The VIX Futures Index was calculated by S&P, and JIC had no control over the movement or calculation of the VIX Futures Index. PS-32, -33, -36. As Plaintiffs were warned, "[p]ublished underlying Index levels from the Index Sponsor may occasionally be subject to delay or postponement. Any such delays or postponements will affect the current underlying Index level and therefore the Intraday Indicative Value of your ETNs." PS-39. The disclosures further cautioned that JIC does not "guarantee[] the accuracy and/or the completeness of . . . any calculations made with respect to [XIV]." PS-49. Following an unprecedented market disruption, these risks outlined in the Offering Documents materialized. Courts in the Second Circuit have routinely cast a skeptical eye on claims that investment losses suffered as part of a systemic event were attributable to fraud. *See, e.g.*, *SRM Glob. Fund*, 2010 WL 2473595, at *10 (concluding that allegations of fraud arising out of market-wide events, founded on hindsight, were not as compelling as benign explanations); *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 596 (S.D.N.Y. 2010) (concluding that a more compelling inference than fraud was that the plaintiffs had a "fundamental misunderstanding and underestimate of the true risks" of their investments in complex instruments, which left them

vulnerable to a systemic market event).  This Court should apply the same reasoning here to reject Plaintiffs' hindsight pleading.

The Section 10(b) claim against Janus Henderson and JIC fails for the additional and independent reason that Plaintiffs make no attempt to meet the rigorous standards for pleading scienter for these corporations.  Because corporations have no state of mind of their own, "[w]hen the defendant is a corporate entity . . . the pleaded facts must create a strong inference that *someone* whose intent could be imputed to the corporation acted with the requisite scienter." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 160 (S.D.N.Y. 2015) (quoting *Dynex*, 531 F.3d at 195) (emphasis added).  "Generally, a plaintiff can raise an inference of corporate scienter by establishing scienter on behalf of an employee who acted within the scope of his employment." *Vining v. Oppenheimer Holdings Inc.*, 2010 WL 3825722, at *12 (S.D.N.Y. Sept. 29, 2010).  No employee of Janus Henderson or JIC has been identified by the Plaintiffs in the Complaint.  Alternatively, "[a] strong inference of corporate scienter may also be appropriate 'where a corporate statement is so important and dramatic that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false."'" *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 384 (E.D.N.Y. 2013).  Plaintiffs' conclusory allegations that two entities, JIC and Janus Henderson, were "intimately aware of all aspects of XIV," Compl. ¶ 231, does not remotely satisfy the requirement to show that the publication of the Intraday Indicative Value was sufficiently important as to warrant an inference of scienter.  "Absent specific facts detailing the alleged [actions of unnamed employees], there is no basis on which to impute scienter to the corporate entity." *Vining,* 2010 WL 3825722 at *13.

**D.      Plaintiffs Have Not Adequately Alleged A Material Misstatement by JIC or Janus Henderson**

Plaintiffs point to a single set of supposedly false or misleading statements made by JIC:  the Intraday Indicative Value of the XIV ETNs that was reported between 4:09 p.m and 5:09 p.m. on February 5, 2018.  *See* Compl. ¶ 176.  That Value, which they refer to as the "Flatline Value," was false or misleading, they say, because during that one-hour window, the Value "no longer represent[ed] the actual current value of the Intraday Indicative Value." *Id.*  The Plaintiffs do not explain what they mean by the "actual current value" of the Intraday Indicative Value or how that value differed from the reported Intraday Indicative Value, but the thrust of their allegations is that the Intraday Indicative Value was false because it did not reflect "the true economic value" or the "market price" of the XIV ETNs.  Compl. ¶¶ 171-73, 180.

The fly in the ointment for Plaintiffs is that the Offering Documents expressly disclosed that the Intraday Indicative Value was never intended to equate to the "true economic value" of the XIV ETNs.  As the Plaintiffs recognize in their Complaint, the Intraday Indicative Value was not directly tied to the Notes' fundamental value, but rather was a figure derived "from a pre-defined formula utilizing the values of . . . the underlying [S&P VIX Futures] index," Compl. ¶ 140, which, at best, represented an "approximat[ion] [of] the economic value of . . . [the] ETNs at a given time," Compl. ¶ 221. "The Intraday Indicative Value . . . [was] not," the Pricing Supplement carefully explained, "the same as the closing price or any other trading price of the ETNs in the secondary market." PS-22.  Because the Intraday Indicative Value was formulaically driven by the reported value of the S&P VIX Futures Index, investors were cautioned that any "delays or postponements" in the VIX Futures Index would necessarily "affect the current underlying Index level and therefore the Intraday Indicative Value of [the] ETNs." PS-39.  That,

in turn, meant that "[t]he actual trading price of the ETNs of any series may be different from their Intraday Indicative Value." *Id.*

Because the Intraday Indicative Value was, by definition, not directly tied to the economic value of the Notes, the fact that the two allegedly diverged during the one-hour period in question raises no inference that it was false or misleading. For Plaintiffs to demonstrate that the Intraday Indicative Value was false or misleading, the Complaint would have to allege, with particularity, a plausible basis to conclude that the Intraday Indicative Value diverged not from the "true economic value" of the Notes, but from the reported value of the underlying S&P VIX Futures Index from which the Intraday Indicative Value was formulaically derived (and, moreover, that the divergence was not a mere technical error, but was the result of some person at Janus acting with the requisite scienter).[7]

Not only have the Plaintiffs failed to make those essential allegations, but publicly-available reported values of the underlying VIX Futures Index reveal that during the one-hour period in question, the Intraday Indicative Value moved in the manner investors were told it would move: with the VIX Futures Index.[8] For example, Plaintiffs' claim that JIC "failed to update" the Intraday Indicative Value between 4:09:48 p.m. and 4:12:33 p.m. (resulting in what they, as mentioned, call a "Flatline Value"), but publicly-available information reveals that the Intraday Indicative Value remained constant not because JIC was not updating it, but because the underlying VIX Futures Index—the driver of the Intraday Indicative Value—was itself constant:[9]

---

[7]   *See supra* Point I(C) (discussing the requirements to adequately plead corporate scienter).

[8]   *See Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000) ("[T]he district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.").

[9]   The data in these charts can be found in Exhibits 2 and 3 to the Halper Declaration.

| VIX Futures Index | | XIVIV | |
|---|---|---|---|
| Timestamp | Level | Timestamp | Level |
| 2/5/2018 4:10:02 PM | 86.51 | 2/5/2018 4:10:03 PM | $27.0855 |
| 2/5/2018 4:10:17 PM | 86.51 | 2/5/2018 4:10:17 PM | $27.0855 |
| 2/5/2018 4:10:32 PM | 86.51 | 2/5/2018 4:10:32 PM | $27.0855 |

The Plaintiffs further claim that JIC failed to update the Intraday Indicative Value at all between 4:38:34 p.m. and 5:09:04 p.m.—despite, they say, JIC knowing that the Notes "true economic value" during that time "was already between $4.22 and $4.40." Compl. ¶¶ 174, 180. According to the Plaintiffs, JIC did not "finally update[] [the Value] to $4.2217" until 5:09:05 p.m. *Id.* But the publicly-available data shows that the reason the Intraday Indicative Value fell to $4.2217 at 5:09 p.m. was not because JIC "finally updated" the Value to the amount it should have been all along, but because that is when the underlying VIX Futures Index suddenly spiked upward, driving the Intraday Indicative Value, correspondingly, down:

| VIX Futures Index | | XIVIV | |
|---|---|---|---|
| Timestamp | Level | Timestamp | Level |
| 2/5/2018 5:08:49 PM | 87.60 | 2/5/2018 5:08:50 PM | $24.6961 |
| 2/5/2018 5:09:04 PM | 96.94 | 2/5/2018 5:09:05 PM | $4.2217 |

Thus, not only have Plaintiffs' failed to make any allegations that the Intraday Indicative Value diverged from the underlying VIX Futures Index during the one-hour period in question, but publicly-available information shows that it did not. Plaintiffs thus have not, and cannot, allege a plausible basis to conclude that the Intraday Indicative Value that JIC published was false or misleading.

**E.**     **Plaintiffs Have Not Sufficiently Alleged Loss Causation**

As explained in the Credit Suisse Memorandum, the Plaintiffs' securities fraud claims against Janus Henderson and JIC fail for another, independent reason: they have failed to adequately allege loss causation. *See* Credit Suisse Memorandum, Section III. Essential to the

viability of a claim under either Section 10(b) or Section 9(a)(4) is that the plaintiff "allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered . . . *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173 (emphasis omitted); *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 80 (S.D.N.Y. 2015) ("[W]hether the claims arise out of Section 10(b) and Rule 10b-5 or Section 9(a) . . . [the plaintiff] must 'adequately allege and prove the traditional elements of causation and loss.'").

When, as here, a plaintiff's loss "coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases." *Lentell*, 396 F.3d at 174 (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)).  Thus, for Plaintiffs' claims to be viable, they must "plead facts which, if proven, would show that [their] loss was caused by the alleged misstatements as opposed to intervening events." *Id.*

Plaintiffs' theory of causation is that "investors took the Flatline Value as a sign of the relative strength of XIV and bought XIV notes at drastically inflated prices" during that period. Compl. ¶ 177.  They allege, in other words, that during that period, "an average investor reasonably relied upon the Intraday Indicative Value to guide the investor's trading decisions," Compl. ¶ 179, and because the Intraday Indicative Value was diverging from the "true economic value" of the Notes during that period, investors were "purchasing XIV at massively inflated values based on materially misleading XIVIV values which were not being updated in real time," Compl. ¶¶ 180, 187.

The problem for Plaintiffs is two-fold.  First, as discussed, investors were warned that the Intraday Indicative Value was "not intended as a price or quotation," PS-39, and was "not the same as the . . . trading price of the ETNs in the secondary market." PS-22.  Because the

Intraday Indicative Value was not intended to capture the XIV ETN's market value, investors were, as the Plaintiffs acknowledge, advised that "[b]efore trading in the secondary market, you should compare the Closing Indicative Value and Intraday Indicative Value with the then-prevailing trading price of the ETNs." Compl. ¶ 182.  And one of the primary reasons investors were cautioned not to rely on the Intraday Indicative Value as a substitute for a secondary market quotation was that it was "possible that the ETNs will trade in the secondary market at a discount below the Intraday Indicative Value." PS Cover at 8.   These disclosures alone undercut the Plaintiffs' allegation that their losses were caused by the fact that they "reasonably relied upon the Intraday Indicative Value" as the measure of the Notes' economic value instead of the Notes' actual trading price in the secondary market.

Second, Plaintiffs' allegations of loss causation conflict with their own market data. In their Complaint, Plaintiffs present a series of charts comparing the price of the Notes in the secondary market to the Intraday Indicative Value before, during, and after the one-hour period during which, Plaintiffs allege, the Intraday Indicative Value constituted a false "Flatline Value." *See* Compl. ¶¶ 172, 184.  The charts show that at 4:09 p.m.—the start of the one-hour period, and the start of when, Plaintiffs claim, JIC stopped updating the Intraday Indicative Value—the trading price of the Notes began to fall, and by the second half of the hour, the price of the Notes had settled into a steady, largely linear rate of decline.  At 5:09 p.m.—the time when, Plaintiffs claim, "the Calculation Agents finally updated" the Intraday Indicative Value from approximately $24 per share to approximately $4 per share, Compl. ¶ 190—the market did not respond to that large swing, as the Plaintiffs' theory would suggest, with a sudden drop.  Instead, the trading price of the Notes continued unfazed on the same, steady rate of decline it had been following over the prior half-hour.

Plaintiffs bear the burden of setting forth plausible allegations that when the alleged hour-long misstatement of Intraday Indicative Value was finally "disclosed, [it] negatively affected the value of the security," *Lentell*, 396 F.3d at 173, but their own market data makes implausible any inference that it did. *See Catton v. Def. Tech. Sys., Inc.*, 2006 WL 27470, at *10 (S.D.N.Y. Jan. 3, 2006) (finding that a complaint failed to plead loss causation because it failed to suggest that "the stock price went up after misstatements and went down after disclosures" or that "the stock price dropped significantly" after any of the alleged disclosures of prior misstatements). To be sure, the Second Circuit has observed that when a "loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a matter of proof at trial," *Lentell*, 396 F.3d at 174 (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)), but as the court went on to recognize, "'when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases,' and a plaintiff's claim fails when 'it has not adequately ple[d] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events,'" *id.* at 174 (quoting *First Nationwide*, 27 F.3d at 772)). *See also In re Merrill Lynch & Co. Res. Rpts. Sec. Litig.*, 289 F. Supp. 2d 416, 422 (S.D.N.Y. 2003) (explaining that a plaintiff's claim cannot survive dismissal if it does not plausibly allege a "second reason," separate from a marketwide downturn, that links an alleged misrepresentation to a decline in value). That is precisely the case here. Plaintiffs' market data belies any inference that the disclosure, at 5:09 p.m., of what they deem the "true Intraday Indicative Value," Compl. ¶ 187, had any material impact on the market, and the only other allegations they make to link the two together are references to two changes in the Notes' market price *before* 5:09 p.m., and one price quote at 6:28 p.m., more than an hour after the supposed corrective disclosure. Compl. ¶ 192. Taken together, the Complaint does not plausibly allege a

causal link between JIC's alleged misstatements and the trading losses that the Plaintiffs (and other investors) suffered that day.

**F.**   **Plaintiffs Have Not Adequately Alleged Their Control Person Claim**

Plaintiffs claim that if JIC is liable for its role as a Calculation Agent, so too is Janus Henderson, JIC's parent.  They rely on Section 20(a) of the Exchange Act, which creates liability for "controlling persons" of Securities Act violators.  To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *In re Deutsche Bank* 2017 WL 4049253, at \*9 (quoting *ATSI*, 493 F.3d at 98).  Where, as here, the primary securities law claim fails, courts likewise dismiss claims for Section 20(a) liability. *Id.*

Even if the alleged securities law violations were viable, Plaintiffs have not adequately alleged any basis to impose controlling person liability on Janus Henderson.  Their Section 20(a) claim, set forth in a single sentence, alleges that Janus Henderson, "[b]y reason of [its] ownership of . . . JIC and [its] culpable participation," "had the power and authority to cause . . . JIC to engage in the wrongful conduct" Compl. ¶ 283.  But other than that conclusory reference (a quintessential example of a "legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555), there is a total absence of any particularized allegations to suggest that Janus Henderson "was, in some meaningful sense, a culpable participant" in JIC's supposed fraud.

Plaintiffs assert, in passing, that the allegedly false Intraday Indicative Value for the one-hour period in question was reported jointly by "Credit Suisse, Janus, [CSI], and JIC." Compl. ¶ 187.  But they acknowledge elsewhere in their Complaint that "Credit Suisse relied on . . . [CSI] and JIC" as Co-Calculation Agents to generate the Intraday Indicative Value, Compl. ¶¶ 126-35, and they offer no allegations that would plausibly suggest any involvement in

that calculation by Janus Henderson.  They also claim that "Janus [Henderson], by owning and controlling JIC, was in possession of real-time information concerning the inputs necessary to compute the Intraday Indicative Value." Compl. ¶ 233.   But a mere allegation that Janus Henderson owned and controlled JIC (and therefore theoretically had access to information available to JIC) does not plausibly allege that Janus Henderson was a "culpable participant" in JIC's alleged fraud.  *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 460-61 (S.D.N.Y. 2018) (recognizing that a defendant's "status as a corporate parent . . . says nothing regarding the control [it] actually exerts over" the subsidiary's wrongful behavior and that an allegation that a parent "had the power and authority to cause [the subsidiary] to engage in the wrongful conduct" is "nothing more than a conclusory allegation of control and is insufficient to state a Section 20(a) claim").

Plaintiffs' allegations, then, fall well short of the requisite "particularized facts of the controlling person's conscious misbehavior or recklessness." *In re Longwei Petrol. Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *7 (S.D.N.Y. Jan. 27, 2014).

## POINT II
## PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED THEIR CLAIM FOR VIOLATION OF SECTION 15 BY JANUS HENDERSON

Plaintiffs' claim for violation of Section 15 of the Securities Act against Janus Henderson must be dismissed as a matter of law.   To establish Section 15 liability, Plaintiffs "must show a 'primary violation' of § 11 and control of the primary violator" by Janus Henderson. *Wyo. State Treasurer v. Moody's Inv'rs Serv., Inc.* (*In re Lehman Bros. Mort.-Backed Sec. Litig.*), 650 F.3d 167, 185 (2d Cir. 2011).  The statute defines control persons as those "who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or

understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable" for primary violations of Sections 11.  15 U.S.C. § 77*o*(a).

Section 15 claims are required to satisfy Rule 9(b)'s particularity standard where, as here, the complaint is grounded in fraud.  *See In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 690 (S.D.N.Y. 2000).  Plaintiffs' generic disclaimer of fraud is insufficient to skirt the requirements of Rule 9(b).  Compl. ¶¶ 294-95.  By "merely disavowing any allegations that would make Rule 9(b) applicable to [their] Securities Act claims," Plaintiffs' boilerplate disclaimer is not enough to prevent Rule 9(b) from applying where the Complaint sounds in fraud.  *Ultrafem*, 91 F. Supp. 2d at 690-91 (applying Rule 9(b) pleading standard to evaluate Section 15 claim).  For example, the Complaint asserts that Janus Henderson "as owner and controlling entity of JIC . . . *knew or recklessly disregarded* the *falsity* or *misleading* nature of the Flatline Value." Compl. ¶ 233 (emphasis added); *see Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (characterizing allegations "that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue* statements of material facts;' and that 'materially *false* and *misleading* written statements' were issued" to be "wording and imputations … classically associated with fraud"). Despite grounding their allegations of control in knowledge or recklessness, Plaintiffs have not pleaded any of the elements of Section 15 against Janus Henderson in accordance with the heightened particularity demanded by Rule 9(b).

First, as explained in the Credit Suisse Memorandum, Plaintiffs have not shown a primary violation of Section 11 of the Securities Act.  *See* Credit Suisse Memorandum, Section 1(A)-(B).  On this basis alone, their Section 15 claim against Janus Henderson fails.  Second, Plaintiffs have not adequately alleged that Janus Henderson controlled the primary alleged violator—the Credit Suisse Defendants—which are completely separate companies that are not

alleged to have any common ownership with Janus Henderson.[10]  Control has been defined as "the power to direct or cause the direction of the management and policies of the primary violators, whether through the ownership of voting securities, by contract, or otherwise." *In re Lehman*, 650 F.3d at 185 (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)).  The power to influence is not the same as the power to direct the management and policies of the primary violators.  *See Fezzani v. Bear, Stearns & Co.,* 384 F. Supp. 2d 618, 646 n.10 (S.D.N.Y. 2004).  Instead, courts have held that "actual control" is essential to control person liability.  *Id.*

Here, there are no allegations that Janus Henderson controlled the Credit Suisse Defendants by owning voting securities or contract.  Plaintiffs instead rely on allegations that Janus Henderson "own[ed] and control[ed] JIC and JHD."  Compl. ¶ 298; *see id.* ¶¶ 231, 233.  But that allegation is irrelevant to the Credit Suisse Defendants and clearly insufficient to establish that Janus Henderson controls the Credit Suisse Defendants.  *See* 15 U.S.C. § 77o(a).

Plaintiffs assert that Janus Henderson's ownership and control over JIC and JHD somehow gave Janus Henderson control over XIV, including the right to cause Credit Suisse to accelerate the redemption of the XIV ETNs.  Compl. ¶ 60; *see id.* ¶ 319.  But the Pricing Supplement explains that the ability to determine whether certain events have occurred which in turn allow Credit Suisse to accelerate the redemption of the XIV ETNs lies with JIC or Credit Suisse International as Calculation Agents,[11] and there is no mention of Janus Henderson's involvement, much less control, over this decision.  PS-49.  Nor does the Complaint offer any factual allegations suggesting Janus Henderson had any involvement (let alone controlled) the

---

[10]   The Credit Suisse Defendants refers to Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam and David R. Mathers.

[11]   The Pricing Supplement explains that the Calculation Agents are tasked with determining whether certain events occurred which in turn gives rise to Credit Suisse's option or obligation to acceleration redemption.

acceleration decision.  *See Fezzani*, 384 F. Supp. 2d at 646 n.10 ("Plaintiffs[ ] seek to hold [defendant] responsible based on tertiary liability—his control of Bear Stearns, which in turn allegedly controlled [broker dealer] Baron.  Plaintiffs[ ] cannot stretch the concept of control liability so far."); *DoubleLine,* 323 F. Supp. 3d at 460 (explaining that a Section 15 defendant's status as a corporate parent "says nothing regarding the control that OEC actually exerts over [the subsidiary]").[12]

For all these reasons, the Section 15 claim against Janus Henderson should be dismissed.

## POINT III
## PLAINTIFFS HAVE NOT SUFFICIENTLY ALLEGED THEIR CLAIMS FOR VIOLATION OF SECTIONS 9(a)(4) OR 9(f)

Plaintiffs' claim for violation of Section 9(a)(4) of the Exchange Act asserted against Janus Henderson and JIC should be dismissed for failure to state a claim.  As a threshold matter, Section 9(a)(4) applies only to broker dealers or those entities that offer or sell securities.  15 U.S.C. § 78i(a)(4).  Neither Janus Henderson or JIC fit this criteria.  In addition, the Section 9(a)(4) claim should be dismissed for the additional reason that it "closely parallels Section 10(b)." *Salvani*, 50 F. Supp. 3d at 476.  Accordingly, Plaintiffs' failure to plead an actionable claim pursuant to Section 10(b) (*see supra* Point I) is fatal to their Section 9 claims. *See Salvani*, 50 F. Supp. 3d at 477 ("Because the Court has already concluded that Plaintiffs failed to plead

---

[12]   District courts in this Circuit have held that Section 15 claims also include a third prong: "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Dimensional Emerging Mkts. Value Fund v. Petróleo Brasileiro S.A.-Petrobras* (*In re Petrobras Sec. Litig.*), 152 F. Supp. 3d 186, 197 (S.D.N.Y. 2016); *see In re Am. Realty Cap. Props., Inc. Litig.,* 2015 WL 6869337, at *4 (S.D.N.Y. Nov. 6, 2015) (noting that several district courts have held the culpable participation requirement applies to Section 15 claims); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 368 (S.D.N.Y. 2012)*.*  Plaintiffs' failure to allege Janus Henderson was a culpable participant in the Credit Suisse Defendants' alleged fraud is another basis for dismissing the Section 15 claim.

reliance under either the direct reliance approach or the fraud on the market approach, Plaintiffs' Section 9(a)(4) claim necessarily fails."); *Panfil* v. *ACC Corp.*, 768 F. Supp. 54, 59 (W.D.N.Y. 1991) ("Given the parallel requirements of these statutes, plaintiff's failure to show the omission of a material fact under rule 10b-5 . . . also defeats his claim under § 9(a)(4)."), *aff'd*, 952 F.2d 394 (2d Cir. 1991); *Stark Trading & Shepherd Inv. Int'l v. Falconbridge Ltd.*, 2008 WL 153542, at *15-16 (E.D. Wis. Jan. 14, 2008) ("The court finds that the plaintiffs' § 9(a) claims must fail for many of the same reasons the plaintiffs' § 10(b) claims must fail."), *aff'd*, 552 F.3d 568 (7th Cir. 2009).

Likewise, their Section 9(f) claims must be dismissed because this section merely creates a private right of action for violations of Section 9(a), 15 U.S.C. § 78i(f), so the failure of their Section 9(a) claim compels dismissal of the Section 9(f) claim. Moreover, a defendant must have "willfully participate[d]" in a violation of Section 9 to be liable under Section 9(f). *I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 539 (S.D.N.Y. 2017). Here, as explained in connection with Point I(C), there are no allegations that any of the Janus Defendants acted with the requisite intent necessary to sustain a Section 9(a) claim, and therefore the Section 9(f) claim must fail as well. *See Cohen*, 722 F. Supp. 2d at 430.

## CONCLUSION

For the foregoing reasons, as well as those set forth in the Credit Suisse Memorandum, the Janus Defendants respectfully request that the Complaint be dismissed with prejudice.[13]

Dated:       November 2, 2018

Respectfully submitted,

By: /s/ *Jason M. Halper*
     Jason M. Halper

Jason M. Halper
Gillian Groarke Burns
Jared Stanisci
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
212-504-6000
Fax: 212-504-6000
jason.halper@cwt.com
gillian.burns@cwt.com
jared.stanisci@cwt.com

*Attorneys for Defendants Janus Henderson Group plc, Janus Index & Calculation Services LLC and Janus Distributors LLC d/b/a Janus Henderson Distributors*

---

[13] In light of the disclosures made to investors in the Offering Documents and the publicly-available data revealing the tandem movement of the Intraday Indicative Value with the underlying VIX Futures Index, Plaintiffs have not, and cannot, plausibly allege violations of Section 10(b) or (9)(a)(4) of the Exchange Act against the Janus Defendants, which bars both those claims and the claims under Sections 20(a) and 9(f) that rely upon them. Nor, for these same reasons, can Plaintiffs plausibly allege a violation of Section 11 of the Securities Act, which bars their controller claim against Janus Henderson under Section 15. And even if a Section 11 claim against the Credit Suisse Defendants were viable, Plaintiffs' theory of controller liability against Janus Henderson under Section 15 has no merit. Thus, any amendment to the Complaint would be futile, and the Plaintiffs' claims should be dismissed with prejudice. *See Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 92 (2d Cir. 2003).