# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SET CAPITAL LLC, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS, JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, and JANUS DISTRIBUTORS LLC d/b/a JANUS HENDERSON DISTRIBUTORS,<br><br>Defendants. | Case No.: 1:18-cv-02268-AT-SN |

# OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

TABLE OF CONTENTS

I.      Introduction .................................................................................................. 1

II.     Background .................................................................................................. 4
        A.      The XIV Notes ................................................................................ 4

        B.      The Credit Suisse Defendants Knew Their Hedging During Volatility
                Spikes Caused Liquidity Issues ...................................................... 4

        C.      The Credit Suisse Defendants Used Their Knowledge to Bet Against XIV ......... 5

        D.      Credit Suisse's Risk Reporting Mechanisms Informed the Individual
                Defendants of the Liquidity Risks and Plan to Profit ............................. 6

        E.      Credit Suisse and Janus Were Responsible for and Issued XIV's Intraday
                Indicative Value .............................................................................. 7

        F.      The Credit Suisse Defendants' Manipulative Scheme Succeeded,
                Steamrolling Over XIV Investors .................................................... 8

        G.      Defendants Compounded the Harm to Investors by Issuing Grossly False
                and Misleading Intraday Indicative Values ...................................... 9

        H.      The Credit Suisse Defendants Locked in Their Profits Through an
                Acceleration Event ......................................................................... 10

        I.      The Credit Suisse Defendants Attempt to Conceal Their Fraud ........... 11

        J.      Defendants' Additional False and Misleading Statements and Omissions ......... 12

III.    Legal Standard .......................................................................................... 13

IV.     Plaintiffs Adequately Allege Exchange Act Claims Under Section 10(b) and
        Section 9 ..................................................................................................... 13
        A.      The Credit Suisse Defendants Engaged in Manipulative Acts Under Rules
                10b-5(a) and (c) .............................................................................. 14

        B.      The Credit Suisse Defendants, Janus, and JIC Made Material
                Misstatements and Omissions Under Rule 10b-5(b) ........................... 18

                1.      Credit Suisse and Janus "Jointly" Made False and Misleading
                        Intraday Indicative Values ..................................................... 18

                2.      The Credit Suisse Defendants Warned of Potential "Risks" They
                        Knew Were Certain to Occur .................................................. 24

        C.      Plaintiffs Adequately Plead Section 9 Claims .................................. 29

                1.      Plaintiffs Adequately Allege that Defendants Violated Section
                        9(a)(4) ................................................................................ 29

                2.      Plaintiffs Adequately Plead that Defendants Violated Section 9(f)
                        by "Willfully Participating" in Violations of Section 9(a) ............ 31

D.    Defendants Acted With Scienter for Purposes of Each Exchange Act Claim .................................................................................................. 33

      1.    The Credit Suisse Defendants Had Motive and Opportunity to Defraud Investors ................................................................... 34

      2.    Plaintiffs Plead Strong Evidence of Conscious and Reckless Misconduct Against All Defendants ................................. 35

      3.    Plaintiffs Adequately Allege Corporate Scienter ..................................... 39

      4.    Defendants Cannot Avoid Liability by Blaming Market-Wide Forces .............................................................................. 40

E.    Plaintiffs Adequately Allege Loss Causation for Purposes of Each Exchange Act Claim ............................................................. 41

F.    Plaintiffs Have Standing for the Flatline Value Misrepresentations ................... 44

V.    Plaintiffs Adequately Allege Securities Act Claims ........................................ 46

VI.   Plaintiffs Adequately Plead Control Person Liability Under Section 20(a) and Section 15 ............................................................. 47

VII.  Conclusion .......................................................................... 50

TABLE OF AUTHORITES

**Page(s)**

CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
   651 F. Supp. 2d 155 (S.D.N.Y. 2009)...................................................................35

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)...................................................................40

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010)...................................................................41

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
   671 F.3d 140 (2d Cir. 2011)...................................................................................45

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................13

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)..............................................................................13, 14

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017)...................................................................20

*In re Beacon Assocs. Litig.*,
   745 F. Supp. 2d 386 (S.D.N.Y. 2010)...................................................................24

*In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)...................................................................41

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................13

*In re BioScrip, Inc. Sec. Litig.*,
   95 F. Supp. 3d 711 (S.D.N.Y. 2015).....................................................................18

*Caiola v. Citibank, N.A., N.Y.*,
   295 F.3d 312 (2d Cir. 2002)...................................................................................27

*Cargo Partner AG v. Albatrans, Inc.*,
   352 F.3d 41 (2d Cir. 2003).....................................................................................30

*Carlson v. Xerox Corp.*,
   392 F. Supp. 2d 267 (D. Conn. 2005)...................................................................33

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)..................................................................14, 41

*Chevron Corp. v. Donziger*,
    974 F. Supp. 2d 362 (S.D.N.Y. 2014).................................................................45

*Chill v. Gen. Elect. Co.*,
    101 F.3d 236 (2d Cir. 1996).................................................................50

*In re CitiGroup Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010).................................................................48

*CompuDyne Corp.*,
    453 F. Supp. 2d 807 (S.D.N.Y. 2006).................................................................50

*Cornwall v. Credit Suisse Grp.*,
    689 F. Supp. 2d 629 (S.D.N.Y. 2010).................................................................33

*Dandong v. Pinnacle Performance Ltd.*,
    No. 1:10-cv-8086 (LBS), 2011 WL 5170293 (S.D.N.Y. Oct. 31, 2011)........................ *passim*

*In re Deutsche Bank AG Sec. Litig.*,
    No. 1:09-cv-1714 (DAB), 2016 WL 4083429 (S.D.N.Y. July 25, 2016),
    *reconsideration denied*, No. 1:09-cv-01714 (DAB), 2016 WL 11201753
    (S.D.N.Y. Sept. 8, 2016).................................................................48

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012).................................................................34

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................44

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).................................................................38

*Elbit Sys., Ltd. v. Credit Suisse Grp.*,
    917 F. Supp. 2d 217 (S.D.N.Y. 2013).................................................................50

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003).................................................................43

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976).................................................................31

*In re EZCorp, Inc. Sec. Litigs.*,
    181 F. Supp. 3d 197 (S.D.N.Y. 2016).................................................................50

*In re Facebook, Inc. IPO Sec. and Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013)..........................................................26, 44

*First Nationwide Bank v. Gelt Funding Corp.*,
  27 F.3d 763 (2d Cir. 1994)..................................................................................43

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)................................................................................45

*Garber v. Legg Mason, Inc.*,
  537 F. Supp. 2d 597 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009)...............30, 47

*In re Gentiva Secs. Litig.*,
  932 F.Supp.2d 352 (S.D.N.Y. 2013).................................................................39

*Goldstein v. Pataki*,
  516 F.3d 50 (2d Cir. 2008)..................................................................................13

*Gormley v. Magicjack Vocaltec Ltd.*,
  220 F. Supp. 3d 510 (S.D.N.Y. 2016).................................................................41

*Hatch v. Morosco Holding Co.*,
  56 F.2d 640 (S.D.N.Y. 1932)..............................................................................44

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003).............................................................45, 49

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  251 F. Supp. 3d 596 (S.D.N.Y. 2017).................................................................37

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ....................................................................................*passim*

*Katz v. Image Innovations Holdings, Inc.*,
  542 F. Supp. 2d 269 (S.D.N.Y. 2008).................................................................39

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)................................................................................43

*Lorenzo v. SEC*,
  139 S. Ct. 398 (2018)..........................................................................................15

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010).................................................................40

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
  761 F.3d 245 (2d Cir. 2014)................................................................................18

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)......................................................................48

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)......................................................................24

*In re NovaGold Res. Inc. Sec. Litig.*,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009)................................................................24, 46

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................................38, 39

*Operating Local Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*,
    595 F.3d 86 (2d Cir. 2010)..................................................................................18

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014).......................................................................49

*In re OSG Sec. Litig.*,
    971 F. Supp. 2d 387 (S.D.N.Y. 2013)......................................................................46

*Overton v. Todman and Co.*,
    478 F.3d 479 (2d Cir. 2007)................................................................................24

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005)......................................................................48

*In re Parmalat Sec. Litig.*,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)......................................................................41

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    446 F.Supp.2d 163 (S.D.N.Y. 2006)......................................................................34

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015)......................................................................40

*In re Prudential Sec. Ltd. P'shps Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ..........................................................................24

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007).......................................................... *passim*

*Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)......................................................................46

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)....................................................................18, 24, 46

*Rombach v. Chang*,
    No. 1:00-cv-0958 (SJ), 2002 WL 1396986 (E.D.N.Y. June 7, 2002), *aff'd and*
    *remanded*, 355 F.3d 164 (2d Cir. 2004)..................................................................46

*Rosado-Acha v. Red Bull Gmbh*,
    No. 1:15-cv-7620 (KPF), 2016 WL 3636672 (S.D.N.Y. June 29, 2016) ..............................44

*In re Salix Pharm., Ltd.*,
    No. 1:14-cv-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...........................39

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)....................................................................49

*SEC v. First Jersey Sec.*,
    101 F.3d 1450 (2d Cir.1996).............................................................................48

*SEC v. Lek Sec. Corp.*,
    276 F. Supp. 3d 49 (S.D.N.Y. 2017).....................................................................48

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,
    167 F. Supp. 2d 639 (S.D.N.Y. 2001)...................................................................19

*Sharette v. Credit Suisse Int'l*,
    No. 1:14-cv-8486 (VM) (SN), 127 F. Supp. 3d 60 (S.D.N.Y. 2015) ............................ *passim*

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010)............................................................................29

*STMicroelectronics v. Credit Suisse Grp.*,
    775 F. Supp. 2d 525 (E.D.N.Y. 2011) ..................................................................48

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................................30, 47

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) at 322-23......................................................................33, 39

*In re TVIX Sec. Litig.*,
    25 F. Supp. 3d 444 (S.D.N.Y 2014)...........................................................27, 28, 29

*Williams v. Affinion Grp., LLC*,
    889 F.3d 116 (2d Cir. 2018)...........................................................................20

*Yi Xiang v. Inovalon Holdings*,
    254 F. Supp. 3d 635 (S.D.N.Y. 2017)..............................................................42, 44

**STATUTES, REGULATIONS & RULES**

15 U.S.C. § 77
  § 77k (a) ......................................................................................................46

15 U.S.C. § 78
  § 78i(f) ................................................................................................ *passim*
  § 78u-4 ...........................................................................................20, 45

17 C.F.R. § 240
  § 240.9 .............................................................................................. *passim*
  § 240.10 ............................................................................................ *passim*
  § 240.11 ............................................................................................ *passim*
  § 240.12 ............................................................................................ *passim*
  § 240.20 ...........................................................................................48, 49

Fed. R. Civ. P. 8 ...................................................................................... *passim*

Fed. R. Civ. P. 9(b) ................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6) .........................................................................13, 43

**OTHER AUTHORITIES**

Douglas E. Abrams, *The Scope of Liability Under Section 12 of the Securities Act of 1933*: *'Participation' and the Pertinent Legislative Materials*, 15 Fordham L.J. 877, 932 (1987) ..............................................................................31

DEFINITION OF TERMS

**Calculation Agents** – two entities, Credit Suisse International ("CSI") and Janus Index & Calculation Services LLC ("JIC"), that, among other things, provided calculation-related services with respect to XIV.

**Closing Indicative Value** – generally, the value of XIV calculated at the end of each trading day.

**ETN** – Exchange Traded Note, an unsecured debt instrument traded on a major exchange that functions similarly to a promissory note.

**Futures Contract** – a contract representing a promise to buy or sell a particular commodity or financial instrument at a predetermined price at some future date.

**Intraday Indicative Value** – as defined by Credit Suisse in its Prospectus (defined below), this value was "designed to approximate the economic value of [XIV] at a given time[,]" and was "calculated every 15 seconds . . . ." The Calculation Agents provided the Intraday Indicative Value to NASDAQ for distribution to the market under the ticker XIVIV.

**Prospectus** – the January 29, 2018 pricing supplement (No. VLS ETN-1/A48) filed with the SEC pursuant to Rule 424(b)(2) and in conjunction with Registration Statement No. 333-218604-02, prospectus supplement dated June 30, 2017, and prospectus dated June 30, 2017.

**VIX or VIX Index** – referred to as Wall Street's "fear index" or "fear gauge," the VIX or VIX Index measures market volatility by providing a value intended to reflect how much the market thinks the S&P 500 Index will fluctuate in the 30 days from the time of each tick of the VIX Index.

**VIX Futures** – futures contracts that allow investors to trade and/or hedge an investment position based on their assessment of future market volatility.

**VIX Futures Index** – the S&P 500 VIX Short-Term Futures Index, which tracks a portfolio of first- and second-month VIX futures contracts with a weighted-average time to maturity of 30 days. This index is disseminated under the ticker SPVXSP.

**XIV** – the common name and trading ticker for VelocityShares Inverse VIX Short Term ETNs, issued by Credit Suisse, sold by Janus, and traded on the NASDAQ.

**XIVIV** – the ticker by which XIV's Intraday Indicative Value was transmitted.

Lead Plaintiffs, Set Capital LLC, Stefan Jager, Nikolay Drozhzhinov, Aleksandr Gamburg, and ACM Ltd. (collectively, "Plaintiffs"), respectfully submit this omnibus memorandum of law in opposition to the motion to dismiss (ECF No. 101) filed by Credit Suisse Group AG and Credit Suisse AG (together, "Credit Suisse" or the "Bank");[1] Credit Suisse's Chief Executive Officer ("CEO") Tidjane Thiam ("Thiam"); and its Chief Financial Officer ("CFO") David R. Mathers ("Mathers," and, together with Thiam, the "Individual Defendants") (collectively, Credit Suisse and the Individual Defendants are the "Credit Suisse Defendants"); and the motion to dismiss (ECF No. 105) filed by Janus Henderson Group plc ("Janus"); Janus Index & Calculation Services LLC ("JIC"); and Janus Distributors LLC d/b/a Janus Henderson Distributors ("JHD") (collectively, Janus, JIC, and JHD are the "Janus Defendants") (together, the Janus Defendants and the Credit Suisse Defendants are the "Defendants").[2]

## I.   <u>INTRODUCTION</u>

On February 5, 2018, the Credit Suisse Defendants executed their plan to profit from the destruction of their product, XIV, and in a single day wiped out ***96%*** of XIV's value, causing ***$1.8 billion*** in investor losses. Unbeknownst to investors, XIV's implosion was not caused by general market movements, but instead was engineered by the Credit Suisse Defendants, who sold millions of XIV notes for hundreds of millions of dollars to unsuspecting investors while actively betting against and designing XIV to fail. As the Credit Suisse Defendants drove XIV into a nosedive during aftermarket trading on February 5, 2018, all of the Defendants compounded the harm to

---

[1] As explained in the Consolidated Class Action Complaint ("CAC"), because Credit Suisse Group AG and Credit Suisse AG are, as a practical matter, synonymous, both entities are referred to herein as "Credit Suisse" or the "Bank."

[2] Citations to the Credit Suisse Defendants' Memorandum in Support of their Motion to Dismiss (ECF No. 102) are set forth as "CS Br.", and the Janus Defendants' Memorandum (ECF No. 106) is "Janus Br." Citations to "¶ __" are to paragraphs of the CAC, ECF No. 82. Unless otherwise indicated, quotation marks and citations are omitted and alterations are adopted.

investors by issuing false and misleading Intraday Indicative Values for the XIV notes, leading investors to buy *$700 million* in additional XIV notes from the Credit Suisse Defendants, who knew the notes were effectively worthless at that time. As a result of these frauds, the Credit Suisse Defendants reaped approximately **half a billion dollars** at the expense of their investors.

Defendants do not meaningfully contest that Credit Suisse actively bet against XIV, knowing it was designed to fail. Nor do they deny that their bet paid off, with Credit Suisse raking in extraordinary profits at investors' expense. Defendants also concede that during the aftermarket period on February 5, 2018, the Intraday Indicative Value—which they told investors "reflect[ed] the economic value" of XIV notes and which they said was "calculated in real time" using "real time prices"—failed even to approximate the notes' real-time economic value. Instead, Defendants argue that XIV investors, who collectively lost $1.8 billion, have no legal recourse because Defendants' activities and XIV's risks were "expressly disclosed." (CS Br. at 8; *see also id.* at 11-14; Janus Br. at 1, 3, 18-20). This is false.

Defendants' meritless argument rests on misconstruing the frauds alleged to retroactively fit Defendants' cherry-picked generic risk disclosures. They claim, for instance, that the fraud alleged is that Credit Suisse engaged in "impermissible hedging activity." They then point to disclosures that Credit Suisse did in fact "expect to hedge" XIV. (CS Br. at 1-2). But Plaintiffs do not allege that Credit Suisse's hedging was concealed; rather, they allege in detail that the Credit Suisse Defendants hid their plan to use large hedging transactions to *destroy the value of XIV notes*, and thereby profit at the expense of investors. *See, e.g.*, ¶¶ 6, 92, 111, 116, 155-170. Indeed, the Credit Suisse Defendants falsely told investors that they "***have no reason to believe that [their] . . . hedging activities will have a material impact on the level of the [VIX Futures Index underlying the XIV] . . . .***" ¶ 226.

Defendants also attempt to deflect responsibility for their fraud, blaming XIV's collapse on market-wide volatility, rather than admit their own culpability in engineering the collapse. (CS Br. at 8, 22-24; Janus Br. at 1, 16, 21-23). Besides impermissibly relying on information outside of the CAC to build this counternarrative, (CS Br. at 8), Defendants' argument ignores that, at the end of the trading day on February 5, 2018, market-wide volatility had caused XIV's value to drop, at most, only 33%—a significant, though not catastrophic, loss. *See* ¶¶ 157, 161. It was only when the Credit Suisse Defendants executed their fraudulently concealed plan to trigger a liquidity crisis in the VIX futures market that XIV lost *96%* of its value—several times the drop in XIV caused by market-wide volatility—triggering an Acceleration Event that wiped out billions in investor holdings. ¶¶ 162-70.

Defendants next argue that their warning against holding XIV notes "long-term" is sufficient to insulate them from liability. (CS Br. at 1, 4-5). But, again, what occurred on February 5 was not the result of long-term investing; it was the execution of Credit Suisse's scheme to destroy XIV.[3] Since the Credit Suisse Defendants failed to disclose their scheme and XIV's true risks when they created and sold to investors "a perfect heads I win, tails you lose investment vehicle," their motion to dismiss should be denied. *Sharette v. Credit Suisse Int'l*, No. 1:14-cv-8486 (VM) (SN), 127 F. Supp. 3d 60 (S.D.N.Y. 2015).

With respect to their false and misleading Intraday Indicative Value statements, Defendants resort to finger pointing, with the Credit Suisse Defendants blaming the Janus Defendants, and the Janus Defendants blaming a third party, Standard & Poor's ("S&P"). (CS Br. at 15-17; *See* Janus Br. at 18-20). But neither can escape the plain language of the Prospectus, which gave both Credit

---

[3] Indeed, as Defendants note, the Class Period spans a mere seven days, (Janus Br. at 11), and a large share of Class members spent hundreds of millions of dollars on XIV notes on February 5, 2018, only to lose their entire investment in a matter of hours or even minutes.

Suisse and Janus joint responsibility for the Intraday Indicative Value, and which required them to announce a "Market Disruption Event" if, as Defendants now claim, their false and misleading Intraday Indicative Value originated with S&P.

Because Defendants' claim that investors were warned of Credit Suisse's fraudulent scheme is untenable, as are their attempts to avoid liability for the patently false Intraday Indicative Values they jointly made, Defendants' motions to dismiss should be denied in their entirety.

## II.   **BACKGROUND**

### A.   **The XIV Notes**

XIV is an Exchange Traded Note ("ETN") issued and sold by Credit Suisse and placed and marketed by Janus. XIV is one of many volatility-linked financial products associated with the VIX Index, which is sometimes referred to as Wall Street's "fear index" or "fear gauge." ¶ 50. The value of XIV is derived from the inverse value of the daily returns of the S&P 500 VIX Short-Term Futures Index ("VIX Futures Index"), which tracks a portfolio of first- and second-month VIX futures contracts. ¶ 56. This means that, generally, when the relevant VIX futures contracts underlying the VIX Futures Index decrease in value by 1%, the XIV notes increase in value by 1%, and vice versa. ¶ 56.

### B.   **The Credit Suisse Defendants Knew Their Hedging During Volatility Spikes Caused Liquidity Issues**

On three occasions during the life of XIV, in 2011, 2015, and 2016, market volatility spiked significantly. During these spikes, VIX futures prices spiked further still as a result of Credit Suisse and other volatility-related ETN issuers placing "hedging" trades to protect their balance sheets, *i.e.* the issuers were buying VIX futures to offset the risk posed by the volatility ETNs they issued. ¶¶ 63-74. Because there were not enough VIX futures contracts to meet this hedging demand, VIX futures prices temporarily spiked unnaturally and far more than would be expected based on

normal market volatility. ¶ 69. As a result of these spikes, the value of XIV—the inverse of VIX futures—temporarily crashed. ¶ 74. These liquidity issues were immediately escalated to Credit Suisse's Capital Allocation and Risk Management Committee ("CARMC"), which was run by the Individual Defendants. ¶ 76. The CARMC decided it needed additional avenues to protect Credit Suisse from these liquidity issues.

Thus, on July 1, 2016, the Credit Suisse Defendants announced (the "July 2016 Announcement") that Credit Suisse would be entitled to force purchasers of XIV notes "to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps." ¶ 75. In other words, due to the liquidity issues in the VIX futures market caused by their own hedging, the Credit Suisse Defendants protected themselves by forcing XIV purchasers to provide them with alternate ways to hedge their exposure to XIV notes. Investors were not informed of the reasons for these VIX futures spikes, that the spikes were driven by Credit Suisse's hedging activities, or that this change was made to enable Credit Suisse to destroy XIV upon the next volatility spike.

### C.     The Credit Suisse Defendants Used Their Knowledge to Bet Against XIV

The Credit Suisse Defendants knew, due to Credit Suisse's risk protocols and modeling, that another volatility spike similar to the three Credit Suisse had experienced in recent years was inevitable. ¶¶ 81-83, 93-110. Further, based on their experience with these previous volatility spikes, the Credit Suisse Defendants knew that when the next volatility spike occurred, they could create an artificial liquidity squeeze in the VIX futures market by buying up large amounts of VIX futures, and because XIV prices are inversely related to VIX futures prices, they could destroy XIV's value. ¶¶ 7, 92, 116.

Armed with this proprietary information, the Credit Suisse Defendants exacerbated the liquidity issues by selling investors *millions* more XIV notes, which, to adequately hedge, required

5

Credit Suisse to buy even more VIX futures. ¶¶ 111-16. They sold these additional XIV notes at prices as high as $135, knowing or recklessly disregarding that their hedging activities during the next volatility spike would destroy XIV and trigger an Acceleration Event and forced redemption, allowing Credit Suisse to pay investors pennies on the dollar and pocket the difference. ¶ 92. As one analyst later put it, Credit Suisse induced XIV investors to effectively "collect[] pennies in front of a steamroller." ¶ 7, 81.[4]

### D.   Credit Suisse's Risk Reporting Mechanisms Informed the Individual Defendants of the Liquidity Risks and Plan to Profit

Credit Suisse's risk reporting mechanisms and protocols ensured senior executives knew the risks posed by XIV. Under these protocols, each of the three VIX spikes and ensuing VIX futures liquidity issues were reported to Defendants Thiam and Mathers. ¶ 93. Further, both sat on the CARMC, ¶ 95, which was responsible for actively monitoring risks and setting risk limits. ¶ 96. These binding limits required any breach to be immediately escalated to Thiam. ¶ 98-99.

Credit Suisse also had a Valuation Risk Management Committee ("VARMC"), chaired by Mathers, which determined the "value at risk" or "VaR" regimen. ¶ 102. VaR measures the maximum possible loss for a given set of investments during a given period of time. Because the VaR "estimate[d] losses associated with *unusually severe market movements*," ¶ 106, the VaR regimen modeled the effects of serious volatility events on XIV. Nevertheless, XIV's $1.8 billion

---

[4] The Credit Suisse Defendants had an additional reason to bet against XIV. In 2015, under shareholder pressure, Defendant Thiam announced that Credit Suisse would begin to reduce earnings volatility by scaling back its investment-banking division in favor of the Bank's more stable wealth-management division. ¶¶ 117-19. The pressure from shareholders only intensified over the following years. ¶¶ 121-22. In October 2017, a group of investors who were dissatisfied with Thiam's and Credit Suisse's lack of progress in winnowing its high-risk investment-banking operations began a campaign to break up the Bank. ¶ 124. The prospect of additional challenges from restive shareholders created immense pressure on Credit Suisse to profitably reduce its exposure to high volatility instruments like XIV. ¶ 125.

loss as a result of Defendants' misconduct was more than *two orders of magnitude* larger than the VaR allotted for Credit Suisse's *entire* equities asset class in 2017. ¶ 108. Because XIV's potential losses during a volatility event—which Credit Suisse expressly forecasted in its VaR but did not tell investors—breached Credit Suisse's internal VaR limits, the breach was reported to and known by the CARMC (thus Thiam and Mathers). *See* ¶ 98.

### E.   Credit Suisse and Janus Were Responsible for and Issued XIV's Intraday Indicative Value

Credit Suisse subsidiary, CSI, and Janus subsidiary, JIC, were the "Calculation Agents" for XIV. ¶ 126. According to the Prospectus, CSI had "the sole ability to make determinations with respect to reduction of the Minimum Redemption Amount, certain Acceleration Events, and calculation of default amounts." ¶ 131. JIC had "the sole ability to calculate and disseminate the Closing Indicative Value, make determinations regarding an Index Business Day, and determinations of splits of reverse splits." ¶ 131. The Prospectus stated that "*[a]ll other determinations will be made by the Calculation Agents jointly.*" ¶ 141.

Among the determinations CSI and JIC shared "joint[]" responsibility for was the calculation and dissemination of the "Intraday Indicative Value." ¶ 139. Defendants told investors that the Intraday Indicative Value "is designed to approximate the economic value of [the XIV notes] at a given time." ¶ 145. Due to the fact that the XIV notes could diverge from the Intraday Indicative Value due to factors "such as imbalances of supply and demand, lack of liquidity and credit considerations . . . ." PS-23,[5] Defendants specifically told investors to "compare the trading price of the [XIV notes] . . . against the Intraday Indicative Value to determine whether the [notes]

---

[5] "PS" refers to the Prospectus, available at ECF No. 103-1.

are trading in the secondary market at a premium or a discount to the ***economic value*** of the [notes] at any given time." ¶ 147.

In the event that S&P "fail[ed] to publish or compute the [VIX Futures Index]" (¶ 152), the Calculation Agents were required to jointly determine whether a "Market Disruption Event" was occurring or had occurred. ¶ 134. The Calculation Agents were also required to announce an "Acceleration Event" "if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value." ¶ 137. Credit Suisse also had the right to announce an Optional Acceleration at any time. *Id.* In addition, the Calculation Agents were permitted to "modify, replace or adjust the [VIX Futures Index] . . . .", if appropriate. ¶ 136. As common with all exchange-traded securities, Credit Suisse and Janus could also temporarily halt trading of XIV notes. *See* ¶¶ 168, 189, 210, 251.

## F.   The Credit Suisse Defendants' Manipulative Scheme Succeeded, Steamrolling Over XIV Investors

Credit Suisse knew the time was ripe for its scheme as, during the year and a half preceding February 5, 2018, XIV's value increased dramatically from $18 to $146.44, or 813%, during an extended period of low volatility. ¶ 61. On June 30, 2017, Credit Suisse offered an additional 5,000,000 XIV notes on top of the 9,018,880 notes that were already issued and outstanding to unsuspecting investors. ¶ 63. On January 29, 2018, Credit Suisse offered an additional 16,275,000 notes on top of the 10,793,880 XIV notes then-outstanding. ¶ 63. The issuance of new notes, combined with the rise in XIV's value, led XIV's market cap to increase to approximately $1.9 billion by February 2018. ¶ 63. With this growth, Credit Suisse was poised to strike when volatility returned, as it knew was statistically certain to occur. ¶¶ 81-83.

On February 5, Credit Suisse seized the opportunity presented and executed its long-awaited plan to close out XIV while pocketing hundreds of millions of dollars at investors'

expense. The previous trading day, XIV closed at $108.37 per note. ¶ 157. On February 5, the S&P 500 dropped 4.1%, prompting the VIX index to spike, as expected, leading short-term VIX futures contracts (and the VIX Futures Index which tracked them) to spike as well. ¶¶ 159-160.

But, as Credit Suisse bought up VIX futures in the afterhours period, XIV – and the VIX futures it was inversely tied to – experienced significantly greater price movements. Between 4:00 p.m. and 4:15 p.m., February and March VIX futures prices skyrocketed as Credit Suisse bought up over 105,000 VIX futures contracts—roughly one quarter of the entire VIX futures market— driving up VIX futures trading volume to *more than 167 times the usual volume*. ¶¶ 8, 162, 164-65. By driving up the price of the VIX futures contracts to which the value of XIV was inversely tied, the Credit Suisse Defendants knew they could close out XIV by announcing an Acceleration Event and pay remaining holders of XIV notes just pennies on the dollar. ¶ 166.

By 4:09 p.m., the plan was paying off. The Credit Suisse Defendants' large purchases of VIX futures contracts caused VIX futures prices to skyrocket, leading XIV's value to drop to $20, down more than 80% from the previous day's close, and constituting an Acceleration Event under the Prospectus. ¶ 167. But the Credit Suisse Defendants, not content with driving down XIV's value by 80%, pressed on with their liquidity squeeze of the VIX futures market. By 4:15 p.m., the Credit Suisse Defendants' massive purchases of VIX futures ensured XIV's value would decline *96%* from the previous day's close. ¶ 169.

## G.    Defendants Compounded the Harm to Investors by Issuing Grossly False and Misleading Intraday Indicative Values

But this was only part one of the two-part fraud perpetrated on XIV investors. Beginning at approximately 4:09 p.m. that same day, the Credit Suisse Defendants, Janus and JIC stopped updating XIV's Intraday Indicative Value. ¶ 174.

Between about 4:09 p.m. and 5:09 p.m., the Credit Suisse Defendants, Janus, and JIC falsely told investors that XIV's Intraday Indicative Value was between about $24 and $27 per note (the "Flatline Value"), ¶ 175, thus concealing that XIV had, in fact, suffered an Acceleration Event and that XIV notes were essentially worthless. ¶¶ 181, 193, 209. Had the Intraday Indicative Value been properly and accurately calculated and conveyed using the real-time values of the relevant VIX futures contracts as promised, investors would have known that XIV was, in fact, worth between $4.22 and $4.40 per note. *See* ¶ 184. In the absence of any announcement of a Market Disruption Event, an Acceleration Event, or any other occurrence that would alert investors to the unreliability of the Intraday Indicative Value, the Flatline Value misled investors into believing XIV had weathered the market volatility experienced on February 5, and investors thus purchased *$700 million* in additional XIV notes at drastically inflated prices. ¶ 177, 193. It was not until 5:09:05 p.m. that Credit Suisse and Janus finally updated the Intraday Indicative Value to $4.2217 per note, approximately ***1/6th*** the artificially inflated value they disseminated during the previous hour. ¶¶ 174, 190.

> ### H.    The Credit Suisse Defendants Locked in Their Profits Through an Acceleration Event

The next day, February 6, 2018, Credit Suisse announced that it was redeeming all XIV notes, citing as its reason that an Acceleration Event occurred as a result of the greater than 80% drop in XIV's Intraday Indicative Value the previous day. ¶ 199. On February 21, 2018, Credit Suisse terminated XIV and redeemed all notes at $5.99 per note, ¶ 201, locking in extraordinary profits for Credit Suisse, which received as much as $135 per XIV note just days before.

On April 25, 2018, Credit Suisse reported that it had made approximately $490 million in its equity sales and trading division for the fiscal quarter ended March 31, 2018, a 30% increase compared the previous quarter, stating that the impressive figures were "***due to more favorable***

*trading conditions, particularly higher levels of volatility which benefited our derivatives business.*" ¶ 194 (emphasis added). Though Credit Suisse continues to conceal the exact profits it made on XIV, by using publicly-available data, Plaintiffs allege that a conservative estimate of Credit Suisse's profits from XIV is approximately *$475 million to $542 million*. ¶¶ 195-98.

I.    **The Credit Suisse Defendants Attempt to Conceal Their Fraud**

The events of February 5, 2018 shocked the market, with reporters and investors questioning Credit Suisse as to how XIV could have collapsed so quickly and dramatically, causing investors to lose nearly two billion dollars. ¶ 203. Further, the SEC began to investigate Credit Suisse and its role in XIV's collapse. ¶ 204.

In response, the Credit Suisse Defendants actively attempted to conceal the fraud by issuing a series of incoherent explanations, many of which were patently false. On February 14, 2018, for instance, Defendant Thiam stated that Credit Suisse closed XIV because "there is no prospect of recovery. . . . Once you hit that bottom, the structure of the product means there is no recovery." ¶ 207. To the contrary, if Credit Suisse had not liquidated XIV, it would have been worth approximately $30.88 by March 6, 2018. Instead, Credit Suisse chose to secure its profits and paid investors $5.99 per share—80.6% less. ¶ 207.

Also on February 14, 2018, Defendant Thiam falsely claimed that the Acceleration Event "was actually to protect investors. Because the product stopped trading, it was quasi-impossible to price, and we needed to give certainty to the market at the market open." ¶ 208. But XIV had not "stopped trading." To the contrary, investors bought approximately $700 million in XIV notes during aftermarket trading, to Credit Suisse's benefit. ¶ 209. Nor was XIV "quasi-impossible to price"—Credit Suisse knew exactly what the market prices of the relevant VIX futures were during the Flatline Value. ¶ 209.

**J.**     **Defendants' Additional False and Misleading Statements and Omissions**

In addition to knowingly or recklessly disseminating the Flatline Value, Defendants made several other false and misleading statements and omissions. Despite the Credit Suisse Defendants' plan to destroy XIV, they told investors in the Prospectus only that its "hedging activities *may* adversely affect the level of the [VIX Futures Index]" and that "[i]t is *possible* that we . . . could receive substantial returns with respect to these hedging activities while the value of your [XIV notes] declines or becomes zero. Any profit in connection with such hedging activities . . . *may* create an additional incentive to sell the [XIV notes] to you." ¶ 217 (emphasis added). Similarly, despite the Credit Suisse Defendants' knowledge of the *certainty* that their planned destruction of XIV created a conflict of interest with investors, they only told investors that there "*may* be conflicts of interest between" investors and Credit Suisse. ¶ 219 (emphasis added).

Further, Defendants misleadingly stated that Credit Suisse's "[d]aily rebalancing . . . *may* impact trading in the underlying futures contracts," and that "[t]he trading activity associated with these hedging transactions . . . *may* adversely affect the market price of the" VIX futures contracts "and in turn the level of the [VIX Futures Index,]" ¶¶ 223, 224, despite the Credit Suisse Defendants' specific plan to destroy XIV through the hedging transactions. ¶ 225 (emphasis added). Indeed, the Credit Suisse Defendants falsely stated that they "*have no reason to believe that our . . . hedging activities will have a material impact on the level of the [VIX Futures] Index . . . .*" ¶ 226 (emphasis added).

Defendants' statements regarding the Intraday Indicative Value "approximat[ing] the economic value" of XIV notes, being "calculated every 15 seconds" based on "real time prices of the relevant VIX futures contracts," and the ability of investors to "compare the trading price" of XIV notes to the Intraday Indicative Value also became false and misleading during the Flatline Value period, and the Credit Suisse Defendants had a duty to update the statements. ¶¶ 221-22.

### III.   <u>LEGAL STANDARD</u>

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In considering a motion to dismiss, the court accepts as true all factual allegations and draws all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008).

### IV.   <u>PLAINTIFFS ADEQUATELY ALLEGE EXCHANGE ACT CLAIMS UNDER SECTION 10(b) AND SECTION 9</u>

The CAC asserts violations of Section 10(b) and Section 9 of the Exchange Act.

Rule 10b-5 promulgated under Section 10(b) provides that it is unlawful "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact . . . or (c) [t]o engage in any act, practice, or course of business which operates . . . as a fraud or deceit . . . ." 17 C.F.R. § 240.10b-5. Plaintiffs assert violations of both the scheme liability provisions of Rules 10b-5(a) and (c) and the false-and-misleading statements provision of Rule 10b-5(b).

A scheme liability claim is adequately pled when "the complaint sets forth, to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). The Credit Suisse Defendants do not contest that they engaged in manipulative acts.

A Rule 10b-5(b) claim is adequately pled when a complaint alleges: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of the security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Defendants challenge only the first, second, and sixth elements.

Plaintiffs also allege violations of Section 9(a)(4) and Section 9(f). Section 9(f) provides for liability against "[a]ny person who *willfully participates* in any act or transaction in violation of subsections (a), (b), or (c)" of Section 9. 15 U.S.C. § 78i(f) (emphasis added). The Janus Defendants move to dismiss both Section 9 claims, while the Credit Suisse Defendants concede that they willfully participated in the alleged misconduct.

### A.      The Credit Suisse Defendants Engaged in Manipulative Acts Under Rules 10b-5(a) and (c)

A claim of manipulation under Rules 10b-5(a) and (c) "can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI*, 493 F.3d at 102. Plaintiffs allege in detail that, after three VIX spikes showed the Credit Suisse Defendants the effects of their hedging activities on VIX futures liquidity and XIV note values, the Credit Suisse Defendants planned to profit at investors' expense by issuing millions more XIV notes, exacerbating the liquidity issue such that it would, with certainty, destroy the value of XIV notes during the next VIX spike. ¶¶ 111-16. On February 5, 2018, when the inevitable next VIX spike occurred, the Credit Suisse Defendants: (1) executed their plan by purchasing over 105,000 VIX futures contracts, causing the prices of the contracts to artificially skyrocket, driving down the value of XIV notes *96%*; and (2) compounded the harm to investors by continuing to purchase VIX futures contracts and allowing trading in XIV notes to continue while investors received

grossly inaccurate Intraday Indicative Values, leading investors to purchase hundreds of millions in additional XIV notes from Credit Suisse at artificially inflated values. ¶¶ 155-190.

The Credit Suisse Defendants do not contest, and thus concede, that they engaged in manipulative acts. Indeed, they do not meaningfully contest Plaintiffs' scheme liability claims at all. Rather, wrongly stating that "Plaintiffs base [both of] their Section 10 . . . claims upon alleged misstatements in the [Prospectus]," they argue that all of Plaintiffs' Section 10(b) claims fail because the Prospectus purportedly disclosed the Credit Suisse Defendants' fraud. (*See* CS Br. at 11; *see also id.* at 10). But this argument conflates liability under the scheme liability provisions of Rules 10b-5(a) and (c), with liability under the false-and-misleading statements provision of Rule 10b-5(b), which are distinct causes of action.[6]

*Sharette* is directly on point. There, the plaintiffs claimed that certain Credit Suisse entities were the "'architect[s] of and key participant[s]' in a scheme to manipulate the price of ECD stock. . . ." *Sharette*, 127 F. Supp. 3d at 73. The defendants were alleged to have structured stock offerings "to allow predatory hedge funds to place massive negative bets on ECD stock with very little risk, shorting huge amounts of ECD Stock, such that the short sales effectuated could not be considered part of the 'legitimate hedging strategy' contemplated by the [offering documents]." *Id* at 70. Specifically, the Credit Suisse defendants were alleged to have:

> facilitated the market manipulation and destruction of [the] stock price by lending out far more shares of common stock for short sales than was actually necessary for

---

[6] In December 2018, the Supreme Court of the United States heard argument in *Lorenzo v. SEC*, No. 17-1077, which involves, among other things, the line between and interpretation of the various provisions of Rule 10b-5. The outcome of this case may have significant effects on the scope of the scheme liability provisions. *See, e.g.*, Tr. of Oral Argument at 11:19-21, *Lorenzo v. SEC*, 139 S. Ct. 398 (2018) (No. 17-1077), https://www.supremecourt.gov/oral_arguments/argument_transcripts/2018/17-1077_6537.pdf (Justice Alito questioning petitioner, who was alleged to have copied-and-pasted his boss's false statements and then emailed them to investors, "[w]hy doesn't his conduct fall squarely within the language of [Rule 10b-5](c)?").

investors to 'hedge' their positions in ECD's convertible notes. The actions of the Credit Suisse Defendants, who were allegedly 'on both sides of the [O]fferings, simultaneously selling the stock and Notes to investors while soliciting hedge funds to make giant bets against the stock,' allowed hedge funds to make 'huge, coordinated' short sales of ECD stock.

*Id.* at 73. These actions caused the price of the stock to "predictably collapse[] in response" from $72 per share to under $1. *Id.*

As in this case, the Credit Suisse defendants in *Sharette* argued that their manipulative scheme was fully disclosed, and there was thus no actionable fraud. Specifically, they argued that "Credit Suisse did precisely what [the] offering documents said that Credit Suisse would do[,]" that is, "solicit[] investors to participate in the offerings, and loan[] out shares that investors used to make short sales." Defs.' Reply Br. at 2, *Sharette*, ECF No. 65 (filed July 10, 2014); *cf.* (CS Br. at 13 ("[T]he Pricing Supplement in fact disclosed every element of [Plaintiffs'] claim.")).

Rejecting Credit Suisse's argument, Judge Marrero found that plaintiffs adequately alleged "how the Credit Suisse Defendants allegedly structured the Offerings to allow for manipulation and how the price of ECD stock then plummeted as ECD's short volume steadily rose after the Offerings." *Sharette*, 127 F. Supp. 3d at 82. While the short sales were not, "in and of themselves, manipulative or illegal," the plaintiffs alleged "a coordinated scheme engineered by the Credit Suisse Defendants to use short selling to manipulate the price of ECD stock[.]" *Id* at 82, 83.

The Credit Suisse Defendants' scheme here is more egregious than the scheme alleged in *Sharette*. Here, there were no intermediary—and unknown—hedge fund clients who were incentivized into short sales to destroy the value of a security. Rather, the Credit Suisse Defendants themselves issued millions of XIV notes to rake in money knowing that during the next volatility spike, their hedging activities would drive a liquidity squeeze in the VIX futures market, collapsing XIV and locking in Credit Suisse's profits (while allowing Credit Suisse to blame market volatility to explain the collapse). Here, as in *Sharette*, the Credit Suisse Defendants claim they disclosed

the individual pieces of their scheme, arguing they told investors that they intended to hedge their XIV exposure, and that this hedging "may" affect the underlying indices. (CS Br. at 13-14).[7] But as in *Sharette,* the mere fact that Credit Suisse disclosed its intent to hedge cannot defeat the allegations that "the Credit Suisse Defendants orchestrated" the growth of XIV "for the purpose of allowing [themselves] to make huge profits while sinking the price of [XIV notes], hid this purpose from [XIV] investors, and then intentionally" caused XIV's implosion by driving a liquidity squeeze in the VIX futures market, including during the Flatline Value period when investors had grossly inaccurate information regarding the XIV notes' value. *Sharette*, 127 F. Supp. 3d at 83. This is enough "to support a reasonable inference of the occurrence of manipulative acts . . . within the meaning of Section 10(b) and Rule 10b-5" and "the heightened pleading standards of Rule 9(b)." *Id.* at 84.

Further, unlike Rule 10b-5(b), the scheme liability provisions do not require the Credit Suisse Defendants to have "made" any false statement. Thus, their argument that they are not liable for any damages stemming from the Flatline Value because they did not "make" the Flatline Value, (CS Br. at 15-16)—which, in any event, is contradicted by the plain terms of the Prospectus as explained below—has no bearing on whether they are liable under Rules 10b-5(a) and (c). Even if the Credit Suisse Defendants did not "make" the Flatline Value (which they did), they are nevertheless liable under Rules 10b-5(a) and (c) for profiting from the Flatline Value by continuing to purchase VIX futures and continuing to sell XIV notes to investors while the Credit Suisse Defendants knew the Intraday Indicative Value was grossly inflated.

---

[7] The Credit Suisse Defendants conveniently omit that they also told investors in the Prospectus that they "have no reason to believe that [their] . . . hedging activities will have a material impact on the level of the [VIX Futures] Index . . . ." ¶ 226.

**B.    The Credit Suisse Defendants, Janus, and JIC Made Material Misstatements and Omissions Under Rule 10b-5(b)**

"[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no existing independent duty to disclose [such] information" on the issue or topic. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). A qualifying misstatement or omission is any statement that "viewed as a whole, would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004). The "veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead" investors; thus, even literally true statements can, through context and presentation, mislead investors. *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (quoting *Operating Local Annuity Tr. Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 92 (2d Cir. 2010)).

### 1.    Credit Suisse and Janus "Jointly" Made False and Misleading Intraday Indicative Values

During the Flatline Value period, Credit Suisse and Janus, through their subsidiaries CSI and JIC, made grossly inflated Intraday Indicative Values, leading investors to pay Defendants *hundreds of millions* of dollars for XIV notes Defendants knew were essentially worthless. Defendants try to shift the blame, with the Credit Suisse Defendants pointing the finger at the Janus Defendants, while the Janus Defendants blame S&P. But Defendants' attempts to pass the buck cannot escape the plain terms of the Prospectus and the events of February 5, 2018.

#### a.    Credit Suisse's Explicit Admission of Joint Authority Over the Intraday Indicative Value Renders It a Statement "Maker"

The Credit Suisse Defendants' attempt to blame the Janus Defendants, and thus avoid liability, fails. They argue they did not calculate or disseminate the false and misleading Intraday Indicative Values, and thus they did not "make" those statements to investors for purposes of Rule

10b-5(b) under the Supreme Court's decision in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). (CS Br. at 15). In support, they rely on language in the Prospectus stating that Janus was responsible for calculating and disseminating the Intraday Indicative Value. (*Id.* at 15-16). But they ignore that the Prospectus explicitly states (and Plaintiffs allege) that Janus had exclusive authority only for the *Closing Indicative Value*, determinations regarding an "Index Business Day," and determinations of splits and reverse splits, while "***[a]ll other determinations will be <u>made</u> by the Calculation Agents [Credit Suisse and Janus] jointly.***" ¶¶ 131-32 (emphasis added). In fact, the Prospectus states that "[t]he Calculation Agents will . . . make all calculations and determinations regarding the value of the ETNs[,]" *e.g.*, the Intraday Indicative Value. ¶ 131. It is entirely consistent with "joint" responsibility for Janus to *also* be "responsible for computing and disseminating the" Intraday Indicative Value. (*See* CS Br. at 15-16).[8] The Credit Suisse Defendants' explicit admission of responsibility for the Intraday Indicative Value more than satisfies Plaintiffs' burden at this stage to plausibly allege that Credit Suisse shared "ultimate authority over the statement[s]," and thus "made" the statements.[9] *Janus*, 564 U.S. at 142.

The Credit Suisse Defendants next wrongly argue that Plaintiffs engage in impermissible "group pleading" by conflating Credit Suisse's role with Janus's role. (CS Br. at 16). The group pleading doctrine, also known as the group-published documents doctrine, however, has no bearing on whether Credit Suisse and Janus are both "makers" of the false Intraday Indicative

---

[8] The Janus Defendants further acknowledge this joint responsibility in their brief, defining CSI and JIC as "Co-Calculation Agents." (Janus Br. at 7).

[9] Even if the language the Credit Suisse Defendants rely upon *did* contradict their explicit admission of joint responsibility—which it does not—the contradiction would, at best, present an issue of fact that cannot be resolved at this stage. *See, e.g.*, *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639 (S.D.N.Y. 2001) ("[T]he court may not choose among plausible interpretations of the disclosure documents—if a trier of fact could agree with plaintiffs' interpretation of the relevant language, the motion to dismiss must be denied.").

Value. The doctrine "applie[s] to claims against corporate insiders" and "permits securities fraud plaintiffs to rely on a presumption that statements in prospectuses . . . or other group-published information[] are the collective work of those individuals . . . ." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 639 (S.D.N.Y. 2017). This is irrelevant here, where Plaintiffs do not rely on any presumption regarding the "direct involvement" of "corporate insiders" in any "group-published" document, but rather on Credit Suisse's own admission that it was responsible for making the Intraday Indicative Value.

More fundamentally, the Credit Suisse Defendants' "group pleading" argument appears to be based on the flawed assumption that there can be only a single "maker" of any given statement. But the very cases upon which the Credit Suisse Defendants rely, readily acknowledge that "nothing in *Janus* dictates that only one person may have ultimate authority over a statement[.]" *In re Banco Bradesco*, 277 F. Supp. 3d at 639. Credit Suisse's acknowledgement of joint authority over the Intraday Indicative Value is conclusive at this stage.[10]

### b.   The Intraday Indicative Values During the Flatline Value Period Were False and Misleading

The Janus Defendants seek to shift the blame to S&P, arguing that the Flatline Value was not false and misleading because Defendants relied on the inaccurate index values provided by S&P, a possibility they claim was disclosed to investors. (Janus Br. at 18-20; CS Br. at 17 n.6). To support their point, the Janus Defendants present a simple, but erroneous argument. They note that the Intraday Indicative Value was based on a formula that used the "reported value of the S&P

---

[10] While the Credit Suisse Defendants suggest that Plaintiffs' allegations regarding Credit Suisse's role in the Intraday Indicative Value fraud are too "vague," (CS Br. at 16), this is belied by specific allegations setting forth the fraudulent Intraday Indicative Value statements, identifying CSI and JIC as the joint speakers, stating precisely when the Intraday Indicative Values were false, and explaining why the values defrauded investors. ¶¶ 131-32, 135, 171-190.  The PSLRA and Rule 9(b) require nothing more. *See Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).

VIX Futures Index." They claim they warned that any "delays or postponements" in the VIX Futures Index could affect the Intraday Indicative Value. They then claim that the VIX Futures Index stopped updating during the Flatline Value period, and the Intraday Indicative Value followed suit. The Janus Defendants contend that the Flatline Value was thus accurate because it mechanically followed the VIX Futures Index, as promised.

But the Janus Defendants ignore the Prospectus and the actual events of February 5, 2018 that rendered the Flatline Value false and misleading. Defendants told investors that the Intraday Indicative Value was based on the VIX Futures Index, which they said was "calculated in **real time** by S&P" by "applying **real time** prices of the relevant VIX futures contracts." ¶ 141 (emphasis added). They further told investors that the Intraday Indicative Value "is designed to reflect" or "approximate" "the economic value of [the XIV notes] at a given time." ¶ 145; PS-7. Because the Prospectus contemplated that factors "such as imbalances of supply and demand, lack of liquidity . . . and credit considerations" may affect the trading price of XIV notes, causing those prices to diverge from the Intraday Indicative Value, PS-23, Defendants specifically told investors to "compare the trading price of the [XIV notes] . . . against the Intraday Indicative Value to determine whether the [notes] are trading in the secondary market at a premium or a discount to the **economic value** of the [notes] at any given time." ¶ 221 (emphasis added). Thus, while the Intraday Indicative Value was "not intended as a price or quotation" PS-39, it was explicitly intended to be relied on by investors to assess, with a reasonable degree of certainty, the notes' economic value.

Indeed, because the Intraday Indicative Value was so critical to investors, Defendants told them that the "[t]he Intraday Indicative Value of [XIV] will be calculated every 15 seconds . . . *when a Market Disruption Event has not occurred*[.]" ¶ 221 (emphasis added).

Defendants specifically defined a Market Disruption Event to include a situation in which S&P "fails to publish or compute the [VIX Futures Index.]" ¶ 152. Pursuant to the Prospectus, Credit Suisse and Janus had the joint, and exclusive, responsibility to determine whether a Market Disruption Event was occurring or had occurred.[11] ¶ 134. Moreover, Defendants also had the responsibility to announce an Acceleration Event "if, at any point, the Intraday Indicative Value is equal to or less than twenty percent (20%) of the prior day's Closing Indicative Value," and Credit Suisse also had the right to announce an Optional Acceleration at any time. ¶ 137. Given the Intraday Indicative Value's importance to investors, Defendants told investors that "[t]he Calculation Agents may modify, replace or adjust the [VIX Futures Index] . . . ." ¶ 136. Finally, Defendants do not contest that they had the power to temporarily halt trading. ¶¶ 168, 189, 210. Against this backdrop, the Janus Defendants' claims that investors were on notice of the Flatline Value fraud alleged are untenable.

Janus tries to shift the blame to S&P by arguing the VIX Futures Index "was itself constant" during the Flatline Value period and then "suddenly spiked upward" at 5:09 p.m., and suggests that Defendants had no choice but to publish the wildly misleading Flatline Value for over an hour. (*See* Janus Br. at 19-20). But what Janus is describing (without acknowledging it) is a Market Disruption Event; that is, S&P's "fail[ure] to publish or compute the [VIX Futures Index]," a determination over which Defendants had explicit and exclusive responsibility. In view of this representation, the Janus Defendants' reliance on the Prospectus's warning of the possibility of delays in the VIX Futures Index is also fatally flawed. This warning does not, and cannot, negate

---

[11] If a Market Disruption Event occurred, Defendants were required to "disseminate[]" such information to investors "over the Consolidated Tape, or other major market data vendor." ¶¶ 145, 221, 301

that Defendants also told investors in the Prospectus that they would announce a Market Disruption Event should such delays occur, but did not do so here. *See, e.g.*, ¶¶ 178-79, 185, 189, 192, 210.

The Credit Suisse Defendants also never announced an Acceleration Event, even though by 4:15 p.m. they knew, based on the prices of the VIX futures contracts they were buying, that XIV had declined by more than **96%**. Although they knew an Acceleration Event had occurred, they instead waited until the next day to announce it (after Credit Suisse profited handsomely from massive sales of XIV notes at inflated values). Defendants also failed to exercise their power to "modify, replace or adjust" the VIX Futures Index, a power they retained presumably to respond to events like the one they now describe, when the VIX Futures Index purportedly failed to reflect the values of the relevant VIX futures contracts underlying XIV. Nor did Defendants exercise their authority to halt trading.

Given Defendants' failure to announce a Market Disruption Event, Acceleration Event, modification or adjustment to the VIX Futures Index, or a trading halt, investors reasonably relied upon Defendants' representations that the Intraday Indicative Value was being updated every 15 seconds based on the *real-time* prices of the VIX futures contracts underlying the value of the XIV notes. ¶¶ 11, 193. As a result, the Flatline Value misled investors into believing XIV had weathered the market volatility experienced on February 5, 2018, leading investors to buy approximately **$700 million dollars** more of XIV notes during the Flatline Value period at drastically inflated prices. Tellingly, Defendants do not even attempt to offer any alternate explanation for the huge volume of XIV purchases at wildly inflated prices during the Flatline Value period.

### c.   The Credit Suisse Defendants Failed to Update their Prior Statements

The Credit Suisse Defendants are also liable for failing to update their assertions regarding the accuracy and real-time pricing of the Intraday Indicative Value. ¶¶ 188, 221-22. A duty to

update exists when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event. *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 410 (S.D.N.Y. 2010); *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) (citing *Overton v. Todman and Co.*, 478 F.3d 479, 487 (2d Cir. 2007)). The Credit Suisse Defendants ignore, and thus concede, that the Flatline Value rendered false and misleading their statements regarding the Intraday Indicative Value approximating the economic value of XIV, being calculated every 15 seconds based on real-time prices of the relevant VIX futures contracts, and investors' ability to compare the trading price of XIV against the Intraday Indicative Value.[12]

### 2.     The Credit Suisse Defendants Warned of Potential "Risks" They Knew Were Certain to Occur

The Credit Suisse Defendants claim that the Prospectus accurately and adequately disclosed the risks that materialized on February 5, 2018. (CS Br. at 4-8, 11-14). Defendants are wrong. Risk disclosures do not protect from liability "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *Rombach*, 355 F.3d at 173. Indeed, "'[g]eneral risk disclosures in the face of specific known risks which border on certainties' are not sufficient to defeat a securities fraud claim." *Dandong v. Pinnacle Performance Ltd.*, No. 1:10-cv-8086 (LBS), 2011 WL 5170293, at *13 (S.D.N.Y. Oct. 31, 2011) (Sand, J.) (quoting *In re Prudential Sec. Ltd. P'shps Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)); *accord In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628-29 (S.D.N.Y. 2003) (Berman, J.) (denying motion to dismiss where defendants "failed to disclose negative consequences from specific risks that . . . were known to be imminent").

---

[12] This is so regardless of whether the Credit Suisse Defendants "made" the Flatline Value.

*Dandong* is directly on point. There, the plaintiffs alleged that Morgan Stanley designed certain collateralized debt obligations ("CDOs") to fail by, among other things, linking them to a collateral pool of assets, such as subprime mortgage lenders, that posed a high risk of default. *Dandong*, 2011 WL 5170293, at *2. Morgan Stanley allegedly profited from this arrangement by taking a short position on the same collateral underlying the CDOs. *Id.* "In other words, [Morgan Stanley] stood to profit in the event that the pool of assets performed poorly, while the investors in the Notes suffered losses." *Id.* In seeking dismissal of the plaintiffs' fraud claims, Morgan Stanley pointed to cautionary language similar to the language Defendants rely on here, including that Morgan Stanley's "economic interests" "may be adverse to the interests of the Noteholders and potential and actual conflicts of interest may arise" as a result of Morgan Stanley's "duties and obligations under the Notes *and as a potential provider of the hedging instrument*." *Id.* at *12 (emphasis added). Morgan Stanley also pointed to language warning investors that the CDOs were extremely risky, including that the securities were "subject to a high degree of complex risks" and that "the market value of such securities may decline significantly, *possibly to zero*." *Id.* (emphasis added).

In denying Morgan Stanley's motion to dismiss, Judge Sand found that the cautionary language did "not embrace the alleged fraud." *Id.* at *13. Specifically, the cautionary language regarding Morgan Stanley's conflicts of interests was "insufficient to put investors on notice of what Plaintiffs allege was the inevitable risk that Morgan Stanley would invest their principal in an instrument that was engineered to fail." *Id.* Regarding the warning that the CDOs' value may drop to zero, the court found that "Plaintiffs have pled sufficient facts to raise the suspicion that [Morgan Stanley] had no intention of selecting anything apart from synthetic CDOs created by [Morgan Stanley] as the underlying assets[,]" and concluded that "'[m]ay decline' is a

misstatement when, assuming Plaintiffs are correct, the CDOs would almost certainly decline." *Id.*; *accord In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013) (company's warnings of possible negative effects of mobile phone usage on revenues was misleading because negative impact already existed).

Here, the Credit Suisse Defendants similarly claim that they are absolved of liability because they warned investors that the "long term" expected value of XIV notes is "zero," that their hedging activities "could" adversely affect the XIV notes, and that these hedging activities "may" present a conflict of interest because Credit Suisse "may" receive a profit from the activities. (CS Br. at 4-8, 11-14). They claim these warnings "disclosed every element of [Plaintiffs'] claim[,]" conveniently misconstruing the claim as one that investors "were unaware that Credit Suisse engaged in hedging transactions[.]" (CS Br. at 13). But the Credit Suisse Defendants do not identify risk disclosures that informed investors of the actual fraud alleged: that Credit Suisse designed XIV to fail by growing the number of XIV notes past the point where Credit Suisse's hedging activities would, with certainty, obliterate XIV during the statistically certain next volatility spike, allowing Credit Suisse to profit while investors were left with effectively worthless securities. To the contrary, the Credit Suisse Defendants affirmatively, and falsely, represented they "***have no reason to believe that [their] . . . hedging activities will have a material impact on the level of the [VIX Futures] Index[.]***" ¶ 226 (emphasis added). "In sum, while there is little doubt that the cautionary language warned Plaintiffs that the Notes carried some risk, it is inadequate to have put the reasonable investor on notice of the alleged fraud." *Dandong*, 2011 WL 5170293, at *13; *Sharette*, 127 F. Supp. 3d at 88 ("Whether the Prospectuses disclosed enough risk to insulate the makers of the documents from liability . . . raises a factual issue for trial."); *see*

*also Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 330-31 (2d Cir. 2002) (once defendant "chose to discuss its hedging strategy, it had a duty to be both accurate and complete").[13]

*In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444 (S.D.N.Y 2014), on which Defendants rely, is not to the contrary. (CS Br. at 12-14; Janus Br. at 4-5). Defendants make *TVIX* the centerpiece of their motions in the hope that, because *TVIX* involves much of the same terminology as the terminology in this case, the Court will conclude that the frauds alleged in both cases also are the same. But, while the terminology is similar, the two alleged frauds could not be more different.

In *TVIX*, the fraud alleged was that Credit Suisse misled plaintiffs as to the appropriate holding periods for the TVIX notes. Specifically, Credit Suisse "'misleadingly implied the TVIX ETNs could or should be held for longer than a single trading session'" and "'omitted material information about . . . the substantial risks that would adversely affect holders of the notes over longer holding periods'" due to "'the quantifiable risk that daily rebalancing of the TVIX ETNs would cause the notes to underperform their targeted returns . . . .'" 25 F. Supp. 3d at 450. Contrary to the Credit Suisse Defendants' assertions, nowhere do Plaintiffs allege that Credit Suisse failed to disclose "the risks of holding the ETNs for longer than one day." (CS Br. at 12).[14] Nor did the risk of holding over time have anything to do with what transpired on February 5. Defendants' repeated references to risk disclosures regarding long-term holdings of XIV notes are thus irrelevant. (CS Br. at 1, 5, 6, 14).

---

[13] Nor is the disclosure that XIV is meant for "sophisticated" investors relevant to the alleged fraud. (CS Br. at 1). Regardless of their sophistication, all XIV investors received false and misleading information.

[14] Plaintiffs allege only that Credit Suisse knew many investors did, in fact, hold XIV notes for long periods of time, and planned to take advantage of and profit from that knowledge. *See* ¶¶ 85-92.

Defendants also claim *TVIX* dealt with allegations of undisclosed "potential liquidity issues," (CS Br. at 12), failing to mention that the liquidity issues alleged in *TVIX* (and Credit Suisse's asserted risk disclosures regarding them) were entirely unrelated to those at issue here. *Compare TVIX*, 25 F. Supp. 3d at 456 (discussing liquidity in TVIX market related to the issuance of TVIX notes) *with* ¶¶ 63-84 (alleging acute liquidity issues in the VIX futures market caused by Credit Suisse's hedging activities during VIX spikes).[15]

The Credit Suisse Defendants next claim that the *TVIX* plaintiffs' allegations that "Defendants knew at the time of their issuance that TVIX ETNs would become worthless in two years", are the same as Plaintiffs' allegations here. (CS Br. at 13). The Credit Suisse Defendants are wrong again. The *TVIX* plaintiffs' allegations were based on their assertion that "given the level of volatility in the VIX" during the two-year period after the allegedly false statements were made, "loss would average approximately [.24%] each and every day." *TVIX*, 25 F. Supp. 3d at 452. The court rightly noted that "[t]his argument appears to be based on a retrospective analysis of the historical data," and that Credit Suisse "could not [have] known in advance" what the level of the VIX would be each and every day for the following two years. *Id.* These allegations once again bear no resemblance to the CAC, which alleges in detail the statistical certainty that a large VIX spike will occur once a year to once every other year, ¶¶ 82-83, and the Credit Suisse Defendants' use of this knowledge to cause and profit from XIV's destruction. Unlike in *TVIX*, no

---

[15] The Credit Suisse Defendants also claim that the issues with daily rebalancing alleged in *TVIX* are the same as the planned destruction of XIV through hedging alleged here. (CS Br. at 12 n.3). In *TVIX*, the plaintiffs alleged that Credit Suisse's daily rebalancing caused underperformance over long periods of time, and argued the defendants should have disclosed more information regarding how the daily rebalancing worked to put investors on notice of this underperformance. That is simply not what is alleged here, where the length of holding is irrelevant to the fraud alleged and where Plaintiffs do not allege the Credit Suisse Defendants should have disclosed additional details regarding the mechanics of the rebalancing, rather that they should have disclosed their plan to use hedging to destroy XIV during the next VIX spike.

"clairvoyance" was required of the Credit Suisse Defendants to know with certainty that their bet against XIV was certain to pay off because they caused its destruction.

Finally, Defendants concede that the Prospectus here contained "the *exact same*" information as the materials at issue in *TVIX*, (CS Br. at 12 (emphasis in original)), despite the fact that after *TVIX* was decided, the Credit Suisse Defendants learned conclusively during subsequent VIX spikes that the possibility of their hedging activities negatively affecting XIV's value had become a certainty, and that the continued growth of XIV would lead the hedging activities to destroy XIV during the next VIX spike.[16] Nevertheless, the Credit Suisse Defendants continued to warn investors through 2018 only of "possible" negative effects, and continued to reassure investors that the Credit Suisse Defendants "have no reason to believe that our . . . hedging activities will have a material impact on the level of the [VIX Futures] Index . . . ." ¶ 226. The "consistency of the defendants' language over time despite the new information they received . . . belies any contention that the cautionary language was 'tailored to the specific future projection.'" *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010).

### C.    Plaintiffs Adequately Plead Section 9 Claims

#### 1.    Plaintiffs Adequately Allege that Defendants Violated Section 9(a)(4)

For the reasons explained in Sections IV.B, D-E concerning the contested elements of Plaintiffs' 10b-5 claims, Plaintiffs adequately allege with particularity Section 9(a)(4) claims for manipulation of securities through the publication of misrepresentations or omissions against: (i) the Credit Suisse Defendants for the misstatements and omissions contained in the Prospectus; and

---

[16] The offering documents at issue in *TVIX* were issued between 2009 and 2012, well before the August 2015 and June 2016 VIX spikes and the July 2016 Announcement that confirmed the Credit Suisse Defendants knew of the serious liquidity issues their hedging caused during VIX spikes. ¶¶ 72-76.

(ii) the Credit Suisse Defendants, Janus, and JIC for the false and misleading Flatline Value statements. Thus, as Plaintiffs adequately allege a violation of Rule 10b-5, they also adequately allege a primary violation of Section 9(a)(4). *See, e.g., Sharette*, 127 F. Supp. 3d at 79 ("Section 9(a)(4) of the Exchange Act closely parallels Section 10(b).").

Janus argues that it is not liable for claims under Section 9(a)(4) because it is not a broker, dealer, or "entit[y] that offers or sells securities." (Janus Br. at 28). Janus, however, presents only conclusory statements and provides no factual support or legal citation to substantiate that it does not meet the requirements of Section 9(a)(4). To the contrary, Plaintiffs allege that Janus, through its broker subsidiary JHD, sold XIV notes, *see* ¶ 58, a fact that Janus concedes. Janus is thus liable under Section 9(a)(4). *See Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir. 2003) (noting at the motion to dismiss stage requiring that "'all factual allegations in the complaint [be accepted] as true and draw[ ] all reasonable inferences in the plaintiff's favor.'").[17]

---

[17] Moreover, Janus's filings with the SEC substantiate that JHD is for all intents and purposes Janus, and that Janus offered to sell XIV notes: (i) Janus Capital Management LLC ("JCM") "is an indirect wholly-owned subsidiary of Janus Henderson Group plc." Janus Capital Management LLC, *Form ADV, Part 2 Brochures,* at 1, U.S. SECURITIES AND EXCHANGE COMMISSION, https://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx ?BRCHR_VRSN_ID=501755 (dated March 29, 2018); (ii) "Janus Henderson Group is responsible for the strategic direction of its subsidiaries." *Id.*; and (iii) "JCM is also affiliated with Janus Henderson Distributors, a registered broker-dealer with the Financial Industry Regulatory Authority ('FINRA'). Janus Henderson Distributors is a limited purpose broker-dealer whose primary function is distributing shares of JCM's Sponsored Funds." *Id*. at 21. The Court may take judicial notice of Janus's subsidiary's filings with the SEC. *See Garber v. Legg Mason, Inc.,* 347 F. App'x 665, 669 (2d Cir. 2009); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 276 (S.D.N.Y. 2008).

2.       **Plaintiffs Adequately Plead that Defendants Violated Section 9(f) by "Willfully Participating" in Violations of Section 9(a)**

a.       **The Credit Suisse Defendants have Conceded their Liability Under Section 9(f)**

In addition to Plaintiffs' Section 9(a)(4) claims, Plaintiffs allege that all Defendants have violated Section 9(f) of the Exchange Act. Under Section 9(f), "[a]ny person ***who willfully participates*** in any act or transaction in violation of subsections (a), (b), or (c) of this section, shall be liable . . . ." 15 U.S.C. § 78i(f) (emphasis added). The Exchange Act does not define the term "willfully participates," though the term appears in several sections of the Exchange and Securities Acts. Commentators have noted that "willfully participates" has a broad scope and applies to parties that even "perform mechanical activities in an act or transaction done by another person." *See* Douglas E. Abrams, *The Scope of Liability Under Section 12 of the Securities Act of 1933*: *'Participation' and the Pertinent Legislative Materials*, 15 Fordham L.J. 877, 932 (1987) (discussing Exchange Act and citing its legislative history). "[W]illfully" does not rise to the level of scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n. 28 (1976) (noting that Exchange Act provisions for civil liability require a "state-of-mind condition requiring something more than negligence" and noting that "Section 9[(f)] creates potential civil liability for any person who 'willfully participates[.]'").

Plaintiffs adequately allege that all Defendants are liable under Section 9(f) for the violations of Section 9(a) alleged. First, the Credit Suisse Defendants do not, because they cannot, argue that Plaintiffs fail to adequately allege a violation of Section 9(f) against them, aside from arguing that the Section 9(f) claim fails because a Section 9(a)(4) claim is not adequately pleaded. (*See* CS Br. at 27 n.10). Because Plaintiffs adequately allege Section 9(a)(4) claims, the Credit Suisse Defendants concede their liability under Section 9(f).

31

Indeed, as explained in detail *infra* in Section IV.B., during the Flatline Value period, the Credit Suisse Defendants failed to take any measures to alert the market concerning the misleading nature of these values, despite their obligations and authority to announce a trading halt, announce a Market Disruption Event, discontinue the marketing and placing of XIV notes, or take any other action to protect the interests of XIV investors. *See, e.g.*, ¶¶ 9, 131-38, 168, 178, 185, 189, 192, 222, 229-242. Thus, the Credit Suisse Defendants each willfully participated in Janus's and JIC's misrepresentations or omissions with respect to the Flatline Value.

Like Rules 10b-5(a) and (c), Section 9(f) contains no requirement that a violator must have "made" any false statement.  Thus, even if the Credit Suisse Defendants did not "make" the false and misleading Intraday Indicative Value, which they did, they are nevertheless liable under Section 9(f) for their willful participation in CSI's Flatline Value fraud.

### b.   The Janus Defendants are Liable for their Willful Participation in Credit Suisse's Misstatements and Omissions

Janus, JIC, and JHD are similarly liable for CSI's role in the misstated Flatline Value and Janus and JHD are liable for JIC's role in the misstated Flatline Value. Like the Credit Suisse Defendants, they failed to take any measures to alert the market concerning the misleading nature of these values. ¶¶ 36, 60, 131-38, 178, 185, 192, 229-42. Thus, Janus and JIC each willfully participated in Janus's and JIC's misrepresentations or omissions with respect to the Flatline Value.

Moreover, Janus, JIC, and JHD are also liable under Section 9(f) for willfully participating in the Credit Suisse Defendants' misrepresentations and omissions in the Prospectus. ¶¶ 215-28. Janus and JHD are liable under Section 9(f) for willfully participating in the misrepresentations and omissions in the Prospectus by marketing and placing XIV notes (and profiting thereby) and growing the XIV note market so large as to allow Credit Suisse's hedging to destroy the value of

the XIV notes. *See, e.g.*, ¶¶ 33, 36-40, 57-59, 126-38, 231. Moreover, each of JIC, JHD, and Janus (by virtue of its ownership and control over JIC and JHD, including their names and trademarks) allowed their names to be used to market the XIV notes through the Prospectus to grow the XIV market in the furtherance of the Credit Suisse Defendants' fraud. *Id.*

Accordingly, the Janus Defendants' arguments that they cannot be liable concerning any fraudulent statements or omissions in the Prospectus fail because they are liable under Section 9(f). Thus, even assuming, *arguendo*, that Janus is not liable for a Section 9(a)(4) violation, Janus, JIC, and JHD are nevertheless liable under Section 9(f) for willfully participating in Credit Suisse's fraudulent statements and omissions in the Prospectus, as Section 9(f) does not impose a similar restriction. *See* 15 U.S.C. § 78i(f) (liability as to "[a]ny person who willfully participates").

### D.       Defendants Acted With Scienter for Purposes of Each Exchange Act Claim

Scienter can be shown by alleging facts: "(1) showing that the defendants had both motive and opportunity to commit the fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Cornwall v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 636 (S.D.N.Y. 2010). Courts must conduct the scienter analysis "holistically" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 at 322-23 (2007) (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference[.]" *Tellabs,* 551 U.S. at 324. "Plaintiff generally must frame the facts respecting the defendant's mental state . . . without the benefit of discovery, and therefore, most often, allegations about a defendant's culpable state of mind must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 287

(D. Conn. 2005). Here, there is strong evidence that the Credit Suisse Defendants had the motive and opportunity to commit fraud and that all Defendants consciously engaged in reckless and knowing misconduct.

### 1. The Credit Suisse Defendants Had Motive and Opportunity to Defraud Investors

Defendants had both motive and opportunity to defraud XIV investors.[18] First, the Credit Suisse Defendants' self-dealing transactions are a telltale sign of motive. In *Dandong*, for instance, the plaintiff had invested in "credit-linked notes" which were supposed to be pegged to low-risk assets. 2011 WL 5170293, at *1. Instead, Morgan Stanley allegedly invested their funds in high-risk CDOs which Morgan Stanley had designed to fail so it could profit from short positions it had taken on the same CDOs. *Id.* at *10-11. The Court found that "[Plaintiffs] have pled what amounts to self-dealing by Morgan Stanley, insofar as Morgan Stanley was betting against, or 'shorting,' the synthetic CDOs that it had itself created. The engineered frailty of the CDOs and Morgan Stanley's position on both sides of the deal adequately alleges motive." *Id.* at *12. Similarly, here, the Credit Suisse Defendants structured XIV such that they profited enormously from its engineered demise. *See also Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 645 (S.D.N.Y. 2012) (crediting allegations of self-dealing where the "[c]omplaint contains factual allegations indicating that Defendants not only knew that [certain] CDOs were unlikely to be profitable and failed to disclose this to investors, but also . . . sought to profit from that insight."). The self-dealing nature of the Credit Suisse Defendants' dealings in XIV supports their scienter.

---

[18] The Credit Suisse Defendants do not dispute that they had the "opportunity" to defraud investors. *See also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F.Supp.2d 163, 181 (S.D.N.Y. 2006) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

Moreover, the scheme allowed Defendant Thiam to realize his specific, long-term strategic goal of increasing Credit Suisse's profitability by divesting highly volatile assets while simultaneously decreasing the likelihood of another revolt from activist investors. ¶¶ 118-25. As a result, Thiam realized concrete benefits from his machinations with respect to XIV above and beyond mere profits. *See Sharette*, 127 F. Supp. 3d at 98 (motive adequately alleged where defendants had "the goal of securing a specific, highly profitable new business opportunity").[19]

### 2. Plaintiffs Plead Strong Evidence of Conscious and Reckless Misconduct Against All Defendants

The CAC is replete with allegations that Defendants were intimately aware of facts relevant to the frauds alleged. For example, Plaintiffs specifically allege that:

- Credit Suisse carefully managed the financial risks associated with its XIV portfolio through committees staffed by the Individual Defendants. ¶¶ 93-108. The Individual Defendants were on the CARMC, which actively monitored risk and set binding risk limits. Any breach of those limits was immediately escalated to Thiam. ¶¶ 93-98. Mathers also chaired the VARMC, which determined the VaR regimen that "estimate[d] losses associated with unusually severe market movements." ¶ 106.

- The Credit Suisse Defendants knew, based on three prior experiences and their own internal risk modeling for "severe market movements," that market volatility had caused the VIX Index to spike in the past and that the VIX Index was statistically certain to spike in a similar fashion in the future. ¶¶ 63-77, 82-83, 106-108.

- The Credit Suisse Defendants knew that, during such a spike in the VIX Index, its end-of-day hedging trades caused the price of VIX futures to spike still higher, driving the price of XIV sharply downward. These VIX futures liquidity issues were immediately escalated to the Individual Defendants who sat on the CARMC. ¶¶ 63-77.

- To protect Credit Suisse from the effects of the liquidity problems caused by its own hedging activities, the Credit Suisse Defendants issued the July 2016 Announcement, giving Credit Suisse alternate avenues to hedge its XIV exposure. ¶ 75. Not only did the Credit Suisse Defendants issue the July 2016 Announcement, but the announcement affected binding risk limits and thus required approval by the CARMC. ¶¶ 93-98.

---

[19] In addition to realizing his strategic goals, in March 2018, Defendant Thiam received $10.2 million in compensation expressly linked to his helming the strategic shift toward wealth management and away from investment banking. ¶ 212. This compensation tied directly to the fraud alleged is sufficient to raise a plausible inference of scienter. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 180 (S.D.N.Y. 2009).

- Despite their knowledge of the liquidity issues caused by Credit Suisse's hedging, the Credit Suisse Defendants issued millions more XIV notes, exacerbating the liquidity issue such that Credit Suisse's hedging during the next volatility spike would, with certainty, destroy XIV notes' value. ¶¶ 63, 111. Because Mathers' VARMC forecasted the effects of severe market movements on XIV, it must have forecasted the liquidity issues and XIV's $1.8 billion loss, which exceeded the total VaR by two orders of magnitude, a breach that required immediate escalation to, and approval from, Thiam. *See* ¶¶ 106-108.

- On February 5, 2018, after a volatility-driven spike in the VIX Index, Credit Suisse bought extraordinary volumes of VIX futures contracts, knowing that this would cause the price of VIX futures to artificially skyrocket and cause XIV's value to collapse. ¶¶ 155-170.

- Credit Suisse and Janus had the joint responsibility to calculate and publish XIV's Intraday Indicative Value based on real-time pricing data at fifteen-second intervals, absent a "Market Disruption Event." ¶ 140. They told investors that they should rely on the Intraday Indicative Value to approximate the real time economic value of XIV. ¶ 147.

- During one critical hour on February 5, 2018, Credit Suisse and Janus egregiously overstated the Intraday Indicative Value of XIV. ¶¶ 171-190.

- Immediately before and during the hour in which it overstated XIV's value, Credit Suisse bought up huge quantities of VIX futures, rendering XIV nearly worthless. Because the Credit Suisse Defendants were purchasing the very VIX futures that determined the Intraday Indicative Value, Credit Suisse knew the Intraday Indicative Value was grossly inaccurate. ¶¶ 187, 155-170.

- Credit Suisse and Janus did not announce a Market Disruption Event, Acceleration Event, halt trading in XIV, or take other action to alert investors to the gross inaccuracy of the Intraday Indicative Value. ¶¶ 9, 189, 210, 251.

- Despite knowing at 4:15 p.m. on February 5 that their purchases of VIX futures had collapsed XIV's value by 96%, the Credit Suisse Defendants waited until the next day to announce that an Acceleration Event had occurred. In the intervening time, Credit Suisse continued to profit from investors' purchases of XIV notes. ¶¶ 169, 199.

- Credit Suisse redeemed all XIV notes at $5.99 per note, reaping a windfall of hundreds of millions in profits. ¶ 201, 194-98.

It is not reasonable to suggest that these events—which Credit Suisse admits netted them at least half a billion dollars—were the product of happenstance or coincidence. To the contrary, the Credit Suisse Defendants had detailed knowledge of each of the events outlined above, which constituted a complex and multi-step financial scheme, and intended the results they achieved. The wealth of evidence of knowing conduct pled in the CAC is far more plausible than any opposing inference.

Further probative of scienter are the facts known to Defendants which contradicted their public statements. The Credit Suisse Defendants knew that their hedging activities during each of the three prior VIX spikes caused significant liquidity issues in VIX futures, and therefore they issued the July 2016 Announcement stating that they were providing themselves additional hedging options. ¶¶ 63-77, 93-98. In view of this knowledge, their subsequent assurance to investors that the Credit Suisse Defendants "***have no reason to believe that [their] . . . hedging activities will have a material impact on the level of the [VIX Futures] Index***" ¶ 226, is patently false. "These allegations alone are enough to satisfy the pleading requirement for scienter." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 621 (S.D.N.Y. 2017) (allegations that defendants knew facts or had access to information contradicting their public statements are enough to satisfy scienter).

Moreover, the fact that the Credit Suisse Defendants continued to issue and profit from the sale of millions more XIV notes despite knowing that this growth would significantly exacerbate the already problematic liquidity issues in XIV is strong evidence of scienter. ¶¶ 63, 106-108, 111; *see Sharette*, 127 F. Supp. 3d at 98-99 (Credit Suisse's creation of an investment vehicle through which hedge funds would profit if the investment failed "is circumstantial evidence that the Credit Suisse Defendants *intended*" the outcome (emphasis in original)).

The Credit Suisse Defendants' scienter is further evidenced by Defendant Thiam's attempts to conceal the fraud. For example, Defendant Thiam falsely asserted that Credit Suisse decided to close XIV because it had become "quasi-impossible to price" since "the product stopped trading." Yet XIV had not stopped trading, nor was it quasi-impossible to price when Credit Suisse elected to close it. ¶ 208. Thiam also claimed that there was no prospect of recovery for XIV, when, despite Credit Suisse's liquidity squeeze, XIV would have been trading at approximately $30.88 by March

6, 2018, had Credit Suisse not terminated it. ¶ 207. Finally, Thiam falsely claimed that the decision to close XIV was made "in the interest of investors[.]" ¶ 209. In reality, Credit Suisse's decision to close XIV was antithetical to the interest of investors and carefully calculated to maximize its own profits. ¶ 209. The mendacity of Defendant Thiam's *post hoc* attempts to justify the decision to close XIV is yet another marker of scienter. *See Novak v. Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000) (holding that scienter may be strongly inferred when defendants' public statements are contrary to specific facts known to them).

But that is not all. Defendants' misrepresentation of the Intraday Indicative Value despite knowing that XIV's economic value was plummeting toward worthlessness is also probative of scienter on its own. Indeed, because the Credit Suisse Defendants were buying the very same VIX futures that determined the Intraday Indicative Value, and simultaneously selling XIV notes to investors at grossly inflated values, they "had access to" pricing information that showed them conclusively that the Flatline Value was "not accurate." *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009). Similarly, despite their protestations to the contrary, (Janus Br. at 14), the Janus Defendants also, at a minimum, had access to information demonstrating that the Intraday Indicative Value, or its underlying inputs, were false. During the Flatline Value, JHD was marketing and placing the XIV notes Credit Suisse sold at artificially inflated values, and thus Janus too had access to pricing information that revealed the Flatline Value was inaccurate. *ECA*, 553 F.3d at 199; *see* ¶¶ 58, 60.

Further, under the Prospectus, Credit Suisse and Janus were responsible for (1) monitoring the information that yields the Intraday Indicative Value to ensure that accurate values were timely published; and (2) announcing a Market Disruption Event if S&P "fails to publish or compute the [VIX Futures Index]." ¶ 152. By definition, Defendants could not know whether S&P was failing

to "publish or compute" the VIX Futures Index unless they were actively monitoring the underlying inputs, *i.e.* the VIX futures prices that showed the falsity of the Flatline Value. If, as Janus suggests, Defendants did not know the Intraday Indicative Value was false, Defendants' failure to uphold their duties and corresponding failure to maintain controls to ensure the accuracy of the Intraday Indicative Value or to announce a Market Disruption Event evinces knowing or reckless misconduct. *See Novak*, 216 F.3d at 311 (scienter may be inferred from failure to check information defendants had a duty to monitor).

Finally, the magnitude of the frauds alleged, which wiped out billions in investor holdings while generating at least half a billion in profits for Credit Suisse, "is startling by any measure," providing additional evidence of scienter. *In re Salix Pharm., Ltd.*, No. 1:14-cv-8925 (KMW), 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016); *see Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("[T]he magnitude of the alleged fraud provides some additional circumstantial evidence of scienter.").

In sum, Plaintiffs' detailed and extensive allegations of Defendants' conduct, knowledge, and motives, when viewed as a whole, are most plausibly explained as evincing extreme recklessness or intent to defraud. *See Tellabs*, 551 U.S. at 311-313.

### 3.    Plaintiffs Adequately Allege Corporate Scienter

The Janus Defendants argue that corporate scienter is not present here. (Janus Br. at 17). "A strong inference of corporate scienter may . . . be appropriate 'where a corporate statement is so important and dramatic that it would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *In re Gentiva Secs. Litig.,* 932 F.Supp.2d 352, 384 (S.D.N.Y. 2013). Here, JIC's exclusive business is to calculate and disseminate trading values for various financial instruments, among the largest, most widely traded, and popular being XIV. ¶¶ 2; 98. Indeed, JIC received *tens of millions of dollars* in fees for

this task. ¶ 59. JIC's specific rights and responsibilities regarding the Intraday Indicative Value, Market Disruption Event, and other determinations were extensively detailed in the Prospectus. JIC's dissemination of the grossly inaccurate Flatline Value and/or failure to announce a Market Disruption Event, pursuant to its duties in the Prospectus, on a day when market volatility spiked dramatically, ¶¶ 229-42, and while its sister company JHD was marketing and placing XIV notes, ¶ 58, is precisely the sort of important statement that implies knowledge by corporate officers.

Contrary to Janus's contention, the mere fact that Plaintiffs have not alleged the specific individual in this small Janus-owned subsidiary (about which Janus provides essentially no public information) is not fatal in light of how critical the Intraday Indicative Value was to investors and to JIC's business during this period. *See In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 460 n. 21 (S.D.N.Y. 2005) ("Defendants[ ] cannot simultaneously argue that the vendor financing arrangements were disclosed to the investing public, but that [defendant's] CEO and CFO were unaware of those commitments."); *In re MBIA, Inc., Sec. Litig.,* 700 F. Supp. 2d 566, 590-91 (S.D.N.Y. 2010) (finding corporate scienter in absence of individual scienter).[20] Thus, Plaintiffs have established corporate scienter against the Janus Defendants.

### 4.    Defendants Cannot Avoid Liability by Blaming Market-Wide Forces

Defendants argue that the most plausible inference is that the investment losses in XIV were caused by market-wide forces over which Defendants had no control. (*See* CS Br. at 22-23; Janus Br. at 16-17). "[D]efendants' arguments on this issue are premised on a convenient

---

[20] In addition, "[a] plaintiff can raise an inference of corporate scienter by establishing scienter on behalf of an employee who acted within the scope of his employment." *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 361 (S.D.N.Y. 2015). The CAC identifies JIC as a discrete set of Janus employees who recklessly or knowingly promulgated a false Intraday Indicative Value and failed to declare a Market Disruption Event. ¶¶ 229-242. The Credit Suisse Defendants do not dispute, and thus concede, that corporate scienter is present as to them.

confusion of cause and effect." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 504 (S.D.N.Y. 2011) (rejecting competing inference of market-wide collapse); *In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 269-70 (S.D.N.Y. 2010) (same). As explained *supra* at Section I, Defendants' attempt to blame market forces ignores that market volatility had little to do with XIV's destruction: market-wide forces decreased XIV's value by, at most, 33% (and even that drop would have been swiftly negated as VIX futures prices quickly tumbled), but it was only because of Credit Suisse's engineered liquidity crisis in the VIX futures market that XIV's value dropped *96%*, triggering an Acceleration Event. ¶¶ 162-70. Defendants do not contest that Credit Suisse caused the VIX futures liquidity crisis that collapsed XIV's value. Their attempt to pin the blame and harm on market-wide forces should be rejected.

**E.      Plaintiffs Adequately Allege Loss Causation for Purposes of Each Exchange Act Claim**

On a motion to dismiss, "courts in this District have historically evaluated loss causation under the notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure." *Sharette*, 127 F. Supp. 3d at 80. As such, "'a short and plain statement that provides the defendant with notice of the loss and its causal connection to the alleged misconduct is sufficient to assert loss causation.'" *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 517 (S.D.N.Y. 2016).

Under Rule 10b-5(b), "Plaintiffs need not demonstrate . . . that the corrective disclosure was the *only* possible cause for decline in the stock price." *Carpenters*, 750 F.3d at 233. Rather, they need only allege that the market reacted negatively to a corrective disclosure of the fraud or that the loss was foreseeable and caused by the materialization of the risk concealed. *Id.* at 232-33. As for Rules 10b-5(a) and (c), "the loss causation requirement will be satisfied if such conduct had the effect of concealing the circumstances that bore on the ultimate loss." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005). And, claims under Sections 11 and 12(a)(2)

"need not allege . . . loss causation" at all. *Yi Xiang v. Inovalon Holdings*, Inc., 254 F. Supp. 3d 635, 644 (S.D.N.Y. 2017).

Repackaging their failed scienter arguments, Defendants argue Plaintiffs fail to allege loss causation because XIV's implosion "coincides with a market wide phenomenon" and that Plaintiffs "concede that their losses were caused by a spike in market-wide volatility." (CS Br. at 23-24; Janus Br. 21-23). Once again, Defendants misconstrue Plaintiffs' allegations. Plaintiffs do not allege that market-wide volatility caused their losses, but rather the losses stem from: (i) the Credit Suisse Defendants' manipulative scheme to grow XIV notes to the point where their hedging activity would create an artificial liquidity squeeze in VIX futures, thus economically damaging investors by artificially affecting the prices of XIV notes; (ii) the misleading statements contained in the Prospectus concealing known risks concerning this scheme, and when these risks ultimately materialized the price of XIV notes declined significantly to remove the inflation from the XIV notes and thereby causing economic loss to investors; and (iii) the Flatline Values being false and/or misleading or omitting material information that caused the XIV notes to trade at artificial prices during the Flatline Value period. Plaintiffs sufficiently meet the pleading standard for loss causation as to each of these.[21]

In addition, despite specific allegations in the CAC to the contrary, Defendants argue that the broader market movements on February 5, 2018 absolve of them of liability at this stage of the

---

[21] Plaintiffs also allege that the Credit Suisse Defendants made materially false and/or misleading statements and omissions in the Prospectus, ¶¶ 215-28, that caused a foreseeable loss when this concealed risk materialized on February 5, 2018, causing the removal of the artificial inflation in the values of XIV notes and causing economic harm to XIV investors. *See* ¶¶ 155-70, 191-99, 251, 259. These allegations are "sufficient to give rise to a plausible inference of loss causation with regard to their misstatement and omission claims under Section 10(b) and Rule 10b–5 and in accordance with the notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure." *Sharette*, 127 F. Supp. 3d at 104.

proceedings. (CS Br. at 30; Janus Br. at 21-24). Although Defendants are correct that "if the loss was caused by an intervening event, . . . the chain of causation will not have been established[,]" they overlook that this "***is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss***." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 189 (2d Cir. 2015) ("The requirement . . . to plead *a* causal link does not place on [p]laintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations."). Plaintiffs have adequately alleged that Defendants concealed the risk of Credit Suisse's purposeful growth of the XIV market to a size that would allow its own hedging to destroy XIV's value so that Credit Suisse could profit, and that upon materialization of this risk it negatively impacted the value of XIV notes.[22] This is all that is required at this stage in the proceedings. Regardless, as explained *supra* Section I, market-wide volatility had only a modest effect on Credit Suisse's value, while Credit Suisse's liquidity squeeze caused XIV to collapse 96%.

The Janus Defendants argue that investors were told not to rely on the Intraday Indicative Value, and thus the Flatline Value could not have caused Plaintiffs' losses. (Janus Br. at 21-22). Despite being contradicted by the plain terms of the Prospectus, *see supra* Section IV.B.1.b., this argument conflates loss causation with reliance, an element the Janus Defendants do not contest. Finally, the Janus Defendants claim the Flatline Value did not cause Plaintiffs' loss because, according to them, XIV prices did not drop significantly after the value was corrected. (Janus Br.

---

[22] Defendants' reliance upon *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763 (2d Cir. 1994) is misplaced. *First Nationwide* involved a RICO claim, not the federal securities laws. *Id.* In finding that loss causation was not adequately pled the Second Circuit noted that it was the "cumulative effect" of many factors, including a five-year gap between the alleged misrepresentations and when the losses occurred, the losses occurring at the same time as the real estate market collapse, and the failure to plead facts that if proven would have resulted in a loss as result of the misstatements. *Id.* at 772.

at 22-23). But Plaintiffs allege that XIV notes were trading at $42.81 during the Flatline Value, ¶ 192, then decreased after the Flatline Value updated at 5:09:05 p.m., ¶ 172, falling to a low of $10.16 at 6:28 p.m., ¶ 192. Nothing more is required. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 at 347 (2005) (pleading loss causation requires only "some indication of the loss and the causal connection that the plaintiff has in mind").[23]

### F.    Plaintiffs Have Standing for the Flatline Value Misrepresentations

Defendants fault Plaintiffs for not specifically denoting which of the Plaintiffs purchased XIV notes during the time between 4:09:48 p.m. and 5:09:04 p.m. on February 5, 2018 when Defendants made the Flatline Value. Setting aside that Plaintiffs adequately allege that they purchased XIV notes during the Class Period, ¶¶ 23-27, which includes the Flatline Value period, the precise issue of whether any of the Plaintiffs purchased XIV notes during the Flatline Value period was extensively litigated during the lead plaintiff phase of this litigation. The Court, after noting that the "aftermarket" period was defined as "February 5, 2018 between 4:10 PM and 5:09 PM[,]" concluded that one or more of the Plaintiffs "purchased their securities during the aftermarket" period. June 21, 2018 Order at 8, 14-15 (ECF No. 74). This Court may "take judicial notice of its own orders" and "its own records." *Rosado-Acha v. Red Bull Gmbh*, No. 1:15-cv-7620 (KPF), 2016 WL 3636672, at *7 (S.D.N.Y. June 29, 2016) (citing *Hatch v. Morosco Holding*

---

[23] Defendants argue that they have proven an affirmative defense to loss causation concerning Lead Plaintiffs' Section 11 claims. (CS Br. at 23). As discussed herein, Plaintiffs adequately plead loss causation concerning the Section 10(b) claims for the misrepresentations contained in the Prospectus (which also are separately identified as misstatements for Section 11 liability) and, thus, Defendants fail in "proving that the allegedly misleading representations did not cause the depreciation in the stock's value." *Inovalon*, 254 F. Supp. 3d at 644. Furthermore, this argument raises an "issue[] of fact [] not appropriate for resolution in the motion to dismiss stage." *In re Facebook*, 986 F. Supp. 2d at 523.

*Co.*, 56 F.2d 640, 640 (S.D.N.Y. 1932)).[24] The Court's prior determination is conclusive at this stage.

The Court's determination was based on sworn PSLRA certifications and declarations, including Bloomberg pricing data, a simple review of which dispels any possible argument that Plaintiffs lack standing.[25] For example, comparing Plaintiff ACM's PSLRA certification with Bloomberg trading data from February 5, 2018 shows that the only possible time ACM could have purchased its shares was during the Flatline Value period. *Compare* ACM's PSLRA Certification (ECF No. 60-1) (purchase of 200,000 XIV notes at $36.5210) *with* ECF Nos. 57, 57-6 (based on Bloomberg data, prices before Flatline Value were always above $92.51 and prices after were always below $32.51; *see also* ¶¶ 172, 192. ACM's trade data upon which its PSLRA certification is based also contains time stamps conclusively demonstrating that it purchased XIV notes during the Flatline Value period. (Decl. of Laura H. Posner, attached hereto as Ex. A).[26]

The Court's determination, ACM's certification, XIV's historical trading prices, and ACM's own trade data firmly establish ACM's allegations that it purchased shares during the Class

---

[24] This order was also specifically referenced in the CAC, ¶¶ 23-27, and is thus part of the CAC. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.").

[25] In addition to these documents being part of the Court's "own records," of which the Court can take judicial notice, *see Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 387 n.14 (S.D.N.Y. 2014), Plaintiffs' PSLRA certifications are "integral to the pleadings" and are deemed to be part of it, and, as Defendants acknowledge, the Court may take judicial notice of stock prices. *In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 347 n.76 (S.D.N.Y. 2003) ("In a securities fraud class action, the lead plaintiff certification must be considered integral to the complaint because it is required by the PSLRA."); (Janus Br. at 19 n.8 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000))).

[26] Defendants' reliance on *Amidax*, 671 F.3d at 146, where the plaintiff's standing argument was directly contradicted by documents plaintiff attached to the complaint, is misplaced.

Period and it has standing to pursue the Flatline Value misrepresentations. As Defendants agree that a "purchaser" has standing under Section 10(b), this aspect of their motion must be denied.

## V.     PLAINTIFFS ADEQUATELY ALLEGE SECURITIES ACT CLAIMS

Securities Act claims are governed by Rule 8(a)(2) notice pleading, which requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *In re NovaGold*, 629 F. Supp. 2d at 283. Defendants claim that the Securities Act claims "sound in fraud" to invoke Rule 9(b)'s heightened pleading standards. (CS Br. at 11; Janus Br. at 26). They are wrong.

*First*, contrary to the Credit Suisse Defendants' claim, "[Plaintiffs'] allegations simply track the language of Section 11 . . . they do not sound in fraud. *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017).[27]

*Second*, contrary to Credit Suisse's argument (CS Br. at 11), "[t]he same course of conduct that would support a [Section 10(b)] claim may as well support a Section 11 claim or a claim under Section 12(a)(2)." *Rombach*, 355 F.3d at 171; *see also In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 405-06 (S.D.N.Y. 2013) ("Plaintiffs may 'plead Section 10(b) fraud and Section 11 negligence claims as alternatives, as long as the complaint is organized in a way that allows the court to determine which allegations support which claim.'").[28]

---

[27] *Compare* 15 U.S.C. § 77k (a) ("In case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, . . . ." (emphasis added)) *with* ¶ 305 ("The [Prospectus] statements above in paragraphs 229 – 304 were materially misleading, contained untrue statements of fact, and omitted to state facts necessary to make the [Prospectus] not misleading, and omitted required material facts . . . .").

[28] *Rombach* is further distinguishable as Plaintiffs have asserted a negligence claim and have not asserted reliance on the misstatements. *See In re Refco, Inc. Sec. Litig*., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (citing *Rombach v. Chang,* No. 1:00-cv-0958 (SJ), 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002), *aff'd and remanded*, 355 F.3d 164 (2d Cir. 2004) (discussing lack of negligence allegations); *Rombach*, 2002 WL 1396986, at *3 (claiming reliance); ¶¶ 294-323.

*Third*, Defendants imply that the Securities Act allegations are somehow intertwined within the Exchange Act claims and that Plaintiffs merely rely on "generic disclosures of fraud," (Janus Br. at 26), or a "boilerplate sentence" to disclaim any reference or reliance on fraud, (CS Br. at 11). To the contrary, such disclaimers support non-fraudulent allegations "[b]ecause [when] plaintiffs have specifically disclaimed any component of fraud in their Sections 11 and 12(a)(2) claims, there are no 'averments of fraud.'" *Garber v. Legg Mason*, Inc., 537 F. Supp. 2d 597, 612 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 665 (2d Cir. 2009). Further, the CAC does not solely rely on disclaimers of fraud, but also employs additional measures to ensure that the Securities Act claims do not sound in fraud by: (i) alleging the Securities Act claims in a "separate" complaint apart from the Exchange Act claims, ¶¶ 294-323; (ii) excluding all Exchange Act averments, ¶ 295; (iii) distinctly alleging the Securities Act claim's false statements and omissions apart from the Exchange Act claims, ¶¶ 299-305; and (iv) pleading only strict liability and negligence while relying on the words drawn from the Securities Act, ¶¶ 305, 312.[29] *See In re Refco*, 503 F. Supp. 2d at 631-32 (allegations did not sound in fraud where complaint was "carefully structured so as to draw a clear distinction between negligence and fraud claims," and defendant's intent was "carefully couched in the language of negligence").[30]

## VI.  PLAINTIFFS ADEQUATELY PLEAD CONTROL PERSON LIABILITY UNDER SECTION 20(a) AND SECTION 15

"Control allegations are evaluated under the liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a)." *In re Take-Two Interactive Sec. Litig*., 551 F. Supp. 2d 247, 307

---

[29] The CAC plainly states that "Credit Suisse is ***strictly liable*** . . . . The Individual Defendants ***owed to Lead Plaintiffs and the Securities Act Class the duty to make a reasonable and diligent investigation*** . . . . ***Neither of the Individual Defendants made a reasonable investigation or possessed reasonable grounds*** . . . ." ¶ 312 (emphasis added).

[30] Even assuming, *arguendo*, that Rule 9(b) applies to the Securities Act claims (which it does not), the CAC easily satisfies that pleading standard as discussed herein.

(S.D.N.Y. 2008). To succeed on a claim under Section 20(a) of the Exchange Act, a plaintiff must only show: "(1) a primary violation by a controlled person and (2) direct or indirect control of the primary violator by the defendant." *SEC v. Lek Sec. Corp.*, 276 F. Supp. 3d 49, 63 (S.D.N.Y. 2017). "Section 15 requires only that a plaintiff plead that the relevant defendant controlled the primary violator, and control for purposes of Section 15 entails only 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010) (quoting *SEC v. First Jersey Sec.*, Inc., 101 F.3d 1450, 1472-73 (2d Cir.1996)).[31]

Credit Suisse, Janus, and the Individual Defendants (the "Controlling Defendants") argue that Plaintiffs fail to adequately plead "culpable participation" as to each of them. (CS Br. at 26-27; Janus Br. at 25-28). However, a majority of judges in this District have found that culpable participation is not an element of Section 15 claims.[32] Similarly, courts in this circuit have also found that Section 20(a) claims do not require culpable participation to be pled in order to state a claim for control person liability. *See, e.g., In re Parmalat*, 375 F. Supp. 2d at 308 (Kaplan, J.); *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536-37 (E.D.N.Y. 2011) (Dearie,

---

[31] The Controlling Defendants (excepting Janus) do not contest that they are a "controlling person" and therefore have conceded this point. Regardless, the CAC adequately meets the notice pleading standard of Rule 8. *See In re Refco*, 503 F. Supp. 2d at 637 ("Control entails the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.")

[32] *See, e.g., In re Deutsche Bank AG Sec. Litig.*, No. 1:09-cv-1714 (DAB), 2016 WL 4083429, at *36 (S.D.N.Y. July 25, 2016), *reconsideration denied*, No. 1:09-cv-01714 (DAB), 2016 WL 11201753 (S.D.N.Y. Sept. 8, 2016) ("A majority of judges in this District . . . have held that allegations of culpable participation are not required."); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 308 (S.D.N.Y. 2013) (same).

C.J.); *In re Initial Pub. Offering Securities Litigation*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003).[33] This Court should conclude the same.

Even if the Court determines that culpable participation is a required element (which it should not), Plaintiffs adequately allege such as to each of the control persons. *See In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634, 634 n.96 (S.D.N.Y. 2014) (finding culpable participation when scienter adequately alleged and noting that culpable participation may be less than scienter). Plaintiffs have sufficiently alleged a primary violation of Section 10(b) and Rules 10b-5(a)-(c), including Defendants' scienter. *See supra* Section IV.A.E.

Moreover, Plaintiffs adequately allege that CSI was controlled by Credit Suisse and Credit Suisse by the Individual Defendants and that the control parties all culpably participated in the fraud on the bases that: the Individual Defendants are senior executives (with Thiam also being a director) intimately involved with the risk management concerning the XIV notes, ¶¶ 32, 93-110; based on their roles and positions that the Individual Defendants knew or recklessly disregarded the next volatility spike while Credit Suisse was selling millions of XIV notes to investors despite internal risk limits concerning the same, ¶¶ 73-84, 111-116, 244-56; Mathers served as both the CFO of Credit Suisse and the President of CSI and by the inherent nature of these position had the ability to control these entities statements, ¶¶ 30, 33-34; Credit Suisse had full voting and ownership control over CSI as it was a "major" subsidiary that accounted for a significant portion of Credit Suisse's business operations, ¶ 30; the role of CSI in the alleged fraudulent scheme and misrepresentations, ¶¶ 126-90; and the role the Individual Defendants played in Credit Suisse's

---

[33] Even if the Court finds that a Section 20(a) claim requires pleading culpable participation, such a finding does not require it also to be an element of a Section 15 claim. *See, e.g.*, *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 387 (S.D.N.Y. 2007) ("Unlike section 20(a) the plaintiff is not required to allege culpable participation . . . in order to state a claim under section 15.").

restructuring plan, ¶¶ 117-25. "This is enough to give rise to a strong inference of culpable participation." *See In re Refco* 503 F. Supp. 2d at 661; *In re EZCorp, Inc. Sec. Litigs.*, 181 F. Supp. 3d 197 (S.D.N.Y. 2016) (primary shareholder's "participation in management," and access to "all reports, agendas, and other information available to the [entity's board] suffices to particularly allege access to information suggesting recklessness, and thus 'culpable participation under even the most rigorous pleading standard.'").[34]

## VII.   **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss in their entirety.[35]

---

[34] The relationship between Credit Suisse and CSI may also be properly seen as an agency relationship that establishes Credit Suisse's culpable participation in CSI's fraud. "Establishment of an agency relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent. In addition, the principal must maintain control over key aspects of the undertaking." *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp. 2d 217, 225 (S.D.N.Y. 2013). Here, Plaintiffs allege that: (i) CSI is a wholly-owned subsidiary that is one of the largest contributors to Credit Suisse's business operations; (ii) Credit Suisse's CFO, Defendant Mathers, is CSI's President; (iii) CSI was subject to oversight and control by Credit Suisse; and (iv) CSI agreed to perform the duties of the calculation agent on behalf of Credit Suisse concerning the XIV notes. *See, e.g.*, ¶¶ 31, 33, 127, 130, 133-38. Moreover, JIC and JHD were subsidiaries performing specific tasks for Credit Suisse at the behest of Janus. *See* ¶¶ 36-39. This is substantiated by the fact that the Janus Defendants provided overarching and coordinated services to Credit Suisse concerning the XIV notes that included calculation agent services, marketing and sales of XIV notes, and the licensing of trademarks and intellectual property. ¶¶ 40, 55, 57-58, 60, 90, 130-38. The level of coordination and the breadth of services JIC and JHD provided Credit Suisse evidences that this was at the behest and approval of Janus. Thus, Plaintiffs plausibly allege: (i) JIC and CSI had actual authority to act as Credit Suisse's calculation agents and that Credit Suisse culpably participated in their fraud; and (ii) JIC and JHD had actual authority to act as Janus's agent and culpable participation on behalf of Janus. *See Elbit Sys.*, 917 F. Supp. 2d at 226; *CompuDyne Corp.*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006).

[35] Should the Court dismiss the CAC, Plaintiffs respectfully request leave to amend. *See Chill v. Gen. Elect. Co.*, 101 F.3d 236, 271 (2d Cir. 1996) ("In the securities litigation context, leave to amend is particularly appropriate[.]").

Dated: December 21, 2018

Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

_/ s / Michael B. Eisenkraft_
Michael B. Eisenkraft
Laura H. Posner
88 Pine Street / 14th Floor
New York, New York 10005
Tel. (212) 838-7797
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com

Steven J. Toll
Eric S. Berelovich
Allen Dreschel
1100 New York Avenue, N.W. / Fifth Floor
Washington, D.C. 20005
Tel. (202) 408-3640
stoll@cohenmilstein.com
eberelovich@cohenmilstein.com
adreschel@cohenmilstein.com

Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Tel. (312) 357-0370
cgilden@cohenmilstein.com

**LEVI KORSINSKY, LLP**
Eduard Korsinsky
Nicholas I. Porritt
Adam M. Apton
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
ek@zlk.com
nporritt@zlk.com
aapton@zlk.com

**LEVI KORSINSKY, LLP**
Alexander Krot
1101 30th Street NW, Suite 115
Washington, D.C. 20007

Tel: (202) 524-4290
Fax: (212) 363-7171
akrot@zlk.com
(*pro hac vice* forthcoming)

*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*

and

**BRONSTEIN, GEWIRTZ & GROSSMAN,
LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel. (212) 697-6484
peretz@bgandg.com

*Additional Counsel for ACM Ltd.*