# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SET CAPITAL LLC, et al., Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No.: 1:18-cv-02268-AT-SN |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS, JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, and JANUS DISTRIBUTORS LLC d/b/a JANUS HENDERSON DISTRIBUTORS, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S REPORT & RECOMMENDATION

TABLE OF CONTENTS

I.      Introduction ............................................................................................................. 1

II.     Legal Standard ........................................................................................................ 3

III.    Plaintiffs Object to the Report's Findings Regarding Scienter ......................... 3

        A.      Plaintiffs Adequately Allege Defendants Acted with Scienter in
                Disseminating and Failing to Correct the False and Misleading Intraday
                Indicative Value ...................................................................................... 3

        B.      Plaintiffs Adequately Allege Defendants Acted with Scienter in
                Manipulating the XIV Market ................................................................ 6

                1.      The Report Erroneously Failed to Consider Multiple Well-Pled
                        Allegations of Scienter ............................................................... 7

                2.      The Report Failed to Accept All Factual Allegations in the
                        Complaint as True and Draw All Reasonable Inferences in
                        Plaintiffs' Favor. ...................................................................... 10

                3.      The Report's Analysis of the Plausibility of Plaintiffs' Scienter
                        Allegations Is Fundamentally Flawed ...................................... 13

IV.     Plaintiffs Object to the Report's Findings Regarding Misstatements and/or
        Omissions in the Offering Documents .............................................................. 17

V.      Plaintiffs Object to the Implicit Recommendation That This Action Be Dismissed
        With Prejudice .................................................................................................... 20

VI.     Conclusion .......................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*,
    651 F. Supp. 2d 155 (S.D.N.Y. 2009).........................................................................................7

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................................................3

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................................20

*In re Bristol Myers Squibb Co. Sec. Litig.*,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)......................................................................................10

*Campo v. Sears Holdings Corp.*,
    371 F. App'x 212 (2d Cir. 2010) ..............................................................................................12

*Chill v. Gen. Elect. Co.*,
    101 F.3d 263 (2d Cir. 1996)......................................................................................................20

*City of Birmingham Ret. and Relief Sys. v. Credit Suisse Grp. AG*,
    No. 17 Civ. 10014 (LGS), 2019 WL 719751 (S.D.N.Y. Feb. 19, 2019)....................................9

*Dandong v. Pinnacle Performance Ltd.*,
    No. 10 Civ. 8086 (LBS), 2011 WL 5170293 (S.D.N.Y. Oct. 13, 2011) ............................7, 19

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012).......................................................................................7

*Ge Dandong v. Pinnacle Performance Ltd.*,
    966 F. Supp. 2d 374 (S.D.N.Y. 2013)......................................................................................11

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) .....................................................................................10

*Goldstein v. Pataki*,
    516 F.3d 50 (2d Cir. 2008)........................................................................................................20

*Halbert v. Credit Suisse AG*,
    No. 2:18-cv-00615-AKK, 2019 WL 3975362 (N.D. Ala. Aug. 22, 2019).............................16

*Katz v. Image Innovations Holdings, Inc.*,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)......................................................................................10

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
    761 F.3d 245 (2d Cir. 2014)........................................................................17

*Myun-Uk Choi v. Tower Research Capital LLC*,
    890 F.3d 60 (2d Cir. 2018)..........................................................................12

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613 (S.D.N.Y. 2003)........................................................19

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).........................................................................5

*In re Prudential Sec. Ltd. P'shps Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996) ...............................................................19

*Ret. Sys. of Gov't of Virgin Islands v. Blanford*,
    794 F.3d 297 (2d Cir. 2015).......................................................................5, 9

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...................................................................17, 19

*In re Salix Pharm., Ltd.*,
    No. 14-cv-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ..............10

*Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*,
    167 F. Supp. 2d 639 (S.D.N.Y. 2001).........................................................6

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015)...............................................7, 8, 11, 16

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010).......................................................................18

*Strougo v. Barclays PLC*,
    312 F.R.D. 307 (S.D.N.Y. 2016) ..........................................................11, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................3, 6, 15

*White v. City of New York*,
    No. 85 Civ. 8127 (CBM), 1986 WL 6164 (S.D.N.Y. May 27, 1986) ...................20

## STATUTES, RULES & REGULATIONS

28 U.S.C. § 636(b)(1)(C) ...................................................................................3

Securities Exchange Act of 1934................................................................2, 20

Securities Act of 1933......................................................................................20

Fed. R. Civ. P. 72(b)(3)..................................................................................................................3

17 C.F.R. § 240.10b-5.......................................................................................................1, 2, 3, 6, 9

Plaintiffs respectfully submit these Objections to Magistrate Judge Netburn's Report & Recommendation (ECF No. 124) (the "Report") (cited to as "R&R").[1]

## I.   **INTRODUCTION**

This action is about a complex financial product, XIV, that the Credit Suisse Defendants intentionally destroyed so that they could profit at the expense of their investors. On February 5, 2018, when this scheme was executed, Defendants[2] compounded the harm to investors—and Credit Suisse's ability to profit—by issuing (and failing to correct) grossly false and misleading Intraday Indicative Values for the XIV notes, leading investors to buy *$700 million* in additional XIV notes that were essentially worthless. Defendants' scheme netted Credit Suisse nearly half a billion dollars in profits while wiping out *$1.8 billion* in investor holdings—including those of thousands of retail investors. Notably, Defendants did not meaningfully contest the foregoing; rather, they claimed the elements of this scheme were fully disclosed in risk disclosures or they are otherwise not responsible for the harm caused.

Magistrate Judge Netburn's Report correctly concluded that Defendants' scheme was fraudulent in at least two respects: (1) Defendants' Flatline Value was "unmistakably misleading, indicating to investors that the underlying value of the XIV notes . . . was much higher than reality" and that Defendants "fail[ed] to correct the Flatline Value" in violation of Rule 10b-5(b) of the

---

[1] Unless otherwise indicated, emphasis is added, quotation marks and citations are omitted, alterations are adopted, and capitalized terms are as defined in Plaintiffs' Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss (ECF No. 114) ("Opp.").

[2] Defendants are Credit Suisse Group AG and Credit Suisse AG (together, "Credit Suisse"); Credit Suisse International ("CSI"), Credit Suisse's CEO Tidjane Thiam ("Thiam"); its CFO David R. Mathers ("Mathers," and, together with Thiam, the "Individual Defendants") (Credit Suisse and the Individual Defendants are the "Credit Suisse Defendants"); Janus Henderson Group plc ("Janus"); Janus Index & Calculation Services LLC ("JIC"); and Janus Distributors LLC d/b/a Janus Henderson Distributors ("JHD," and, together with Janus and JIC, the "Janus Defendants").

Securities Exchange Act, 17 C.F.R. § 240.10b-5;[3] and (2) the Credit Suisse Defendants violated Rules 10b-5(a) and (c) of the Securities Exchange Act by manipulating the market for XIV notes by structuring it such that Credit Suisse's hedging activities during the statistically-certain next volatility spike would collapse the value of XIV. (R&R at 29).

Nevertheless, the Report found that Plaintiffs fail to adequately allege that any Defendant knew or recklessly disregarded that the Flatline Value was misleading or that Credit Suisse was manipulating the market for XIV. Respectfully, the Report's conclusions regarding scienter are erroneous in several respects, including because the Report fails to: take into account multiple, key allegations in the Complaint; apply binding Second Circuit precedent; accept all factual allegations in the Complaint as true and to draw all reasonable inferences in Plaintiffs' favor; and perform the required holistic analysis of all of Plaintiffs' scienter allegations rather than viewing each allegation in isolation.

Plaintiffs further object to the Report's conclusion that Plaintiffs fail to allege an actionable misstatement or omission in the Offering Documents, particularly given that the Magistrate Judge correctly concluded that the Offering Documents "undisputedly did not disclose" that "Credit Suisse had an intention in January 2018 to issue more XIV notes because they knew it would increase the volume of future hedging transactions, which would in turn trigger a liquidity crunch and an Acceleration Event." (R&R at 27). The conclusion regarding the Offering Documents' misstatements or omissions also is based on impermissibly drawing inferences in Defendants'

---

[3] The Magistrate Judge also correctly concluded that, even if the Credit Suisse Defendants did not "make" the Flatline Value for purposes of Rule 10b-5(b), Plaintiffs would still have a viable claim under Rules 10b-5(a) and (c) against the Credit Suisse Defendants for their employment of a scheme to defraud investors using the Flatline Value. (R&R at 30 n.6).

favor to find certain facts were publicly known, and fails to apply binding Second Circuit precedent that a defendant cannot warn of the possibility of a risk that the defendant knows to be imminent.

Finally, Plaintiffs respectfully object to the Report's implicit recommendation that the Court should dismiss Plaintiffs' claims with prejudice.

## II.   LEGAL STANDARD

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party makes specific objections, the court reviews *de novo* those portions of the report and recommendation to which objection is made. *Id.*; Fed. R. Civ. P. 72(b)(3).

## III.   PLAINTIFFS OBJECT TO THE REPORT'S FINDINGS REGARDING SCIENTER

A court must conduct the scienter analysis "holistically" to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference." *Id.* at 324. Further, at the motion to dismiss stage, "a tie on scienter goes to the plaintiff." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 667 (S.D.N.Y. 2017). As set forth below, Plaintiffs more than adequately alleged Defendants' scienter under the standard set forth in *Tellabs*.

### A.   Plaintiffs Adequately Allege Defendants Acted with Scienter in Disseminating and Failing to Correct the False and Misleading Intraday Indicative Value

The Report correctly found that "the Flatline Value was unmistakably misleading, indicating to investors that the underlying value of the XIV notes . . . was much higher than reality[,]" and that Defendants "fail[ed] to correct the Flatline Value . . . by announcing an

3

Acceleration Event or a Market Disruption Event, or by halting trading[,]" in violation of Rule 10b-5(b). (R&R at 29). Nevertheless, the Report found that Plaintiffs fail to allege that any Defendant knew or recklessly disregarded the foregoing. (R&R at 35-40). In reaching this conclusion, the Report ignored key allegations and fails to apply binding Second Circuit precedent.

With respect to Janus and JIC, the Report erroneously stated that "[t]he only allegation . . . is that JIC must have known that the Flatline Value was misleading because it had access to the price of the VIX Futures Index" and that "[n]owhere . . . does the Complaint allege that the irregular changes in the price of the VIX Futures Index should have alerted JIC to the error." (R&R at 37). Likewise, with respect to CSI, the Report erroneously stated that the Complaint does not "explain why someone at CSI would have been familiar with the price of VIX futures in the after-hours market." (R&R at 39). But as Plaintiffs explained in their Opposition Brief, (Opp. at 38-39), Plaintiffs allege in great detail that, under the express provisions of the Prospectus, both JIC and CSI were responsible for (1) monitoring the information underlying the Intraday Indicative Value to ensure that accurate values were timely published; and (2) announcing a Market Disruption Event if S&P "fails to publish or compute the [VIX Futures Index]." ¶ 152; *see also* ¶¶ 138, 230. Necessarily, the only way for JIC and CSI to determine whether S&P was failing to "publish or compute" the VIX Futures Index (and thus whether there was a Market Disruption Event) was to monitor the VIX Futures Index and compare it with its underlying inputs (*i.e.* the prices of the VIX futures on which the Index is based). *See* ¶¶ 186-87, 189. Rather than a "general allegation that JIC [and CSI] *should have* known the inputs were incorrect[,]" (R&R at 37), these are specific allegations—and party admissions—that JIC and CSI were in fact *required* to know if the inputs were incorrect. The Complaint thus adequately alleges circumstantial evidence of scienter because JIC and CSI "knew facts or had access to information suggesting that

4

their public statements were not accurate." *Emps.' Ret. Sys. of Gov't of Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).[4]

Because the Report did not consider JIC and CSI's statements admitting that they were responsible for monitoring the underlying inputs of the VIX Futures Index, the Report then erroneously concluded that it is more plausible "that JIC did not notice the odd behavior in the underlying price Index[,]" that "personnel at CSI were not monitoring price movements of the VIX futures[,]" and the "failure to catch the Flatline Value was the result of merely careless mistakes[.]" (R&R at 37, 39-40).[5] But to the extent these are even plausible inferences given JIC and CSI's own statements of their activities, these "competing" inferences themselves establish scienter because, under Second Circuit authority, scienter may be inferred where defendants "failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (2d Cir. 2015); *see also* Opp. at 38-39 (citing *Novak*, 216 F.3d at 311).[6]

---

[4] Moreover, even viewing the values of the VIX Futures Index during the Flatline Value in isolation would have "suggested" to someone in Defendants' unique position "that [the Flatline Value was] not accurate." *Id.* The near-total freeze of the values of the Index for an hour on a day of turbulent volatility in the VIX futures market was unprecedented and strongly indicative of an issue Defendants had a duty to remedy. This inference is all the more compelling for the Credit Suisse Defendants, who were also responsible for announcing an Acceleration Event, modifying or adjusting the VIX Futures Index, and temporarily halting trading, and *who were simultaneously executing massive purchases of the very VIX futures contracts underlying the VIX Futures Index in order to protect Credit Suisse's financial interests*. ¶¶ 162-65.

[5] Notably, the Credit Suisse Defendants never argued—and there are no allegations to support— the Report's hypothesized inferences on this point.

[6] With respect to Credit Suisse, the only avenue for scienter the Report considered was whether an individual at Credit Suisse AG or its affiliates who was "purchasing the VIX futures would also have monitored the intraday indicative value," (R&R at 39), and concluded that this was unlikely to be the case. As explained above, this theory overlooks the allegations that establish knowledge or reckless disregard of the falsity of the Intraday Indicative Value through Credit Suisse's express admission that it was required to monitor both the VIX Futures Index and the underlying VIX futures prices to determine whether a Market Disruption Event was occurring or had occurred.

Under these circumstances, there appears to be no plausible non-culpable inference, and even if there were, the inference of scienter is, at a minimum, at least as compelling. *See Tellabs*, 551 U.S. at 322. Plaintiffs' allegations are thus sufficient to establish scienter. *Id.*[7]

**B.  Plaintiffs Adequately Allege Defendants Acted with Scienter in Manipulating the XIV Market**

The Magistrate Judge correctly concluded that the Complaint adequately alleged the Credit Suisse Defendants manipulated the market for XIV in violation of Rules 10b-5(a) and (c) by structuring it such that Credit Suisse's hedging activities during the statistically-certain next volatility spike would collapse the value of XIV, securing Credit Suisse nearly half a billion in profits. (*See* R&R at 27-28). Nevertheless, the Report concluded that Plaintiffs' scienter allegations were deficient. (*Id.* at 32-35). Respectfully, this conclusion is flawed in several ways: it fails to consider several key, well-pled allegations of scienter; it impermissibly fails to accept all factual allegations in the complaint as true and draw all reasonable inferences in Plaintiffs' favor; and it considers Plaintiffs' allegations in isolation rather than "holistically" as required.

That the Credit Suisse Defendants *also* stood to profit from turning a blind eye to the falsity of the Flatline Value only bolsters the plausibility of the scienter allegations.

[7] Though not necessary to find scienter (and thus liability) under the foregoing analysis, Plaintiffs also object to the Report's conclusion that "JIC, not CSI, was the entity tasked with calculating and disseminating the intraday indicative value." (R&R at 39). To reach this conclusion, the Report relied on certain language in the Prospectus ignoring that, as explained in detail in Plaintiffs' Opposition Brief and alleged in the Complaint, the Prospectus elsewhere details JIC's duties (which do not include calculating and disseminating the Intraday Indicative Value), and then states that "[a]ll other determinations will be made by the Calculation Agents [CSI and JIC] jointly." (Opp. at 19 (quoting ¶¶ 131-32)). It is entirely consistent with "joint" responsibility for CSI to *also* be responsible for the Intraday Indicative Value. And even if the language the Report relies upon contradicted CSI's admission of joint responsibility—which it does not—the contradiction would, at best, present an issue of fact that the Court is not permitted to resolve at this stage. *See, e.g.*, *Sedighim v. Donaldson, Lufkin & Jenrette, Inc.*, 167 F. Supp. 2d 639, 647 (S.D.N.Y. 2001) ("[T]he court may not choose among plausible interpretations of the disclosure documents[.]").

6

### 1.   The Report Erroneously Failed to Consider Multiple Well-Pled Allegations of Scienter

*First*, with respect to motive and opportunity, the Report acknowledged only the allegation that Credit Suisse was motivated, in part, by pressure from activist investors to slash its investment banking division, ignoring the primary allegation of motive Plaintiffs articulated: that the Credit Suisse Defendants intentionally engineered XIV to fail and sought to profit from that failure. (*See* Opp. at 34). Such allegations are routinely found to adequately plead motive and opportunity. *Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086 (LBS), 2011 WL 5170293, at *12 (S.D.N.Y. Oct. 13, 2011) ("The engineered frailty of the CDOs and Morgan Stanley's positions on both sides of the deal adequately alleges motive."); *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 645 (S.D.N.Y. 2012) (scienter established where the "[c]omplaint contains factual allegations indicating that Defendants not only knew that [certain] CDOs were unlikely to be profitable and failed to disclose this to investors, but also . . . sought to profit from that insight"); *see also Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 97 (S.D.N.Y. 2015) (that "the Credit Suisse Defendants structured the Offerings, and in doing so created an investment vehicle through which investors could profit hugely even if—and especially if—the price of ECD stock fell, is circumstantial evidence that the Credit Suisse Defendants *intended*" that result (emphasis in original)). That the Credit Suisse Defendants' manipulative structuring took place amidst investor pressure to "scale back Credit Suisse's investment bank" and "generate profit," ¶ 125, only bolsters the allegations of motive and opportunity.[8]

---

[8] The Report also failed to consider Plaintiffs' allegation that, in March 2018, Defendant Thiam received $10.2 million in compensation expressly linked to his helming the strategic shift away from investment banking (of which XIV's destruction was a part), ¶ 212, and that this compensation, which was tied directly to the fraud alleged, is sufficient to raise a plausible inference of scienter. *See Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 180 (S.D.N.Y. 2009) (compensation tied to the fraud raises an inference of scienter).

*Second*, the Report did not consider any of the alleged circumstantial evidence of conscious misbehavior or recklessness pled in the Complaint. This includes the critical allegations that establish that the Credit Suisse Defendants knew, based on three prior VIX spikes, that Credit Suisse's end-of-day hedging trades during such spikes caused the price of VIX futures to temporarily spike drastically, driving the price of XIV sharply downward. ¶¶ 63-77. Under Credit Suisse's risk management policies, these VIX futures liquidity issues were immediately escalated to the CARMC, a risk committee that included the Individual Defendants. *Id.* After the third such spike in June 2016, to protect Credit Suisse from the effects of the liquidity problems caused by its own hedging activities, the Credit Suisse Defendants issued the July 2016 Announcement, which explicitly gave Credit Suisse the right to use alternate instruments (such as swaps) to hedge its XIV exposure. ¶ 75. The *only* plausible inference from the July 2016 Announcement is that the Credit Suisse Defendants knew of the liquidity issues in the VIX futures market during volatility spikes, correctly anticipated that another volatility spike was inevitable, and acted to protect Credit Suisse during the next spike by giving it access to alternative hedging instruments.

But despite this knowledge, after the July 2016 Announcement the Credit Suisse Defendants nevertheless issued millions more XIV notes, knowing such growth was certain to exacerbate the liquidity issue such that Credit Suisse's hedging during even a modest volatility spike—which Plaintiffs allege is statistically certain to occur once every year to once every other year, ¶¶ 81-82—would, without a doubt, destroy XIV's value, ¶ 111. Indeed, the Credit Suisse Defendants grew XIV so large that the VaR (a measure used for risk monitoring) for XIV was *two orders of magnitude* larger than the VaR allotted for Credit Suisse's *entire* equities asset class. *See* ¶¶ 107-108. These breaches of Credit Suisse's binding risk limits were required to be approved by the CARMC, and thus the Individual Defendants. ¶¶ 95-100, 109. *See City of Birmingham Ret.*

*and Relief Sys. v. Credit Suisse Grp. AG*, No. 17 Civ. 10014 (LGS), 2019 WL 719751, at *7-*8 (S.D.N.Y. Feb. 19, 2019) (scienter adequately alleged where the Credit Suisse Defendants breached "binding" risk limits and the "Defendants knew about the risk limits as members of CARMC during the Class Period"). The only plausible explanation is that the Credit Suisse Defendants allowed the limits to be breached because they knew Credit Suisse protected itself using alternate hedging instruments and would profit by growing XIV to ensure its destruction upon the next VIX spike.[9]

*Third*, the Report also failed to consider that, despite the foregoing knowledge, the Credit Suisse Defendants continued to assure investors that while it was *possible* that their end-of-day hedging activities could affect the underlying VIX Futures Index, the Credit Suisse Defendants "*have no reason to believe that [their] . . . hedging activities will have a material impact on the level of the [VIX Futures] Index.*" ¶ 226. In view of the foregoing, this assurance was patently false when made, and constitutes further circumstantial evidence of scienter. *Blanford*, 794 F.3d at 306 (circumstantial evidence of scienter includes defendants' knowledge of facts or "access to information suggesting that their public statements were not accurate").[10]

*Fourth*, the Report also failed to consider Plaintiffs' detailed allegations that Defendant Thiam attempted to conceal the foregoing fraud. *See Blanford*, 794 F.3d at 308 (defendants' efforts to conceal the fraud demonstrate scienter). For example, on February 14, 2018, Thiam stated that the decision to announce an Acceleration Event "was actually to protect investors. Because the

---

[9] Indeed, Credit Suisse had cited its "internal limits on the size of the [ETN]" as its reason for closing a different VIX-related ETN in 2012, ¶ 80, and the fact that such internal limits were no obstacle to the tremendous growth of XIV mandates the conclusion that the Credit Suisse Defendants knew the growth would inevitably lead to XIV's collapse and Credit Suisse's profit.

[10] As explained *infra* at Section IV, Plaintiffs further object to the Report's conclusion that this and other statements were not false and/or misleading under Rule 10b-5(b).

product stopped trading, it was quasi-impossible to price . . . ." ¶ 208. These assertions were false. XIV had not "stopped trading"; to the contrary, investors bought approximately $700 million in XIV notes during aftermarket trading on February 5, 2018. Nor was XIV "quasi-impossible to price" (and this certainly was not the case on February 6, 2018, when Credit Suisse elected to close XIV). ¶ 208. Finally, Thiam's assertion that the decision to accelerate XIV notes close to the nadir of their prices, locking in hundreds of millions in profits for Credit Suisse and billions in losses for investors, "was actually to protect investors" is shamelessly self-serving as well as false.

*Fifth and finally*, the Report fails to consider the magnitude of the fraud alleged, particularly in light of Credit Suisse's rigorous risk protocols. The scheme wiped out *billions* in investor holdings while generating at least half a billion in profits for Credit Suisse. The magnitude of this fraud "is startling by any measure[,]" providing additional evidence of scienter. *In re Salix Pharm., Ltd.*, No. 14-cv-8925 (KMW), 2016 WL 1629341, at *16 (S.D.N.Y. Apr. 22, 2016); *see Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) ("[T]he magnitude of the alleged fraud provides some additional circumstantial evidence of scienter."). Indeed, the magnitude was so large and the circumstances so suspicious that XIV's collapse prompted the SEC to investigate Credit Suisse, ¶ 204, providing yet more circumstantial evidence of scienter. *See, e.g.*, *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("[C]ourts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter." (citing *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 168 (S.D.N.Y. 2008))).

### 2.     The Report Failed to Accept All Factual Allegations in the Complaint as True and Draw All Reasonable Inferences in Plaintiffs' Favor.

In addition to failing to consider the bulk of Plaintiffs' allegations supporting a strong inference of scienter, the Report also erred by failing to accept as true many of the factual

allegations it did consider. Most critically, the Report failed to credit Plaintiffs' allegations of the "historical tendency of volatility increases to be rather sharp" and the statistical certainty that such sharp spikes are expected to occur once every other year to once every year. ¶¶ 81-82. The Report concluded on its own (in an argument not raised by Defendants) that these allegations "def[y] economic reason; for a market as large and liquid as the S&P 500, no market movements are certain." (R&R at 33). As an initial matter, that "no market movements are certain" is irrelevant, because Plaintiffs' theory does not rise or fall on the existence of absolute certainty; all that is necessary is that the Credit Suisse Defendants bet against XIV—that is, they bet that a VIX spike would indeed occur at some point and they structured XIV to ensure its destruction (and Credit Suisse's profits) during such a spike. *See, e.g.*, *Sharette*, 127 F. Supp. 3d at 97 (Credit Suisse "structured the Offerings, and in doing so created an investment vehicle through which investors could profit hugely even if—and especially if—the price of ECD stock fell"); *Ge Dandong v. Pinnacle Performance Ltd.*, 966 F. Supp. 2d 374, 379-80 (S.D.N.Y. 2013) (sustaining securities fraud claim where defendant "bet against" CDOs it had selected, and thus "stood to profit in the event that the pool of assets performed poorly"). That the Complaint goes beyond this to show that VIX spikes are indeed statistically certain to occur—and that Credit Suisse specifically modeled and tested the effects of such spikes on its products, ¶ 106—only bolsters the inference of knowing misconduct here.

Moreover, these allegations are well-pled and it is reversible error for the Court to discount them on a motion to dismiss. The authority upon which the Report relied to conclude these allegations "def[y] economic reason" is inapposite. The Report cited to *Strougo v. Barclays PLC*, 312 F.R.D. 307, 317-18 (S.D.N.Y. 2016) for the proposition that, "[i]n an efficient market, stock returns follow what is known as a 'random walk,' meaning that investors cannot use past stock

11

price movements to predict the next day's stock price movement." *Id.* But the Complaint does not allege that the Credit Suisse Defendants predicted "the next day's stock price movement," but rather that they structured XIV around the statistical certainty that VIX futures would spike sharply at *some point* in the range of every year to every other year.[11] And the Credit Suisse Defendants do not even contest the allegations of their knowledge that volatility would indeed return, recognizing that this is an issue of fact and the subject of expert testimony about statistics—not a decision on a motion to dismiss. *See Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (on a motion to dismiss, allegations of statistical certainty are sufficient to establish privity). The Report's citation to *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 (2d Cir. 2010) is likewise inapt. In *Campo*, unlike here, the plaintiff's own allegations showed that the defendants' only financial incentive was to *increase* the price of the stock at issue, not to decrease it, contrary to their theory of the case. *Id.* at 215-16. There is no remotely plausible inference here that Credit Suisse had an incentive to *increase* the prices of XIV notes, and, to the contrary, it reaped half a billion dollars from its destruction.

The Report thus erred in rejecting these allegations as "def[ying] economic reason," and, as a result, erred in its further conclusion that the economic implausibility of these allegations renders "Plaintiff's theory . . . exceptionally vulnerable to plausible, non-culpable explanations." (R&R at 33).[12]

---

[11] Far from defying economic reason, the proposition that market volatility is statistically certain to spike every so often is no more groundbreaking than an analogous and undisputable proposition that economies are statistically certain to undergo a recession every so often. *Strougo* is inapposite for the further reason that it did not deal with the plausibility of scienter allegations at all; rather, the opinion addressed a securities plaintiff's motion for class certification, and, specifically, whether the securities at issue traded in an efficient market. *Id.*

[12] The Report also erred in construing Plaintiffs' allegations as "Credit Suisse also knew that its hedging activity during volatility spikes *could* drive the price of VIX futures up and the value of

3.     **The Report's Analysis of the Plausibility of Plaintiffs' Scienter Allegations Is Fundamentally Flawed**

Having ignored the bulk of Plaintiffs' allegations and drawn impermissible adverse inferences, the Report concluded that the Complaint's "allegation of scienter is undermined also by the theory upon which it is based." The Report reasoned that the decision to issue millions more XIV notes in January 2018 would have been "strange" because it would have "exacerbate[d]" the threat to Credit Suisse's ability to hedge at a time when it was under pressure from activist investors to reduce its risk. (R&R at 32-33).[13] The Report concluded that Plaintiffs can only explain

_____

the XIV notes down," (R&R at 32), when in fact Plaintiffs allege that the Credit Suisse Defendants definitively knew that Credit Suisse's hedging transactions during volatility spikes *necessarily* affected these prices, ¶¶ 63-84. Indeed, Plaintiffs allege that the Credit Suisse Defendants' knowledge of the certain repercussions of their hedging led to their July 2016 Announcement.

[13] The Report also claimed that there are "several other" purported "logical holes" in the Complaint. (R&R at 33 n.7). But the Complaint readily addresses these supposed shortcomings. First, the Report noted that, because Credit Suisse had a short exposure to VIX futures contracts in order to hedge its XIV exposure, Credit Suisse stood to lose money when the value of VIX futures rose. *Id.* The Report then correctly noted that Credit Suisse was willing to accept this risk in order to trigger an Acceleration Event. *Id.* But the Report then reasons that "Credit Suisse was already entitled to declare an Optional Acceleration, as opposed to an Acceleration Event, *at any time*," and claims that "[t]he Complaint does not explain why Credit Suisse did not close the XIV notes with that non-fraudulent option." *Id.* (emphasis in original). But there is an obvious answer to this question: closing XIV notes by declaring an Optional Acceleration—say, at any time in the months or years before February 5, 2018 when XIV's value was several times greater—would have required Credit Suisse to pay XIV note holders billions of dollars, resulting in a huge loss for Credit Suisse. And, contrary to the Report's conclusion, the Complaint explicitly alleges this: the Complaint alleges the Credit Suisse Defendants wanted to drive a liquidity crunch in VIX futures during the next volatility spike so "it could announce an Acceleration Event allowing it to pay XIV investors pennies on the dollar while protecting itself from a public relations disaster by blaming the Acceleration Event on volatility." ¶ 116. And that is *exactly* what the Credit Suisse Defendants did. *See* ¶¶ 199, 208. Indeed, they continue to blame XIV's collapse on market volatility in their briefing in this very case. And the fact that Credit Suisse terminated two other VIX-related ETNs months later supposedly "without resorting to market manipulation" does not undermine the foregoing. (R&R at 34 n.7). As an initial matter, nowhere does the Complaint allege that these other ETNs were closed without manipulation, and it is not permissible to draw such an inference at this stage. In any event, because XIV was one of the largest VIX-related ETNs on the market— requiring roughly *one quarter* of the entire VIX futures market to hedge on February 5—its closure and the smaller size of Credit Suisse's other ETNs (not to mention the fact that each ETN was

this supposed "conundrum" by alleging that it was statistically certain VIX futures would spike, which would allow Credit Suisse to accelerate the XIV notes, but (as explained above) the Report erroneously rejected the allegation, claiming that it "defies economic reason." (R&R at 33). But the decision to grow XIV is "strange" only if one ignores the July 2016 Announcement, which gave Credit Suisse alternate hedging instruments that ensured Credit Suisse's "ability to hedge its exposure to the XIV notes" was *not* "threatened" during the next volatility spike. There is thus no "conundrum" at all. And, as explained above, it is error to fail to take as true the allegations that the Credit Suisse Defendants knew volatility spikes are statistically certain.

Thus, the Magistrate Judge erred in concluding that the Complaint's extensive allegations of scienter "undermine[]" themselves. To the contrary, given the Credit Suisse Defendants' knowledge of the VIX futures liquidity issues and the role of their hedging in creating those issues, their active planning for the next spike by issuing the July 2016 Announcement, the fact that they breached internal limits to nevertheless continue to grow XIV, and the fact that the Credit Suisse Defendants structured XIV to ensure Credit Suisse would profit from its destruction, it is impossible to conclude the Credit Suisse Defendants did not act knowingly or, at the very least, recklessly. The plausibility of Plaintiffs' theory is all the more compelling when *all* of Plaintiffs'

---

structured differently from XIV) meant that Credit Suisse did not have the same ability to close these ETNs through a similar VIX futures liquidity scheme.

Finally, the Report concluded that the fact that Credit Suisse chose to redeem the XIV notes at the closing value on February 15, 2018, rather than the closing value on February 5, 2018 "gave the XIV notes a chance to recover from the hedging-induced price drop" and thus "belies the theory that Credit Suisse acted with scienter" because it "defies economic reason." (R&R at 34 n.7). But as Plaintiffs allege, XIV notes unquestionably did *not* have a chance to meaningfully recover in this short period of time: due to the structure of how XIV is priced, by February 15, the value of notes had only increased to $5.99 from a low of $4.22 on February 5 (both of which represented a catastrophic >90% loss from the February 4 closing value of $108.37, ¶ 157), despite the swift dissipation of Credit Suisse's engineered liquidity squeeze. *See* ¶¶ 174, 197. This price change hardly impacted Credit Suisse's hundreds of millions in profits and cannot support the factual assertion that this brief delay "def[ied] economic reason." (R&R at 34 n.7).

14

allegations are viewed holistically, as the Court is required to do. In addition to the foregoing, Plaintiffs' allegations include Credit Suisse's continued assurances that they had "no reason to believe" their hedging would adversely affect the VIX Futures Index, Defendant Thiam's attempts to conceal the fraud, the magnitude of the fraud alleged, and the SEC's investigation of Credit Suisse after XIV's implosion. By failing to consider these allegations supporting scienter, the Report necessarily erred by failing to consider *all* of the allegations supporting scienter holistically, as required under *Tellabs*. Here, taking all of the facts alleged collectively creates an inference of scienter that "a reasonable person would deem . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

The Report's proffered non-culpable inference suffers from similar flaws stemming from a failure to consider critical allegations and draw inferences in Plaintiffs' favor. The Report concluded that "it appears that Credit Suisse chose to sell additional XIV notes when they were selling at exceptionally high prices" and "[w]hen volatility returned soon thereafter and the value of the XIV notes plummeted, Credit Suisse, without any prior fraudulent intent, decided to exercise its right—which was well disclosed—to secure its serendipitous profits and declare an Acceleration Event." (R&R at 34).

As an initial matter, contrary to the Report's statement that Defendants advanced this supposed non-culpable explanation, (R&R at 34), a review of the briefing reveals that no party advanced this theory. And for good reason: the conclusion that Credit Suisse's repeated large sales of XIV notes were driven solely by high prices and that Credit Suisse's resulting half billion in profits at investors' expense on a highly complex structured product was simply the result of "serendipit[y]" can only be reached by ignoring the allegations in the Complaint that establish the motivations and facts known to the Credit Suisse Defendants. In particular, given (1) the three

15

prior VIX spikes that prove the Credit Suisse Defendants knew of the liquidity issues caused by their hedging activities; (2) the July 2016 Announcement that shows they correctly anticipated another spike and acted to protect themselves from the inevitable liquidity issues; (3) that they signed off on the continued growth of XIV despite this growth breaching Credit Suisse's internal risk limits; and (4) the structuring of XIV to ensure Credit Suisse would profit from its destruction, it is far more plausible that the Credit Suisse Defendants grew XIV intending for this growth to trigger XIV's destruction (and Credit Suisse's profits) during the next volatility spike. That Credit Suisse *also* stood to profit from this growth by selling XIV notes at high prices only strengthens the plausibility of an inference of scienter. And, contrary to the Report's conclusion, it defies common sense that the Credit Suisse Defendants, armed with the foregoing knowledge, "serendipitous[ly]" structured XIV such that they would reap half a billion dollars from XIV's destruction once volatility returned.[14] *See Sharette*, 127 F. Supp. 3d at 98 ("[W]hile there may be a nonculpable explanation of the Credit Suisse Defendants' conduct in structuring [the product], the existence of such an explanation does not defeat a finding of scienter . . . .").[15, 16]

---

[14] Indeed, given that the Magistrate Judge concluded (correctly) that XIV was in fact structured in such a manner, (*see* R&R at 27-28), it is difficult to see how a defendant could unknowingly structure a complex product such that the defendant would profit from its destruction.

[15] Plaintiffs object to the Report's conclusory statement, in a footnote, that the Complaint engages in "group pleading against the Credit Suisse Defendants." (R&R at 40 n.10). The Report neither provided any examples of such group pleading nor how any purported group pleading undermines any of Plaintiffs' well-pled claims.

[16] In *Halbert v. Credit Suisse AG*, No. 2:18-cv-00615-AKK, 2019 WL 3975362, at *10 (N.D. Ala. Aug. 22, 2019), the court ultimately dismissed the plaintiffs' federal securities claims, which also stemmed from XIV's collapse on February 5, 2018, largely on the basis of a lack of scienter. Notably, however, the plaintiffs in *Halbert* did not argue—and the court did not consider—nearly any of the foregoing allegations and arguments Plaintiffs set forth in this case establishing scienter.

## IV.   PLAINTIFFS OBJECT TO THE REPORT'S FINDINGS REGARDING MISSTATEMENTS AND/OR OMISSIONS IN THE OFFERING DOCUMENTS

"[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth" on the issue or topic. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). A qualifying misstatement or omission is any statement that "viewed as a whole, would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004).

*First*, the Report erred by adopting Defendants' characterizations of what the misstatements and omissions are alleged to be, rather than analyzing the actual misstatements and omissions alleged in the Complaint. *Compare* R&R at 23 *with* CS Br., ECF 102, at 4, 13-14, *and* ¶¶ 215-228. As a result, the Report analyzed statements never alleged to be false or misleading and failed to analyze other statements that are, in fact, alleged to be false or misleading. For instance, the Report erroneously stated that Plaintiffs allege the Offering Documents misstated or omitted that "the XIV notes were not appropriate for long term investors," (R&R at 23), despite Plaintiffs never alleging this; in fact, Plaintiffs pointed out Defendants' error on this point multiple times in their Opposition Brief.[17] At the same time, the Report failed to consider key alleged misstatements regarding Credit Suisse's hedging activity and its potential conflicts of interests, such as the Credit Suisse Defendants' continued assurances that, while it was *possible* that their end-of-day hedging activities could affect the underlying VIX Futures Index, the Credit Suisse Defendants "*have no reason to believe that [their] . . . hedging activities will have a material*

---

[17] (Opp. at 3, 27 ("[N]owhere do Plaintiffs allege that Credit Suisse failed to disclose 'the risks of holding the ETNs for longer than one day' . . . [n]or did the risk of holding over time have anything to do with what transpired on February 5.")). Likewise, the Report analyzed whether the Offering Documents "made it clear that an Acceleration Event could . . . impose significant losses" despite Plaintiffs never alleging that Defendants omitted this information. (R&R at 26).

*impact on the level of the [VIX Futures] Index*[.]" ¶ 226; *see also* ¶ 300 ("There *may* be conflicts of interests between you, us, the Redemption Agent, and the Calculation Agents.").

**Second,** the Report is internally inconsistent. The Magistrate Judge correctly concluded that the Offering Documents "undisputedly did not disclose" that "Credit Suisse had an intention in January 2018 to issue more XIV notes because they knew it would increase the volume of future hedging transactions, which would in turn trigger a liquidity crunch and an Acceleration Event." (R&R at 27). In view of this conclusion, it is error to find that the Offering Documents' statements about the *possibility* of Credit Suisse's hedging affecting the VIX Futures Index (while disclaiming having any reason to believe this would actually happen) and the *possibility* of conflicts of interests were not false and/or misleading.

**Third**, the Report failed to consider the Credit Suisse Defendants' continued assurances that they "have no reason to believe" their hedging would affect the VIX Futures Index. ¶ 226. This statement was false and misleading. As alleged, the Credit Suisse Defendants had several concrete "reason[s] to believe" their hedging activities would drastically affect the VIX Futures Index: three prior VIX spikes left the Credit Suisse Defendants with no doubt that Credit Suisse's hedging activity during such spikes caused an acute liquidity crunch in the VIX futures market; as a result, the Credit Suisse Defendants actively planned for the liquidity crunch that was certain to occur during the next VIX spike by issuing the July 2016 Announcement; and the Credit Suisse Defendants continued to grow XIV despite the known liquidity issues because they planned to profit from its destruction. The "consistency of the defendants' language over time despite the new information they received . . . belies any contention that the cautionary language was 'tailored to the specific [ ] projection.'" *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010).

Moreover, because the Credit Suisse Defendants did "have [] reason to believe" their hedging activities would affect the underlying index, they were not permitted to warn only of the *possibility* of this happening. In the Second Circuit, risk disclosures do not protect from liability "someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *Rombach*, 355 F.3d at 173.[18] Here, the Credit Suisse Defendants not only knew the Grand Canyon lay one foot away, but they actively placed the Grand Canyon on the hiking path. The Magistrate Judge erred by failing to consider and apply this binding precedent to the misstatements and omissions alleged.

**Finally,** the Report erred by drawing inferences in Defendants' favor. The Report concluded that the Credit Suisse Defendants' statements regarding their hedging activities were not misleading partial disclosures because "[i]t was . . . public knowledge that the cause [of the three previous disproportionate VIX futures spikes] was likely the fact that the VIX-related ETN market had grown so large that it was impacting the value of the underlying futures." (R&R at 25). But this finding again impermissibly draws inferences in favor of Defendants. The finding is based exclusively on the allegation that one analyst speculated "the *potential issue* is whether this is a symptom of the volatility-based exchange-traded products starting to outgrow the size of the VIX futures market." (*Id.* (quoting ¶ 80)). The Report then impermissibly drew from this analyst's speculation about the *possibility* that the size of VIX-related ETNs was impacting underlying futures the inference that "it was public knowledge" that this "*was likely*" the case. It is reversible

---

[18] *See also Dandong*, 2011 WL 5170293, at *13 (Sand, J.) ("'[g]eneral risk disclosures in the face of specific known risks . . .' are not sufficient to defeat a securities fraud claim.") (quoting *In re Prudential Sec. Ltd. P'shps Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)); *accord In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628-29 (S.D.N.Y. 2003) (Berman, J.) (defendants "failed to disclose negative consequences from specific risks that . . . were known to be imminent").

error to draw such an inference. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008).[19]

## V.   PLAINTIFFS OBJECT TO THE IMPLICIT RECOMMENDATION THAT THIS ACTION BE DISMISSED WITH PREJUDICE

Because the Report does not specify whether it recommends dismissal with or without prejudice, the Report is deemed to impliedly recommend dismissal with prejudice. *See White v. City of New York*, No. 85 Civ. 8127 (CBM), 1986 WL 6164, at *1 (S.D.N.Y. May 27, 1986) ("The general rule is that if a dismissal does not specify that it is without prejudice, it is treated as a dismissal with prejudice."). Plaintiffs requested leave to amend in the event the Magistrate Judge determined dismissal of the Complaint was warranted. (Opp. at 50 n.35). The Second Circuit has held that in the securities litigation context, leave to amend is particularly appropriate. *Chill v. Gen. Elect. Co.*, 101 F.3d 263, 271 (2d Cir. 1996). That is particularly so here, because the Magistrate Judge found Plaintiffs have pleaded actionable market manipulation and misstatements or omissions, and scienter is a fact-intensive inquiry. If Court adopts the Report's recommendation that dismissal is warranted, Plaintiffs respectfully request the dismissal be without prejudice and allow Plaintiffs an opportunity to amend.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully object to the Report.

---

[19] Because the Court should find that Plaintiffs have adequately alleged scienter, Plaintiffs' claims under Section 9(a) and Section 9(f) must also be sustained. The only basis for the Report's dismissal of Plaintiffs' Section 9 claims was the Report's conclusion that the Complaint failed to state a Section 10(b) claim. (R&R at 41). Moreover, because the Court should find Plaintiffs adequately allege misstatements and/or omissions, Plaintiffs' claims under Section 11 must also be sustained. The only basis for the Report's dismissal of Plaintiffs' Section 11 claims was the conclusion that there are no actionable misstatements or omissions in the Offering Documents. (R&R at 23). Finally, because the Court should find Plaintiffs adequately alleged violations of the Securities Act and the Exchange Act, the Court must also find Plaintiffs state a claim for control person liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act.

Dated: August 30, 2019 Respectfully submitted,

**COHEN MILSTEIN SELLERS & TOLL PLLC**

*/ s / Michael B. Eisenkraft*
Michael B. Eisenkraft
Laura H. Posner
88 Pine Street / 14th Floor
New York, New York 10005
Tel. (212) 838-7797
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com

Steven J. Toll
Eric S. Berelovich
Allen Dreschel
1100 New York Avenue, N.W. / Fifth Floor
Washington, D.C. 20005
Tel. (202) 408-3640
stoll@cohenmilstein.com
eberelovich@cohenmilstein.com
adreschel@cohenmilstein.com

Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Tel. (312) 357-0370
cgilden@cohenmilstein.com

**LEVI KORSINSKY, LLP**
Eduard Korsinsky
Nicholas I. Porritt
Adam M. Apton
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
ek@zlk.com
nporritt@zlk.com
aapton@zlk.com

**LEVI KORSINSKY, LLP**
Alexander Krot
1101 30th Street NW, Suite 115
Washington, D.C. 20007

Tel: (202) 524-4290
Fax: (212) 363-7171
akrot@zlk.com
(*pro hac vice* forthcoming)

*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Class*

and

**BRONSTEIN, GEWIRTZ & GROSSMAN,
LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel. (212) 697-6484
peretz@bgandg.com

*Additional Counsel for ACM Ltd.*