## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SET CAPITAL LLC, et al., Individually and on Behalf of All Others Similarly Situated, | |
| **Plaintiffs,** | Case No.: 1:18-cv-02268-AT-SN |
| v. | **LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS, JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, and JANUS DISTRIBUTORS LLC d/b/a JANUS HENDERSON DISTRIBUTORS, | |
| **Defendants.** | |

## DEFINITION OF TERMS

**ETN** – Exchange Traded Note, an unsecured debt instrument traded on a major exchange that functions similarly to a promissory note. ETNs are one type of Exchange Traded Product ("ETP").

**ETP** – exchange traded product, of which ETNs are one type.

**Futures contract** – a contract representing a promise to buy or sell a particular commodity or financial instrument at a predetermined price at some future date.

**Offering Documents -** the Offering Documents are Credit Suisse's (i) January 29, 2018 pricing supplement (No. VLS ETN-1/A48) (the "January Supplement") filed with the SEC pursuant to Rule 424(b)(2) and in conjunction with (ii) Registration Statement No. 333-218604-02, (iii) prospectus supplement dated June 30, 2017, and (iv) prospectus dated June 30, 2017.

**VIX or VIX Index** – referred to as Wall Street's "fear index" or "fear gauge," the VIX or VIX Index measures market volatility by providing a value intended to reflect how much the market thinks the S&P 500 Index will fluctuate in the 30 days from the time of each tick of the VIX Index.

**VIX futures** – futures contracts that allow investors to trade and/or hedge an investment position based on their assessment of future market volatility.

**XIV** – The common name and trading ticker for VelocityShares Inverse VIX Short Term ETNs, issued by Credit Suisse and traded on the NASDAQ.

**XIVIV** – the ticker by which XIV's Intraday Indicative Value was transmitted.

### TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   PROCEDURAL HISTORY .................................................................................. 6

III.  STATEMENT OF FACTS COMMON TO THE CLASSES ............................. 6

IV.   LEGAL ARGUMENT ......................................................................................... 9

  A.   The Proposed Classes Satisfy the Standards for Class Certification Under
       Rule 23. ....................................................................................................... 9

  B.   The Proposed Classes Meet the Rule 23(a) Requirements. .................... 10

    1.   The Proposed Classes Are so Numerous that Joinder Is
         Impracticable ...................................................................................... 10

    2.   The Action Raises Common Questions of Law and Fact. ................. 11

    3.   The Class Representatives' Claims Are Typical of the Classes. ....... 12

    4.   Lead Plaintiffs Will Fairly and Adequately Protect the Interests of
         the Classes .......................................................................................... 13

  C.   The Proposed Classes Meet the Rule 23(b)(3) Requirements. ............... 14

    1.   Common Questions of Law and Fact Predominate Over Individual
         Questions ............................................................................................ 14

      a.   Where Plaintiffs' Claims Require Proof of Reliance, the
           Proposed Classes Are Entitled to the *Basic* Presumption of
           Reliance ...................................................................................... 16

        (1)   High Weekly Trading Volume (*Cammer* Factor 1). .......... 18

        (2)   Financial Analysts' Coverage (*Cammer* Factor 2). .......... 19

        (3)   Numerous Market Makers (*Cammer* Factor 3). ............... 20

        (4)   S-3 Registration Statements (*Cammer* Factor 4). ............ 20

        (5)   Reaction of XIV to News (*Cammer* Factor 5). ................. 21

        (6)   High Market Capitalization (*Krogman* Factor 1) ............. 22

        (7)   Narrow Bid-Ask Spread (*Krogman* Factor 2) .................. 22

        (8)   Public Float (*Krogman* Factor 3). ................................... 23

        (9)   Institutional Investors ....................................................... 23

        (10)  Lack of Autocorrelation .................................................... 23

      b.   Where Plaintiffs' Claims Require Proof of Reliance, the
           Proposed Class Is Entitled to the *Affiliated Ute* Presumption
           of Reliance. ................................................................................ 24

      c.   Damages Can Be Calculated on a Class-Wide Basis .................. 25

        2.     A Class Action Is the Superior Means of Resolving this Dispute. ........... 27

    D.    The Court Should Appoint Lead Plaintiffs' Choice of Co-Lead Counsel as Class Counsel. ................................................................................................ 28

V.    CONCLUSION ................................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Affiliated Ute Citizens of the State of Utah v. United States*,
    406 U.S. 128 (1972)................................................................................................24, 25

*In re Alstom SA Sec. Litig.*,
    253 F.R.D. 266 (S.D.N.Y. 2008) .........................................................................19

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 ........................................................................................................14

*Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*,
    568 U.S. 455 ...............................................................................10, 12, 15, 25

*Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    955 F.3d 254 (2d Cir. 2020), *vacated and remanded on other grounds*, 141 S.
    Ct. 1951 (2021) ....................................................................................................16

*In re Barclays Liquidity Cross and High Frequency Trading Litig.*,
    390 F. Supp. 3d 432 (S.D.N.Y. 2019).................................................................25

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................14, 16, 24

*Billhofer v. Flamel Techs., S.A.*,
    281 F.R.D. 150 (S.D.N.Y. 2012) ..............................................................17, 20, 23

*Bolanos v. Norwegian Cruise Lines Ltd.*,
    212 F.R.D. 144 (S.D.N.Y. 2002) ........................................................................12

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) ................................................................ *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) .................................................................. *passim*

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
    No. 17-cv-1580-LGS, 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020).....................6

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995)...................................................................................11

*In re Deutsche Bank AG Sec. Litig.*,
    328 F.R.D. 71 (S.D.N.Y. 2018) ....................................................................12, 13

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) ......................................................................12

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................5, 9

*In re Enron Corp. Sec.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ...........................................................26

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)..........................................................................................15

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
    312 F.R.D. 332 (S.D.N.Y. 2015) ........................................................10, 13, 26

*In re Gaming Lottery Sec. Litig.*,
    No. 96-cv-5567-RPP, 2001 WL 204219 (S.D.N.Y. Mar. 1, 2001)) ................24

*Green v. Wolf Corp.*,
    406 F.2d 291 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969)..............5, 9, 10, 27

*Gruber v. Gilbertson*,
    No. 16-cv-9727, 2019 WL 4439415 (S.D.N.Y. Sept. 17, 2019) ...........................12

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014)....................................................................................12, 17

*In re IndyMac Mortgage-Backed Sec. Litig.*,
    286 F.R.D. 226 (S.D.N.Y. 2012) ....................................................................14

*In re Initial Pub. Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009).............................................................25

*In re Initial Public Offering Sec. Litig.*,
    260 F.R.D. 81 (S.D.N.Y. 2009) ......................................................................20

*Kaplan v. S.A.C. Cap. Advisors, L.P*,
    311 F.R.D. 373 (S.D.N.Y. 2015) ..............................................................11, 25

*Kleen Prod. LLC v. Int'l Paper*,
    No. 10-cv-5711, 2017 WL 2362567 (N.D. Ill. May 31, 2017)..........................26

*Lapin v. Goldman Sachs & Co.*,
    254 F.R.D. 168 (S.D.N.Y. 2008) ....................................................................27

*In re Livent*,
    210 F.R.D. 512 (S.D.N.Y. 2002) ....................................................................28

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997)............................................................................6, 10

*McIntire v. China MediaExpress Holdings, Inc.*,
  38 F.Supp.3d 415 (S.D.N.Y. 2014) ............................................................ *passim*

*N.J. Carpenters Health Fund v. Residential Cap., LLC*,
  Nos. 08-cv-8781-HB, 08-cv-5093-HB, 2013 WL 6839093 (S.D.N.Y. Dec. 27,
  2013) .............................................................................................................26

*ODS Cap. LLC v. JA Solar Holdings Co.*,
  2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020) ........................................................17

*In re Omnicom Grp., Inc. Sec. Litig.*,
  No. 02-cv-4483-RCC, 2007 WL 1280640 (S.D.N.Y. Apr. 30, 2007)....................................28

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012).............................................................................16

*In re Patriot Nat'l, Inc. Sec. Litig.*,
  828 F. App'x 760 (2d Cir. 2020) ......................................................................13

*In re Petrobras Sec. Litig.*,
  312 F.R.D. 354 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub. nom. In re
  Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017)....................................................23, 25

*In re Pfizer Inc. Sec. Litig.*,
  282 F.R.D. 38 (S.D.N.Y. 2012) ........................................................................11

*Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*,
  No. 18-cv-871-MJD-HB, 2020 WL 5757695 (D. Minn. Sept. 28, 2020) .............................26

*Roach v. T.L. Cannon Corp.*,
  778 F.3d 401 (2d Cir. 2015)............................................................................25

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
  659 F.3d 234 (2d Cir. 2011).............................................................................10

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 16-cv-6728-CM-RWL, 2019 WL 3001084 (S.D.N.Y. July 10, 2019)......................22, 25

*In re Smith Barney Transfer Agent Litig.*,
  290 F.R.D. 42 (S.D.N.Y. 2013) ........................................................................24

*Strougo v. Barclays PLC*,
  312 F.R.D. 307 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)......................................................................18, 24, 25

*In re SunEdison, Inc. Sec. Litig.*,
    329 F.R.D. 124 (S.D.N.Y. 2019) .......................................................15

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015)................................................................25

*Teachers Ret. Sys. of La. v. ACLN Ltd.*,
    No. 01-cv-11814-LAP, 2004 WL 2997957 (S.D.N.Y. Dec. 27, 2004) ...................................12

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    No. 05-cv-1898-SAS, 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546
    F.3d 196 (2d Cir. 2008)....................................................................18

*Trief v. Dun & Bradstreet Corp.*,
    144 F.R.D. 193 (S.D.N.Y. 1992) .......................................................5

*Tsereteli v. Residential Asset Securitization Tr. 2006-A8*,
    283 F.R.D. 199 (S.D.N.Y. 2012) ................................................14, 15

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010)..............................................................14

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)..............................................................10

*In re Vivendi Universal S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) ...................................................10, 11

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017)........................................................10, 17, 18

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)........................................................................11

*Wallace v. IntraLinks*,
    302 F.R.D. 310 (S.D.N.Y. 2014) .......................................................13

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D 437 (S.D.N.Y. 2013) .......................................................20

*Y-GAR Cap. LLC v. Credit Suisse Grp. AG*,
    No. 19-cv-2827-AT, 2020 WL 71163 (S.D.N.Y. Jan. 2, 2020) .............................................15

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Lead Plaintiffs Set Capital LLC, Stefan Jager, Aleksandr Gamburg, and Apollo Asset Limited[1] ("Lead Plaintiffs"), respectfully submit this Memorandum of Law in support of their motion to: (i) certify a class of all persons and entities that purchased or acquired the VelocityShares Inverse VIX Short Term Exchange Traded Notes ("XIV Notes," "Notes," or "XIV") between January 29, 2018 and February 5, 2018, inclusive (the "Misrepresentation Class Period"), and who were damaged thereby (the "10b-5(b) Class"); (ii) certify a class of all persons and entities that sold or redeemed the XIV Notes on or after February 5, 2018 (the "Manipulation Class Period") and who were damaged thereby (the "10b-5(a) and (c) Class" and, together with the 10b-5(b) Class, the "Exchange Act Classes"); (iii) certify a class of all persons and entities that purchased or acquired XIV Notes pursuant to or traceable to Credit Suisse's Offering Documents and who were damaged thereby (the "Securities Act Class" and, collectively with the Exchange Act Classes, the "Classes"); (iv) certify Lead Plaintiffs as representatives of the proposed Classes; and (v) appoint Co-Lead Counsel as Class Counsel.

## I.    INTRODUCTION

This securities class action (the "Action"), brought pursuant to Sections 10(b), 9(a)(4), 9(f), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and Sections 11 and 15 of the Securities Act, arises out of market manipulation conducted and material misstatements and omissions made by Credit Suisse Group AG and Credit Suisse AG (together, "Credit Suisse"); Credit Suisse's Chief Executive Officer Tidjane Thiam;

---

[1] Apollo Asset Limited was previously referred to as ACM in the pleadings as Counsel believed that Apollo Asset Limited had changed its name to ACM.  Counsel recently learned that the corporate name-change from Apollo Asset Limited to ACM was never filed with the relevant authorities, so the name of the entity did not formally change and remains Apollo Asset Limited. Counsel plans to file the appropriate form or motion to correct the docket shortly.

and its Chief Financial Officer David R. Mathers (the "Individual Defendants" and, collectively with Credit Suisse, the "Defendants") concerning the artificial prices of XIV Notes during the Class Periods.[2]

XIV is an Exchanged Traded Note ("ETN") issued and sold by Credit Suisse and placed and marketed by Janus Henderson Group plc ("Janus"). Consolidated Amended Complaint ("Complaint") ¶ 2, ECF No. 82. XIV was created in 2010 to allow investors to track the inverse of VIX futures contracts. *Id.* VIX futures contracts generally measure expected volatility—*i.e.*, how much a security price is anticipated to change over a given period of time—in the broader market. *Id.* Because XIV Notes tracked the *inverse* of VIX futures, when VIX futures contracts decreased in value by 1%, XIV increased in value by 1%, and vice versa. *Id.* As the issuer of XIV Notes, Credit Suisse was obligated to pay XIV investors the value of their XIV Notes, should investors choose to redeem them. ¶ 3. To offset this potential exposure, Credit Suisse would regularly buy short positions in VIX futures. *Id.* Thus, when VIX futures prices dropped (and XIV prices rose), Credit Suisse made money from its short positions, which in turn offset the resulting higher XIV prices—and thus higher redemption values—that Credit Suisse was required to pay XIV investors who wanted to redeem their Notes. *Id.*

On at least three occasions during the life of XIV, market volatility spiked significantly. ¶ 3. During these occasions, VIX futures prices also spiked, but in a manner disproportionate to what would normally be expected for the given level of volatility. *Id.* These disproportionate spikes were, in significant part, caused by Credit Suisse and other volatility-related ETN issuers buying VIX futures to offset the risk posed by the volatility ETNs they issued, including, as to Credit Suisse, XIV. *Id.* Given the growth in value and number of XIV Notes issued, the Defendants knew

---

[2] "Class Periods" refers to the Misrepresentation Class Period and Manipulation Class Periods.

or recklessly disregarded that there was not sufficient liquidity—*i.e.*, VIX futures—to allow volatility-related product issuers like Credit Suisse to hedge their positions during volatility spikes without significantly exacerbating those spikes. ¶ 4. Based on its risk protocols and modeling, Defendants knew another volatility spike similar to the three Credit Suisse had experienced in recent years was inevitable. ¶ 6. They knew that when said spike eventually occurred, they could amplify it in VIX futures prices, thereby running the inversely-related XIV Notes into the ground. *Id.* In a signal that it understood the seriousness of the liquidity issue, in July 2016, Credit Suisse announced a unilateral right to demand purchasers of XIV Notes sell Credit Suisse various hedging instruments, ¶ 75, but it did nothing to warn XIV's investors of the risk of its hedging activity or disclose the liquidity threat to their investments. ¶ 6. Instead, Credit Suisse falsely told investors that "we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index. . . ." ¶ 226.

On February 5, 2018, volatility returned, as Defendants knew it would, and Credit Suisse responded by buying up over 100,000 VIX futures contracts after the market closed. ¶ 8. By 4:09 PM, Credit Suisse's purchases of VIX futures had driven the value of XIV down to approximately $20, a more than 80% drop in value from the previous day's closing value. ¶ 9. This drop in value meant that Credit Suisse could announce an "Acceleration Event" for the XIV Notes. ¶ 6. But Credit Suisse did not do so; nor did it halt trading or otherwise protect investors. ¶ 189. Instead, Credit Suisse continued purchasing VIX futures, wiping out a full 96% of XIV's value by 4:15 PM and increasing Credit Suisse's profits. ¶ 9.[3]

---

[3] The percentage change in the S&P 500 on February 5, 2018, was approximately negative 4%. ¶ 170. Historically, the correlation of the front month VIX futures contract to the S&P 500 index should have produced a 15% to 25% jump in the front month VIX futures contract price from the prior day's close. *Id.* Instead, on February 5, 2018, due to Credit Suisse's liquidity squeeze, the jump was almost 100%—devasting XIV investors. *Id.*

On February 5, 2018, XIV closed 4:00 PM at $99 per Note. ¶ 192. Within an hour and a half, that price had imploded to $10.16. *Id.* However, XIV's price at the close of regular-hours trading suggested the Note had actually *withstood* the doubling of VIX volatility levels, further enticing ***$700 million*** of new investments. ¶ 193. Those investors lost 80% to 90% of the money they invested from 4:08 pm to 5:09 pm. *Id.* It was not until the next day, February 6, 2018, that Credit Suisse announced an Acceleration Event, ¶ 199, which caused investors to lose hundreds of millions of dollars because it gave Credit Suisse the right to buy back investors' XIV Notes for just pennies on the dollar. ¶¶ 193, 109.

Credit Suisse profited handsomely from this scheme: on April 25, 2018, it reported that it had made about $490 million in its equity sales and trading division for the fiscal quarter ended March 31, 2018. ¶ 16. Credit Suisse credited this profit to "***more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business.***" *Id.* While Credit Suisse was proud of its profiteering, it took steps to conceal its manipulation. In response to questions about XIV's collapse, Credit Suisse executives falsely claimed they had actually taken steps to *protect* XIV investors. ¶ 17. On February 20, 2018, XIV ceased trading. ¶ 201. The following day, February 21, 2018, XIV was terminated and redeemed at $5.99 per Note. *Id.*

Lead Plaintiffs now seek class certification of three classes.[4] First, Lead Plaintiffs seek class certification on behalf of a proposed Class consisting of:

> all persons and entities that purchased or acquired VelocityShares Inverse VIX Short Term Exchange Traded Notes between January 29, 2018 and February 5,

---

[4] Excluded from each of the Classes are Defendants and any of their immediate family members, the officers, directors and affiliates of Defendants at all relevant times, the legal representatives, heirs, successors or assigns of any Defendant, and any entity in which any Defendant has or had a controlling interest. Also excluded from the Classes are Janus, Janus Index and Calculation Services ("JIC"), and Janus Distributors LLC d/b/a Janus Henderson Distributors ("JHD") (collectively, the "Janus Entities"), and any officers and directors or their immediate family members, affiliates, legal representatives, heirs, successors or assigns of the Janus Entities.

2018, inclusive (the "Misrepresentation Class Period"), and who were damaged thereby (the "10b-5(b) Class").

Second, Lead Plaintiffs seek certification on behalf of a proposed Class consisting of:

> all persons and entities that sold or redeemed the VelocityShares Inverse VIX Short Term Exchange Traded Notes on or after February 5, 2018 (the "Manipulation Class Period") and who were damaged thereby (the "10b-5(a) and (c) Class" and, together with the 10b-5(b) Class, the "Exchange Act Classes").

Third, Lead Plaintiffs seek certification on behalf of a proposed Class consisting of:

> all persons and entities that purchased or acquired VelocityShares Inverse VIX Short Term Exchange Traded Notes pursuant to or traceable to Credit Suisse's Offering Documents, and were damaged thereby (the "Securities Act Class"). The Offering Documents are Credit Suisse's (i) January 29, 2018 pricing supplement (No. VLS ETN-1/A48) filed with the Securities and Exchange Commission ("SEC") pursuant to Rule 424(b)(2) and in conjunction with (ii) Registration Statement No. 333-218604-02, (iii) prospectus supplement dated June 30, 2017, and (iv) prospectus dated June 30, 2017.

The United States Supreme Court, the Second Circuit, and this Court recognize the appropriateness of class action treatment for cases alleging violations of the federal securities laws. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) ("The securities statutes seek to maintain public confidence in the marketplace.");[5] *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 197 (S.D.N.Y. 1992) ("The class action procedure is singularly suited to securities fraud actions because in such cases 'a large number of individuals may have been injured, although no one person may have been damaged to a degree which would have induced him to institute litigation solely on his own behalf.'") (quoting *Green v. Wolf Corp.*, 406 F.2d 291, 296 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969)). Because of the utility of class actions in securities cases, in such cases "the class certification requirements of Rule 23 are to be construed liberally." *Katz v. Image Innovations Holdings, Inc.*, No. 06-cv-3707-JGK, 2010 WL 2926196, at *3 (S.D.N.Y.

---

[5] Citations, alterations, and internal quotations are omitted from quoted authority unless otherwise indicated.

July 22, 2010); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) ("Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility[.]"); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-cv-1580-LGS, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) ("The Second Circuit has directed district courts to interpret Rule 23 liberally, to maximize the benefits to both private parties and to the public provided by class actions."). As explained herein, the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy), as well as the requirements of Rule 23(b)(3) (predominance and superiority), are all met. Likewise, Lead Plaintiffs' choice of counsel to serve as Co-Lead Counsel, Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Levi & Korsinsky, LLP ("Levi Korsinsky"), are qualified under Rule 23(g).

For the foregoing reasons, Lead Plaintiffs respectfully submit that their Motion for Class Certification should be granted.

## II.   PROCEDURAL HISTORY

After being appointed as Lead Plaintiffs by this Court, Lead Plaintiffs filed the operative Amended Complaint against Defendants on August 20, 2018. ECF No. 82. On November 2, 2018, Defendants moved to dismiss the Complaint. ECF Nos. 101, 105. Upon a Report and Recommendation by Magistrate Judge Netburn, ECF No. 124, this Court dismissed Plaintiffs' claims in their entirety. ECF No. 135. Plaintiffs timely appealed, and the Second Circuit Court of Appeals resuscitated Plaintiffs' claims, except those alleging failure to correct the Flatline Value. ECF No. 143.

## III.   STATEMENT OF FACTS COMMON TO THE CLASSES

XIV is an ETN (Exchanged Traded Note) issued and sold by Credit Suisse. ¶ 2. XIV was created in 2010 to track the inverse of VIX futures contracts, which monitor expected future volatility. ¶¶ 2, 50. The VIX futures track higher when the market anticipates increased volatility

6

and track lower when the market anticipates less volatility in the coming thirty days. ¶ 51. Because XIV was derived from the inverse value of VIX futures, generally speaking, when VIX futures went down 1% in one trading day, XIV was designed to go up 1% that same trading day, and vice versa. ¶ 56.

Initially, XIV enjoyed tremendous success, with significant popularity and a rapidly increasing price. ¶ 61. To hedge its own exposure to XIV, Credit Suisse needed to hold largely short positions in VIX futures such that, when VIX futures prices dropped, Credit Suisse made money from its short positions, which offset the ensuing higher XIV price—and thus higher redemption values—Credit Suisse was required to pay XIV investors seeking to redeem their Notes. ¶ 66. Over time, Credit Suisse continued to issue more and more XIV Notes to investors: five million in June of 2017 and another 16.275 million in January of 2018. ¶ 63. By February 2018, XIV's market cap had reached nearly $2 billion. *Id.*

Credit Suisse issued XIV Notes despite knowing that the next VIX volatility spike would threaten XIV's viability. ¶ 64. Prior to February 2018, on at least three occasions during the life of XIV, market volatility spiked significantly. ¶ 3. During these spikes, VIX futures also spiked, though in a manner disproportionate to what would normally be expected for the given level of volatility. *Id.* These spikes were, in significant part, the result of Credit Suisse and other volatility-related ETN issuers buying VIX futures to offset the risk posed by the volatility ETNs they issued. *Id.* As a result of these spikes, Defendants learned that there were simply not enough VIX futures contracts relative to the hedging demand from Credit Suisse and other VIX-related exchange traded product ("ETP") issuers. ¶ 69. In other words, spikes in the VIX caused serious liquidity issues in the VIX futures market. *Id.* Defendants knew that these types of volatility events were expected to occur ***every year or two***. ¶ 82.

In an indication that it understood the seriousness of these liquidity issues, in July 2016, Credit Suisse announced a unilateral right to demand purchasers of XIV Notes sell Credit Suisse various hedging instruments, ¶ 75, but it did nothing to warn XIV's investors of this risk or disclose the liquidity threat to their investments. ¶ 6. Instead, Credit Suisse falsely told investors that "we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index. . . ." ¶ 226.

Even though Credit Suisse knew that XIV had already grown too big to be adequately hedged by the relatively small VIX futures market, and that there were liquidity issues with VIX futures, Credit Suisse continued to issue new XIV Notes. ¶ 78. This was because Defendants also knew that when a volatility spike eventually occurred, they could amplify the corresponding spike in VIX futures prices. ¶ 6. In other words, the next VIX volatility spike would give Credit Suisse the opportunity to run the inversely-related XIV Notes into the ground and thereby make money as it could then redeem the XIV Notes at very low prices. *Id.*

On February 5, 2018, Credit Suisse's plan came to fruition: volatility returned and, in turn, the VIX index spiked and XIV plummeted. ¶¶ 160-61. XIV opened the day at $104.27 and closed at $72.59 at the end of regular market trading. *Id.* Credit Suisse responded by seizing the opportunity and executing its plan to rid itself of XIV while making hundreds of millions of dollars at investors' expense and blaming the collapse on market forces. ¶ 162. First, Credit Suisse bought up over 100,000 VIX futures contracts after the market closed, drastically reducing the contracts' supply, thereby driving up their price. *Id.* Credit Suisse's purchase of VIX futures was enormous: indeed, the trading volume in VIX futures on February 5 was more than ***167 times*** the usual volume of trades. ¶ 165.

The spike in VIX futures prices was disastrous for XIV prices. By 4:09 PM, Credit Suisse's

purchases of VIX futures had driven the value of XIV down to approximately $20, a more than 80% drop in value from the previous day's closing value. ¶ 9. This drop meant that Credit Suisse could announce an "Acceleration Event" and halt trading. ¶ 6. But Credit Suisse did not announce an Acceleration Event, halt trading, or otherwise protect investors—rather, it continued purchasing VIX futures, wiping out a full *96%* of XIV's value by 4:15 PM while increasing Credit Suisse's own profits. ¶ 169. Not until the next day did Credit Suisse announce an Acceleration Event, which caused investors to lose hundreds of millions of dollars. ¶ 193. Notably, a former analyst for Merrill Lynch and Bank of America found the probability of a one-day VIX futures spike of 80% occurring to be between 0.18% and 0.37%, or once every year or two. ¶ 82.

Credit Suisse profited handsomely from this scheme: on April 25, 2018, it reported that it had made about $490 million in its equity sales and trading division for the fiscal quarter ended March 31, 2018. ¶ 16. Credit Suisse credited this profit to "***more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business.***" *Id.* While Credit Suisse was proud of its profiteering, it also took steps to conceal its manipulation. Credit Suisse executives falsely claimed that they had actually taken steps to *protect* XIV investors. ¶ 17.

## IV.   LEGAL ARGUMENT

### A.   The Proposed Classes Satisfy the Standards for Class Certification Under Rule 23.

The United States Supreme Court, Second Circuit, the Southern District of New York recognize the particular appropriateness of class action treatment for cases alleging violations of the federal securities laws. *See Dura Pharms.*, 544 U.S. at 345 ("The securities statutes seek to maintain public confidence in the marketplace."); *Green*, 406 F.2d at 296 (in a securities case, "a class action may well be the appropriate means for expeditious litigation of the issues, because a large number of individuals may have been injured, although no one person may have been

9

damaged to a degree which would have induced him to institute litigation solely on his own behalf"). Class certification is warranted when a putative class satisfies the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and one of Rule 23(b)'s subsections. *See* Fed. R. Civ. P. 23(a); *see, e.g.*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 88 (2d Cir. 2017).

The Second Circuit has directed District Courts to "apply Rule 23 according to a liberal rather than a restrictive interpretation[,]" and noted that "[i]f there is to be an error made, let it be in favor and not against the maintenance of the class action. . . ." *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 312 F.R.D. 332, 340 (S.D.N.Y. 2015) (citing *Green*, 406 F.2d at 298); *see also Marisol*, 126 F.3d at 377 ("Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility ..."). Determining whether a class should be certified requires courts to consider whether Rule 23's requirements have been met—not whether plaintiffs will ultimately prevail on the merits. *See In re Vivendi Universal S.A. Sec. Litig.*, 242 F.R.D. 76, 83 (S.D.N.Y. 2007) ("[The Court must] assure that a class certification motion does not become a pretext for a partial trial of the merits."); *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."). The question at hand is, thus, only whether the "evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001). Because all the requirements are met in this case, the Court should certify the proposed Classes.

## B.   The Proposed Classes Meet the Rule 23(a) Requirements.

### 1.   The Proposed Classes Are so Numerous that Joinder Is Impracticable.

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is presumed for classes larger than forty members, though plaintiffs need not

10

provide evidence of an exact class size to establish numerosity. *See Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). In securities actions involving nationally listed public companies, numerosity is satisfied by showing that a large number of shares were outstanding and traded during the time period. *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. at 84.

Based on the millions of XIV Notes outstanding and traded during the Class Periods, ¶ 196; Exhibit A, Report of Professor Joshua Mitts, PhD. ("Prof. Mitts Report") ¶ 24 (over ten million XIV Notes outstanding on January 26, 2018, and over sixty million XIV Notes traded between January 29, 2018 and February 5, 2018), and the sixteen million XIV Notes offered in the January Supplement, ¶ 196, Class members likely number in at least the thousands and are geographically dispersed, ¶ 43. Joinder of parties so numerous and widespread would be burdensome, expensive, and impracticable for both the parties and the judicial system, confirming that Rule 23(a)(1) is satisfied. *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 43 (S.D.N.Y. 2012) (numerosity satisfied where six million shares of stock were outstanding and weekly trading volume was in the millions of shares).

### 2.    The Action Raises Common Questions of Law and Fact.

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement is a "low hurdle," *Kaplan v. S.A.C. Cap. Advisors, L.P*, 311 F.R.D. 373, 378 (S.D.N.Y. 2015); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F.Supp.3d 415, 424 (S.D.N.Y. 2014), requiring only that class members' claims depend upon at least one "common contention. . . capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

The commonality requirement is satisfied here "because the class proceeding will generate

common answers to several key questions," including (depending on the claim at issue): "whether Defendants engaged in deceptive conduct and omitted the disclosure of material facts"; "whether there was scienter"; whether Defendants' misstatements or omissions were material; whether the price of XIV Notes were artificial during the Class Periods; for the Exchange Act claims, whether manipulation occurred; and whether damages exist. *See Gruber v. Gilbertson*, No. 16-cv-9727, 2019 WL 4439415, at *3 (S.D.N.Y. Sept. 17, 2019); *see also Amgen*, 568 U.S. at 459, 475 (holding that, "[b]ecause materiality is judged according to an objective standard, the materiality of [an issuer's] alleged misrepresentations and omissions is a question common to all members of the class" and "the falsity or misleading nature of the defendants' alleged statements or omissions are common questions"); *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 282 (2014) ("[M]ateriality is an objective issue susceptible to common, classwide proof.").

### 3.    The Class Representatives' Claims Are Typical of the Classes.

Typicality under Rule 23(a)(3) requires "only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *MF Glob. Holdings*, 310 F.R.D. at 236. The "claims only need to share the same essential characteristics, and need not be identical[.]" *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 113 (S.D.N.Y. 2015) (quoting *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 155 (S.D.N.Y. 2002)). When determining whether the claims are typical, "the focus must be on the defendants' behavior and not that of the plaintiffs." *Teachers Ret. Sys. of La. v. ACLN Ltd.*, No. 01-cv-11814-LAP, 2004 WL 2997957, at *4 (S.D.N.Y. Dec. 27, 2004). Courts in this district have emphasized that the typicality requirement is "not demanding." *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y. 2018).

Lead Plaintiffs' claims are typical of the claims of all other proposed Class members. For the Securities Act Class, Lead Plaintiffs and the proposed Class all allege that Defendants misstated and

omitted the same material facts. In the case of the Exchange Act Classes, Lead Plaintiffs and the proposed Classes all allege the same misrepresentations and omissions as well as the same manipulative scheme. Given that each of the Lead Plaintiffs' and the Classes' claims turn upon the very same facts and legal theories and will be proven by the same evidence, typicality is satisfied, as courts regularly find under similar circumstances. *See, e.g.*, *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. at 81 (finding typicality where the "Court has found that all class members' claims arise from a single, common course of conduct committed against all members of the class"); *In re Facebook*, 312 F.R.D. at 341 (same). Nor are there any defenses unique to Lead Plaintiffs. *See MF Glob. Holdings*, 310 F.R.D. at 236-37.

### 4.    Lead Plaintiffs Will Fairly and Adequately Protect the Interests of the Classes.

Rule 23(a)(4) requires that "the representative of the parties will fairly and adequately protect the interests of the class." *MF Glob. Holdings*, 310 F.R.D. at 235. A determination of adequacy asks whether: "(1) plaintiff's interests are antagonistic to the interests of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. at 81. Like typicality, the "adequacy requirement is not demanding[,]" *Wallace v. IntraLinks*, 302 F.R.D. 310, 316 (S.D.N.Y. 2014), and both elements of Rule 23(a)(4) are met here.

*First*, in order for a conflict between Lead Plaintiffs and the proposed Classes to defeat class certification, the conflict must be "fundamental." *In re Patriot Nat'l, Inc. Sec. Litig.*, 828 F. App'x 760, 764 (2d Cir. 2020). Where all claims arise from the same wrongful conduct, "[a]ny conflict that may exist is not fundamental." *In re Facebook*, 312 F.R.D. at 344. Here, Lead Plaintiffs' interests are aligned with those of the proposed Classes because their claims arise from the same misconduct and involve the same legal theories, and they will fairly and adequately protect the interests of the proposed

13

Classes. *See* Exhibit B, Joint Declaration of Lead Plaintiffs.

*Second*, Lead Plaintiffs have also satisfied the second element by selecting co-counsel, Cohen Milstein and Levi Korsinsky, that have vigorously prosecuted this action, including by defeating Defendants' motion to dismiss on appeal, and possess extensive experience successfully representing investors in securities class actions. Further details regarding counsels' relevant experience are set forth in their firm resumes, attached as Exhibits C, Cohen Milstein Firm Resume and D, Levi Korsinsky Firm Resume, and in Section IV.D below. Lead Counsel therefore satisfy the adequacy requirement. *See MF Glob. Holdings*, 310 F.R.D. at 237.

### C. The Proposed Classes Meet the Rule 23(b)(3) Requirements.

In addition to meeting the requirements of Rule 23(a), a class action must satisfy at least one of the three Rule 23(b) requirements. Here, Lead Plaintiffs move for class certification under Rule 23(b)(3), which authorizes certification where: (i) "the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This action satisfies both of those conditions.

### 1. Common Questions of Law and Fact Predominate Over Individual Questions.

"Predominance is a test readily met in certain cases alleging. . . securities [claims]." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 625; *see also Basic Inc. v. Levinson*, 485 U.S. 224 (1988). A plaintiff is not required to show that there are *no* individual issues. *In re IndyMac Mortgage-Backed Sec. Litig.*, 286 F.R.D. 226, 235-236 (S.D.N.Y. 2012). Rather, "[c]lass-wide issues predominate 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Tsereteli v. Residential Asset*

*Securitization Tr. 2006-A8*, 283 F.R.D. 199, 210 (S.D.N.Y. 2012) (quoting *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010)). In assessing predominance, "a court's inquiry is directed primarily toward whether the issue of liability is common to members of the class." *Id.*

Under Rule 10b-5(b), plaintiffs must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 810 (2011). Materiality, loss causation, and "the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified." *Amgen*, 568 U.S. at 474-75; *Halliburton I*, 563 U.S. at 809. The same is true of scienter. *See In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 147 (S.D.N.Y. 2019). As explained below, the remaining elements of a Rule 10b-5(b) claim—reliance and damages—will also be established with common proof on a class-wide basis.

Under Rule 10b-5(a), plaintiffs must prove defendants employed "any device, scheme, or artifice to defraud," "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. And under Rule 10b-5(c), plaintiffs must prove defendants engaged in "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *Id.* Thus, the focus is on Defendants' conduct and the elements of these claims are common between Lead Plaintiffs and Class members.

"A claim under Section 9(a)(4) requires a (1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price." *Y-GAR Cap. LLC v. Credit Suisse Grp. AG*, No. 19-cv-2827-AT, 2020 WL 71163, at *9 (Torres, J.) (S.D.N.Y. Jan. 2, 2020).

Many of these elements are identical to the 10b-5(b) elements and, thus, all of the common questions pertinent to those claims are also common questions pertinent to Plaintiffs' Section 9(a)(4) claims. The two additional elements to a Section 9(a)(4) claim—elements (4) and (6) above—are both questions of Defendants' conduct, and thus are also common across the Classes. These elements are also common as to Lead Plaintiffs' Section 20(a) claim because Defendants Thiam's and Matther's liability as control persons does not vary among proposed Class members.

Section 11 is a strict liability statute. Plaintiff need only demonstrate that "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (citing 15 U.S.C. §§ 77k, 77l(a)(2)). Neither scienter nor loss causation is an element of a Section 11 claim. Like under Rule 10b-5(b), the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified. Thus, each of Lead Plaintiffs' claims consist entirely of common questions of law and fact across the Classes.

### a.   Where Plaintiffs' Claims Require Proof of Reliance, the Proposed Classes Are Entitled to the *Basic* Presumption of Reliance.

To the extent that Plaintiffs' Exchange Act claims require Plaintiffs to establish the element of reliance, they are entitled to the fraud-on-the-market presumption of reliance under *Basic v. Levinson*. "The idea behind *Basic* is that investors presume that theoretically efficient markets, such as. . . Nasdaq, incorporate all public information—including material misstatements—into a share price." *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 261 (2d Cir. 2020), *vacated and remanded on other grounds*, 141 S. Ct. 1951 (2021); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) ("In most cases,

16

evidence that a stock trades at high volumes on a large national market, such as the … NASDAQ, and is followed by a large number of analysts will be sufficient to satisfy the *Basic* presumption on class certification."); Prof. Mitts Report ¶¶ 18-22. Therefore, a plaintiff may prove reliance by invoking the presumption that "a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation" for purposes of a Rule 10b-5 action. *Halliburton II*, 573 U.S. at 283-84.

The Second Circuit has "declined to adopt a particular test for market efficiency[,]" and has made clear that the burden to demonstrate market efficiency "is not an onerous one." *Waggoner*, 875 F.3d at 94, 97. Courts in this Circuit presume that the NASDAQ, upon which XIV Notes were traded prior to and during the Class Periods, is an efficient market. *See, e.g.*, *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012); *see also ODS Cap. LLC v. JA Solar Holdings Co.*, 2020 WL 7028639, at *14 (S.D.N.Y. Nov. 30, 2020) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency.").

To determine whether a security traded in an efficient market, courts generally consider a non-exhaustive list of factors, commonly referred to as the *Cammer* factors, which are: (1) a large weekly trading volume of the security; (2) the existence of a significant number of analyst reports regarding the company; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file a Form S-3 registration statement with the SEC; and (5) a history of immediate movement of stock price caused by unexpected corporate events or financial releases. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989). None of these factors

17

is individually dispositive of or required to prove market efficiency.[6] Courts in this Circuit may also look to what are known as the *Krogman* factors: "(1) the company's market capitalization; (2) the relative size of the bid-ask spread for the security; and (3) the company's float, or the degree to which shares of the security are held by the public, rather than insiders." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014).

As demonstrated herein and in Professor Mitts' Report, the fact that XIV Notes traded on the NASDAQ, as well as an analysis of the *Cammer* and *Krogman* factors, demonstrates that the market for XIV Notes was efficient during the Class Periods. *See, e.g.*, *Strougo*, 312 F.R.D. at 318; Prof. Mitts Report ¶¶ 18–71. In light of this showing, the Exchange Act Classes are entitled to the fraud-on-the-market presumption here to the extent necessary.

### (1)    High Weekly Trading Volume (*Cammer* Factor 1).

The high trading volume for XIV's publicly traded Notes supports a finding of efficiency. *See id.* at ¶¶ 25-28. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one." *McIntire*, 38 F. Supp. 3d at 431 (quoting *Cammer*, 711 F. Supp. at 1293). The average weekly trading volume of XIV Notes was 101%—more than fifty times above the standard benchmark for market efficiency. *See* Prof. Mitts Report ¶ 28.

---

[6] *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 83 (S.D.N.Y. 2015) (explaining that the Second Circuit "has not required [the *Cammer* factors'] use or held that any one of them is dispositive"); *Waggoner*, 875 F.3d at 97–99 (finding that, where other *Cammer* and *Krogman* factors weighed in favor of market efficiency, a district court did not need to rely on *Cammer* factor 5); *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898-SAS, 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008) (suggesting courts use the factors "as an analytical tool rather than as a checklist"); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 321 (S.D.N.Y. 2016), *aff'd sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017) ("Event studies test for a degree of efficiency that may not be required.").

### (2)     Financial Analysts' Coverage (*Cammer* Factor 2).

Substantial market coverage of an issuer and/or the security at issue suggests market efficiency because it indicates that investment professionals are monitoring company reports and announcements to inform buy/sell recommendations to their clients. *Cammer*, 711 F. Supp. at 1286.  The analyst-coverage factor is met where analyst reports concerning a company's financial condition were generated and made publicly available during the class period "by a significant number of brokerage firms[.]" *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008). Here, Credit Suisse generally, and information relevant to the XIV Notes specifically (such as information pertaining to Credit Suisse's credit risk), were extensively covered by twenty-seven securities analysts, including Bank of America, Merrill Lynch, Barclays and Morgan Stanley. Prof. Mitts Report ¶¶ 31-32. Moreover, because the redemption value of the XIV Notes was a function of the market's expectation as to the implied volatility of the S&P 500 index two months into the future, two other types of public analysis pertinent to the XIV Notes—macroeconomic forecasts indicating whether the S&P 500 index is likely to rise or fall—were released and available during the Class Periods. *Id.* at ¶¶ 33-36 (discussing the reports issued by the National Association of Manufacturers, a large industry association, and the Federal Open Market Committee, an authoritative body in the field).

Moreover, information regarding XIV was also widely available to the press and analysts through other mechanisms. For example, XIV was covered extensively in the investment analysis and news press during the Class Periods.  Investment websites like Seeking Alpha, which conducts analysis aimed at quantifying near-term volatility expectations, categorized dozens of articles from January 1, 2017 to the end of the Class Periods as relevant to XIV. *Id.* at ¶ 37. Factiva similarly identified over 300 articles published between January 1, 2017 and February 5, 2018, which contained reference to XIV notes. *Id.* at ¶ 38. And Credit Suisse's SEC filings were widely

distributed over the SEC's Edgar system. *Id.* at ¶ 70.

This wide coverage of information relevant to the XIV Notes implies that there was an active market for information regarding XIV and that the information was widely distributed. This wide coverage further weighs in favor of market efficiency. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D 437, 446 (S.D.N.Y. 2013) (finding market efficient where three analysts followed security at issue); *Billhofer*, 281 F.R.D. at 160 (eight analysts); Prof. Mitts Report ¶ 39.

### (3)   Numerous Market Makers (*Cammer* Factor 3).

A market maker is an entity that agrees to purchase or sell securities on demand, to support a liquid market for the shares. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 446-47. "Market makers promote efficiency by reacting quickly to new information by buying or selling securities in order to drive their price to the market-clearing level." *Id.* at 446. During 2018, there were fifty-two market makers for XIV Notes. Prof. Mitts Report ¶ 42. This is more than sufficient to support a finding of efficiency. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 446 (six market makers supported market efficiency finding); *In re Initial Public Offering Sec. Litig.*, 260 F.R.D. 81, 100 (S.D.N.Y. 2009) (fourteen market makers supported market efficiency finding).

### (4)   S-3 Registration Statements (*Cammer* Factor 4).

Credit Suisse's eligibility to file a Form F-3 registration statement (a foreign company's equivalent of a Form S-3 registration statement) further supports a finding of market efficiency. Eligibility indicates that a company's stock trades on an efficient market because the SEC has reserved eligibility for companies that have met all reporting requirements for twelve consecutive months and have a market capitalization of at least $75 million held by non-affiliates. *See In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. at 447 ("The ability to file this form indicates that the company is easily able to issue new securities."); 17 C.F.R. § 239.13. These requirements are based on the SEC's belief that the market operates efficiently for such companies. *Cammer*, 711 F. Supp.

at 1284.

Credit Suisse was eligible to file a Form F-3 during the Class Periods, and it had done so on June 8, 2017, before the Class Periods.[7] Prof. Mitts Report ¶¶ 48, 49. Credit Suisse also filed Forms F-3 after the Class Periods, on May 15, 2020.[8] *Id.* at ¶ 49.

### (5)      Reaction of XIV to News (*Cammer* Factor 5).

The fifth *Cammer* factor looks to whether Plaintiffs can make a *prima facie* showing that, during the Class Periods, XIV's price quickly responded to the release of relevant news events (a "cause and effect relationship"). *Cammer*, 711 F. Supp. at 1287, 1291. Professor Mitts reviewed the peer-reviewed literature on VIX derivatives. Prof. Mitts Report ¶¶ 52-54. **Independent, peer reviewed studies, unrelated to this litigation** have **already** found that VIX derivatives, like the XIV Notes, are informationally efficient. *Id.* Other **independent peer-reviewed studies unrelated to this litigation** found that **XIV Notes respond rapidly to new information regarding volatility expectations.** *Id.* at ¶ 57. In other words, independent, peer reviewed studies unrelated to this litigation have already found that XIV Notes respond quickly to information. Professor Mitts performed the same analyses conducted in those independent, peer-reviewed studies to confirm that the findings in those studies held for purposes of this case: first, he examined whether intraday price changes in VIX futures and XIV Notes at 5-minute intervals satisfied the standard informational efficiency tests employed in the literature. *Id.* at ¶ 59. He found that they did. *Id.* at ¶ 60. Second, he examined whether 5-minute trading prices for intraday VIX futures and XIV

---

[7] Credit Suisse Group AG, Registration Statement (Form F-3) (June 8, 2017), https://www.sec.gov/Archives/edgar/data/0001159510/000104746917003893/a2231913zf-3.htm.

[8] Credit Suisse Group AG, Registration Statement (Form F-3) (May 15, 2020), https://www.sec.gov/Archives/edgar/data/0001159510/000110465920062775/tm2019510-1_f3.htm.

Notes were cointegrated[9] during the Misrepresentation Class Period and found that they were. *Id.* at ¶ 61. Consequently, *Cammer* Factor 5 is satisfied. *Id.* at ¶ 62.

### (6)      High Market Capitalization (*Krogman* Factor 1).

Market capitalization, or the number of shares multiplied by the prevailing share price, is another quantitative indicator of market efficiency. *Krogman*, 202 F.R.D. at 478; Prof. Mitts Report ¶ 63. The considerable demand for investment in highly capitalized companies tends to result in an active market for the securities they issue, leading courts to conclude that the market for such securities is efficient. *See id.* During the Misrepresentation Class Period, the market capitalization of XIV Notes averaged $4.5 billion. *Id.* at ¶ 64. This figure supports a finding of market efficiency. *See McIntire*, 38 F. Supp. 3d at 433 (finding that first *Krogman* factor was satisfied where company's market capitalization "ranged from $292 million to $585 million during the Class Period").

### (7)      Narrow Bid-Ask Spread (*Krogman* Factor 2).

The bid-ask spread is the difference between the prices at which investors are willing to buy shares and the prices at which current stockholders are willing to sell them. *See Krogman*, 202 F.R.D. at 478. Smaller bid-ask spreads are associated with more efficient markets. *See id.*; Prof. Mitts Report ¶ 65. During the Misrepresentation Class Period, the average bid-ask spread for XIV Notes was approximately 0.127%, with the smallest bid-ask spread being 0.078% and the largest spread being 0.15%. *Id.* at ¶ 66. This range supports a finding of market efficiency. *See In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728-CM-RWL, 2019 WL 3001084, at *12 (S.D.N.Y. July 10, 2019) (finding that average bid-ask spread of 0.3% "strongly indicates that the stock traded in

---

[9] "Cointegration is a statistical concept which implies that two series of prices arise from a common trend, and indicating a rapid flow of information between two securities." Prof. Mitts Report ¶ 53.

an efficient market").

### (8)   Public Float (*Krogman* Factor 3).

A company's float is "the degree to which shares of the security are held by the public, rather than insiders." *Billhofer*, 281 F.R.D. at 160. The market value of XIV depended on one- and two-month volatility expectations rather than company-specific information. Prof. Mitts Report ¶ 68. Thus, XIV's market value did not depend on material, nonpublic information regarding corporate news held by corporate insiders. *Id.* This *Krogman* factor thus supports the efficiency of the market in XIV Notes.

### (9)   Institutional Investors

Institutional investors are sophisticated, well-informed, and known to engage in detailed analysis of the securities in their portfolios. *Id.* at ¶ 69. Such investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to devote to such analysis. *Id.* According to the most recent quarter-end date preceding the Class Periods, institutions holdings totaled 92.69% of the issued and outstanding XIV Notes. *Id.* at ¶ 70. This high level of institutional ownership, coupled with high trading volumes, further supports a conclusion of market efficiency. *See In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 366 (S.D.N.Y. 2016), *aff'd in part, vacated in part sub. nom. In re Petrobras Sec.*, 862 F.3d 250 (2d Cir. 2017).

### (10)   Lack of Autocorrelation

Autocorrelation is the degree to which previous price movements have the ability to predict future price movements. Prof. Mitts Report ¶ 72. If a market's autocorrelation is persistent, sufficiently large and in the same direction, it could suggest market inefficiency if the information in previous price movements was not fully accounted for in current prices. *Id.* Here, Professor Mitts found that there is no evidence of statistically significant autocorrelation during the

Misrepresentation Class Period such that a trader could take advantage of the autocorrelation for the XIV Notes. *Id.* at ¶ 73. Therefore, this factor also supports the conclusion that XIV Notes traded in an efficient market. *See In re Gaming Lottery Sec. Litig.*, No. 96-cv-5567-RPP, 2001 WL 204219, at *17 (S.D.N.Y. Mar. 1, 2001) (market efficiency supported by the fact that the stock "did not exhibit autocorrelation").

***

In sum, the market for XIV Notes was efficient throughout the Class Periods. Accordingly, the members of the proposed Classes are entitled to the *Basic* presumption. *See Basic*, 485 U.S. at 247. As a result, there is no requirement for individual proof of reliance. Common issues will predominate, and the proposed Classes properly can and should proceed with this case as a class action. *Id.*

> **b.    Where Plaintiffs' Claims Require Proof of Reliance, the Proposed Class Is Entitled to the *Affiliated Ute* Presumption of Reliance.**

Where, as here, "a plaintiff's fraud claims are based on omissions, reliance may be satisfied so long as the plaintiff shows that defendants had an obligation to disclose the information and the information withheld is material." *See Strougo*, 312 F.R.D. at 313 (citing *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 154 (1972)). The *Affiliated Ute* presumption reflects the reality that where information is omitted, "reliance as a practical matter is impossible to prove." *In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013).

Lead Plaintiffs are also entitled to the *Affiliated Ute* presumption to establish reliance here. First, Plaintiffs' market manipulation claims under Rule 10b-5(a) and (c) and Section 9 are entitled to the *Affiliated Ute* presumption as market manipulation claims do not involve any affirmative misrepresentations and, as established in *Affiliated Ute* itself, are covered by the *Affiliated Ute* presumption. *See Affiliated Ute*, 406 U.S. at 146 (holding presumption applies to market

24

manipulation claims); *In re Barclays Liquidity Cross and High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 448 (S.D.N.Y. 2019) (applying *Affiliated Ute* presumption where omissions involved defendants' manipulation); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 496 (S.D.N.Y. 2009) (applying the *Affiliated Ute* presumption in a market manipulation case and noting that "*Affiliated Ute* itself was a case based on manipulative conduct").

In addition, Lead Plaintiffs' Rule 10b-5(b) claims primarily allege that Defendants made several material omissions regarding XIV Notes. *See, e.g.*, ¶¶ 61–84 (omitting certainty of volatility spike); 215–18 (omitting risks of Credit Suisse's hedging operation on value of XIV); 223–28 (same). This is sufficient to invoke the *Affiliated Ute* presumption of reliance for the Rule 10b-5(b) Class. *See Strougo*, 312 F.R.D. at 319.

### c.   Damages Can Be Calculated on a Class-Wide Basis.

Lead Plaintiffs do not need to produce a class-wide damages model at the class certification stage. *In re Petrobras Sec. Litig.*, 312 F.R.D. at 372.[10] Nor do Lead Plaintiffs need to demonstrate loss causation at the class certification stage. *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 402 (2d Cir. 2015); *see also Amgen*, 568 U.S. at 475 (loss causation is a common question that need not be adjudicated for a class to be certified). All that is required here is that Lead Plaintiffs show that their damages arise from their theory of liability. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015); *see also In re Signet*, 2019 WL 3001084, at *20 ("Plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of

---

[10] Furthermore, it is "well-established that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat" predominance or class certification. *Kaplan v. S.A.C. Cap. Advisors, L.P*, 311 F.R.D. 373, 382 (S.D.N.Y. 2015); *see also In re Signet*, 2019 WL 3001084, at *20) ("[W]hile Plaintiff ultimately will need to disaggregate confounding factors to prove economic loss, it need not do so at [the class certification] juncture to establish that common issues relating to damages predominate.").

liability.").

Lead Plaintiffs have met their burden here. With respect to Lead Plaintiffs' market manipulation claims under Rule 10b-5(a) and (c) and Section 9, Professor Mitts has concluded that the damages calculation "depends only on pricing data and the defendant's hedging activity, and thus can be applied formulaically to yield an estimate of investor losses on a class-wide basis." Prof. Mitts Report ¶ 84. Specifically, Professor Mitts has identified an "ordinary least squares regression model on 15-minute intraday windows" as a widely accepted damages methodology that can be used on a classwide basis to calculate damages. *Id. See also Kleen Prod. LLC v. Int'l Paper*, No. 10-cv-5711, 2017 WL 2362567, at *6 (N.D. Ill. May 31, 2017) (acknowledging the propriety of an ordinary least squares regression model). With respect to Lead Plaintiffs' 10b-5(b) claims, Professor Mitts points to the event study as a widely accepted damages methodology that can be used on a classwide basis to calculate damages. Prof. Mitts Report ¶¶ 76-77; *see also Plymouth Cnty. Ret. Sys. v. Patterson Companies, Inc.*, No. 18-cv-871-MJD-HB, 2020 WL 5757695, at *14 (D. Minn. Sept. 28, 2020) (approving of event study methodology); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 720 (S.D. Tex. 2006) ("One method increasingly recognized by courts [to calculate damages] is an event study[.]"). For Plaintiffs' Securities Act claims, Section 11 itself provides a statutory damages formula that is routinely applied on a classwide basis. Prof. Mitts Report ¶ 87; *see also In re Facebook*, 312 F.R.D. at 350 ("*Comcast* does not bar certification here, where Section 11(e) of the Securities Act provides a statutory formula for damages."); *N.J. Carpenters Health Fund v. Residential Cap., LLC*, Nos. 08-cv-8781-HB, 08-cv-5093-HB, 2013 WL 6839093, at *5 (S.D.N.Y. Dec. 27, 2013) (rejecting *Comcast*'s application to claims under Sections 11, 12(a)(2), and 15 of the Securities Act where Section 11(e) provided a damages formula). In summary, Professor Mitts concludes that "damages for each of Lead Plaintiffs' claims

in this matter can be calculated on a Class-wide basis utilizing a common methodology." Prof. Mitts Report ¶ 89.

### 2.     A Class Action Is the Superior Means of Resolving this Dispute.

Rule 23(b)(3) identifies four factors for assessing whether a class action is superior to other methods of adjudication: (1) the interests of the class members in "individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3). "Securities suits easily" satisfy Rule 23(b)(3)'s second element—that a class action is superior to other methods for adjudicating the controversy—"because 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'" *MF Glob. Holdings*, 310 F.R.D. at 239 (quoting *Green*, 406 F.2d at 301).

The same logic applies here: with thousands of geographically dispersed class members whose individual damages likely are too small to make individual litigation economically worthwhile, it is unlikely that all but a few of the proposed members of the Classes have an economic interest sufficient to assert separate claims. *See, e.g.*, *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 187 (S.D.N.Y. 2008). Lead Plaintiffs are aware of only two individual cases commenced by any members of the Classes regarding the scheme alleged in this action out of the thousands of Class members, one of which has settled. *See* Complaint, *Samuel v. Does*, No. 18-cv-01593-AT (S.D.N.Y Feb. 21, 2018), ECF No. 1; Order Dismissing Case, *Halbert v. Credit Suisse AG*, No. 18-cv-00615-AKK (N.D. Ala. Oct. 1, 2020), ECF No. 82. "[I]n the absence of class certification . . . many putative class members— particularly, retail investors—would also be discouraged from even seeking legal relief as their

potential recovery would be outweighed by the transaction costs of individual litigation." *In re Livent*, 210 F.R.D. 512, 518 (S.D.N.Y. 2002). That is particularly true where, as here, Lead Plaintiffs and Co-Lead Counsel have already obtained significant discovery and resolved a motion to dismiss. ECF No. 143; *see also In re MF Global*, 310 F.R.D. at 239 (finding superiority requirement met where lead plaintiff and lead counsel had engaged in "significant discovery" and won the motion to dismiss). Nor is there any reason to expect difficulties in the management of this case as a class action. *See In re Omnicom Grp., Inc. Sec. Litig.*, No. 02-cv-4483-RCC, 2007 WL 1280640, at *8 (S.D.N.Y. Apr. 30, 2007) ("[I]n Rule-23(b)(3) securities fraud cases, this Circuit has expressed a strong preference in favor of using judicial management tools, rather than refusing to certify a class for management reasons."). Thus, the class action device is superior to any other means to adjudicate this action.

### D. The Court Should Appoint Lead Plaintiffs' Choice of Co-Lead Counsel as Class Counsel.

In addition to Cohen Milstein and Levi Korsinsky's satisfaction of Rule 23(a)(4)'s requirement that they will "fairly and adequately represent the interests of the class," the factors enumerated in Rule 23(g) weigh in favor of appointing them as Class Counsel. Those factors are: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A).

Cohen Milstein and Levi Korsinsky are well qualified to represent the Classes here. They have extensive experience in class action litigation, including securities class actions, and through their efforts has achieved billions of dollars in recoveries for investors. *See* Exhibits C, Cohen Milstein Firm Resume; D, Levi Korsinsky Firm Resume. Since the Court's appointment of Cohen Milstein and Levi

Korsinsky as Co-Lead Counsel on June 21, 2018, they have investigated the claims at issue, drafted a detailed complaint that, coupled with their opposition briefing, survived Defendants' motion to dismiss on appeal, and are now further pursuing those claims in discovery. ECF No. 143. Moreover, as demonstrated by their track record in other securities class actions, Co-Lead Counsel have the resources to effectively pursue and vigorously prosecute those claims on behalf of the Classes. The requirements of Rule 23(a)(4) and 23(g) are therefore satisfied, and Lead Plaintiffs respectfully submit that their choice of counsel should be appointed Class Counsel.

## V.    CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court: (i) certify this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure; (ii) certify Lead Plaintiffs as representative of the proposed Classes; and (iii) appoint Co-Lead Counsel as Class Counsel.

Dated: July 1, 2022                                  Respectfully submitted,

                                                     /s/ *Michael B. Eisenkraft*
                                                     Michael B. Eisenkraft
                                                     Laura H. Posner
                                                     **COHEN MILSTEIN SELLERS
                                                       & TOLL PLLC**
                                                     88 Pine Street
                                                     14th Floor
                                                     New York, NY 10005
                                                     Tel.: (212) 838-7797
                                                     Fax: (212) 838-7745
                                                     meisenkraft@cohenmilstein.com
                                                     lposner@cohenmilstein.com

                                                     Steven J. Toll (*pro hac vice*)
                                                     Brendan Schneiderman (*pro hac vice*
                                                     forthcoming)
                                                     1100 New York Ave. N.W., Fifth Floor
                                                     Washington, D.C. 20005

Tel.: (202) 408-3640
Fax: (202) 408-4699
stoll@cohenmilstein.com
bschneiderman@cohenmilstein.com

Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Tel. (312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
Nicholas I. Porritt
Adam M. Apton
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
ek@zlk.com
nporritt@zlk.com
aapton@zlk.com

**LEVI & KORSINSKY, LLP**
Alexander A. Krot III
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (212) 363-7171
akrot@zlk.com
(*admitted pro hac vice* forthcoming)

*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Classes*

**BRONSTEIN, GEWIRTZ &
GROSSMAN,
LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel. (212) 697-6484
peretz@bgandg.com

*Additional Counsel for Apollo Asset Limited*

30