**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SET CAPITAL LLC, et al.,

                Plaintiff,

      v.

CREDIT SUISSE GROUP AG, et al.,

                Defendants.

1:18-cv-02268 (AT) (SN)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS ACTION CERTIFICATION

**CAHILL GORDON & REINDEL LLP**
    Herbert S. Washer
    David G. Januszewski
    Sheila C. Ramesh
    Adam S. Mintz
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam, and David R. Mathers*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

THE NATURE OF THE ACTION AND THE CLAIMS ALLEGED.......................................4

    A.    XIV Notes Overview and Function ..............................................................4

    B.    Credit Suisse's Hedging of XIV Notes.........................................................5

    C.    The February 5, 2018 Volatility Event .........................................................6

    D.    Plaintiffs' Allegations ................................................................................7

    E.    Plaintiffs' Motion for Class Certification ....................................................8

    F.    Plaintiffs' Investments in XIV Notes...........................................................9

LEGAL STANDARD.....................................................................................................10

ARGUMENT................................................................................................................11

I.      THE SECURITIES ACT CLASS CANNOT BE CERTIFIED ................................11

    A.    Because Plaintiffs Have Not Established Standing on a Class-Wide Basis, Individual Questions Predominate.............................................................11

    B.    The Securities Act Class is Not Readily Ascertainable ............................12

    C.    Individualized Questions of Investor Knowledge of the Alleged Misconduct Preclude Class Certification....................................................13

II.    THE MISREPRESENTATION CLASS CANNOT BE CERTIFIED .....................14

    A.    The Conflict Between the Misrepresentation and Manipulation Classes Precludes Certification..............................................................................14

    B.    Plaintiffs Have Not Demonstrated Any Ability to Measure Damages for the Misrepresentation Class on a Class-Wide Basis..................................16

        1.    *Goldman* Requires that Plaintiffs Provide a Damages Model to Support Their Motion to Certify the Misrepresentation Class .........17

        2.    Plaintiffs' Proposed Theory of Damages Does Not Account for Inter-Class Conflicts ..........................................................................18

3.   Plaintiffs' Proposed Theory of Damages Cannot Measure
Damages Tied to the Misrepresentation Class's Alleged Injury ..................... 19

C.   The Misrepresentation Class Is Not Entitled to Any Presumption of
Reliance ................................................................................................................. 20

1.   The *Basic* Presumption Does Not Apply .......................................................... 21

2.   The *Affiliated Ute* Presumption Does Not Apply ............................................ 21

D.   Individualized Inquiries of Investor Knowledge of the Alleged
Misconduct Preclude Certification of the Misrepresentation Class .......................... 22

III.   THE MANIPULATION CLASS CANNOT BE CERTIFIED ................................. 23

A.   The Direct Conflict of Interests Between the Manipulation and
Misrepresentation Classes Precludes Certification .................................................... 23

B.   Plaintiffs Have Not Demonstrated Any Ability to Measure Damages for
the Manipulation Class on a Class-Wide Basis ......................................................... 23

1.   *Goldman* Requires that Plaintiffs Provide a Damages Model to
Support Their Motion to Certify the Manipulation Class ................................ 24

2.   Plaintiffs' Proposed Theory of Damages Does Not Account for
Inter-Class Conflicts ........................................................................................ 24

3.   Plaintiffs' Proposed Theory of Damages Cannot Measure
Damages Tied to the Manipulation Class's Alleged Injury .............................. 24

C.   The Manipulation Class Is Not Entitled to Any Presumption of Reliance ............... 26

1.   The *Basic* Presumption Does Not Apply .......................................................... 26

2.   The *Affiliated Ute* Presumption Does Not Apply ............................................ 26

D.   Individualized Inquiries of Investor Knowledge of the Alleged
Misconduct Preclude Class Certification of the Manipulation Class ........................ 27

IV.   THE PROPOSED CLASS REPRESENTATIVES ARE NEITHER TYPICAL NOR
ADEQUATE ............................................................................................................ 28

A.   Plaintiffs' Inability to Demonstrate that They Are Members of the
     Securities Act Class Precludes its Certification..........................................................28

B.   Mr. Jager and Mr. Gamburg Are Subject to Unique Defenses That
     Preclude Class Certification.......................................................................................29

CONCLUSION.........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of the State of Utah* v. *United States*,
    406 U.S. 128 (1972) ........................................................................................................... *passim*

*Amchem Products, Inc.* v. *Windsor*,
    521 U.S. 591 (1997) ............................................................................................................ 10, 11

*American Express Co.* v. *Italian Colors Restaurant*,
    570 U.S. 228 (2013) ................................................................................................................. 10

*Basic Incorporated* v. *Levinson*,
    485 U.S. 224 (1988) ........................................................................................................... *passim*

*Brecher* v. *Republic of Argentina*,
    806 F.3d 22 (2d Cir. 2015) ...................................................................................................... 12

*Brown* v. *Kaye*,
    889 F. Supp. 2d 468 (S.D.N.Y. 2012) ................................................................................. 29–30

*Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*,
    310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................................................... 26

*Central States, Southeast & Southwest Areas Pension Fund* v. *Federal Home*
    *Loan Mortgage Corporation*,
    543 F. App'x 72 (2d Cir. 2013) .............................................................................................. 20

*Choi* v. *Tower Research Capital LLC*,
    2022 WL 4484485 (S.D.N.Y. Sept. 27, 2022) ....................................................................... 18

*Cohen* v. *Beneficial Industrial Loan Corporation*,
    337 U.S. 541 (1949) ................................................................................................................. 28

*Colangelo* v. *Champion Petfoods USA, Inc.*,
    2022 WL 991518 (N.D.N.Y. Mar. 31, 2022) ......................................................................... 18

*Comcast Corporation* v. *Behrend*,
    569 U.S. 27 (2013) ............................................................................................................. 11, 16

*Desai* v. *Deutsche Bank Sec. Limited*,
    573 F.3d 931 (9th Cir. 2009) .................................................................................................. 26

*EMA Financial, LLC* v. *NFusz, Inc.*,
    509 F. Supp. 3d 18 (S.D.N.Y. 2020) ...................................................................................... 30

*In re Facebook, Inc., IPO Sec. and Derivative Litig.*,
   312 F.R.D. 332 (S.D.N.Y. 2015) ..............................................................................16

*In re Federal Home Loan Mortgage Corporation (Freddie Mac) Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) ........................................................................20–21

*Fernandez* v. *UBS AG*,
   2018 WL 4440498 (S.D.N.Y. Sept. 17, 2018)................................................13n, 16

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)......................................................................................20

*Freeland* v. *AT&T Corporation*,
   238 F.R.D. 130 (S.D.N.Y. 2006) .............................................................................25

*Garcia De Leon* v. *New York University*,
   2022 WL 2237452 (S.D.N.Y. June 22, 2022) ...........................................15, 16, 23

*George* v. *China Automotive Systems, Inc.*,
   2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...........................................................30

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*,
   141 S. Ct. 1951 (2021).....................................................................................*passim*

*Grochowski* v. *Phoenix Construction*,
   318 F.3d 80 (2d Cir. 2003)......................................................................................30

*In re Grupo Televisa Sec. Litig.*,
   2021 WL 2000005 (S.D.N.Y. May 19, 2021) ........................................................29

*Levitt* v. *J.P. Morgan Sec. Inc.*,
   710 F.3d 454 (2d Cir. 2013)....................................................................................26

*McMahan & Company* v. *Warehouse Entertainment, Inc.*,
   65 F.3d 1044 (2d Cir. 1995)....................................................................................13

*In re Merrill Lynch Auction Rate Sec. Litig.*,
   704 F. Supp. 2d 378 (S.D.N.Y. 2010).....................................................................27

*In re MetLife Demutualization Litig.*,
   262 F.R.D. 217 (E.D.N.Y. 2009).............................................................................23

*New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*,
   272 F.R.D. 160 (S.D.N.Y. 2011) ......................................................................13, 28

*In re Petrobras Sec. Litig.*,
   862 F.3d 250 (2d Cir. 2017)....................................................................................10

*Price* v. *L'Oreal USA, Inc.*,
  2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021)........................................................................17

*In re Public Offering Antitrust Litig.*,
  2004 WL 350696 (S.D.N.Y. Feb. 25, 2004)...........................................................................18

*Rocco* v. *Nam Tai Electronics, Inc.*,
  245 F.R.D. 131 (S.D.N.Y. 2007) .....................................................................................28, 29

*Royal Park Investments SA/NV* v. *Deutsche Bank National Trust Company*,
  2017 WL 1331288 (S.D.N.Y. Apr. 4, 2017)...........................................................................11

*Schwab* v. *E\*TRADE Financial Corporation*,
  258 F. Supp. 3d 418 (S.D.N.Y. 2018).....................................................................................22

*Starr* v. *Georgeson Shareholder, Inc.*,
  412 F.3d 103 (2d Cir. 2005).............................................................................................21–22

*Stoneridge Investment Partners LLC* v. *Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)................................................................................................................20

*Talley* v. *ARINC, Inc.*,
  222 F.R.D. 260 (D. Md. 2004).......................................................................................15–16, 23

*Tolbert* v. *RBC Capital Markets Corporation*,
  2016 WL 3034497 (S.D. Tex. May 26, 2016) ..................................................................15, 23

*Wal-Mart Stores, Inc.* v. *Dukes*,
  564 U.S. 338 (2011)..........................................................................................................10, 29

**Statutes**

15 U.S.C. § 77k...............................................................................................................................11

**Other Authorities**

Fed. R. Civ. P.
  Rule 16 ....................................................................................................................................30
  Rule 19 ....................................................................................................................................29
  Rule 23 .............................................................................................................................*passim*

Defendants Credit Suisse Group AG, Credit Suisse AG and Credit Suisse International (collectively, "Credit Suisse"), Tidjane Thiam and David R. Mathers ("Individual Defendants," together with Credit Suisse, "Defendants"), respectfully submit this memorandum in opposition to Plaintiffs' Motion for Class Certification of the proposed Misrepresentation Class, Manipulation Class, and Securities Act Class (ECF 178).[1]

## PRELIMINARY STATEMENT

Plaintiffs submit a boilerplate memorandum of law in support of their motion for class certification. But this is not a typical securities class action. Here, Plaintiffs seek to certify three separate classes of investors: (1) a "Securities Act Class" of "all persons and entities that purchased or acquired XIV Notes pursuant to or traceable to Credit Suisse's Offering Documents and who were damaged thereby"; (2) a "Misrepresentation Class" of "all persons and entities that purchased or acquired [XIV Notes] between January 29, 2018 and February 5, 2018"; and (3) a "Manipulation Class" of "all persons and entities that sold or redeemed the XIV Notes on or after February 5, 2018." The same four plaintiffs ("Plaintiffs") purport to serve as the representatives of all three classes. In support of their motion, Plaintiffs offer only legal conclusions without justification or analysis and fail to seriously engage with the significant complexities raised by attempting to certify multiple classes. Because each purported class is plagued by fundamental failures and contradictions, Plaintiffs' motion for class certification must be denied.

The Securities Act Class cannot be certified because Plaintiffs do not offer any method for establishing Section 11 standing on a class-wide basis, which precludes them from demonstrating

---

[1] Unless otherwise noted, Defendants adopt the same defined terms as in Plaintiffs' brief. ECF 179 (Memorandum of Law in Support of Motion for Class Certification) ("Br."). Defendants do not concede that these terms represent a fair or appropriate characterization of the matters described therein. Further, unless otherwise stated, internal citations and quotations are omitted and emphasis is added.

both predominance and ascertainability. Plaintiffs define the Securities Act Class as including all persons and entities who purchased or acquired XIV Notes pursuant to or traceable to the January 29, 2018 Offering (the "Challenged Offering"), which brought to market 4.2 million notes. But more than 10 million XIV Notes were already trading in the market prior to the time of the Challenged Offering. Plaintiffs have not proposed any way to trace any purported class member's XIV Notes transaction to the Challenged Offering. Without a systematic method of connecting an investor's XIV Note purchase to the Challenged Offering, there is no way to know whether a member of the potential class purchased notes issued in the Challenged Offering or if they made their purchase from among the approximately 10 million XIV Notes that were already trading in the market (*i.e.*, whether or not a member of the class has standing to bring her claims). As a result, each potential Securities Act Class member is subject to individualized inquiries that are necessary to establish standing, which would predominate over any issues that might be common to the proposed class.

The absence of a mechanism for determining whether an investor purchased shares in the Challenged Offering also prevents Plaintiffs from demonstrating that the Securities Act Class is readily ascertainable. Because Plaintiffs define the Securities Act Class as including purchasers who have standing to bring a Section 11 claim, their inability to establish standing for potential class members makes it impossible to determine who is and is not a member of the Securities Act Class. The Securities Act Class also cannot be certified for the separate and independent reason that Plaintiffs fail to address the fact that much, if not all, of the information concerning the alleged misconduct was discussed extensively in press reports and other public sources. Because this information was publicly available, a question arises as to whether, and to what extent, each class member had actual knowledge of the alleged misconduct when transacting in XIV Notes. Because

2

Section 11 only creates liability where investors were *not* aware of the alleged misconduct, individualized inquiries concerning each Plaintiff's awareness of the alleged misconduct at issue here will predominate over any issues that may be common to the class.

As for the proposed Misrepresentation and Manipulation Classes, they too suffer from multiple defects that preclude certification. First, neither Plaintiffs nor their counsel can adequately represent both the Misrepresentation and Manipulation Classes because the interests of those two classes are in direct conflict. On the one hand, in defining the purported Misrepresentation Class, Plaintiffs allege that the prices for XIV Notes were *inflated* as a result of Defendants' alleged misrepresentations. At the same time, when describing the purported Manipulation Class, Plaintiffs claim that the prices for XIV Notes purchased by investors were *deflated* as a result of Credit Suisse's alleged manipulation of the XIV Notes market. These conflicting allegations create two classes with diametrically opposed interests, which preclude certification.

Second, neither the Misrepresentation nor the Manipulation Class can be certified for the additional and independent reason that Plaintiffs have not met their burden of presenting a sound and reliable methodology for calculating class-wide damages consistent with Plaintiffs' theory of liability for either class. Indeed, Plaintiffs have not even attempted to create a model to calculate damages. Instead, they describe possible, abstract approaches that they claim may be capable of measuring damages for both classes. But Plaintiffs have not shown, as they must, that any of these hypothetical models can address the unique issues raised here by inter-class conflicts and significant loss causation and damages questions, which plague both the Misrepresentation and Manipulation Classes. Plaintiffs attempt to paper over the absence of a reliable damages model by arguing that they need not present one at this stage of the litigation because it goes to the merits

of the case.  In so arguing, Plaintiffs ignore the Supreme Court's decision in *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021) ("*Goldman*"), which specifically requires that courts conduct a rigorous analysis of Rule 23 before certifying a class to ensure that all elements are satisfied, "even when that requires inquiry into the merits."  *Id.* at 1960.

Third, as with the Securities Act Class, Plaintiffs fail to offer any methodology for determining on a class-wide basis, whether and to what extent each class member of the Misrepresentation and Manipulation Classes was aware of the publicly available information regarding the alleged wrongdoing.  Because Plaintiffs must demonstrate that Misrepresentation and Manipulation Class members acquired XIV Notes without knowing of the alleged misconduct, specific inquiries into each class member's individual knowledge will be required, and absent a class-wide methodology for doing so, individual inquiries as to each class member's knowledge will overwhelm any issues common to the class.

Fourth, because the *Basic Incorporated* v. *Levinson*, 485 U.S. 224 (1988) ("*Basic*") and *Affiliated Ute Citizens of the State of Utah* v. *United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*") presumptions of reliance are not available, individual questions of reliance predominate over any common questions presented by the Misrepresentation and Manipulation Classes.

Finally, several of the class representatives suffer from various infirmities that preclude them from serving as class representatives, and consequently they do not appear to be suitable representatives of any of the three purported classes.

For these reasons, Plaintiffs' motion for class certification should be denied.

## THE NATURE OF THE ACTION AND THE CLAIMS ALLEGED

### A.    XIV Notes Overview and Function

XIV Notes were exchange-traded notes issued by Credit Suisse AG ("CSAG") and traded on NASDAQ.  ECF 190 (Amended Complaint) ("AC") ¶¶ 2, 265; *see also* Declaration of Herbert

S. Washer ("Washer Decl.") Ex. A (Pricing Supplement, dated Jan. 29, 2018 ("PS")), at PS-Cover at 1, 5. XIV Notes were designed to inversely correlate to the Chicago Board Options Exchange's VIX Short-Term Futures Index ("VIX Futures Index")—as the value of the VIX Futures Index rose, the value of XIV Notes fell, and *vice versa*. *See id.*

XIV Notes were issued pursuant to Registration Statement No. 333-218604-02, the June 30, 2017 Prospectus and Prospectus Supplement No. 333-218604-02, the June 30, 2017 Pricing Supplement, and the January 29, 2018 Amended Pricing Supplement No. VLS ETN-1/A48 (collectively, the "Offering Documents") filed with the SEC. *See* Washer Decl. Ex. A (PS) PS-Cover at 1. These materials contained robust disclosures concerning, *inter alia*, the risks of investing in and holding XIV Notes (*id.* at 10, 15–16); Defendants' intent to hedge its exposure to XIV Notes (*id.* at 13, 24, 50); the potential for conflicts of interest between Defendants and investors (*id.* at 25); and other pricing risks. *Id.* at 18. The Offering Documents made clear that XIV Notes were designed for "sophisticated investors" to be used for the sole purpose of "manag[ing] daily trading risks." *Id.* at 1. XIV Notes were *not* designed to be held for longer than one day. *Id.* PS-Cover at 1 ("[XIV Notes] **may not be suitable for investors who plan to hold them for longer than one day.**") (emphasis in original). The Offering Documents likewise warned that the long-term expected value of XIV Notes was zero. *Id.* at 16.

### B. Credit Suisse's Hedging of XIV Notes

Credit Suisse also disclosed that it engaged in a hedging strategy to reduce its exposure to its obligations under the XIV Notes. Credit Suisse warned that its hedges "could affect the value of the Index, and accordingly, the value of [XIV Notes]," as well as result in Credit Suisse receiving "a profit, even if the market value of the [Notes] declines." *Id.* at 13. Credit Suisse also noted that its trading activities could "present a conflict" between the bank and investors in XIV Notes. *Id.* at 25. The Offering Documents also noted that "[a]lthough we and our affiliates have

no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index, there can be no assurance that the level of the applicable underlying Index will not be affected." *Id.* at 50.

Moreover, as the issuer of XIV Notes, Credit Suisse was obligated to pay the value of XIV Notes to the holder on the maturity date, or on some earlier valuation date in the event that XIV Notes were redeemed prior to the maturity date for any reason. *Id*. at 4, 6. To protect itself against fluctuations in the market price of XIV Notes, Credit Suisse entered into hedging transactions in the VIX futures market and through swaps entered into with purchasers of XIV Notes. AC ¶¶ 3, 5. This risk was known to the market as both Plaintiffs and their expert concede. *See* Washer Decl. Ex. A (PS) at PS-13, PS-23, PS-24, PS-48–50; *see also* Washer Decl. Ex. N (Expert Report of Professor Joshua Mitts, PH.D.) ("Mitts Report") Ex. 3 ("Investing In The VIX During Extended Periods Of Low Volatility", "Combining XIV With VXX: What Happens To The Risk Profile?", "Long XIV/VXX Strategies are Ludicrous", "Why Levered S&P 500 Is Not Necessarily A Slam Dunk Relative To The XIV/VXX 'Straddle'"); Washer Decl. Ex. E (Sylvester Tr.) at 130:18–131:1, 132:5–8.

### C. The February 5, 2018 Volatility Event

On February 5, 2018, financial markets experienced an extraordinary volatility event, and the Intraday Indicative Value of XIV Notes declined sharply, ultimately falling to a value that was less than 20% of the prior day's Closing Indicative Value. *See* Washer Decl. Ex. H (Feb. 6, 2018 Press Release). The unexpected decline in value was caused by a spike in the VIX index, which dramatically affected all VIX-linked products, including XIV Notes. *See* Washer Decl. Ex. I (Apr. 30, 2018, Reuters, *February volatility 'hurricane' upended VIX-linked trading*). On February 6, 2018, pursuant to the terms of the Offering Documents, Credit Suisse exercised its right to accelerate XIV Notes (*i.e.*, redeem the Notes prior to their stated maturity date). *See* Washer Decl.

Ex. A (PS) at PS-19.  On February 13, 2018, NASDAQ notified Credit Suisse that it intended to

suspend trading of XIV Notes because of Credit Suisse's decision to accelerate.  *See* Washer Decl.

Ex. J (Feb. 14, 2018 Press Release).  Investors still holding XIV Notes ultimately received a cash

payment based on the Notes' value as of February 15, 2018.  *Id*.

### D.   Plaintiffs' Allegations

Plaintiffs allege that Defendants failed to disclose the risk that Credit Suisse's hedging of

its XIV Notes exposure was likely to cause a collapse in the price of XIV Notes.  AC ¶¶ 217–228.

Plaintiffs further allege that Credit Suisse's hedging activities, which purportedly involved Credit

Suisse buying roughly 105,000 VIX futures contracts between 4 p.m. and 4:15 p.m. on February

5, 2018 (*see* AC ¶ 8), caused the collapse of XIV Notes on February 5 and resulted in Credit Suisse

earning $475 million in profits.  AC ¶ 195.  This Court previously held that these allegations were

not plausible (ECF 135 (Sept. 25, 2019 Order) at 10–11) and, indeed, fact discovery has now

demonstrated that they are patently false.

First, Credit Suisse did not purchase 105,000 futures contracts on February 5, 2018.

Rather, the evidence shows that Credit Suisse purchased only 6,919 futures contracts between 4:00

p.m. and 4:15 p.m. on that day, which was a *de minimis* percentage of overall market trading volu

me in the relevant VIX futures contracts during that 15 minute window.  Washer Decl. Ex. B (Hen

dershott Report) ¶ 34.

Second, Credit Suisse did not earn $475 million as a result of the collapse of XIV Notes.

*See* AC ¶ 195.  Instead, the evidence confirms that Credit Suisse hedged its exposure to XIV Notes

each day leading up to February 5, and therefore did not stand to profit significantly from a

collapse.  Rather, it earned a profit of approximately $10 million on February 5, (*see* Washer Decl.

Ex. B (Hendershott Report) ¶ 34), which was simply the result of Credit Suisse choosing not to

fully adjust its hedging position before 4:15 p.m. as the market moved that day, since that would

have required Credit Suisse to buy additional VIX futures contracts, (*see id*.), and Credit Suisse did not want to place further pressure on an already volatile market.

Moreover, the Offering Documents warned investors at length of the serious risks of investing in XIV Notes.  *See supra* Part A–B.  This risk was also known to the market.  It was discussed in numerous articles, (*see, e.g.*, Washer Decl. Ex. K (Dec. 30, 2017, Seeking Alpha, *VIX Surge Appears Imminent As Correction Looms Over Stocks*) ("[W]hen significant VIX surges occur XIV can lose substantial portions of its value in relatively short time periods.")), and Plaintiffs themselves knew of this risk.

### E.  Plaintiffs' Motion for Class Certification

Four of the plaintiffs have moved to represent each of the three Proposed Classes:  Set Capital LLC ("Set Capital"), Apollo Asset Ltd. ("Apollo"), Aleksandr Gamburg, and Stefan Jager.[2]

---

[2] Nikolay Drozhzhinov is not moving to serve as a class representative (*see* Br.) "due to circumstances from the geopolitical situation in and around Russia and Ukraine."  ECF 182 (July 1, 2022 Joint Letter) at n.1.

████████████████████████████████████████████████████████

█████████████████████████████

In support of their Motion for Class Certification, Plaintiffs submitted the Mitts Report. However, the Mitts Report fails to make the showings required to allow for certification of any of the three proposed classes. First, the Mitts Report makes no attempt to set forth a method for addressing Section 11 standing on a class-wide basis, which dooms the Securities Class. Second, the Mitts Report briefly references several potential methods for calculating the Misrepresentation and Manipulation Classes' damages on a class-wide basis, but offers no actual model for calculating damages or any other meaningful analysis. *See* Washer Decl. Ex. N (Mitts Report) ¶¶ 31–38; *see also* Memorandum of Law in Support of Defendants' Motion to Exclude the Expert Opinions of Joshua Mitts, Sections II & III. As a result, Professor Mitts has done nothing to demonstrate that a damages model could account for the inter-class conflicts, loss causation, and damages issues present in this case. Credit Suisse has therefore moved to exclude the Mitts Report in a separate motion submitted herewith. *See id.*

## F.      Plaintiffs' Investments in XIV Notes

Plaintiffs allege that they can trace their XIV Notes purchases to the Challenged Offering but have provided no factual basis for doing so. Credit Suisse made numerous separate issuances between 2010 and 2018, and there were 14,993,883 XIV Notes outstanding after January 31, 2018. Washer Decl. Ex. B (Hendershott Report) ¶ 25 n.45. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████    And even if Plaintiffs could trace

their note purchases, Mitts has not put forward a method for tracing XIV Notes purchases on a class-wide basis.

Mr. Jager is also subject to a unique defense because he failed to join an indispensable party. ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████

## LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 348 (2011). Federal Rule of Civil Procedure 23 "does not set forth a mere pleading standard." *Comcast Corporation* v. *Behrend*, 569 U.S. 27, 33 (2013). Rather, "a party seeking class certification must affirmatively demonstrate his compliance with [Rule 23]", *Wal-Mart*, 564 U.S. at 350, which "imposes stringent requirements for certification that in practice exclude most claims." *American Express Co.* v. *Italian Colors Restaurant*, 570 U.S. 228, 234 (2013). The court conducts a "rigorous analysis" of the sufficiency of Plaintiffs' proffered evidence for class certification. *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 33 (2d Cir. 2006).

Rule 23(a) provides that a class may be certified only if Plaintiffs prove by a preponderance of the evidence that four prerequisites have been met: numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a); *Wal-Mart*, 564 U.S. at 349; *In re Petrobras Sec. Litig.*, 862 F.3d 250, 260 (2d Cir. 2017). These are "threshold requirements." *Amchem Products, Inc.* v. *Windsor*, 521 U.S. 591, 613 (1997). In addition, Plaintiffs must establish that the class meets the prerequisites of Rule 23(b)(3), which provides that a class action may be maintained only if "the

court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3). This "predominance criterion is far more demanding" than the commonality inquiry required under Rule 23(a). *Amchem Products*, 521 U.S. at 623–24; *see also Comcast*, 569 U.S. at 34. It also requires that Plaintiffs demonstrate that they can measure damages "across the entire class." *Id.* at 35. "[A] court has an obligation before certifying a class to determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits." *Goldman*, 141 S. Ct. at 1960–61. A rigorous analysis of Plaintiffs' proffered evidence demonstrates their failure to satisfy Rule 23's requirements.

## ARGUMENT

### I.   THE SECURITIES ACT CLASS CANNOT BE CERTIFIED

#### A.   Because Plaintiffs Have Not Established Standing on a Class-Wide Basis, Individual Questions Predominate

Standing is an essential element of a Section 11 claim. *See, e.g.*, 15 U.S.C. § 77k; *Royal Park Investments SA/NV* v. *Deutsche Bank National Trust Company*, 2017 WL 1331288, at \*8–9 (S.D.N.Y. Apr. 4, 2017) (Section 11 claims require that purchasers "can trace their shares to an allegedly misleading registration statement"). "Tracing may be established either through proof of a direct chain of title from the original offering to the [plaintiff] . . . or through proof that the [plaintiff] bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *In re Initial Public Offerings Sec. Litig.*, 471 F.3d at 31 n.1.

XIV Notes were first available on the market to investors in 2010. By the time of the acceleration event in February 2018, there had been three offerings and 14,993,883 notes issued. Here, Plaintiffs only challenge the January 31, 2018 offering, which brought to market 4.2 million

of those nearly 15 million notes. *See* Washer Decl. Ex. B (Hendershott Report) ¶ 48. But Plaintiffs have failed to offer any evidentiary basis for tracing the class representatives' purchases to the January 31, 2018 offering and, perhaps not surprisingly then, have also failed to suggest any methodology that would allow for the tracing of purchases by the Securities Act Class on a class-wide basis. Therefore, any attempt to trace the purchases by members of the Proposed Securities Act Class to the January 31, 2018 offering would necessitate individualized proof that would predominate over class-wide issues, which precludes certification of the Securities Class. *In re Initial Public Offering Sec. Litig.*, 227 F.R.D. 65, 118–119 (S.D.N.Y. 2004) (denying class certification for certain class representatives on the basis that "[w]hile some individual class members who purchased after the end of the class period might be able to trace their shares successfully, the resulting inquiry would fragment the class action into myriad mini-trials on the subject of tracing").

### B.    The Securities Act Class is Not Readily Ascertainable

Plaintiffs define the Securities Act Class as including "all persons and entities that purchased or acquired [XIV Notes] pursuant to or traceable to Credit Suisse's Offering Documents, and were damaged thereby." Br. at 5. Because Plaintiffs offer no mechanism to establish the traceability of XIV Notes on a class-wide basis, they also cannot demonstrate, as they must, that the members of the Securities Class can be easily ascertained or determined. *Brecher* v. *Republic of Argentina*, 806 F.3d 22, 24–25 (2d Cir. 2015) ("A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case."). This is another independent basis for denial of Plaintiffs' motion to certify the Securities Class.

## C.   Individualized Questions of Investor Knowledge of the Alleged Misconduct Preclude Class Certification

Plaintiffs' proposed Securities Act Class would include investors who had different levels of knowledge about publicly available information concerning the alleged misconduct at the time each investor purchased his shares.   Because a class member's awareness of the alleged misconduct is a defense to Plaintiffs' Section 11 claim,[3] *McMahan & Company* v. *Warehouse Entertainment, Inc.*, 65 F.3d 1044, 1047 (2d Cir. 1995) (holding that Section 11 liability only applies where "plaintiffs acquired the securities *without knowledge* of such misrepresentations"), individualized questions of what precisely each investor knew at the time of his or her purchase of XIV Notes will predominate over class-wide issues and preclude class certification.   *New Jersey Carpenters Health Fund* v. *Residential Capital, LLC*, 272 F.R.D. 160, 168–70 (S.D.N.Y. 2011) (finding that "that the proposed class would include investors with different levels of knowledge, and that such individual issues predominate.").

The issue of varying levels of investor knowledge is especially acute here, where the alleged misrepresentation (that Defendants misrepresented the risk that Credit Suisse's hedging could cause the XIV Notes market to collapse) was well-known to the market.   As a preliminary matter, the Offering Documents themselves specifically warned investors that the long-term value of XIV Notes was likely zero.   Washer Decl. Ex. A (PS) PS-1, 11, 19, 25.   In addition, numerous publicly available articles warned specifically of the risks of volatility spikes and the devastating effect they could have on XIV Notes, as well as the risks posed by hedging transactions in response to those spikes.   Washer Decl. Exs. K (Dec. 30, 2017, Seeking Alpha, *VIX Surge Appears Imminent*

---

[3] Affirmative defenses, such as this one, raise individual questions that preclude class certification.  *See Fernandez* v. *UBS AG*, 2018 WL 4440498, at *21 (S.D.N.Y. Sept. 17, 2018) (individual and affirmative defenses raise individual questions that support denial of class certification).

*As Correction Looms Over Stocks*), Ex. B (Hendershott Report) ¶¶ 35–48.  Indeed, Plaintiffs' own expert, Professor Mitts, acknowledged at his deposition that public articles discussed these risks.  *See* Washer Decl. Ex. G (Mitts Tr.) at 159:1–6 ("[T]hat is my understanding of the author's argument that there would be an Event Acceleration").  ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Because individualized inquiries into each investor's individual knowledge of the alleged misconduct would be necessary to evaluate the application of this defense, Plaintiffs' motion to certify the Securities Act Class must be denied.  *See, e.g.*, *In re Initial Public Offerings Sec. Litig.*, 471 F.3d at 42 (denying class certification because the issue of knowledge of the alleged misconduct created an individualized issue).

## II.  THE MISREPRESENTATION CLASS CANNOT BE CERTIFIED

### A.  The Conflict Between the Misrepresentation and Manipulation Classes Precludes Certification

In defining their proposed Misrepresentation and Manipulation Classes, Plaintiffs' theories of liability place these two classes in direct conflict with one another.  Specifically, Plaintiffs seek certification of a Misrepresentation Class consisting of investors who purchased XIV Notes at *inflated* prices caused by Credit Suisse's alleged misrepresentations concerning its XIV Notes hedging practices.  At the same time, they also claim that the proposed Manipulation Class consists of investors who sold XIV Notes at *deflated* prices because of Credit Suisse's alleged manipulation of the XIV Notes market, also caused by its improper hedging.

So, for example, the proposed Misrepresentation Class would include those who purchased XIV Notes on February 5, while the Manipulation Class would include those who sold XIV Notes

on February 5. 

Thus, there is a manifest and unavoidable conflict between

the members of these two classes, as the members of the Misrepresentation Class will be motivated

to demonstrate that XIV Notes were artificially *inflated* when they bought on February 5, while

the members of the Manipulation Class will be motivated to show that XIV Notes were *deflated*

when they sold on February 5.

Obviously, the same transactions cannot suffer simultaneously from both inflation and

deflation.  This irreconcilable conflict makes it impossible for Plaintiffs to adequately represent

both classes at the same time.[4]  *Garcia De Leon* v. *New York University*, 2022 WL 2237452, at

*14 (S.D.N.Y. June 22, 2022) (holding that in order to demonstrate adequacy, Plaintiffs must show

that they have "no interests that are antagonistic to the interest of other members of the class"); *see

also Tolbert* v. *RBC Capital Markets Corporation*, 2016 WL 3034497, at *7 (S.D. Tex. May 26,

2016) (holding that class representatives failed to demonstrate that they would adequately protect

the interests of the class as a whole due to conflicts between proposed classes); *Talley* v. *ARINC,*

---

[4] This irreconcilable conflict between these two classes is further illustrated by Plaintiffs'
conflicting positions on market efficiency.  Plaintiffs allege that the XIV Notes traded in an
efficient market (Br. at 16–24), yet at the same time, Plaintiffs allege that Credit Suisse was
manipulating that very same market.  AC ¶ 262 ("[I]n reliance on an assumption of an efficient
market free of manipulation, [Plaintiffs] purchased the XIV notes.").  As Plaintiffs' own expert
admitted, a market that is the subject of trade-based manipulation, as Plaintiffs allege to have been
the case here, cannot be efficient.  Washer Decl. Ex. G (Mitts Tr.) at 98:25–99:10.  Plaintiffs cannot
have it both ways—either the market was efficient or the market was manipulated.  *See* Washer
Decl. Ex. B (Hendershott Report) ¶¶ 99–105.

*Inc.*, 222 F.R.D. 260, 269–70 (D. Md. 2004) ("[C]onflicts between and among" proposed classes "preclude the proposed class representatives from adequately representing the interests of absent class members.").

This conflict between proposed classes precludes Plaintiffs and their counsel from acting in the best interests of each class. Often when proposing multiple classes in a securities class action, plaintiffs' counsel will appoint a different representative to advocate for the unique interests of each alleged class. *See, e.g.*, *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 312 F.R.D. 332, 344 (S.D.N.Y. 2015) (granting motions for class certifications for two subclasses and the appointment of different individuals to represent each subclass). Here, however, Plaintiffs ask the Court to certify three separate classes that are all represented by the same four Plaintiffs. This approach is fundamentally flawed, as Plaintiffs' interests are necessarily "antagonistic to the interest of other members of the class." *Garcia De Leon*, 2022 WL 2237452, at \*14. As a result, Plaintiffs have failed to demonstrate that they can fairly and adequately represent the interests of the two proposed classes.

## B. Plaintiffs Have Not Demonstrated Any Ability to Measure Damages for the Misrepresentation Class on a Class-Wide Basis

In order to certify each class, Plaintiffs must demonstrate that they can calculate damages on a class-wide basis and that such calculation will measure only the purported harm stemming from Plaintiffs' alleged theory of liability. *See Comcast*, 569 U.S. at 27, 34–35; *see also Fernandez* v. *UBS AG*, 2018 WL 4440498, at \*21–22 (S.D.N.Y. Sept. 17, 2018) (denying class certification where plaintiffs' damages model failed to measure the proposed class's injuries). Plaintiffs here do not even attempt to satisfy that standard as they fail to put forward any damages model capable of calculating the losses suffered by the Misrepresentation Class. *See* Washer Decl. Ex. G (Mitts Tr.) at 31:7–16; 32:25; 33:1–2. Instead, they identify potential theories for calculating damages

16

and claim, without justification or explanation, that those theories should be able to address the complex inter-class conflicts, loss causation, and damages issues presented here. Plaintiffs' failure to engage substantively with these issues requires the denial of their motion to certify the Misrepresentation Class.

### 1.   Goldman *Requires that Plaintiffs Provide a Damages Model to Support Their Motion to Certify the Misrepresentation Class*

Plaintiffs claim that they "do not need to produce a class-wide damages model at the class certification stage." Br. at 25. In taking this position, Plaintiffs do not even attempt to address the Supreme Court's decision in *Goldman*, which specifically held that all elements of Rule 23 must be satisfied, even if they overlap with the merits, *before* a class can be certified. *Goldman*, 141 S. Ct. at 1960–61 ("[A] court has an obligation before certifying a class to determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits."). *Goldman* further cautioned that courts "should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 1960.

Plaintiffs cannot seriously dispute that following *Goldman*, they must provide a damages model that can measure the damages suffered by the proposed class as a result of the alleged theory of liability. Indeed, each of the authorities Plaintiffs cite for the proposition that no model need be proffered at this stage pre-dates the *Goldman* decision. In the post-*Goldman* world, however, courts in this Circuit not only require that Plaintiffs put forward a damages model, but also insist that the model be statistically robust and capable of isolating and quantifying the impact of the alleged wrongdoing on a class-wide basis. *See, e.g.*, *Price* v. *L'Oreal USA, Inc*., 2021 WL 4459115, at *6 (S.D.N.Y. Sept. 29, 2021) ("Plaintiffs have not provided the necessary evidence for [Plaintiffs' expert's] formula to suffice, and Plaintiffs' proposal that each class member can use [the expert's] formula to prove his or her own damages is not enough to satisfy their burden

of proving class-wide damages."); *Choi* v. *Tower Research Capital LLC*, 2022 WL 4484485, at

*11 (S.D.N.Y. Sept. 27, 2022) (denying class certification post-*Goldman* where "none of the[]

flaws in [plaintiffs' expert's] damages model can be remedied with a simple, mechanical tweak to

his methodology" and issues with the model presented "deep, conceptual problems, akin to the

challenge in *Comcast*"). Thus, Plaintiffs' failure to put forward any damages model at all, by

itself, requires that Plaintiffs' motion to certify the Misrepresentation Class be denied.

### 2. *Plaintiffs' Proposed Theory of Damages Does Not Account for Inter-Class Conflicts*

Even if no damages model were required at this stage, Plaintiffs' hypothetical approach to

calculating damages for the Misrepresentation Class does not account for its significant conflicts

with the Manipulation Class. This failure creates a serious risk of double counting, which also

precludes class certification here. *See In re Public Offering Antitrust Litig.*, 2004 WL 350696, at

*7 (S.D.N.Y. Feb. 25, 2004) ("[T]he Court in this case is faced with exactly the type of double

recovery the Supreme Court sought to avoid in *Illinois Brick*, two separate plaintiffs suing for the

exact same injury."); *Colangelo* v. *Champion Petfoods USA, Inc.*, 2022 WL 991518, at *10

(N.D.N.Y. Mar. 31, 2022) (separate damages calculations for omissions and misrepresentations in

a fraudulent misrepresentation and fraud by omission case "cannot simply be added" without

"obvious[ly]" double counting).

Rather than presenting a single methodology for calculating damages for all injured

investors, Plaintiffs present separate theories of potential damages calculation for the

Misrepresentation and Manipulation Classes. Specifically, Plaintiffs claim that they will calculate

damages for the Misrepresentation Class by measuring the inflation caused by Credit Suisse's

alleged misrepresentations. *See* Washer Decl. Ex. N (Mitts Report) ¶¶ 85–86. In order to calculate

damages for the Manipulation Class, Plaintiffs plan to measure the deflation caused by Credit

Suisse's alleged manipulative hedging. *See id*. ¶ 84. Conducting two separate damages analyses that do not interact with each other creates the obvious risk of double counting. *See* Washer Decl. Ex. B (Hendershott Report) ¶¶ 95–97 (explaining how Plaintiffs' proposed damages methods could overlap with each other and result in double counting).

Rather than engaging on this issue, Plaintiffs and their expert respond with another conclusory claim that "there is absolutely no reason to double count." Washer Decl. Ex. G (Mitts Tr.) at 139:1–3; *see also* Washer Decl. Ex. N (Mitts Report) ¶ 78. Despite Plaintiffs' attempt to brush away the issue, this unanswered risk of double counting is another reason that their motion for class certification must be denied.

### 3. *Plaintiffs' Proposed Theory of Damages Cannot Measure Damages Tied to the Misrepresentation Class's Alleged Injury*

A third flaw in Plaintiffs' approach to damages for the Misrepresentation Class is that Plaintiffs claim they will perform an event study to measure damages on a class-wide basis. As Plaintiffs' expert explained in his deposition, event studies seek to identify a "corrective disclosure" — the moment in time when the market learns of a previously undisclosed misrepresentation or omission — and demonstrate that this, rather than other factors or market forces, caused a decline in the price of the subject asset. Washer Decl. Ex. G (Mitts Tr.) at 127:22–128:1; 129:22–25; 130:17–21 ("So what we really have to do is show . . . that the truth has been revealed and that the truth caused losses, net of all the other factors that could explain a price decline."); *see* Washer Decl. Ex. N (Mitts Report) ¶¶ 85–86.

The difficulty here is that Plaintiffs have not identified any potential corrective disclosure, either in their amended complaint or in their certification motion. In fact, their expert concedes that he has not even considered the question of whether a corrective disclosure occurred in this case. Washer Decl. Ex. G (Mitts Tr.) at 13:9–21 ("Q: Do you have a view as to when, if or when

a corrective disclosure occurred in this case?  A: No, I haven't yet—I haven't at all, actually.  I haven't been asked to evaluate that question.  Even when thinking, as we have been discussing so far, about how one might answer that question, I haven't formed a view as to when a corrective disclosure occurred.").

Without a corrective disclosure — an "event" — it is impossible to conduct an "event" study to measure price impact.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (plaintiffs could not establish loss causation where they "fail to connect the decline in the price of [the security] to any corrective disclosures as required by the second prong of *Lentell*."); *see also Central States, Southeast & Southwest Areas Pension Fund* v. *Federal Home Loan Mortgage Corporation,* 543 F. App'x 72, 76 (2d Cir. 2013) (finding Plaintiffs failed to show loss causation because they did not "plausibly allege a causal connection between the drop of the share price and the information revealed in the corrective disclosures.").

As a consequence, Plaintiffs have not only failed to proffer an actual event study, but have also failed to identify even the most basic and requisite elements of a roadmap to demonstrate that an event study *can* be conducted.  In such circumstances, it cannot be said that Plaintiffs have met the relatively exacting standard for class certification articulated by the Supreme Court in *Goldman*.

## C.  The Misrepresentation Class Is Not Entitled to Any Presumption of Reliance

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action."  *Stoneridge Investment Partners LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008).  Because proof of individual class member reliance would overwhelm any common issues, "[c]lass certification is available only if [a] plaintiff can establish a class-wide presumption of reliance . . . ."  *In re Federal Home Loan Mortgage Corporation (Freddie Mac)*

*Sec. Litig.*, 281 F.R.D. 174, 177 (S.D.N.Y. 2012). Plaintiffs do not and cannot show that the Misrepresentation Class is entitled to a presumption of reliance under *Basic* or *Affiliated Ute*.

### 1. *The* **Basic** *Presumption Does Not Apply*

Plaintiffs argue that they are entitled to rely on the "fraud-on-the-market" theory set out in *Basic*, which can allow class-action plaintiffs to rely on a presumption of reliance for the entire class. *See* Br. at 16. "To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman*, 141 S. Ct. at 1958. Other than materiality, "class-action plaintiffs must prove the *Basic* prerequisites before class certification[.]" *Id*. at 1959.

As discussed *supra* in Section III.B.3, Plaintiffs here fail to identify any corrective disclosure. As a result, they fail to satisfy the fourth prong necessary to invoke the *Basic* presumption of reliance: "that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Id*. Because Plaintiffs have not defined the time at which the alleged "truth was revealed," they cannot demonstrate that they traded in the relevant window.

As a result, Plaintiffs cannot rely upon the *Basic* presumption in their effort to certify the Misrepresentation Class.

### 2. *The* **Affiliated Ute** *Presumption Does Not Apply*

Plaintiffs rather brazenly argue that the class they have dubbed the "Misrepresentation Class" can avail itself of the presumption of reliance set forth in *Affiliated Ute*. *See* Br. at 24–25. As Plaintiffs correctly acknowledge, the *Affiliated Ute* presumption does not apply to cases involving affirmative misrepresentations, and only applies to cases alleging omissions of material information. *See id*. at 24; *see also Starr* v. *Georgeson Shareholder, Inc*., 412 F.3d 103, 109 n.5

(2d Cir. 2005) (holding *Affiliated Ute* presumption not applicable because plaintiff focused on false and misleading statements); *see also Schwab* v. *E\*TRADE Financial Corporation*, 258 F. Supp. 3d 418, 429 (S.D.N.Y. 2018) (finding that the *Affiliated Ute* presumption is inapplicable in "primarily an affirmative misrepresentation case").

In order to take advantage of that presumption, Plaintiffs argue that the Misrepresentation Class's claims "primarily allege" claims premised on material omissions.  *See* Br. at 25.  This position is untenable on its face.  Plaintiffs cannot seriously dispute that the Misrepresentation Class's case is premised on affirmative misrepresentations.  *Id*. at 8 ("Credit Suisse falsely told investors that we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying index"); *id*. at 9 ("Credit Suisse executives falsely claimed that they had actually taken steps to protect XIV investors.").  As a result, the *Affiliated Ute* presumption is inapplicable.  Because the *Basic* presumption also does not apply, individualized questions of reliance will dominate the lawsuit and warrant the denial of class certification under Rule 23(b)(3).

### D.      Individualized Inquiries of Investor Knowledge of the Alleged Misconduct Preclude Certification of the Misrepresentation Class

Even if there were a class-wide presumption of reliance, the Misrepresentation Class (along with the Securities Act and Manipulation Classes) would include investors with different levels of knowledge of the voluminous publicly available information concerning the alleged misconduct.  Because a class member's awareness of the alleged fraud is a defense to Plaintiffs' misrepresentation claims under Section 10(b), individualized questions of what precisely each investor knew at the time of his purchase of XIV Notes will predominate over class-wide issues and preclude class certification of the Misrepresentation Class.  *See In re Initial Public Offerings Sec. Litig*, 471 F.3d at 43, *decision clarified on denial of reh'g sub nom. In re Initial Public*

*Offering Sec. Litig.*, 483 F.3d 70 (2d Cir. 2007) ("There is no dispute that a section 10(b) claimant must allege and prove that the claimant traded in ignorance of the fact that the price was affected by the alleged manipulation"); *In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 232 (E.D.N.Y. 2009) (to succeed on a Section 10b claim, "plaintiff must show that the defendant had *no knowledge* of the alleged misrepresented or omitted a material fact") (quoting *Mayer* v. *Oil Field Systems Corp.*, 803 F.2d 749, 755 (2d Cir. 1986)).

### III.    THE MANIPULATION CLASS CANNOT BE CERTIFIED

#### A.    The Direct Conflict of Interests Between the Manipulation and Misrepresentation Classes Precludes Certification

The same conflicts of interest that preclude certification of the Misrepresentation Class discussed *supra* in Section II.A require denial of Plaintiffs' motion to certify the Manipulation Class, as well.  Plaintiffs cannot adequately represent both the Manipulation Class and the Misrepresentation Class because the theories of liability underlying each proposed class are in direct conflict.  *See Garcia De Leon*, 2022 WL 2237452, at *14 (holding that in order to demonstrate adequacy, Plaintiffs must show that they have "no interests that are 'antagonistic to the interest of other members of the class'"); *see also Tolbert*, 2016 WL 3034497, at *7 (holding that class representatives failed to demonstrate that they would adequately protect the interests of the class as a whole due to conflicts between proposed classes).  It is not possible for Plaintiffs to advocate for the interests of one class without potentially harming the other.  *Talley*, 222 F.R.D. at 269–70 ("[C]onflicts between and among" proposed classes "precludes the proposed class representatives from adequately representing the interests of absent class members.").

#### B.    Plaintiffs Have Not Demonstrated Any Ability to Measure Damages for the Manipulation Class on a Class-Wide Basis

For the same reasons that Plaintiffs failed to demonstrate that they can calculate damages on behalf of the Misrepresentation Class (*see supra* section II.B), Plaintiffs also do not show that

they can measure damages on a class-wide basis for the Manipulation Class.  Washer Decl. Ex. B (Hendershott Report) ¶ 54.  Again, Plaintiffs do not present a model to support their motion to certify the Manipulation Class, but rely instead on conclusory conjecture and promises that they believe they will be able to calculate class-wide damages for the Manipulation Class at some point in the future.  This approach is legally insufficient to support their motion to certify the Manipulation Class.

### 1.   **Goldman** *Requires that Plaintiffs Provide a Damages Model to Support Their Motion to Certify the Manipulation Class*

As discussed in section II.B.1, *supra*, Plaintiffs' claim that they need not produce a class-wide damages model in support of their motion for class certification is premised on stale case law that does not address the Supreme Court's specific instruction in *Goldman* that a plaintiff must satisfy all elements of Rule 23, even if they overlap with the merits, before a class can be certified. *See Goldman*, 141 S. Ct. at 1960–61.  Their failure to produce a model capable of calculating damages for the Manipulation Class requires the denial of their motion.

### 2.   *Plaintiffs' Proposed Theory of Damages Does Not Account for Inter-Class Conflicts*

As discussed in section II.B.2, *supra*, Plaintiffs' inability to address the serious risk of double counting in presenting two separate methodologies for calculating damages for the Misrepresentation and Manipulation Classes, respectively, precludes the certification of the Manipulation Class for the same reasons it does the Misrepresentation Class.

### 3.   *Plaintiffs' Proposed Theory of Damages Cannot Measure Damages Tied to the Manipulation Class's Alleged Injury*

Here, again, Plaintiffs not only fail to provide a model, but also refuse to even consider whether and how certain fundamental factors and issues would impact any hypothetical model. Plaintiffs promise a future model that is similar to an "event study," which they claim will be

24

capable of measuring the "abnormal price impact" of the alleged manipulation. Washer Decl. Ex. G (Mitts Tr.) at 120:7–121:8. But Plaintiffs offer no way to separate the effect of Credit Suisse's allegedly manipulative hedging activity from other trading and market forces, all of which would have affected the price of XIV Notes. Indeed, they claim that the calculation of damages for the proposed Manipulation Class "depends only on pricing data and the defendant's hedging activity." Washer Decl. Ex. N (Mitts Report) ¶ 84. This critical failure requires the denial of Plaintiffs' bid to certify the Manipulation Class. *Freeland* v. *AT&T Corporation,* 238 F.R.D. 130, 148–49 (S.D.N.Y. 2006) (failure to control for important variables rendered regression analysis "essentially worthless" and therefore inadmissible).

This willful blindness is striking in light of Plaintiffs' own allegations about other factors affecting the price of XIV Notes. For example, Plaintiffs allege that Credit Suisse had a legitimate business purpose for hedging its exposure to XIV Notes. AC ¶¶ 3, 65. And Credit Suisse disclosed to the market that it hedged its exposure. AC ¶¶ 217, 226. Professor Mitts's proposed methodology makes no distinction between legitimate hedging activity and manipulative hedging activity. *See* Washer Decl. Exs. G (Mitts Tr.) at 31:13–16 ("I have not conducted an analysis of Credit Suisse's hedging activities in this case."), Ex. B (Hendershott Report) ¶ 72 ("Dr. Mitts provides no methodology that could account for any impact on the price of the XIV Notes resulting from other, legitimate hedging or trading activity by *any* market participant on February 5, 2018").

Similarly, though the Amended Complaint acknowledges that many other market participants, including issuers of other products tied to the VIX futures indices, will have traded and/or hedged in the VIX futures market (*see, e.g.*, AC ¶ 68 ("Importantly, virtually all VIX-related ETP issuers engaged in such hedging activities and, thus, during large market movements these issuers simultaneously bought VIX futures to hedge their positions.")), Plaintiffs offer no

25

methodology for separating out the impact of that trading from Credit Suisse's allegedly manipulative activity.

Professor Mitts also fails to account for other trading and informational market forces that affected the price of XIV Notes.  For example, market participants could have calculated the Intraday Indicative Value — which reflects the economic value of the XIV Notes (Washer Decl. Ex. A (PS) at PS-7) — from generally available market information.  Washer Decl. Ex. B (Hendershott Report) ¶ 22.  Despite this, the Mitts Report makes no attempt to disentangle these various sources of price impact.

### C.   The Manipulation Class Is Not Entitled to Any Presumption of Reliance

#### 1.   *The* Basic *Presumption Does Not Apply*

For the same reasons discussed *supra* in Section II.C.1, the Manipulation Class is not entitled to invoke the *Basic* presumption of reliance.

#### 2.   *The* Affiliated Ute *Presumption Does Not Apply*

In arguing that the Manipulation Class is entitled to invoke the *Affiliated Ute* presumption of reliance, Plaintiffs disregard the many court decisions holding that *Affiliated Ute* does not apply to market manipulation claims.  *See Desai* v. *Deutsche Bank Sec. Limited*, 573 F.3d 931, 940–41 (9th Cir. 2009) (holding that the "presumption of reliance under *Affiliated Ute* is limited to cases that can be characterized as ... primarily alleg[ing] omissions," which is distinct from allegations of manipulation and misrepresentation); *see also Levitt* v. *J.P. Morgan Sec. Inc.*, 710 F.3d 454, 467–68 & n.9 (2d Cir. 2013) (leaving open question of whether an act of market manipulation triggers a duty to disclose); *Carpenters Pension Trust Fund of St. Louis* v. *Barclays PLC*, 310 F.R.D. 69, 98 (S.D.N.Y. 2015) ("[a]pplying the *Affiliated Ute* presumption in [manipulation] cases, . . . would risk . . . swallow[ing] the reliance requirement almost completely.").

These courts have refused to apply the *Affiliated Ute* presumption to manipulation cases because the presumption is only intended to apply in omission cases, and courts "have been hesitant to allow the mere fact of [ ] concealment to transform [ ] alleged malfeasance into an omission." *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 398 (S.D.N.Y. 2010), *aff'd sub nom. Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) (declining to apply the *Affiliated Ute* presumption where plaintiffs put forward a theory of market manipulation).   Applying the *Affiliated Ute* presumption in such cases, these courts have concluded, would risk "read[ing] the Supreme Court's case law on manipulative conduct as little more than an entertaining, but completely superfluous, intellectual exercise." *Id.* (quoting *Desai*, 573 F.3d at 941).

Here, unlike in the cases on which Plaintiffs rely, Plaintiffs have already answered that question and framed Credit Suisse's alleged manipulation as a misrepresentation.  Br. at 3 ("Credit Suisse falsely told investors that we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index"). Plaintiffs' kitchen sink approach again bars their bid for class certification.  They cannot, on the one hand, frame their injury as the result of a misrepresentation to benefit from the *Basic* presumption of reliance, and on the other claim to have suffered damages as a result of an omission to invoke the *Affiliated Ute* presumption.  Their inability to commit to a coherent basis for class certification precludes them from relying upon any presumption of reliance, which dooms their motion.

### D.     Individualized Inquiries of Investor Knowledge of the Alleged Misconduct Preclude Class Certification of the Manipulation Class

Even if Plaintiffs could demonstrate that they are entitled to a presumption of reliance (and they are not), individual questions of investor knowledge of publicly available information

concerning the alleged misconduct would predominate over class-wide issues in the Manipulation Class for the same reasons that they preclude certification of the Misrepresentation and Securities Act Classes. *See, supra*, sections I.C and II.D. Because of the wide public dissemination of information regarding the potential risks of Credit Suisse's hedging activity, it is necessary to conduct individualized inquiries into each investor's knowledge of the alleged misconduct, which in turn precludes certification of the Manipulation Class. *See New Jersey Carpenters Health Fund*, 272 F.R.D. at 168–70 (finding that "the proposed class would include investors with different levels of knowledge, and that such individual issues predominate.").

## IV. THE PROPOSED CLASS REPRESENTATIVES ARE NEITHER TYPICAL NOR ADEQUATE

A class representative is a fiduciary, and the interests of the class are "dependent upon his diligence, wisdom and integrity." *Cohen* v. *Beneficial Industrial Loan Corporation*, 337 U.S. 541, 549–50 (1949). Plaintiffs' inability to satisfy this most basic of standards requires dismissal of their motion for class certification. *See Rocco* v. *Nam Tai Electronics, Inc.*, 245 F.R.D. 131, 135 (S.D.N.Y. 2007) ("[W]here a putative class representative is subject to unique defenses which threaten to become the focus of the litigation, certification for the class is improper because he or she can no longer act in the best interest of the class.").

### A. Plaintiffs' Inability to Demonstrate that They Are Members of the Securities Act Class Precludes its Certification

None of the four proposed class representatives has adequately demonstrated that he can trace his shares to the Challenged Offering. *See*, *supra*, Section I.A. ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████ As discussed in section I.B *supra*, Plaintiffs define the Securities Act Class to include only those investors who

can trace their XIV Notes purchases to the Challenged Offering, or, in other words, to those investors who have standing to assert the Section 11 Claim.  Because Plaintiffs cannot establish Section 11 standing, they cannot demonstrate that they are members of the Securities Act Class. This critical failure requires denial of Plaintiffs' motion to certify the Securities Act Class.  *Wal-Mart*, 564 U.S. at 348 ("a class representative must be a part of the class"); *In re Grupo Televisa Sec. Litig.*, 2021 WL 2000005, at *1 (S.D.N.Y. May 19, 2021) ("The Supreme Court has repeatedly held that the class representative must be part of the class").

### B.   Mr. Jager and Mr. Gamburg Are Subject to Unique Defenses That Preclude Class Certification

Plaintiffs Jager and Gamburg are also not qualified to serve as representatives of the Misrepresentation and Manipulation Classes because they are subject to unique defenses that preclude class certification.  *Rocco*, 245 F.R.D. 131, 135 (S.D.N.Y. 2007) (where a class representative "is subject to unique defenses which threaten to become the focus of the litigation, certification for the class is improper").

Although Defendants requested documents concerning the disposition or change of ownership interests in XIV Notes in October 2021 (*see* Washer Decl. Ex. M (Document Requests)),                                                                          Fed. R. Civ. P. 19 (an indispensable party is one who "is so situated that disposing of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest"); *see Brown* v. *Kaye*, 889 F. Supp.2d 468, 488–89 (S.D.N.Y. 2012), *aff'd*, 514 F. App'x

58 (2d Cir. 2013) (dismissing complaint, in part, for failure to join Plaintiff's sister, who, under a parental divorce settlement, had a joint interest in the family's art collection and was a "necessary" party). ████████████████████████████████████████████

████████████████████ *See id*. The deadline for joining additional parties was July 21, 2022. ECF 188 (Second Amended Case Management Order). Because Mr. Jager has known of this issue since ████████████, he cannot demonstrate any good cause for failing to meet this deadline. *See* Fed. R. Civ. P. 16(b)(4); *Grochowski* v. *Phoenix Construction*, 318 F.3d 80, 86 (2d Cir.2003) ("A finding of good cause depends on the diligence of the moving party."); *see also EMA Financial, LLC* v. *NFusz, Inc.*, 509 F. Supp. 3d 18, 36–37 (S.D.N.Y. 2020) (denying untimely request to amend when party failed to show good cause).

Plaintiff Gamburg is also subject to a unique defense because, as he has admitted, ████ ████████████████████████████████ Washer Decl. Ex. F (Gamburg Tr.) at 160:5–7; 161:9–10. This ████████████████ subjects Mr. Gamburg "to unique inquiries regarding [his] trading patterns and why [he] made investment decisions . . . and whether on individual trades [he] profited [and] . . . will also require considerable time and resources, and indeed threaten to become the focus of the litigation." *George* v. *China Automotive Systems, Inc*., 2013 WL 3357170, at \*6–7 (S.D.N.Y. July 3, 2013).

## CONCLUSION

Plaintiffs' motion for class certification should be denied.

Dated: October 14, 2022
New York, New York

**CAHILL GORDON & REINDEL LLP**

By: /s/ Herbert S. Washer
Herbert S. Washer
David G. Januszewski
Sheila C. Ramesh
Adam S. Mintz
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for the Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam, and David R. Mathers*