# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SET CAPITAL LLC, et al., individually and on behalf of all others similarly situated,<br><br>                   Plaintiffs,<br>vs.<br><br>CREDIT SUISSE GROUP AG, et al.,<br><br>                   Defendants. | Case No. 1:18-cv-02268 (AT) (SN) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE PROPOSED EXPERT SECTION 10(b) DAMAGES OPINIONS OF PROFESSOR JOSHUA MITTS, Ph.D.**

# TABLE OF CONTENTS

Table of Authorities.................................................................................................................ii

Introduction...........................................................................................................................1

Professor Mitts's Background and Experience .......................................................................2

Summary of Relevant Reports and Testimony.......................................................................4

I.    Professor Mitts's Reports and Testimony ........................................................................4

II.   Defendants' Proposed Expert's Concessions...................................................................6

    A.   Hendershott admits he did not consider what qualifies as a "corrective disclosure" ...............8

    B.   Hendershott concedes his criticisms were limited to believing that applying Professor
    Mitts's methodology to calculate the Misrepresentation Class's damages here would be a
    "very hard" analysis that he would advise a "graduate student" against...................................10

    C.   Hendershott admits Professor Mitts's proposed methodology for calculating the
    Manipulation Class's damages would be possible and Hendershott used similar
    methodologies in his own work. .......................................................................................11

    D.   Hendershott concedes that the class definitions and out-of-pocket damages cap obviate
    his "double counting" critique .........................................................................................13

Defendants Misstate the applicable Legal Standard ............................................................15

Argument .............................................................................................................................16

I.    Professor Mitts's Section 10(b) Damages Methodology Opinions are Admissible .......17

II.   Defendants' *Comcast* and *Goldman* Arguments are Not Grounds for Exclusion Under *Daubert* ...18

    A.   Professor Mitts did not need to conduct a loss causation analysis or calculate damages on
    a class-wide basis to conclude that it could be done...........................................................24

    B.   Professor Mitts did not need to conduct a loss causation analysis by identifying corrective
    disclosures or disaggregating confounding information at class certification..........................26

    C.   Professor Mitts's proposed methodologies do not create a "risk of double counting
    damages".......................................................................................................................29

Conclusion ...........................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China N.E. Petroleum Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) ................................................................................................16

*In re Allergan PLC Securities Litig.*,
  2021 WL 4077942 (S.D.N.Y. Sept. 8, 2021) ................................................................ 19, 27

*Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*,
  568 U.S. 455 (2013) .........................................................................................................29

*Amorgianos v. Natl. R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ..............................................................................................15

*In re Aphria, Inc. Sec. Litig.*,
  No. 18-cv-11376, 2022 WL 3903373 (S.D.N.Y. Aug. 30, 2022) ......................................19

*AstraZeneca AB v. United Food & Commercial Workers Unions & Emp'rs Midwest Health
Benefits Fund (In re Nexium Antitrust Litig.)*,
  No. 14–1521, 2015 WL 265548 (1st Cir. Jan. 21, 2015) ..................................................18

*In re Barrick Gold Securities Litig.*,
  314 F.R.D. 91 (S.D.N.Y. 2016) .........................................................................................17

*Butler v. Sears, Roebuck and Co.*,
  727 F.3d 796 (7th Cir. 2013) .............................................................................................18

*C. States, S.E. and S.W. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
  543 Fed. Appx. 72 (2d Cir. 2013) ................................................................................ 22, 26

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) .........................................................................................27

*Choi v. Tower Research Capital LLC*,
  No. 14-cv-9912, 2022 WL 4484485 (S.D.N.Y. Sept. 27, 2022) .......................................19

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*,
  322 F. Supp. 3d 676 (D. Md. 2018) ...................................................................................18

*Colangelo v. Champion Petfoods USA*
  No. 18-cv-1228, 2022 WL 991518, (N.D.N.Y. Mar. 31, 2022) ................................... 21, 30

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................................................................22

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ................................................................................................ *passim*

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ................................................................................................ 18

*Dura Pharmaceuticals v. Broudo*,
544 U.S. 336 (2005) ................................................................................................ 14

*Dzielak v. Whirlpool Corp.*,
No. 12-cv-89 (KM), 2017 WL 1034197 (D.N.J. Mar. 17, 2017) ........................................ 22

*In re Federal Home Mortgage Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ........................................................................................ 22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
574 F.3d 29 (2d Cir. 2009) ........................................................................................ 22, 26

*Freeland v. AT & T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ........................................................................................ 22

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
579 F. Supp. 3d 520 (S.D.N.Y. 2021) ........................................................................ *passim*

*In re Google Play Store Antitrust Litig.*,
No. 21-md-2981 (JD), 2022 WL 17252587 (N.D. Cal. Nov. 28, 2022) .............................. 21

*In re Heckmann Corp. Sec. Litig.*,
No. 10-cv-378 (LPS), 2013 WL 2456104 (D. Del. June 6, 2013) ...................................... 18

*Iowa Pub. Employees' Ret. System v. Bank of Am. Corp.*,
No. 17-cv-6221 (KPF), 2022 WL 2829880 (S.D.N.Y. June 30, 2022) ....................... 19, 24

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) ............................................................................ 15, 22

*MacDougall v. Am. Honda Motor Co., Inc.*,
No. 20-56056, 2021 WL 6101256 (9th Cir. Dec. 21, 2021) .............................................. 20

*Martinek v. AmTrust Fin. Services, Inc.*,
No. 19-cv-8030 (KPF), 2022 WL 326320 (S.D.N.Y. Feb. 3, 2022) ............................ *passim*

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014) ............................................................................ 23, 27

*Menaldi v. Och-Ziff Capital Mgt. Group LLC*,
328 F.R.D. 86 (S.D.N.Y. 2018) (Oetken, J.) ..................................................................... 29

*In re Namenda Indirect Purchaser Antitrust Litig.*,
No. 15-cv-6549 (CM), 2022 WL 4298767 (S.D.N.Y. Sept. 19, 2022) ................................. 19

*Neale v. Volvo Cars of N.A., LLC*,
794 F.3d 353 (3d Cir. 2015) ...................................................................................... 18

*Neale v. Volvo Cars of N. Am., LLC*,
794 F.3d 353 (3d Cir. 2015) ...................................................................................... 18

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ...................................................................................... 15

*In re Pfizer Inc. Sec. Litig.*,
819 F.3d 642 (2d Cir. 2016) ............................................................................... 15, 25

*Price v. L'Oreal USA, Inc.*,
No. 17-cv-614 (LGS), 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021) ................... 19, 22, 29

*Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*,
No. 16-cv-10632, 2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ...................................... 23

*In re Pub. Offering Antitrust Litig.*,
No. 98 -cv-7890(LMM), 2004 WL 350696 (S.D.N.Y. Feb. 25, 2004) .......................... 22, 29

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ...................................................................................... 18

*Purple Mt. Tr. v. Wells Fargo & Co.*,
No. 18-cv-03948 (JD), 2022 WL 3357835 (N.D. Cal. Aug. 15, 2022) .......................... 27

*R.F.M.A.S., Inc. v. So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010) ..................................................................... 22, 27

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015) ...................................................................................... 18

*Robroy Industries-Texas, LLC v. Thomas & Betts Corp.*,
No. 15-cv-512 (WCB), 2017 WL 1319553 (E.D. Tex. Apr. 10, 2017) ........................... 26

*SEC v. Lek Sec.*,
17-cv-01789, ECF No. 75 (S.D.N.Y. May 9, 2017) ..................................................... 11

*SEC v. Lek Sec. Corp.*,
No. 17-cv-1789, 2019 WL 1304452 (S.D.N.Y. Mar. 21, 2019) ....................................... 3

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
341 F.R.D. 542 (S.D.N.Y. 2022) ............................................................................... 19

*Suchanek v. Sturm Foods, Inc.*,
    No. 11-cv-565 (NJR), 2017 WL 3704206 (S.D. Ill. Aug. 28, 2017) ......................................................22

*Sykes v. Mel S. Harris and Associates LLC*,
    780 F.3d 70 (2d Cir. 2015) ............................................................................................ 17, 18

*In re Term Commodities Cotton Futures Litig.*,
    No. 12-cv-5126 (ALC), 2022 WL 485005 (S.D.N.Y. Feb. 17, 2022) ........................................ 20, 25

*In re Teva Securities Litig.*,
    No. 17-cv-558 (SRU), 2021 WL 872156 (D. Conn. Mar. 9, 2021) .............................18, 21, 23, 24

*In re U.S. Foodservice Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013) ............................................................................................15

*U.S. v. Whitman*,
    555 Fed. Appx. 98 (2d Cir. 2014) ....................................................................................22

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007) ............................................................................................15

*Utesch v. Lannett Co., Inc.*,
    No. 16-cv-5932, 2021 WL 3560949 (E.D. Pa. Aug. 12, 2021) ..........................................24

*In re Vale S.A. Securities Litig.*,
    No. 19-cv-526 (RJD), 2022 WL 122593 (E.D.N.Y. Jan. 11, 2022) ...............................24, 25, 26, 27

*In re Vale S.A. Securities Litig.*,
    No. 19-CV-526 (RJD), 2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) ..................................18, 19, 24

*Vrakas v. U.S. Steel Corp.*,
    No. 17-cv-579, 2019 WL 7372041 (W.D. Pa. Dec. 31, 2019) ..........................................17

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ..............................................................................................17

*In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*,
    722 F.3d 838 (6th Cir. 2013) ..........................................................................................18

*Zwillinger v. Garfield Slope Housing Corp.*,
    No. 94-cv-4009 (SMG), 1998 WL 623589 (E.D.N.Y. Aug. 17, 1998) ...............................22, 27

**Other Authorities**

*Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] AC 133 (Eng.). ....................................3

*Burford Capital Ltd. v. London Stock Exchange Group Plc* [2020] EWHC (Comm.) 1183
    (Eng.) .........................................................................................................................3

## INTRODUCTION

Defendants ask the Court to exclude the opinion of Plaintiffs' expert, Professor Joshua Mitts, that Section 10(b) damages can be calculated on a class-wide basis using common methodologies. But in support of that exceptional request, Defendants neither dispute that Professor Mitts's proposed out-of-pocket measure is the standard method for calculating damages in securities cases like this one, nor point to any flaw in Professor Mitts's methodology. And Defendants do not contest that Professor Mitts's proposed methodologies could calculate damages on a class-wide basis.

Instead, Defendants repeat their arguments from their opposition to class certification that, under *Comcast Corp. v Behrend*, Plaintiffs are "obligated" to describe in detail each of the inputs to their loss causation and damages methodologies to "prove" that they can calculate damages class-wide. That argument has been refuted by the Second Circuit as "misstating the holding of *Comcast*" and rejected by dozens of courts in every circuit. Undeterred, Defendants insist that the Court should defy the Second Circuit by holding that the Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System* abrogated longstanding principles of securities law and the uniform caselaw of nearly every circuit—and somehow did so without anybody else noticing. *See* Eisenkraft Decl. Exhibit B, Federal District Court Decisions Certifying Securities Class Actions and Rejecting *Comcast* Arguments ("List of Opinions Rejecting *Comcast* Arguments").

But *Goldman* did no such thing. The Second Circuit has been crystal clear: all that is required at the class certification stage is that Plaintiffs show that their damages stemmed from the defendant's actions that created the legal liability. And courts in the Second Circuit, both before and after *Goldman,* uniformly conclude that the exact same out-of-pocket methodology that Plaintiffs propose satisfies *Comcast*. It is no surprise, then, that Defendants identify *no* court that has *ever* excluded an expert's damages opinion (or, for that matter, denied class certification) on these grounds.

Defendants' arguments for exclusion all rest on their discredited interpretation of *Comcast*. They claim that Professor Mitts needed to create a damages model and prove that it works, to identify the specific "corrective disclosures" that his model would measure, and to show how his model would "disaggregate" specific potentially confounding information. But each of these arguments has been roundly rejected by courts in the Second Circuit as tantamount to requiring proof of loss causation, which the Supreme Court has held is not required at the class certification stage. Indeed, even Defendants' own expert, Professor Terrence Hendershott, repeatedly acknowledged that "plaintiffs don't have to do a loss causation analysis at class certification" and conceded that he could not "rule out" that Professor Mitts's proposed methodologies could work.

In short, to support their request for the exceptional relief of exclusion, Defendants offer neither arguments nor case law that have anything to do with admissibility or expert opinions like the one at issue here. Instead, as in their Opposition, Defendants invite the Court to stand alone and adopt a position that courts have uniformly rejected, and which would contravene longstanding Supreme Court precedent, based on a novel interpretation of *Goldman* that no court has adopted. This request was meritless when they made it in their Opposition to class certification, and it is meritless here. This motion should thus be denied.

## PROFESSOR MITTS'S BACKGROUND AND EXPERIENCE

Joshua Mitts, Ph.D., is a Professor of Law at Columbia Law School, where he teaches courses on securities regulation, law and economics, and data science, covering economic theory, quantitative methods of valuation, asset pricing, investments, and data analytics, as well as the economics of securities fraud, market manipulation, and insider trading. Expert Report of Professor Joshua Mitts, Ph.D. on Plaintiffs' Motion for Class Certification, ECF No. 206-1 ("Mitts Rep."), ¶ 6. Professor Mitts, who holds both a Ph.D. in Finance & Economics from Columbia University and a J.D. from Yale University, uses advanced data science for his research on corporate and securities law, and his work is widely

published both in leading financial and legal peer-reviewed journals on topics such as manipulative conduct, insider trading, corporate governance, and trading in electronic markets. *Id.* at ¶¶ 2-3, App'x A (Mitts curriculum vitae). Professor Mitts also presents regularly at conferences, symposia and workshops on topics pertaining to financial economics and the law, is a Fellow in the Columbia Law School Program in the Law and Economics of Capital Markets, and is a member of the Center for Financial and Business Analytics at Columbia University's Data Science Institute. On top of his academic work, Professor Mitts has delivered expert testimony in private legal actions in the United States and abroad, submitted a rulemaking petition to the SEC on short selling regulation, and regularly advises and supports the Department of Justice on issues pertaining to market manipulation and securities law violations. *Id.* at ¶ 5.

Defendants claim that one court has "already rejected Professor Mitts's opinions on similar grounds" and that "[t]he same unsubstantiated analysis is featured in Professor Mitts's analysis here," citing Justice Baker's decision in the *Burford* decision. Memorandum of Law in Support of Defendants' Motion to Exclude Expert Opinions of Joshua Mitts, ECF No. 205 ("Mot.") at 17. But that is patently false. That case involved a *Norwich Pharmacal* order under U.K. law to compel the London Stock Exchange to reveal the identity of anonymous market participants allegedly engaged in spoofing the shares of Burford Capital's stock. *Burford v. LSE, CL-2019-000604* (Bus. and Property Courts of England and Wales Commercial Court (QBD)). Professor Mitts did not and could not opine on a damages methodology in that case, because a *Norwich Pharmacal* order only "requires a respondent to disclose certain documents or information to the applicant." *Norwich Pharmacal Co. v. Customs and Excise Commissioners* [1974] AC 133 (Eng.). Nor, for that matter, is the decision otherwise remotely relevant. In *Burford*, Professor Mitts analyzed *anonymized* order book data to identify patterns which he opined reflected spoofing, notably, using the exact same methodology employed by Professor Hendershott in other U.S.-based litigation and approved by U.S. courts. *Burford Capital Ltd. v. London Stock Exchange*

*Group Plc* [2020] EWHC (Comm.) 1183 (Eng.); *SEC v. Lek Sec. Corp.*, No. 17-cv-1789, 2019 WL 1304452, at *1-4 (S.D.N.Y. Mar. 21, 2019) (Cote, J.).

Further, there, the court's decision rested on its determination that the use of anonymized order book data was not enough to raise a "good arguable case" of spoofing because anonymized data could not reveal subjective intent. But this is not a spoofing case, Professor Mitts has presented no analysis of high-frequency trading data here, and his proposed methodology would rely on *deanonymized* data, obviating the primary concern identified by Justice Baker in *Burford*. Thus, the *Burford* decision does not undermine Professor Mitts's opinions and, if anything, only bolsters the credibility of his proposed methodology in this case.

## SUMMARY OF RELEVANT REPORTS AND TESTIMONY

### I.  Professor Mitts's Reports and Testimony

Professor Mitts was retained by Lead Plaintiffs to determine whether the market for XIV Notes was efficient from January 29, 2018, to February 5, 2018, inclusive ("Class Period"). Mitts Rep. at ¶ 8. Professor Mitts was also asked to opine on whether the calculation of damages on a classwide basis for the three causes of action[1] are subject to common methodologies. *Id.* In his report, Professor Mitts stated that, based on his analysis, review of materials, experience, and professional judgment, he had formed the opinion that "the market for XIV Notes was efficient during the Class Period" and that "damages in this matter can be calculated on a class-wide basis subject to a common methodology for all three of the asserted causes of action." Mitts Rep. at ¶ 10.

In his report, Professor Mitts explained that damages for the Misrepresentation and Manipulation Classes can both be calculated classwide by using the "out-of-pocket" measure, which is "widely accepted for use in Rule 10b-5 cases." Mitts Rep. at ¶ 75-76. Under the out-of-pocket methodology, a

---

[1] The three proposed classes are: (1) the Section 11 Class; (2) the Section 10b5-(b) Class or Misrepresentation Class; and (3) the Section 10b5-(a) and (c) Class or the Manipulation Class.

class member recovers "only the excess of what he paid over the value of what he got." Mitts Rep. at ¶ 76 (quoting *Acticon AG v. China N.E. Petroleum Holdings Ltd.,* 692 F.3d 34, 39 (2d Cir. 2012)). As applied here, Professor Mitts explains that damages are thus "determined by calculating the artificial inflation in the price of XIV Notes at the time of purchase minus the artificial inflation in the price at the time of sale" (or, if the XIV Notes were not sold before the full revelation of the fraud, the price during the 90-day lookback period under the PSLRA). Mitts Rep. at ¶ 76.

Professor Mitts explains that the out-of-pocket measure can be applied to claims by the Misrepresentation and Manipulation Classes and does not lead to a "double recovery." Mitts Rep. at ¶¶ 77-79. While the actual "calculation of artificial inflation and deflation" requires a loss causation analysis, conducted after the conclusion of fact discovery, Mitts Rep. at ¶¶ 81-82, because the out-of-pocket method depends only on pricing and trade data, it can be "performed on a Class-wide basis" and is "not dependent upon the identities or circumstances of individual class members." Mitts Rep. at ¶ 81.

In his report, Professor Mitts also explains how the out-of-pocket measure can be applied to calculate damages for the Misrepresentation and Manipulation Classes. For the Misrepresentation Class, Professor Mitts explains that the "inflation in the price of XIV Notes" caused by the misrepresentations or omissions "can be estimated using an event study or other common financial and statistical methods" and that "the effect of such confounding factors on the price of XIV Notes can be determined on a common, Class-wide basis using various accepted methodologies." Mitts Rep. at ¶¶ 85-86. This analysis involves a "weighty, complex decision," Professor Mitts explained, requiring the expert to "carefully evaluating the security at issue, the environment at which it trades, making sure that the controls that one chooses are appropriately related theoretically" and that this "decision should be informed by a careful review of the peer-reviewed literature. Exhibit C, Deposition of Professor Joshua Mitts ("Mitts Dep.") 124:11-24. But Professor Mitts explained how that determination might be made here, after fact discovery. Mitts Dep. 124:11-125:22.

Similarly, for the Manipulation Class, Professor Mitts notes that "[p]eer-reviewed literature in financial economics has examined how hedging activity can inflate or deflate the price of publicly traded securities" and that "[t]hese studies employ standard methods which are well-established and can be formulaically applied to all Class Members." Mitts Rep. at ¶ 84. "That sort of method depends on pricing data and the defendant's hedging activity," Professor Mitts notes, "and thus can be applied formulaically to yield an estimate of investor losses on a Class-wide basis." *Id.* As Professor Mitts also explained in his deposition: "[T]he price impact of the alleged manipulation is directly measurable. It's measurable at the high frequency. That price impact would have occurred even if Credit Suisse had not made a misstatement. So that directly measurable price deflation is compensatory, in my view, for the [Alleged Manipulation] class, even in a world where there is zero price impact to the misstatement." Mitts Dep. 138:6-15. Thus, "one would ultimately have a model," Professor Mitts explained, "examining the effect of the alleged hedging activity on the price [of XIV Notes] after controlling for the expected level of volatility" and "that is ultimately a formulaic calculation that can be applied class-wide and does not turn on any single Plaintiffs' trading activity." Mitts Dep. 125:13-22.

## II. Defendants' Expert Conceded the Market for XIV Was Efficient, that Section 11 Damages Could Be Calculated Under the Statutory Formula on a Class Wide Basis, and that a Loss Causation Analysis was Not Necessary for Class Certification

In connection with their Opposition and this Motion, Defendants submitted an expert report from Professor Terrence Hendershott, an academic associated with Cornerstone Research, an economic consulting firm focused on providing defense-side expert testimony. Expert Report of Terrence Hendershott, ECF No. 206-4 ("Hendershott Rep."); Eisenkraft Decl. Exhibit D, Deposition of Terrence Hendershott ("Hendershott Dep.") at 10:7-11:25.[2] In his report, Hendershott did not contest Professor Mitts's finding that the market for XIV Notes was efficient under the *Cammer* and *Krogman*

---

[2] While Hendershott has a Ph.D, it is in neither economics or finance, but instead in operations, information and technology.  *See* Hendershott Rep. at 48.

factors applied by courts, confirming that he did not even examine any of those factors. Hendershott Dep. at 29:18-20. He also did not contest Professor Mitts's finding that the damages for the Section 11 Class could be calculated under the statutory formula on a classwide basis. Hendershott Dep. 37:17-43:10. Instead, Hendershott's critiques were limited to Professor Mitts's opinion that damages for the Misrepresentation and Manipulation Classes can be calculated on a classwide basis.

In making those criticisms, Hendershott conceded that "Plaintiffs do not need to analyze loss causation or calculate per-share damages at the class certification stage." Hendershott Rep. at ¶ 49; *see also id.* at ¶¶ 55 ("To be clear, I am not suggesting that Dr. Mitts needs to perform a loss causation analysis at this stage."), ¶ 7 n.2 ("I understand that actual calculation of damages, if any, is an issue for a later phase."); Hendershott Dep. at 75:21-24 ("I understand the plaintiffs don't have to do a loss causation analysis at class certification, and I believe they have to do it later."). Hendershott's criticisms instead mostly focus on his view that Professor Mitts had not adequately "described" with sufficient "details" how his proposed damages methodologies might apply to the specific facts and circumstances here. *See, e.g.*, Hendershott Rep. at ¶ 50, ¶ n.104 (claiming that "the approach [Professor Mitts] describes contains only vague references to tools and techniques Dr. Mitts indicates he *may* ultimately use to calculate damages in this case, and his focus appears to be mostly on whether his generic description is applicable class-wide").

But as Professor Mitts explains in his Rebuttal Report, many of Hendershott's critiques are based on confusion as to the facts alleged and elementary principles of financial economics. Hendershott's criticisms are otherwise limited to disputing whether Professor Mitts described his methodologies with sufficient detail at the class certification stage, a legal conclusion that Hendershott admitted he was not qualified to offer an opinion on. Hendershott Dep. at 75:23-76:10.

**A. Hendershott admits he did not consider what qualifies as a "corrective disclosure"**

In his report, Hendershott states that "Plaintiffs so far have not identified any corrective disclo-

sures that supposedly 'corrected' the alleged misrepresentations" and which could be analyzed by an

event study, Hendershott Rep. at ¶¶ 12, 13.b, 59, 66-73, which Defendants rely on in both their Op-

position and this Motion. *See* Defendants' Opposition to Class Certification, ECF No. 199 ("Opp.")

at 19-21; Mot. at 2, 10-13.

In his deposition, though, Professor Mitts explained that whether or when a corrective disclosure

or materialization of the risk occurred is "not Plaintiff-specific" and "common to the class as a whole,"

and thus "whenever that date is determined to be, the losses can be calculated at the level of the class."

Mitts Dep. at 132:22-133:11. Further, in his Rebuttal Report, Professor Mitts explains that Hender-

shott mischaracterizes the Complaint, which alleges that the price of XIV Notes dropped after a "ma-

terialization of the risk" rather than a "corrective disclosure," noting that Plaintiffs identified "specific

misstatements concerning the nature of the Defendants' hedging activities," including that "the Credit

Suisse Defendants knew that during the next VIX spike" they planned to profit from their hedging

and trading activity by "creating a liquidity squeeze in the VIX futures market that would inflate the

value of VIX futures, thereby wiping out the value of XIV and triggering an Acceleration Event."[3]

Eisenkraft Decl. Exhibit A, Rebuttal Report of Professor Joshua Mitts, Ph.D., in Support of Plaintiffs'

Motion for Class Certification ("Mitts Rebuttal Rep.") at ¶ 6 (quoting Compl. at ¶ 220). Then, on

February 5, 2018, as Plaintiffs allege, the truth regarding Credit Suisse's activities—that is, the creation

of a liquidity squeeze in the VIX futures markets that would inflate the value of VIX futures, thereby

wiping out the value of XIV and triggering an Acceleration Event—was revealed to the market, re-

moving the inflation from the price of XIV securities, and causing real economic loss to investors

---

[3] Consolidated Amended Complaint, ECF No. 82 ("Compl.") at ¶ 220.

who had purchased XIV notes during the Class Period. Mitts Rebuttal Rep. at ¶ 3. "That materialization of the risk," Professor Mitts says, "reveals the truth of the misstatement precisely as it was alleged by the Plaintiffs." Mitts Rebuttal Rep. at ¶ 6.

Further, even though identification of a "corrective disclosure" is the linchpin of Hendershott's critique of Professor Mitts's proposed damages event study, when Hendershott was asked to explain his understanding of what the term "corrective disclosure" means, he admitted that he "didn't spend a lot of time thinking about what exactly would qualify…":

> Q.  Okay.  Do you understand what a corrective disclosure is in the securities fraud context?
>
> A.   I mean, so corrective disclosure – I mean, it has a plain meaning that there was something that was not correct before, and there was later a disclosure which corrected that.
>
> Q.  Okay.  Do you have any understanding of what is specifically required in order for something to qualify as a corrective disclosure under the federal securities laws?
>
> A.  …Dr. Mitts didn't identify a corrective disclosure, so I didn't spend a lot of time thinking about what exactly would qualify because he hasn't identified any.

Hendershott Dep. at 76:18-77:11. When asked how he could opine in his report that "Plaintiffs have not identified a corrective disclosure" without thinking about what would qualify as such a disclosure, Hendershott characterized that statement in his report as a mistake, because he was "asked to comment on Dr. Mitts' report" and thus should have said only that "Dr. Mitts so far has not identified any corrective disclosures." Hendershott Dep. at 79:17-80-21. But this was not an isolated statement, and Hendershott repeated the assertion throughout his report.[4] Yet Hendershott was also unable to define a "materialization of the risk," making clear that he did not consider whether Plaintiffs alleged

---

[4] *See* Hendershott Rep. at ¶ 13.b ("Plaintiffs have not specified any alleged 'corrective disclosures in this case.'"); *id.* at ¶ 49 ("[N]either the Complaint nor Dr. Mitts specifies an alleged corrective disclosure for the alleged misrepresentation claims."); *id.* at ¶ 51 ("Dr. Mitts faces serious challenges in applying the so-called back-casting approach based on an event study in this case, because Plaintiffs have not specified any alleged 'corrective disclosure' that can serve as an 'event' to study in this framework."); *id.* at ¶ 67 ("I understand that Plaintiffs have not alleged any specific 'corrective disclosures' in this case."); *id.* at ¶ 90 ("Plaintiffs have not specified what disclosure occurred on February 5, 2018 that purportedly corrected the alleged misrepresentations…").

one in the Complaint. Hendershott Dep. at 80:22-81:9 ("Q. Do you know whether the materialization of a risk is sufficient under the federal securities laws to allege loss causation? A. That sounds like a legal opinion. So I'm not sure what the federal securities laws require as a legal matter. Q. Okay. Did you consider in reaching your opinions in the report whether plaintiffs have alleged materialization of the risk in their complaint? A. I'd have to review the complaint carefully, but there was—right, I mean, Credit Suisse disclosed a number of things that were in—that I discuss and the investors had some knowledge of, and then—which related to the acceleration event, and then the acceleration event occurred."). In short, Hendershott claimed Professor Mitts failed to identify a corrective disclosure, but, when pressed, could not even identify what a corrective disclosure is and had no idea whether the Plaintiffs allege a materialization of the risk. Had Hendershott known what a corrective disclosure or a materialization of the risk looked like, he would have been able to identify it in Plaintiffs' complaint and in Professor Mitts' description of it in his report. Mitts Rep. at ¶ 86; Mitts Rebuttal Rep. at ¶ 5.

### B. Hendershott concedes his criticisms were limited to believing that applying Professor Mitts's methodology to calculate the Misrepresentation Class's damages here would be a "very hard" analysis that he would advise a "graduate student" against

Hendershott does not identify any specific flaw with Professor Mitts's proposed event study methodology for calculating the Misrepresentation Class's damages. Indeed, he concedes the reliability of that event study methodology, which Professor Mitts used to find that the market for XIV was efficient throughout the Class Period. Hendershott Dep. at 84:10-86:2. Hendershott also admitted that the event study methodology had been applied in both peer reviewed research and litigation to securities, including bonds,[5] preferred stock,[6] and options, which are similar to XIV.[7] Hendershott

---

[5] *See In re American Realty Cap. Prop., Inc. Litig.*, 15-mc-00040 (S.D.N.Y. Feb 13, 2015).

[6] *See In re Allergan PLC Sec. Litig.,* 18-cv-12089 (S.D.N.Y. Dec 20, 2018); *Martinek v. AmTrust Fin. Servs., Inc. et al.,* 19-cv-08030 (S.D.N.Y. Aug 28, 2019)).

[7] *See In re Tesla, Inc. Sec. Litig.*, 18-cv-04865 (N.D. Cal. Aug 10, 2018).

Dep. at 87:18-22 (bonds); 88:12-14 (preferred stock); 88:15-20 (options); Mitts Rebuttal Rep. at ¶ 9. Instead, Hendershott explained that he was merely "commenting" that conducting an event study to calculate the Misrepresentation Class's damages would be "very difficult" and the inputs to the event study would "need to be carefully thought through." Notably, Hendershott also does not claim that such an analysis is impossible, only that he "didn't know" whether it could be done. Hendershott Dep. at 85:12-86:2. Nor does Hendershott ever claim that such a methodology, if applied, would be unable to calculate damages on a class-wide basis. Instead, Hendershott summed up his view as follows: "If I had a graduate student who was proposing trying to do this, I might encourage them to do something else because it's really hard. But, you know, until you see every proposed solution, it's very difficult to rule it out." Hendershott Dep. at 105:6-19. Professor Mitts is no graduate student. And that Hendershott believes his methodology would be hard for a graduate student is not grounds for exclusion under *Daubert*.

### C. Hendershott admits Professor Mitts's proposed methodology for calculating the Manipulation Class's damages would be possible and Hendershott used similar methodologies in his own work.

In his report, Hendershott opines that Professor Mitts did not specify how his event study would "disentangle" the deflationary effects of Credit Suisse's trading activity from trading by other market participants. Hendershott Rep. at ¶ 82. Defendants then rely on this assertion in both their Opposition and this Motion. Opp. at 25-26; Mot. at 3, 15. Putting aside the fact that no such loss causation analysis is necessary at the class certification stage, in both his Opening Report and at his deposition, Professor Mitts explained generally how one could disentangle unrelated deflationary effects from the deflationary effects of Defendants' fraud, Mitts Rep. at ¶¶ 81; Mitts Dep. at 139:4-140:17, and in his Rebuttal Report, Professor Mitts explains further that it is "straightforward to isolate the effect of trading activity by Credit Suisse from that of other market participants," because "the CBOE had produced

detailed, deanonymized data for individual trades and orders in VIX futures." Mitts Dep. at 119:5-120:7; Mitts Rebuttal Rep. at ¶¶ 23.

At his deposition, Hendershott conceded that precisely such an analysis would be appropriate here, testifying that it would be possible to disentangle Credit Suisse's trading activity from other trading activity by analyzing deanonymized trading data like the data produced by CBOE, explaining that to perform such an analysis he would "think about what's affecting the price of VIX futures" and what effect "past actions" may have on "current actions and what effect they may have on current price." Hendershott Dep. at 104:1-105:5.

Indeed, in *SEC v. Lek Sec.*, Hendershott himself similarly devised criteria to identify allegedly manipulative trading activity when nobody else had ever set out such criteria—either in peer-reviewed literature or prior expert testimony. *SEC v. Lek Sec.*, 17-cv-01789, ECF No. 75 (S.D.N.Y. May 9, 2017) at 25:7-31:20. In *Lek Securities*, despite characterizing it as an "especially complicated case[]" with orders "submitted to a variety of markets," Hendershott concluded that based on his analysis, the manipulative trading at issue "impact[ed] the market" at a "more favorable price." *Id.* at 128:19-22; *id.*, ECF No. 88-1 (S.D.N.Y. July 20, 2017) at ¶ 30. Similarly, Professor Mitts notes that while Hendershott identifies the "complication" that the market for VIX futures and XIV are "interlinked," and that it might be a "challenge" to "parse the common component that they have," Hendershott himself had conducted such an analysis in his article "Price Pressures," published in the *Journal of Financial Economics*.[8] Mitts Rebuttal Rep. at ¶ 28. Thus, "Hendershott's own prior work published in a peer-reviewed journal provides ample reason to doubt that the problem is anywhere near as difficult as he suggests" as a paid defense expert here now. Mitts Rebuttal Rep. at ¶ 31.

---

[8] *See also* Hendershott Dep. at 21:5-10 ("So I've published several papers on hedging activities, for example, "*Price Pressures*," and there's some discussion of how -- that was directly in the equities market, but there's some discussion about how those market-makers may be hedging in derivatives.").

**D. Hendershott concedes that the class definitions and out-of-pocket damages cap obviate his "double counting" critique**

In his report, Hendershott claims that Professor Mitts's methodologies create a risk of "double counting damages" across the Misrepresentation and Manipulation Classes, Hendershott Rep. at ¶¶ 89, 91, 93-95, which Defendants rely on in their Opposition and this Motion. Opp. at 14, 18-19; Mot. at 1-2, 8-10. As revealed at his deposition, Hendershott's double counting critique turns on his own confusion as to the definitions of the two classes and the correct meaning of "out-of-pocket damages."

First, Hendershott conceded in his deposition that his double counting critique presumes that Plaintiffs alleged that the price of XIV Notes was inflated at the same time as the price was deflated by Defendants' manipulation, admitting that if "inflation is completely dissipated before the manipulation class begins," he was "*not sure what the conflict would be*." Hendershott Dep. at 143:11-20. Hendershott confirmed that his criticism was limited to "when there's inflation and deflation occurring simultaneously," and "*if there's no inflation and deflation simultaneously,*" then "*presumably…the two classes don't care about each other.*" Hendershott Dep. at 146:11-147:13. In his Rebuttal Report, Professor Mitts points out that there is "only one unmanipulated, uninflated price of XIV Notes." Mitts Rebuttal Rep. at ¶ 42. "It is mathematically impossible for a price to be inflated and deflated simultaneously," Professor Mitts explains, because "[i]f the price of XIV Notes is above the unmanipulated, uninflated price of XIV Notes, it is inflated, and if the price of XIV Notes is below the unmanipulated, uninflated price of XIV Notes, it is deflated." Mitts Rebuttal Rep. at ¶ 55. But for any given investor, the out-of-pocket methodology, by definition, ensures that they can recover only the difference between 'the artificial inflation in the price of the XIV Notes at the time of purchase" and "the artificial inflation in the price at the time of sale". Mitts Rep. at ¶ 76; Mitts Rebuttal Rep. at ¶ 52. Second, Professor Mitts explains in both of his reports that "the out-of-pocket measure ensures the damages award *cannot lead to a double recovery* because no member of any Class receives more than the actual loss that was caused by the

violation of Section 10(b)." Mitts Rebuttal Rep. at ¶ 47; Mitts Rep. at ¶¶ 75-77. In his deposition,

Hendershott did not contest this elementary point. In fact, when Hendershott was asked to explain

how there could be a risk of double recovery when an investor's damages are limited to their out-of-

pocket losses, he revealed his lack of knowledge as to the basic meaning of the term:

> Q. And assuming there was a cap on out-of-pocket losses, would there be any risk that esti-
> mated damages would exceed the XIV price decline?
>
> A. What do you mean by a "cap on out-of-pocket damages"?
>
> Q. Are you familiar with the term "out-of-pocket losses" under the federal securities laws?
>
> A. I have a familiarity with how financial economists do this sometimes in cases, but again,
> I'm not offering any legal opinions about the federal law.
>
> Q. What do you understand "out-of-pocket losses" to mean in the context of a securities
> case?
>
> A. At a high level, they're looking at the difference between which depending upon whether
> it's inflation or deflation, *it's comparing the price that the investor received or paid, and the difference
> between what it would have been in a different world where something else had been disclosed, for example.*

Hendershott Dep. at 147:14-148:21. Professor Mitts explains that this definition is incorrect, because

it appears to refer to inflation, the "but for" price if the fraud had not occurred—which the Supreme

Court rejected in *Dura Pharmaceuticals*. Mitts Rebuttal Rep. at ¶ 50 (citing *Dura Pharmaceuticals v. Broudo*,

544 U.S. 336, 342 (2005)). That sort of "elementary error," Professor Mitts noted, "calls into question

whether Dr. Hendershott has even a basic understanding of damage measures under Section 10(b)."

Mitts Rebuttal Rep. at ¶ 50. When Plaintiffs' counsel pointed out Hendershott's error, Hendershott

tried to restate the definition of out-of-pocket losses, but again defined the term incorrectly:

> Q. Sorry. That's but-for losses, no?
>
> A. Ah. So you're talking about the out-of-pocket, and so there, if someone bought and sold,
> then you could—I *mean, "out-of-pocket" could refer to that, to the difference between the price at which
> someone bought and sold.*

Hendershott Dep. at 148:23-149:6. Hendershott's second attempt was also wrong, Professor Mitts

explains, because it would award a class member "more than the artificial inflation or deflation in the

price of XIV Notes," violating the Supreme Court's admonishment in *Dura Pharmaceuticals* that, when

an investor resells their shares, "even at a lower price," that lower price may not reflect the

"misrepresentations," but other confounding factors like "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts." Mitts Rebuttal Rep. at ¶ 8 (quoting *Dura Pharmaceuticals,* 544 U.S. at 342-43). Professor Mitts confirms that the correct definition of out-of-pocket losses is "the artificial inflation in the price of XIV Notes at the time of purchase minus the *artificial inflation in the price at the time of sale,*" which reflects the measure consistently employed by courts in the Second Circuit. Mitts Rebuttal Rep. at ¶ 52. Because no member of any class can receive more than the actual loss caused by any Section 10(b) violation, Professor Mitts reiterates that the out-of-pocket measure ensures the damages award *cannot lead to a double recovery.* Mitts Rebuttal Rep. at ¶ 47. Hendershott could not explain his contrary view. Mitts Rebuttal Rep. at ¶ 49 (citing Hendershott Dep. at 149:15-150:24).

### DEFENDANTS MISSTATE THE APPLICABLE LEGAL STANDARD

Though Defendants claim that Plaintiffs' burden for submitting expert testimony at the class certification stage is "well-established," the Second Circuit disagrees. In *Kurtz v. Costco Wholesale Corp.*, the Second Circuit explained that it is "far from well-established" that an expert report "must be admissible under Federal Rule of Evidence 702 and *Daubert"* at the class certification stage. 818 Fed. Appx. 57, 61 n.3 (2d Cir. 2020). Indeed, "[n]either the Supreme Court nor the Second Circuit has definitely decided whether the *Daubert* standard governs the admissibility of expert evidence submitted at the class certification stage." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129–30 (2d Cir. 2013) ("The Supreme Court has not definitively ruled on the extent to which a district court must undertake a *Daubert* analysis at the class certification stage."). This makes sense because the purpose of *Daubert* is to protect the ***jury*** from misleading testimony and there is no jury at the class certification stage. *See* Fed. R. Evid. 702 (expert opinion testimony is to assist "the trier of fact"); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993). To the extent Rule 702 applies at class certification at all, the Second

Circuit has recognized that the rule "embodies a liberal standard of admissibility for expert opinions," *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005). Under Rule 702, experts with "specialized knowledge" that "will help the trier of fact" may testify so long as their testimony is "based on sufficient facts or data" and "is the product of reliable principles and methods" that the witness has "reliably applied" to the "facts of the case." *In re Pfizer Inc. Sec. Litig.,* 819 F.3d 642, 658 (2d Cir. 2016). The proponent of expert testimony bears the burden of establishing these requirements, with the Court acting as a "gatekeeper" to ensure that the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *United States v. Williams,* 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert*, 509 U.S. at 597).

While the Court has "broad discretion to carry out its gatekeeping function," and its inquiry is a "flexible one," the "gatekeeping" function under *Daubert* is "fundamentally about 'ensur[ing] the reliability and relevancy of expert testimony,' and district courts may not stray from those goals." *Pfizer,* 819 F.3d at 658 (quoting *Kumho Tire Co., Ltd v. Carmichael,* 526 U.S. 137, 152 (1991)). In carrying out that gatekeeping responsibility, the Court's responsibility is to ensure the exclusion of "junk science" while "admitting reliable expert testimony that will assist the trier of fact." *Amorgianos v. Natl. R.R. Passenger Corp.,* 303 F.3d 256, 266–67 (2d Cir. 2002). And the Court must be mindful that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596. The "rejection of expert testimony" is thus "the exception rather than the rule." Fed. R. Civ. Proc. 702 (Adv. Cmte. Notes to 2000 Amendments).

## ARGUMENT

Professor Mitts's opinions readily satisfy the requirements of Rule 702 and *Daubert*. Defendants do not dispute that Professor Mitts is highly qualified or that his opinions are relevant. Professor Mitts's opinions also "rest on a reliable foundation," because they are grounded in widely accepted

16

and standard methods for calculating damages in securities cases that have been approved over and over by courts in the Second Circuit and across the country. Defendants' contrary view rests solely on their claim that Professor Mitts "has made no attempt to" conduct a loss causation analysis or calculate damages on a class-wide basis or "even to prove that it can be done." But Professor Mitts did not need to conduct analyze loss causation or calculate damages to conclude that his methodologies could be used to do so on a class-wide basis.

## I. Professor Mitts's Section 10(b) Damages Methodology Opinions are Admissible

Professor Mitts concluded that Section 10(b) damages can be calculated on a class-wide basis using the "out-of-pocket" methodology, which would determine damages by "calculating the artificial inflation in the price of XIV Notes at the time of purchase minus the artificial inflation in the price at the time of sale." Mitts Rep. at ¶ 76. The Second Circuit recognized that the Supreme Court "adopted the out-of-pocket measure of damages" fifty years ago when it held that the "correct measure of damages" in securities cases "is the difference between the fair value of all [the plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (quoting *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155 (1972)). Courts in the Second Circuit regularly affirm that the out-of-pocket methodology "directly measure[s]" the damages under Section 10(b) and is thus "directly linked" to Plaintiffs' theory of liability. *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017); *In re Barrick Gold Securities Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016) (Scheindlin, J.) (explaining that the "out-of-pocket damages calls for the application of a damages model across the entire class").[9]

---

[9] *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019) (McMahon) (approving similar out-of-pocket methodology, explaining that it is "the generally accepted method for measuring damages in a securities fraud class action"); *Martinek*, 2022 WL 326320, at *18; *In re Vale S.A. Sec. Litig.*, No. 19-cv-526, 2022 WL 969724, at *6 (E.D.N.Y. Mar. 31, 2022) (Dearie, J.) (same); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018)

Professor Mitts also details how the out-of-pocket methodology could be used to calculate damages for the Section 10(b) classes "by using 'valuation tools,' including event study analysis, to determine the impact of Defendants' alleged misstatements." *Martinek v. AmTrust Fin. Servs, Inc.*, No. 19-cv-8030, 2022 WL 326320, at *18 (S.D.N.Y. Feb. 3, 2022) (Failla, J.) (certifying class and approving of similar description of out-of-pocket methodology). *See supra* at 4-5, 7 (describing methodologies). Defendants do not dispute the reliability of the out-of-pocket methodology—which they do not mention *once*. Nor do they contest that Professor Mitts's event study and regression methodologies are also widely regarded as standard and reliable methods for calculating class-wide damages in securities cases like this one. Indeed, they concede that the very same methodology as applied to determine whether the market for XIV was efficient throughout the Class Period is appropriate and without methodological error. Because it is undisputed that Professor Mitts is highly qualified, that his damages opinion is relevant, and that his opinion rests on reliable methods, Plaintiffs have more than satisfied their burden under Rule 702 and *Daubert*.

## II. Defendants' *Comcast* and *Goldman* Arguments are Not Grounds for Exclusion Under *Daubert*

Defendants' arguments to exclude Professor Mitts's opinion are carbon copies of their arguments in their Opposition that, under *Comcast Corp. v. Behrend,* Plaintiffs are "obligated in a case like this one" to "provide a sound and reliable methodology capable of calculating damages on a class-wide basis *before* a class can be certified." Mot. at 7; *see* Opp. at 3, 8-9, 20, 24-25. That argument "misstate[s] the central holding of *Comcast*," *Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 88 (2d Cir. 2015), because "[*Comcast*] did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance." *Roach v. T.L. Cannon Corp.,* 778 F.3d 401, 407 (2d Cir.

---

(Furman, J.) (same). *Wilson v. LSB Indus., Inc.*, No. 15-cv-7614, 2018 WL 3913115, at *17 (S.D.N.Y. Aug. 13, 2018) (Gorenstein, M.J.) (same).

2015).[10] The law on this is crystal clear: "All that is required at class certification is that 'the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.'" *Sykes,* 780 F.3d at 88.[11] Courts in the Second Circuit have recognized *Comcast* thus presents a low bar, *Vale,* 2022 WL 969724, at *6 (E.D.N.Y. Mar. 31, 2022) (Dearie, J.) (rejecting argument that Comcast sets a "higher bar"), and that "securities class actions rarely have trouble complying with *Comcast,*" emphasizing: "It is a rare—perhaps even nonexistent—securities case that raises damages issues that are so individualized as to defeat the predominance of the critical common issues in the case." *In re Teva Sec. Litig.,* No. 17-cv-558, 2021 WL 872156, at *41 (D. Conn. Mar. 9, 2021) (citation omitted and alterations adopted). *See also* List of Opinions Rejecting *Comcast* Arguments.

Defendants seek to solve that glaring problem with their remarkable claim that the Supreme Court decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System* abrogated this uniform precedent, claiming that "courts considering these issues after *Goldman* have refused to certify a class for failure to calculate class-wide damages based on far more robust analysis than Plaintiffs have offered here." Mot. at 7-8. Defendants make the same claim in their Opposition, contending that in "the post-*Goldman* world" courts in this Circuit not only "require" that Plaintiffs "put forward a damages model," but also "insist" that the model is "statistically robust" and "capable of isolating and quantifying the

---

[10] Indeed, courts have observed that "[a] close reading" of *Comcast* "makes it clear that the predominance analysis was specific to the antitrust claim at issue," *Neale v. Volvo Cars of N. Am., LLC,* 794 F.3d 353, 374 (3d Cir. 2015), and "was not in regard to a securities fraud litigation, which have generally been certified for class status," *In re Heckmann Corp. Sec. Litig.,* No. 10–378, 2013 WL 2456104, at *14 (D. Del. June 6, 2013); *see also City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ,* 322 F. Supp. 3d 676, 692 (D. Md. 2018) (*Comcast* "in no way announced a rule that plaintiffs in a securities fraud case must put forth any particular damages calculation methodology.").

[11] Every circuit to consider the issue agrees. *See AstraZeneca AB v. United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund (In re Nexium Antitrust Litig.),* No. 14-cv-1521, 2015 WL 265548, at *8, *10 (1st Cir. Jan. 21, 2015); *Neale,* 794 F.3d at 374–75; *In re Deepwater Horizon,* 739 F.3d 790, 815 (5th Cir. 2014); *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.,* 722 F.3d 838, 860 (6th Cir. 2013) (same) *Butler v. Sears, Roebuck and Co.,* 727 F.3d 796, 800 (7th Cir. 2013) (same); *Pulaski & Middleman, LLC v. Google, Inc.,* 802 F.3d 979, 987 (9th Cir. 2015) (same).

impact of the alleged wrongdoing on a class-wide basis." Opp. at 17; *see also id.* 3-4, 11, 17-20. But that

is simply untrue. To the contrary, before and after *Goldman,* every court in the Second Circuit continues

to recognize that *Comcast* sets a low bar, rejecting arguments that Plaintiffs must "provide a damages

model that is sufficiently specific for the court to 'understand, concretely, how plaintiffs propose to

reliably establish damages.'" *Vale*, 2022 WL 969724, at *6; *accord Martinek*, 2022 WL 326320, at *19

(rejecting argument that Plaintiffs' expert had "not adequately described his proposed model for meas-

uring class damages").[12] And Defendants do not cite a single case that suggests otherwise.[13]

---

[12] *Accord In re Allergan PLC Sec. Litig.*, No. 18-cv-12089, 2021 WL 4077942, at *15 (S.D.N.Y. Sept. 8, 2021) (McMahon, J.) (rejecting argument that similar "event study damages model" did not comply with *Comcast*); *see also Iowa Pub. Emp.' Ret. Sys. v. Bank of Am. Corp.*, , No. 17-cv-6221, 2022 WL 2829880, at *15 (S.D.N.Y. June 30, 2022) (Kahn, J.) (explaining in antitrust case that "[c]ourts have generally found *Comcast* 'to pose a low bar'" and that "[t]he Second Circuit has rejected a broad reading of *Comcast*"); *In re Namenda Indirect Purchaser Antitrust Litig.*, No. 15-cv-6549, 2022 WL 4298767, at *8 (S.D.N.Y. Sept. 19, 2022) (McMahon, J.) ("Defendants are reminded that, to the extent they are arguing that *Comcast* overturned the well-established rule in this Circuit that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification under Rule 23(b)(3),' they are wrong.") (citing *Roach*, 778 F.3d at 405); *In re Term Commodities Cotton Futures Litig.*, No. 12-cv-5126, 2022 WL 485005, at *6 (S.D.N.Y. Feb. 17, 2022) (explaining that "Plaintiffs are only required to demonstrate that "their damages stemmed from the defendant's actions that created the legal liability" and "the complexity of the damages calculation is not a sufficient bar to certification at this stage in the litigation") (citations omitted); *In re Aphria, Inc. Sec. Litig.*, No. 18-cv-11376, 2022 WL 3903373, at *4 (S.D.N.Y. Aug. 30, 2022) (certifying class where expert stated "my expert opinion that, while I have not been asked to quantify damages, the damages incurred by Aphria class members can be calculated on a class-wide basis through the widely accepted out-of-pocket method") (ECF No. 174 at *2); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 546–47 (S.D.N.Y. 2022) (certifying class where plaintiffs' expert opined that, while he had not done so, an "out of pocket method" would suffice to calculate damages on class-wide basis at later point along with a loss causation analysis) (ECF No. 220-21 at 24-26); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 579 F. Supp. 3d 520, 531–32 (S.D.N.Y. 2021) (same, *see* ECF No. 137 at 44-46).

[13] Not only are neither of the cases Defendants cite securities cases, but both rejected the argument that Defendants try to advance here. *Price v. L'Oreal USA, Inc.*, No. 17-cv-614, 2021 WL 4459115, at *6 (S.D.N.Y. Sept. 29, 2021) (decertifying class in consumer action after completion of discovery and explaining that "[c]lass certification was originally appropriate because [the expert's] proposed methodology *appeared to be capable* of measuring class-wide damages") (emphasis added); *Choi v. Tower Rsch. Cap. LLC,* No. 14-cv-9912, 2022 WL 4484485, at *9, *11 (S.D.N.Y. Sept. 27, 2022) (distinguishing unjust enrichment claims at issue with securities fraud cases that have "well-established methods of determining price artificiality" and reaffirming that "[a] class may be certified in spite of the need to make individualized damages determinations.").

More to the point, whether Plaintiffs' proposed damages methodologies satisfy *Comcast* has noth-

ing to do with whether they are reliable enough to be admissible. The admissibility inquiry under

*Daubert* turns on the reliability of Professor Mitts's "principles and methodology," not "the conclu-

sions that they generate." *Daubert*, 509 U.S. at 595. That is why courts routinely reject *Daubert* motions

that, like Defendants' here, seek exclusion of a damages expert's opinion based its substantive probity

under *Cocmast* or for other aspects of class certification rather than its admissibility under *Daubert*. *See,*

*e.g., Teva*, 2021 WL 872156, at *36 (denying *Daubert* motion that was "essentially duplicative of their

opposition to class certification" which concerned only the "weight" of an expert's opinion, not its

"admissibility"); *MacDougall v. Am. Honda Motor Co., Inc.*, No. 20-56060, 2021 WL 6101256, at *1 (9th

Cir. Dec. 21, 2021) (finding district court abused its discretion when it excluded expert's testimony

based on case law that considered only a survey method's "substantive probity…under *Comcast"* rather

than its "admissibility" under *Daubert*). Indeed, even one of Defendants' own cited cases, *Colangelo v.*

*Champion Petfoods USA,* rejected a similar attempt to rely on *Comcast* arguments to support a request to

exclude an expert opinion under *Daubert*. No. 18-cv-1228, 2022 WL 991518, at *8 & n.23 (N.D.N.Y.

Mar. 31, 2022) (denying motion to exclude and explaining that courts in the Second Circuit "regard

the inquiries under *Comcast* and *Daubert* as distinct").

Here, "every substantive point" made by Defendants and their expert are "presented mainly to

say that plaintiffs cannot establish…predominance for Rule 23 purposes," which "is a wholly different

question from admissibility." *In re Google Play Store Antitrust Litig.*, No. 21-md-02981, 2022 WL

17252587, at *7 (N.D. Cal. Nov. 28, 2022) (denying motion to exclude expert's damages opinion); *see*

*also Teva,* 2021 WL 872156, at *38 (denying motion to exclude event study because "Defendants' con-

ception of 'error rate' is erroneous because it is a legal question whether a particular security traded in

an efficient or inefficient market" and was "irrelevant to determining the admissibility of Dr. Tabak's

tests").[14] Defendants recycle each of their *Comcast* and *Goldman* arguments from their Opposition, often nearly verbatim and citing the same cases, as grounds to exclude Professor Mitts's opinions:

| Defendants' arguments in their Class Certification Opposition | Defendants' arguments in their Motion to Exclude |
|---|---|
| "Plaintiffs here do not even attempt to…put forward any damages model capable of calculating [damages]. Instead, they identify potential theories for calculating damages and claim…that those theories should be able to address…issues presented here." Opp. at 16-17, 23-24. | "Mitts…has made no attempt to [calculate damages on a class-wide basis], or even to prove that it could be done.…[I]nstead [Mitts] offer[s] only various hypothetical approaches that he believes may suffice at some point in the future."  Mot. at 7. |
| "Plaintiffs' hypothetical approach to calculating damages… creates a serious risk of double counting, which also precludes class certification here." Opp. at 8-9 (citing *Colangelo, In re Public Offering Antitrust Litig,* and *Price*). | "Plaintiffs must…put forward a damages methodology that…avoids double-counting.  Any proposed model or methodology that fails to do so must be excluded." Mot. at 8-9 (citing *Colangelo, In re Public Offering Antitrust Litig,* and *Price*). |
| "Plaintiffs have not only failed to proffer an actual event study, but have also failed to identify [a corrective disclosure] to demonstrate that an event study *can* be conducted. In such circumstances, it cannot be said that Plaintiffs have met the relatively exacting standard for class certification articulated by the Supreme Court in *Goldman*." Opp. at 20 (citing *Flag Telecom Holdings* and *Central States*). | "Not only has Mitts failed to proffer an event study… he has also failed to identify a corrective disclosure and to explain how he can undertake an event study without a corrective disclosure…. Courts routinely reject damages methodologies…that fail to identify a corrective disclosure." Mot. at 11-12 (citing *Flag Telecom Holdings* and *Central States*). |
| "Plaintiffs offer no way to separate…allegedly manipulative hedging activity from other trading and market forces.…This critical failure requires the denial of Plaintiffs' bid to certify the Manipulation Class." Opp. at 24-25 (citing *Freeland*). | "[Mitts] makes no attempt to distinguish such legitimate hedging activities…from actual manipulative hedging activities…This failure…is fatal to Mitts's approach." Mot. at 14-15 (citing *Freeland*). |

None of the arguments or authority that Defendants rely on are relevant to the reliability of Professor

Mitts's methods, much less show that they are "junk science" or otherwise so unreliable to be

---

[14] *See also Suchanek v. Sturm Foods, Inc.*, No. 11-cv-565, 2017 WL 3704206, at *9 (S.D. Ill. Aug. 28, 2017) (rejecting *Daubert* motion that "repeat[ed] the same exact argument" raised to oppose class certification); *Dzielak v. Whirlpool Corp.*, No. 12-cv-0089, 2017 WL 1034197, at *13 (D.N.J. Mar. 17, 2017) (same); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015) (same).

inadmissible. Most of the cases Defendants cite either denied a *Daubert* motion or did not involve one;[15] other cases involved irrelevant expert opinions in individual tort and copyright cases, antitrust class actions, and criminal proceedings.[16] And the two cases Defendants cite that did involve an expert's opinion at class certification are not remotely similar to the one at issue here.[17]

In short, this is not a *Daubert* motion but an unauthorized supplemental brief in opposition to class certification. Defendants do not argue that Professor Mitts's opinions rest on unreliable methods or principles, but instead recycle their flawed arguments that those opinions are insufficiently detailed to satisfy *Comcast* because they do not include the inputs required to conduct a full loss causation analysis. Even if those arguments had merit —and they do not—they are "without merit for the

---

[15] *See Price*, 2021 WL 4459115 (decertifying class after discovery and denying *Daubert* motion as moot); *Colangelo*, 2022 WL 991518, at *10 (granting summary judgment, and denying class-certification and *Daubert* motions as moot); *In re Pub. Offering Antitrust Litig.*, No. 98-cv-7890, 2004 WL 350696, at *1 (S.D.N.Y. Feb. 25, 2004) (dismissing antitrust claims for lack of standing on unrelated grounds); *C. States, S.E. and S.W. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 Fed. Appx. 72, 73 (2d Cir. 2013) (affirming dismissal of complaint on unrelated grounds); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (affirming order granting certification in part, finding in-and-out trader did not meet adequacy requirement).

[16] *See Zwillinger v. Garfield Slope Housing Corp.*, No. 94-cv-4009, 1998 WL 623589, at *17 (E.D.N.Y. Aug. 17, 1998) (excluding toxicity expert on summary judgment in individual tort action for negligent carpet installation); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010) (excluding trial expert in individual copyright and trade dress infringement action); *Freeland v. AT & T Corp.*, 238 F.R.D. 130, 145 (S.D.N.Y. 2006) (denying class certification; expert's opinion previously excluded in part on summary judgment); *U.S. v. Whitman*, 555 Fed. Appx. 98, 101 (2d Cir. 2014) (affirming partial exclusion of trial experts on industry jargon and trading).

[17] In *LIBOR-Based Financial Instruments Antitrust Litigation*, the district court excluded the expert's four models because they were "rife with inconsistencies," were "internally inconsistent," "inconsistent" with another plaintiff's expert's "opinions," and "inconsistent with…plaintiffs' own allegations." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 489. In *Freddie Mac*, the district court did not credit the testimony of an expert's market efficiency testimony, a significantly more demanding evidentiary requirement at class certification, because the expert submitted multiple event studies that contained "several significant errors," including miscalculations and inclusion of dates outside the class period, and the second study involving a changed methodology, concluding the plaintiffs' expert's "analysis changed so many times in important ways and was so internally inconsistent that I found it unreliable and unpersuasive." *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012).

purposes of a *Daubert* motion." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 430–31 (S.D.N.Y. 2014) (rejecting objections to expert's event study methodology because while the defendant "styled these arguments as part of a motion to strike expert testimony, its actual claim is that [the expert's] event study fails to prove that [the] stock traded on an efficient market"); *Teva*, 2021 WL 872156, at \*36 (explaining that "Defendants' *Daubert* motion is essentially duplicative of their opposition to class certification" and that "repetitiveness emphasizes" that their arguments "regard the weight I should afford the results, rather than their admissibility").

### A. Professor Mitts did not need to conduct a loss causation analysis or calculate damages on a class-wide basis to conclude that it could be done

Defendants claim that Professor Mitts's opinions should be excluded because "he has made no attempt to" conduct a loss causation analysis or calculate damages on a class-wide basis "or even to prove that it could be done." Mot. 7; *id.* at 10 (claiming that Professor Mitts merely "promises" that he will "eventually measure" damages with "an event study"). But it would put "the cart before the horse to insist" that "plaintiffs demonstrate that the proposed method will precisely and accurately prove their damages 'before any class can be certified.'" *Pub. Emp. Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, No. 16-cv-10632, 2020 WL 919249, at \*8 (N.D. Ill. Feb. 26, 2020). Even when "there are significant obstacles to proving damages," courts in the Second Circuit explain that "plaintiffs are not required to demonstrate either loss causation or damages for purposes of class certification." *Vale*, 2022 WL 122593, at \*19 (affirming reliability of similar out-of-pocket methodology even though expert had "not yet computed damages or conducted a loss causation analysis"). That is because conducting the out-of-pocket methodology "depends on the specific set of facts and circumstances for a given case and could incorporate information produced through discovery." Mitts Rep. at ¶ 81. Defendants' expert agrees, explaining in his report that he was "not suggesting that Dr. Mitts needs to perform a loss causation analysis at this stage" and the "actual calculation of damages, if any, is an issue for a

later phase." Hendershott Rep. at ¶¶ 55, 7 n.2. *See Martinek*, 2022 WL 326320, at *19 (rejecting argument that expert's opinion had "not yet computed damages or conducted a loss causation analysis," because that argument "goes to the issue of loss causation").

"This case comfortably complies with *Comcast*." *Teva*, 2021 WL 872156, at *42 (certifying class and approving of similar expert opinion describing out-of-pocket methodology). Although Professor Mitts "has not yet computed damages or conducted a loss causation analysis, the model he outlines is similar in operation and detail to ones that have regularly been approved by other courts in this circuit." *Vale.*, 2022 WL 122593, at *19. Professor Mitts detailed how his proposed out-of-pocket methodology would measure the amount of inflation and deflation of XIV Notes by using standard and well-accepted methods, such as event studies, regression models, and other valuation tools. Mitts Rep. at ¶¶ 84, 86. Because these methods all depend solely on information "common to the class as a whole," Professor Mitts could readily conclude that his proposed methodologies could calculate damages on a class-wide basis. Mitts Tr. at 132:22-133:11. Courts routinely approve of similar descriptions of damages methodologies in securities cases, finding them sufficient under both *Comcast* and *Daubert*. *Vale,* 2022 WL 969724, at *6. (concluding that defendants' objections that expert did not "specify any valuation tools or methods" was "contrary to the many recent in-circuit cases concluding that damages models very similar to the one offered here were sufficiently concrete and detailed to pass muster at the class certification stage"); *Utesch v. Lannett Co., Inc.*, No. 16-cv-5932, 2021 WL 3560949, at *16 (E.D. Pa. Aug. 12, 2021) (denying motion to exclude similar expert opinion).

Defendants nonetheless contend that more is required "in a case like this one," Mot. at 7, claiming that Professor Mitts needed to prove that his proposed methodologies could and how they would address the "complex" issues presented here, Opp. at 16-17. "Other than their own self-serving statements, however, Defendants have failed to substantiate these [claims] with empirical or academic evidence." *Iowa Pub. Employees' Ret. System*, 2022 WL 2829880, at *23. To be clear, Professor Mitts states

that Defendants' expert "is overstating the difficulty and complexity of the event study analysis." Mitts Rebuttal Rep. at ¶ 21. But "the complexity of the damages calculation is not a sufficient bar to certification at this stage in the litigation." *Cotton Futures Litig.*, 2022 WL 485005, at *6. It is true that this case is "intricate," but that is no different than "many securities fraud actions," *Vale,* 2022 WL 122593, at *19, and the "complexities" that Defendants identify are all issues "common to the class as a whole." Mitts Tr. 132:22-133:1. *See Martinek*, 2022 WL 326320, at *19 (rejecting argument that expert's damages model was insufficient under *Comcast* because the "model fails to account for certain confounding information" that "could complicate the damages analysis in this case").

### B. Professor Mitts did not need to conduct a loss causation analysis by identifying corrective disclosures or disaggregating confounding information at class certification

Defendants contend that Professor Mitts's proposed methodologies are unreliable because he has not identified a "corrective disclosure" that could be analyzed by an event study or explain how his methodologies would disaggregate confounding factors. Mot. at 3, 12-14. But Defendants mischaracterize the Complaint and Professor Mitts's report and testimony.

To begin with, the Complaint alleges a materialization of the risk, not a corrective disclosure. Complaint at ¶ 259; *see also id.* at ¶¶ 171-202, 257-63. Not only did Defendants' expert admit that he did not "spend a lot of time thinking about" what qualifies as a corrective disclosure, he admitted that he did not even examine whether Plaintiffs identified a materialization of the risk. *See supra* at 9. *Pfizer*, 819 F.3d at 659 (district court abused its discretion because its "rationale for excluding" expert's testimony rested on "misapprehension" the plaintiffs' "theory of the case"). Neither Defendants nor their expert dispute that an event study could calculate damages on a class-wide basis by measuring the price decline after a materialization of the risk. And, as Professor Mitts explained, when and whether that materialization of the risk occurred is "not plaintiff-specific" and "common to the class as a whole" and thus "whenever that date is determined to be, the losses can be calculated at the level

of the class." Mitts Dep. at 132:22-133:11. Defendants do not say otherwise.[18]

Further, Professor Mitts explained in detail how his proposed methodologies would account for "confounding factors," including by "examining the effect of the alleged hedging activity on the price after controlling for the expected level of volatility." Mitts Rebuttal Rep. at 37; Mitts Dep. at 125:15-18. And as Professor Mitts's explained, the application of such methodology "is ultimately a formulaic calculation that can be applied class-wide and does not turn on any single Plaintiffs' trading activity." Mitts Dep. at 125:15-22. Similarly, Professor Mitts explained how he would "disentangle" the price impact of manipulative activity from other market factors by using detailed, deanonymized data recently produced by the CBOE. Mitts Rebuttal Rep. at ¶ 23.[19] And Defendants' expert concedes that he cannot "rule out" that Professor Mitts's proposed methodology could adequately disentangle manipulative activity from other trading activity. See supra at 2.

Courts routinely reject arguments that plaintiffs "must address each misrepresentation at issue and tie it to the corresponding corrective disclosures" or disaggregate "confounding information" as a "loss causation argument in disguise," Vale, 2022 WL 122593, at *19; Martinek, 2022 WL 326320, at *19 (rejecting argument that expert's damages model "fails to account for certain confounding

---

[18] None of the cases Defendants cite had anything to do with "damages methodologies," much less support the proposition that courts "routinely reject" methodologies that fail to "identify a corrective disclosure." See Flag Telecom. 574 F.3d 29, 39 (2d Cir. 2009) (holding an investor who sold his shares months before the corrective disclosures could not be an adequate and typical representative of the class); C. States, S.E. and S.W. Areas Pension Fund v. Fed. Home Loan Mortg. Corp., 543 Fed. Appx. 72, 77 (2d Cir. 2013) (affirming dismissal for failure to plead loss causation).

[19] Defendants also argue that Professor Mitts's opinion regarding "the impact of Credit Suisse's alleged manipulative hedging" was improper because he relied on the allegations in the Complaint to understand Credit Suisse's hedging activity. But Professor Mitts did not offer any opinion as to the impact of Credit Suisse's alleged manipulative activity. Mitts Dep. 31:13-16. Nor did Professor Mitts need to do so. Robroy Industries-Texas, LLC v. Thomas & Betts Corp., No. 15-cv-512, 2017 WL 1319553, at *4 (E.D. Tex. Apr. 10, 2017) (explaining that it is a principle "beyond serious challenge" that a damages expert is "allowed to assume liability and address only the issue of damages").

information that "could complicate the damages analysis in this case").[20] Indeed, courts have also "rejected the suggestion that an event study is incapable of disaggregating the effects of confounding information. Were it otherwise, nearly every securities fraud class action would fail." *Allergan*, 2021 WL 4077942, at *15 (quoting *Signet*, 2019 WL 3001084, at *20) (alterations adopted); *Vale,* 2022 WL 122593, at *18 (explaining that "an event study, capable of 'disaggregating' 'confounding information disclosed in the numerous purported corrective disclosures'—is 'the generally accepted method for measuring damages in a securities fraud class action'") (quoting *Signet*, 2019 WL 3001084, at *19-20). Likewise, courts refuse to exclude damages methodologies on similar grounds, because such arguments "go to the weight, not the sufficiency of the evidence." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015) (refusing to exclude event study because disputes about construct of the event study "go to the weight, not the sufficiency of the evidence"); *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. Aug. 15, 2014) (finding concerns about event study went to weight, not admissibility, because "an expert who is conducting an event study necessarily must use his or her discretion to define selection criteria that are conducive to the execution of a meaningful multivariate regression analysis"). Defendants do not cite a single case suggesting otherwise.[21]

---

[20] *Purple Mt. Tr. v. Wells Fargo & Co.*, No. 18-cv-03948, 2022 WL 3357835, at *5–6 (N.D. Cal. Aug. 15, 2022) ("Wells Fargo's suggestion that Steinholt has not described how his methodology will disaggregate the effects of dismissed claims, confounding information, or changing knowledge or circumstances, is not a bar to certification.").

[21] Neither of the cases Defendants cite are securities cases or even class actions, and are not remotely relevant to the damages opinions at issue here. *Zwillinger*, 1998 WL 623589, at *1 (toxic tort case brought by an individual in which the expert testified about the toxicity of allegedly deficient and negligent carpeting); *R.F.M.A.S, Inc. v. So.,* 748 F. Supp.2d 244, 249 (2010) (copyright and trade dress infringement action brought by an individual).

**C. Professor Mitts's proposed methodologies do not create a "risk of double counting damages"**

Defendants contend that Professor Mitts's Section 10(b) damages opinion "must be excluded" because it "fails to account for the risk of double-counting damages across the Misrepresentation and Manipulation Classes." Mot. 1-2, 8-9. But that argument misunderstands the boundaries of the two classes specifically and the out-of-pocket methodology generally. Credit Suisse first artificially inflated the price of XIV Notes through their misrepresentations. The Misrepresentation Class suffered damages because they bought XIV Notes at that artificially inflated price and then sold when the price declined after the risk concealed by Defendants' misrepresentations had materialized. Then, after the artificial inflation had dissipated, Credit Suisse's manipulative activity artificially deflated the price of XIV Notes even further. The Manipulation Class suffered damages because they were forced to sell at that artificially deflated price. "There is," as Professor Mitts points out, "only one unmanipulated, uninflated price of XIV Notes." Mitts Rebuttal Rep. at ¶ 42. "It is mathematically impossible for a price to be inflated or deflated simultaneously," because "[i]f the price of XIV Notes is above the unmanipulated, uninflated price of XIV Notes, it is inflated, and if the price of XIV Notes is below the unmanipulated, uninflated price of XIV Notes, it is deflated." Mitts Rebuttal at ¶ 42. But for any given investor, the out-of-pocket methodology, by definition, ensures that they can recover only "the difference between the artificial inflation in the price of the XIV Notes at the time of purchase and the artificial inflation in the price at the time of sale." Mitts Rebuttal Rep. at ¶ 52; Mitts Rep. at ¶¶ 76. Defendants' contrary review, as their expert's deposition makes clear, does not identify a flaw in the out-of-pocket methodology, but a flaw in their expert's understanding of it. *See supra* at 10-15.

At any rate, Defendants' expert's speculation that Professor Mitts's methodologies *might* need to account for double counting in no way undermines Professor Mitts's opinion that those methodologies can be used to calculate damages on a class-wide basis. After all, "even if this case had only one

plaintiff who bought only one share," it would still be necessary "to figure out the same issue: whether there is a quantifiable difference between the two theories of liability, and if so, how much of the price drop is attributable to [one theory] as opposed to the [other]." *Menaldi v. Och-Ziff Cap. Mgt. Grp. LLC*, 328 F.R.D. 86, 98–99 (S.D.N.Y. 2018) (Oetken, J.). Defendants' expert admits as much, contending that there would be a "risk of double counting" even if this case involved only one plaintiff who bought and sold XIV Notes before and after February 5, 2018. Hendershott Rep. at ¶ 88. "Litigating this case on a classwide basis does not make this problem more or less difficult to solve," because "[t]he answer for the class will be the same as the answer for the hypothetical lone plaintiff." *Menaldi*, 328 F.R.D. at 98–99. Defendants thus do not point out "some fatal dissimilarity" among class members, but at most "a fatal similarity—an alleged failure of proof as to the element of the plaintiffs' cause of action." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 470 (2013). That argument, even if plausible, creates no barrier to class certification and provides no reason to doubt Professor Mitts's opinions, much less to exclude them. And Defendants offer no argument or authority suggesting otherwise.[22]

## CONCLUSION

For these reasons, Defendants' motion to exclude the Section 10(b) damages opinions of Professor Joshua Mitts, Ph.D. should be denied in its entirety.

---

[22] None of Defendants' cited cases remotely support their "double counting" argument. *See Colangelo,* 2022 WL 991518, at *10 (denying *Daubert* motion despite expert's failure to "clearly articulate" how his unrelated survey methodology could calculate damages for "a combination of misrepresentation and omissions claims" was "not enough to render [the expert's] approach inadmissible"). *Price,* 2021 WL 4459115, at *6 (decertifying class after close of discovery in consumer class action involving unrelated survey methods); *In re Pub. Offering Antitrust Litig.,*. 2004 WL 350696, at *6 (dismissing antitrust complaint after concluding that plaintiffs were "indirect purchasers" and were thus barred from bringing an antitrust lawsuit under the *Illinois Brick* rule).