**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SET CAPITAL LLC, et al.,

          Plaintiff,

      v.

CREDIT SUISSE GROUP AG, et al.,

          Defendants.

1:18-cv-02268 (AT) (SN)

---

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE PROPOSED EXPERT OPINIONS OF JOSHUA MITTS

CAHILL GORDON & REINDEL LLP
    Herbert S. Washer
    David G. Januszewski
    Sheila C. Ramesh
    Adam S. Mintz
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam, and David R. Mathers*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT ................................................................................................................................ 3

I.      *DAUBERT* APPLIES AT THE CLASS CERTIFICATION STAGE ................................. 3

II.     MITTS'S DAMAGES METHODOLOGIES MUST BE TIED TO PLAINTIFFS' THEORIES OF LIABILITY ............................................................................................................. 6

III.    MITTS FAILS TO ACCOUNT FOR INTER-CLASS CONFLICTS BETWEEN THE MISREPRESENTATION AND MANIPULATION CLASSES ................................................... 8

IV.     MITTS'S METHODOLOGY FOR MEASURING THE MISREPRESENTATION CLASS'S DAMAGES REMAINS UNSOUND AND UNRELIABLE ..................................... 10

V.      MITTS'S METHODOLOGY FOR MEASURING THE MANIPULATION CLASS'S DAMAGES REMAINS UNSOUND AND UNRELIABLE ....................................................... 13

CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Barrick Gold Sec. Litig.*,
    314 F.R.D. 91 (S.D.N.Y. 2016) .............................................................................................8

*Bozick* v. *Conagra Foods, Inc.*,
    2021 WL 1198320 (S.D.N.Y. Mar. 30, 2021) .........................................................................11

*Burford Capital Limited* v. *London Stock Exchange Group plc.*,
    [2020] EWHC 1183 (Comm)....................................................................................................1

*CBF Industria de Gusa S/A* v. *AMCI Holdings, Inc.*,
    2021 WL 4190628 (S.D.N.Y. Aug. 18, 2021) .......................................................................11

*Choi* v. *Tower Research Capital LLC*,
    2022 WL 4484485 (S.D.N.Y. Sept. 27, 2022)..........................................................................7

*Comcast Corp.* v. *Behrend*,
    569 U.S. 27 (2013)....................................................................................................................6

*Cyberlux Corp.* v. *AJW Partners, LLC*,
    2008 WL 11513151 (S.D.N.Y. Mar. 17, 2008) ......................................................................11

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).........................................................................................................*passim*

*Development Specialists, Inc.* v. *Weiser Realty Advisors LLC*,
    2012 WL 242835 (S.D.N.Y. Jan. 24, 2012) .............................................................................6

*In re Federal Home Mortgage Corp. (Freddie Mac) Sec. Litig.*,
    281 F.R.D. 174 (S.D.N.Y. 2012) ..............................................................................................5

*Fernandez* v. *UBS AG*,
    2018 WL 4440498 (S.D.N.Y. Sept. 17, 2018)....................................................................6, 13

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*,
    141 S. Ct. 1951 (2021)...........................................................................................................2, 6

*Kurtz* v. *Costco Wholesale Corp.*,
    818 Fed. App'x 57 (2d Cir. 2020)............................................................................................4

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
    299 F. Supp. 3d 430 (S.D.N.Y. 2018)...................................................................................4, 5

*Louisiana Municipal Police Employees Retirement System* v. *Green Mountain Coffee Roasters, Inc.*,
2017 WL 3149424 (D. Vt. July 21, 2017) ................................................................................8

*Martínek* v. *AmTrust Financial Services, Inc.*,
2022 WL 326320 (S.D.N.Y. Feb. 3, 2022) ..........................................................................6, 7

*Menaldi* v. *Och-Ziff Capital Management Group LLC*,
328 F.R.D. 86 (S.D.N.Y. 2018) ...............................................................................................8

*Nimely* v. *City of New York*,
414 F.3d 381 (2d Cir. 2005) ....................................................................................................9

*In re Petrobras Sec. Litig.*,
312 F.R.D. 354 (S.D.N.Y. 2016), *affirmed in part, vacated in part*, 862 F.3d
250 (2d Cir. 2017) ....................................................................................................................8

*Pirnik* v. *Fiat Chrysler Automobiles, N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ...........................................................................................7, 8

*Price* v. *L'Oréal USA, Inc.*,
2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021) ......................................................................13

*Royal Park Investments SA/NV* v. *Bank of New York Mellon*,
2019 WL 652841 (S.D.N.Y. Feb. 15, 2019) .....................................................................7, 10

*Royal Park Investments SA/NV* v. *Wells Fargo Bank, N.A.*,
2018 WL 1831850 (S.D.N.Y. Apr. 17, 2018) ..........................................................................7

*Scott* v. *Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) ...............................................................................................5

*Strougo* v. *Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................................................8

*In re U.S. Foodservice Pricing Litig.*,
729 F.3d 108 (2d Cir. 2013) .....................................................................................................5

*In re Vale S.A. Sec. Litig.*,
2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) .......................................................................6, 7

*Wal-Mart Stores, Inc.* v. *Dukes*,
564 U.S. 338 (2011) ..................................................................................................................4

*Wilson* v. *LSB Industries Inc.*,
2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) .........................................................................8

**Secondary Authorities**

7AA Charles A. Wright et al., *Federal Practice & Procedure* § 1785 (3d ed. 2022) ............................................................................................................................5

1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 3:14 (19th ed. 2022) ..........................5

**Rules**

Fed. R. Evid. 702 ..................................................................................................................*passim*

Defendants Credit Suisse Group AG, Credit Suisse AG and Credit Suisse International (collectively, "Credit Suisse") and Tidjane Thiam and David R. Mathers (together with Credit Suisse, "Defendants") respectfully submit this reply memorandum of law in further support of their motion to exclude the proposed expert opinions of Professor Joshua Mitts, Ph.D. ("Mitts") (ECF 204) pursuant to Federal Rule of Evidence 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*").[1]

## PRELIMINARY STATEMENT

Plaintiffs concede in their Opposition that Mitts has not presented a viable damages methodology for either the Misrepresentation Class or Manipulation Class. They also fail to address the numerous other inconsistencies and omissions that Defendants identified in their moving papers. Despite Plaintiffs' claims to the contrary, as in *Burford Capital*, Mitts's proposed methodologies simply cannot be accepted because they are "fundamentally flawed" and contain "unjustified" conclusions. Declaration of Herbert S. Washer ("Washer Decl.") Ex. 3 (*Burford Capital Limited* v. *London Stock Exchange Group plc.*, [2020] EWHC 1183 (Comm)) ¶¶ 95, 121. Plaintiffs' failure to demonstrate that Mitts's report satisfies the strict standards set forth in Federal Rule of Evidence 702 and *Daubert* renders his opinion inadmissible.

Unable to defend Mitts's damages methodology, Plaintiffs argue instead that the *Daubert* standard does not apply at class certification and that any defects in his hypothetical models should not be considered until later in the proceedings because they overlap with merits issues. But these arguments reveal the weakness of Plaintiffs' position. They also ignore the Supreme Court's

---

[1] Unless otherwise noted, Defendants adopt the same defined terms as in their opening brief. Memorandum of Law in Support of Defendants' Motion to Exclude the Proposed Expert Opinions of Joshua Mitts ("*Daubert* Mot.") (ECF 205). Further, unless otherwise stated, internal citations and quotations are omitted and emphasis is added.

specific instruction in *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*, 141 S. Ct. 1951, 1960–61 (2021) ("*Goldman*") that courts must "determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits." Indeed, courts routinely reject damages approaches, like those proposed by Mitts here, that lack a sound and reliable methodology for resolving the complex issues raised by this case.

*First*, Mitts has not provided a methodology capable of navigating the risk of double-counting damages across the Misrepresentation and Manipulation Classes. Faced with his inability to address this critical issue, Mitts attempts to sidestep it, claiming that he need not address it because the artificial inflation alleged by the Misrepresentation Class had fully dissipated before Defendants caused the deflation alleged by the Manipulation Class. But this position collapses under scrutiny. Plaintiffs allege that the very same event — the February 5, 2018 price drop — caused the damages for both classes. It is obvious that the same event cannot cause the alleged inflation to completely disappear and then later cause the alleged deflation. Mitts has not provided any viable alternative basis for addressing this problem.

*Second*, Mitts has not offered a sound and reliable damages model (or even a viable approach to the creation of a model) for the Misrepresentation Class. Most fundamentally, Mitts has failed to identify a corrective disclosure, which is necessary to run his proposed event study. In light of this critical flaw, Plaintiffs have revised their entire theory of damages, claiming for the first time that they have actually pled a "materialization of the risk" theory of damages. But, in reality, Plaintiffs neither pled that theory nor mentioned it in any of their opening motion papers. As a result, they cannot assert it now. Regardless, even if they could, it would not cure Mitts's failure to provide a reliable method of calculating damages for the Misrepresentation Class because

neither Plaintiffs nor Mitts have identified, as they must, any new information that "materialized" on February 5.

*Third*, Mitts also does not provide a viable model for measuring the Manipulation Class's damages. Plaintiffs allege that Credit Suisse manipulated the market for XIV Notes through its hedging activities but, at the same time, concede that Credit Suisse and others in the market also had a legitimate basis to hedge their XIV investments. Mitts, however, offers no way to differentiate manipulative hedging from legitimate hedging. Although he claims that data produced by the Chicago Board Options Exchange ("Cboe") solves this problem, it does not. In fact, the Cboe data demonstrates that the vast majority of trading during the relevant time period was done by other market participants, which caused Credit Suisse to hedge to protect itself from that trading activity, not to manipulate XIV Notes.

Mitts's total failure to provide any testable or verifiable basis for any conclusions relating to the calculation of damages for the proposed Misrepresentation and Manipulation Classes requires their exclusion.

## ARGUMENT

## I.   *DAUBERT* APPLIES AT THE CLASS CERTIFICATION STAGE

Unable to defend Mitts's analysis on the merits, Plaintiffs argue that the *Daubert* standard should not apply at the class certification stage.[2]   Lead Plaintiffs' Memorandum of Law in

---

[2] Plaintiffs' claim that Defendants' *Daubert* motion is an "unauthorized supplemental brief in opposition to class certification" is disingenuous. *Daubert* Opp. at 23–24. Defendants' motion appropriately seeks to exclude certain of Mitts's opinions regarding his purported damages models for the Misrepresentation and Manipulation Classes because they are unsupported by sound and reliable methods.  Similarly, Plaintiffs and Mitts repeatedly mischaracterize Hendershott's opinions and testimony to suit their own purposes. Hendershott's reports and testimony speak for themselves and should be considered without Plaintiffs' and Mitts's unsupported spin. For example, Plaintiffs and Mitts criticize Hendershott for testifying that the type of analysis that would be required would be "very hard" for a graduate student. *Daubert* Opp. at 10.  But

Opposition to Defendants' Motion to Exclude the Proposed Expert Section 10(b) Damages Opinions of Professor Joshua Mitts, Ph.D. ("Opposition" or "*Daubert* Opp.") (ECF 221) at 15. Plaintiffs are wrong.  They rely on *dicta* in a non-precedential decision, *Kurtz* v. *Costco Wholesale Corp.*, 818 Fed. App'x 57, 62 n.3 (2d Cir. 2020), to support the position that an expert report need not "be admissible under Federal Rule of Evidence 702 and *Daubert*" at the class certification stage.  In so arguing, they overlook the fact that because the parties in *Kurtz* did not dispute that the expert report must be admissible under Federal Rule of Evidence 702 and *Daubert* at the class certification stage, the Second Circuit actually *applied* those standards in *Kurtz*.  Indeed, as Plaintiffs' own authority confirms, courts routinely apply the *Daubert* standard to expert reports at the class certification stage.[3]  *See, e.g.*, *Daubert* Opp. at 15 (citing *In re LIBOR*, 299 F. Supp. 3d at 470, 471 (concluding that "expert evidence submitted at the class certification stage is subject to the *Daubert* standard" and "disputes between experts must be resolved if necessary to the Rule 23 analysis")).  Even the Supreme Court has recognized that *Daubert* analysis is appropriate at class certification.  *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 354 (2011) (doubting the district court's determination that *Daubert* did not apply at the class certification stage); *see also In re LIBOR*, 299 F. Supp. 3d at 470 (reading *Wal-Mart* as "suggesting that a *Daubert* analysis may be

_____

Hendershott's testimony is clear that this was an illustration and the analysis would be "very hard" even for the most sophisticated economist.  Washer Decl. Ex. 1 (Deposition transcript of Terrence Hendershott, Ph.D. ("Hendershott Tr.")) at 105:13–16; 116:14–16 ("I would think this would be very hard.  If I had a graduate student who was proposing trying to do this, I might encourage them to do something else because it's really hard. . . .  I would offer the same advice to a co-author who has a Ph.D.").

[3] In any event, even if *Daubert* somehow did not apply at class certification (and it does), whether Plaintiffs have submitted a reliable damages model is still relevant to the Rule 23 analysis.  *See, e.g.*, *In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 470–71 (S.D.N.Y.  2018).

required at least in some circumstances" and finding it to be "the only discussion of [the issue] by the Supreme Court of which we are aware" and, therefore, consider it "to be persuasive authority").

While Plaintiffs argue that there is no need to apply *Daubert* here because it is intended to prevent jury confusion and there is no jury at the class certification stage, Plaintiffs ignore that evidence must nonetheless be admissible in order to be considered at the class certification stage. *See, e.g.*, *In re U.S. Foodservice Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (holding that the District Court "effectively fulfil[ed] its gatekeeping function under *Daubert*" by considering the admissibility of expert testimony at the class certification stage); *see also In re LIBOR*, 299 F. Supp. 3d at 470 (reading Second Circuit case law as requiring the application of the *Daubert* standard). As a result, the evidence on which they rely must satisfy the rigorous *Daubert* standard. *Scott* v. *Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 55 (S.D.N.Y. 2016) ("[T]rial courts in [the Second Circuit] often subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to Rule 23 class certification analysis."); *In re Federal Home Mortgage Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012) (relying on *Daubert* to preclude plaintiffs' expert at class certification stage). Several leading treatises have reached the same conclusion. 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 3:14 (19th ed. 2022) ("[T]he Court should determine under the *Daubert* standard whether expert evidence is sufficiently reliable to be considered and then weigh the significance of expert evidence relevant to any class certification requirement, even if the court's determination overlaps with the merits."); 7AA Charles A. Wright et al., *Federal Practice & Procedure* § 1785 (3d ed. 2022) ("Several courts of appeals . . . have ruled that if plaintiff's expert testimony is challenged on class certification, the trial court must find that that testimony satisfies the standard for the admissibility of scientific evidence set out by the Supreme Court in *Daubert* v. *Merrell Dow Pharmaceuticals,*

*Inc.*, before ruling on certification. It is not sufficient for the court simply to determine that the testimony could evolve into something admissible by the time of trial.").

Plaintiffs also argue, again, that any deficiencies with Mitts's proposed methodologies are really merits issues that should not be considered at class certification. *Daubert* Opp. at 27–28. But *Goldman* made clear that any incidental overlap between a merits issue and a class certification issue is not a basis to defer its resolution. 141 S. Ct. at 1960–61 ("[A] court has an obligation before certifying a class to determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits."). As discussed at length in the Opposition, courts can and do reject plaintiffs' damages models at the class certification stage. Unsurprisingly, none of Plaintiffs' cases contravene this uncontroversial point. Instead, each of them addresses far more typical financial instruments and markets that do not implicate the complex issues raised here by the complex market for XIV Notes. *See In re Vale S.A. Sec. Litig.*, 2022 WL 969724, at \*7 (E.D.N.Y. Mar. 31, 2022) (involving American Depositary Shares and debt securities); *Martínek* v. *AmTrust Financial Services, Inc.*, 2022 WL 326320, at \*19 (S.D.N.Y. Feb. 3, 2022) (involving a preferred stock owner).

## II.   MITTS'S DAMAGES METHODOLOGIES MUST BE TIED TO PLAINTIFFS' THEORIES OF LIABILITY

To satisfy Federal Rule of Evidence 702 and *Daubert*, Mitts's opinions must be relevant for the purpose for which they are being submitted. *See Development Specialists, Inc.* v. *Weiser Realty Advisors LLC*, 2012 WL 242835, at \*8 (S.D.N.Y. Jan. 24, 2012). Here, in order to succeed on a bid for class certification, Mitts's method for measuring damages must be tied to Plaintiffs' theory of liability. *See Comcast Corp.* v. *Behrend*, 569 U.S. 27, 35 (2013) ("*Comcast*") ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."); *see also Fernandez* v. *UBS AG*, 2018 WL 4440498, at \*21–

23 (S.D.N.Y. Sept. 17, 2018) (denying class certification where proposed damages model failed to measure class's injury). Plaintiffs concede that Mitts has not done so here and, instead, claim that a promise to do so in the future is sufficient to support their bid for class certification. This approach is insufficient under *Comcast* and *Goldman*.

Plaintiffs cite a litany of cases for the proposition that "*every* court in the Second Circuit continues to recognize that *Comcast* sets a low bar, rejecting arguments that Plaintiffs must provide a damages model that is sufficiently specific for the court to understand, concretely, how plaintiffs propose to reliably establish damages" and claim that were this Court to find to the contrary it would "stand alone." *Daubert* Opp. at 2, 19–20. But Plaintiffs ignore that courts routinely reject plaintiffs' damages models at the class certification stage. *See Choi* v. *Tower Research Capital LLC*, 2022 WL 4484485, at *12 (S.D.N.Y. Sept. 27, 2022) (denying class certification because the damages model presented "deep, conceptual problems, akin to the challenge in *Comcast*"); *Royal Park Investments SA/NV* v. *Bank of New York Mellon*, 2019 WL 652841, at *8 (S.D.N.Y. Feb. 15, 2019) (holding that "[b]ecause [Plaintiffs'] common damages model still requires the resolution of many individualized inquiries in order to compute a potential class member's damages, it cannot support a finding of predominance."); *Royal Park Investments SA/NV* v. *Wells Fargo Bank, N.A.*, 2018 WL 1831850, at *8 (S.D.N.Y. Apr. 17, 2018), *report and recommendation adopted*, 2018 WL 739580 (S.D.N.Y. Jan. 10, 2018) (denying class certification where "individualized inquiries necessary to distribute damages among investors, along with the individualized questions discussed [elsewhere], would dwarf the only common question identified in this case.").

Indeed, the cases on which Plaintiffs rely are inapposite. In many of them, the plaintiffs' experts detailed multi-step damages models.[4] In others, plaintiffs alleged run-of-the-mill

---

[4] *See Martínek*, 2022 WL 326320, at *15, 18; *In re Vale*, 2022 WL 969724, at *6; *Pirnik* v. *Fiat*

misrepresentation cases with clear misrepresentations, corrective disclosures, and well-established economic tools.[5]  These cases almost universally involve one homogenous class or, at most, two separate classes.  None seek to certify potentially overlapping classes with conflicting interests concerning a market and product as complex as the XIV Notes.  *See Daubert* Mot. at 2, 8–10.  In a complex securities case like this, a plaintiff cannot rely on an unsubstantiated promise that economic tools that work in run-of-the-mill securities cases will work here in some yet to be discussed way at some point in the future.  Instead, Plaintiffs must identify and explain the economic tools capable of actually calculating damages tied to each Class's theory of liability.  Plaintiffs and Mitts simply have not done that.

## III.   MITTS FAILS TO ACCOUNT FOR INTER-CLASS CONFLICTS BETWEEN THE MISREPRESENTATION AND MANIPULATION CLASSES

The Misrepresentation and Manipulation Classes pursue conflicting theories of damages, which require Plaintiffs to put forward a damages methodology that disentangles the alleged damages between the two classes and avoids double counting.  *Daubert* Mot. at 8–10; Opp. Br. at 14–15, 18–19.  Mitts claims that there is no need for such a methodology because after the artificial inflation had fully dissipated, Defendants manipulated the price of XIV down.  *Daubert* Opp. at 9, 29; Washer Decl. Ex. 5 (Rebuttal Report of Professor Joshua Mitts, Ph.D. in support of Plaintiffs' Motion for Class Certification ("Mitts Rebuttal Report")) ¶ 41.

---

*Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 47 (S.D.N.Y. 2018); *Wilson* v. *LSB Industries Inc.*, 2018 WL 3913115, at *16–17 (S.D.N.Y. Aug. 13, 2018).

[5] *See, e.g.*, *Menaldi* v. *Och-Ziff Capital Management Group LLC*, 328 F.R.D. 86, 98–99 (S.D.N.Y. 2018); *Wilson*, 2018 WL 3913115, at *16–17; *Pirnik*, 327 F.R.D. at 47–48; *Louisiana Municipal Police Employees Retirement System* v. *Green Mountain Coffee Roasters, Inc.*, 2017 WL 3149424, at *6–7 (D. Vt. July 21, 2017); *In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104–07 (S.D.N.Y. 2016); *Strougo* v. *Barclays PLC*, 312 F.R.D. 307, 313, 327 (S.D.N.Y. 2016); *In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 371–72 (S.D.N.Y. 2016), *affirmed in part, vacated in part*, 862 F.3d 250 (2d Cir. 2017).

This opinion is inadmissible because it lacks the required "rigorous analytical connection between that methodology and [Mitts's] conclusions." *Nimely* v. *City of New York*, 414 F.3d 381, 396 (2d Cir. 2005). As a threshold matter, Mitts's conclusion makes no sense because Plaintiffs claim that the same manipulation that caused the artificial inflation to dissipate also caused the February 5 liquidity squeeze (*i.e.*, the alleged price deflation). Washer Decl. Ex. 4 (Mitts Rebuttal Report) ¶ 6. That alleged squeeze only took place once, between 4 p.m. and 4:15 p.m., according to Plaintiffs. Br. at 8–9. It is simply not possible for it to have occurred once for purposes of the Misrepresentation Class and to have then occurred again for purposes of the Manipulation Class. Plaintiffs are simply seeking to recoup the same alleged harm twice on behalf of two different classes, and Mitts has not offered a rigorous analytical approach to resolve this problem. *See* Washer Decl. Ex. 2 (Expert Sur-Reply Report of Terrence Hendershott, Ph.D. ("Hendershott Sur-Reply Report")) ¶ 4.

Mitts further claims that there cannot be a risk of double counting here because "there is only one unmanipulated, uninflated price of XIV Notes." Washer Decl. Ex. 4 (Mitts Rebuttal Report) ¶ 42. But the same problem remains: he has not provided a viable methodology for demonstrating that. The two proposed classes have two different theories of damages, each of which, Plaintiffs claim, damaged each class separately. Mitts has not identified a viable method to confirm that the two theories will yield a single "unmanipulated, uninflated" price. Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶¶ 28–29.

Doubling down on Mitts's failure to provide a viable methodology, Plaintiffs argue that double counting is not a barrier to class certification because the issue would exist even if this were an individual action. That is simply not true. The interests of each class member will vary depending on when they bought or sold their XIV Notes. *See* Washer Decl. Ex. 2 (Hendershott

9

Sur-Reply Report) ¶¶ 25–30.[6] Seeking damages on behalf of a large class of investors only compounds the problem and creates countless individualized issues unsuitable for treatment as a class. *See Bank of New York Mellon*, 2019 WL 652841, at *8 (denying class certification where expert's damages model would ultimately require "the resolution of many individualized inquiries.").

Moreover, even if the predominance concern could be addressed, a damages methodology that does not remove inter-class conflicts creates serious issues regarding the adequacy of the proposed class representatives. A class representative cannot fairly and adequately represent multiple classes, each with competing interests. Opp. Br. at 14–16, 28. Plaintiffs have no answer to this, because there is none.

## IV. MITTS'S METHODOLOGY FOR MEASURING THE MISREPRESENTATION CLASS'S DAMAGES REMAINS UNSOUND AND UNRELIABLE

For similar reasons, Mitts's damages model for the Misrepresentation Class is inadmissible. Defendants demonstrated that without a corrective disclosure, Mitts's proposed damages model for the Misrepresentation Class falls apart. *Daubert* Mot. at 10–13. Plaintiffs concede in their Opposition that they do not allege a corrective disclosure. In an attempt to save

---

[6] For example, as Hendershott's report illustrates, an investor "in the Alleged Misrepresentation Class, who bought XIV Notes at the price of $109.68 at 9:30 am ET on February 5, 2018 and sold the notes at the price of $95.60 at 3:09 pm ET the same day [would have] . . . suffered a loss of $14.08 per share. Notably, [purchases of] VIX futures by Credit Suisse [that would have pushed down the price of XIV] took place after 3:09 pm ET on February 5, 2018. Therefore, it is hard to see how [she] can be a member of the Alleged Manipulation Class" since that manipulative trading is not alleged to have begun until 4 pm. Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶ 26. Nor is it clear how this investor could have suffered damages as a member of the Misrepresentation Class, since the price decline she experienced would have been the result of trading by others, not CS, and thus could not have been the result of the revelation of the "truth" – presumably, that CS was going to engage in manipulative trading between 4 pm and 4:15 pm. But presumably this investor will attempt to be included within the Misrepresentation Cass (since, as a matter of timing, she cannot be in the Manipulation Class) and will argue that CS's trading affected her class, rather than the Manipulation Class.

his doomed damages model, Mitts now claims that he was always relying on a "materialization of the risk" theory despite not once mentioning it in his opening papers.

In reality, Plaintiffs never pled a "materialization of the risk" theory.  That phrase, or its equivalent, is not used anywhere in the Complaint and the vague allegations Plaintiffs and Mitts cite are insufficient to put Defendants on notice of that theory of damages.[7]  *Cyberlux Corp.* v. *AJW Partners, LLC*, 2008 WL 11513151, at *3 (S.D.N.Y. Mar. 17, 2008) (finding that a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"). The Federal Rules of Civil Procedure do not "give a license to [a] disclosing party to offer a new theory out of time when the responding party has demonstrated that the disclosing party's initial theory is incorrect."  *Bozick* v. *Conagra Foods, Inc.*, 2021 WL 1198320, at *3 (S.D.N.Y. Mar. 30, 2021); *see also CBF Industria de Gusa S/A* v. *AMCI Holdings, Inc.*, 2021 WL 4190628, at *9 (S.D.N.Y. Aug. 18, 2021) ("[E]xperts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions.").

Regardless, Mitts's invocation of the "materialization of the risk" theory cannot save his fatally flawed damages model because, critically, Mitts cannot identify any new information that was "revealed" to the market on February 5, 2018.  Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶ 6. Mitts embraces Plaintiffs' claims, without support or explanation, that "the relevant truth' of Credit Suisse's alleged manipulation activities was *fully* revealed on February 5, 2018 even *before* such alleged manipulative trading *started*[.]"  *Id.* ¶ 7.  This analysis is based on the

---

[7] None of the Complaint allegations identified by Plaintiffs support their theory of risk materialization.  *See* Amended Complaint ("AC") (ECF 190) ¶ 259 (describing corrective disclosure); ¶¶ 171–202; 257–63 (alleging that Defendants made false and misleading statements as opposed to fraudulently concealing events that later came to light).

assertion that "Credit Suisse *first* artificially inflated the price of XIV through their false statements and *then, after* that artificial inflation had *dissipated*, manipulated it downwards past its natural price to an artificially low price." *Id.* (emphasis in original); Washer Decl. Ex. 4 (Mitts Rebuttal Report) ¶ 5.  Under this theory, it is not possible that new information was revealed *before* the liquidity squeeze that caused the alleged inflated price to disappear.

Mitts explained in his expert report that event studies are premised on a "corrective disclosure," Washer Decl. Ex. 5 (Expert Report of Professor Joshua Mitts, Ph.D. ("Mitts Report")) ¶ 86 ("Event studies measure price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations."), and that an event study may be used to "measure price reactions to corrective disclosures."  Washer Decl. Ex. 4 (Mitts Rebuttal Report) ¶ 8.  Mitts has failed to provide the critical first step necessary to this type of analysis: identifying a corrective disclosure.  Standard event studies identify the price response due to a publicized informational event by measuring price movements following the event.  Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶ 8.  Without a public disclosure, an event study has no value.

In the absence of a corrective disclosure or the disclosure of some new information, Mitts's event study becomes circular, attempting to measure a price decline that was caused by a price decline.  *Id.* ¶ 8 ("[T]his construct would be circular and anything but 'standard'"); *see also* ECF 206-4 (Expert Report of Terrence Hendershott, Ph.D. ("Hendershott Report")) ¶ 68.  Mitts takes for granted that the *ex post* price decline, allegedly attributed to actual alleged manipulation (*i.e.*, deflation), can also serve as a proxy for the *ex ante* discount attributed to alleged undisclosed risk of manipulation (*i.e.*, inflation).  Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶¶ 9–10.  He

provides no example from peer-reviewed literature to support this assertion. *Id*. ¶ 11. In fact, Mitts provides no basis whatsoever for this; it is pure and impermissible *ipse dixit*.

## V.   MITTS'S METHODOLOGY FOR MEASURING THE MANIPULATION CLASS'S DAMAGES REMAINS UNSOUND AND UNRELIABLE

Plaintiffs' Opposition also confirms that Mitts's damages model for the Manipulation Class is inadmissible. For Mitts's proposed model to work, it must be capable of distinguishing between legitimate and manipulative hedging. *Daubert* Mot. at 14–17; Opp. Br. at 25–26. Although Plaintiffs concede that Credit Suisse and other market participants had legitimate reasons for hedging their exposure to XIV Notes, Mitts has not offered any mechanism to distinguish legitimate hedging from illegitimate hedging. AC ¶¶ 3, 65; Hendershott Report ¶ 83; Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶ 17.

Mitts claims in his rebuttal report that the deanonymized trading data produced by Cboe will permit him to conduct this analysis. Washer Decl. Ex. 4 (Mitts Rebuttal Report) ¶¶ 22–23. But the Cboe data only further complicates this already challenging analysis. Specifically, as Professor Hendershott demonstrated in his rebuttal report, "the vast majority of VIX futures trading during the period of alleged manipulation was attributed to other market participants' activity, which could have induced additional hedging needs on Credit Suisse's part." Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶ 17. This confirms that Credit Suisse's hedging activities were driven by a need to protect itself from other market participants' trading in the VIX futures market, and not due to any purported scheme to manipulate XIV. Mitts's lack of a viable methodology for disentangling legitimate hedging from manipulative hedging renders his proposed model inadmissible. *See, e.g.*, *Fernandez*, 2018 WL 4440498, at *10, 21–22 (finding plaintiffs damages were not "capable of classwide resolution" because plaintiffs "propose[d] no damages model at all that is linked to their theory of liability"); *Price* v. *L'Oréal USA, Inc.*, 2021

WL 4459115, at *6 (S.D.N.Y. Sept. 29, 2021) (rejecting plaintiffs' expert's proposed damages methodology because there was no reliable data in the record to input into plaintiffs' expert's formula for class-wide damages).

Mitts claims that he can use Hendershott's studies and work in other cases to carry out the necessary analysis of distinguishing legitimate from manipulative hedging. But none of those studies provides the "rigorous analytical connection" to support Mitts's conclusion. For example, Mitts cites Hendershott's Price Pressures study (Washer Decl. Ex. 4 (Mitts Rebuttal Report) ¶ 28), but that study is inapplicable here. Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶ 18. The Price Pressures study analyzed price movements for NYSE-traded common stocks, which are not "part of a tightly interlinked system of financial products, such as VIX futures and S&P 500 options, as is the case for the XIV Notes." *Id.* ¶ 18. Mitts fails to explain how that study could be extended to "appropriately adjust[] for trading activity in interlinked markets like options and VIX futures both contemporaneously and in the past," which Mitts concedes is necessary for measuring the impact of manipulation. *Id.* ¶ 18; Washer Decl. Ex. 4 (Mitts Rebuttal Report) ¶¶ 26–28.

The same is true of Hendershott's expert report in *SEC* v. *Lek*. In *Lek*, Hendershott identified manipulative behavior in the form of spoofing or layering (where a trader places large orders on the opposite side of the market to attempt to improve the price of a trade) and assessed the impact on trade prices of that manipulative behavior. *See* Washer Decl. Ex. 6 (*SEC* v. *Lek Securities Corp.*, 17-cv-1789, Expert Report of Terrence Hendershott, Ph.D., (S.D.N.Y. Apr. 3, 2017)). Hendershott's methodology does not apply to isolating the impact of only the allegedly manipulative VIX futures trading by Defendants given other legitimate hedging activity by Credit Suisse and trading by other market participants. *See* Washer Decl. Ex. 1 (Hendershott Tr.) at 107:10–20.

14

For similar reasons, Mitts also cannot rely on the study reflected in the paper *Intraday Share Price Volatility and Leveraged ETF Rebalancing*.  Hendershott Report ¶¶ 81–82.  That study, at most, shows how hedging trades in VIX futures "affect the volatility of these future prices."  It does not show, as Mitts must, how allegedly manipulative trading would have increased or decreased the prices of VIX futures and XIV Notes, respectively, or how to distinguish legitimate from manipulative hedging.  Washer Decl. Ex. 2 (Hendershott Sur-Reply Report) ¶¶ 19–20; Washer Decl. Ex. 1 (Hendershott Tr.) at 92:10–21.

**CONCLUSION**

For the foregoing reasons and the reasons set forth in Defendants' opening brief, Defendants respectfully request that the Court exclude Mitts's opinions regarding a damages methodology for the Misrepresentation Class and the Manipulation Class.

Dated: January 31, 2023
New York, New York

**CAHILL GORDON & REINDEL LLP**

By: /s/ Herbert S. Washer
    Herbert S. Washer
    David G. Januszewski
    Sheila C. Ramesh
    Adam S. Mintz
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for the Credit Suisse Group AG,*
*Credit Suisse AG, Credit Suisse*
*International, Tidjane Thiam, and David*
*R. Mathers*