**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SET CAPITAL LLC, et al.,

                Plaintiff,

        v.

CREDIT SUISSE GROUP AG, et al.,

                Defendants.

1:18-cv-02268 (AT) (SN)

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE PROPOSED EXPERT OPINIONS OF JOSHUA MITTS

CAHILL GORDON & REINDEL LLP
Herbert S. Washer
David G. Januszewski
Sheila C. Ramesh
Adam S. Mintz
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam, and David R. Mathers*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................1

LEGAL STANDARD............................................................................................................4

ARGUMENT ....................................................................................................................7

    I.     MITTS FAILS TO ACCOUNT FOR INTER-CLASS CONFLICTS
          BETWEEN THE MISREPRESENTATION AND MANIPULATION
          CLASSES ............................................................................................8

    II.    MITTS'S METHODOLOGY FOR MEASURING THE
          MISREPRESENTATION CLASS'S DAMAGES IS UNSOUND AND
          UNRELIABLE ......................................................................................10

    III.   MITTS'S METHODOLOGY FOR MEASURING THE
          MANIPULATION CLASS'S DAMAGES IS UNSOUND AND
          UNRELIABLE ......................................................................................14

CONCLUSION.................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos* v. *National Railroad Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)...................................................................4-5, 13, 16

*Arista Records LLC* v. *Lime Group LLC*,
   2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...........................................................6

*Boucher* v. *U.S. Suzuki Motor Corporation*,
   73 F.3d 18 (2d Cir. 1996).......................................................................................14

*Central States, Southeast & Southwest Areas Pension Fund* v. *Federal Home*
   *Loan Mortgage Corporation*,
   543 F. App'x 72 (2d Cir. 2013) .............................................................................12

*Colangelo* v. *Champion Petfoods USA, Inc.*,
   2022 WL 991518 (N.D.N.Y. Mar. 31, 2022) ..........................................................8

*Comcast Corp.* v. *Behrend*,
   569 U.S. 27 (2013)................................................................................................4, 7

*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)........................................................................................*passim*

*Development Specialists, Inc.* v. *Weiser Realty Advisors LLC*,
   2012 WL 242835 (S.D.N.Y. Jan. 24, 2012) ............................................................6

*In re Federal Home Mortage Corp. (Freddie Mac) Sec. Litig.*,
   281 F.R.D. 174 (S.D.N.Y. 2012) ...........................................................................10

*Fernandez* v. *UBS AG*,
   2018 WL 4440498 (S.D.N.Y. Sept. 17, 2018).........................................................7

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   574 F.3d 29 (2d Cir. 2009)......................................................................................11

*Freeland* v. *AT&T Corporation*,
   238 F.R.D. 130 (S.D.N.Y. 2006) ...........................................................................14

*General Electric Company* v. *Joiner*,
   522 U.S. 136 (1997)................................................................................................16

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*,
   141 S. Ct. 1951 (2021).............................................................................................7

ii

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
   2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ...................................................4, 5, 7

*Kumho Tire Co.* v. *Carmichael*,
   526 U.S. 137 (1999) .................................................................................................5

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ....................................................................10

*Matthews* v. *Hewlett-Packard Company*,
   2017 WL 5459662 (S.D.N.Y. Dec. 22, 2017) ........................................................17

*Choi* v. *Tower Research Capital LLC*,
   2022 WL 4484485 (S.D.N.Y. Sept. 27, 2022) ..........................................................8

*Nimely* v. *City of New York*,
   414 F.3d 381 (2d Cir. 2005)...................................................................................5, 6

*Price* v. *L'Oreal USA, Inc.*,
   2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021)........................................................8, 9

*In re Public Offering Antitrust Litig.*,
   2004 WL 350696 (S.D.N.Y. Feb. 25, 2004) .............................................................9

*R.F.M.A.S., Inc.* v. *So*,
   748 F. Supp. 2d 244 (S.D.N.Y. 2010)......................................................................16

*Royal Park Investments SA/NV* v. *Deutsche Bank National Trust Company*,
   2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018)..........................................................18

*S.E.C.* v. *Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013)........................................................................9

*Scott* v. *Chipotle Mexican Grill, Inc.*,
   315 F.R.D. 33 (S.D.N.Y. 2016) .................................................................................4

*U.S. Information Systems Inc.* v. *International Brotherhood Of Electric Workers
   Local Union No. 3, AFL-CIO*,
   313 F. Supp. 213 (S.D.N.Y. 2004) ..........................................................................17

*United States* v. *Whitman*,
   555 F. App'x 98 (2d Cir. 2014) ...............................................................................14

*Wal-Mart Stores, Inc.* v. *Dukes*,
   564 U.S. 338 (2011).................................................................................................4

*Weisgram* v. *Marley Co.*,
   528 U.S. 440 (2000).................................................................................................6

iii

*Zwillinger* v. *Garfield Slope Housing Corp.*,
    1998 WL 623589 (E.D.N.Y. Aug. 17, 1998)...........................................................................13

**Rules**

Fed. R. Evid. 104 ...........................................................................................................................6

Fed. R. Evid. 702 ..................................................................................................................*passim*

Defendants Credit Suisse Group AG, Credit Suisse AG and Credit Suisse International (collectively, "Credit Suisse") and Tidjane Thiam and David R. Mathers (together with Credit Suisse, "Defendants") respectfully submit this memorandum of law in support of their motion to exclude the proposed expert opinions of Professor Joshua Mitts, Ph.D. ("Mitts").

## PRELIMINARY STATEMENT

Plaintiffs have moved to certify three separate classes: a Securities Act Class, a Misrepresentation Class, and a Manipulation Class.[1]  As set forth in Defendants' opposition to Plaintiffs' motion for class certification (*see* Declaration of Herbert S. Washer in Support of Defendants' Motion to Exclude the Proposed Expert Opinions of Joshua Mitts ("Washer Decl.") Ex. G ("Opp. Br." or "Opposition")), each of these classes is riddled with flaws that preclude its certification.  In support of their motion, Plaintiffs rely on the opinion of their proposed expert, Professor Joshua Mitts, Ph.D. ("Mitts").  *See* Washer Decl. Ex. A (Expert Report of Professor Joshua Mitts, Ph.D. on Plaintiffs' Motion for Class Certification, July 1, 2022, ECF 180-1 ("Mitts Report")).  Like Plaintiffs' motion for class certification, however, his opinion is rife with internal inconsistencies and fails to address critical, substantive issues.  Indeed, Mitts did not even attempt to offer a viable methodology to calculate damages for two of Plaintiffs' proposed classes.  These fundamental failures prevent Mitts from satisfying the strict standards of Rule 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"), and require the exclusion of his opinions from the Court's consideration.

*First*, Mitts fails to account for the risk of double-counting damages across the

---

[1] Unless otherwise noted, Defendants adopt the same defined terms as in Plaintiffs' brief (Lead Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, July 1, 2022, ECF 179) ("Br."). Defendants do not concede that these terms represent a fair or appropriate characterization of the matters described therein.  Further, unless otherwise stated, internal citations and quotations are omitted and emphasis is added.

Misrepresentation and Manipulation Classes.  The two classes assert overlapping and conflicting theories of misconduct.  The Misrepresentation Class claims that the price of XIV was inflated because of alleged misrepresentations regarding Credit Suisse's hedging activities.  The Manipulation Class, on the other hand, claims that the price of XIV was deflated because of Credit Suisse's hedging activities.  Although Mitts acknowledges the risk of double-counting in calculating damages here, he does not propose any solution for avoiding that risk.  *See* Washer Decl. Ex. B (Mitts Tr.) at 138:23–139:3.  Instead, he simply promises, without any justification or explanation, that his damages model for each class will not result in a double recovery.  This conclusory approach does not satisfy the exacting demands of *Daubert* and Rule 702.

*Second*, Mitts fails to provide a sound and reliable method for calculating the Misrepresentation Class's damages.  As a preliminary matter, he has not proposed *any* viable methodology relating to Plaintiffs' alleged theory of liability for calculating damages for the Misrepresentation Class.  Instead, he simply promises to undertake an event study at some point in the future.  But, as Mitts explained in his deposition, event studies are premised on the concept of a "corrective disclosure," or the moment in time when the market learns of a previously undisclosed misrepresentation or omission.  Washer Decl. Ex. B. (Mitts Tr.) at 129:22–130:21. The purpose of an event study is to demonstrate that the corrective disclosure, rather than other factors or market forces, caused a decline in the price of the subject asset.  *Id*.  The problem here is twofold:  (1) Plaintiffs have not identified a corrective disclosure, and (2) Mitts has not demonstrated that he has a sound and reliable method for calculating damages without a corrective disclosure.  *See* Washer Decl. Ex. B (Mitts Tr.) at 132:9–21.  These critical failures preclude any claim that Mitts will be able to calculate damages on a class-wide basis for the Misrepresentation Class and demonstrates the absence of any empirical basis for his claim to the contrary.

2

*Third*, Mitts also fails to provide a method for calculating class-wide damages for the Manipulation Class.  Once again, he not only fails to provide a viable methodology for determining damages, but also fails to engage with fundamental factors that a methodology would have to consider in order to calculate class-wide damages for the Manipulation Class.  Specifically, Plaintiffs allege that Credit Suisse manipulated the market for XIV by hedging its exposure to XIV via VIX futures, causing a decline in the price of XIV on February 5, 2018.  As Plaintiffs and Mitts acknowledge, however, there are a wide variety of other factors in addition to Credit Suisse's alleged manipulative trading that could have affected the price of XIV, including legitimate hedging activities by Credit Suisse or others in the market, as well as broader market forces.  Nonetheless, Mitts fails to offer any method to disentangle the price impact of any purported manipulation by Credit Suisse from these other benign explanations for the February 5 price decline.  Mitts's inability to demonstrate that he has any way of measuring the potential impact of Defendants' alleged misconduct on the price of XIV renders him unable to calculate damages on a class-wide basis for the Manipulation Class and requires the exclusion of his opinion.

This is not the first time that Mitts has submitted an opinion so lacking in intellectual rigor that it has been excluded by a Court.  Despite his limited experience as an expert witness—providing an expert opinion in only four cases before this one—a court in England rejected one of his opinions as unreliable, unsound, and speculative.  Washer Decl. Ex. C. (*Burford Capital Limited* v. *London Stock Exchange Group plc.*, [2020] EWHC 1183 (Comm) (the "*Burford Capital Ltd.* Decision")) ¶ 124.  The very same flaws require the exclusion of his opinion here.

Because Mitts's opinions regarding the calculation of damages for the proposed Misrepresentation and Manipulation Classes are completely devoid of any testable or verifiable

bases for his conclusions, they fail to satisfy the stringent standards established by *Daubert* and Rule 702 and should be excluded.

## LEGAL STANDARD[2]

A party seeking to rely on expert testimony in support of its motion for class certification bears "the burden of establishing . . . that the admissibility requirements under [Federal Rules of Evidence] Rule 702 are satisfied." *Scott* v. *Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43, 55 (S.D.N.Y. 2016) (recognizing that trial courts in the Second Circuit "often subject expert testimony to *Daubert*'s rigorous standards insofar as that testimony is relevant to Rule 23 class certification analysis."). That is because "class certification is a crucial inflection point in securities litigation— and requires a careful analysis of the Rule 23 factors." *IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 5815472, at \*22 (S.D.N.Y. Oct. 29, 2013) (holding *Daubert* hearing, precluding plaintiffs' expert, and denying class action certification in federal securities action). "A party seeking class certification must affirmatively demonstrate his compliance with Rule [23]," *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011), by taking a "close look at whether common questions predominate over individual ones." *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 34 (2013).

The Supreme Court has made clear that the district courts play a "gatekeeper" role regarding expert testimony, charging them with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" by rigorously examining the data and methodology underlying the proffered expert opinions. *Amorgianos* v. *National Rail*

---

[2] So as not to burden the Court with factual background with which it is already familiar, Defendants respectfully refer the Court to the background set forth in its October 14, 2022 opposition to Plaintiffs' motion for class certification, which Defendants adopt and incorporate here.

*Road Passenger Corp.*, 303 F.3d 256, 265, 267 (2d Cir. 2002).  "Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case."  *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 158 (1999); *see also IBEW Local 90 Pension Fund*, 2013 WL 5815472, at *12  ("A trial court is tasked with the responsibility of weeding out proffered expert opinions which do not meet certain required standards.").

The burden placed upon Plaintiffs is well-established.  For expert testimony to be admissible, the expert must be qualified, and the testimony must be deemed both reliable and relevant.  *See Daubert*, 509 U.S. at 579, 588–89; *Nimely* v. *City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).  Under Rule 702, an expert's testimony is permitted only if (i) the expert is qualified "by knowledge, skill, experience, training, or education," (ii) the testimony is based on sufficient facts or data, (iii) the testimony is the product of reliable principles and methods, and (iv) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702. In considering the reliability of expert opinions, *Daubert* sets forth a non-exhaustive list of factors to consider, including whether the theory or technique: (1) is testable; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error; (4) is guided by standards controlling its operation; and (5) has gained general acceptance in the relevant scientific community.  *Daubert*, 509 U.S. at 593–95.  The Supreme Court has stated that these *Daubert* factors are not to be used as a "definitive checklist," but rather should be thought of as non-exclusive considerations that may guide the trial judge's "flexible" inquiry under Rule 702.  *Id*. at 594.

Additionally, the Supreme Court has explained that "[s]cientific methodology today is based on generating hypotheses and testing them" so "a key question" as to considering an expert's

5

opinion is whether the expert's proffered theories or techniques "can be (and has been) tested." *Id*. at 593.

The Supreme Court has stressed that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that "there is simply too great an analytical gap between the data and the opinion proffered." *Arista Records LLC* v. *Lime Group LLC*, 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011). Expert testimony must satisfy "exacting standards of reliability," *Weisgram* v. *Marley Co.*, 528 U.S. 440, 455 (2000), and should be excluded when the expert's methodology or conclusions are "speculative or conjectural." *Arista Records*, 2011 WL 1674796, at *4.

"[T]he Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions." *Nimely*, 414 F.3d at 396. "The reliability inquiry is context-specific, and the question before the Court is 'not the reasonableness [of the expert's methodology] *in general*,' but rather 'the reasonableness of using such an approach . . . to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*.'" *Development Specialists, Inc.* v. *Weiser Realty Advisors LLC*, 2012 WL 242835, at *8 (S.D.N.Y. Jan. 24, 2012) (alteration in original).

The relevance prong requires the court to determine whether the expert's opinions "fit" the case at hand and thereby "assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 591–92; *see also* Fed. R. Evid. 104. "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Arista Records*, 2011

WL 1674796, at *4; *IBEW Local 90 Pension Fund*, 2013 WL 581547, at *12 (granting a *Daubert* motion where an expert's proffered work was "methodologically flawed").

## ARGUMENT

Before a class can be certified, Plaintiffs must set forth a method for measuring damages tied to their theory of liability. *See Comcast*, 569 U.S. at 35 ("[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory."); *see also* Opp. Br. at Sections II.B, III.B. Without one, Plaintiffs "cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23[]." *Comcast*, 569 U.S. at 35; *see also Fernandez* v. *UBS AG*, 2018 WL 4440498, at *21–23 (S.D.N.Y. Sept. 17, 2018) (denying class certification where plaintiffs' damages model failed to measure the proposed class's injuries).

Although Mitts claims that he can calculate damages on a class-wide basis, he has made no attempt to do so, or even to prove that it could be done. He has not articulated any viable method for calculating damages tied to any of Plaintiffs' theories of liability, and instead offered only various hypothetical approaches that he believes may suffice at some point in the future. This approach—essentially, expert opinion via speculation—fails. Plaintiffs are obligated in a case like this one, where there are serious questions of inter-class conflicts, loss causation, and damages, to provide a sound and reliable methodology capable of calculating damages on a class-wide basis *before* a class can be certified. Plaintiffs' claims to the contrary are premised on case law that pre-dates the Supreme Court's decision in *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021) ("*Goldman*"), which specifically held that "[a] court has an obligation before certifying a class to determin[e] that Rule 23 is satisfied, even when that requires inquiry into the merits." *Id.* at 1960–61. Courts considering these issues after *Goldman* have

refused to certify a class for failure to calculate class-wide damages based on far more robust analysis than Plaintiffs have offered here. *See, e.g.*, *Price* v. *L'Oreal USA, Inc.*, 2021 WL 4459115, at *6 (S.D.N.Y. Sept. 29, 2021) ("Plaintiffs have not provided the necessary evidence for [Plaintiffs' expert's] formula to suffice, and Plaintiffs' proposal that each class member can use [the expert's] formula to prove his or her own damages is not enough to satisfy their burden of proving class-wide damages."); *Choi* v. *Tower Research Capital LLC*, 2022 WL 4484485, at *12 (S.D.N.Y. Sept. 27, 2022) (denying class certification post-*Goldman* where "none of the[] flaws in [plaintiffs' expert's] damages model can be remedied with a simple, mechanical tweak to his methodology" and issues with the model presented "deep, conceptual problems, akin to the challenge in *Comcast*").

Not only has Mitts not created a viable model, he has not even identified a sound and reliable method for calculating damages. His opinions and testimony on those subjects must, therefore, be excluded. And, without a sound and reliable method for measuring damages for either class, neither the Misrepresentation nor Manipulation Class can be certified.

## I.   MITTS FAILS TO ACCOUNT FOR INTER-CLASS CONFLICTS BETWEEN THE MISREPRESENTATION AND MANIPULATION CLASSES

As set forth in Defendants' Opposition, the proposed Misrepresentation and Manipulation Classes advance overlapping and conflicting theories of damages. *See* Opp. Br. at Sections II.A, III.A. Plaintiffs must, therefore, put forward a damages methodology that disentangles the damages alleged by each proposed class and avoids double-counting. *Colangelo* v. *Champion Petfoods USA, Inc.*, 2022 WL 991518, at *10 (N.D.N.Y. Mar. 31, 2022) (recognizing that, in a case alleging both fraudulent misrepresentation and fraud by omission, damages calculations for omissions and misrepresentations "cannot simply be added" without "obvious[ly]" double counting). Any proposed model or methodology that fails to do so must be excluded, as courts

have squarely rejected this form of "double recovery." *See In re Public Offering Antitrust Litig.*, 2004 WL 350696, at *7 (S.D.N.Y. Feb. 25, 2004) ("[T]he Court in this case is faced with exactly the type of double recovery the Supreme Court sought to avoid in *Illinois Brick*, two separate plaintiffs suing for the exact same injury."); *Price*, 2021 WL 4459115, at *6 ("Plaintiffs have not provided the necessary evidence for [Plaintiffs' expert's] formula to suffice, and Plaintiffs' proposal that each class member can use [the expert's] formula to prove his or her own damages is not enough to satisfy their burden of proving class-wide damages.").

Mitts acknowledges the risk of double-counting across the two proposed classes (Mitts Report ¶ 78; Washer Decl. Ex. B. (Mitts Tr.) at 138:23–139:3), but fails to provide a sound and reliable methodology that avoids that risk. Instead, he describes two separate ways in which he plans to calculate damages for each class and then, without any reasoning or analysis, asserts that those methods will not result in double counting. *See* Washer Decl. Ex. B (Mitts Tr.) at 31:7–16, 32:25–33:2, 127:1–132:4; Washer Decl. Ex. A (Mitts Report) ¶ 78. This is pure *ipse dixit* and is inadmissible. *See S.E.C.* v. *Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) ("The law is clear that mere ipse dixit is not appropriate expert testimony because it is not based on reliable methodology, as *Daubert* requires.").

As Professor Terrence Hendershott, Ph.D demonstrates in his report, however, there is a significant risk of double-counting here. Washer Decl. Ex. D (October 14, 2022 Expert Report of Terrence Hendershott, Ph.D. ("Hendershott Report") ¶ 55. Mitts's abstract discussion of how to apportion damages to avoid double recovery is "untethered" from the issue of damages calculation for classes with mutually-conflicting theories of liability. Washer Decl. Ex. D (Hendershott Report) ¶¶ 90–91 ("In other words, Dr. Mitts fails to demonstrate that his proposed damages methodologies for the two classes avoid [double recovery]; he merely asserts that there will be no

double recovery without any explanation of a mechanism that will ensure that is the case."). The end result is "two independent models [that] could result in estimated damages across the two classes exceeding 100% of the XIV Notes price decline." *Id.* ¶ 90.

In the absence of any sound and reliable method for accounting for the risk of double-counting, Mitts's report and testimony on this issue must be excluded. *In re LIBOR-Based Finicial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 478 (S.D.N.Y. 2018) (excluding expert opinion where, inter alia, expert's models were "internally inconsistent"); *In re Federal Home Mortgage Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012) (Plaintiffs' expert found "unreliable and unpersuasive" where expert's analysis was "internally inconsistent").

## II.   MITTS'S METHODOLOGY FOR MEASURING THE MISREPRESENTATION CLASS'S DAMAGES IS UNSOUND AND UNRELIABLE

Rather than present a sound and reliable model to calculate the damages of the Misrepresentation Class, Mitts promises that he will eventually measure the class's damages by conducting an event study. But, again, he does not support that speculation with any substantive analysis. As Mitts explained at his deposition, an event study is a method of analysis intended to demonstrate that an alleged misrepresentation, rather than other factors, caused the price of a security to decline. In order to execute an event study, a party must identify a corrective disclosure when the truth of a misrepresentation is revealed in order to measure the alleged price impact of the misrepresentation. Washer Decl. Ex. B (Mitts Tr.) at 130:17–21 ("So what we really have to do is show . . . that the truth has been revealed and that the truth caused losses, net of all the other factors that could explain a price decline."), 129:9–21; Washer Decl. Ex. A (Mitts Report) ¶¶ 85–56.

Not only has Mitts failed to proffer an event study connected to the Misrepresentation Class's theory of liability, he has also failed to identify a corrective disclosure and to explain how

he can undertake an event study without a corrective disclosure.[3]  *See* Washer Decl. Ex. B (Mitts

Tr.) at 132:9–21 ("Q: Do you have a view as to when, if or when a corrective disclosure occurred

in this case?  A: No, I haven't yet—I haven't at all, actually.  I haven't been asked to evaluate that

question.  Even when thinking, as we have been discussing so far, about how one might answer

that question, I haven't formed a view as to when a corrective disclosure occurred."); Washer Decl.

Ex. A (Mitts Report) ¶¶ 81, 85–86.  Because Mitts has not provided any substantive explanation

of his proposed approach for calculating damages for the Misrepresentation Class, it is impossible

for the Court to determine if his damages methodology (1) is testable; (2) has been subjected to

peer review and publication; (3) has a known or potential rate of error; (4) is guided by standards

controlling its operation; or (5) has gained general acceptance in the relevant scientific community,

as required by *Daubert* and Rule 702.  *Daubert*, 509 U.S. at 593–95.

Courts routinely reject damages methodologies for misrepresentation-based classes that

fail to identify a corrective disclosure.  *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d

29, 41 (2d Cir. 2009) (plaintiffs could not establish loss causation where they "fail to connect the

decline in the price of [the security] to any corrective disclosures as required by the second prong

of *Lentell*."); *see also Central States, Southeast & Southwest Areas Pension Fund* v. *Federal Home*

---

[3] It is entirely possible that no such disclosure ever occurred. Mitts conceded at his deposition that it was
public knowledge that Credit Suisse's hedging activities created a risk of the events that occurred on
February 5, 2018.  Washer Decl. Ex. B (Mitts Tr.) at 158:7–159:4 ("WASHER: Is it fair to summarize what
the author is saying here is that, again, over a long enough period of time, as you point out, that it is a,
quote/unquote, eventual inevitability that XIV will experience an Event Acceleration?  MITTS: Yeah. . . .
[T]hat is my understanding of the author's argument that there would be an Event Acceleration.").  Plaintiffs
themselves have attested the same.  Washer Decl. Ex. E (Set Capital Tr.) at 73:18–75:2; *see also id*. at
74:17–75:2 ("*[W]ith relative unsophisticated math and assessment . . . somebody could have predicted
that exactly what happened would happen . . .* for somebody that has a general understanding of liquidity
in the markets, they could have looked at this product and sa[id] that . . . there was a very good likelihood
. . . that at a certain point, such as what happened on February 5th, that there could have been a liquidity
crisis and that that liquidity crisis would have fed upon itself and resulted in exactly what happened.").

*Loan Mortgage Corporation,* 543 F. App'x 72, 76 (2d Cir. 2013) (finding Plaintiffs failed to show loss causation because they could not "plausibly allege a causal connection between the drop of the share price and the information revealed in the corrective disclosures").   As Professor Hendershott explains in his report, observing price changes after a corrective disclosure is "not a reliable proxy for an *ex ante* 'risk discount,' and Dr. Mitts has not described any approach to account for the degree of understatement of the risk or described how to measure the 'risk discount' that would have prevailed but-for the alleged misrepresentations."   Washer Decl. Ex. D (Hendershott Report) ¶ 53.

Nor has Mitts suggested any other mechanism for determining whether the price of XIV dropped on February 5, 2018 because of the alleged misrepresentations or, instead, because of other factors.  *See* Washer Decl. Ex. D (Hendershott Report) ¶ 57.  These other factors include, *inter alia*, (1) market-wide exogenous factors, (2) hedging by other market participants,[4] and (3) Credit Suisse's alleged manipulation.   Disentangling legitimate price changes caused by normal market conditions from the purported price impact of the alleged misrepresentations is necessary in order to measure the Misrepresentation Class's alleged damages.  Washer Decl. Ex. D (Hendershott Report) ¶¶ 84, 85.

Professor Mitts acknowledged as much at his deposition.  Washer Decl. Ex. B (Mitts Tr.) at 130:2–9; 130:22–131:2 ("So even in the situation where the price was inflated on the day of the misstatement, it would be necessary to show that the truth was revealed and the price declined net of all the other factors that could drive the price decline" because "the price decline accompanying

---

[4] Mitts also failed to propose a viable methodology that considers other trading (beyond hedging) by other market participants that could also affect the price of VIX futures.  *See* Washer Decl. Ex. D (Hendershott Report) ¶ 54.

the corrective disclosure itself may also be subject to changed economic circumstances, investor expectations, industry or firm-specific facts, conditions or other events which, taken separately or together, account for the decline on the date of the corrective disclosure.") These alternative explanations could have caused XIV's price decline, and are wholly unaccounted for in Mitts's proposed methodology. Washer Decl. D (Hendershott Report) ¶ 54 ("Critically, however, Dr. Mitts fails to provide a methodology that can distinguish impact attributed to alleged manipulative trading from other effects that include non-manipulative trading by Credit Suisse, trading by other market participants, or the impact of macroeconomic factors.").

As in other reports that Mitts has submitted in other matters, the Mitts Report lacks care "in formulating his basic propositions," is "fundamentally flawed," and contains "unjustified" conclusions. Washer Decl. Ex. C (*Burford Capital Ltd.* Decision) ¶¶ 95, 97, 121. In the absence of any discussion of how he would separate the price change that can be attributed to the alleged misrepresentations from other benign contributing factors, any model or opinion based on Mitts's proposed methodology would have an unacceptably high rate of error and inaccuracy. *See Zwillinger* v. *Garfield Slope Housing Corp.*, 1998 WL 623589, at *17 (E.D.N.Y. Aug. 17, 1998) (excluding expert testimony where there are "aspects of [the] study which suggest that [the expert's] work may suffer from a high potential rate of error").

Because Mitts fails to provide a sound and reliable method for measuring damages caused by the alleged misstatements, his opinions on this topic must be excluded. *Amorgianos*, 303 F.3d at 266 ("[W]hen an expert opinion is based on . . . methodology . . . that [is] simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

### III.   MITTS'S METHODOLOGY FOR MEASURING THE MANIPULATION CLASS'S DAMAGES IS UNSOUND AND UNRELIABLE

For similar reasons, Professor Mitts's opinions regarding a damages model for the Manipulation Class should also be excluded.

First, he fails to provide a methodology that considers whether and how certain obvious and fundamental factors beyond Credit Suisse's alleged manipulation would have affected the price of XIV.  *See Boucher* v. *U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (noting that "expert testimony should be excluded if it is speculative or conjectural").

Mitts concedes that hedging is a common practice among issuers and market participants to balance their exposure.  Washer Decl. Ex. B (Mitts Tr.) at 31:7–16.  But he makes no attempt to distinguish such legitimate hedging activities, which are necessary to balance a portfolio, from actual manipulative hedging activities.  In fact, he provides no methodology whatsoever to assess whether any portion of Credit Suisse's trading was actually manipulative.  *United States* v. *Whitman*, 555 F. App'x 98, 102 (2d Cir. 2014) (finding that a court may not rely on the unexplained assumptions of an expert and accept a makeshift, subjective methodology that cannot be tested); *Freeland* v. *AT&T Corporation,* 238 F.R.D. 130, 144–45 (S.D.N.Y. 2006) (failure to control for important variables rendered regression analysis "essentially worthless" and therefore inadmissible).

This is striking in light of Plaintiffs' own allegations about other factors affecting the price of XIV.  For example, Plaintiffs allege that Credit Suisse had a legitimate business purpose for hedging its exposure to XIV (AC ¶¶ 3, 65) and that Credit Suisse disclosed to the market that it hedged its exposure to XIV (AC ¶¶ 217, 226).

Similarly, Plaintiffs allege that many other market participants, including issuers of other products tied to the VIX futures indices, will have traded and/or hedged in the VIX futures market.

14

*See*, *e.g.*, AC ⁋ 68 ("Importantly, virtually all VIX-related ETP issuers engaged in such hedging activities and, thus, during large market movements these issuers simultaneously bought VIX futures to hedge their positions."). Mitts himself acknowledged that hedging activity is a widely-recognized and common practice among derivative issuers. Washer Decl. Ex. B. (Mitts Tr.) at 31:7–12 ("most derivatives issuers will hedge their exposure").

Mitts makes no attempt to distinguish the impact of this legitimate trading from the alleged impact of Credit Suisse's allegedly manipulative trading. *See* Washer Decl. Ex. B (Mitts Tr.) at 31:14–16 ("I have not conducted an analysis of Credit Suisse's hedging activities in this case."), 36:16-19 ("I have no independent information that I acquired in other means who may or may not have been hedging in the market for XIV or VIX futures during this time."); Washer Decl. Ex. D (Hendershott Report) ⁋ 72 ("Dr. Mitts provides no methodology that could account for any impact on the price of the XIV Notes resulting from other, legitimate hedging or trading activity by *any* market participants on February 5, 2018.").

Professor Mitts also fails to account for other trading and informational market forces that affected the price of XIV. For example, Professor Hendershott demonstrates that market participants could have calculated the intraday indicative value—which reflects the economic value of XIV (Washer Decl. Ex. F (Jan. 29, 2018 Pricing Supplement) at PS-7)—from generally available market information. Washer Decl. Ex. C (Hendershott Report) ¶ 22.

This failure to disentangle, or even consider, the many forces bearing on the price of XIV notes is fatal to Mitts's approach. *See R.F.M.A.S., Inc.* v. *So*, 748 F. Supp. 2d 244, 270–71 (S.D.N.Y. 2010) (excluding expert report that failed to rule out alternative causes in a company's decline in sales); *see also Amorgianos*, 303 F.3d at 267 (finding that *Daubert* requires that "an expert's analysis be reliable at every step" because "any step that renders the analysis unreliable

under the *Daubert* factors renders the expert's testimony inadmissible") (quoting *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)); *General Electric Company* v. *Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.").

Second, Mitts also does not consider Credit Suisse's actual hedging position when reaching his conclusions.  Washer Decl. Ex. B (Mitts Tr.) at 31:13–16 ("[I]n my report, and in connection with this testimony, I have not conducted an analysis of Credit Suisse's hedging activities in this case.").  Instead, he relied exclusively on the allegations in the Complaint and conversations with Plaintiffs' counsel as the basis for his understanding of Credit Suisse's hedging activity.  *See* Washer Decl. Ex. A (Mitts Tr.) at 32:10-19; *see also id.* at 34:7–14 ("WASHER: So outside of conversations with counsel, have you done any work to review and analyze any Credit Suisse trading activity in connection with the XIV notes?  MITTS: No.").

But the allegations and assumptions on which Mitts exclusively relies have been proven false.  For example, Plaintiffs allege that Credit Suisse purchased approximately 105,000 contracts on February 5, 2018.  AC ¶ 8.  The record has proven that allegation to be demonstrably false, as Credit Suisse purchased only 6,919 futures contracts between 4:00 pm and 4:15 pm on that day.  Washer Decl. Ex. D (Hendershott Report) ¶ 34.  Therefore, Mitts's opinion regarding the impact of Credit Suisse's alleged manipulative hedging relies on no "more than Plaintiff's own opinion on [the] issue, without the benefit of any additional or independent analysis." *Matthews* v. *Hewlett-Packard Company*, 2017 WL 6804075, at *4 (S.D.N.Y. Dec. 22, 2017) (finding that, where an expert's opinion is "based on little more than Plaintiff's own opinion on [the] issue, without the benefit of any additional or independent analysis," the expert's opinion is not reliable); *see also*

*U.S. Information Systems Inc.* v. *International Brotherhood Of Electric Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 227 (S.D.N.Y. 2004).

One court has already rejected Mitts's opinions on similar grounds.  In the *Burford Capital Ltd.* Decision, the plaintiff alleged that the decrease in its share price was the result of market manipulation.  Washer Decl. Ex. C.  In order to support that claim, the plaintiff relied on an expert opinion from Mitts, who analyzed trading data and observed certain patterns of repeated placing and cancelling of orders within a short time frame that he concluded provided strong evidence of market manipulation.  *Id.* at ¶¶ 59, 61.  The court, however, disagreed, finding that Mitts's "data analysis [left] Burford, and the court, in the dark as to whether [illegal market manipulation] might really have occurred; the case that it did is speculative."  *Id.* at ¶¶ 124, 126.  Justice Baker held that the patterns identified by Mitts were consistent with any number of "lawful execution strategies . . . that might be adopted in the face of a rapidly moving price target" and wrote that Mitts's reasoning on this point was "overly simplistic."  *Id.* at ¶ 93.  Ultimately, Justice Baker wrote: "There is an inherent weakness in any claim that a case can be built upon Mitts's analysis, namely that there is no true control for comparison. . . . All that data analysis of the sort undertaken by Prof Mitts can ever claim to do is identify quantitatively measurable features or patterns in the data." *Id.* at  ¶ 71.  The same unsubstantiated analysis is featured in Mitts's analysis here.

Because Mitts has not provided a damages model capable of reliably determining the effect of the alleged manipulative activities on the price of XIV, this court should exclude Mitts's opinions regarding a damages model for the Manipulation Class.  *See Royal Park Investments SA/NV* v. *Deutsche Bank National Trust Company*, 2018 WL 1750595, at *6 (S.D.N.Y. Apr. 11, 2018) (recognizing that courts should "focus on the principles and methodology employed by the expert" and exclude the expert's testimony if those principles and methodology are unreliable).

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court exclude Mitts's

opinions regarding a damages methodology for the Misrepresentation Class and the Manipulation

Class.

Dated: October 14, 2022
      New York, New York

CAHILL GORDON & REINDEL LLP

By: /s/ Herbert S. Washer
Herbert S. Washer
David G. Januszewski
Sheila C. Ramesh
Adam S. Mintz
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
djanuszewski@cahill.com
sramesh@cahill.com
amintz@cahill.com

*Attorneys for the Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam, and David R. Mathers*

18