# Exhibit B

Page 1

1

2                UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------)
                                   )
4    SET CAPITAL LLC, et al.,       )
                                   )
5    Individually and on Behalf of )
                                   )
6    All Others Similarly Situated,)
                                   )
7              Plaintiffs,          )
                                   )
8        vs.                        )No. 18-cv-02268-AT-SN
                                   )
9    CREDIT SUISSE GROUP AG, CREDIT)
                                   )
10   SUISSE AG, CREDIT SUISSE       )
                                   )
11   INTERNATIONAL, TIDJANE THIAM,  )
                                   )
12   DAVID R. MATHERS, JANUS        )
                                   )
13   HENDERSON GROUP PLC, JANUS     )
                                   )
14   INDEX & CALCULATION SERVICES   )
                                   )
15   LLC, and JANUS DISTRIBUTORS    )
                                   )
16   LLC d/b/a JANUS HENDERSON      )
                                   )
17   DISTRIBUTORS,                  )
                                   )
18              Defendants.         )
                                   )
19   ------------------------------)

20      REMOTE VIDEOTAPED DEPOSITION OF LEONARDO MAYER

21                   February 2, 2023

22                      Volume 1

23

24   Reported by:  ANITA SHEMIN, CSR

25   JOB NO. 222284

1
2
3
4
5
6
7
8
9    Thursday, February 2, 2023
10      9:53 a.m.
11
12
13
14   REMOTE VIDEOTAPED DEPOSITION OF
15 LEONARD MAYER, Volume I, before Anita Shemin,
16 a Certified Shorthand Reporter and Notary
17 Public of the State of New York.
18
19
20
21
22
23
24
25

1
2 A P P E A R A N C E S:
3
4 Cohen Milstein Sellers & Toll
5 Attorneys for Plaintiffs
6  1100 New York Avenue
7  Washington, DC 20005
8 BY: Brendan Schneiderman, Esq.
9  Robert Dumas, Esq.
10
 Mark A. Strauss Law
11
 Mark Strauss, Esq. (NOT PRESENT)
12
 Attorney for Plaintiff The Stone
13
 Family Trust in Case No. 19 Civ 5192
14
  590 Madison Avenue
15
 New York, New York 10022
16
17 Kirby McInerney
18 Attorneys for Plaintiff The STONE
19  250 Park Avenue
20  New York, NY 10177
21 BY: Belden Nago, Esq.
22
23
24
25

1
2 A P P E A R A N C E S:
3
4 Cahill Gordon & Reindel
5 Attorneys for Defendants and Witness
6  32 Old Slip
7  New York, NY 10005
8 BY: Herbert Washer, Esq.
9  Lauren Riddell, Esq.
10
11 ALSO PRESENT: S. HANSON
12     MANUEL GARCIA, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4   IT IS HEREBY STIPULATED AND AGREED by
5 and between the attorneys for the
6 respective parties herein, that filing and
7 sealing be and the same are hereby waived.
8   IT IS FURTHER STIPULATED AND AGREED
9 that all objections, except as to the form
10 of the question, shall be reserved to the
11 time of the trial.
12   IT IS FURTHER STIPULATED AND AGREED
13 that the within deposition may be sworn to
14 and signed before any officer authorized
15 to administer an oath, with the same force
16 and effect as if signed and sworn to
17 before the Court.
18    - o0o -
19
20
21
22
23
24
25

LEONARDO MAYER

1
2    THE VIDEOGRAPHER:  Good morning.  My name
3  is Manuel Garcia.  I am a certified legal
4  videographer in association with TSG Reporting,
5  Inc.
6    Because this is a remote deposition, I
7  will not be in the same room as the witness;
8  instead, I will record this videotaped
9  deposition remotely.
10    The reporter, Anita Shemin, also will not
11  be in the same room and will swear the witness
12  remotely.
13    Do all parties stipulate to the validity
14  of this video recording and remote swearing,
15  and that it will be admissible in the courtroom
16  following Rule 30 of the Federal Rules of Civil
17  Procedure and the state rules where this case
18  is pending?
19    MR. SCHNEIDERMAN:  Yes.
20    MR. WASHER:  Yes.
21    THE VIDEOGRAPHER:  This is the start of
22  Media No. 1 of the Videotaped Deposition of
23  Leonardo Mayer in the matter of Set Capital
24  LLC, et al. versus Credit Suisse Group, AG, et
25  al., on February 2nd, 2023, at approximately

LEONARDO MAYER

1
2  9:53 a.m.
3    My name is Manuel Garcia.  I am the
4  certified legal videographer with TSG
5  Reporting, Inc.  The court reporter is Anita
6  Shemin, in association with TSG Reporting.
7    Counsel, please introduce yourselves.
8    MR. SCHNEIDERMAN:  Brendan Schneiderman,
9  for the Plaintiffs.
10    MR. WASHER:  Herb Washer, for the
11  Defendants, as well as the witness, Leo Mayer.
12    THE VIDEOGRAPHER:  Will the court reporter
13  please swear in the witness.
14  L E O N A R D O   M A Y E R,
15  The Witness, having been first duly sworn, was
16  examined and testified as follows:
17  EXAMINATION
18  BY MR. SCHNEIDERMAN:
19    Q.  Good morning, Mr. Mayer.
20    A.  Good morning.
21    Q.  My apologies for the slow start here.
22  Thanks for your patience.
23    Have you ever been deposed before?
24    A.  I have not.
25    Q.  Okay.  So I am going to start by just

LEONARDO MAYER

1
2  going over some of the ground rules.
3    So, as you can see, there's a court
4  reporter writing down everything that we say.  It's
5  important that you give verbal answers rather than
6  gestures, no mm-hmms or uh-uhs.
7    Do you understand?
8    A.  Understood.
9    Q.  Okay.  It's also important that you and I
10  not talk over each other, so please wait to answer
11  until I have completed each question, and I will try
12  my best to not interrupt your answers, okay?
13    A.  Okay.
14    Q.  Also, if you ever feel like you don't
15  fully understand that I have asked, just
16  let me know, and I will try to clarify, okay?
17    A.  Got it.
18    Q.  And your attorney may object to questions
19  that I ask, but unless he instructs you not to
20  answer, you have to answer my question, okay?
21    A.  Got it.
22    Q.  And finally, as long as there isn't a
23  question pending, please let me know if you need a
24  break at any time.  We will try to do it about every
25  hour or so, but if you need something else, just let

LEONARDO MAYER

1
2  us know.
3    A.  Okay.
4    Q.  Do you have any lawyers with you today?
5    A.  Yes, I do.
6    Q.  Who is representing you?
7    A.  Herb Washer and the team at Cahill, as
8  well as, I think, Sarah Hanson, who is from Credit
9  Suisse.
10    Q.  Is there anyone else in the room with you
11  right now?
12    A.  In my room, no.
13    Q.  Yes.
14    A.  No.  I am in an office here at Credit
15  Suisse.
16    Q.  Okay.  If anyone enters the room at any
17  time, can you let me know?
18    A.  I will.
19    Q.  And do you have anything on your screen
20  except for this Zoom and the AgileLaw window?
21    A.  Just those two things.
22    Q.  Okay.  Can we agree that you won't have
23  anything else on your screen except for those two
24  during the deposition?
25    A.  Yes.

LEONARDO MAYER

1
2      Q.    And if you get interrupted by anything
3  else, you will let me know?
4      A.    I will.
5      Q.    Okay.  Do you have your phone on you?
6      A.    Yes.
7      Q.    Can we agree that you won't look at your
8  phone during the deposition unless we are on a
9  break?
10     A.    Okay.  I will put this where I can't get
11 it.
12     Q.    And if you receive a call that you need to
13 take, we can take a break, just let me know.
14     A.    Okay.
15     Q.    Also, if you speak with anyone other than
16 counsel during a break, will you let me know?
17     A.    I will.
18     Q.    You understand that even though this is a
19 deposition over Zoom, you are still under oath and
20 have to answer the questions truthfully under the
21 penalty of perjury?
22     A.    I understand.
23     Q.    Can you think of anything that may affect
24 your ability to testify today?
25     A.    No.

LEONARDO MAYER

1
2      Q.    Finally, you understand that you are not a
3  Defendant in this matter, correct?
4      A.    I understand, yes.
5      Q.    The investors I represent are suing Credit
6  Suisse and its former CEO and CFO and not you.
7            Do you understand that?
8      A.    I do.
9      Q.    Great.
10           What did you do to prepare for today's
11 deposition?
12     A.    I met with the Cahill lawyers.
13     Q.    About how many times did you meet?
14     A.    We met for a couple of hours yesterday.
15     Q.    That was it?
16     A.    That was it.
17     Q.    Without telling me what the documents
18 contained, did you review any documents in
19 preparation for the deposition?
20     A.    Yes.
21     Q.    Did any of those documents refresh your
22 memory about your involvement in Credit Suisse's
23 trading and hedging activity with respect to XIV?
24     A.    They did not refresh my memory.
25     Q.    Did you speak to anyone aside from counsel

LEONARDO MAYER

1
2  about the deposition today?
3      A.    No.
4      Q.    Did you do anything else to prepare for
5  today's deposition?
6      A.    No.
7      Q.    And did you bring any documents with you
8  today to the deposition?
9      A.    No.
10     Q.    Okay.  So you currently work at Credit
11 Suisse?
12     A.    I do.
13     Q.    And what are your responsibilities in your
14 current role?
15     A.    My role is to manage the index flow
16 trading team, which is a team of traders that make
17 markets and index options in the U.S.
18     Q.    Are you personally involved in trading, or
19 is it mostly managerial?
20     A.    No, I am involved in trading.
21     Q.    And so what are some of the financial
22 instruments that you are involved in trading?
23     A.    We trade options on the S&P 500 and other
24 indices in the U.S., as well as UTF options and
25 options on the vega.

LEONARDO MAYER

1
2      Q.    Is Credit Suisse paying for your lawyer?
3      A.    Yes.
4      Q.    Do you have any agreements with Credit
5  Suisse including, but not limited to,
6  nondisparagement clauses or nondisclosure agreements
7  that would prevent your ability to fully and
8  truthfully testify today?
9      A.    I am not sure what that means exactly.
10     Q.    You know what an NDA is?
11     A.    Yes.
12     Q.    Have you signed any NDAs that would
13 prevent you from being able to speak about your
14 involvement with XIV?
15     A.    I have not.
16     Q.    Okay.  When did you start working at
17 Credit Suisse?
18     A.    I started working in, I believe, April of
19 2016.
20     Q.    What was your title when you started?
21     A.    My title was a director.
22     Q.    Director in index flow trading?
23     A.    Yes, a very similar role.
24     Q.    Do you have any sense of why you were
25 hired by Credit Suisse?

LEONARDO MAYER

1
2    A.   I was hired to build out their index flow
3    trading business.
4    Q.   Do you remember if you applied for a job
5    or if you were recruited?
6    A.   I was recruited.  Yes, I was recruited,
7    but I eventually applied for the job there.  There
8    was another trader -- there were several traders
9    here that any one of them, which was Dan McNeill.
10   Q.   Is he still at Credit Suisse?
11   A.   He is not.
12   Q.   So you mentioned that your role, when you
13   started, was very similar to your current role.
14        How were they different, if at all?
15   A.   My role had just become more senior over
16   time as we have expanded the team, but in terms of
17   the products traded, it is similar.
18   Q.   Okay.  And what does more seniority
19   entail?
20   A.   More seniority entails, you know,
21   management of the team and does general ownership of
22   the business.
23   Q.   Okay.  Did you have any other titles in
24   your time at Credit Suisse, or has it just been
25   director and then manager?

LEONARDO MAYER

1
2    A.   Just those two.
3    Q.   Do you know when the title changed?
4    A.   I think I was promoted.  I don't recall
5    the exact year, but maybe 2019.
6    Q.   Okay.  How was your compensation
7    structured in 2017?
8    A.   I don't recall anything specific of how it
9    was structured, but are you asking me in terms of
10   the split between stock and cash, or what are you
11   referring to?
12   Q.   I think at a higher level, the split
13   between -- I am assuming you had a base salary and
14   some kind of bonus, something like that?
15   A.   Yes.
16   Q.   So how was that bonus determined?
17   A.   The bonus was determined based on the
18   performance of the index flow trading team, as well
19   as the performance of the Equity Derivatives
20   business and the larger CS group and based on, you
21   know, being within all regulatory requirements.
22   Q.   How did your bonus compare to your salary
23   percentage wise?
24   A.   I don't recall the exact specifics, but I
25   would think that the salary was between -- was

LEONARDO MAYER

1
2    probably around one-third of the compensation, total
3    compensation.
4    Q.   Do you have a general sense of what your
5    bonus was in 2017?
6    A.   I don't recall the exact number, but it
7    would have been about one and a half million.
8    Q.   How about 2018?
9    A.   Around similar levels, but I don't
10   remember the exact numbers.
11   Q.   All right.  That's fine.  I won't hold you
12   to it.
13        So between 2017 -- let's say the start of
14   2017 and February of 2018, who were your bosses?
15   A.   In 2017 -- around that time, my bosses
16   were Robert Sowler and as well as Philippe Carrier.
17   Q.   In 2018, did that change, the first couple
18   of months?
19   A.   I don't recall.  There were some changes
20   in the reporting line, but it would have been one of
21   the two.  I can't remember if it was Philippe or
22   Robert Sowler that I reported to at the time, but
23   they would have been the senior traders on the team.
24   Q.   How about Michael Ebert?
25   A.   Michael Ebert is the head of the equities

LEONARDO MAYER

1
2    driven business, so he would have been the boss of
3    my bosses.
4    Q.   So how often did you interact with
5    Mr. Sowler and Mr. Carrier?
6    A.   On a regular basis.
7    Q.   Is that every day, multiple times a day?
8    A.   It could be certainly every day and
9    multiple times a day potentially, yes.
10   Q.   What was your usually mode of
11   communication?
12   A.   We could speak either on the phone or in
13   person.  Philippe was in London, so it mostly was on
14   the phone and perhaps also on chat.
15   Q.   How about email?
16   A.   Oh, yes, email, of course, as well.
17   Q.   Okay.  When you emailed your bosses, were
18   you careful to ensure the accuracy of any analysis
19   that was contained in your email?
20   A.   Yes.
21   Q.   If you discovered mistakes in your emails,
22   would you follow-up to correct them?
23   A.   If I had, I would imagine that I would
24   have, yes.
25   Q.   Can you think of an instance where you

LEONARDO MAYER

1  noticed a mistake and didn't reach out to correct
2  it?
3
4      A.   I can't remember that, no.
5      Q.   Okay.  If your bosses discovered any
6  issues in your analyses, would they reach out to
7  follow-up?
8      A.   I would -- I don't recall them doing that,
9  but I would have imagined that they would have.
10     Q.   Did you ever withhold significant
11 market-related information from your bosses?
12     A.   No.
13     Q.   Were you ever dishonest about the
14 information that you passed to your superiors?
15     A.   No.
16     Q.   Did your bosses trust you?
17     A.   I think they did, yes.
18     Q.   Why do you think that?
19     A.   There was nothing that made me think that
20 they did not, and I have always operated under full
21 honesty.
22     Q.   Okay.  If your superiors asked you to
23 track down the answer to a question, you would do
24 so?
25     A.   Yes.

LEONARDO MAYER

1
2      Q.   And you would use the most accurate
3  available information to do so?
4      A.   Yes.
5      Q.   Did you have access to a Bloomberg
6  terminal?
7      A.   Yes.
8      Q.   Is that one source of information that you
9  would use?
10     A.   Yes, it is.
11     Q.   Okay.  And did you ever use off-channel
12 messaging apps, like WhatsApp or Signal or Facebook
13 Messenger to discuss work-related matters?
14     A.   No.
15     Q.   Do you have any memory of any of your
16 colleagues doing so?
17     A.   No.
18     Q.   So, who from the Global Markets team would
19 you say had primary responsibility for XIV in 2018?
20     A.   The Global Markets team?
21     Q.   Yes.
22     A.   So the product was risk managed out of our
23 index flow trading business, and then overseeing
24 that index flow trading business was the global head
25 of flow, which at the time was either Rob Sowler or

LEONARDO MAYER

1  Philippe, which I had mentioned, and then overseeing
2  that was the Global Head of Equity Derivatives,
3  Michael Ebert.
4      Q.   Who is Michael Ebert's boss, do you
5  recall?
6      A.   Who did Michael Ebert report up to?  I
7  don't recall the org structure at that point, but it
8  probably would have been the head of the investment
9  bank or some other...
10     Q.   Was it Mike Stewart?
11     A.   Yes, that's possible, yes.  As the head of
12 equities, yes.
13     Q.   And who did Mike Stewart report to, do you
14 know?
15     A.   Michael would have reported up to maybe
16 Brian Chin, who was the head of the investment bank.
17     Q.   Okay.  So within the flow desk, how was
18 responsibilities for XIV organized?  I know that's
19 kind of a general question, but to the extent that
20 you can paint a picture for me of how responsibility
21 was divvied up?
22     A.   Sure.
23          We had -- the XIV was -- the day-to-day
24 management of the rehedging and other trade-related

LEONARDO MAYER

1  activities was handled by Mel Oechslin, and I worked
2  on Mel with that closely supervising it as well.
3      Q.   Did you have a sense of how much revenue
4  XIV generated for Credit Suisse in, say, 2017?
5      A.   I don't recall the exact numbers, but I
6  think the trading P&Ls were on the order of 20 to
7  25 million --
8      Q.   Okay.
9      A.   -- on an annual basis.
10     Q.   Okay.
11          MR. SCHNEIDERMAN:  Rob, can we pull up
12 Tab BJ.
13     Q.   So, Mr. Mayer, we are going to start
14 looking at documents on AgileLaw.  Tell me if you
15 have any issues --
16     A.   Okay.
17     Q.   -- as we pull the document up.
18     A.   Okay.
19     Q.   And we have been marking the exhibits in
20 series.  Some of these exhibits have already been
21 introduced, but this is a new one, so this is going
22 to be marked as Exhibit 155.
23          (5/8/17 email between Leonardo Mayer and
24 James Cheesbrough marked Exhibit 155 for

LEONARDO MAYER

1
2    identification, as of this date.)
3        A.   Okay.  So I believe I click on this.
4             Okay, here we are.
5        Q.   There's not much to this first one, but
6    can you see it okay?
7        A.   Yes.  It says, "Take a look."
8        Q.   Do you recognize this document?
9        A.   I do not.
10       Q.   Do you have any reason to doubt it's an
11   email between you and James Cheesbrough from
12   May 8th, 2017?
13       A.   I don't have any reason to doubt that it
14   is an email between us, no.
15       Q.   Just so you know, I am going to have to
16   ask those questions with all of the documents I show
17   you.  So I understand it's going to feel repetitive,
18   but it's just for the record.
19       A.   Got it.
20       Q.   Okay.  So you can see there's an
21   attachment to this email, the Flow Index Overview
22   Final PowerPoint.
23            Do you see that?
24       A.   There's an attachment -- I don't see that.
25       Q.   We will pull up the attachment in the next

LEONARDO MAYER

1
2    document.  I just want to make sure that you can see
3    that there is that attachment.
4        A.   On this particular item?
5        Q.   If you just look next to attachments, it
6    says "Flow Index Overview File."
7        A.   You are saying on, like, the subject line,
8    right?
9        Q.   Correct, yes.
10       A.   Okay, yes.
11       Q.   Yes?
12       A.   I can see that.
13       Q.   Okay.
14            MR. SCHNEIDERMAN:  Can we pull up Tab BK.
15            And this is Exhibit 156.
16            (May 2017 document marked Exhibit 156 for
17       identification, as of this date.)
18   BY MR. SCHNEIDERMAN:
19       Q.   So this is -- this is that attachment.
20       A.   Okay.  I am going to click on this?
21       Q.   Yes.
22       A.   Okay.
23       Q.   So feel free to look it over.  We are not
24   going to dive too deeply into it.  If you want to
25   just take a look at it.

LEONARDO MAYER

1
2        I am going to direct your attention to
3    Slide 9.
4        A.   Okay.  Page 9, okay.
5        Q.   Okay.  Do you recognize this document?
6        A.   I don't recall this document, no.
7        Q.   Okay.  So this --
8        A.   This is from May 2017, okay.
9        Q.   Right, correct.
10       A.   You said we are focusing on Page 9?
11       Q.   Correct.
12       A.   Okay.
13       Q.   So the title of this slide is "Client
14   Revenue Trends."
15            Can you explain to me what client revenue
16   is?
17       A.   Client revenue is the revenue associated
18   to a particular client that is a trading partner
19   of -- with Credit Suisse.
20       Q.   Okay.  And then in that first bullet
21   point, it says, "Flow Sales Headcount."
22            Do you see that?
23       A.   Yes, I do.
24       Q.   What is "Flow Sales Headcount"?
25       A.   That refers to the number of people in the

LEONARDO MAYER

1
2    flow sales team.
3        Q.   So the number of employees on the team at
4    Credit Suisse?
5        A.   Yes.  Yes, I believe so, yes.
6        Q.   Okay.  And so that first bullet point says
7    that the headcount is down 53 percent versus 2014
8    and about 30 percent versus 2015 and 2016?
9        A.   Yes.
10       Q.   Okay.  So that means that just the literal
11   number of employees working on flow sales is down
12   those percentages?
13       A.   That's how I understand it, right.
14       Q.   Okay.  And then if we look at the bottom
15   of the slide, it says, "CREV Booked into Flow
16   Derivatives."
17            Do you see that?
18       A.   Yes.
19       Q.   And you see there's a "Grand Total" row.
20            What is the capturing?
21       A.   It looks like it's the total client
22   revenue in each year per trading desk.
23       Q.   So in 2014, it's almost 40 million,
24   correct?
25       A.   In index flow, yes.

LEONARDO MAYER

1
2   Q.   For flow index, yes, sorry.
3        And that's your desk?
4   A.   Yes.
5        I wasn't here at the time, but, yes.
6   Q.   Right.
7        2015, it's almost 55 million?
8   A.   Yes.
9   Q.   Correct?
10       2016, it's almost 49 million, correct?
11  A.   Yes.
12  Q.   And so then for 2017, I believe it says
13  2017 annualized; is that correct?
14  A.   That's what it appears, yes.
15  Q.   And it's 26 million, right?
16  A.   That's correct.
17  Q.   So it's down fairly dramatically in 2017;
18  is that a fair characterization?
19  A.   Yes.
20       MR. SCHNEIDERMAN:  We can move away from
21  that document now.  Thanks.
22  Q.   So beginning in August of 2017, would you
23  say there was an increased focus on index-related
24  products for the desk?
25       MR. WASHER:  Objection.

LEONARDO MAYER

1
2   A.   I don't recall that specifically.
3   Q.   You mentioned Mel Oechslin before?
4   A.   Yes.
5   Q.   Who is he?
6   A.   Mel is the trader, no longer with Credit
7   Suisse, who was part of the index flow team and
8   focused a lot on these products.
9   Q.   And he was brought on in August 2017; does
10  that sound right?
11  A.   That sounds about right, yes.
12  Q.   Okay.  In your experience with
13  Mr. Oechslin, was he capable at his job?
14  A.   Yes.
15  Q.   If you asked him to conduct an analysis,
16  would he provide it?
17  A.   Yes.
18  Q.   Would he do so in a timely manner?
19  A.   Yes, he would.
20  Q.   And his analyses were generally accurate?
21  A.   Yes.
22  Q.   If you spotted a mistake in his analysis,
23  would you point it out?
24  A.   I would have, yes.
25  Q.   Did you ever have any experiences with him

LEONARDO MAYER

1
2   where he would withhold material information from
3   you or the rest of the team?
4   A.   No, no.  I did not, no.
5        MR. SCHNEIDERMAN:  Let's pull up Tab M,
6        which was previously marked as Exhibit 91.
7        THE WITNESS:  I am sorry, I am going to
8        tab which one?  Oh, Exhibit 91, okay.
9   BY MR. SCHNEIDERMAN:
10  Q.   Yes.
11  A.   Okay, I see an email here.
12  Q.   Okay, great.
13       Do you recognize this email?
14  A.   I don't remember it now.
15  Q.   Okay.  If you look, the second email, you
16  will see that -- do you have any reason to doubt
17  that that email is from Mel Oechslin to Philippe
18  Carrier with you cc'ed from August 30, 2017?
19  A.   No, no, I don't.
20  Q.   And if we -- if we look at the second page
21  of the document --
22  A.   Okay.
23  Q.   Sorry, one second.
24       At the bottom of the first page, you can
25  see first there's an email from Mr. Carrier to Mel

LEONARDO MAYER

1
2   Oechslin with you cc'ed.
3        Do you see that?
4   A.   Yes.
5   Q.   Okay.  So this is that same period we are
6   talking about, August 2017.
7        And so then if you go to the second page,
8   that last line in Mr. Carrier's email, "I understand
9   Mike Ebert was a VIX specialist at BAML..."
10       I take it that means Bank of
11  America/Merrill Lynch?
12  A.   Yes.
13  Q.   Okay.  "I understand Mike Ebert was a VIX
14  specialist at BAML, so I suspect you will be" -- it
15  seems like there's a typo here -- "you will be one
16  of his main focus of attention"?
17  A.   Yes.
18  Q.   Does that refresh your memory at all about
19  the desk's focus starting around August 2017?
20  A.   No, it does not.
21  Q.   Okay.
22       MR. SCHNEIDERMAN:  Let's pull up Tab BM, M
23       as in Mary.
24       THE WITNESS:  You said BM?
25

Page 30

LEONARDO MAYER

1
2    BY MR. SCHNEIDERMAN:
3        Q.   It looks like it's 38 in AgileLaw.
4        A.   Okay.
5             What are we looking at here, Document 157?
6        Q.   Correct.
7             MR. SCHNEIDERMAN:  This is Exhibit 157.
8             (9/2017 email chain between Leonardo
9        Mayer, Michael Ebert, and Philippe Carrier
10       marked Exhibit 157 for identification, as of
11       this date.)
12            THE WITNESS:  Okay.
13   BY MR. SCHNEIDERMAN:
14       Q.   Do you recognize this document?
15       A.   Again, I don't remember it specifically,
16   but there's nothing to make me think that it's not
17   an accurate document, a real document.
18       Q.   Okay.
19            All right.  It's an email exchange between
20   you and Michael Ebert and Philippe Carrier from
21   September 2017?
22       A.   Yes.
23       Q.   Okay.  And Mr. Ebert asks you to forward
24   him a copy of the presentation from last week.
25            Do you see that at the bottom?

Page 31

LEONARDO MAYER

1
2        A.   Yes.
3             MR. SCHNEIDERMAN:  Let's go to Tab BN, N
4        as in Nancy, which is the attached
5        presentation.
6             THE WITNESS:  Document 158?
7             MR. SCHNEIDERMAN:  Correct.
8             (PowerPoint titled "Equity Derivatives
9        Flow Index Midyear Review 2017" marked
10       Exhibit 158 for identification, as of this
11       date.)
12       A.   Okay.
13       Q.   Do you recognize this document?
14       A.   I don't recall it, but, again, there's
15   nothing that makes me think that it's not a real
16   document.
17       Q.   Okay.  So this is a PowerPoint titled,
18   "Equity Derivatives Flow Index Midyear Review 2017"?
19       A.   Yes.
20       Q.   And I think the PowerPoint just
21   automatically updates to today's date, so that's why
22   it says February 2023 there at the bottom.
23       A.   Okay.
24       Q.   But this is from 2017.
25            So, if you recall, the email we just

Page 32

LEONARDO MAYER

1
2    looked at mentioned the presentation from last week
3    that was sent in September, so is it fair to assume
4    that this presentation was circulated or presented
5    in September?
6        A.   I am not certain, but it sounds like it,
7    yes.
8             MR. SCHNEIDERMAN:  Okay.  Let's go to
9        Slide 4.
10            THE WITNESS:  Okay.
11   BY MR. SCHNEIDERMAN:
12       Q.   I want to turn your attention to the
13   bottom right corner.  You see that it says, "Sales
14   and trading desks suffered from low staffing level"?
15       A.   Yes.
16       Q.   Is that the same thing we were looking at
17   before with the headcount?
18            MR. WASHER:  Objection to the form.
19       A.   It appears that it is.
20       Q.   Okay.  And it also notes that "Low
21   margin/increased competition environment has led to
22   lower client revenue retention on large trades"?
23       A.   Yes.
24            What about that?
25       Q.   I am just confirming that that is what

Page 33

LEONARDO MAYER

1
2    that is saying.
3        A.   Yes, got it.
4        Q.   So this is saying lower margins and
5    increased competition are reducing client revenue in
6    large trades?
7        A.   Right.
8        Q.   Okay.
9             MR. SCHNEIDERMAN:  Let's look at Slide 5.
10            THE WITNESS:  Okay.
11   BY MR. SCHNEIDERMAN:
12       Q.   Is this laying out the target revenues for
13   2018 by book?  Am I interpreting that right?
14       A.   Yes.
15       Q.   And so it says for VIX ETNs, the target
16   revenue for 2018 is $50 million?
17       A.   Right.
18            MR. SCHNEIDERMAN:  Let's go to Slide 10.
19            THE WITNESS:  Okay.
20   BY MR. SCHNEIDERMAN:
21       Q.   So the title of this slide is, "What Are
22   We Doing to Improve Profitability," correct?
23       A.   Yes.
24       Q.   So it seems like the profitability of the
25   desk is a concern at this time; is that right?

Page 34

LEONARDO MAYER

1
2     MR. WASHER:  Objection to the form.
3     A.   Yes.
4     Q.   Who would have made this presentation?
5     MR. WASHER:  Objection to the form.
6     A.   I don't remember exactly.
7     Q.   Do you have a sense of which teams would
8  contribute to it?
9     MR. WASHER:  Same objection.
10    A.   Sorry?
11    Q.   Your counsel was just objecting.  You can
12  answer.
13    A.   My -- I don't remember exactly who worked
14  on it, but it would have had input from the trading
15  team, as well as from the COO team, the Chief
16  Operating Officer and their team.
17    Q.   And who would it be for?
18    A.   Who would it be for?  It would have been
19  for -- you know, I don't recall who we did it for,
20  but -- yes, I don't recall who we did it for.
21    Q.   In general, these kinds of midyear
22  reviews, I mean, who were those circulated to?
23    A.   It would potentially have been for more
24  senior management or a general discussion about the
25  business.

Page 35

LEONARDO MAYER

1
2     Q.   And what was the point of circulating this
3  kind of information to senior management?
4     A.   Review of the business, as you would
5  imagine, I would imagine, you would typically have
6  in any business line.
7     Q.   So if we -- you can take my word for it or
8  we can look back to the previous email, but this
9  presentation, you sent this along to Michael Ebert
10  and Philippe Carrier.
11         Does that seem right?
12    A.   Yes.
13    Q.   What is their responsibility with this
14  information?
15    A.   Well, the responsibility was they were
16  overseeing the business, and they would have wanted
17  more information in terms of what was happening in
18  the business and a general review of it.
19    Q.   Is there anything that they would be
20  expected to do with it?
21    MR. WASHER:  Objection to the form;
22  foundation.
23    A.   I am not sure if there were any immediate
24  actions that would have resulted from the review.
25    MR. SCHNEIDERMAN:  Okay.  Let's pull up

Page 36

LEONARDO MAYER

1
2  Tab G.
3     Q.   This was previously marked as Exhibit 85.
4     A.   Are you waiting on me?
5     Q.   I don't think it has been put up yet.
6     MR. SCHNEIDERMAN:  Rob, are you able to
7  put up the document?  Thanks.
8     THE WITNESS:  Okay.
9  BY MR. SCHNEIDERMAN:
10    Q.   Let me know when you can see it.
11    A.   Yes.
12         Okay.
13    Q.   Do you recognize this document?
14    A.   I don't recognize it, but, again, there's
15  nothing that leads me to believe that it's not an
16  actual document.
17    Q.   Okay.  So this is an email from 2017
18  involving you and also Michael Ebert; is that
19  correct?
20    A.   Yes.  I am cc'ed on this email, correct.
21    Q.   And if you look at the second paragraph
22  there from Paul Somma, you see where he says, "As
23  you know, XIV is not a highly profitable ETN"?
24    A.   Where is that?
25         Okay, the second paragraph.

Page 37

LEONARDO MAYER

1
2         Okay.
3     Q.   Why wasn't XIV profitable?
4     A.   My impression of the product was that it
5  was profitable, not wildly profitable, but it did
6  provide some profitability to the bank.
7     Q.   Why is Paul Somma saying to Mike Ebert,
8  "As you know, XIV is not a highly profitable ENT"?
9     MR. WASHER:  Objection to the form;
10  foundation.
11    A.   I am not sure.  I have to read through the
12  rest of this email.
13    Q.   If you want to look over it, you can take
14  a minute.
15    A.   Okay.  I don't know exactly what Paul had
16  in mind with that sentence, but I would imagine that
17  he was thinking about the costs of rebalancing the
18  hedges for the XIV product, also the split in the
19  management fee, and any other potentially, you know,
20  capital costs that would be incurred in the product,
21  but my impression was that it was profitable, but
22  not wildly profitable, again, for the firm.
23    Q.   Would part of the difference be your
24  timeline here where he's talking about XIV in
25  October and you are thinking about it maybe after

LEONARDO MAYER

1  that point?
2      MR. WASHER:  Objection to the form;
3  foundation.
4      A.   I am not sure that's the case.
5      Q.   Okay.  So this email is sent to a lot of
6  people.
7          Looking over who is cc'ed, how would you
8  describe this group of people?
9      MR. WASHER:  Objection to the form.
10     A.   Well, again, you have Michael Ebert, who
11 is the head of the business, and you have
12 stakeholders across the trading desk, as well as
13 sales and -- and sales, yes.
14     Q.   Okay.  Are there risk management people
15 looped in here?
16     A.   No, not specifically.
17     Q.   Okay.  Do you have an example of a highly
18 profitable ETN for Credit Suisse?
19     A.   I am not aware of an example I can provide
20 to you now.
21     Q.   Okay.  Do you recall around this time
22 Credit Suisse being unsure whether it wanted to keep
23 XIV around?
24     A.   I don't recall that specific -- you know,
25

LEONARDO MAYER

1  I don't recall that specifically because I don't --
2      Q.   Okay.
3      MR. SCHNEIDERMAN:  Let's pull up Tab H,
4  which has been previously marked as Exhibit 86.
5      THE WITNESS:  Okay.
6  BY MR. SCHNEIDERMAN:
7      Q.   Take a moment to look over this document.
8      A.   Okay.
9      Q.   Do you recognize it?
10     A.   I do.
11     Q.   What is it?
12     A.   It's an email between Mike -- an email
13 between Robert Sowler and me, and then from me to
14 Rob and Mel.
15     Q.   And you see for the record, and it's from
16 October 2017, correct?
17     A.   Yes.
18     Q.   So you see at the top, you say, "based on
19 your conversation with Mike."
20         I take that to be Mike Ebert, correct?
21     A.   Yes.
22     Q.   You say, "Based on your conversation with
23 Mike Ebert, you have been asked to do a lot more
24 deep thinking about ETNs and whether or not
25

LEONARDO MAYER

1  economics makes sense to keep XIV"?
2      A.   Yes, I read that.
3      Q.   Does that refresh your recollection?
4      A.   I mean, I don't remember this, the exact
5  conversation that I had with Mike, but this email
6  makes me think that, you know, we were having a
7  discussion about the general profitability of the
8  business, but it would not have been different about
9  any conversation we would have had about any
10 business or any reevaluation of any business line.
11     Q.   So when you say "whether or not economics
12 makes sense," that's referring to the profitability?
13     A.   Yes.
14     Q.   Okay.  So then you lay out some specific
15 items to follow-up on.
16         Do you see that in the second paragraph?
17     A.   Yes.
18     Q.   And that includes more research on lending
19 and how it works and what is keeping us from buying
20 back more in the open market?
21     A.   Yes.
22     Q.   Was the request for more research on
23 lending and how it works a directive that came from
24 Ebert?
25

LEONARDO MAYER

1      A.   I don't recall that specifically.
2      Q.   Given your understanding of XIV, why would
3  looking more into lending be a specific item to
4  follow-up on after a conversation where you are
5  discussing the economics of XIV with Mike Ebert?
6      MR. WASHER:  Objection to the form;
7  foundation.
8      A.   Can you tell me that question again?
9      Q.   Sure.
10         I guess my question is:  Why does lending
11 come to mind as a specific item to follow-up on as a
12 result of a discussion about XIV's profitability?
13 What does one have to do with the other?
14     MR. WASHER:  Objection to the form.
15     A.   Okay.  I think it goes back to what I said
16 before, which it sounds like this was a review of
17 the general profitability of the business, and one
18 of the -- one part of the business was lending of
19 the VIX ETNs, and we were -- it looks like we were
20 trying to assess -- you know, take a look at that
21 particular business line within the ETN business.
22     Q.   How would you go about looking more into
23 it?
24     A.   I don't remember exactly what analysis we

LEONARDO MAYER

1   did, but I guess we would have looked at the actual
2   lending revenue that came in to start from the share
3   that we lent out to the prime brokerage.
4       Q.   Okay.  I know we started a little bit
5   late, but you have given us over an hour of your
6   time now.  I don't know if you want to take, like, a
7   five-minute break here.  This is an okay spot for me
8   to stop.
9       A.   That would be great.  Let's take a
10  five-minute break, and we will come back.
11      MR. SCHNEIDERMAN:  Okay.  We will come
12  back at 10:40.
13      THE WITNESS:  Okay.
14      MR. WASHER:  Can we just get a breakout
15  room for the Defendants' side?  So that's for
16  the witness, for myself, for Sarah Hanson, and
17  also for Lauren Riddell, and that will be true
18  for every break.  We may or may not use it, but
19  can you set up a breakout room setup for each
20  break?
21      THE VIDEOGRAPHER:  Hold on.  Give me one
22  second.
23      (Recess taken)
24      THE VIDEOGRAPHER:  We are going back on

LEONARDO MAYER

1   the record.
2       MR. SCHNEIDERMAN:  Can we pull up Tab D,
3   as in dog.  This was previously marked as
4   Exhibit 82.
5       THE WITNESS:  Okay.
6   BY MR. SCHNEIDERMAN:
7       Q.   Take a minute to just look over the email.
8       A.   Okay.
9       Q.   Do you recognize this email?
10      A.   I don't remember this email, but, yes, it
11  sounds like -- it looks like it's an email between
12  me and some of the rest of the sales and trading
13  teams.
14      Q.   From August 23rd, 2017?
15      A.   Yes.
16      Q.   So, you start this conversation by noting
17  that there has been a, quote, "large increase in XIV
18  lending activity via prime."
19      Do you see that?
20      A.   Yes.
21      Q.   That's the prime brokerage desk?
22      A.   Yes.
23      Q.   And then you ask a bunch of questions to
24  try to figure out, quote, "why this is happening,"

LEONARDO MAYER

1   right?  Do you see that?
2       A.   I do.
3       Q.   So, your first question is, "Who is
4   driving the demand"?
5       A.   Right.
6       Q.   How would you figure that out?
7       A.   I don't remember the exact analysis that
8   we did here, but we were trying to see if it was
9   prime customers driving the demand or some other
10  driver.  I don't recall exactly what was the result
11  of this analysis.
12      Q.   How would you go about answering that
13  question?
14      A.   We would have gone back and taken a look
15  at who was asking for -- who was asking to borrow
16  shares or what -- if we could get any color around
17  what was happening.
18      Q.   And is that a conversation you would have
19  with prime brokerage, or are you able to just look
20  up that information yourself?
21      A.   I don't recall exactly how we approached
22  that.
23      Q.   You could do it either way?
24      A.   Could you do it either way?  I guess you

LEONARDO MAYER

1   could look at the open interest in Bloomberg and
2   other things, and we could see if we had more
3   creations for lending.  I guess it would have been a
4   combination of things.
5       Q.   Could it have been by talking to prime
6   brokerage as well?
7       A.   Potentially.
8       Q.   Okay.  You also ask, "What is the
9   potential motivation behind the demand?"
10      Do you see that?
11      A.   I do.
12      Q.   How would you figure that out?
13      A.   I don't know if we had an easy way to
14  figure that out.  This would have been kind of
15  typical of any trading-related question mark around
16  trading, what is driving the demand of someone
17  creating a VIX ETN to short or what is the demand
18  for someone buying an S&P put to hedge, just trying
19  to get general market color.
20      Q.   What are some ways that you would go about
21  getting that market color?
22      A.   I would imagine we would have kind of
23  tried to see if it was maybe -- what did we do?  I
24  don't know exactly what we did.  I don't recall.

LEONARDO MAYER

1
2    Q.   Can you speak generally about how you
3  would approach a problem like this -- or a question
4  like this, rather?
5    A.   Yes.  I mean, if any -- if someone asked
6  me about a trade and what's the general motivation
7  behind that, one could think about, you know, if
8  there's some dislocation in the market or some view
9  that a customer is trying to express.  Maybe there
10 was a view that no accounts wanted to sell XIV at
11 the moment, or, you know, again, more generally, it
12 could have been, you know, someone looking to hedge
13 the market, so they would buy S&P puts.
14        But, again, I don't recall exactly what we
15 found and how we went about resolving this.  I am
16 not sure if the email says anything about it.
17   Q.   You just used the words "dislocation in
18 the market."
19        What does that mean?
20   A.   If there was -- you know, if, for
21 example -- dislocation meaning maybe, you know, the
22 price of -- you know, the price of -- say the
23 people -- a customer thought that the price of VIX
24 was high, and he wanted to buy XIV to take that view
25 or maybe they wanted to do something different.

LEONARDO MAYER

1
2    Q.   Just a disagreement between the market and
3  a specific market participant?
4    A.   Right.  Someone would want to trade some
5  option, or some derivative, or some other cash
6  product to take a view on the market or potentially
7  to hedge something.
8    Q.   Okay.  Do you recall getting an answer to
9  the question of what is the motivation behind
10 this --
11   A.   I don't recall that, no.
12   Q.   Okay.  You were also asked, "What is the
13 profitability of an HF" -- I believe that means
14 hedge fund?
15   A.   Yes.
16   Q.   "What is the profitability of a hedge fund
17 borrowing XIV at current rates and
18 hedging/rebalancing the position nightly with
19 futures"?
20   A.   Right.
21   Q.   Can you explain what that means?
22   A.   What I think we were after here in this
23 question is if someone came in to borrow XIV, and
24 they would hedge the exposure with big futures, and
25 that would involve some rebalancing at the end of

LEONARDO MAYER

1
2  the day, if that in itself would have been a
3  profitable position for how profitable it was.
4    Q.   So in that instance, borrowing XIV is
5  equivalent to being short XIV?
6    A.   That's what I would have imagined they may
7  have been doing, yes.
8    Q.   Okay.  And then you say, in that same
9  bullet point, "Holding it" -- I think the "it" is
10 borrowing XIV notes -- "Holding it versus long
11 SVXY"?
12   A.   Yes.
13   Q.   "SVXY," is that an XIV competitor?
14   A.   That is an ETF that is also -- yes, it's
15 another part of the ETN exchange traded note suite
16 of products in the market.
17   Q.   So, is it an appropriate paraphrase to say
18 that, quote, "Holding it versus long SVXY," is
19 asking how the economics of holding XIV compares
20 with the economics of holding an XIV competitor?
21   A.   I think what I was trying to get to with
22 this question was that, yes, one guess as to why
23 there may have been increased lending were accounts
24 potentially shorting XIV, borrowing it, shorting,
25 and then hedging it by buying SVXY, but again, I

LEONARDO MAYER

1
2  think this is purely a question mark.
3    Q.   And then you ask, "Why are we seeing a
4  large increase in borrowing through prime, but
5  nothing via creation"?
6    A.   Yes.
7    Q.   I take that to mean the demand is for
8  borrowing XIV notes and not purchasing through a
9  swap; is that right?
10   A.   That's right.
11        MR. WASHER:  Objection to the form.
12   Q.   Okay.  Why are you interested in that
13 question?
14   A.   I think just -- what I guess is we were
15 just trying to get coloring, trying to understand
16 what could be trading in the market and why.
17   Q.   Do you remember getting an answer to that
18 question?
19   A.   I don't.  Perhaps you will show me some
20 other emails that get to the answer, but I don't
21 recall what the conclusion was of this line of
22 questions.
23   Q.   Okay.
24        Okay.  So then if we look at the top of
25 the document, you follow-up and ask for "a review of

LEONARDO MAYER

1                       LEONARDO MAYER
2  the legal/reputational restrictions that prevent us
3  from changing the rate at which we lend XIV and
4  stopping self-creation for lending'?
5      A.   Yes.
6      Q.   Do you recall Credit Suisse ultimately
7  changing the rates for lending that fall?
8      A.   I don't recall that, no.
9      Q.   Would it surprise you to learn that Credit
10 Suisse did that?
11     A.   It is possible.  I don't recall what the
12 exact lending rate was for it, but, again, I think
13 this was just general thinking of, you know, we have
14 had some increase in lending or we were lending it
15 at the appropriate rate and just general thinking
16 about that line of business.
17     Q.   Okay.  Who would be involved in reviewing
18 the legal/reputational restrictions on changing the
19 lending rate?
20     A.   I don't recall who was responsible.  As I
21 see this email, it looks like I addressed it to Mel
22 maybe to look more into it, as well as Lisa, who
23 worked with Paul Somma, and the sales team.
24     Q.   Okay.  And what are their roles?
25     A.   Paul Somma was working on the ETN sales.

LEONARDO MAYER

1                       LEONARDO MAYER
2  Lisa worked with him as well.  And Mel, we have
3  spoken about.
4      Q.   Do you know who would be involved in the
5  decision to actually change the lending rate?
6      A.   Well, I would imagine it would have been
7  someone in prime because they did the actual
8  physical lending, but, again, I think my question
9  was more open ended.
10     Q.   If prime were to make that decision, would
11 it be based on a conversation with your desk?  How
12 would that decision kind of get made?
13     A.   It wouldn't have been something that our
14 desk would have necessarily driven, but, again, I
15 don't know if we got to that point.  My line of
16 questioning here, as I see it here on this email, it
17 looks like we were just kind of exploring the idea,
18 look, we are getting a lot of lending, are we
19 lending it at the right rate, and let's have a
20 thought about that.
21     Q.   Okay.  Do you recall any other
22 conversations with Mel Oechslin or others about
23 lending at the time?
24     A.   I don't recall, no.
25     Q.   Okay.  This is something I asked a bit on

LEONARDO MAYER

1                       LEONARDO MAYER
2  the previous document, but where -- where would the
3  directive to start looking into lending have come
4  from?
5      A.   I think it would have -- I don't know who
6  would have been driving it other than just general,
7  you know, oversight of the business.  Again, it goes
8  back to any other line of business, if you start to
9  see an increase in activity, we review why is it
10 happening, are we engaging it in the appropriate way
11 and pricing it correctly, and just general thinking.
12          So, you know, I think it would have
13 been -- you know, it looks like the questions are
14 coming from me.  I don't know if there were other
15 conversations around that to more senior managers,
16 but I don't recall those specifically.
17     Q.   Okay.  It looks like Philippe Carrier is
18 looped into this email.
19     A.   Okay.
20     Q.   So, I mean -- okay.  That's fine.
21          It seems like you are flagging this for
22 the group as something to look more deeply into
23 while also keeping your superiors in the loop about
24 the fact that you are going to be looking into it
25 more.

LEONARDO MAYER

1                       LEONARDO MAYER
2          Is that the right characterization?
3      A.   That sounds like it is addressed to sales
4  and trading partners, and it looks like, as you
5  mentioned, looped in Philippe and Rob as well.
6      Q.   Okay.
7          MR. SCHNEIDERMAN:  Can we go to Tab E,
8  please, which was previously marked as
9  Exhibit 83.
10     Q.   Take a moment to look over this.  I am
11 going to primarily ask about the third page.
12     A.   We are on Exhibit 83?
13     Q.   Correct.
14     A.   I am just going to read a little bit from
15 the bottom to get the context.
16     Q.   Sure.
17          I am going to ask you about the bottom,
18 but feel free to read the whole thing over.
19     A.   Okay, I read that quickly.  Which part are
20 we focusing on?
21     Q.   Page 3.
22     A.   Page 3, okay.
23     Q.   First, do you recognize this email?
24     A.   I don't remember it, but it does look like
25 an email between Mel and Philippe.  Philippe really

LEONARDO MAYER

1     is in product control.

2          Q.    What does product control do?

3          A.    Product control has oversight of the

4     business in terms of making sure that, you know, the

5     trades are -- P&Ls are reported appropriately and

6     risks are captured appropriately, that sort of

7     thing.

8          Q.    So in this email from Mel Oechslin, he

9     notes that XIV -- sorry, Credit Suisse has lent out

10    north of 3 million shares of XIV to PB clients.

11         Do you see that?

12    A.    Yes.

13         Q.    That's the prime brokerage clients?

14    A.    Yes.

15         Q.    Do you know who the prime brokerage

16    clients were that it was being lent to?

17    A.    No.

18         Q.    How would you go about figuring that out?

19    A.    I don't know if we would have shared that

20    type of information.

21         Q.    Okay.  When you say "we," you mean between

22    the flow desk and prime brokerage?

23    A.    Yes.

24         MR. SCHNEIDERMAN:  Let's go to Tab F,

LEONARDO MAYER

1     which was previously marked as Exhibit 84.

2          Q.    Let me know when you have had a chance to

3     look this over.

4     A.    Okay.

5          Okay.

6          Q.    Do you recognize this document?

7     A.    I don't remember it, but it looks like an

8     exchange between Rob Montefiore and Mel.

9          Q.    And you are cc'ed on it?

10    A.    I am as well, that is correct.

11         Q.    And it's from September 20th, 2017?

12    A.    Correct.

13         Q.    So just for the record, there's reference

14    to BPS here.

15         I take that to mean basis points?

16    A.    Yes.

17         Q.    So, this email is laying out the P&Ls for

18    three different ways to create XIV, correct?

19    A.    Yes.  Well, two, I think, it's saying --

20    well, yes, without a swap, with a swap, and creating

21    a lend, okay.  Yes.

22         Q.    Can you walk me through how the creation

23    with a swap works?

24    A.    Sure.

LEONARDO MAYER

1          The customers could come in and create --

2     basically borrow -- create shares in XIV or one of

3     the other PMs for TVIX, and we would basically ask

4     them to also have an offsetting swap to replicate

5     the exposure of it.

6          I can't remember the exact maturity of the

7     swaps, but they were three months, or six months, or

8     longer, but they could only essentially come in and

9     create with a swap associated with it.

10         Q.    We are going to talk about the terms of

11    the swaps later.

12    A.    Okay.

13         Q.    What is the functionality of that

14    offsetting swap, from Credit Suisse's perspective?

15    A.    It hedges out the exposure that we would

16    have in the creation of the ETN.

17         Q.    So it is --

18    A.    It's a risk mitigating function.

19    Derivatives, exactly.

20         Q.    For Credit Suisse?

21    A.    Yes.

22         Q.    Okay.  And so it looks like Rob is telling

23    you and Mel that creating and lending is the most

24    profitable of these three; is that right?

LEONARDO MAYER

1     A.    It appears that is the case, although it

2     has been some time since I thought about this

3     specific issue, so I would have to go back and think

4     exactly how we came up with these numbers.

5          Q.    Setting aside how the numbers were

6     produced, is that the bottom line conclusion that

7     the email is conveying?

8     A.    That's what it appears to be, yes.

9          Q.    And in your experience with Rob

10    Montefiore, was he capable in his job?

11    A.    He was.  He is, yes.

12         Q.    Okay.  Is he still at Credit Suisse?

13    A.    He is.

14         Q.    Okay.

15         Why would this kind of analysis be put

16    together?

17    A.    Again, I think general thinking about the

18    business, analyzing the profitability and the risks

19    within different business lines, and I think here,

20    it looks like we were having a deeper dive into what

21    the actual P&L and risks associated were with the

22    lending business.

23         Q.    And who would you circulate this kind of

24    analysis to?

Page 58

LEONARDO MAYER

1  A.   I imagine I would have, again, circulated
2  it to the trading sales partners and probably kept
3  the -- kept my managers also in the loop, although I
4  don't recall specifically if we did for this email
5  or not.
6  Q.   In general, that's something you do,
7  though?
8  A.   Yes.
9  Q.   Okay.  Actually, we can turn now to a
10 document that maybe will shed some light on that
11 question.
12 MR. SCHNEIDERMAN:  Can we pull up Tab BI,
13 B as in boy and I as in Idaho.
14 And this will be marked as Exhibit 159.
15 (10/29/17 email chain between Leonardo
16 Mayer and Mike Ebert marked Exhibit 159 for
17 identification, as of this date.)
18 THE WITNESS:  Exhibit 159, okay.
19 BY MR. SCHNEIDERMAN:
20 Q.   Take a moment to look over it.
21 A.   Yes.
22 Okay.
23 Q.   Do you recognize this document?
24 A.   The same thing as before.  I don't recall

Page 59

LEONARDO MAYER

1  this specific document or remember it, but it looks
2  like it's an email exchange between me and Mike
3  Ebert.
4  Q.   From October 29th, 2017?
5  A.   Correct.
6  Q.   Okay.  So to start, your first email at
7  the bottom of Page 2, you send -- you forward to
8  Mike Ebert, the quote, "Daily email that is sent out
9  with what we are lending in VIX ETNs."
10 Do you see that?
11 A.   That's right.
12 Q.   I think this is kind of what we were just
13 talking about.  This is keeping Ebert in the loop
14 about the state of lending?
15 A.   That's what it appears to, yes.
16 Q.   Why is that information important for
17 Mr. Ebert to have?
18 MR. WASHER:  Objection to the form;
19 foundation.
20 A.   Why is it important for Michael Ebert to
21 have?  I think it would have been no different than
22 any other kind of other supervisory duty that he
23 would have had.  He needs to know what's going on in
24 the businesses, and I don't know the exact

Page 60

LEONARDO MAYER

1  motivation behind this particular email that I
2  forwarded to him, but just general understanding of
3  what's happening in the businesses.
4  Q.   Okay.  And then at the top of your second
5  email, about a third of the way down that second
6  page, you mention a discussion on VIX ETNs on Friday
7  evenings.
8  Do you see that?
9  A.   On which paragraph, on Point 3?
10 Q.   It's the very top of the next email.
11 A.   Yes.  "Hi Mike: Following up on our
12 discussion on Friday evening."
13 Okay, yes.
14 Q.   Do you recall anything about that
15 discussion?
16 A.   I don't.  I don't remember that
17 discussion.
18 Q.   Was it a pretty regular occurrence, that
19 the two of you would maybe discuss the state of VIX
20 ETNs?
21 A.   We would discuss many things as an ongoing
22 dialogue around the businesses and risks.  ETNs
23 would have been part of that.
24 Q.   Okay.  So in that Paragraph 1, just below

Page 61

LEONARDO MAYER

1  the part that we are talking about, you have a
2  question, I think it's just posing this as something
3  to think about, but you say, "Do the current
4  creation/redemption restrictions actually do
5  anything when, in theory, you could have infinite
6  AUM" -- I take that to mean assets under management
7  -- "from buying demand in open markets satisfied by
8  market makers that short."
9  Do you see that?
10 A.   Yes.
11 Q.   Can you explain to me what that means?  I
12 don't have a background in finance, so that's a
13 confusing one for me.
14 A.   Sure.
15 You know, it's been some years since this
16 email.  Let me read the whole paragraph because I
17 need a little more context, as well, to that one
18 sentence.
19 Q.   Sure.
20 A.   Okay.  Yeah, I think it's the same kind of
21 thinking along the lines of we are trying to
22 understand, really, the drivers and the color and
23 the flow that are happening in the ETN business.  I
24 think this particular sentence is -- you know, is

LEONARDO MAYER

1  kind of thinking about, well, could one thing that
2  would be happening here is there's buyers of XIV in
3  the open market, there's market makers that are
4  selling and hedging with VIX futures, and those
5  market makers that are shorting XIV are coming to CS
6  to borrow that restock and how is that mechanic
7  really working.
8  I don't know --
9  Q.   So you mentioned --
10  A.   I'm sure you're going to ask whether
11  that's an infinite AUM demand.  I don't know exactly
12  why I phrased it like that.  I think I was just kind
13  of thinking about one scenario where you could just
14  have a lot -- a lot of demand from end users, we
15  don't know who those are, in the open market buying
16  XIV, and market makers continuously shorting it, and
17  that ETN would have to be created through a lending
18  process.
19  But there's nothing to make me think that
20  there would be an infinite demand or anything like
21  that.  This is just kind of general thinking about
22  what potential -- potentially could happen or what
23  might be happening.
24  Q.   You also reference in that sentence "the


LEONARDO MAYER

1  current creation/redemption restriction"?
2  A.   Yes.
3  Q.   I am trying to understand what that
4  piece -- you know, the role that that piece plays in
5  the question.
6  A.   Right.
7  Q.   Is this about -- is this about channeling
8  demand towards creations via swap versus borrowing
9  XIV?
10  MR. WASHER:  Objection to the form.
11  A.   I think it's the same kind of thinking,
12  which is, you know, we have -- at the time, as we
13  just mentioned, we have the creation process that
14  comes in -- that accounts could come in to create,
15  but they have to do it via swap, which was a way to
16  limit the AUM of the product.
17  But then you also have the mechanics of,
18  again, participants in the open market buying the
19  ETN and market markers having to short it and create
20  it, and, really, at the end of the day, what were
21  the drivers -- what were the drivers causing the AUM
22  to go up or down, you know, was it the actual
23  creation/redemption process, or was it really coming
24  from market -- again, from participants in the

LEONARDO MAYER

1  market buying and market makers having to short and
2  borrow that stock from the lending.
3  Q.   "The current creation/redemption
4  restrictions," is that referring to the requirement
5  that the creation must be accompanied by a swap?
6  A.   Yes, I think so.
7  Q.   Okay.  And then if we go up a bit further
8  in this document, if we can go towards the top of
9  the first page, you will see that Mike Ebert asks
10  "What's our next step in this analysis/thought
11  process?"
12  Do you see that?
13  A.   Yes.  Okay, yes.  On November 2nd.
14  Q.   Okay.  The reason I point that out is we
15  are going to look at another document now where that
16  conversation picks up.
17  MR. SCHNEIDERMAN:  So can we pull up
18  Tab I, as in Idaho.  And this is Exhibit 87.
19  THE WITNESS:  Okay.
20  BY MR. SCHNEIDERMAN:
21  Q.   Take a moment to look this over.
22  A.   It's a little bit difficult to read this
23  one.
24  Q.   You should be able to zoom in and out.  I

LEONARDO MAYER

1  am not sure if that will make it easier.
2  A.   Okay, yes.  Yes, that does help.  Thank
3  you.
4  Q.   Okay.  Let me know -- with all of these,
5  if you have any issues seeing anything, just let us
6  know.
7  A.   Okay.
8  Okay.
9  Q.   Okay.  Do you recognize this email?
10  A.   I do not.
11  Q.   Do you have any reason to doubt it's an
12  email dated November 3rd, 2017, between you, Robert
13  Sowler, and Mel Oechslin?
14  A.   I don't see that.
15  Oh, okay, I wasn't seeing all of the
16  sheets before.  Okay, there are three sheets here.
17  Got it.
18  That is correct, that's an email from me
19  to Rob and Mel, yes.
20  Q.   If you want to take a minute to look over
21  the other two pages, that's fine.
22  A.   Okay, sure.  Just a moment for that.
23  Okay.
24  Q.   Okay.  So if you go to the very bottom,

LEONARDO MAYER

1  LEONARDO MAYER
2  you will see the thread begins with the same
3  question from Ebert, "What's our next step in this
4  analysis/thought process?"
5      Do you see that?
6  A.  I do.
7  Q.  Okay.  And then in response, you lay out
8  what you call "Four states of
9  business/profitability."
10      That's at the top of Page 1, if you are
11  looking for it.
12  A.  Right, okay.
13      "Four states of business/profitability,"
14  okay.
15  Q.  And so if we have a look at -- you can
16  kind of quickly look over the first three, but I am
17  focused on the fourth one.
18      So, let me know when you have had a chance
19  to glance over it.
20  A.  Yes, just a second.
21      So, current position --
22      Okay.  Which one are you focusing on,
23  No. D?
24  Q.  Yes.
25      So Scenario D says, "Buy back all risk

LEONARDO MAYER

1  LEONARDO MAYER
2  inventory and assume half shares we buy back comes
3  back to us in increased lending."
4  A.  Okay.
5  Q.  Is that right?
6  A.  That's what it reads, yes.
7  Q.  So it's the same buy back XIV notes and
8  assume we are able to lend half of them?
9  A.  That's what it looks like, yes.
10  Q.  Okay.  And then if we scroll down a bit
11  more, you kind of start a new header, which is,
12  "Buying back XIV"?
13  A.  Yes.
14  Q.  And then if we scroll down a bit more to
15  Page 3, under that topic, you say, "Risk of shares
16  coming back in the form of new creations is less
17  than what we may have originally considered"?
18  A.  I see that, yes, Point D.
19  Q.  Can you explain to me what that means?
20  A.  "Risk of shares coming back in the form of
21  new creations is less than what we may have
22  originally considered."
23  Q.  And just to remind you, for the context
24  here, this is in the context of buying back XIV.
25  A.  Well, I think the broader picture here is

LEONARDO MAYER

1  LEONARDO MAYER
2  that we were evaluating different -- different ways
3  to risk manage the ETN portfolio, one of which was
4  to buy back, essentially, the shares that we created
5  and we were short in having to hedge and rebound,
6  and I think what we were trying to think about here
7  was that if we actually went out and bought those
8  shares from the market, market makers that
9  presumably would be short would have to create those
10  shares, right, and so they would either come back to
11  borrow shares or they would create them via the
12  creation process that we just discussed, which was
13  creating and having the swap with it.
14  Q.  Why would it be a problem if that's
15  happening?
16  A.  I don't know if it would have necessarily
17  been a problem, but our -- I think our -- our aim of
18  the risk management was to try to have a position
19  that carried -- you know, that didn't carry -- where
20  we were controlling the risk, that we didn't want to
21  be short too many XIV shares, and we were just being
22  efficient and clinical in the way we were
23  approaching that.
24      The more specific to your question, if we
25  were just buying back the shares, and then someone

LEONARDO MAYER

1  LEONARDO MAYER
2  was coming in to create them again, it was maybe not
3  an effective risk management tool.
4  Q.  As opposed to if they are borrowing them,
5  that's not -- that doesn't run into the same kind of
6  inefficiency problem?
7  A.  Well, they could come back and borrow
8  them, but, you know, for our purposes, we were just
9  trying to have sort of a balanced book in terms of
10  the total number of notes that we were short and
11  having to hedge.
12  Q.  I will just point out the last sentence in
13  this same bullet point, you say, "The short sellers
14  are likely to be market makers who do not have ISDAs
15  and are unable to create in a traditional manner
16  (with offsetting swap) and instead would likely just
17  borrow/lead to increase in lending."
18      Do you see that?
19  A.  Right.  Yes, I do, yes.
20  Q.  So --
21  A.  So --
22  Q.  Go ahead.
23      MR. WASHER:  Sorry.  There's no question
24  pending.  You want to wait for a question.
25  Q.  I was just going to ask -- I mean, my

Page 70

LEONARDO MAYER

1                  LEONARDO MAYER
2  interpretation of this is the concern that you just
3  laid out was not actually happening because of the
4  behavior you described here to the extent the market
5  makers need more notes, they are coming back to
6  borrow them.
7         MR. WASHER:  Objection to the form.
8     A.   That's what it sounds like.
9         MR. WASHER:  Objection to the form.  It's
10     still not a question.
11    Q.   Is that correct?  Is that your
12  understanding?
13    A.   Sorry, what is the specific question?
14    Q.   Okay.  So the first sentence lays out
15  "risk of shares coming back in the form of new
16  creations is less than what we may have originally
17  considered."
18    A.   Right.
19    Q.   I am asking if the reason the risk of
20  shares coming back in the form of new creations is
21  less than what you may have originally considered is
22  because of your explanation in that last sentence,
23  that to the extent market makers are coming back for
24  more XIV notes, they are coming back in the form of
25  lending?

Page 71

LEONARDO MAYER

1                  LEONARDO MAYER
2         MR. WASHER:  Objection.
3    A.   Yes, I think that's what we were thinking
4  was potentially happening, that's right.
5    Q.   Okay.
6         Okay.  So if we go, then, to the top of
7  this document -- I know there's a lot of scrolling
8  around here.
9    A.   Okay.  We are back to Page 1, right?
10    Q.   Yes, the top of Page 1.
11    A.   Okay.
12    Q.   So you follow-up with a note to Mr. Sowler
13  and Mr. Oechslin saying, "As I was walking in, Mike
14  pulled me into his office, so let's do this is at a
15  high level."
16         I am assuming that's Mike Ebert, correct?
17    A.   Yes.
18    Q.   And you say, "Bottom line, wants to get
19  the vega risk we manage to around 20 million and
20  assets to bring them in if we need help getting the
21  green light from legal/compliance to go ahead and
22  start purchasing shares."
23         Do you see that?
24    A.   I do, yes.
25    Q.   So does this mean that the team ultimately

Page 72

LEONARDO MAYER

1                  LEONARDO MAYER
2  elected to go with Scenario D of these four states
3  of business/profitability?
4    A.   I don't remember exactly what came out of
5  this conclusion, but it sounds like -- it sounds
6  like we ended up trying to buy back shares.  I think
7  the primary motivation behind that was that we
8  were -- like any market making business, we were
9  trying to risk manage our position, and from here,
10  it looks like Mike was most comfortable with us
11  being in a position to risk manage $20 million of
12  vega, and that's what we -- it sounds like we
13  ultimately did, right, by buying potentially some
14  shares back in the market, and I don't know if we
15  did anything else.
16    Q.   None of these other scenarios or states of
17  business that you laid out involved buying back
18  shares, right?
19    A.   Do any of the other scenarios -- I'd have
20  to go back and review them here, but it looks like D
21  option was to buy back shares, yes.
22    Q.   Okay.  Do you recall anything else about
23  this conversation with Mike Ebert when he pulled you
24  into his office?
25    A.   I do not.

Page 73

LEONARDO MAYER

1                  LEONARDO MAYER
2    Q.   How would he have arrived at the decision
3  to pursue this strategy?
4         MR. WASHER:  Objection to the form;
5     foundation.
6    A.   How would he have arrived at this
7  strategy?  I don't know exactly how, but I would
8  guess he took into consideration some of the input
9  from the trading desk and maybe his general thinking
10  about the risk that the business should run.
11    Q.   Who would he have consulted in making the
12  decision?
13         MR. WASHER:  Objection to the form;
14     foundation.
15    A.   In making that decision, I am not sure.
16    Q.   Can you say generally how he would have
17  made this kind of decision?
18         MR. WASHER:  Same objection.
19    A.   How would he -- generally how he would
20  approach decision making?  I think he would have
21  taken input, again, from the trading desk, and from
22  the risk team, and from other partners across the
23  businesses, but I can't tell you specifically how he
24  came up with the $20 million of vega.
25    Q.   Who would he have informed about the

LEONARDO MAYER

1
2  decision to pursue this strategy?
3      MR. WASHER:  Objection to the form.
4  A.   He would have told me and probably Rob and
5  Mel.
6  Q.   Would he tell his supervisors?
7      MR. WASHER:  Objection to the form;
8  foundation.
9  A.   Oh, you mean if he would have informed
10 above him, you are saying?
11 Q.   Yes.
12 A.   I don't know.  I don't know how -- I don't
13 know how Mike managed that part of the conversation.
14 Q.   Okay.
15     MR. SCHNEIDERMAN:  Let's go to Tab J, as
16     in January.  This was previously marked as
17     Exhibit 88.
18     THE WITNESS:  Okay, Exhibit 88.
19 BY MR. SCHNEIDERMAN:
20 Q.   Take a minute to look over this.
21 A.   Okay.
22 Q.   Do you recognize this?
23 A.   Sorry, I missed a page.  Just a moment.
24 Q.   Yes, it's three pages.
25 A.   Okay.  Yes, I don't recall this exact

LEONARDO MAYER

1
2  document or remember it, but I can see that there's
3  an exchange between Mike Ebert and me and Rob Sowler
4  and Mel from November of 2017.
5  Q.   Okay.  So at the bottom of Page 2, you
6  note --
7  A.   Okay.
8  Q.   -- you note that you are going to forward
9  Mike Ebert some analysis on breakevens on borrowing
10 versus creating from an external counterparty
11 perspective.
12     Do you see that?
13 A.   Yes.
14 Q.   So this is essentially comparing how
15 attractive borrowing versus creating with swaps is
16 from the external counterparty perspective?
17 A.   I think so, yes.
18 Q.   Okay.  And you provide some initial
19 thoughts.  If we scroll up, you determine that it
20 cost DB -- I take that to mean Deutsche Bank?
21 A.   Yes, I think so.
22 Q.   It costs Deutsche Bank 2.4 percent to
23 create XIV with a swap?
24 A.   2.14.
25 Q.   Sorry, 2.14.

LEONARDO MAYER

1
2      And then it costs them 2.85 percent to
3  borrow from Credit Suisse?
4  A.   Okay, yes.  That's what it seems like it
5  says here.
6  Q.   Okay.  And you say it's FF plus 1.67
7  equals 2.85 percent.
8      Is that FF finder's fee, or what is that?
9  A.   Fed fund rate.
10 Q.   Fed fund, okay.
11     And then in the next sentence, you say,
12 "One way to incentivize borrower versus creation
13 would be to lower the lending right to
14 counterparties that can create to below that
15 2.14 percent," correct?
16 A.   Okay, yes.
17 Q.   How are you able to put together this kind
18 of analysis for Deutsche Bank's perspective?
19     MR. WASHER:  Objection to the form.
20 A.   I think we were -- how did we come up with
21 this?  I think we had some assumptions that what if
22 we were in the position of Deutsche Bank, what type
23 of costs we would have in engaging either one of
24 these activities, whether it was borrowing or
25 creating with swap, and you know, some of the things

LEONARDO MAYER

1
2  are public.
3      You know, the management fee, you can
4  assume some funding rate, we can assume some cost of
5  rehedging, and the rest.
6      But this is -- this is a model.  We don't
7  know for certain.
8  Q.   Why didn't you use Deutsche Bank as the
9  example?
10 A.   Why did we?
11 Q.   Yes.
12 A.   I don't know.  I'm not sure why we used
13 them.  I would imagine that we had them -- they had
14 created on swap, and so they could have been one
15 counterparty that we had, but I don't recall the
16 specifics of why we looked at them.
17 Q.   Okay.  So you are sending this analysis to
18 Mike Ebert and Rob Sowler?
19 A.   Yes.
20 Q.   And I think we may have talked about this
21 before, but can you remind me what your relationship
22 is to Rob Sowler at this time?
23 A.   Rob was -- Rob was one of my managers.  I
24 can't remember at what point my direct manager was
25 Rob Sowler and at one point it was Philippe Carrier.

LEONARDO MAYER

1  I guess at this point, maybe Rob was my manager, I
2  can't remember exactly, but he was one of the senior
3  managers.
4
5      Q.   And you said Mike Ebert would have been
6  his boss?
7      A.   Correct.
8      Q.   Okay.  Why are you forwarding this kind of
9  analysis to them?
10     A.   Just general business -- business
11 practice.  You know, Mel was part of the team,
12 obviously doing the VIX, and then Rob was my senior
13 manager, so we were just having a discussion of how
14 we should manage the business.
15     Q.   Okay.  We talked about this a little bit
16 before, but was there any way for you to track who
17 loans were going out to?
18     A.   Who the loans were going out to?
19     Q.   Yes.
20     A.   You mean the borrow?
21     Q.   The borrow --
22     A.   Who was borrowing the shares?
23     Q.   Yes.
24     A.   No, we were not privileged to that
25 information.  That was part of the prime brokerage

LEONARDO MAYER

1  business, which is separate from ours.
2      Q.   What kind of information were you able to
3  review regarding who the loan counterparties were?
4
5          MR. WASHER:  Objection to form.
6      A.   We did not -- we did not know who the --
7  we did not know who the loan counterparties were, we
8  just knew how much the prime brokerage was requiring
9  us to facilitate in the lending.
10     Q.   Did you know how many lending parties
11 there were?
12     A.   No.  We knew the number of shares, as we
13 saw before, there were emails tracking that, but I
14 didn't know the number of counterparties borrowing
15 that I can recall, no.
16     Q.   Did you know the size of the loans?
17     A.   On an individual basis, no.  On an
18 aggregate sum basis, yes.
19     Q.   Okay.  So why -- on the next email up from
20 you, you mention four different alternatives to
21 incentivize more lending, less creation.
22          Why does Credit Suisse want to increase
23 lending and reduce creation?
24     A.   We wanted to increase lending versus
25 creation because it was -- it was less -- there was

LEONARDO MAYER

1  less risky activity.  It did not -- you know, the --
2  creating and then having -- the creation was with
3  the swap, as I had mentioned, was risk neutral for
4  CS, but as soon as the swaps rolled off, then we had
5  to start -- we were at risk on being short those
6  notes.
7
8          And so -- and so that was a riskier
9  activity, and that's what we were trying to limit.
10     Q.   And then because you don't have to hedge
11 the risk with the lending, that's also more
12 profitable?
13     A.   Is it more profitable?  As we did the
14 analysis here, yes, that's what the analysis is
15 showing.
16     Q.   Okay.  And then Mike Ebert responds and
17 says, "Yes.  Talk tomorrow."
18          Do you recall anything from that
19 conversation?
20     A.   I do not.
21     Q.   Having looked over these documents, do you
22 recall anything more about the decision to shift
23 from creation to lending?
24     A.   Not specifically, no.
25     Q.   Okay.

LEONARDO MAYER

1          MR. SCHNEIDERMAN:  Let's go to tab BV, B
2  as in boy, V as in violin.
3          MR. WASHER:  Brendan, we have been going a
4  little more than an hour.  Is now a good time
5  to take a break, you think?
6          MR. SCHNEIDERMAN:  Do you want to do ten
7  minutes, five minutes?
8          MR. WASHER:  Ten is fine.
9          MR. SCHNEIDERMAN:  Okay.  We will be back
10 in ten minutes.
11         THE VIDEOGRAPHER:  The time is 12:45.  We
12 are going off the record.
13         (Recess taken)
14         THE VIDEOGRAPHER:  The time is 12:59.  We
15 are going back on the record.
16 BY MR. SCHNEIDERMAN:
17     Q.   So before we turn to the next document,
18 just following up on our conversation about Mike
19 Ebert, did he ever tell you that he was not passing
20 information along that you gave him?
21         MR. WASHER:  Objection to the form.
22     A.   Can you say that one more time, please?
23     Q.   Did he ever tell you he was not going to
24 tell his superiors about any analysis you provided

LEONARDO MAYER

1
2  him?
3          MR. WASHER:  Objection to the form.
4      Q.  Did he ever tell you that any of the
5  analysis you were doing for him was a secret?
6      A.  No.
7          MR. WASHER:  Objection to the form.
8      Q.  In your experience with Mike Ebert, was he
9  competent in his job?
10     A.  Yes.
11     Q.  Was he communicative with his supervisors?
12         MR. WASHER:  Objection to the form;
13     foundation.
14     A.  I don't know that.
15     Q.  In your experience with him, would he hide
16  material information?
17         MR. WASHER:  Objection to the form.
18     A.  No.
19     Q.  Okay.
20         MR. SCHNEIDERMAN:  All right.  Let's go to
21     document -- or Tab BV, B as in boy, V as in
22     violin.
23         MR. DUMAS:  Exhibit 160?
24         MR. SCHNEIDERMAN:  This will be marked as
25     Exhibit 160.

LEONARDO MAYER

1
2      (11/2017 email chain between Leonardo
3      Mayer, Paul Somma, Mel Oechslin, and Mike Ebert
4      marked Exhibit 160 for identification, as of
5      this date.)
6  BY MR. SCHNEIDERMAN:
7      Q.  Take a minute to look it over.
8      A.  Okay.
9      Q.  Do you recognize this document?
10     A.  Again, I don't remember this document, but
11  it does appear to be an exchange between me, Paul
12  Somma, Mel, and Mike Ebert around November of 2017.
13     Q.  Okay.  And the initial email that you
14  send, you ask about the obligations regarding
15  creation?
16     A.  Yes.
17     Q.  You asked, "If someone came in to create a
18  very large XIV quantity, would we be obliged to do
19  it?"
20         Do you see that?
21     A.  Yes.
22     Q.  And, also, it says, "Yes, unless we are
23  informed the exchange and issue a press release
24  ahead of time."
25         Do you see that?

LEONARDO MAYER

1
2      A.  I do.
3      Q.  Is that under the Exchange's rules, or is
4  that an internal policy of Credit Suisse's?
5      A.  I am not 100 percent sure.  What it reads
6  to me is that it was an Exchange rule.  I am not
7  100 percent sure.
8      Q.  Okay.  And you forward this to Mike Ebert,
9  if you scroll up to the middle of the first page --
10     A.  Yes.
11     Q.  -- and then he says, "Let's discuss."
12         Do you see that?
13     A.  Where he says "Let's discuss" --
14     Q.  "I have a hard time believing that" --
15     A.  Yes, yes, that's right.
16     Q.  Do you recall anything about that
17  discussion?
18     A.  I do not.
19     Q.  Do you remember what the ultimate answer
20  was to that question?
21     A.  It sounds like the -- I don't remember the
22  specific result of this, but it sounds like there
23  was no limit of what someone could come in to
24  create.
25     Q.  Based on the other documents we've been

LEONARDO MAYER

1
2  reviewing, what's your impression of why you're
3  asking that question?
4      A.  I think it's the same idea, we are trying
5  to make sure we are appropriately risk managing this
6  produce and that the AUM doesn't get too large where
7  it's difficult to risk manage.
8      Q.  And as you said before, the creation
9  restrictions were a way of limiting the AUM?
10     A.  That's correct.
11     Q.  So it seems like this is just asking for
12  confirmation whether the creation restrictions are
13  operative in the way that you understand them to be?
14     A.  Yes.  Well, yes, we are asking -- I guess
15  I am asking if there's any -- like it says, any
16  limit to the amount that could be created on one
17  day.
18     Q.  Okay.
19         MR. SCHNEIDERMAN:  Let's go to Tab K.
20     This was previously introduced as Exhibit 89.
21         THE WITNESS:  Okay.  I am going to read
22     from the bottom.
23  BY MR. SCHNEIDERMAN:
24     Q.  Okay?
25     A.  Okay.

Page 86

LEONARDO MAYER

1
2  Q.  Do you recognize this document?
3  A.  Again, I don't remember this one, but it
4  looks like it's an exchange between me and Mel
5  and Rob Sowler, Mike Ebert in December of '17.
6  Q.  Okay.  And so Mel Oechslin starts this
7  thread by circulating details on the buyback of XIV
8  notes; is that right?
9  A.  Yes, that's correct.
10  Q.  And he notes how many shares the desk
11  could buy back and at what premium to NAV; is that
12  right?
13  A.  That's right.
14  Q.  He also notes the amount of vega needed to
15  be purchased in the event of an XIV knockout?
16  A.  Yes.
17  Q.  Why is he circulating this update to this
18  group?
19  A.  I don't know the specific reason.
20  Q.  Generally, why would this group receive an
21  update like this?
22  MR. WASHER:  Objection to the form.
23  A.  Because it looks like we likely took on --
24  we were buying back shares, and he wanted to give an
25  update to the business.

Page 87

LEONARDO MAYER

1
2  Q.  And so Mike Ebert's response is, "What are
3  we doing to encourage lending"?
4  A.  Yes.
5  Q.  Why is he so eager to encourage lending?
6  MR. WASHER:  Objection to the form;
7  foundation.
8  A.  I don't know exactly why Mike was saying
9  that.
10  Q.  What are some possible reasons?
11  MR. WASHER:  Objection to the form;
12  foundation.  Wild speculation.
13  A.  Again, I am not sure what -- I am not sure
14  why he was specifically saying that.
15  Q.  So you are discussing -- the update from
16  Mel is about the buyback and risk management?
17  A.  Yes.
18  Q.  Again, we talked about this a little bit
19  before, but what does lending have to do with those
20  topics?
21  A.  Would lending -- well, lending is one of
22  the parts of the ETN business that we ran, so it
23  would be part of the conversation, which it is, and
24  it looks like what this is -- this is detailing out,
25  right?

Page 88

LEONARDO MAYER

1
2  MR. SCHNEIDERMAN:  Let's go to Tab BF, B
3  as in boy, F as in Friday.
4  THE WITNESS:  Okay.  I will read through
5  this.
6  BY MR. SCHNEIDERMAN:
7  Q.  Okay.
8  A.  Okay.
9  Q.  So you will see this is a later email from
10  that same chain we just looked at?
11  A.  Agreed.
12  Q.  So in response to Mike Ebert's question,
13  "Are we approved to buy more, what do we do to
14  encourage lending," you come back and answer,
15  "Request has been raised to buy more.  Approval
16  pending completion/review of first stage, which, as
17  Mel details, concludes this week.  Increasing
18  lending also in motion with compliance on request to
19  lower lending rate to specific customers like DB/SG
20  that come in for creations."
21  "DB/SG," that's Deutsche Bank and Societe
22  Generale?
23  A.  Yes, that's correct.
24  Q.  So the plan here is to encourage specific
25  customers like Deutsche Bank and Soc Gen to change

Page 89

LEONARDO MAYER

1
2  their purchasing behavior from creations with swaps
3  to borrowing notes?
4  A.  That's right.
5  Q.  Philippe Carrier is looped into this
6  email; is that right?
7  A.  Yes, there's a forward to him.
8  Q.  And he says, "Thanks for the update"?
9  A.  Right.
10  MR. SCHNEIDERMAN:  Let's go to Tab N, as
11  in Nicole.  This was previously marked as
12  Exhibit 92.
13  Q.  This is just one page, but take a moment
14  to review it.
15  A.  Right, Exhibit 92.  I am opening that up.
16  Okay.
17  Q.  Do you recognize this document?
18  A.  Similar to before, I don't remember it,
19  but I see that it's a document between Mel and me in
20  August of '17.
21  Q.  And in it Mel is discussing, among other
22  things, the negative convexity inherent in inverse
23  and levered VIX ETN and ETF products?
24  A.  Yes.
25  Q.  He's also discussing the volume of VIX

Page 90

LEONARDO MAYER

1  futures contracts exchanging hands?
2      A.   Yes.
3      Q.   The subject line of this email is "Draft
4  for Tomorrow."
5      A.   Okay.
6      Q.   Do you know what that refers to?
7      A.   I do not.
8      Q.   Would that be for a presentation?
9      A.   I just don't recall this specific email
10  enough to know what it was for.
11      Q.   In general, was there a practice of having
12  the team meet regularly to discuss, you know, market
13  events like this?
14      A.   We met regularly to discuss the market and
15  positions and general business, but not specifically
16  to discuss, you know, one particular trading day or
17  something like this in this email that I can recall.
18      Q.   Okay.  When you say you would regularly
19  discuss these things, who all would be part of those
20  meetings?
21      A.   Well, we would have the trading team meet.
22  What I mean by meeting is formal and informal
23  meetings.  You know, we sit right next to each
24  other, so we often just talk on the desk or

Page 91

LEONARDO MAYER

1  sometimes we go off the desk and discuss things, but
2  it would be the trading team, yes.
3      Q.   Would that not include Mike Ebert and
4  Philippe Carrier?
5      A.   It might, but not always.
6      Q.   Mel passes this information along to
7  Marcus Payne.
8          Do you know who that is?
9      A.   Marcus Payne was a salesperson on the
10  desk.
11      Q.   Okay.
12          MR. SCHNEIDERMAN:  Okay.  Let's go to
13  Tab O, which was previously marked as
14  Exhibit 93.
15      Q.   I am going to ask you about this first
16  page, but feel free to look through the other pages
17  if you would like.
18      A.   Yes.
19          Okay, I'm with you.
20      Q.   Okay.  Do you recognize this document?
21      A.   Similar to before, I don't recall this
22  specific document, but I can see that it's an
23  exchange between Mel, James Cheesbrough, and John
24  Colello is copied here as well, from August of '17.

Page 92

LEONARDO MAYER

1      Q.   Okay.  If you look towards the bottom of
2  Page 1, you asked Mel for a detailed strategy on ETN
3  business opportunities challenges where you want to
4  take it?
5      A.   Yes.
6      Q.   What is the purpose of putting something
7  like that together?
8          MR. WASHER:  Objection to the form.
9      A.   It sounds like we were putting together
10  some index flow presentation, just reading from the
11  title, which is something that we would do
12  periodically in the business just to review the
13  business.
14      Q.   Who would see that presentation?
15      A.   Who would typically see that presentation
16  would be my senior managers, like probably Philippe
17  or Rob Sowler and Mike Ebert.
18      Q.   And what would they do with it?
19          MR. WASHER:  Objection to the form.
20      A.   You know, they would -- they would, you
21  know, take in the information.  What would they do
22  specifically with it, I don't know.
23      Q.   Okay.
24          MR. SCHNEIDERMAN:  Let's go to Tab BR, B

Page 93

LEONARDO MAYER

1  as in burr, R as in Rebecca.
2          This is an alphabet exercise for me today.
3          This will be Exhibit 162.
4          (9/2017 email chain between Leonardo
5      Mayer, Michael Ebert, Robert Sowler, and Mandy
6      Xu marked Exhibit 162 for identification, as of
7      this date.)
8          THE WITNESS:  I don't think it has come up
9      yet.
10  BY MR. SCHNEIDERMAN:
11      Q.   Okay.  You could try refreshing the
12  browser.
13      A.   It's Exhibit 93?
14      Q.   Exhibit 162.
15      A.   I am with you.  Pardon me.
16      Q.   No problem.
17      A.   Okay.
18      Q.   Do you recognize this document?
19      A.   As I said before, I don't remember this
20  specific document, but it looks like it's an
21  exchange between me, Ebert, Sowler, and Mandy Xu,
22  who is our strategist, and copied from September of
23  '17.
24      Q.   If we look at the middle of the second

LEONARDO MAYER

1  page, among other things, you provided an update on
2  the ETN front?
3      A.   The middle of the second page.
4      Q.   It's right in the middle of that
5  paragraph.
6      A.   Oh, the paragraph from the P&L and risk.
7           Okay.
8      Q.   So you are doing an update here on the
9  share buyback and the state of lending demands; is
10 that right?
11     A.   Yes, that's what it appears to, that's
12 right.
13     Q.   Is there a difference between redeeming
14 shares of XIV inventory and tearing up shares?
15     A.   Redeeming shares from inventory and
16 tearing up shares.
17          I think they are the same thing, no?
18     Q.   That's my impression.  I wanted to give
19 you a chance to correct me if I am wrong about that.
20     A.   Yes.
21     Q.   Okay.
22     A.   If I understand it correctly, yes.
23     Q.   Okay.  So this isn't actually buying back
24 shares, this is tearing up shares?

LEONARDO MAYER

1      A.   The way this reads to me, and it does not
2  allow an explanation to it, is that yes, we tore up
3  one and a half million shares.
4      Q.   Because of a creation demand?
5      A.   That's what I wrote, yes.
6      Q.   Do you have a reason to doubt that that's
7  not accurate?
8      A.   No, I don't.
9      Q.   Okay.  If we go to Page 1, Mike Ebert
10 replies asking for a daily mail with a summary of
11 volatility levels; is that right?
12     A.   I see that, yes.
13     Q.   And you respond that you will add him to
14 that daily mail?
15     A.   Right.
16     Q.   Okay.
17          MR. SCHNEIDERMAN:  Let's go to Tab BO, B
18 as in boy, O as in Ohio.
19     Q.   And this is, again, just to lay the
20 groundwork for an attachment that we are going to
21 look at.
22     A.   Okay.  One --
23          MR. SCHNEIDERMAN:  This is Exhibit 163.
24          (10/2017 email chain between Mel Oechslin

LEONARDO MAYER

1  and Philippe Carrier copying Leonardo Mayer
2  marked Exhibit 163 for identification, as of
3  this date.)
4          THE WITNESS:  Okay, I read it.
5  BY MR. SCHNEIDERMAN:
6      Q.   Do you recognize this document?
7      A.   Similar as before, I don't remember it
8  specifically, but I can see it's an exchange between
9  me -- it's an email from Mel to Philippe, copying
10 me, in October of '17.
11     Q.   And you see that there's an attachment?
12     A.   Yes.
13     Q.   It's the VIX ETN summary, September 2017?
14     A.   Yes.
15          MR. SCHNEIDERMAN:  So let's pull up that
16 attachment.  This is Tab BP, and this is going
17 to being marked as Exhibit 164.
18          (Presentation titled "VIX ETN Product
19 Update" marked Exhibit 164 for identification,
20 as of this date.)
21 BY MR. SCHNEIDERMAN:
22     Q.   So you can have a look through this
23 document.  You don't need to process it in any great
24 detail, but feel free to get familiar with it.

LEONARDO MAYER

1      A.   Okay.  I think I am still waiting for it
2  to pop up.
3      Q.   Okay.
4      A.   Okay.
5           Okay.
6      Q.   Okay.  So this presentation is titled,
7  "VIX ETN Product Update"?
8      A.   Yes.
9      Q.   It is dated October 2017?
10     A.   Right.
11     Q.   Who would have put a DEC like this
12 together?
13     A.   This would have been the input between the
14 trading desk and, again, the COO team.
15     Q.   Would sales be involved?
16     A.   I am not sure.  Probably not.
17     Q.   Why not?
18     A.   It's possible that Paul Somma was
19 involved, but I just -- I don't recall a specific
20 instance of him putting together a pitch book like
21 this.
22     Q.   Okay.  And who is the pitch book for?
23     A.   Again, I don't know specifically why we
24 put this one together in October of '17, but it

Page 98

LEONARDO MAYER

1  would have likely have been for a discussion with
2  other stakeholders in the business.
3      Q.   Is that other people on the flow desk or
4  other parts of Global Markets?  Who are you
5  referring to?
6      A.   Yes, I would imagine it would have been --
7  maybe it was for risk or maybe it was for the
8  business heads.  Again, it's a part of our regular
9  review.  As I mentioned before, we would do these
10 types of presentations from time to time.
11     Q.   Okay.  So if we take a look at Slide 7 --
12 do you see Slide 7?
13     A.   Yes.  Pardon, yes, I am with you, Slide 7.
14     Q.   It says, "Regarding XIV, with the current
15 economics and restrictions, XIV levies should not be
16 listed"?
17     A.   Right.
18     Q.   Those are the levies against creation?
19     A.   Yes, that's what I think it's referring
20 to.
21     Q.   And we spoke before about economics kind
22 of being interchangeable with profitability.
23          Is that what this is saying, because of
24 the profitability of XIV, the levy should not be

Page 99

LEONARDO MAYER

1  lifted?
2      A.   I don't know the -- I don't know the
3  drivers behind this statement.  Maybe there's a
4  slide after it.  My guess is that this is a
5  statement referring -- taking into consideration the
6  profitability, as you mentioned, Mr. Schneiderman,
7  and as well as the risk in the product to Credit
8  Suisse.
9      Q.   Okay.
10         MR. SCHNEIDERMAN:  Let's go to Tab 2.
11 This was previously introduced as Exhibit 95.
12     Q.   Are you able to see it?
13     A.   No.  I am still -- the last thing I can
14 see -- oh, it just came up.  It's a bit of a delay.
15 Now I see it, Exhibit 95, okay.
16     Q.   Do you recognize this document?
17     A.   Same as before, I don't recall this
18 specific document, but I can see it looks like
19 it's -- it's a meeting email, a meeting invite, and
20 it has got Mel, and I, and Yogi Logan, and Robert
21 McDonald, and it's coming from Clement Florentin,
22 who's in structure, and this was in October of '17.
23     Q.   I was going to ask you about who these
24 other people are.

Page 100

LEONARDO MAYER

1      It sounds like you recognize the names?
2      A.   Yes.  So Clement is a structure.  I
3  believe he was working -- I believe he was working
4  in Asia or London, not here in New York.
5          Logi runs the QIS business, Quantitative
6  Investment Strategy business.
7          And Robert McDonald, I can't remember that
8  name that well now.
9      Q.   Are these people that you would meet with
10 regularly?
11     A.   Not regularly, no.
12     Q.   So the subject here is "VIX Options
13 Liquidity"?
14     A.   Yes.
15     Q.   Do you remember this meeting?
16     A.   I do not remember this meeting, no.
17     Q.   Given their respective roles, do you have
18 a sense of what the meeting would be about?
19     A.   I don't recall the specific meeting.
20 Again, my guess is that maybe it was something we
21 were thinking about from the structuring side in
22 terms of VIX, and we were analyzing perhaps options
23 liquidity, but, again, I don't recall this meeting.
24     Q.   Can you tell me a little bit more about

Page 101

LEONARDO MAYER

1  what structure does?
2      A.   The structuring team looks for more
3  tailored solutions to customer needs.  They may, for
4  example, create a strategy or an investment strategy
5  for a customer, and they are involved in the
6  structuring or the creation of the structuring in
7  the back testing.
8      Q.   Would that potentially involve lending
9  rates?
10         MR. WASHER:  Objection to the form.
11     A.   Would it involve lending rates?  It's not
12 obvious that it would.
13     Q.   What about terms of swaps?
14     A.   Terms of swaps may be specifically to a
15 QIS strategy, but it would be -- I am just guessing
16 here.
17     Q.   Okay.  What about QIS, what does QIS do?
18     A.   QIS, again, it, for example, would be the
19 creation of a strategy for a customer to invest in a
20 particular way, and that's done in a systematic
21 fashion, and the QIS is the vehicle by which a
22 customer can invest in that type of strategy.
23     Q.   Okay.
24         MR. SCHNEIDERMAN:  Let's look at Tab BB.

LEONARDO MAYER

1             LEONARDO MAYER
2    This is marked as Exhibit 165.
3       (Email marked Exhibit 165 for
4       identification, as of this date.)
5  BY MR. SCHNEIDERMAN:
6    Q.   Take a look at that.
7    A.   Right.
8       Okay.
9    Q.   I am curious about -- first of all, do you
10 recognize this document?
11    A.   Like I said before, I don't remember this
12 specific document, but I can see that it looks like
13 it's an email going over the different the risk
14 parameters for XIV and TVIX, and it has sales, risk,
15 and trading copied.
16    Q.   That's what I was going to ask about it,
17 is the group of people here.
18    A.   Yes.
19    Q.   Sales, risk, and trading, you said?
20    A.   Yes.
21    Q.   The topic of conversation, as Paul Somma
22 lays out, is removing the gates/conditions currently
23 in place on creations of new TVIX ETNs.
24    A.   Right.
25    Q.   So I guess my question is:  Why are these

1             LEONARDO MAYER
2 the three teams that come together to discuss a
3 topic like that?
4      MR. WASHER:  Objection to the form;
5    foundation.
6    A.   Why are they the three teams that would
7 come together?  I think you have your risk, which
8 oversees risk, you have Trading, which would manage
9 the product, and you have sales that manages the --
10 manages the product sales to customers, so I think
11 this sounds like it was kind of an exploratory email
12 between all of these participants on this topic.
13    Q.   Is this the course of business regarding,
14 like, adjustments to creation guidelines that these
15 three teams would be in touch with each other?
16      MR. WASHER:  Objection to the form.
17    A.   Yes, I think it is.
18    Q.   Okay.
19      MR. SCHNEIDERMAN:  Let's go to Tab T.  And
20    this was previously marked as Exhibit 97.
21    THE WITNESS:  Exhibit 97.
22    Okay, opening that up.
23    Okay.
24
25

1             LEONARDO MAYER
2 BY MR. SCHNEIDERMAN:
3    Q.   Do you recognize this?
4    A.   Similar to before, it's an exchange
5 between Mel and me and Rob Sowler from October
6 of '17.
7    Q.   October 24th, right?
8    A.   Yes.
9    Q.   So we are going to look at the attachment
10 here.  You see there's an attachment, "XIV Q and A"?
11    A.   I do.
12    Q.   But before we look at that, do you see the
13 subject line is "Notes for Tomorrow's Session"?
14    Do you know what that's in reference to?
15    A.   I don't remember that, no.
16    Q.   Okay.
17      MR. SCHNEIDERMAN:  Let's pull up the
18    attachment, which is Tab U.  And this was
19    previously marked Exhibit 98.
20    THE WITNESS:  Okay.  Exhibit 98, I am
21    opening that.
22    Okay.
23 BY MR. SCHNEIDERMAN:
24    Q.   Do you recognize this document?
25    A.   I don't remember this document, no.

1             LEONARDO MAYER
2    Q.   So it appears to be a general Q and A
3 around XIV and TVIX, does that seem right?
4    A.   Yes.
5    Q.   Who would have drafted a document like
6 this?
7      MR. WASHER:  Objection to the form;
8    foundation.
9    A.   Who would have drafted it?  It would have,
10 again, likely have been a collaboration between
11 sales and the COO team.
12    Q.   And who would they get circulated to?
13      MR. WASHER:  Objection to form.
14    A.   Who would it have been circulated to?
15 Again, likely other stakeholders in the business,
16 including senior management and other -- perhaps
17 risk as well.
18    Q.   Do you have any recollection as to why a Q
19 and A around XIV would be put together at this time,
20 late October --
21    A.   I don't -- I don't remember the specific
22 meeting or this document.
23    Q.   Okay.
24      MR. SCHNEIDERMAN:  Let's pull up Tab D,
25    which was previously marked Exhibit 99.

LEONARDO MAYER

1   BY MR. SCHNEIDERMAN:
2
3       Q.   Take a minute.
4       A.   Exhibit 99, yes.
5            Okay.
6       Q.   Do you recognize this document?
7       A.   Again, I don't recall this specific
8   exchange, but it looks like it's a Bloomberg instant
9   messenger conversation between Paul Somma, Mel, and
10  I.
11      Q.   From October 31st, 2017?
12      A.   That's right.
13      Q.   Okay.  So if you look at Page 2, the
14  middle of that page, you ask Paul Somma for an
15  explanation on what date exactly the risk would
16  unwind from an accelerated event, the one where XIV
17  is 80 percent --
18      A.   Yes.
19      Q.   What do you mean by the date the risk
20  would unwind?
21      A.   I think this was just part of a general
22  conversation we were having about, like any
23  business, you are trying to plan to see what -- how
24  you would manage risk in different situations, and I
25  think what I am asking here is that if -- if, for

LEONARDO MAYER

1   example, CS chose to accelerate the termination of
2   XIV, when that would actually materialize, so in
3   other words, thinking about when we would actually
4   have that risk come off the books and when we would
5   have to enter hedges.
6       Q.   So in terms of what date exactly the risk
7   would unwind, is that --
8       A.   Yes.
9       Q.   -- is that the date at which the
10  redemption price gets locked in, is that the date at
11  which the notes are actually redeemed?  How would
12  you define that?
13      A.   I think I was asking about, yes, when
14  essentially the notes are terminated and they are
15  redeemed for whatever cash value they have at the
16  time.
17      Q.   So the date of redemption?
18      A.   Yes, the date at which there is no longer
19  market risk in the note.  There is -- the note has
20  terminated, and it's purely cash.
21      Q.   You see, my -- where I get confused is if
22  the -- there's the valuation date, and then sometime
23  later is the actual redemption.  So in terms of when
24  the risk is off the books, I am trying to understand

LEONARDO MAYER

1   if that's when that price gets locked in or when the
2   notes are actually redeemed.
3            Do you see the distinction?
4       A.   Are you talking about the difference
5   between when -- when you basically have the
6   settlement price, and then it actually settles where
7   the cash exchanges, right?
8       Q.   Right?
9       A.   I think I am asking more when the actual
10  trade terminates, not some much the actual
11  settlement date, meaning when the actual cash is
12  exchanged, because that would be important for our
13  risk management.
14      Q.   Okay.  And then a little bit lower down,
15  you ask to please discuss offline.
16           Do you see that?
17      A.   Yes.
18      Q.   Is there a reason you would want to
19  discuss offline?
20      A.   I think it would just have been easier
21  just to discuss it just in person.  We sat a couple
22  of rows from each other.
23      Q.   Do you recall anything from that
24  conversation?

LEONARDO MAYER

1
2       A.   I don't specifically, no.
3       Q.   In response, Paul Somma says, "Ideally, we
4   provide notice to Exchange on same date VIX ETN is
5   down 80 percent or more."
6            Do you see that?
7       A.   Yes.
8       Q.   Is that to avoid the possibility of a
9   rebound the next day?
10           MR. WASHER:  Objection to the form;
11  foundation.
12      A.   No, I don't think that's the case.  I
13  don't think so.
14      Q.   What is your interpretation of what he
15  means there?
16      A.   As I read this again, I don't exactly
17  understand the mechanics that clearly, it has been
18  several years since then, but I think, again, what
19  we were asking for is if you have an acceleration
20  event, when that's communicated, when does that
21  actually happen in the market, and then when does
22  the trade settle.
23           So it's not clear to me -- it's not clear
24  to me what he's actually saying there.  Acceleration
25  value date has to be at least seven business dates

LEONARDO MAYER

1
2 after we provide notice to the Exchange.  I would
3 have to have that conversation again with him.
4       Q.   Okay.  So, yes, he's talking here about
5 the time between the notice of an acceleration and
6 the acceleration valuation date?
7       A.   Yes.
8       Q.   What are the expectations around the
9 impact to the price of XIV when the acceleration is
10 announced?
11            MR. WASHER:  Objection to the form;
12       foundation.  Whose expectations?
13       Q.   You can answer.
14       A.   Can you -- sorry, can you rephrase your
15 question?  Can you say your question again?
16       Q.   What were your expectations around the
17 impact that the announcement of an acceleration
18 event would have on the price of XIV?
19       A.   My expectations on the impacts of an
20 acceleration event, I never -- I never would have
21 thought that there would have been an acceleration
22 event unless -- you know, unless, I guess, the --
23 the XIV went down, and we chose to do it at that
24 point.  I don't know, it's something I didn't really
25 think about.

LEONARDO MAYER

1
2       Q.   That's a little bit different than -- so
3 my question is:  Assuming an acceleration event is
4 announced, what is the expectation for what that
5 does to the XIV price?
6       A.   What does it do to the XIV price?  If you
7 are going to accelerate the event, at that point you
8 would have to -- you would have to exit the hedges,
9 which means you would be buying back XIV -- I'm
10 sorry, VIX futures, and then you would terminate --
11 you would terminate the contract, but it's not
12 obvious exactly what would happen.
13       Q.   It's not obvious what would happen to the
14 price of XIV upon an announcement that it's
15 ultimately going to terminate?
16       A.   No.
17       Q.   Why is that not obvious?
18            MR. WASHER:  Objection to the form.
19       A.   We have never -- we have never terminated
20 one before, so I don't have historical experience of
21 what that would have done, but from what we have
22 seen of what did happen, we terminated XIV, and the
23 price basically -- that was it, it was terminated
24 and it was unallowed.
25       Q.   I am sorry, I didn't understand the last

LEONARDO MAYER

1
2 part there.
3       A.   What I am saying is we had never
4 terminated one before in the market.  The only
5 example I can point to is the one that, as you know,
6 XIV was terminated, and after that, the cash was
7 returned, whatever was left on the note, and we
8 exited whatever finalizers we had, and the market
9 impact at that point was very little because the
10 price of the note had already gone down so much.
11       Q.   There's a lot of discussion about the
12 acceleration clauses leading up to February 2018.
13 There is -- you are saying there was no expectation
14 of how an acceleration event would be perceived in
15 the market?
16            MR. WASHER:  Objection to the form;
17       foundation.
18       A.   There was no expectation of what would
19 happen, you mean?
20       Q.   Meaning the price impact of announcing an
21 acceleration, no one on your team formulated
22 expectations about what that would do to the price
23 of XIV?
24       A.   I don't recall specifically having a
25 conversation about that, no.

LEONARDO MAYER

1
2 Q.   Okay.
3            MR. SCHNEIDERMAN:  Let's go to Tab BQ.
4            MR. WASHER:  Brendan, we have been going a
5 little over an hour.  Is now a good time to
6 take a lunch break?
7            MR. SCHNEIDERMAN:  I would say I maybe
8 have an hour left.  If you want to break for
9 lunch, that's fine.
10            THE VIDEOGRAPHER:  We are going off the
11 record at 12:50.
12            (Luncheon Recess)
13            (Time noted:  12:50 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 114

                    LEONARDO MAYER
1
2       A F T E R N O O N   S E S S I O N
3       (Time noted:  1:31 p.m.)
4       THE VIDEOGRAPHER:  The time is 1:31.  We
5  are back on the record.
6       MR. SCHNEIDERMAN:  Okay.  Let's pull up
7  document marked Tab BQ, Q as in queen.
8       And this will be marked as Exhibit 166.
9       (11/2017 email chain between Mel Oechslin
10  and Leonardo Mayer marked Exhibit 166 for
11  identification, as of this date.)
12 BY MR. SCHNEIDERMAN:
13     Q.   Let me know when you --
14     A.   My screen says, "Presenter has locked your
15 screen."
16          Is that something you need to unlock?
17     Q.   Rob can take care of that.
18     A.   Okay.
19          Okay, I am with you.
20     Q.   Do you recognize this document?
21     A.   Similar to before, I don't remember this
22 specific email.  It looks like it's an exchange
23 between Mel and I from November of '17.
24     Q.   And here, Mel is flagging for you -- the
25 subject line is "2017 XIV Swaps"?

Page 115

                    LEONARDO MAYER
1
2       A.   Right.
3       Q.   So the date of this email is November 2nd.
4            You see the column marked "Valuation
5  Date"?
6       A.   Yes.
7       Q.   Is that the date at which these swaps
8  expire?
9       A.   I think so.
10      Q.   So is it flagging for you the volume of
11 swaps that are expiring in the next month and a
12 half?
13      A.   That's what it looks like, yes.
14      Q.   And would that be because once those
15 expire, Credit Suisse then incurs the risk
16 associated with those notes?
17           MR. WASHER:  Objection to form; function;
18 speculation.
19      Q.   I couldn't hear your answer.
20      A.   Can you ask one more time?
21      Q.   Sure.
22           MR. SCHNEIDERMAN:  Could the court
23 reporter read that back.
24           (Requested portion read back)
25      A.   It looks like this email is flagging swaps

Page 116

                    LEONARDO MAYER
1
2  we have on, when they are expiring, and why Mel sent
3  that to me is likely, yes, to tell me that, yes, we
4  would be looking at the risk that we would have when
5  the swaps expire, yes, that's right.
6       Q.   This also seems to suggest that the terms
7  of the swaps are three months.
8            Is that your understanding, looking at
9  this?
10      A.   That's what it looks like, yes.
11      Q.   Okay.
12           MR. SCHNEIDERMAN:  Let's go to Tab BU.
13           And we will mark this Exhibit 167.
14           (11/7/17 email between Leonardo Mayer, Mel
15   Oechslin, Rob Sowler, and Mike Ebert marked
16   Exhibit 167 for identification, as of this
17   date.)
18 BY MR. SCHNEIDERMAN:
19      Q.   Take a moment to look at it.
20      A.   Right.
21           Okay.
22      Q.   Do you recognize this document?
23      A.   Similar to before, I don't recall this
24 exact email, but it looks like it's an exchange
25 between me, Mel, Rob Sowler, Mike Ebert, and it's

Page 117

                    LEONARDO MAYER
1
2  from November 7th of '17.
3       Q.   Okay.  So let's turn to the third page,
4  which is the beginning of the email chain.
5       A.   Right.
6       Q.   So Mel is letting Russ Davidson and
7  Brenden Bailey know, "We are awaiting new guidelines
8  from you to start executing on a bigger scale to get
9  to our desired size."
10           Do you see that?
11      A.   We are -- yes, okay.
12           THE VIDEOGRAPHER:  This is the
13 videographer.
14           Can the witness turn himself just a little
15 more?
16           THE WITNESS:  Yes, I can move this,
17 probably.
18           Is that better?
19           THE VIDEOGRAPHER:  Yes, thank you.
20           THE WITNESS:  Okay.
21 BY MR. SCHNEIDERMAN:
22      Q.   The guidelines that Mel is referring to
23 here, those are the -- that's Credit Suisse's
24 tolerance for the premium paid relative to NAV,
25 right?

LEONARDO MAYER

1
2      A.   I think so, yes.
3      Q.   And that's regarding the buyback of XIV
4  notes?
5      A.   Right, in the open market.
6      Q.   All right.  And then Russ Davidson, who is
7  Russ Davidson?
8      A.   Russ Davidson is one of the members of
9  the -- of the -- the risk -- not the risk -- one of
10 the control functions.
11     Q.   Okay.
12     A.   Pardon me, I am searching for the right
13 word.  He's part of the compliance team.
14     Q.   Okay.  So he says he can update you all
15 tomorrow, and then the next day, he says, at
16 10:00 a.m., there's a follow-up call that afternoon.
17          Do you see that?
18     A.   Yes, I do.
19     Q.   And then you respond at 1:45 asking for an
20 update?
21     A.   Right.
22     Q.   And then at 2:30, Russ says the call has
23 to be pushed back to the next day?
24     A.   Okay.
25     Q.   And then you note to Russ, "I want to

LEONARDO MAYER

1
2  stress again that we should please be moving with a
3  sense of urgency on this open item to allow us to
4  engage in risk reducing trades at attractive levels
5  for our ETN portfolio"?
6      A.   Right.
7      Q.   Why the urgency?
8      A.   The urgency is, I think, if I remember
9  correctly and looking at this graph, it looks like
10 we wanted to buy XIV notes to reduce our risk, and
11 they were trading close to NAV, and it seemed like
12 an opportune time in the market to do so.
13     Q.   Did you generally circulate emails calling
14 for a sense of urgency when you saw an opportunity,
15 like a trade opportunity regarding premiums?
16          MR. WASHER:  Objection to the form.
17     A.   Did I do it often?  No, but I think this
18 situation merited it.
19     Q.   Why is that?
20     A.   Again, we are not in the business of
21 managing risk and doing so in an appropriate manner
22 in the market, and this presented itself as a good
23 chance to do so.
24     Q.   Okay.  And at the end -- so if you go to
25 the third top of the document --

LEONARDO MAYER

1
2      A.   Right.
3      Q.   -- Russ adds Rich O'Keefe to the
4  conversation.
5          Do you know who Rich is?
6      A.   I can't place the name now.  I can't
7  remember who that is.
8      Q.   Okay.  Does the context of the email give
9  you a sense of why he would be added?
10     A.   No.  I just don't remember who Richard
11 O'Keefe is.
12     Q.   Okay.  What would the process be like for
13 adjusting these guidelines?
14     A.   What would be the process of adjusting the
15 guidelines?  We were deferring to compliance to make
16 sure that we were -- we were conducting the trades
17 in an open market in an appropriate fashion, and we
18 were waiting for them to get a clearance on whether
19 or not we could do so, I think, at the moment there.
20     Q.   So the interest in adjusting the
21 guidelines starts with your desk, and then you
22 reported to compliance for sign-off, or how does
23 that work?
24     A.   We would ask compliance, can we purchase
25 XIV in the market, how much can we purchase, and

LEONARDO MAYER

1
2  they would basically come back to us with the
3  guidance of how much was -- was -- if it was okay to
4  do so.
5      Q.   So is this a -- if we turn back, it might
6  be helpful to look at the third page.  There is a
7  message from Mel.
8      A.   Right.
9      Q.   I guess what I am trying to get at is if
10 this is something that needs to happen every time
11 you want to initiate a new buyback, or is it for
12 every trade, or what's the cadence with which you
13 would need to get new guidelines?
14     A.   What's the cadence?  We would -- as far as
15 I recall, every time we were trading XIV in the open
16 market, out of an abundance of caution to make sure
17 that we were operating under appropriate -- in an
18 appropriate way, we would check in with compliance.
19     Q.   Do you see where Mel says he wants new
20 guidelines to start executing on a bigger scale?
21     A.   Yes.
22     Q.   To get to our desired size?
23     A.   Okay.
24     Q.   So what does that mean?
25     A.   I think we just wanted to purchase more.

Page 122

LEONARDO MAYER

1   I don't recall the exact amount that we were looking
2   to buy back, but it looks like we were looking to do
3   more than maybe 100,000 shares a day.
4       Q.   Okay.
5           MR. SCHNEIDERMAN:  Let's go to Tab BE, E
6   as in Edward.
7           And this will be marked as Exhibit 168.
8       (11/22/17 email between Mel Oechslin,
9       Michael Ebert, Robert Sowler, and Leonardo
10      Mayer marked Exhibit 168 for identification, as
11      of this date.)
12          THE WITNESS:  Okay.
13  BY MR. SCHNEIDERMAN:
14      Q.   Okay.  Do you recognize this document?
15      A.   Similar to before, I don't recall this
16  exact one, but it looks like it's an email between
17  Mel and Ebert, Sowler, me, with an update on the XIV
18  buyback dated November 22nd, 2017.
19      Q.   Here, Mel is summarizing the premiums
20  above NAV paid to buy back XIV?
21      A.   That's right.
22      Q.   And over the course of November -- so, he
23  says in the email this is since November 3rd, 2017.
24      A.   Right.

Page 123

LEONARDO MAYER

1       Q.   So over the course of November 2017, we
2   see the premium above NAV is somewhere between 14
3   and 32 basis points?
4       A.   Yes.
5       Q.   What's the point of circulating this
6   information?
7       A.   I think it's just a general update on what
8   we have done to update -- it looks like me, and
9   Sowler, and Ebert -- on the progress of the risk
10  production in the portfolio.
11      Q.   Do you have an understanding of what Mike
12  Ebert or Rob Sowler would do with this?
13      A.   Beyond taking the information in, no.
14      Q.   Okay.
15          MR. SCHNEIDERMAN:  Let's go to Tab AG.
16  This was previously introduced as Exhibit 105.
17          THE WITNESS:  Okay.
18  BY MR. SCHNEIDERMAN:
19      Q.   Do you recognize this document?
20      A.   Similar to before, I don't recall this
21  specific email, but this looks like an update or an
22  exchange with compliance again on the XIV repurchase
23  in the market from December 8th, '17.
24      Q.   You mentioned before not recalling exactly

Page 124

LEONARDO MAYER

1   the number of shares bought back.
2           So here, Mel is identifying --
3       A.   Yes.
4       Q.   -- an additional 2 million shares that the
5   desk wants to buy back?
6       A.   Yes.  Yes, that's right.
7       Q.   Okay.  Does this give you any further
8   recollection about kind of the process for getting
9   approval to do something like that, just the
10  people -- go ahead.
11      A.   Not beyond what we discussed,
12  Mr. Schneiderman.  We would speak to compliance and
13  make sure we were all on the same page of what we
14  were going to do, and looped into that were the
15  managers and COO of the department as well.
16      Q.   Your supervisors were aware of the crash
17  risk inherent to XIV, right?
18          MR. WASHER:  Objection to the form.
19      A.   Yes.
20      Q.   Sorry, you can answer.
21      A.   Yes.
22          MR. SCHNEIDERMAN:  Can we pull up Tab AA.
23  This was previously introduced as Exhibit 102.
24          THE WITNESS:  So we are looking at Exhibit

Page 125

LEONARDO MAYER

1   102, right?
2   BY MR. SCHNEIDERMAN:
3       Q.   Correct.
4       A.   Okay.
5       Q.   Do you recognize this document?
6       A.   Same as before, it's not one that I
7   remember specifically, but it looks like it's an
8   exchange about the XIV knockout level between me,
9   Ebert, and copied is Rob Sowler and Mel, from
10  October 19, 2017.
11      Q.   So at the bottom of that top paragraph,
12  Mel tells the group, "7.5 percent to 10.5 percent
13  selloff in STX leading to a knockout level in XIV."
14          Do you see that?
15      A.   I do.
16      Q.   Do you remember having a reaction to that
17  analysis?
18      A.   Not specifically.
19      Q.   Do you remember Ebert or Sowler having a
20  reaction to it?
21      A.   Not beyond what Ebert wrote in this email
22  right here.
23      Q.   So I think that the analysis from Mel
24  comes after -- that the sentence that I just

LEONARDO MAYER

1   LEONARDO MAYER
2   referred to --
3       A.   Pardon, yes, there was one -- one estimate
4   of what it could be previously.  You were replied to
5   it on Mel's last email here, the one from 1/18/19.
6   I don't recall what the reaction was from Ebert or
7   Sowler to that.
8       Q.   Okay.  Yes, let's actually take a look at
9   that second page.
10          So you provide an initial estimate a --
11  for full context here, you asked Mel for what spot
12  bonds in STX would result in VIX levels where XIV
13  goes to zero?
14      A.   Yes.
15      Q.   He gets back to you with an estimate of a
16  24 percent selloff?
17      A.   Right.
18      Q.   And Mike Ebert responds, "Seems far too
19  low"?
20      A.   Right.
21      Q.   What does he mean by that?
22      A.   We were looking at, as you mentioned
23  yourself -- can I proceed.
24      Q.   Go ahead.
25      A.   Yes, so the question we are trying to

LEONARDO MAYER

1   LEONARDO MAYER
2   answer is at what level of spot move and bold move
3   would the XIV knock out essentially, and the chain
4   really is some guesses as to what that would be.  Of
5   course, we don't know exactly what that would have
6   been, but given some assumptions on spot and
7   volatility, we come up with different estimates as
8   to what that would be.
9       Q.   So, what Mike Ebert is saying, then, is
10  that the 24 percent selloff is a larger selloff than
11  he believes would be required?
12      A.   That's right.  That's his first kind of --
13  it sounds like kind of like an off-the-cuff remark.
14  On that first kind of assumption, he thinks that
15  that's too much of a selloff.  He would expect to
16  knock out with less of a selloff.
17      Q.   Okay.
18          MR. SCHNEIDERMAN:  Let's go to Tab BC.
19          And this will be Exhibit 169.
20          (1/5/18 email from Michael Ebert to Paul
21      Somma, Mel Oechslin, and Leonardo Mayer marked
22      Exhibit 169 for identification, as of this
23      date.)
24          THE WITNESS:  Okay, yes.
25

LEONARDO MAYER

1   LEONARDO MAYER
2   BY MR. SCHNEIDERMAN:
3       Q.   Go ahead and take a look at it.
4       A.   Right.
5           Okay.
6       Q.   Do you recognize this document?
7       A.   Same as before, I don't remember this
8   exact document, but I can see it is -- it looks like
9   it's something about extending the swap terms for
10  XIV from January 5th, '18, between Ebert -- sent
11  from Ebert to Somma, Mel and I, and Rob Montefiore
12  as well.
13      Q.   This is a meeting invitation, right?
14      A.   It is a meeting invitation, right.  Okay,
15  yes.
16      Q.   And the subject, as you said, is extending
17  swap terms for XIV?
18      A.   Right.
19      Q.   Do you remember anything about this
20  meeting?
21      A.   I do not.
22      Q.   Okay.  Do you know who would have called
23  this meeting?
24      A.   I don't remember specifically.
25      Q.   Does the fact that it's in Michael Ebert's

LEONARDO MAYER

1   LEONARDO MAYER
2   office suggest anything about who would have called
3   it?
4       A.   I would guess it was probably Ebert that
5   called it.
6       Q.   Okay.  Do you recall if you ultimately did
7   extend the terms for XIV swaps?
8       A.   I think we did, but my memory, again, is a
9   little bit foggy since it's been several years, but
10  I think we switched it from three months to six
11  months, but I would have to double-check on that.
12      Q.   Your memory is good.
13          MR. SCHNEIDERMAN:  We can pull up Tab BD.
14          This Exhibit 170.
15          (1/5/18 email from Paul Somma to Lisa
16      marked Exhibit 170 for identification, as of
17      this date.)
18          THE WITNESS:  Okay.
19  BY MR. SCHNEIDERMAN:
20      Q.   Do you recognize this document?
21      A.   I was just reading through it.  So this
22  looks like it's some more detail extending the
23  maturity of the XIV swaps done with creations, and
24  it's from Paul Somma to Lisa, who worked for him,
25  and copying the trading desk and supervisors on

LEONARDO MAYER

1  Jan. 5th, '18.
2      Q.   So this is confirmation that the swaps
3  were extended from three months to six months?
4      A.   That's what it appears, that's right.
5      Q.   Why would that be done?
6      MR. WASHER:  Objection to the form.
7      A.   This was done, again, to try to risk
8  manage the product in terms of the exposures to
9  Credit Suisse and also to try to -- try to, you
10 know, control the AUM of the product.
11     Q.   When you say "risk manage," you mean
12 reduce the risk?
13     A.   That's right.
14     Q.   Okay.  Who would be involved in making the
15 decision to extend swap terms?
16     A.   Who would be involved in the decision
17 to -- well, it would have been Paul Somma and likely
18 Mike Ebert's -- Mike Ebert's call as well.
19     Q.   Would they need approval from their
20 supervisors to do that?
21     A.   I don't know specifically.  I would
22 imagine -- I am not sure.
23     Q.   Okay.
24     MR. SCHNEIDERMAN:  Let's pull up Tab BG.

LEONARDO MAYER

1      Q.   Take a minute to get familiar with it.  I
2  am going to have a few questions about it.
3      A.   Okay.
4      Okay.
5      MR. SCHNEIDERMAN:  Okay.  So this is
6  Exhibit 171, if I didn't say it before.
7      (1/2018 email between Phlippe Carrier,
8      Michael Ebert, Robert Sowler, Leonardo Mayer,
9      and Mel Oechslin marked Exhibit 171 for
10     identification, as of this date.)
11 BY MR. SCHNEIDERMAN:
12     Q.   So at the very bottom, this starts with an
13 email from Mike Ebert to Tair Aurmont.
14     Do you recognize this document?
15     A.   The same as before, I don't recall this
16 specific email, but I can see it's an exchange
17 between Carrier, Ebert, Sowler, me, and probably Mel
18 around January of '18, and we are talking about the
19 different -- we are looking at the risks in the
20 portfolio given the notes and the hedges we have in
21 place.
22     Q.   Okay.  So, Mike Ebert's original question
23 is, "Can you show me the RT vega slide by desk?"
24     I think that means realtime?

LEONARDO MAYER

1      A.   That means route time vega.  That's a way
2  to normalize vega with respect to time, but it's a
3  measure of vega risk, yes.
4      Q.   What is route time vega slide, what does
5  that mean?
6      A.   That means we are looking at the vega
7  sensitivity of the books of the portfolio across
8  different levels of spot.  So what does that
9  exposure look like with the market year, what does
10 exposure look like with the market down 5, 10,
11 15 percent.
12     Q.   Okay.  So just to kind of break that down,
13 I understand vega to mean sensitivity to changes in
14 volatility; is that right?
15     A.   That's right.
16     Q.   So you are looking at these changes in
17 sensitivity to volatility as a function of different
18 market prices?
19     A.   We are looking at that exposure, which you
20 say, Mr. Schneiderman, is the sensitivity of the
21 portfolio to changes in volatility, and that
22 sensitivity is going to change based upon where you
23 are in spot.  It will be different in spot at flat
24 or in spot with a market crash eventually.

LEONARDO MAYER

1      Q.   By spot, you mean market prices?
2      A.   Yes, yes.
3      Q.   Do you know why Mike Ebert would be asking
4  for that information?
5      A.   Our oversight over the risk of the book,
6  whether it's measured in vega or any of the other
7  ways, it's something that we would routinely do as a
8  business every day, many times a day.  So this would
9  have been something that would have been routine,
10 especially if we were looking through the portfolio.
11     Q.   Okay.  And then if we scroll up to Page 4,
12 Mike Ebert then asks, "What's driving RT vega
13 downside"?
14     A.   I am trying to get to that.  What is
15 driving the RT vega on the downside?
16     Okay, right.
17     Q.   What does that mean?
18     A.   He is noting that, as you can see in the
19 email before, down 15 percent, it looks -- I think
20 this is a block information here of the route time
21 vega.  The route time vega of the business down
22 15 percent is $14 million, of which index is -- flow
23 index is 18.6.  So it's a large contributor of that
24 number.

Page 134

LEONARDO MAYER

1
2    And so he was asking what was driving that
3 downside.
4    Q.   Why would he want that information?
5    MR. WASHER:  Objection to the form;
6    foundation.
7    A.   He would want that information from -- you
8 know, any risk manager would look through the slide
9 of its business, meaning analyzing how it behaves
10 and what risks you have across different levels of
11 spot or cash prices.
12    So, again, it would be something routine
13 for a risk manager to ask questions about.
14    Q.   Okay.  So going up to -- if we go up to
15 the first page --
16    A.   Right.
17    Q.   -- on January --
18    A.   Okay.
19    Q.   -- on January 17th, Mr. Ebert asks you,
20 "Do we have any update on XIV risk recycling with
21 clients"?
22    A.   Right.
23    Q.   What is risk recycling?
24    A.   Risk recycling in this instance refers to
25 finding a way to edge the risk or lay off some of

Page 135

LEONARDO MAYER

1 the risk with clients who are in the market.
2    Q.   Is that Credit Suisse's risk or the
3
4 clients' risk?
5    A.   This would be our Credit Suisse's risk.
6    Q.   Okay.  And then she says, "I thought Wild
7 Cat was interested."
8    A.   Yes.
9    Q.   What is Wild Cat?
10    A.   Wild Cat was the name for a hedge fund.
11    Q.   So what does that mean, they are
12 interested?
13    A.   Interested meaning I think he's asking
14 whether or not Wild Cat, the hedge fund, was
15 interested in taking over some of the -- some of the
16 hedges for the XIV risk.
17    Q.   Would that be through lending?
18    A.   Well, I don't recall what format it would
19 have been.  It could have been something like an
20 offsetting swap, like we had discussed similar to
21 the hedges that were put on for the creations, but
22 the big picture here is that we were looking for
23 trading partners to try to lay off some of the risks
24 that we had on our books as a result of the ETN
25 business.

Page 136

LEONARDO MAYER

1
2    Q.   Okay.  And then you respond, "We have not
3 had much success in the knock-in forward format."
4    Is that another way of saying you are
5 struggling to find entities who want to take on that
6 risk?
7    A.   Yes.  This one looks like -- I don't
8 remember the specifics of this.  Knock-in forward is
9 another type of derivative that, again, the big
10 picture here is it would be another hedge for the
11 XIV risk, and it looks like we had showed it to Wild
12 Cat, we had engaged with that firm, which is another
13 asset manager, and it didn't seem like we had much
14 luck in finding trading partners to help us hedge
15 some of those risks through customer trades.
16    Q.   And then "We have also not been able to
17 buy back any more shares," and that was another
18 strategy for reducing Credit Suisse's exposure,
19 right?
20    A.   Right.
21    Which we just discussed before, right?
22    Q.   Right.
23    A.   Right.
24    Q.   And you say, "Premium has blown out to
25 greater than 1.5 percent range."

Page 137

LEONARDO MAYER

1
2    That means you are unable to buy back
3 shares for less than 150 basis point premium?
4    A.   Up to NAV, exactly.
5    MR. SCHNEIDERMAN:  Let's go to Tab ET.
6    THE WITNESS:  Can you repeat the tab
7    number?
8 BY MR. SCHNEIDERMAN:
9    Q.   ET, Bates ending in 7405.
10    A.   It's Document 171?
11    Q.   No.  It will be 172.
12    (Bloomberg chat between Leonardo Mayer and
13    Johan Drylewicz marked Exhibit 172 for
14    identification, as of this date.)
15 BY MR. SCHNEIDERMAN:
16    Q.   It's coming up now.
17    A.   Right, okay.
18    Q.   Have a look at this.
19    A.   Okay.
20    Okay.
21    Q.   Do you recognize this document?
22    A.   Again, I don't recall the specific
23 conversation, but it's an instant message -- instant
24 Bloomberg chat between me and Johan Drylewicz, who
25 works -- I think still works at the hedge fund.

Page 138

LEONARDO MAYER

1
2      MR. SCHNEIDERMAN:  For the court reporter,
3   that is Johan Drylewicz, J-O-H-A-N
4   D-R-Y-L-E-W-I-C-Z.
5      Q.   Does -- Mr. Drylewicz worked, at the time,
6   at Laurion Capital; is that right?
7      A.   Yes.  I am sorry.
8      Q.   You said that that's a hedge fund?
9      A.   Yes, it is.
10     Q.   Okay.  He starts the chat by asking if
11  there's a way to create XIV without the swap?
12     A.   Right.
13     Q.   And he notes that the swap is super
14  capital intensive?
15     A.   Right.
16     Q.   And you tell him that another alternative
17  if you need XIV is to borrow it, assuming you want
18  to short?
19     A.   Right.
20     Q.   And he tells you it's an expensive borrow
21  at 5 percent?
22     A.   Right.
23     Q.   And that's the rate that he's getting at
24  MS.
25          Is that Morgan Stanley?

Page 139

LEONARDO MAYER

1
2      A.   Yes, that sounds like what he's saying,
3   yes.
4      Q.   And you tell him that the Credit Suisse
5   rate should be closer to 3.5 percent?
6      A.   Yes.
7      Q.   So this is an example of kind of making
8   the economics of borrowing more attractive than
9   creating with a swap, right?
10     A.   Well, it depends.  I think for this
11  particular customer, that may have been the case
12  because it sounds like it was very capital
13  intensive, as he is saying, to hold an actual swap
14  on creation versus lending, but you know, you would
15  have to ask him exactly to see how that really
16  shaped out for him.
17     Q.   Is there something particular about why
18  this would be the circumstance for him, but not
19  others?
20     A.   I don't know exactly what -- how his
21  capital is allocated at the hedge funds or the
22  charges he would get.
23     Q.   And one thing you mentioned before is that
24  the flow desk didn't have insight as to who was
25  borrowing XIV because that was handled by prime

Page 140

LEONARDO MAYER

1
2   brokerage?
3      A.   Right.
4      Q.   So how do you square that with this
5   conversation that you are having with someone at a
6   hedge fund about borrowing XIV?
7          MR. WASHER:  Objection to the form.
8      A.   This was kind of a reverse inquiry.  He
9   was kind of asking me, and I said you can borrow
10  shares, but I wouldn't know if he had actually gone
11  to borrow shares with our prime broker at the end, I
12  wouldn't know if he had, or how many he had done.  I
13  was just pointing out to him what he could borrow
14  and at what rate.
15     Q.   Did you have conversations like this
16  regularly?
17          MR. WASHER:  Objection to the form.
18     A.   I don't recall that, no.
19     Q.   Do you remember this being an exceptional
20  conversation?
21          MR. WASHER:  Objection to the form.
22     A.   I don't recall too many conversations like
23  this, but, again, it has been some time.
24     Q.   Okay.  But this would be a way of gaining
25  some sense of who the participants are in the XIV

Page 141

LEONARDO MAYER

1
2   borrowing, right?
3          MR. WASHER:  Objection to the form.
4      A.   Well, I would know so far as they would be
5   considering borrowing it, but, again, had the
6   customer come in to borrow either through their
7   prime brokerage or my prime brokerage, I would not
8   if they had, or how many shares they had, or
9   anything else.  All I would know is that we would be
10  lending out more shares, and I would know the tally
11  of the total shares that were being lent as a firm.
12     Q.   I understand.
13     A.   Unless, of course, the customer
14  volunteered that information.
15     Q.   Okay.  I understand you wouldn't have
16  formal confirmation about the execution of borrowed
17  shares, but this would give you some understanding
18  as to the level of interest in borrowing and who was
19  interested in borrowing, right?
20          MR. WASHER:  Objection to the form.
21     A.   At some level, yes.
22     Q.   Okay.
23          MR. SCHNEIDERMAN:  Let's go to Tab BH, H
24  as in Henry.
25     Q.   And I have got just a couple more here.  I

LEONARDO MAYER

1  don't think we will be too much longer.
2      A.   Okay.
3           So 173?
4      Q.   That's right.
5           (Email between Robert Montefiore, Mel
6      Oechslin and Leonardo Mayer marked Exhibit 173
7      for identification, as of this date.)
8           THE WITNESS:  Okay.
9  BY MR. SCHNEIDERMAN:
10     Q.   Do you recognize this document?
11     A.   Again, similar to before, I don't recall
12 this specific email, but it looks like it's an
13 exchange on XIV revenues between Montefiore, Mel,
14 and I from Jan. 30, '18.
15     Q.   Okay.  And here, Rob is laying out a
16 comparison of the revenues generated for VIX ETNs
17 across different creations?
18     A.   Yes.
19     Q.   Okay.  And those scenarios are created
20 without a swap, created with a swap, and loan?
21     A.   Right.
22     Q.   And Rob states -- you asked him, what is
23 this, and he states it's -- if you look up a couple
24 of lines, he says, "The annualized P&Ls in each

LEONARDO MAYER

1  activity in basis points when considered in
2  isolation for those ETNs"?
3      A.   Right.
4      Q.   Okay.  So this is annualized revenue under
5  these three scenarios?
6      A.   Right.
7      Q.   And it's saying there are negative
8  revenues for notes created without a swap for XIV?
9      A.   Yes, that's what it's saying.
10     Q.   And then there's revenues of 76 basis
11 points for creations with swaps?
12     A.   Right.
13     Q.   And 161 basis points of revenue for
14 lending?
15     A.   Right.
16     Q.   So lending is far away the most profitable
17 of the three?
18     A.   That's what this suggests, yes.
19     Q.   So why would you create with swaps instead
20 of lend at this point?
21     A.   As a customer, you mean?
22     Q.   From Credit Suisse's perspective?
23     A.   Well, we are in the -- we are fulfilling
24 customer requests.  We are not driving one or the

LEONARDO MAYER

1  other necessarily.  If customers want to come in to
2  create on swap, which is what we are offering in the
3  product, we'll do that, and if they come in to
4  borrow with lending, we will do that as well, but
5  from a profitability perspective, as you note, it's
6  more profitable to lend.
7      Q.   So it was best for Credit Suisse for
8  lending rather than creating with swaps?
9           MR. WASHER:  Objection to the form.
10     A.   Yes.  This data suggests that it is more
11 profitable to lend.
12     Q.   What would you do with this information?
13          MR. WASHER:  Objection to the form.
14     A.   What did we do with this information?  I
15 think, again, we took it onboard as we continued to
16 review the business on a regular basis, this
17 business and many other business lines, and we --
18 you know, we knew that creation without swap was not
19 profitable.  We tried to limit the creations with
20 swap to have it more extended to reduce AUM, and we
21 would continue to lend, which was profitable.
22     Q.   Do you recall if at this time Credit
23 Suisse was pursuing a significant number of notes
24 through swaps?

LEONARDO MAYER

1      A.   At this time, January '18, if we were
2  issuing a lot of swaps, are you saying?
3      Q.   Yes.
4      A.   I don't recall specifically.
5      Q.   Would it surprise you to know that you
6  were?
7      A.   No.
8      Q.   Why not?
9      A.   I just -- I mean, it depended on what
10 the -- what the business demands were at the time.
11 We were not -- there were periods of time where
12 there was a lot of creation, there was a lot of
13 lending, it just depended.
14     Q.   Okay.  So, I mean, would you suspect that
15 if there was a substantial portion of notes being
16 created with swaps rather than being lent out at
17 that period, that it would be a reflection of
18 reduced lending demand?
19          MR. WASHER:  Objection to the form.
20     A.   If there was lots of creation and not
21 lending, you are saying?
22     Q.   Correct.
23     A.   Again, I think it fit different customer
24 profiles.  Some preferred to borrow, because perhaps

LEONARDO MAYER

1   LEONARDO MAYER
2   they couldn't create on swap, they didn't have
3   ISDAs, and some did and preferred.  So, it really
4   depended on what customer interests were.  We
5   weren't driving the customer interests, we were more
6   facilitating customer interests.
7       Q.   Okay.
8            MR. SCHNEIDERMAN:  Let's go to Tab AN, N
9   as in Nancy.
10           THE WITNESS:  Okay.  So Document 109?
11  BY MR. SCHNEIDERMAN:
12      Q.   Correct, this was previously introduced as
13  Exhibit 109.
14      A.   Yes.
15           Okay.  Did we look at this one before?
16      Q.   We did not look at this before.  We looked
17  at other discussions of acceleration, but we didn't
18  have this before.
19      A.   Okay.  So I don't remember this particular
20  email, similar to the other ones, but I can see it's
21  an exchange between Mel and I on some of the details
22  of a potential acceleration event, and it's from
23  November of '17.
24      Q.   Why would you ask Mel for this
25  information?

LEONARDO MAYER

1   LEONARDO MAYER
2            MR. WASHER:  Objection to form.
3       A.   I don't remember exactly what was
4   prompting this particular email at the time, but,
5   you know, as managing the business or any other
6   business, we look to make sure that we are prepared
7   for any kind of situation and risk, and while this
8   was a remote event, I think, potentially happening,
9   we did want to know how it would eventually play out
10  in the event that it did.
11      Q.   What makes you say it was a remote event?
12      A.   As I said -- as we looked at before,
13  Mr. Schneiderman, the different scenarios that we
14  considered that where the XIV could knock out seemed
15  pretty infrequent or remote events in the market, so
16  nothing that we could foresee happening in the short
17  term.
18      Q.   You are talking about that email where the
19  ballpark was 7 and a half to 10 and a half percent
20  movement in STX?
21      A.   Yes, yes.
22      Q.   And what makes you say that was a remote
23  possibility?
24      A.   Those are pretty unlikely events in the
25  market.

LEONARDO MAYER

1   LEONARDO MAYER
2       Q.   Are they unprecedented?
3       A.   They are not unprecedented, but they are
4   unlikely.
5       Q.   How unlikely?
6            MR. WASHER:  Objection to form.
7       A.   Well, you had -- you know, you had a down
8   10 percent day, you know, during 2008, which was, as
9   you know, a large crisis in the market, and since
10  then, you know, you don't see too many 10 percent
11  down days.
12      Q.   At the time that that email was
13  circulated, did you have the ability to check how
14  frequently STX has moved 7 and a half percent or
15  more?
16      A.   We could have done some analysis, yes,
17  some historical analysis, but, again, I am sure it
18  would show it would be an infrequent event.
19      Q.   How many times would you estimate that
20  would have happened?
21      A.   In what period of time?
22      Q.   Let's say since 1983.
23      A.   Well, my memory of -- I would say I know
24  there was a large crash, as you know, in 1987.  That
25  would have probably happened then.  Again, in 2020,

LEONARDO MAYER

1   LEONARDO MAYER
2   in 2020, we had, during COVID, a very large movement
3   in the market, and then 2008.
4            So over a period of 40 years, maybe it
5   happens less than a handful of times.
6       Q.   Do you remember conducting that analysis?
7       A.   No.
8       Q.   Do you think you would have conducted that
9   analysis?
10           MR. WASHER:  Objection to form.
11      A.   I don't recall.
12      Q.   To be clear here, we are talking about
13  movement in individual days, correct?
14      A.   One day moves, yes.  That's what the model
15  was suggesting, yes.
16      Q.   And your estimate, sitting here today, is
17  that it would have been less than a handful of
18  times?
19      A.   Yes.
20      Q.   Okay.
21           MR. SCHNEIDERMAN:  Let's pull up Tab AP, P
22  as in Paul.  This was previously introduced as
23  Exhibit 111.
24      Q.   So this is going to look very similar to
25  the previous document.

```
 1                LEONARDO MAYER
 2           Do you recognize it?
 3      A.   I am sorry, I think I might have messed
 4 this up here.  So we are back on Exhibit 111?
 5      Q.   Correct.
 6      A.   Okay.
 7           Right, okay.  So I don't recall this one,
 8 again, specifically, but it is -- it's details on an
 9 acceleration event to Mike Ebert from Mel, copying
10 me and Rob Sowler, on November 8th, '17.
11      Q.   My only question here is:  Why did this
12 get passed on to Mike Ebert?
13           MR. WASHER:  Objection to the form.
14      A.   On this particular -- I don't remember why
15 it was passed on directly to him on this day.
16      Q.   Is this pertinent information for him to
17 have?
18      A.   Again, I think as we speak about the
19 business and any business we risk manage, we think
20 about all potential scenarios and how we would
21 conduct the business and manage the risk, and this
22 was one to be aware of and know what -- how it would
23 work.
24      Q.   Okay.  Who is Matt Levine?
25           MR. WASHER:  Objection to form.
```

```
 1                LEONARDO MAYER
 2      A.   Matt Levine, I am sorry, I can't place
 3 that name right now.
 4      Q.   He doesn't work at Credit Suisse.  He's a
 5 journalist.
 6           Does that ring a bell?
 7      A.   No.
 8           MR. WASHER:  Objection, foundation.
 9      Q.   Okay.
10           MR. SCHNEIDERMAN:  Can we pull up Tab BA.
11           THE WITNESS:  Okay.
12           MR. SCHNEIDERMAN:  And this is marked
13 Exhibit 174.
14           (2/9/18 email marked Exhibit 174 for
15           identification, as of this date.)
16           THE WITNESS:  Right.
17 BY MR. SCHNEIDERMAN:
18      Q.   Do you recognize this document?
19      A.   I don't recall this email, but I -- it's
20 clearly something that I sent -- as it says here, I
21 sent myself from Bloomberg to my account, and it was
22 from February 9th, '18.
23           And the reason I likely did that is I
24 wanted to have time to read it later.  It's a
25 Bloomberg article detailing some of the events.
```

```
 1                LEONARDO MAYER
 2           MR. WASHER:  When was it written?
 3           THE WITNESS:  February 9th.  It was
 4      written February 9th.  It's an article about
 5      XIV that I likely wanted to read.
 6 BY MR. SCHNEIDERMAN:
 7      Q.   Do you recall reading this document, this
 8 article?
 9      A.   No, I really don't recall it.  I would
10 have to go through it again to see what the main
11 points were made here.
12           MR. SCHNEIDERMAN:  Okay.  I think that's
13      all that I have.  I will yield the floor to
14      Mr. Washer in case he has any questions, but I
15      think you may be done.
16           THE WITNESS:  Okay.  Thank you.
17           MR. WASHER:  I appreciate that.
18           I have no questions, so I think we are all
19      set.
20           MR. SCHNEIDERMAN:  Okay.  Thank you for
21      your time, Mr. Mayer.
22           THE WITNESS:  Okay.  Thank you very much.
23           THE VIDEOGRAPHER:  The time is 2:27.  This
24      concludes the deposition, Thursday,
25      February 2nd.  We are off the record.
```

```
 1                J U R A T
 2
 3 I,          , do hereby certify under
 4 penalty of perjury that I have read the foregoing
 5 transcript of my deposition taken on          ;
 6 that I have made such corrections as appear noted
 7 herein in ink, initialed by me; that my testimony as
 8 contained herein, as corrected, is true and correct.
 9
10 DATED this ____ day of _____,2023,
11 at _____,          .
12
13
14
15
16
17 _____
18      SIGNATURE OF WITNESS
19
20
21
22
23
24
25
```

Page 154

```
1
2              C E R T I F I C A T E
3    STATE OF NEW YORK   )
4                        ) ss.:
5    COUNTY OF NEW YORK  )
6
7          I, ANITA SHEMIN, a Notary Public
8    within and for the State of New York, do
9    hereby certify:
10         That LEONARDO MAYER, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such
13   deposition is a true record of the
14   testimony given by such witness.
15         I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage; and that I am
18   in no way interested in the outcome of
19   this matter.
20         IN WITNESS WHEREOF, I have hereunto
21   set my hand this 14th day of February,
22   2023.
23
                    Anita Shemin
24                ANITA SHEMIN, CSR
25
```

Page 155

```
1
2    FEBRUARY 2, 2023
3                  I N D E X
4    WITNESS          EXAMINATION BY      PAGE
5    LEONARDO MAYER    Mr. Schneiderman     7
6
7              E X H I B I T S
8    FOR IDENTIFICATION                   PAGE
```

```
9    Exhibit 155   5/8/17 email between    21
               Leonardo Mayer and James
10             Cheesbrough
11   Exhibit 156   May 2017 document       23
12   Exhibit 157   9/2017 email chain      30
               between Leonardo Mayer,
13             Michael Ebert, and
               Philippe Carrier
14
     Exhibit 158   PowerPoint titled       31
15             "Equity Derivatives Flow
               Index Midyear Review
16             2017"
17   Exhibit 159   10/29/17 email chain    58
               between Leonardo Mayer
18             and Mike Ebert
19   Exhibit 160   11/2017 email chain     83
               between Leonardo Mayer,
20             Paul Somma, Mel
               Oechslin, and Mike Ebert
21
     Exhibit 162   9/2017 email chain      93
22             between Leonardo Mayer,
               Michael Ebert, Robert
23             Sowler, and Mandy Xu
24
25
```

Page 156

```
1
2              E X H I B I T S
3    FOR IDENTIFICATION                   PAGE
```

```
4    Exhibit 163   10/2017 email chain     95
               between Mel Oechslin and
5              Philippe Carrier copying
               Leonardo Mayer
6
     Exhibit 164   Presentation titled "VIX 96
7              ETN Product Update"
8    Exhibit 165   Email                  102
9    Exhibit 166   11/2017 email chain    114
               between Mel Oechslin and
10             Leonardo Mayer
11   Exhibit 167   11/7/17 email between   116
               Leonardo Mayer, Mel
12             Oechslin, Rob Sowler,
               and Mike Ebert
13
     Exhibit 168   11/22/17 email between  122
14             Mel Oechslin, Michael
               Ebert, Robert Sowler,
15             and Leonardo Mayer
16   Exhibit 169   1/5/18 email from       127
               Michael Ebert to Paul
17             Somma, Mel Oechslin, and
               Leonardo Mayer
18
     Exhibit 170   1/5/18 email from Paul  129
19             Somma to Lisa
20   Exhibit 171   1/2018 email between    131
               Phlippe Carrier, Michael
21             Ebert, Robert Sowler,
               Leonardo Mayer, and Mel
22             Oechslin
23
24
25
```

Page 157

```
1
2              E X H I B I T S
3    FOR IDENTIFICATION                   PAGE
```

```
4    Exhibit 172   Bloomberg chat between  137
               Leonardo Mayer and Johan
5              Drylewicz
6    Exhibit 173   Email between Robert    142
               Montefiore, Mel Oechslin
7              and Leonardo Mayer
8    Exhibit 174   2/9/18 email            151
9
10     REFERENCE TO PREVIOUSLY MARKED EXHIBITS
11   EXHIBIT              PAGE   LINE
12   Exhibit 91            28    5
13   Exhibit 85            36    3
14   Exhibit 86            39    4
15   Exhibit 82            43    3
16   Exhibit 83            53    7
17   Exhibit 84            54    25
18   Exhibit 87            64    18
19   Exhibit 88            74    15
20   Exhibit 89            85    19
21   Exhibit 92            89    10
22   Exhibit 93            91    13
23   Exhibit 95            99    11
24   Exhibit 97           103    19
25
```

Page 158

```
1
2         REFERENCE TO PREVIOUSLY MARKED EXHIBITS
3    EXHIBIT              PAGE  LINE
4    Exhibit 98           104   17
5    Exhibit 99           105   24
6    Exhibit 105          123   16
7    Exhibit 102          124   23
8    Exhibit 109          146   12
9    Exhibit 111          149   21
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**$**

**$14** 133:23

**$20** 72:11 73:24

**$50** 33:16

**1**

**1** 6:22 60:25 66:10
71:9,10 92:3 95:10

**1.5** 136:25

**1.67** 76:6

**1/18/19** 126:5

**1/2018** 131:8

**1/5/18** 127:20 129:15

**10** 33:18 132:11
147:19 148:8,10

**10.5** 125:13

**10/2017** 95:25

**10/29/17** 58:16

**100** 84:5,7

**100,000** 122:4

**102** 124:24 125:2

**105** 123:17

**109** 146:10,13

**10:00** 118:16

**10:40** 42:13

**11/2017** 83:2 114:9

**11/22/17** 122:9

**11/7/17** 116:14

**111** 149:23 150:4

**12:45** 81:12

**12:50** 113:11,13

**12:59** 81:15

**14** 123:3

**15** 132:12 133:20,23

**150** 137:3

**155** 21:23,25

**156** 23:15,16

**157** 30:5,7,10

**158** 31:6,10

**159** 58:15,17,19

**160** 82:23,25 83:4

**161** 143:14

**162** 93:4,7,15

**163** 95:24 96:3

**164** 96:18,20

**165** 102:2,3

**166** 114:8,10

**167** 116:13,16

**168** 122:8,11

**169** 127:19,22

**17** 86:5 89:20 91:25
93:24 96:11 97:25
99:23 104:6 114:23
117:2 123:24 146:23
150:10

**170** 129:14,16

**171** 131:7,10 137:10

**172** 137:11,13

**173** 142:4,7

**174** 151:13,14

**17th** 134:19

**18** 128:10 130:2
131:19 142:15 145:2
151:22

**18.6** 133:24

**19** 125:11

**1983** 148:22

**1987** 148:24

**1:31** 114:3,4

**1:45** 118:19

**2**

**2** 59:8 75:5 99:11
106:13 124:5

**2.14** 75:24,25 76:15

**2.4** 75:22

**2.85** 76:2,7

**2/9/18** 151:14

**20** 21:7 71:19

**2008** 148:8 149:3

**2014** 25:7,23

**2015** 25:8 26:7

**2016** 13:19 25:8
26:10

**2017** 15:7 16:5,13,14,
15 21:5 22:12 23:16
24:8 26:12,13,17,22
27:9 28:18 29:6,19
30:21 31:9,18,24
36:17 39:17 43:15
55:12 59:5 65:13
75:4 83:12 96:14
97:10 106:11 114:25
122:19,24 123:2
125:11

**2018** 16:8,14,17
19:19 33:13,16
112:12

**2019** 15:5

**2020** 148:25 149:2

**2023** 6:25 31:22

**20th** 55:12

**22nd** 122:19

**23rd** 43:15

**24** 126:16 127:10

**24th** 104:7

**25** 21:8

**26** 26:15

**29th** 59:5

**2:27** 152:23

**2:30** 118:22

**2nd** 6:25 64:14 115:3
152:25

**3**

**3** 53:21,22 54:11
60:10 67:15

**3.5** 139:5

**30** 6:16 25:8 28:18
142:15

**31st** 106:11

**32** 123:4

**38** 30:3

**3rd** 65:13 122:24

**4**

**4** 32:9 133:12

**40** 25:23 149:4

**49** 26:10

**5**

**5** 33:9 132:11 138:21

**5/8/17** 21:24

**500** 12:23

**53** 25:7

**55** 26:7

**5th** 128:10 130:2

**7**

**7** 98:12,13,14 147:19
148:14

**7.5** 125:13

**7405** 137:9

**76** 143:11

**7th** 117:2

**8**

**80** 106:17 109:5

**82** 43:5

**83** 53:9,12

**84** 55:2

**85** 36:3

**86** 39:5

**87** 64:19

**88** 74:17,18

**89** 85:20

**8th** 22:12 123:24
150:10

**9**

**9** 24:3,4,10

**9/2017** 30:8 93:5

**91** 28:6,8

**92** 89:12,15

**93** 91:15 93:14

**95** 99:12,16

**97** 103:20,21

**98** 104:19,20

**99** 105:25 106:4

**9:53** 7:2

**9th** 151:22 152:3,4

**A**

**a.m.** 7:2 118:16

**AA** 124:23

**ability** 10:24 13:7
148:13

**abundance** 121:16

**accelerate** 107:2
111:7

**accelerated** 106:16

**acceleration**
109:19,24 110:5,6,9,
17,20,21 111:3
112:12,14,21 146:17,
22 150:9

**access** 19:5

**accompanied** 64:6

**account** 151:21

**accounts** 46:10
48:23 63:15

**accuracy** 17:18

**accurate** 19:2 27:20
30:17 95:8

**actions** 35:24

**activities** 21:2 76:24

**activity** 11:23 43:19 52:9 80:2,9 143:2

**actual** 36:16 42:2 51:7 57:22 63:23 107:24 108:10,11,12 139:13

**add** 95:14

**added** 120:9

**additional** 124:5

**addressed** 50:21 53:3

**adds** 120:3

**adjusting** 120:13,14, 20

**adjustments** 103:14

**admissible** 6:15

**affect** 10:23

**afternoon** 118:16

**AG** 6:24 123:16

**aggregate** 79:18

**Agilelaw** 9:20 21:15 30:3

**agree** 9:22 10:7

**Agreed** 88:11

**agreements** 13:4,6

**ahead** 69:22 71:21 83:24 124:11 126:24 128:3

**aim** 68:17

**allocated** 139:21

**alphabet** 93:3

**alternative** 138:16

**alternatives** 79:20

**America/merrill** 29:11

**amount** 85:16 86:14 122:2

**analyses** 18:6 27:20

**analysis** 17:18 27:15,22 41:25 44:8, 12 57:16,25 75:9 76:18 77:17 78:9 80:14 81:25 82:5 125:18,24 148:16,17 149:6,9

**analysis/thought** 64:11 66:4

**analyzing** 57:19 100:23 134:9

**Anita** 6:10 7:5

**announced** 110:10 111:4

**announcement** 110:17 111:14

**announcing** 112:20

**annual** 21:10

**annualized** 26:13 142:25 143:5

**answering** 44:13

**answers** 8:5,12

**AP** 149:21

**apologies** 7:21

**appears** 26:14 32:19 57:2,9 59:16 94:12 105:2 130:5

**applied** 14:4,7

**approach** 46:3 73:20

**approached** 44:22

**approaching** 68:23

**appropriately** 54:6, 7 85:5

**approval** 88:15 124:10 130:20

**approved** 88:13

**approximately** 6:25

**apps** 19:12

**April** 13:18

**arrived** 73:2,6

**article** 151:25 152:4, 8

**Asia** 100:5

**asks** 30:23 64:10 133:13 134:19

**assess** 41:21

**asset** 136:13

**assets** 61:7 71:20

**association** 6:4 7:6

**assume** 32:3 67:2,8 77:4

**assuming** 15:13 71:16 111:3 138:17

**assumption** 127:14

**assumptions** 76:21 127:6

**attached** 31:4

**attachment** 22:21, 24,25 23:3,19 95:21 96:12,17 104:9,10,18

**attachments** 23:5

**attention** 24:2 29:16 32:12

**attorney** 8:18

**attractive** 75:15 119:4 139:8

**August** 26:22 27:9 28:18 29:6,19 43:15 89:20 91:25

**AUM** 61:7 62:12 63:17,22 85:6,9 130:11 144:21

**Aurmont** 131:14

**automatically** 31:21

**avoid** 109:8

**awaiting** 117:7

**aware** 38:20 124:17 150:22

---

**B**

---

**BA** 151:10

**back** 35:8 40:21 41:16 42:11,13,25 44:15 52:8 57:4

66:25 67:2,3,7,12,16, 20,24 68:4,10,25 69:7 70:5,15,20,23, 24 71:9 72:6,14,17, 20,21 81:10,16 86:11,24 88:14 94:24 101:8 111:9 114:5 115:23,24 118:23 121:2,5 122:3,21 124:2,6 126:15 136:17 137:2 150:4

**background** 61:13

**Bailey** 117:7

**balanced** 69:9

**ballpark** 147:19

**BAML** 29:9,14

**bank** 20:10,17 29:10 37:6 75:20,22 76:22 77:8 88:21,25

**Bank's** 76:18

**base** 15:13

**based** 15:17,20 39:19,23 51:11 84:25 132:23

**basically** 56:3,4 108:6 111:23 121:2

**basis** 17:6 21:10 55:16 79:17,18 123:4 137:3 143:2,11,14 144:17

**Bates** 137:9

**BB** 101:25

**BC** 127:18

**BD** 129:13

**beginning** 26:22 117:4

**begins** 66:2

**behaves** 134:9

**behavior** 70:4 89:2

**believes** 127:11

**believing** 84:14

**bell** 151:6

**BF** 88:2

**BG** 130:25

**BH** 141:23

**BI** 58:13

**big** 47:24 135:22 136:9

**bigger** 117:8 121:20

**bit** 42:5 51:25 53:14 64:8,23 67:10,14 78:15 87:18 99:15 100:25 108:15 111:2 129:9

**BJ** 21:13

**BK** 23:14

**block** 133:21

**bloomberg** 19:5 45:2 106:8 137:12,24 151:21,25

**blown** 136:24

**BM** 29:22,24

**BN** 31:3

**BO** 95:18

**bold** 127:2

**bonds** 126:12

**bonus** 15:14,16,17, 22 16:5

**book** 33:13 69:9 97:21,23 133:6

**Booked** 25:15

**books** 107:5,25 132:8 135:24

**borrow** 44:16 47:23 56:3 62:7 64:3 68:11 69:7 70:6 76:3 78:20, 21 138:17,20 140:9, 11,13 141:6 144:5 145:25

**borrow/lead** 69:17

**borrowed** 141:16

**borrower** 76:12

**borrowing** 47:17 48:4,10,24 49:4,8 63:9 69:4 75:9,15 76:24 78:22 79:14

89:3 139:8,25 140:6
141:2,5,18,19

**boss** 17:2 20:5 78:6

**bosses** 16:14,15
17:3,17 18:5,11,16

**bottom** 25:14 28:24
30:25 31:22 32:13
53:15,17 57:7 59:8
65:25 71:18 75:5
85:22 92:2 125:12
131:13

**bought** 68:7 124:2

**boy** 58:14 81:3 82:21
88:3 95:19

**BP** 96:17

**BPS** 55:15

**BQ** 113:3 114:7

**BR** 92:25

**break** 8:24 10:9,13,
16 42:8,11,19,21
81:6 113:6,8 132:13

**breakevens** 75:9

**breakout** 42:15,20

**Brendan** 7:8 81:4
113:4

**Brenden** 117:7

**Brian** 20:17

**bring** 12:7 71:20

**broader** 67:25

**broker** 140:11

**brokerage** 42:4
43:22 44:20 45:7
54:14,16,23 78:25
79:8 140:2 141:7

**brought** 27:9

**browser** 93:13

**BU** 116:12

**build** 14:2

**bullet** 24:20 25:6
48:9 69:13

**bunch** 43:24

**burr** 93:2

**business** 14:3,22
15:20 17:2 19:23,24
34:25 35:4,6,16,18
38:12 40:9,11 41:18,
19,22 50:16 52:7,8
54:5 57:19,20,23
61:24 72:8,17 73:10
78:10,14 79:2 86:25
87:22 90:16 92:4,13,
14 98:3,9 100:6,7
103:13 105:15
106:23 109:25
119:20 133:9,22
134:9 135:25 144:17,
18 145:11 147:5,6
150:19,21

**business/
profitability** 66:9,13
72:3

**businesses** 59:25
60:4,23 73:23

**buy** 46:13,24 66:25
67:2,7 68:4 72:6,21
86:11 88:13,15
119:10 122:3,21
124:6 136:17 137:2

**buyback** 86:7 87:16
94:10 118:3 121:11
122:19

**buyers** 62:3

**buying** 40:20 45:19
48:25 61:8 62:16
63:19 64:2 67:12,24
68:25 72:13,17 86:24
94:24 111:9

**BV** 81:2 82:21

**C**

**cadence** 121:12,14

**Cahill** 9:7 11:12

**call** 10:12 66:8
118:16,22 130:19

**called** 128:22 129:2,
5

**calling** 119:13

**capable** 27:13 57:11

**capital** 6:23 37:20

138:6,14 139:12,21

**captured** 54:7

**capturing** 25:20

**care** 114:17

**careful** 17:18

**carried** 68:19

**Carrier** 16:16 17:5
28:18,25 30:9,20
35:10 52:17 77:25
89:5 91:5 96:2 131:8,
18

**Carrier's** 29:8

**carry** 68:19

**case** 6:17 38:5 57:2
109:12 139:11
152:14

**cash** 15:10 47:5
107:16,21 108:8,12
112:6 134:11

**Cat** 135:7,9,10,14
136:12

**causing** 63:22

**caution** 121:16

**cc'ed** 28:18 29:2
36:20 38:8 55:10

**CEO** 11:6

**certified** 6:3 7:4

**CFO** 11:6

**chain** 30:8 58:16
83:2 88:10 93:5
95:25 114:9 117:4
127:3

**challenges** 92:4

**chance** 55:3 66:18
94:20 119:23

**change** 16:17 51:5
88:25 132:23

**changed** 15:3

**changing** 50:3,7,18

**channeling** 63:8

**characterization**
26:18 53:2

**charges** 139:22

**chat** 17:14 137:12,24
138:10

**check** 121:18 148:13

**Cheesbrough** 21:25
22:11 91:24

**Chief** 34:15

**Chin** 20:17

**chose** 107:2 110:23

**circulate** 57:24
119:13

**circulated** 32:4
34:22 58:2 105:12,14
148:13

**circulating** 35:2
86:7,17 123:6

**circumstance**
139:18

**Civil** 6:16

**clarify** 8:16

**clauses** 13:6 112:12

**clear** 109:23 149:12

**clearance** 120:18

**Clement** 99:22 100:3

**click** 22:3 23:20

**client** 24:13,15,17,18
25:21 32:22 33:5

**clients** 54:11,14,17
134:21 135:2

**clients'** 135:4

**clinical** 68:22

**close** 119:11

**closely** 21:3

**closer** 139:5

**Colello** 91:25

**collaboration**
105:10

**colleagues** 19:16

**color** 44:17 45:20,22
61:23

**coloring** 49:15

**column** 115:4

**combination** 45:5

**comfortable** 72:10

**communicated**
109:20

**communication**
17:11

**communicative**
82:11

**compare** 15:22

**compares** 48:19

**comparing** 75:14

**comparison** 142:17

**compensation** 15:6
16:2,3

**competent** 82:9

**competition** 32:21
33:5

**competitor** 48:13,20

**completed** 8:11

**completion/review**
88:16

**compliance** 88:18
118:13 120:15,22,24
121:18 123:23
124:13

**concern** 33:25 70:2

**concludes** 88:17
152:24

**conclusion** 49:21
57:7 72:5

**conduct** 27:15
150:21

**conducted** 149:8

**conducting** 120:16
149:6

**confirmation** 85:12
130:3 141:16

**confirming** 32:25

**confused** 107:22

confusing 61:14

consideration 73:8
99:6

considered 67:17,
22 70:17,21 143:2
147:14

consulted 73:11

contained 11:18
17:19

context 53:15 61:18
67:23,24 120:8
126:11

continue 144:22

continued 144:16

continuously 62:17

contract 111:11

contracts 90:2

contribute 34:8

contributor 133:24

control 54:2,3,4
118:10 130:11

controlling 68:20

conversation 39:20,
23 40:6,10 41:5
43:17 44:19 51:11
64:17 72:23 74:13
80:19 81:19 87:23
102:21 106:9,22
108:25 110:3 112:25
120:4 137:23 140:5,
20

conversations
51:22 52:15 140:15,
22

convexity 89:22

conveying 57:8

COO 34:15 97:15
105:11 124:16

copied 91:25 93:23
102:15 125:10

copy 30:24

copying 96:2,10
129:25 150:9

corner 32:13

correct 11:3 17:22
18:2 23:9 24:9,11
25:24 26:9,10,13,16
30:6 31:7 33:22
36:19,20 39:17,21
53:13 55:11,13,19
59:6 65:19 70:11
71:16 76:15 78:7
85:10 86:9 88:23
94:20 125:4 145:23
146:12 149:13 150:5

correctly 52:11
94:23 119:9

cost 75:20 77:4

costs 37:17,20 75:22
76:2,23

counsel 7:7 10:16
11:25 34:11

counterparties
76:14 79:4,7,14

counterparty 75:10,
16 77:15

couple 11:14 16:17
108:22 141:25
142:24

court 7:5,12 8:3
115:22 138:2

courtroom 6:15

COVID 149:2

crash 124:17 132:25
148:24

create 55:19 56:2,3,
10 63:15,20 68:9,11
69:2,15 75:23 76:14
83:17 84:24 101:5
138:11 143:20 144:3
146:2

created 62:18 68:4
77:14 85:16 142:20,
21 143:9 145:17

creating 45:18 55:21
56:24 68:13 75:10,15
76:25 80:3 139:9
144:9

creation 49:5 55:23
56:17 63:14 64:6
68:12 76:12 79:21,

23,25 80:3,23 83:15
85:8,12 95:5 98:19
101:7,20 103:14
139:14 144:19
145:13,21

creation/
redemption 61:5
63:2,24 64:4

creations 45:4 63:9
67:16,21 70:16,20
88:20 89:2 102:23
129:23 135:21
142:18 143:12
144:20

Credit 6:24 9:8,14
11:5,22 12:10 13:2,4,
17,25 14:10,24 21:5
24:19 25:4 27:6
38:19,23 50:6,9
54:10 56:15,21 57:13
76:3 79:22 84:4 99:8
115:15 117:23
130:10 135:3,5
136:18 139:4 143:23
144:8,23 151:4

CREV 25:15

crisis 148:9

CS 15:20 62:6 80:5
107:2

curious 102:9

current 12:14 14:13
47:17 61:4 63:2 64:4
66:21 98:15

customer 46:9,23
101:4,6,20,23 136:15
139:11 141:6,13
143:22,25 145:24
146:4,5,6

customers 44:10
56:2 88:19,25 103:10
144:2

_____

**D**

D-R-Y-L-E-W-I-C-Z
138:4

daily 59:9 95:11,15

Dan 14:9

data 144:11

date 22:2 23:17 30:11
31:11,21 58:18 83:5
93:8 96:4,21 102:4
106:15,19 107:7,10,
11,18,19,23 108:12
109:4,25 110:6
114:11 115:3,5,7
116:17 122:12
127:23 129:17
131:11 137:14 142:8
151:15

dated 65:13 97:10
122:19

dates 109:25

Davidson 117:6
118:6,7,8

day 17:7,8,9 48:2
63:21 85:17 90:17
109:9 118:15,23
122:4 133:9 148:8
149:14 150:15

day-to-day 20:24

days 148:11 149:13

DB 75:20

DB/SG 88:19,21

DEC 97:12

December 86:5
123:24

decision 51:5,10,12
73:2,12,15,17,20
74:2 80:22 130:16,17

deep 39:25

deeper 57:21

deeply 23:24 52:22

Defendant 11:3

Defendants 7:11

Defendants' 42:16

deferring 120:15

define 107:13

delay 99:15

demand 44:5,10
45:10,17,18 49:7
61:8 62:12,15,21

63:9 95:5 145:19

demands 94:10
145:11

department 124:16

depended 145:10,14
146:4

depends 139:10

deposed 7:23

deposition 6:6,9,22
9:24 10:8,19 11:11,
19 12:2,5,8 152:24

derivative 47:5
136:9

Derivatives 15:19
20:3 25:16 31:8,18
56:20

describe 38:9

desired 117:9 121:22

desk 20:18 25:22
26:3,24 33:25 38:13
43:22 51:11,14 54:23
73:9,21 86:10 90:25
91:2,11 97:15 98:4
120:21 124:6 129:25
131:24 139:24

desk's 29:19

desks 32:14

detail 96:25 129:22

detailed 92:3

detailing 87:24
151:25

details 86:7 88:17
146:21 150:8

determine 75:19

determined 15:16,
17

Deutsche 75:20,22
76:18,22 77:8 88:21,
25

dialogue 60:23

difference 37:23
94:14 108:5

difficult 64:23 85:7

**direct** 24:2 77:24

**directive** 40:24 52:3

**directly** 150:15

**director** 13:21,22 14:25

**disagreement** 47:2

**discovered** 17:21 18:5

**discuss** 19:13 60:20, 22 84:11,13 90:13, 15,17,20 91:2 103:2 108:16,20,22

**discussed** 68:12 124:12 135:20 136:21

**discussing** 41:6 87:15 89:21,25

**discussion** 34:24 40:8 41:13 60:7,13, 16,18 78:13 84:17 98:2 112:11

**discussions** 146:17

**dishonest** 18:13

**dislocation** 46:8,17, 21

**distinction** 108:4

**dive** 23:24 57:21

**divvied** 20:22

**document** 21:18 22:8 23:2,16 24:5,6 26:21 28:21 30:5,14, 17 31:6,13,16 36:7, 13,16 39:8 49:25 52:2 55:7 58:11,24 59:2 64:9,16 71:7 75:2 81:18 82:21 83:9,10 86:2 89:17, 19 91:21,23 93:19,21 96:7,24 99:17,19 102:10,12 104:24,25 105:5,22 106:6 114:7,20 116:22 119:25 122:15 123:20 125:6 128:6,8 129:20 131:15 137:10,21 142:11 146:10 149:25 151:18 152:7

**documents** 11:17, 18,21 12:7 21:15 22:16 80:21 84:25

**dog** 43:4

**double-check** 129:11

**doubt** 22:10,13 28:16 65:12 95:7

**downside** 133:14,16 134:3

**Draft** 90:4

**drafted** 105:5,9

**dramatically** 26:17

**driven** 17:2 51:14

**driver** 44:11

**drivers** 61:23 63:22 99:4

**driving** 44:5,10 45:17 52:6 133:13,16 134:2 143:25 146:5

**Drylewicz** 137:13,24 138:3,5

**duly** 7:15

**DUMAS** 82:23

**duty** 59:23

---

**E**

**eager** 87:5

**easier** 65:2 108:21

**easy** 45:14

**Ebert** 16:24,25 20:4,7 29:9,13 30:9,20,23 35:9 36:18 37:7 38:11 39:21,24 40:25 41:6 58:17 59:4,9,14, 18,21 64:10 66:3 71:16 72:23 75:3,9 77:18 78:5 80:16 81:20 82:8 83:3,12 84:8 86:5 91:4 92:18 93:6,22 95:10 116:15,25 122:10,18 123:10,13 125:10,20, 22 126:6,18 127:9,20 128:10,11 129:4

**131:9,14,18 133:4,13 134:19 150:9,12

**Ebert's** 20:5 87:2 88:12 128:25 130:19 131:23

**economics** 40:2,12 41:6 48:19,20 98:16, 22 139:8

**edge** 134:25

**Edward** 122:7

**effective** 69:3

**efficient** 68:22

**elected** 72:2

**email** 17:15,16,19 21:24 22:11,14,21 28:11,13,15,17,25 29:8 30:8,19 31:25 35:8 36:17,20 37:12 38:6 39:13 40:6 43:8, 10,11,12 46:16 50:21 51:16 52:18 53:23,25 54:9 55:18 57:8 58:5, 16 59:3,7,9 60:2,6,11 61:17 65:10,13,19 79:19 83:2,13 88:9 89:6 90:4,10,18 93:5 95:25 96:10 99:20 102:3,13 103:11 114:9,22 115:3,25 116:14,24 117:4 120:8 122:9,17,24 123:22 125:22 126:5 127:20 129:15 131:8, 14,17 133:20 142:6, 13 146:20 147:4,18 148:12 151:14,19

**emailed** 17:17

**emails** 17:21 49:20 79:13 119:13

**employees** 25:3,11

**encourage** 87:3,5 88:14,24

**end** 47:25 62:15 63:21 119:24 140:11

**ended** 51:9 72:6

**ending** 137:9

**engage** 119:4

**engaged** 136:12

**engaging** 52:10 76:23

**ensure** 17:18

**ENT** 37:8

**entail** 14:19

**entails** 14:20

**enter** 107:6

**enters** 9:16

**entities** 136:5

**environment** 32:21

**equals** 76:7

**equities** 16:25 20:13

**Equity** 15:19 20:3 31:8,18

**equivalent** 48:5

**essentially** 56:9 68:4 75:14 107:15 127:3

**estimate** 126:3,10,15 148:19 149:16

**estimates** 127:7

**et al** 6:24

**ETF** 48:14 89:23

**ETN** 36:23 38:19 41:22 45:18 48:15 50:25 56:17 61:24 62:18 63:20 68:3 87:22 89:23 92:3 94:3 96:14,19 97:8 109:4 119:5 135:24

**ETNS** 33:15 39:25 41:20 59:10 60:7,21, 23 102:23 142:17 143:3

**evaluating** 68:2

**evening** 60:13

**evenings** 60:8

**event** 86:15 106:16 109:20 110:18,20,22 111:3,7 112:14 146:22 147:8,10,11 148:18 150:9

**events** 90:14 147:15, 24 151:25

**eventually** 14:7 132:25 147:9

**exact** 15:5,24 16:6,10 21:6 40:5 44:8 50:12 56:7 59:25 74:25 116:24 122:2,17 128:8

**EXAMINATION** 7:17

**examined** 7:16

**exceptional** 140:19

**exchange** 30:19 48:15 55:9 59:3 75:3 83:11,23 84:6 86:4 91:24 93:22 96:9 104:4 106:8 109:4 110:2 114:22 116:24 123:23 125:9 131:17 142:14 146:21

**Exchange's** 84:3

**exchanged** 108:13

**exchanges** 108:8

**exchanging** 90:2

**executing** 117:8 121:20

**execution** 141:16

**exercise** 93:3

**Exhibit** 21:23,25 23:15,16 28:6,8 30:7, 10 31:10 36:3 39:5 43:5 53:9,12 55:2 58:15,17,19 64:19 74:17,18 82:23,25 83:4 85:20 89:12,15 91:15 93:4,7,14,15 95:24 96:3,18,20 99:12,16 102:2,3 103:20,21 104:19,20 105:25 106:4 114:8, 10 116:13,16 122:8, 11 123:17 124:24,25 127:19,22 129:14,16 131:7,10 137:13 142:7 146:13 149:23 150:4 151:13,14

**exhibits** 21:20,21

**exit** 111:8

**exited** 112:8

**expanded** 14:16

**expect** 127:15

**expectation** 111:4 112:13,18

**expectations** 110:8, 12,16,19 112:22

**expected** 35:20

**expensive** 138:20

**experience** 27:12 57:10 82:8,15 111:20

**experiences** 27:25

**expire** 115:8,15 116:5

**expiring** 115:11 116:2

**explain** 24:15 47:21 61:12 67:19

**explanation** 70:22 95:3 106:15

**exploratory** 103:11

**exploring** 51:17

**exposure** 47:24 56:6,16 132:10,11,20 136:18

**exposures** 130:9

**express** 46:9

**extend** 129:7 130:16

**extended** 130:8 144:21

**extending** 128:9,16 129:22

**extent** 20:20 70:4,23

**external** 75:10,16

---

**F**

**Facebook** 19:12

**facilitate** 79:9

**facilitating** 146:6

**fact** 52:24 128:25

**fair** 26:18 32:3

**fairly** 26:17

**fall** 50:7

**familiar** 96:25 131:2

**fashion** 101:22 120:17

**February** 6:25 16:14 31:22 112:12 151:22 152:3,4,25

**Fed** 76:9,10

**Federal** 6:16

**fee** 37:19 76:8 77:3

**feel** 8:14 22:17 23:23 53:18 91:17 96:25

**FF** 76:6,8

**figure** 43:25 44:7 45:13,15

**figuring** 54:19

**File** 23:6

**Final** 22:22

**finalizers** 112:8

**finally** 8:22 11:2

**finance** 61:13

**financial** 12:21

**find** 136:5

**finder's** 76:8

**finding** 134:25 136:14

**fine** 16:11 52:20 65:22 81:9 113:9

**firm** 37:22 136:12 141:11

**fit** 145:24

**five-minute** 42:8,11

**flagging** 52:21 114:24 115:10,25

**flat** 132:24

**floor** 152:13

**Florentin** 99:22

**flow** 12:15 13:22 14:2 15:18 19:23,24,25 20:18 22:21 23:6 24:21,24 25:2,11,15, 25 26:2 27:7 31:9,18 54:23 61:24 92:11 98:4 133:23 139:24

**focus** 26:23 29:16,19

**focused** 27:8 66:17

**focusing** 24:10 53:20 66:22

**foggy** 129:9

**follow-up** 17:22 18:7 40:16 41:5,12 49:25 71:12 118:16

**foresee** 147:16

**form** 32:18 34:2,5 35:21 37:9 38:3,10 41:7,15 49:11 59:19 63:11 67:16,20 70:7, 9,15,20,24 73:4,13 74:3,7 76:19 79:5 81:22 82:3,7,12,17 86:22 87:6,11 92:9, 20 101:11 103:4,16 105:7,13 109:10 110:11 111:18 112:16 115:17 119:16 124:19 130:7 134:5 140:7,17,21 141:3,20 144:10,14 145:20 147:2 148:6 149:10 150:13,25

**formal** 90:23 141:16

**format** 135:18 136:3

**formulated** 112:21

**forward** 30:23 59:8 75:8 84:8 89:7 136:3, 8

**forwarded** 60:3

**forwarding** 78:8

**found** 46:15

**foundation** 35:22 37:10 38:4 41:8 59:20 73:5,14 74:8 82:13 87:7,12 103:5 105:8 109:11 110:12 112:17 134:6 151:8

**fourth** 66:17

**free** 23:23 53:18 91:17 96:25

**frequently** 148:14

**Friday** 60:7,13 88:3

**front** 94:3

**fulfilling** 143:24

**full** 18:20 126:11

**fully** 8:15 13:7

**function** 56:19 115:17 132:18

**functionality** 56:14

**functions** 118:10

**fund** 47:14,16 76:9, 10 135:10,14 137:25 138:8 140:6

**funding** 77:4

**funds** 139:21

**futures** 47:19,24 62:5 90:2 111:10

---

**G**

**gaining** 140:24

**Garcia** 6:3 7:3

**gates/conditions** 102:22

**gave** 81:21

**Gen** 88:25

**general** 14:21 16:4 20:20 34:21,24 35:18 40:8 41:18 45:20 46:6 50:13,15 52:6, 11 57:18 58:7 60:3 62:22 73:9 78:10 90:12,16 105:2 106:21 123:8

**Generale** 88:22

**generally** 27:20 46:2,11 73:16,19 86:20 119:13

**generated** 21:5 142:17

**gestures** 8:6

**give** 8:5 42:22 86:24 94:19 120:8 124:8 141:17

**glance** 66:19

**global** 19:18,20,24 20:3 98:5

**good** 6:2 7:19,20 81:5 113:5 119:22 129:12

**Grand** 25:19

**graph** 119:9

**great** 11:9 28:12 42:10 96:24

**greater** 136:25

**green** 71:21

**ground** 8:2

**groundwork** 95:21

**group** 6:24 15:20 38:9 52:22 86:18,20 102:17 125:13

**guess** 41:11 42:2 44:25 45:4 48:22 49:14 73:8 78:2 85:14 99:5 100:21 102:25 110:22 121:9 129:4

**guesses** 127:4

**guessing** 101:16

**guidance** 121:3

**guidelines** 103:14 117:7,22 120:13,15, 21 121:13,20

---

**H**

**half** 16:7 67:2,8 95:4 115:12 147:19 148:14

**handful** 149:5,17

**handled** 21:2 139:25

**hands** 90:2

**Hanson** 9:8 42:17

**happen** 62:23 109:21 111:12,13,22 112:19 121:10

**happened** 148:20,25

**happening** 35:17 43:25 44:18 52:10 60:4 61:24 62:3,24 68:15 70:3 71:4 147:8,16

**hard** 84:14

**head** 16:25 19:24 20:3,9,12,17 38:12

**headcount** 24:21,24 25:7 32:17

**header** 67:11

**heads** 98:9

**hear** 115:19

**hedge** 45:19 46:12 47:7,14,16,24 68:5 69:11 80:10 135:10, 14 136:10,14 137:25 138:8 139:21 140:6

**hedges** 37:18 56:16 107:6 111:8 131:21 135:16,21

**hedging** 11:23 48:25 62:5

**hedging/ rebalancing** 47:18

**helpful** 121:6

**Henry** 141:24

**Herb** 7:10 9:7

**HF** 47:13

**hide** 82:15

**high** 46:24 71:15

**higher** 15:12

**highly** 36:23 37:8 38:18

**hired** 13:25 14:2

**historical** 111:20 148:17

**hold** 16:11 42:22 139:13

**holding** 48:9,10,18, 19,20

**honesty** 18:21

**hour** 8:25 42:6 81:5 113:5,8

**hours** 11:14

**I**

**Idaho** 58:14 64:19

**idea** 51:17 85:4

**Ideally** 109:3

**identification** 22:2 23:17 30:10 31:10 58:18 83:4 93:7 96:3, 20 102:4 114:11 116:16 122:11 127:22 129:16 131:11 137:14 142:8 151:15

**identifying** 124:3

**imagine** 17:23 35:5 37:16 45:23 51:6 58:2 77:13 98:7 130:23

**imagined** 18:9 48:6

**impact** 110:9,17 112:9,20

**impacts** 110:19

**important** 8:5,9 59:17,21 108:13

**impression** 37:4,21 85:2 94:19

**Improve** 33:22

**incentivize** 76:12 79:21

**include** 91:4

**includes** 40:19

**including** 13:5 105:16

**increase** 43:18 49:4 50:14 52:9 69:17 79:22,24

**increased** 26:23 33:5 48:23 67:3

**Increasing** 88:17

**incurred** 37:20

**incurs** 115:15

**index** 12:15,17 13:22 14:2 15:18 19:23,24 22:21 23:6 25:25 26:2 27:7 31:9,18 92:11 133:23,24

**index-related** 26:23

**indices** 12:24

**individual** 79:17 149:13

**inefficiency** 69:6

**infinite** 61:6 62:12,21

**informal** 90:23

**information** 18:11, 14 19:3,8 28:2 35:3, 14,17 44:21 54:21 59:17 78:25 79:3 81:21 82:16 91:7 92:22 123:7,14 133:5,21 134:4,7 141:14 144:13,15 146:25 150:16

**informed** 73:25 74:9 83:23

**infrequent** 147:15 148:18

**inherent** 89:22 124:18

**initial** 75:18 83:13 126:10

**initiate** 121:11

**input** 34:14 73:8,21 97:14

**inquiry** 140:8

**insight** 139:24

**instance** 17:25 48:4 97:21 134:24

**instant** 106:8 137:23

**instructs** 8:19

**instruments** 12:22

**intensive** 138:14 139:13

**interact** 17:4

**interchangeable** 98:23

**interest** 45:2 120:20 141:18

**interested** 49:12 135:7,12,13,15 141:19

**interests** 146:4,5,6

**internal** 84:4

**interpretation** 70:2 109:14

**interpreting** 33:13

**interrupt** 8:12

**interrupted** 10:2

**introduce** 7:7

**introduced** 21:22 85:20 99:12 123:17 124:24 146:12 149:22

**inventory** 67:2 94:15,16

**inverse** 89:22

**invest** 101:20,23

**investment** 20:9,17 100:7 101:5

**investors** 11:5

**invitation** 128:13,14

**invite** 99:20

**involve** 47:25 101:9, 12

**involved** 12:18,20,22 50:17 51:4 72:17 97:16,20 101:6 130:15,17

**involvement** 11:22 13:14

**involving** 36:18

**ISDAS** 69:14 146:3

**isolation** 143:3

**issue** 57:4 83:23

**issues** 18:6 21:16

65:6

**issuing** 145:3

**item** 23:4 41:4,12 119:3

**items** 40:16

**J**

**J-O-H-A-N** 138:3

**James** 21:25 22:11 91:24

**Jan** 130:2 142:15

**January** 74:16 128:10 131:19 134:17,19 145:2

**job** 14:4,7 27:13 57:11 82:9

**Johan** 137:13,24 138:3

**John** 91:24

**journalist** 151:5

**K**

**keeping** 40:20 52:23 59:14

**kind** 15:14 20:20 35:3 45:15,23 51:12,17 57:16,24 59:13,23 61:21 62:2,13,22 63:12 66:16 67:11 69:5 73:17 76:17 78:8 79:3 98:22 103:11 124:9 127:12, 13,14 132:13 139:7 140:8,9 147:7

**kinds** 34:21

**knew** 79:8,12 144:19

**knock** 127:3,16 147:14

**knock-in** 136:3,8

**knockout** 86:15 125:9,14

**L**

**laid** 70:3 72:17

**large** 32:22 33:6 43:18 49:4 83:18 85:6 133:24 148:9,24 149:2

**larger** 15:20 127:10

**late** 42:6 105:20

**Lauren** 42:18

**Laurion** 138:6

**lawyer** 13:2

**lawyers** 9:4 11:12

**lay** 40:15 66:7 95:20 134:25 135:23

**laying** 33:12 55:18 142:16

**lays** 70:14 102:22

**leading** 112:12 125:14

**leads** 36:15

**learn** 50:9

**led** 32:21

**left** 112:7 113:8

**legal** 6:3 7:4

**legal/compliance** 71:21

**legal/reputational** 50:2,18

**lend** 50:3 55:22 67:8 143:21 144:7,12,22

**lending** 40:19,24 41:4,11,19 42:3 43:19 45:4 48:23 50:7,12,14,19 51:5,8, 18,19,23 52:3 56:24 57:23 59:10,15 62:18 64:3 67:3 69:17 70:25 76:13 79:9,10, 21,23,24 80:11,23 87:3,5,19,21 88:14, 18,19 94:10 101:9,12 135:17 139:14 141:10 143:15,17

144:5,9 145:14,19,22

**lending'** 50:4

**lent** 42:4 54:10,17 141:11 145:17

**Leo** 7:11

**Leonardo** 6:1,23 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1,24 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1,8 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1, 16 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1,2 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1,5 94:1 95:1 96:1,2 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1,10 115:1 116:1,14 117:1 118:1 119:1 120:1 121:1 122:1,10 123:1 124:1 125:1 126:1 127:1,21 128:1 129:1 130:1 131:1,9 132:1 133:1 134:1 135:1 136:1 137:1,12 138:1 139:1 140:1 141:1 142:1,7 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1

**letting** 117:6

**level** 15:12 32:14 71:15 125:9,14 127:2 141:18,21

**levels** 16:9 95:12 119:4 126:12 132:9 134:10

**levered** 89:23

**levies** 98:16,19

**Levine** 150:24 151:2

**levy** 98:25

**lifted** 99:2

**light** 58:11 71:21

**limit** 63:17 80:9 84:23 85:16 144:20

**limited** 13:5

**limiting** 85:9

**lines** 57:20 61:22 142:25 144:18

**liquidity** 100:14,24

**Lisa** 50:22 51:2 129:15,24

**listed** 98:17

**literal** 25:10

**LLC** 6:24

**loan** 79:4,7 142:21

**loans** 78:17,18 79:16

**locked** 107:11 108:2 114:14

**Logan** 99:21

**Logi** 100:6

**London** 17:13 100:5

**long** 8:22 48:10,18

**longer** 27:6 56:9 107:19 142:2

**looked** 32:2 42:2 77:16 80:21 88:10 146:16 147:12

**loop** 52:23 58:4 59:14

**looped** 38:16 52:18 53:5 89:5 124:15

**lot** 27:8 38:6 39:24 51:18 62:15 71:7 112:11 145:3,13

**lots** 145:21

**low** 32:14,20 126:19

**lower** 32:22 33:4 76:13 88:19 108:15

**luck** 136:14

**lunch** 113:6,9

**luncheon** 113:12

**Lynch** 29:11

**M**

**made** 18:19 34:4 51:12 73:17 152:11

**mail** 95:11,15

**main** 29:16 152:10

**make** 12:16 23:2 30:16 51:10 62:20 65:2 85:5 120:15 121:16 124:14 147:6

**makers** 61:9 62:4,6, 17 64:2 68:8 69:14 70:5,23

**makes** 31:15 40:2,7, 13 147:11,22

**making** 54:5 72:8 73:11,15,20 130:15 139:7

**manage** 12:15 68:3 71:19 72:9,11 78:14 85:7 103:8 106:24 130:9,12 150:19,21

**managed** 19:22 74:13

**management** 14:21 20:25 34:24 35:3 37:19 38:15 61:7 68:18 69:3 77:3 87:16 105:16 108:14

**manager** 14:25 77:24 78:2,13 134:8, 13 136:13

**managerial** 12:19

**managers** 52:15 58:4 77:23 78:4 92:17 124:16

**manages** 103:9,10

**managing** 85:5 119:21 147:5

**Mandy** 93:6,22

**manner** 27:18 69:15 119:21

**Manuel** 6:3 7:3

**Marcus** 91:8,10

**margin/increased** 32:21

**margins** 33:4

**mark** 45:16 49:2 116:13

**marked** 21:23,25 23:16 28:6 30:10 31:9 36:3 39:5 43:4 53:8 55:2 58:15,17 74:16 82:24 83:4 89:11 91:14 93:7 96:3,18,20 102:2,3 103:20 104:19 105:25 114:7,8,10 115:4 116:15 122:8, 11 127:21 129:16 131:10 137:13 142:7 151:12,14

**markers** 63:20

**market** 40:21 45:20, 22 46:8,13,18 47:2,3, 6 48:16 49:16 61:9 62:4,6,16,17 63:19, 20,25 64:2 68:8 69:14 70:4,23 72:8, 14 90:13,15 107:20 109:21 112:4,8,15 118:5 119:12,22 120:17,25 121:16 123:24 132:10,11,19, 25 133:2 135:2 147:15,25 148:9 149:3

**market-related** 18:11

**markets** 12:17 19:18,20 61:8 98:5

**marking** 21:20

**Mary** 29:23

Index: material..objection

**material** 28:2 82:16

**materialize** 107:3

**Matt** 150:24 151:2

**matter** 6:23 11:3

**matters** 19:13

**maturity** 56:7 129:23

**Mayer** 6:1,23 7:1,11,
19 8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1,14,24 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1,9
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1,
17 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1,3 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1,6
94:1 95:1 96:1,2 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1,10 115:1
116:1,14 117:1 118:1
119:1 120:1 121:1
122:1,11 123:1 124:1
125:1 126:1 127:1,21
128:1 129:1 130:1
131:1,9 132:1 133:1
134:1 135:1 136:1
137:1,12 138:1 139:1
140:1 141:1 142:1,7
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1,21

**Mcdonald** 99:22
100:8

**Mcneill** 14:9

**meaning** 46:21
108:12 112:20 134:9
135:13

**means** 13:9 25:10
29:10 47:13,21 61:12
67:19 109:15 111:9
131:25 132:2,7 137:2

**measure** 132:4

**measured** 133:7

**mechanic** 62:7

**mechanics** 63:18
109:17

**Media** 6:22

**meet** 11:13 90:13,22
100:10

**meeting** 90:23 99:20
100:16,17,19,20,24
105:22 128:13,14,20,
23

**meetings** 90:21,24

**Mel** 21:2,3 27:3,6
28:17,25 39:15 50:21
51:2,22 53:25 54:9
55:9 56:24 65:14,20
74:5 75:4 78:11 83:3,
12 86:4,6 87:16
88:17 89:19,21 91:7,
24 92:3 95:25 96:10
99:21 104:5 106:9
114:9,23,24 116:2,
14,25 117:6,22
121:7,19 122:9,18,20
124:3 125:10,13,24
126:11 127:21
128:11 131:10,18
142:6,14 146:21,24
150:9

**Mel's** 126:5

**members** 118:8

**memory** 11:22,24
19:15 29:18 129:8,12
148:23

**mention** 60:7 79:20

**mentioned** 14:12
20:2 27:3 32:2 53:5
62:10 63:14 80:4
98:10 99:7 123:25

**Michael** 16:24,25
20:4,5,7,16 30:9,20
35:9 36:18 38:11
59:21 93:6 122:10
127:20 128:25 131:9

**middle** 84:9 93:25
94:4,5 106:14

**midyear** 31:9,18
34:21

**Mike** 20:11,14 29:9,
13 37:7 39:13,20,21,
24 40:6 41:6 58:17
59:3,9 60:12 64:10
71:13,16 72:10,23
74:13 75:3,9 77:18
78:5 80:16 81:19
82:8 83:3,12 84:8
86:5 87:2,8 88:12
91:4 92:18 95:10
116:15,25 123:12
126:18 127:9 130:19
131:14,23 133:4,13
150:9,12

**million** 16:7 21:8
25:23 26:7,10,15
33:16 54:11 71:19
72:11 73:24 95:4
124:5 133:23

**mind** 37:16 41:12

**minute** 37:14 43:8
65:21 74:20 83:7
106:3 131:2

**minutes** 81:8,11

**missed** 74:23

**mistake** 18:2 27:22

**mistakes** 17:21

**mitigating** 56:19

**mm-hmms** 8:6

**mode** 17:10

**model** 77:6 149:14

**moment** 39:8 46:11
53:10 58:21 64:22
65:23 74:23 89:13
116:19 120:19

**Montefiore** 55:9
57:11 128:11 142:6,
14

**month** 115:11

**months** 16:18 56:8
116:7 129:10,11
130:4

**Morgan** 138:25

**morning** 6:2 7:19,20

**motion** 88:18

**motivation** 45:10
46:6 47:9 60:2 72:7

**move** 26:20 117:16
127:2

**moved** 148:14

**movement** 147:20
149:2,13

**moves** 149:14

**moving** 119:2

**multiple** 17:7,9

——————————

**N**

**names** 100:2

**Nancy** 31:4 146:9

**NAV** 86:11 117:24
119:11 122:21 123:3
137:4

**NDA** 13:10

**NDAS** 13:12

**necessarily** 51:14
68:16 144:2

**needed** 86:14

**negative** 89:22 143:8

**neutral** 80:4

**Nicole** 89:11

**nightly** 47:18

**nondisclosure** 13:6

**nondisparagement**
13:6

**normalize** 132:3

**north** 54:11

**note** 48:15 71:12
75:6,8 107:20 112:7,
10 118:25 144:6

**noted** 113:13 114:3

**notes** 32:20 48:10
49:8 54:10 67:7
69:10 70:5,24 80:7
86:8,10,14 89:3
104:13 107:12,15
108:3 115:16 118:4
119:10 131:21
138:13 143:9 144:24
145:16

**notice** 109:4 110:2,5

**noticed** 18:2

**noting** 43:17 133:19

**November** 64:14
65:13 75:4 83:12
114:23 115:3 117:2
122:19,23,24 123:2
146:23 150:10

**number** 16:6 24:25
25:3,11 69:10 79:12,
14 124:2 133:25
137:7 144:24

**numbers** 16:10 21:6
57:5,6

——————————

**O**

**O'KEEFE** 120:3,11

**oath** 10:19

**object** 8:18

**objecting** 34:11

**objection** 26:25
32:18 34:2,5,9 35:21
37:9 38:3,10 41:7,15
49:11 59:19 63:11
70:7,9 71:2 73:4,13,

18 74:3,7 76:19 79:5
81:22 82:3,7,12,17
86:22 87:6,11 92:9,
20 101:11 103:4,16
105:7,13 109:10
110:11 111:18
112:16 115:17
119:16 124:19 130:7
134:5 140:7,17,21
141:3,20 144:10,14
145:20 147:2 148:6
149:10 150:13,25
151:8

**obligations** 83:14

**obliged** 83:18

**obvious** 101:13
111:12,13,17

**occurrence** 60:19

**October** 37:25 39:17
59:5 96:11 97:10,25
99:23 104:5,7 105:20
106:11 125:11

**Oechslin** 21:2 27:3,
13 28:17 29:2 51:22
54:9 65:14 71:13
83:3 86:6 95:25
114:9 116:15 122:9
127:21 131:10 142:7

**off-channel** 19:11

**off-the-cuff** 127:13

**offering** 144:3

**office** 9:14 71:14
72:24 129:2

**Officer** 34:16

**offline** 108:16,20

**offsetting** 56:5,15
69:16 135:20

**Ohio** 95:19

**onboard** 144:16

**one-third** 16:2

**ongoing** 60:22

**open** 40:21 45:2 51:9
61:8 62:4,16 63:19
118:5 119:3 120:17
121:15

**opening** 89:15

103:22 104:21

**operated** 18:20

**operating** 34:16
121:17

**operative** 85:13

**opportune** 119:12

**opportunities** 92:4

**opportunity** 119:14,
15

**opposed** 69:4

**option** 47:5 72:21

**options** 12:17,23,24,
25 100:13,23

**order** 21:7

**org** 20:8

**organized** 20:19

**original** 131:23

**originally** 67:17,22
70:16,21

**overseeing** 19:23
20:2 35:16

**oversees** 103:8

**oversight** 52:7 54:4
133:6

**Overview** 22:21 23:6

**ownership** 14:21

———————

**P**

**P&I** 57:22 94:7

**P&Is** 21:7 54:6 55:18
142:25

**p.m.** 113:13 114:3

**pages** 65:22 74:24
91:17

**paid** 117:24 122:21

**paint** 20:21

**paragraph** 36:21,25
40:17 60:10,25 61:17
94:6,7 125:12

**parameters** 102:14

**paraphrase** 48:17

**Pardon** 93:16 98:14
118:12 126:3

**part** 27:7 37:23 41:19
48:15 53:19 60:24
61:2 74:13 78:11,25
87:23 90:20 98:9
106:21 112:2 118:13

**participant** 47:3

**participants** 63:19,
25 103:12 140:25

**parties** 6:13 79:10

**partner** 24:18

**partners** 53:4 58:3
73:22 135:23 136:14

**parts** 87:22 98:5

**passed** 18:14
150:12,15

**passes** 91:7

**passing** 81:20

**patience** 7:22

**Paul** 36:22 37:7,15
50:23,25 83:3,11
97:19 102:21 106:9,
14 109:3 127:20
129:15,24 130:18
149:22

**paying** 13:2

**Payne** 91:8,10

**PB** 54:11

**penalty** 10:21

**pending** 6:18 8:23
69:24 88:16

**people** 24:25 38:7,9,
15 46:23 98:4 99:25
100:10 102:17
124:11

**perceived** 112:14

**percent** 25:7,8 75:22
76:2,7,15 84:5,7
106:17 109:5 125:13
126:16 127:10
132:12 133:20,23
136:25 138:21 139:5
147:19 148:8,10,14

**percentage** 15:23

**percentages** 25:12

**performance** 15:18,
19

**period** 29:5 145:18
148:21 149:4

**periodically** 92:13

**periods** 145:12

**perjury** 10:21

**person** 17:13 108:22

**personally** 12:18

**perspective** 56:15
75:11,16 76:18
143:23 144:6

**pertinent** 150:16

**Philippe** 16:16,21
17:13 20:2 28:17
30:9,20 35:10 52:17
53:5,25 77:25 89:5
91:5 92:17 96:2,10

**Phlippe** 131:8

**phone** 10:5,8 17:12,
14

**phrased** 62:13

**physical** 51:8

**picks** 64:17

**picture** 20:21 67:25
135:22 136:10

**piece** 63:5

**pitch** 97:21,23

**place** 102:23 120:6
131:22 151:2

**Plaintiffs** 7:9

**plan** 88:24 106:23

**play** 147:9

**plays** 63:5

**PMS** 56:4

**point** 20:8 24:21 25:6
27:23 35:2 38:2 48:9
51:15 60:10 64:15
67:18 69:12,13
77:24,25 78:2 110:24

111:7 112:5,9 123:6
137:3 143:21

**pointing** 140:13

**points** 55:16 123:4
143:2,12,14 152:11

**policy** 84:4

**pop** 97:3

**portfolio** 68:3 119:5
123:11 131:21 132:8,
22 133:11

**portion** 115:24
145:16

**posing** 61:3

**position** 47:18 48:3
66:21 68:18 72:9,11
76:22

**positions** 90:16

**possibility** 109:8
147:23

**potential** 45:10
62:23 146:22 150:20

**potentially** 17:9
34:23 37:19 45:8
47:6 48:24 62:23
71:4 72:13 101:9
147:8

**powerpoint** 22:22
31:8,17,20

**practice** 78:11 90:12

**preferred** 145:25
146:3

**premium** 86:11
117:24 123:3 136:24
137:3

**premiums** 119:15
122:20

**preparation** 11:19

**prepare** 11:10 12:4

**prepared** 147:6

**presentation** 30:24
31:5 32:2,4 34:4 35:9
90:9 92:11,15,16
96:19 97:7

**presentations** 98:11

**presented** 32:4
119:22

**Presenter** 114:14

**press** 83:23

**pretty** 60:19 147:15,
24

**prevent** 13:7,13 50:2

**previous** 35:8 52:2
149:25

**previously** 28:6 36:3
39:5 43:4 53:8 55:2
74:16 85:20 89:11
91:14 99:12 103:20
104:19 105:25
123:17 124:24 126:4
146:12 149:22

**price** 46:22,23
107:11 108:2,7
110:9,18 111:5,6,14,
23 112:10,20,22

**prices** 132:19 133:2
134:11

**pricing** 52:11

**primarily** 53:11

**primary** 19:19 72:7

**prime** 42:4 43:19,22
44:10,20 45:6 49:4
51:7,10 54:14,16,23
78:25 79:8 139:25
140:11 141:7

**privileged** 78:24

**problem** 46:3 68:14,
17 69:6 93:17

**Procedure** 6:17

**proceed** 126:23

**process** 62:19
63:14,24 64:12 66:4
68:12 96:24 120:12,
14 124:9

**produce** 85:6

**produced** 57:7

**product** 19:22 37:4,
18,20 47:6 54:2,3,4
63:17 96:19 97:8
99:8 103:9,10 130:9,
11 144:4

**production** 123:11

**products** 14:17
26:24 27:8 48:16
89:23

**profiles** 145:25

**profitability** 33:22,
24 37:6 40:8,13
41:13,18 47:13,16
57:19 98:23,25 99:7
144:6

**profitable** 36:23
37:3,5,8,21,22 38:19
48:3 56:25 80:12,13
143:17 144:7,12,20,
22

**progress** 123:10

**promoted** 15:4

**prompting** 147:4

**provide** 27:16 37:6
38:20 75:18 109:4
110:2 126:10

**provided** 81:25 94:2

**public** 77:2

**pull** 21:12,18 22:25
23:14 28:5 29:22
35:25 39:4 43:3
58:13 64:18 96:16
104:17 105:24 114:6
124:23 129:13
130:25 149:21
151:10

**pulled** 71:14 72:23

**purchase** 120:24,25
121:25

**purchased** 86:15

**purchasing** 49:8
71:22 89:2

**purely** 49:2 107:21

**purpose** 92:7

**purposes** 69:8

**pursue** 73:3 74:2

**pursuing** 144:24

**pushed** 118:23

**put** 10:10 36:5,7

45:19 57:16 76:17
97:12,25 105:19
135:21

**puts** 46:13

**putting** 92:7,10
97:21

**Q**

**QIS** 100:6 101:16,18,
19,22

**Quantitative** 100:6

**quantity** 83:18

**queen** 114:7

**question** 8:11,15,20,
23 18:23 20:20 41:9,
11 44:4,14 45:16
46:3 47:9,23 48:22
49:2,13,18 51:8
58:12 61:3 63:6 66:3
68:24 69:23,24
70:10,13 84:20 85:3
88:12 102:25 110:15
111:3 126:25 131:23
150:11

**questioning** 51:16

**questions** 8:18
10:20 22:16 43:24
49:22 52:13 131:3
134:13 152:14,18

**quickly** 53:19 66:16

**quote** 43:18,25 48:18
59:9

**R**

**raised** 88:15

**ran** 87:22

**range** 136:25

**rate** 50:3,12,15,19
51:5,19 76:9 77:4
88:19 138:23 139:5
140:14

**rates** 47:17 50:7
101:10,12

**reach** 18:2,6

**reaction** 125:17,21
126:6

**read** 37:11 40:3
53:14,18,19 61:17
64:23 85:21 88:4
96:5 109:16 115:23,
24 151:24 152:5

**reading** 92:11
129:21 152:7

**reads** 67:6 84:5 95:2

**real** 30:17 31:15

**realtime** 131:25

**reason** 22:10,13
28:16 64:15 65:12
70:19 86:19 95:7
108:19 151:23

**reasons** 87:10

**rebalancing** 37:17
47:25

**Rebecca** 93:2

**rebound** 68:5 109:9

**recall** 15:4,8,24 16:6,
19 18:8 20:6,8 21:6
24:6 27:2 31:14,25
34:19,20 38:22,25
39:2 41:2 44:11,22
45:25 46:14 47:8,11
49:21 50:6,8,11,20
51:21,24 52:16 58:5,
25 60:15 72:22 74:25
77:15 79:15 80:18,22
84:16 90:10,18 91:22
97:20 99:18 100:20,
24 106:7 108:24
112:24 116:23
121:15 122:2,16
123:21 126:6 129:6
131:16 135:18
137:22 140:18,22
142:12 144:23 145:5
149:11 150:7 151:19
152:7,9

**recalling** 123:25

**receive** 10:12 86:20

**recess** 42:24 81:14
113:12

**recognize** 22:8 24:5
28:13 30:14 31:13

36:13,14 39:10 43:10
53:23 55:7 58:24
65:10 74:22 83:9
86:2 89:17 91:21
93:19 96:7 99:17
100:2 102:10 104:3,
24 106:6 114:20
116:22 122:15
123:20 125:6 128:6
129:20 131:15
137:21 142:11 150:2
151:18

**recollection** 40:4
105:18 124:9

**record** 6:8 22:18
39:16 43:2 55:14
81:13,16 113:11
114:5 152:25

**recording** 6:14

**recruited** 14:5,6

**recycling** 134:20,23,
24

**redeemed** 107:12,16
108:3

**redeeming** 94:14,16

**redemption** 107:11,
18,24

**reduce** 79:23 119:10
130:13 144:21

**reduced** 145:19

**reducing** 33:5 119:4
136:18

**reevaluation** 40:11

**reference** 55:14
62:25 104:14

**referred** 126:2

**referring** 15:11
40:13 64:5 98:6,20
99:6 117:22

**refers** 24:25 90:7
134:24

**reflection** 145:18

**refresh** 11:21,24
29:18 40:4

**refreshing** 93:12

**regular** 17:6 60:19 98:9 144:17

**regularly** 90:13,15, 19 100:11,12 140:16

**regulatory** 15:21

**rehedging** 20:25 77:5

**relationship** 77:21

**relative** 117:24

**release** 83:23

**remark** 127:13

**remember** 14:4 16:10,21 18:4 28:14 30:15 34:6,13 40:5 41:25 43:11 44:8 49:17 53:24 55:8 56:7 59:2 60:17 72:4 75:2 77:24 78:3 83:10 84:19,21 86:3 89:18 93:20 96:8 100:8,16,17 102:11 104:15,25 105:21 114:21 119:8 120:7, 10 125:8,17,20 128:7,19,24 136:8 140:19 146:19 147:3 149:6 150:14

**remind** 67:23 77:21

**remote** 6:6,14 147:8, 11,15,22

**remotely** 6:9,12

**removing** 102:22

**repeat** 137:6

**repetitive** 22:17

**rephrase** 110:14

**replicate** 56:5

**replied** 126:4

**replies** 95:11

**report** 20:7,14

**reported** 16:22 20:16 54:6 120:22

**reporter** 6:10 7:5,12 8:4 115:23 138:2

**reporting** 6:4 7:5,6

16:20

**represent** 11:5

**representing** 9:6

**repurchase** 123:23

**request** 40:23 88:15, 18

**requested** 115:24

**requests** 143:25

**required** 127:11

**requirement** 64:5

**requirements** 15:21

**requiring** 79:8

**research** 40:19,23

**resolving** 46:15

**respect** 11:23 132:3

**respective** 100:18

**respond** 95:14 118:19 136:2

**responds** 80:16 126:18

**response** 66:7 87:2 88:12 109:3

**responsibilities** 12:13 20:19

**responsibility** 19:19 20:21 35:13,15

**responsible** 50:20

**rest** 28:3 37:12 43:13 77:5

**restock** 62:7

**restriction** 63:2

**restrictions** 50:2,18 61:5 64:5 85:9,12 98:16

**result** 41:13 44:11 84:22 126:12 135:24

**resulted** 35:24

**retention** 32:22

**returned** 112:7

**revenue** 21:4 24:14, 15,17 25:22 32:22

33:5,16 42:3 143:5, 14

**revenues** 33:12 142:14,17 143:9,11

**reverse** 140:8

**review** 11:18 31:9,18 35:4,18,24 41:17 49:25 52:9 72:20 79:4 89:14 92:13 98:10 144:17

**reviewing** 50:17 85:2

**reviews** 34:22

**Rich** 120:3,5

**Richard** 120:10

**Riddell** 42:18

**ring** 151:6

**risk** 19:22 38:15 56:19 66:25 67:15,20 68:3,18,20 69:3 70:15,19 71:19 72:9, 11 73:10,22 80:4,6, 11 85:5,7 87:16 94:7 98:8 99:8 102:13,14, 19 103:7,8 105:17 106:15,19,24 107:5, 7,20,25 108:14 115:15 116:4 118:9 119:4,10,21 123:10 124:18 130:8,12,13 132:4 133:6 134:8, 13,20,23,24,25 135:2,3,4,5,16 136:6, 11 147:7 150:19,21

**riskier** 80:8

**risks** 54:7 57:19,22 60:23 131:20 134:10 135:23 136:15

**risky** 80:2

**Rob** 19:25 21:12 36:6 39:15 53:5 55:9 56:23 57:10 65:20 74:4 75:3 77:18,22, 23,25 78:2,12 86:5 92:18 104:5 114:17 116:15,25 123:13 125:10 128:11 142:16,23 150:10

**Robert** 16:16,22 39:14 65:13 93:6 99:21 100:8 122:10 131:9 142:6

**role** 12:14,15 13:23 14:12,13,15 63:5

**roles** 50:24 100:18

**rolled** 80:5

**room** 6:7,11 9:10,12, 16 42:16,20

**route** 132:2,5 133:21, 22

**routine** 133:10 134:12

**routinely** 133:8

**row** 25:19

**rows** 108:23

**RT** 131:24 133:13,16

**rule** 6:16 84:6

**rules** 6:16,17 8:2 84:3

**run** 69:5 73:10

**runs** 100:6

**Russ** 117:6 118:6,7, 8,22,25 120:3

**S**

**S&p** 12:23 45:19 46:13

**salary** 15:13,22,25

**sales** 24:21,24 25:2, 11 32:13 38:14 43:13 50:23,25 53:3 58:3 97:16 102:14,19 103:9,10 105:11

**salesperson** 91:10

**Sarah** 9:8 42:17

**sat** 108:22

**satisfied** 61:8

**scale** 117:8 121:20

**scenario** 62:14 66:25 72:2

**scenarios** 72:16,19 142:20 143:6 147:13 150:20

**Schneiderman** 6:19 7:8,18 21:12 23:14, 18 26:20 28:5,9 29:22 30:2,7,13 31:3, 7 32:8,11 33:9,11,18, 20 35:25 36:6,9 39:4, 7 42:12 43:3,7 53:7 54:25 58:13,20 64:18,21 74:15,19 81:2,7,10,17 82:20, 24 83:6 85:19,23 88:2,6 89:10 91:13 92:25 93:11 95:18,24 96:6,16,22 99:7,11 101:25 102:5 103:19 104:2,17,23 105:24 106:2 113:3,7 114:6, 12 115:22 116:12,18 117:21 122:6,14 123:16,19 124:13,23 125:3 127:18 128:2 129:13,19 130:25 131:6,12 132:21 137:5,8,15 138:2 141:23 142:10 146:8, 11 147:13 149:21 151:10,12,17 152:6, 12,20

**screen** 9:19,23 114:14,15

**scroll** 67:10,14 75:19 84:9 133:12

**scrolling** 71:7

**searching** 118:12

**secret** 82:5

**self-creation** 50:4

**sell** 46:10

**sellers** 69:13

**selling** 62:5

**selloff** 125:14 126:16 127:10,15,16

**send** 59:8 83:14

**sending** 77:17

**senior** 14:15 16:23 34:24 35:3 52:15 78:3,12 92:17 105:16

**seniority** 14:18,20

**sense** 13:24 16:4 21:4 34:7 40:2,13 100:19 119:3,14 120:9 140:25

**sensitivity** 132:8,14, 18,21,23

**sentence** 37:16 61:19,25 62:25 69:12 70:14,22 76:11 125:25

**separate** 79:2

**September** 30:21 32:3,5 55:12 93:23 96:14

**series** 21:21

**Session** 104:13

**set** 6:23 42:20 152:19

**Setting** 57:6

**settle** 109:22

**settlement** 108:7,12

**settles** 108:7

**setup** 42:20

**shaped** 139:16

**share** 42:3 94:10

**shared** 54:20

**shares** 44:17 54:11 56:3 67:2,15,20 68:4, 8,10,11,21,25 70:15, 20 71:22 72:6,14,18, 21 78:22 79:12 86:10,24 94:15,16, 17,25 95:4 122:4 124:2,5 136:17 137:3 140:10,11 141:8,10, 11,17

**shed** 58:11

**sheets** 65:17

**Shemin** 6:10 7:6

**shift** 80:22

**short** 45:18 48:5 61:9 63:20 64:2 68:5,9,21 69:10,13 80:6 138:18 147:16

**shorting** 48:24 62:6, 17

**show** 22:16 49:19 131:24 148:18

**showed** 136:11

**showing** 80:15

**side** 42:16 100:22

**sign-off** 120:22

**Signal** 19:12

**signed** 13:12

**significant** 18:10 144:24

**similar** 13:23 14:13, 17 16:9 89:18 91:22 96:8 104:4 114:21 116:23 122:16 123:21 135:20 142:12 146:20 149:24

**sit** 90:24

**sitting** 149:16

**situation** 119:18 147:7

**situations** 106:24

**size** 79:16 117:9 121:22

**slide** 24:3,13 25:15 32:9 33:9,18,21 98:12,13,14 99:5 131:24 132:5 134:8

**slow** 7:21

**Soc** 88:25

**Societe** 88:21

**solutions** 101:4

**Somma** 36:22 37:7 50:23,25 83:3,12 97:19 102:21 106:9, 14 109:3 127:21 128:11 129:15,24 130:18

**sort** 54:7 69:9

**sound** 27:10

**sounds** 27:11 32:6 41:17 43:12 53:3

70:8 72:5,12 84:21, 22 92:10 100:2 103:11 127:13 139:2, 12

**source** 19:8

**Sowler** 16:16,22 17:5 19:25 39:14 65:14 71:12 75:3 77:18,22, 25 86:5 92:18 93:6, 22 104:5 116:15,25 122:10,18 123:10,13 125:10,20 126:7 131:9,18 150:10

**speak** 10:15 11:25 13:13 17:12 46:2 124:13 150:18

**specialist** 29:9,14

**specific** 15:8 38:25 40:15 41:4,12 47:3 57:4 59:2 68:24 70:13 84:22 86:19 88:19,24 90:10 91:23 93:21 97:20 99:19 100:20 102:12 105:21 106:7 114:22 123:22 131:17 137:22 142:13

**specifically** 27:2 30:15 38:17 39:2 41:2 52:16 58:5 73:23 80:24 87:14 90:16 92:23 96:9 97:24 101:15 109:2 112:24 125:8,19 128:24 130:22 145:5 150:8

**specifics** 15:24 77:16 136:8

**speculation** 87:12 115:18

**split** 15:10,12 37:18

**spoke** 98:22

**spoken** 51:3

**spot** 42:8 126:11 127:2,6 132:9,24,25 133:2 134:11

**spotted** 27:22

**square** 140:4

**staffing** 32:14

**stage** 88:16

**stakeholders** 38:13 98:3 105:15

**Stanley** 138:25

**start** 6:21 7:21,25 13:16 16:13 21:14 42:3 43:17 52:3,8 59:7 67:11 71:22 80:6 117:8 121:20

**started** 13:18,20 14:13 42:5

**starting** 29:19

**starts** 86:6 120:21 131:13 138:10

**state** 6:17 59:15 60:20 94:10

**statement** 99:4,6

**states** 66:8,13 72:2, 16 142:23,24

**step** 64:11 66:3

**Stewart** 20:11,14

**stipulate** 6:13

**stock** 15:10 64:3

**stop** 42:9

**stopping** 50:4

**strategist** 93:23

**strategy** 73:3,7 74:2 92:3 100:7 101:5,16, 20,23 136:18

**stress** 119:2

**structure** 20:8 99:23 100:3 101:2

**structured** 15:7,9

**structuring** 100:22 101:3,7

**struggling** 136:5

**STX** 125:14 126:12 147:20 148:14

**subject** 23:7 90:4 100:13 104:13 114:25 128:16

**substantial** 145:16

**success** 136:3

**suffered** 32:14

**suggest** 116:6 129:2

**suggesting** 149:15

**suggests** 143:19 144:11

**suing** 11:5

**Suisse** 6:24 9:9,15 11:6 12:11 13:2,5,17, 25 14:10,24 21:5 24:19 25:4 27:7 38:19,23 50:6,10 54:10 56:21 57:13 76:3 79:22 99:9 115:15 130:10 139:4 144:8,24 151:4

**Suisse's** 11:22 56:15 84:4 117:23 135:3,5 136:18 143:23

**suite** 48:15

**sum** 79:18

**summarizing** 122:20

**summary** 95:11 96:14

**super** 138:13

**superiors** 18:14,22 52:23 81:25

**supervising** 21:3

**supervisors** 74:6 82:11 124:17 129:25 130:21

**supervisory** 59:23

**surprise** 50:9 145:6

**suspect** 29:14 145:15

**SVXY** 48:11,13,18,25

**swap** 49:9 55:21,24 56:5,10,15 63:9,16 64:6 68:13 69:16 75:23 76:25 77:14 80:4 128:9,17 130:16 135:20 138:11,13 139:9,13 142:21

143:9 144:3,19,21
146:2

**swaps** 56:8,12 75:15
80:5 89:2 101:14,15
114:25 115:7,11,25
116:5,7 129:7,23
130:3 143:12,20
144:9,25 145:3,17

**swear** 6:11 7:13

**swearing** 6:14

**switched** 129:10

**sworn** 7:15

**systematic** 101:21

────────────

**T**

**tab** 21:13 23:14 28:5,
8 29:22 31:3 36:2
39:4 43:3 53:7 54:25
58:13 64:19 74:15
81:2 82:21 85:19
88:2 89:10 91:14
92:25 95:18 96:17
99:11 101:25 103:19
104:18 105:24 113:3
114:7 116:12 122:6
123:16 124:23
127:18 129:13
130:25 137:5,6
141:23 146:8 149:21
151:10

**tailored** 101:4

**Tair** 131:14

**taking** 99:6 123:14
135:15

**talk** 8:10 56:11 80:17
90:25

**talked** 77:20 78:15
87:18

**talking** 29:6 37:24
45:6 59:14 61:2
108:5 110:4 131:19
147:18 149:12

**tally** 141:10

**target** 33:12,15

**team** 9:7 12:16
14:16,21 15:18 16:23

**thoughts** 75:19

**thread** 66:2 86:7

**Thursday** 152:24

**time** 8:24 9:17 14:16,
24 16:15,22 19:25
26:5 33:25 38:22
42:7 51:23 57:3
63:13 77:22 81:5,12,
15,23 83:24 84:14
98:11 105:19 107:17
110:5 113:5,13
114:3,4 115:20
119:12 121:10,15
132:2,3,5 133:21,22
138:5 140:23 144:23
145:2,11,12 147:4
148:12,21 151:24
152:21,23

**timeline** 37:24

**timely** 27:18

**times** 11:13 17:7,9
133:9 148:19 149:5,
18

**title** 13:20,21 15:3
24:13 33:21 92:12

**titled** 31:8,17 96:19
97:7

**titles** 14:23

**today** 9:4 10:24 12:2,
8 13:8 93:3 149:16

**today's** 11:10 12:5
31:21

**told** 74:4

**tolerance** 117:24

**tomorrow** 80:17
90:5 118:15

**Tomorrow's** 104:13

**tool** 69:3

**top** 39:19 49:24 60:5,
11 64:9 66:10 71:6,
10 119:25 125:12

**topic** 67:15 102:21
103:3,12

**topics** 87:20

**tore** 95:3

**total** 16:2 25:19,21
69:10 141:11

**touch** 103:15

**track** 18:23 78:16

**tracking** 79:13

**trade** 12:23 46:6 47:4
108:11 109:22
119:15 121:12

**trade-related** 20:25

**traded** 14:17 48:15

**trader** 14:8 27:6

**traders** 12:16 14:8
16:23

**trades** 32:22 33:6
54:6 119:4 120:16
136:15

**trading** 11:23 12:16,
18,20,22 13:22 14:3
15:18 19:23,24 21:7
24:18 25:22 32:14
34:14 38:13 43:13
45:17 49:16 53:4
58:3 73:9,21 90:17,
22 91:3 97:15
102:15,19 103:8
119:11 121:15
129:25 135:23
136:14

**trading-related**
45:16

**traditional** 69:15

**Trends** 24:14

**true** 42:18

**trust** 18:16

**truthfully** 10:20 13:8

**TSG** 6:4 7:4,6

**turn** 32:12 58:10
81:18 117:3,14 121:5

**TVIX** 56:4 102:14,23
105:3

**type** 54:21 76:22
101:23 136:9

**types** 98:11

**typical** 45:16

**typically** 35:5 92:16

**typo** 29:15

────────────

**U**

**U.S.** 12:17,24

**uh-uhs** 8:6

**ultimate** 84:19

**ultimately** 50:6
71:25 72:13 111:15
129:6

**unable** 69:15 137:2

**unallowed** 111:24

**understand** 8:7,15
10:18,22 11:2,4,7
22:17 25:13 29:8,13
49:15 61:23 63:4
85:13 94:23 107:25
109:17 111:25
132:14 141:12,15

**understanding** 41:3
60:3 70:12 116:8
123:12 141:17

**Understood** 8:8

**unlock** 114:16

**unprecedented**
148:2,3

**unsure** 38:23

**unwind** 106:16,20
107:8

**update** 86:17,21,25
87:15 89:8 94:2,9
96:20 97:8 118:14,20
122:18 123:8,9,22
134:20

**updates** 31:21

**urgency** 119:3,7,8,
14

**users** 62:15

**UTF** 12:24

────────────

**V**

**validity** 6:13

19:18,20 25:2,3 27:7
28:3 34:15,16 50:23
71:25 73:22 78:11
90:13,22 91:3 97:15
101:3 105:11 112:21
118:13

**teams** 34:7 43:14
103:2,6,15

**tearing** 94:15,17,25

**telling** 11:17 56:23

**tells** 125:13 138:20

**ten** 81:7,9,11

**term** 147:17

**terminal** 19:6

**terminate** 111:10,11,
15

**terminated** 107:15,
21 111:19,22,23
112:4,6

**terminates** 108:11

**termination** 107:2

**terms** 14:16 15:9
35:17 54:5 56:11
69:9 100:23 101:14,
15 107:7,24 116:6
128:9,17 129:7
130:9,16

**testified** 7:16

**testify** 10:24 13:8

**testing** 101:8

**theory** 61:6

**thing** 32:16 53:18
54:8 58:25 62:2
94:18 99:14 139:23

**things** 9:21 45:3,5
60:22 76:25 89:22
90:20 91:2 94:2

**thinking** 37:17,25
39:25 50:13,15 52:11
57:18 61:22 62:2,14,
22 63:12 71:3 73:9
100:22 107:4

**thinks** 127:14

**thought** 46:23 51:20
57:3 110:21 135:6

**valuation** 107:23
110:6 115:4

**vega** 12:25 71:19
72:12 73:24 86:14
131:24 132:2,3,4,5,7,
14 133:7,13,16,22

**vehicle** 101:22

**verbal** 8:5

**versus** 6:24 25:7,8
48:10,18 63:9 75:10,
15 76:12 79:24
139:14

**video** 6:14

**view** 46:8,10,24 47:6

**violin** 81:3 82:22

**VIX** 29:9,13 33:15
41:20 45:18 46:23
59:10 60:7,20 62:5
78:12 89:23,25
96:14,19 97:8
100:13,23 109:4
111:10 126:12
142:17

**volatility** 95:12 127:7
132:15,18,22

**volume** 89:25 115:10

**volunteered** 141:14

_____

**W**

_____

**wait** 8:10 69:24

**waiting** 36:4 97:2
120:18

**walk** 55:23

**walking** 71:13

**wanted** 35:16 38:23
46:10,24,25 79:24
86:24 94:19 119:10
121:25 151:24 152:5

**Washer** 6:20 7:10
9:7 26:25 32:18 34:2,
5,9 35:21 37:9 38:3,
10 41:7,15 42:15
49:11 59:19 63:11
69:23 70:7,9 71:2
73:4,13,18 74:3,7
76:19 79:5 81:4,9,22

82:3,7,12,17 86:22
87:6,11 92:9,20
101:11 103:4,16
105:7,13 109:10
110:11 111:18
112:16 113:4 115:17
119:16 124:19 130:7
134:5 140:7,17,21
141:3,20 144:10,14
145:20 147:2 148:6
149:10 150:13,25
151:8 152:2,14,17

**ways** 45:21 55:19
68:2 133:8

**week** 30:24 32:2
88:17

**Whatsapp** 19:12

**Wild** 87:12 135:6,9,
10,14 136:11

**wildly** 37:5,22

**window** 9:20

**wise** 15:23

**withhold** 18:10 28:2

**word** 35:7 118:13

**words** 46:17 107:4

**work** 12:10 120:23
150:23 151:4

**work-related** 19:13

**worked** 21:2 34:13
50:23 51:2 129:24
138:5

**working** 13:16,18
25:11 50:25 62:8
100:4

**works** 40:20,24
55:24 137:25

**writing** 8:4

**written** 152:2,4

**wrong** 94:20

**wrote** 95:6 125:22

_____

**X**

_____

**XIV** 11:23 13:14
19:19 20:19,24 21:5

36:23 37:3,8,18,24
38:24 40:2 41:3,6
43:18 46:10,24
47:17,23 48:4,5,10,
13,19,20,24 49:8
50:3 54:10,11 55:19
56:3 62:3,6,17 63:10
67:7,12,24 68:21
70:24 75:23 83:18
86:7,15 94:15 98:15,
16,25 102:14 104:10
105:3,19 106:16
107:3 110:9,18,23
111:5,6,9,14,22
112:6,23 114:25
118:3 119:10 120:25
121:15 122:18,21
123:23 124:18 125:9,
14 126:12 127:3
128:10,17 129:7,23
134:20 135:16
136:11 138:11,17
139:25 140:6,25
142:14 143:9 147:14
152:5

**XIV's** 41:13

**Xu** 93:7,22

_____

**Y**

_____

**year** 15:5 25:22
132:10

**years** 61:16 109:18
129:9 149:4

**yesterday** 11:14

**yield** 152:13

**Yogi** 99:21

**York** 100:5

_____

**Z**

_____

**zoom** 9:20 10:19
64:25