UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #: _____             │
│ DATE FILED:  3/16/2023____           │
└─────────────────────────────────────┘
```

SET CAPITAL LLC, et al., Individually and on Behalf of
All Others Similarly Situated,

                    Plaintiffs,

                  -against-

CREDIT SUISSE GROUP AG, CREDIT SUISSE AG,
CREDIT SUISSE INTERNATIONAL, TIDJANE
THIAM, DAVID R. MATHERS, JANUS HENDERSON
GROUP PLC, JANUS INDEX & CALCULATION
SERVICES LLC, and JANUS DISTRIBUTORS LLC
d/b/a JANUS HENDERSON DISTRIBUTORS,

                    Defendants.

18 Civ. 2268 (AT)

**ORDER**

ANALISA TORRES, District Judge:

      Plaintiffs Set Capital LLC, Stefan Jager, Aleksandr Gamburg, and Apollo Asset Limited[1]

bring this securities class action lawsuit on behalf of themselves and purchasers, acquirers,

sellers, and redeemers of VelocityShares Inverse VIX Short Term Exchange Traded Notes

("XIV Notes," or the "notes") who were damaged thereby, against Defendants Credit Suisse

Group AG, Credit Suisse AG, and Credit Suisse International (collectively, "Credit Suisse"), and

Credit Suisse's CEO, Tidjane Thiam, and CFO, David R. Mathers,[2] alleging claims under §§ 9,

10(b), and 20(a), of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5

promulgated thereunder, and §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act").

Am. Compl. at 1, ¶¶ 23–24, 26–35, 270–93, 306–23, ECF No. 190.

      XIV Notes, which were issued and managed by Credit Suisse, were a derivative financial

product that rose in value when stock market volatility fell, and vice versa. *Id.* ¶ 2. Plaintiffs

---

[1] On December 21, 2022, the Court granted Nikolay Drozhzhinov's request to withdraw as a lead plaintiff. ECF No. 224.

[2] On July 1, 2021, Plaintiffs voluntarily dismissed all claims against Janus Henderson Group PLC, Janus Index & Calculation Services LLC, and Janus Distributors LLC without prejudice. ECF No. 160.

principally allege that Defendants made material misstatements and omissions about the pricing of XIV Notes to induce investors to purchase XIV Notes at an inflated value, and on February 5, 2018, Defendants executed on their complex fraud by collapsing the market for XIV Notes, earning hundreds of millions of dollars in profit at their investors' expense. *Id.* ¶¶ 1, 6–19.

Before the Court are Plaintiffs' motion for class certification and appointment of class counsel, ECF No. 178, and Defendants' motion to exclude expert testimony, ECF No. 204. For the reasons stated below, Defendants' motion to exclude is DENIED; Plaintiffs' motion to certify is GRANTED in part and DENIED in part; and Plaintiffs' motion to appoint class counsel is GRANTED in part and DENIED in part.

## BACKGROUND[3]

I.      Factual Background

This case arises out of the collapse of XIV Notes, which were a complex investment vehicle that provided a mechanism by which investors could profit from low volatility in the stock market. Am. Compl. ¶¶ 2, 56. In purchasing an exchange traded note ("ETN"), like XIV Notes, investors agree to pay money to the institution sponsoring the ETN in return for a payment when the note matures, the amount of which is determined by the value of a market index. *Id.* ¶ 55. In this case, the value of XIV Notes was derived from the S&P 500 VIX Short-Term Futures Index (the "VIX Futures Index"), an index that aggregates the price of VIX futures contracts, which in turn track a measure of market volatility. *Id.* ¶¶ 55–56.[4] To allow investors

---

[3] The Court presumes familiarity with the facts and procedural history, which have been set forth in previous decisions in this case, *see, e.g.*, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 69–75 (2d Cir. 2021), and restates some key factual and procedural details here. The facts in this section are taken from the amended complaint and are accepted as true for the purpose of considering a motion to certify a class. *See Shabazz v. Morgan Funding Corp.*, 269 F.R.D. 245, 249 (S.D.N.Y. 2010).

[4] The XIV Notes' value was derived from several layers of indices that measure expected market volatility. First, there is the VIX Index, sometimes referred to as Wall Street's "fear index" or "fear gauge," which is a metric

to bet against market volatility, the value of XIV Notes was inverse to the value of the VIX Futures Index.  *Id.* ¶ 56.  Credit Suisse issued and sold the XIV Notes.  *Id.* ¶¶ 2, 57.

Credit Suisse issued XIV Notes on three occasions:  in 2010, when it issued 9,018,880 notes; in June 2017, when it issued 5 million notes; and on January 29, 2018, when it issued another 16,275,000 notes.  *Id.* ¶¶ 61, 63.  The value of the XIV Notes increased dramatically during this time period.  *Id.* ¶ 62.  Credit Suisse's potential liability increased proportionately with the value of the XIV Notes, so it hedged against its obligations by taking a short position[5] on VIX futures.  *Id.* ¶¶ 65–66.  Therefore, a decrease in the VIX Futures Index would increase Credit Suisse's obligation to noteholders but would also allow Credit Suisse to make profits from its short position on VIX futures.  *Id.* ¶ 66.

Credit Suisse issued the January 29, 2018 XIV Notes pursuant to a registration statement, prospectus, prospectus supplement, and a January 29, 2018 pricing supplement (collectively, the "Offering Documents"), each of which was filed with the Securities and Exchange Commission ("SEC").  *Id.* ¶¶ 216, 296.  The Offering Documents set forth various terms, conditions, and risk disclosures applicable to XIV Notes in connection with the issuance of the 16,275,000 XIV Notes.  *See, e.g.*, ECF No. 103-1.  The Offering Documents also included disclosures concerning

---

developed by the Chicago Board of Exchange ("CBOE") to measure the expected volatility in the S&P 500 Index over the next thirty days. Am. Compl. ¶¶ 50–51. The VIX Index is not itself an asset that can be purchased. *Id.* However, the CBOE later created VIX futures, which are futures contracts—a promise, generally made through a futures exchange, to buy or sell a particular commodity or financial instrument at a predetermined price at some future date—based on the VIX Index. *Id.* ¶¶ 52–53. Second, there is another index, the VIX Futures Index, that tracks the value of first- and second-month VIX futures. *Id.* ¶ 56. The value of XIV Notes was based on that VIX Futures Index. *Id.* Specifically, the XIV Notes' value rose and fell inversely with the daily returns of the VIX Futures Index. *Id.* Generally, when the VIX futures contracts underlying the VIX Futures Index decreased in value by one percent, the XIV Notes' value increased by once percent, and vice versa. *Id.*

[5] A short position "is created when a trader sells a security first with the intention of repurchasing it or covering it later at a lower price. A trader may decide to short a security when she believes that the price of that security is likely to decrease in the near future." James Chen, *Short (Short Position) Definition*, Investopedia (updated Sept. 12, 2022), https://www.investopedia.com/terms/s/short.asp/.

the risks of investing in and holding the notes, Credit Suisse's intent to hedge its exposure to the notes, and Credit Suisse's right to accelerate the notes under certain circumstances, giving it the ability to force investors of XIV Notes to redeem their notes.[6]  *See, e.g.*, Am. Compl. ¶¶ 137, 152, 217, 219, 223–24, 226, 242, 299–304.

On February 5, 2018, the S&P 500 Index dropped 4.1 percent.  *Id.* ¶¶ 8, 159.  This spike in market volatility was reflected in the VIX Futures Index, and over the course of regular trading on February 5, the intraday indicative value of XIV Notes dropped from approximately $108.37 to $72.59.  *Id.* ¶¶ 157, 160–61.  In response to this drop in value of XIV Notes, Credit Suisse reduced its short position on VIX futures by purchasing over 105,000 VIX futures contracts after the market closed.  *Id.* ¶¶ 8, 162.  These purchases amounted to roughly one-fourth of the entire VIX futures market.  *Id.*  That increase in trading caused the VIX Futures Index to skyrocket, and thus the value of XIV Notes to plummet, landing ninety-six percent below where they had closed on the previous trading day.  *Id.* ¶ 9.  The next morning, Credit Suisse declared an acceleration event based on the drop in value, specifying February 15 as the date for calculating the closing indicative value that would be paid out to holders of XIV Notes (the "Acceleration Event").  *Id.* ¶¶ 14, 199.  Credit Suisse ultimately redeemed the notes at $5.99 per note.  *Id.* ¶¶ 14, 201.  Plaintiffs estimate that Credit Suisse made between $475 million and $542 million in profit by redeeming the notes at that price.  *Id.* ¶ 197.

---

[6] Credit Suisse could "accelerate" the notes in two circumstances: (1) at its option, in which case it would be required to pay the closing indicative value at a date at least five days after the optional acceleration; or (2) if a predefined "acceleration event" occurred—including if the intraday indicative value dropped eighty percent or more from the prior day's closing indicative value—in which case it would pay the closing indicative value on the day the acceleration event occurred.  Am. Compl. ¶ 137.

II.   Procedural History

After several plaintiffs sued Defendants, the Honorable Sarah Netburn consolidated the actions and appointed Plaintiffs as lead plaintiffs.  ECF No. 74.  On August 20, 2018, Plaintiffs filed an amended consolidated complaint against Defendants.  ECF No. 82.  On November 2, 2018, Defendants moved to dismiss the complaint.  ECF No. 101.  Upon a Report and Recommendation by Judge Netburn, ECF No. 124, the Court dismissed Plaintiffs' claims in their entirety.  ECF No. 135.  On April 27, 2021, the Second Circuit affirmed in part, and vacated and remanded in part, the Court's order of dismissal.  *See Set Cap. LLC*, 996 F.3d at 69.

On July 1, 2022, on remand, Plaintiffs moved to certify three classes:

[(1)] all persons and entities that purchased or acquired [XIV Notes] between January 29, 2018 and February 5, 2018, inclusive (the "Misrepresentation Class Period"), and who were damaged thereby (the "10b-5(b) Class" [or the "Misrepresentation Class"]). . .[;]

[(2)] all persons and entities that sold or redeemed [XIV Notes] on or after February 5, 2018 (the "Manipulation Class Period") and who were damaged thereby (the "10b-5(a) and (c) Class" [or the "Manipulation Class"] and, together with the 10b-5(b) Class, the "Exchange Act Classes") . . . [; and]

[(3)] all persons and entities that purchased or acquired [XIV Notes] pursuant to or traceable to [the] Offering Documents, and were damaged thereby (the "Securities Act Class") . . . .

Pls. Cert. Mem. at 4–5, ECF No. 179; *see* ECF No. 178.  Plaintiffs also moved to certify Plaintiffs as class representatives for all three classes and to appoint co-lead counsel as class counsel for all three classes.  *See generally* Pls. Cert Mem.  In support of their motion to certify the three classes and appoint class counsel, Plaintiffs filed an expert report authored by Joshua Mitts.  *See* Mitts Report, ECF No. 180-1.  On August 18, 2022, Plaintiffs filed the operative amended consolidated complaint.  Am. Compl.  On October 14, 2022, with their opposition to Plaintiffs' motion to certify the classes and appoint class counsel, *see* Defs. Cert. Opp., ECF Nos.

199, 237, Defendants separately moved to exclude Mitts' testimony, Defs. Daubert Mem., ECF Nos. 205, 239; *see* ECF No. 204.

The Court first addresses Defendants' motion to exclude Mitts' expert testimony, then considers Plaintiffs' motions for certification of the three classes and appointment of class counsel.

## DISCUSSION

I.     <u>Expert Testimony</u>

A.  Legal Standard

As a threshold matter, the parties dispute whether the *Daubert* standard governs the admissibility of expert testimony at the class certification stage.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Plaintiffs contend that "it is 'far from well-established' that an expert report 'must be admissible under Federal Rule of Evidence 702 and *Daubert*' at the class certification stage."  Pls. Daubert Opp. at 15, ECF No. 221 (quoting *Kurtz v. Costco Wholesale Corp.*, 818 Fed. App'x 57, 61 n.3 (2d Cir. 2020) (summary order)).  In response, Defendants argue that "courts routinely apply the *Daubert* standard to expert reports at the class certification stage," and "[e]ven the Supreme Court has recognized that [a] *Daubert* analysis is appropriate at class certification."  Defs. Daubert Reply at 4 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011)), ECF No. 229.

The Supreme Court has not definitively ruled on the extent to which a district court must conduct a *Daubert* analysis at the class certification stage, but it has suggested in dicta that a *Daubert* analysis may be required in some circumstances.  *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 269 (S.D.N.Y. 2018) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013)).  The issue remains unsettled in the Second Circuit and in this district.  *See*

*Kurtz*, 818 Fed. App'x at 61 n.3. *Compare Dandong v. Pinnacle Performance Ltd.*, No. 10 Civ. 8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013), *with In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 412 n.8 (S.D.N.Y. 2015). Courts in this district have often assumed without deciding that *Daubert* and Rule 702 apply at the class certification stage. *See Kassman*, 416 F. Supp. 3d at 269; *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018).

For the reasons stated below, even applying a *Daubert* analysis, the Court finds that Mitts' testimony is admissible. Therefore, the Court shall assume without deciding that *Daubert* and Rule 702 apply at the class certification stage.

Rule 702 provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

District courts are the gatekeepers of expert testimony, responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

Courts first address "the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v.*

*City of New York,* 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702).  After

considering the expert's qualifications, courts determine whether the expert testimony is reliable.

In determining reliability, courts consider "the theory's testability, the extent to which it 'has

been subjected to peer review and publication,' the extent to which a technique is subject to

'standards controlling the technique's operation,' the 'known or potential rate of error,' and the

'degree of acceptance' within the 'relevant scientific community.'"  *United States v. Romano*,

794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593–94).  "A minor flaw in an

expert's reasoning or a slight modification of an otherwise reliable method will not render an

expert's opinion *per se* inadmissible."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256,

267 (2d Cir. 2002).  Rather, "[t]he judge should only exclude the evidence if the flaw is large

enough that the expert lacks good grounds for his or her conclusions."  *Id.* (cleaned up).  "The

mere fact that an expert's testimony conflicts with the testimony of another expert or scientific

study does not control admissibility."  *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230,

285 (E.D.N.Y. 2007).

Even after qualifying a witness as an expert and determining that the opinion is reliable,

courts ask whether the expert's testimony as to a particular matter is "relevant to the task at

hand."  *Daubert*, 509 U.S. at 597.  When a motion to exclude expert testimony is made at the

class certification stage, the inquiry is "limited to whether or not the [expert report is] admissible

to establish the requirements of [Federal] Rule [of Civil Procedure] 23."  *In re NYSE Specialists*

*Sec. Litig.,* 260 F.R.D. 55, 66 (S.D.N.Y. 2009).  In other words, "[t]he question is not, therefore,

whether a jury at trial should be permitted to rely on [the expert's] report to find facts as to

liability, but rather whether [the Court] may utilize it in deciding whether the requisites of Rule

23 have been met." *In re Visa Check/Mastermoney Antitrust Litig.,* 192 F.R.D. 68, 77 (S.D.N.Y. 2000).

Although the proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are met, *Williams*, 506 F.3d at 160, the district court is the ultimate gatekeeper, *see* Fed. R. Evid. 104(a).  Exclusion of expert testimony is "the exception rather than the rule."  *Media Glow Digit., LLC v. Panasonic Corp. of N. Am.*, No. 16 Civ. 7907, 2019 WL 1055527, at *1 (S.D.N.Y. Mar. 6, 2019) (quoting Fed. R. Evid. 702 advisory committee's notes to the 2000 amendments).

### B.   Analysis

Plaintiffs offer the testimony of Joshua Mitts, a professor of law at Columbia Law School and the principal of a consulting firm specializing in financial economics.  Mitts Report ¶ 1. Mitts holds a J.D. and a Ph.D. in finance and economics.  *Id.*  He has published in the fields of economics, finance, and law, and has lectured on securities regulation, law and economics, data science, and contracts.  *Id.* ¶¶ 2, 6.  His courses encompass economic theory, quantitative methods of valuation, asset pricing, and data analytics.  *Id.* ¶ 6.

In his expert report, Mitts offers two opinions:

[(1)] the market for XIV Notes was efficient during the Class Period [from January 29, 2018 to February 5, 2018, inclusive] . . . [and]

[(2)] damages in this matter can be calculated on a [c]lass-wide basis subject to a common methodology for all three of the asserted causes of action.

*Id.* ¶¶ 8, 10.  Defendants do not contest Mitts' qualifications.  Nor do Defendants challenge Mitts' opinion that the market for XIV Notes was efficient or his opinion that damages for the Securities Act Class could be calculated on a class-wide basis.  *See generally* Defs. Daubert Mem.  Rather, Defendants argue that Mitts: (1) "fails to account for the risk of double-counting

damages across the Misrepresentation and Manipulation Classes";[7] (2) "fails to provide a sound and reliable method for calculating the Misrepresentation Class' damages"; and (3) "fails to provide a method for calculating class-wide damages for the Manipulation Class."  Defs. Daubert Mem. at 1–3.

First, Defendants contend that "the proposed Misrepresentation and Manipulation Classes advance overlapping and conflicting theories of damages," and Mitts "fails to provide a sound and reliable methodology that avoids that risk."  *Id.* at 8–9.  Defendants assume as a premise that the damages of the two classes overlap, which Mitts addresses and disputes in his expert report. Mitts states that his out-of-pocket methodology "does not lead to a double recovery" because the price of XIV Notes cannot be simultaneously inflated and deflated, and his methodology ensures that Plaintiffs can separately recover the damages from Defendants' alleged misrepresentation and the damages from Defendants' alleged manipulation.  *Id.* ¶¶ 77–79.  Mitts explains that his out-of-pocket methodology determines damages by "calculating the artificial inflation in the price of XIV Notes at the time of purchase minus the artificial inflation in the price at the time of sale," *id.* ¶ 76, thus ensuring that each plaintiff recovers only his or her total out-of-pocket losses and nothing more.  This methodology has long been endorsed by the Second Circuit, *see Acticon AG v. China N. E. Petrol. Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012) (quoting *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972)).   Mitts' opinion is reliably supported by his

---

[7] As stated above, the Misrepresentation and Manipulation Classes are defined as:

> [(1)] all persons and entities that purchased or acquired [XIV Notes] between January 29, 2018 and February 5, 2018, inclusive (the "Misrepresentation Class Period"), and who were damaged thereby (the "10b-5(b) Class" [or the "Misrepresentation Class"]). . . [and]

> [(2)] all persons and entities that sold or redeemed [XIV Notes] on or after February 5, 2018 (the "Manipulation Class Period") and who were damaged thereby (the "10b-5(a) and (c) Class" [or the "Manipulation Class"] and, together with the 10b-5(b) Class, the "Exchange Act Classes") . . . .

Pls. Cert. Mem. at 4–5

education, specialized knowledge, and extensive practical experience applying quantitative methodologies.  *See Nimely,* 414 F.3d at 396 n.11.

In response, Defendants offer the testimony of Terrence Hendershott, a professor at the Haas School of Business at the University of California Berkeley, who challenges Mitts' explanation and contends that there is a risk of double recovery.  Hendershott Report ¶¶ 88, 95–96, ECF Nos. 206-4, 240-4.  But, "[t]he mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility."  *In re Zyprexa Prods.*, 489 F. Supp. 2d at 285.

Further, even assuming Defendants raise a proper question about the two proposed classes' overlapping theories of damages, whether Mitts' methodology might need to account for double recovery is a question for the damages stage of this action, not for considering Defendants' motion to exclude, where the sole inquiry is "whether or not [Mitts' report is] admissible to establish the requirements of Rule 23."  *In re NYSE Specialists,* 260 F.R.D. at 66.

Second, Defendants argue that Mitts' proposed methodology for measuring the Misrepresentation Class' damages is unsound and unreliable because he "fail[s] to identify a corrective disclosure" for his proposed event study or to explain how he would "undertake an event study without a corrective disclosure."  Defs. Daubert Mem. at 10–11.  Defendants further argue that Mitts' proposed methodology fails to account for alternative factors and explanations for XIV Notes' price changes.  *Id.* at 12–13.  The Court disagrees.  Here, Mitts has not yet computed damages or conducted an event study.  However, at the class certification stage, and before the completion of fact discovery, it is sufficient for Mitts to outline his methodology and how he will apply it.  *See In re Vale S.A. Sec. Litig.*, No. 19 Civ. 526, 2022 WL 122593, at *19 (E.D.N.Y. Jan. 11, 2022), *adopting report and recommendation*, 2022 WL 969724 (E.D.N.Y.

11

Mar. 31, 2022).  The use of an event study to calculate artificial inflation is widely recognized and endorsed by courts.  *See, e.g.*, *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018); *Wilson v. LSB Indus., Inc.*, No. 15 Civ. 7614, 2018 WL 3913115, at *17 (S.D.N.Y. Aug. 13, 2018).  And, Mitts cites caselaw and his personal experience in concluding that he can measure the Misrepresentation Class' damages with an event study.  *E.g.*, Mitts Report ¶¶ 85–86; *see Nimely,* 414 F.3d at 396 n.11.

At this stage, Mitts' proposed methodology need not "address each misrepresentation at issue and tie it to the corresponding corrective disclosures."[8]  *In re Vale*, 2022 WL 122593, at *19.  Nor is he required to identify potential confounding factors and provide an explanation for addressing them in his model, before discovery has even revealed what those confounding factors may be.  *See Martínek v. AmTrust Fin. Servs., Inc.*, No. 19 Civ. 8030, 2022 WL 326320, at *19 (S.D.N.Y. Feb. 3, 2022).  At a later point in this litigation, Defendants may challenge Mitts' construction of his event study, his selection of his corrective disclosure(s), or his treatment of confounding factors, but these arguments all "go to the weight, not the sufficiency of the evidence."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015).  An event study—which is "capable of disaggregating confounding information disclosed in the numerous purported corrective disclosures [and] is the generally accepted method for measuring damages in a securities fraud class action," *In re Vale*, 2022 WL 122593, at *18 (cleaned up)—is sufficiently reliable for the Court to "utilize . . . in deciding

---

[8] In reply, Defendants argue that Plaintiffs and Mitts advance a new "materialization of the risk" theory for the first time in their opposition to Defendants' motion to exclude.  *See* Defs. Daubert Reply at 10–11.  The Court does not address whether this is a new argument because, even assuming Plaintiffs are bound to a "corrective disclosure" theory, for the reasons stated, the Court holds that Mitts does not need to identify any such corrective disclosure at this stage.

whether the requisites of Rule 23 have been met." *In re Visa Check/Mastermoney,* 192 F.R.D. at 77.

Third, for substantially the same reasons, the Court rejects Defendants' argument that Mitts' methodology for measuring the Manipulation Class' damages is unsound and unreliable. Defendants argue that Mitts' opinions regarding a damages model for the Manipulation Class should be excluded because he fails to provide a methodology that considers how confounding factors, such as "legitimate" trading and other market forces, would have affected the price of XIV Notes, and he also fails to consider Credit Suisse's hedging position. Defs. Daubert Mem. at 14–16. As stated above, at the class certification stage, Mitts is not required to anticipate these potential factors in his proposed methodology, where information produced through discovery could provide the very facts that Defendants claim his analysis is missing. *See In re Vale*, 2022 WL 122593, at *19; *Martínek*, 2022 WL 326320, at *19.

Nor does Mitts need to identify a specific quantitative model before all the relevant facts are before him. In his report, Mitts concludes that he may calculate damages on a class-wide basis using the out-of-pocket methodology, Mitts Report ¶¶ 75–76, and identifies potential quantitative methods that may be used to model damages for the Manipulation Class, depending on additional information that arises through discovery. *Id.* ¶ 84. He cites academic literature and studies applying quantitative models to how hedging activity may inflate or deflate the price of securities, such as a study by Pauline Shum et al.,[9] that applies an ordinary least squares regression model on fifteen-minute intraday windows. *Id.* Thus, the Court determines that Mitts' proposed methods are reliable. *See Romano*, 794 F.3d at 330.

---

[9] Pauline Shum, Walid Hejazi, Edgar Haryanto & Arthur Rodier, *Intraday Share Price Volatility and Leveraged ETF Rebalancing*, 20 Rev. Fin. 2379 (2016).

Accordingly, Defendants' motion to exclude Mitts' testimony is DENIED.

II.    Class Certification

A.  Legal Standard

To certify a class under Rule 23(b)(3), a court must determine that the proposed class meets the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3).  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 88 (2d Cir. 2017).  Plaintiffs must meet each of the Rule 23(a) and 23(b)(3) requirements by a preponderance of the evidence.  *See Clark v. City of New York*, No. 18 Civ. 2334, 2021 WL 603046, at *2 (S.D.N.Y. Feb. 16, 2021) (citing *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)).  The members of the proposed class must also be ascertainable "by reference to objective criteria."  *Katz v. Prof'l Billing Collections, LLC*, No. 20 Civ. 3043, 2021 WL 2418387, at *2 (S.D.N.Y. June 14, 2021) (quoting *Stinson v. City of New York*, 282 F.R.D. 360, 367 (S.D.N.Y. 2012)).

1.    Numerosity

A proposed class is sufficiently numerous if "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  It is not necessary that Plaintiffs demonstrate evidence of the exact size of the proposed class, nor the identity of all class members; rather, the Court must make a factual finding as to the approximate size of the class and determine whether it meets the legal standard governing numerosity.  *Robinson v. N.Y.C. Transit Auth.*, No. 19 Civ. 1404, 2020 WL 5814189, at *4 (S.D.N.Y. Sept. 30, 2020).  A proposed class with more than forty members presumably satisfies the numerosity requirement.  *Id.* (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).  In securities actions involving nationally listed public companies, numerosity is satisfied by showing that a large number of shares were outstanding and traded

during the time period.  *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84

(S.D.N.Y. 2007).

>            2.      Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  Fed.

R. Civ. P. 23(a)(2).  The commonality requirement is satisfied where a class-wide proceeding is

capable of "generat[ing] common answers apt to drive the resolution of the litigation."  *Dukes*,

564 U.S. at 350 (emphasis omitted).

>            3.      Typicality

The typicality requirement "is satisfied when the lead plaintiffs' claims arise from the

same series of events and find support in the same legal theories as the claims of all of the

remaining class members."  *Houser v. Pritzker*, 28 F. Supp. 3d 222, 245 (S.D.N.Y. 2014); *see

also* Fed. R. Civ. P. 23(a)(3) (requiring that "the claims or defenses of the representative parties

are typical of the claims or defenses of the class").  The lead plaintiffs' claims need not be

"identical" to the class members' claims, but the lead plaintiffs must "have the 'incentive to

prove all the elements of the cause of action which would be presented by the individual

members of the class were they initiating individualized actions.'"  *Houser*, 28 F. Supp. 3d at

245 (quoting *In re NASDAQ Market-Makers Antitr. Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y.

1996)); *see also Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999), *called

into question on other grounds by In re IPO*, 471 F.3d 24 (2d Cir. 2006) ("[Typicality] requires

that the disputed issue of law or fact occupy essentially the same degree of centrality to the

named plaintiff[s'] claim as to that of other members of the proposed class." (cleaned up)).

### 4.    Adequacy

To satisfy the adequacy requirement, courts inquire whether (1) "plaintiff[s'] interests are antagonistic to the interest of other members of the class," and (2) "plaintiff[s'] attorneys are qualified, experienced and able to conduct the litigation." *Floyd v. City of New York*, 283 F.R.D. 153, 161 (S.D.N.Y. 2012) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).  "In order to defeat a motion for certification, any conflicts between the class representative and members of the putative class must be 'fundamental.'" *Ligon v. City of New York*, 288 F.R.D. 72, 80 (S.D.N.Y. 2013) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

### 5.    Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3). The predominance requirement "ensures that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (alterations omitted) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).  Plaintiffs meet this requirement "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  "[T]he predominance requirement calls only for predominance, not exclusivity, of common questions." *In re LIBOR-Based Fin. Instruments Antitr. Litig.*, 299 F. Supp. 3d 430,

462 (S.D.N.Y. 2018) (quoting *In re Visa Check/MasterMoney*, 280 F.3d at 140).  But, the predominance standard is "more demanding" than the commonality requirement under Rule 23(a).  *Id.* (quoting *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015)).

Courts "must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Nextel*, 780 F.3d at 138 (cleaned up).  This assessment is "more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case." *In re LIBOR*, 299 F. Supp. 3d at 462 (cleaned up).  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages[.]" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation and quotation marks omitted).

6.     Superiority

Rule 23(b)(3) also requires that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  Courts analyze: (1) "the interest of the class members in maintaining separate actions"; (2) "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the difficulties likely to be encountered in the management of a class action." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) (quoting Fed. R. Civ. P. 23(b)(3)).

7.   Ascertainability

To certify a class, a court must also determine that the members of the proposed class are ascertainable.  *Katz*, 2021 WL 2418387, at *2.  A class is ascertainable where it can "be defined using objective criteria that establish a membership with definite boundaries."  *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).

B.   Analysis

1.   Securities Act Class

Defendants do not challenge that the proposed Securities Act Class satisfies many of Rule 23's requirements, including numerosity, commonality, and superiority.  Rather, Defendants argue that the Securities Act Class cannot be certified because: (1) individualized questions as to standing predominate over class-wide issues; (2) the members of the Securities Act Class cannot be easily ascertained or determined; and (3) "individualized inquiries into each investor's individual knowledge of the alleged misconduct" predominate over class-wide issues. Defs. Cert. Opp. at 1–3, 11–14.  Defendants also argue that "several of the class representatives suffer from various infirmities that preclude them from serving as class representatives."  *Id.* at 4.

To begin, the Court determines that the proposed Securities Act Class satisfies the requirements of Rule 23(a).  First, based on the millions of XIV Notes outstanding and traded between January 29, 2018, and February 5, 2018, *see* Am. Compl. ¶ 196, class members likely number in at least the thousands.  Therefore, the numerosity requirement is satisfied.  *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 43 (S.D.N.Y. 2012).  Second, the commonality requirement is satisfied because there are common questions to all class members, including "whether there were any misrepresentations or omissions in [the Offering Documents] and whether any such misrepresentations or omissions were material."  *Haw. Structural Ironworkers*

18

*Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 214–15 (S.D.N.Y. 2021);

*see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 282 (2014) ("[M]ateriality is

an objective issue susceptible to common, class[-]wide proof.").  Third, Plaintiffs' claims are

typical because they "arise from the same series of events and find support in the same legal

theories as the claims of all of the remaining class members."  *Houser*, 28 F. Supp. 3d at 245.

Specifically, Plaintiffs and the remaining class members all allege that Defendants misstated and

omitted material facts in the Offering Documents.  Fourth, the adequacy requirement is satisfied

because Plaintiffs' interests align with those of the proposed Securities Act Class.  *See Floyd*,

283 F.R.D. at 161.  As stated above, Plaintiffs' claims and the proposed class' claims arise from

the same misconduct and involve the same legal theories.  Therefore, the Court finds that

Plaintiffs will fairly and adequately protect the interests of the proposed class, and Defendants do

not point to any "fundamental" conflict between Plaintiffs and the class.

Defendants' arguments that the class representatives "suffer from various infirmities" are

unpersuasive.  Defs. Cert. Opp. at 4.  First, Defendants argue that none of the Plaintiffs has

"adequately demonstrated that he can trace his shares to the [Offering Documents]."  *Id.* at 28.

But, for the reasons discussed in more detail below, "tracing is a merits issue that the court need

not consider at the class certification stage."  *Wallace v. IntraLinks*, 302 F.R.D. 310, 319

(S.D.N.Y. 2014).  Second, Defendants' argument that Plaintiffs "fail[] to join . . . Jager's ex-

wife," Defs. Cert. Opp. at 30, misstates the joinder requirement, which creates an exception for

class actions.  *See* Fed. R. Civ. P. 19(d), 23; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832

(1999).  And, third, the Court rejects Defendants' argument that Gamburg cannot be a class

representative because he is an in-and-out trader.  Defs. Cert. Opp. at 30.  Although Gamburg

may have sold some shares and profited from those trades, he also purchased shares after January

31, 2023, and suffered damages from those purchases, so he may properly represent the proposed class. *See, e.g.*, *Ellenburg v. JA Solar Holdings Co. Ltd.*, 262 F.R.D. 262, 268 (S.D.N.Y. 2009); *see also* Pls. Cert. Reply at 15, ECF No. 220.

The Court next turns to the superiority and predominance requirements of Rule 23(b)(3). Defendants do not dispute superiority or offer any alternative means of adjudicating this action. As such, the Court finds that a class action is superior to other methods of adjudicating this controversy because "the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (cleaned up). As to predominance, Defendants contend that individualized questions predominate over class-wide questions for two separate reasons. Defs. Cert. Opp. at 11–14.

First, Defendants argue that Plaintiffs "failed to suggest any methodology that would allow for the tracing of purchases [to the Offering Documents] by the Securities Act Class on a class[-]wide basis," *id.* at 12, so individualized proof of tracing, and thus standing, predominates over class-wide issues. The Court disagrees. It is true that "only those who can trace their shares to the allegedly misleading registration statement have standing in a [§] 11 claim," but "tracing is a merits issue that the court need not consider at the class certification stage." *Wallace*, 302 F.R.D. at 319.[10] And, although "traceability may require individualized inquiries, the potential

---

[10] The tracing requirement stems from the Second Circuit's long-standing practice of "permitting suit under § 11 by those who can 'trace' their shares to the allegedly defective registration statement." *DeMaria v. Andersen*, 318 F.3d 170, 176 (2d Cir. 2003). In other words, any individual who can show that his or her shares were issued under or registered to the allegedly defective registration statement—regardless of whether the shares were acquired directly from the issuer or in the secondary market—has standing to pursue a § 11 claim. "Tracing may be established either through proof of a direct chain of title from the original offering to the plaintiff or through proof that the plaintiff bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *In re IPO,* 471 F.3d at 31 n.1 (cleaned up).

for such inquiries alone does not defeat predominance" because the liability issue, which involves the class-wide issue of whether the Offering Documents contain material misstatements and omissions as alleged by Plaintiffs, "clearly predominates over individualized tracing inquiries." *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 61 (S.D.N.Y. 2013).

Second, the Court likewise rejects Defendants' argument that "individualized inquiries into each investor's individual knowledge of the alleged misconduct" predominate over class-wide questions. Defs. Cert. Opp. at 13–14. Defendants note that "numerous publicly available articles warned specifically of the risks of volatility spikes and the devastating effect they could have on XIV Notes, as well as the risks posed by hedging transactions in response to those spikes." *Id.* at 13. But, contrary to Defendants' contention, news stories and other publicly available information raise "issues of knowledge, actual or constructive, subject to generalized proof," and apply to the whole class. *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 529 (S.D.N.Y. 2018) (citation and quotation marks omitted); *see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 133–34 (S.D.N.Y. 2014). Therefore, the Court finds that Plaintiffs have established that questions of law and fact common to all class members predominate over any individualized questions.

As to ascertainability, Defendants contend that "[b]ecause Plaintiffs offer no mechanism to establish the traceability of XIV Notes on a class-wide basis, they also cannot demonstrate, as they must, that the members of the Securities Act Class can be easily ascertained or determined." Defs. Cert. Opp. at 12. However, Defendants' argument misstates the proper legal standard. In the Second Circuit, the ascertainability requirement does not demand that a court determine whether the proposed class is administratively feasible. *In re Petrobras Sec.*, 862 F.3d at 264. The inquiry only asks whether the class can be "defined using objective criteria that establish a

membership with definite boundaries." *Id.* Under that standard, Plaintiffs' defined class—"all persons and entities that purchased or acquired [XIV Notes] pursuant to or traceable to [the] Offering Documents, and were damaged thereby"—satisfies the ascertainability requirement.

Lastly, Rule 23(c)(1)(B) requires a court certifying a class to appoint class counsel under Rule 23(g). Rule 23(g)(1)(A) requires a court to consider: (1) "the work counsel has done in identifying or investigating potential claims in the action"; (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (3) "counsel's knowledge of the applicable law"; and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). Plaintiffs' counsel, Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Levi & Korsinsky, LLP ("Levi Korsinsky"), satisfy these criteria. Plaintiffs' counsel diligently investigated the claims in this case, drafted a detailed complaint, survived a motion to dismiss on appeal, and have further investigated the claims in discovery. Plaintiffs' counsel also has extensive experience in class action litigation, including securities class actions. *See* ECF Nos. 180-3–180-4. And, their engagement of an expert witness, management of discovery, and preparation of filings demonstrate that they have committed sufficient resources to the litigation. Therefore, Cohen Milstein and Levi Korsinsky are able to fairly and adequately represent the interests of the proposed Securities Act Class.

Accordingly, Plaintiffs' motion to certify the Securities Act Class is GRANTED.

2. Exchange Act Classes

As with the Securities Act Class, Defendants do not challenge that the proposed Misrepresentation and Manipulation Classes satisfy many of Rule 23's requirements, including numerosity, commonality, superiority, and ascertainability. Rather, Defendants argue that the classes cannot be certified because: (1) the interests of the Misrepresentation and Manipulation

Classes are in direct conflict; (2) "Plaintiffs have not met their burden of presenting a sound and reliable methodology for calculating class-wide damages consistent with Plaintiffs' theory of liability for either class"; (3) individualized inquiries into each investor's knowledge of the alleged misconduct predominate over class-wide issues; and (4) the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*") presumptions of reliance do not apply, so "individual questions of reliance predominate over any common questions presented by the Misrepresentation and Manipulation Classes." Defs. Cert. Opp. at 3–4.

The Court begins with the Rule 23(a) requirements. First, for substantially the same reasons discussed above for the Securities Act Class, the Court finds that the numerosity requirement is satisfied for both Exchange Act Classes because class members likely number in at least the thousands, based on the millions of XIV Notes outstanding and traded between January 29, 2018, and February 5, 2018. Am. Compl. ¶ 196; *see In re Pfizer*, 282 F.R.D. at 43. Second, the Court also finds that the commonality requirement is satisfied for both classes because there are common questions to all class members, such as "whether the price of XIV Notes w[as] artificial during the Class Periods," "whether manipulation occurred," and "whether damages exist." Pls. Cert. Mem. at 12; *see, e.g.*, *Gruber v. Gilbertson*, No. 16 Civ. 9727, 2019 WL 4439415, at *3 (S.D.N.Y. Sept. 17, 2019).

As to typicality and adequacy, Defendants contend that the two Exchange Act Classes cannot be certified because "Plaintiffs' theories of liability place these two classes in direct conflict with one another." Defs. Cert. Opp. at 14. In response, Plaintiffs contend that Defendants' argument is the "seller-purchaser conflict," which has been repeatedly rejected by courts. Pls. Cert. Reply at 6; *see In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 377–78

23

(S.D.N.Y. 2000).  The Court agrees that any potential seller-purchaser conflict is not grounds for denying class certification.  "The [seller-purchase conflict] is said to be an inherent conflict between individuals who buy stock and individuals who sell stock during the class period . . . this conflict arises out of sellers' presumed desire to minimize price inflation at the time of the sale, as opposed to the presumed purchaser's desire to maximize price inflation on the date of purchase."  *In re Oxford Health*, 191 F.R.D. at 377.  But, this purported conflict, which could potentially motivate class members to argue that XIV Notes were more or less inflated at different time periods, is a question for the damages stage of litigation, not class certification.  *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 341 F.R.D. 542, 548–49 (S.D.N.Y. Apr. 11, 2022).  "The chief role of price inflation remains its function in determining each plaintiff's damages," and "common questions [of fact and law] bind class members with more force than the varying questions related to price inflation drive them apart."  *In re Gaming Lottery Sec. Litig.,* 58 F. Supp. 2d 62, 70 (S.D.N.Y. 1999).  To the extent Defendants raise an argument based on the seller-purchaser conflict, the Court rejects that argument as improper for class certification.

However, the Court agrees with Defendants that Plaintiffs' theories of liability for the Misrepresentation and Manipulation Classes, as a whole, are in direct conflict with each other. Plaintiffs' expert, Mitts, explains that both classes' damages will be calculated using an out-of-pocket methodology, which is "determined by calculating the artificial inflation in the price of XIV Notes at the time of purchase minus the artificial inflation in the price at the time of sale." Mitts Report ¶ 76.  Because Mitts' methodology does not allow for double recovery, the total sum of out-of-pocket damages will be attributable either to the alleged artificial inflation from Defendants' misrepresentations or the alleged deflation from Defendants' manipulative conduct. *Id.* ¶¶ 76–78.  As such, damages calculated for a member of the proposed Misrepresentation

Class are higher if the price decline in XIV Notes is attributed to the corrective disclosures (or the materialization of the risk) of Defendants' misrepresentations, whereas damages calculated for the proposed Manipulation Class are higher if the price decline in XIV Notes is attributed to Defendants' manipulative conduct.  *Cf.* Hendershott Report ¶ 89.

For illustration, the Court offers a modification to the hypothetical posed by Mitts in his expert report.[11]  Consider a hypothetical plaintiff who purchased XIV Notes for $100 per note before January 29, 2018, but was forced to redeem the value of the XIV Notes after February 5, 2018, for $5.99 pursuant to Credit Suisse's declaration of the Acceleration Event.  This plaintiff would be a member of the Manipulation Class but not the Misrepresentation Class.  *See* Pls. Cert. Mem. at 4–5.  On February 5, 2018, assume the value of XIV Notes dropped from $100 to $5.99, yielding total out-of-pocket losses of $94.01 per note.  *Cf.* Mitts Report ¶ 77.  Unlike Mitts' hypothetical plaintiff, the Court' hypothetical plaintiff has a vested interest in arguing that the entire $94.01 of out-of-pocket losses are a consequence of Defendants' allegedly manipulative conduct.  That is, because the Court's plaintiff is not a member of the

---

[11] In his report, Mitts offers a hypothetical plaintiff:

> Consider a hypothetical plaintiff who purchases XIV Notes for $100 per Note on the morning of February 5, 2018.  Suppose, hypothetically, that absent the alleged misstatements or omissions concerning the risk of Credit Suisse's trading, the price of XIV Notes would have been $50 at the time of the plaintiff's purchase.  In that case, the artificial inflation would be $100 - $50 = $50 per Note.  If the truth regarding the alleged misstatements and omissions were revealed at that moment, the price of XIV Notes would decline to $50 and the plaintiff would suffer $50 per Note of losses, even if Credit Suisse had not subsequently engaged in allegedly manipulative conduct.

> Now consider the effect of Credit Suisse's allegedly manipulative conduct on such a hypothetical plaintiff.  Suppose that the alleged manipulation caused an artificial decline in the price of XIV Notes which ultimately led to a redemption of the plaintiff's XIV Notes at a price of $5.99 per Note.  The hypothetical plaintiff's damage claim consists of two components:  the $50 per Note of artificial inflation and the additional $50 - $5.99 = $44.01 per Note of artificial deflation, yielding total out-of-pocket losses of $94.01 per Note.  In this example, compensating the hypothetical plaintiff for those total out-of-pocket losses is fully compensatory and does not yield a double recovery.

Mitts Report ¶¶ 77–78.

Misrepresentation Class, this plaintiff has an interest in arguing that there were in fact no alleged misstatements or omissions concerning the risk of Credit Suisse's trading, and the losses experienced on February 5, 2018, were entirely the consequence of Defendants' allegedly manipulative conduct.  Unlike the seller-purchaser conflict, this fundamental conflict between the Misrepresentation Class and the Manipulation Class extends beyond damages calculations to the classes' theories of liability.

Therefore, the Court finds that Plaintiffs have not met the typicality and adequacy requirements by a preponderance of evidence for the Exchange Act Classes because Plaintiffs, who are each a member of both Exchange Act Classes, do not have the same "incentive to prove all the elements of the cause of action" that members of only one of the classes would have. *Houser*, 28 F. Supp. 3d at 245.  Further, Plaintiffs and their counsel cannot adequately represent both the Misrepresentation and Manipulation Classes because the conflict between the classes is fundamental.  *See Ligon*, 288 F.R.D. at 80.  Because the Court finds that Plaintiffs have not satisfied the Rule 23(a) requirements for the Exchange Act Classes, the Court does not reach the Rule 23(b)(3) requirements or Defendants' remaining arguments.

Accordingly, Plaintiffs' motion to certify the Misrepresentation and Manipulation Classes is DENIED, without prejudice to refiling by alternative class representatives and counsel within sixty days of this Order.

## CONCLUSION

For the foregoing reasons, the parties' motions are GRANTED in part, and DENIED in part.  Specifically:

1. Defendants' motion to exclude Mitts' testimony is DENIED.

2. Plaintiffs' motion to certify the Securities Act Class is GRANTED.

3.  Plaintiffs' motion to appoint class counsel of the Securities Act Class is GRANTED.

4.  Plaintiffs' motion to certify the Misrepresentation Class is DENIED, without prejudice to refiling by alternative class representatives and counsel by **May 15, 2023**.

5.  Plaintiffs' motion to certify the Manipulation Class is DENIED, without prejudice to refiling by alternative class representatives and counsel by **May 15, 2023**.

The Clerk of Court is directed to change ACM Ltd. to Apollo Asset Limited in the case caption and to terminate the motions at ECF Nos. 178 and 204.

SO ORDERED.

Dated:  March 16, 2023
        New York, New York

ANALISA TORRES
United States District Judge