# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SET CAPITAL LLC, et al., individually and on behalf of all others similarly situated, | Case No. 1:18-cv-02268 (AT) (SN) |
|         Plaintiffs, | |
| vs. | |
| CREDIT SUISSE GROUP AG, et al., | |
|         Defendants. | |

# LEAD PLAINTIFFS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO AMEND THE COMPLAINT TO CONFORM TO THE EVIDENCE

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    ARGUMENT ........................................................................................................... 1

    A.    Rule 15 Governs This Motion.......................................................................... 1

    B.    Plaintiffs' Amendments Are Not Futile ............................................................ 2

          1.    The Second Circuit's Determination that Plaintiffs' Successfully Pled Market Manipulation is Not Altered by the Proposed Amendment .......................................................................................... 2

          2.    The PTAC Pleads Actionable Misstatements and Omissions in the Offering Documents.................................................................... 6

          3.    Flatline Value Amendments Are Not Futile Because They Fill the Exact Requirements Identified by the Second Circuit .............................. 8

          4.    There is No Basis To Disturb the Second Circuit's Conclusion that Plaintiffs Adequately Plead Scienter for Its Securities Fraud Claims ................................................................................................ 9

          5.    The Prospectus Disclosures Did Not Disclose or Permit Securities Fraud ................................................................................ 12

    C.    Plaintiffs Have Demonstrated Good Cause to Amend ......................................... 12

III.    CONCLUSION.................................................................................................... 15

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Communications Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)................................................................................4, 6, 7

*Browning Debenture Holders' Comm. v. DASA Corp.*,
560 F.2d 1078 (2d Cir. 1977)..........................................................................19

*ECD Investor Grp. v. Credit Suisse Int'l*,
No. 14-CV-8486, 2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017)...............................7

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*,
304 F.R.D. 170 (S.D.N.Y. 2014) ...........................................................................19

*Grewal v. Cuneo Gilbert & LaDuca LLP*,
No. 13-CV-6836, 2017 WL 1215752 (S.D.N.Y. Mar. 31, 2017), *aff'd*, 803 F.
App'x 457 (2d Cir. 2020)...................................................................................16

*N.H. Ins. Co. v. Total Tool Supply, Inc.*,
621 F. Supp. 2d 121 (S.D.N.Y. 2009)......................................................................3

*NextG Networks of New York, Inc. v. City of New York*,
No. 03CIV9672RMBJCF, 2006 WL 8456389 (S.D.N.Y. Dec. 5, 2006) ................19

*Obra Pia Ltd. v. Seagrape Invs. LLC*,
No. 19-CV-7840, 2021 WL 1978545 (S.D.N.Y. May 18, 2021) ............................2

*Onel v. Top Ships, Inc.*,
806 F. App'x 64 (2d Cir. 2020) ...............................................................................7

*Parker v. Columbia Pictures Indus.*,
204 F.3d 326 (2d Cir. 2000)..............................................................................1, 2

*Estate of Ratcliffe v. Pradera Realty Co.*,
No. 05-CV-10272, 2007 WL 3084977 (S.D.N.Y. Oct. 19, 2007)...........................2

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)...................................................................................10

*Sharette v. Credit Suisse International*,
127 F. Supp. 3d 60 (S.D.N.Y. 2015)....................................................................4, 7

*Sokol Holdings, Inc. v. BMD Munai, Inc.*,
No. 05-CV-3749, 2009 WL 2524611 (S.D.N.Y. Aug. 14, 2009)............................2

## I.   INTRODUCTION

On April 27, 2021, the Second Circuit held that Plaintiffs adequately pled actionable federal securities law claims with respect to Credit Suisse's manipulation of and misrepresentations regarding XIV. ECF No. 143 (the "Order").   After months of diligent discovery, which included the review of over one million pages and thirteen depositions, the evidence makes clear the secret scheme Credit Suisse executed over the fall of 2017 and early 2018 to bring about XIV's demise.  Despite Plaintiffs' timely filing of their Motion for Leave to Amend, ECF No. 304 ("Mot."), at the appropriate time under the Court-ordered schedule, and submitting their Proposed Third Amended Complaint therewith, ECF No. 305-001 ("PTAC"), Defendants continue to refuse to accept the Second Circuit's reasoning, and instead wrongly insist that Plaintiffs have no claim here.  ECF No. 310 ("Opp.").  Because Defendants' arguments— many of which are recycled from prior briefing, which the Second Circuit already rejected—are baseless, this Court should grant Plaintiffs' Motion and permit Plaintiffs' amendments.

## II.   ARGUMENT

### A.   Rule 15 Governs this Motion

Rule 15 governs this Motion.  Mot. at 3, 5.  Defendants' argument that Rule 16 should govern, Opp. at 6, is wrong.  As even Defendants' cases make clear, for Rule 16 to apply, the deadline for moving to amend must have passed.  Opp. at 5; *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).  Here, as is typical in securities fraud cases, the Case Management Plan ("CMP") set the deadline for the amendment of the pleadings ***after*** the conclusion of fact discovery, and Plaintiffs complied with that deadline.  ECF No. 259 at 2.[1]

---

[1] Defendants' cited cases are inapposite.  *Cf Parker*, 204 F.3d at 341 (noting plaintiff "had all the information necessary to support a breach of contract claim," when he first filed the claim, "and nothing he learned in discovery or otherwise altered that fact."); *Sec. & Exch. Comm'n v. Rio Tinto*

Despite Defendants' claim, Rule 15 does not apply only during and after trial.  Motions to conform the pleadings to the evidence are routine and regularly take place throughout the litigation, including post-fact discovery, and pre-summary judgment and trial.  *See* Mot. at 3-4.  Rule 15(b) itself explicitly states that "a party may move—***at any time***, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue."  FED. R. CIV. P. 15 (emphasis added).  It makes little sense that a motion to amend would be denied now, but permitted in a few months at summary judgment, particularly given Defendants' claim that delay somehow prejudices them.  Accordingly, the "more liberal" Rule 15 standard applies to Plaintiffs' Motion.[2]

B.    Plaintiffs' Amendments Are Not Futile

An amendment "is futile when it could not withstand a motion to dismiss."  *Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19-CV-7840, 2021 WL 1978545, at *2 (S.D.N.Y. May 18, 2021).  The amendment here adequately states its claims and should be permitted.

1.    The Second Circuit's Determination that Plaintiffs Successfully Pled Market Manipulation Is Not Altered by the Proposed Amendment

In its thorough and well-reasoned decision, the Second Circuit held that Plaintiffs' first amended complaint adequately alleged market manipulation based on allegations, among others, that Defendants knowingly or recklessly "exacerbate[d] the risk of illiquidity in the VIX futures market and create[d] conditions" that led to the crash of the XIV Notes.  Order at 19.  The PTAC

---

plc, No. 17-CV-07994, 2020 WL 2504008, at *5 (S.D.N.Y. Mar. 9, 2020) (SEC never claimed amendment was necessary to incorporate information learned through discovery; rather, "virtually all of the additional factual allegations that the SEC seeks to add to the Complaint are based on information that the SEC obtained prior to its moving to amend").

[2] But even if Rule 16 did govern, Plaintiffs have more than established "good cause" to amend, as Plaintiffs did not have the information necessary to support their new allegations prior to the conclusion of fact discovery.  *See, e.g.*, *Sokol Holdings, Inc. v. BMD Munai, Inc.*, No. 05-CV-3749, 2009 WL 2524611, at *8 (S.D.N.Y. Aug. 14, 2009); *Estate of Ratcliffe v. Pradera Realty Co.*, No. 05-CV-10272, 2007 WL 3084977, at *4 (S.D.N.Y. Oct. 19, 2007).

elaborates on those allegations, adding substantial damning evidence of Defendants' deliberate scheme to manipulate the XIV market. *See, generally*, PTAC ¶¶ 93-94, 100-102, 140-149. Defendants' futility argument fails, as they have not established that the PTAC differs in such a way from the previous complaint that it now "fails to state a claim, the traditional Fed. R. Civ. P. 12(b) standard." *N.H. Ins. Co. v. Total Tool Supply, Inc.*, 621 F. Supp. 2d 121, 124 (S.D.N.Y. 2009).[3]

Rather than significantly departing from earlier pleadings as Defendants suggest, Opp. at 12, the PTAC conforms the pleadings to the discovery record, including evidence that: (1) Defendants knew from prior market volatility spikes that just a 7.5% drop in the S&P would drive XIV Notes to zero (PTAC ¶ 140); (2) Defendants plotted internally to shift all XIV risk from Credit Suisse to unsuspecting investors (*id.* ¶¶ 141-145); (3) Credit Suisse bought back and then lent out XIV Notes, which Defendants knew would pump the market full of short sellers who would financially benefit from XIV crashing (*id.* ¶¶ 146-149, 158-160); (4) Defendants incentivized such lending with direct insight into who the borrowers were and the hedges they would purchase in the market (*id.* ¶¶ 150-154); (5) Defendants flooded the already-saturated XIV market with millions more XIV Notes in the lead up to the February 5, 2018 crash, knowing that hedging would further strain VIX futures' liquidity and drive XIV's price down far more than market fundamentals and volatility dictated (*id.* ¶¶ 63-66, 140-159); (6) when the VIX spiked on February 5, 2018, and XIV began losing value at an unprecedent rate, Credit Suisse traded VIX futures to hedge its own position, exacerbating the liquidity crisis; and (7) as they planned, once the VIX spiked and XIV crashed, Credit Suisse announced an acceleration event and forced out XIV investors for pennies

---

[3] Plaintiffs are subject to Rule 9(b) pleading standards and are not required to plead evidence.

on the dollar (*id.* ¶¶ 160, 199-214)—not to help investors, as it claimed, but to benefit Credit Suisse (*id.* ¶¶ 248-249).

Courts sustain manipulation claims based on allegations far less detailed than those in the PTAC.[4]  But rather than meaningfully address Plaintiffs' well-pleaded claim, Defendants distort the PTAC's factual allegations and the applicable legal standards.   Among other mischaracterizations, the PTAC does not allege that "various unnamed third parties . . . drove the liquidity squeeze" (Opp. at 12), but rather that ***Defendants*** did so by intentionally lending XIV Notes at reduced rates to market participants that they knew would then hedge their positions, squeezing VIX futures liquidity, thereby driving down XIV prices, and allowing Credit Suisse to force an acceleration and redeem the remaining XIV Notes for a rock-bottom price.  PTAC ¶¶ 98-99, 141-148, 160, 261.  Indeed, Credit Suisse intentionally lowered rates for lending XIV Notes, while simultaneously raising fees for purchasing them, knowing it would cause investors to borrow (*i.e.*, short) more Notes, placing massive pressure on the already illiquid VIX futures market.  This sent VIX futures through the roof and crushed XIV Notes' prices  with the next spike in market volatility.  *Id.* ¶¶ 141, 145, 148-154.

The PTAC also does not allege that Defendants merely "set the stage" for manipulation.  Opp. at 13.  The allegations demonstrate how Defendants, after observing the effect of previous

---

[4] Beyond this case itself, in *Sharette v. Credit Suisse International*, 127 F. Supp. 3d 60 (S.D.N.Y. 2015), for example, the court sustained allegations of "a coordinated scheme engineered by [Defendants] to use short-selling to manipulate the price [of stock.]"  *Id.* at 83.  The court credited allegations based on data showing "how many shares" Credit Suisse had available and "lent out for short sales," along with defendants' knowledge of investors' short selling and "how the Credit Suisse Defendants allegedly structured" its securities offerings "to allow for manipulation."  *Id.* at 82.  Such allegations, like those here, expressly distinguished *Sharette* from Defendants' cited case *ATSI Communications Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007), where plaintiffs "failed to allege what the defendants did—beyond simply mentioning common types of manipulative activity—or state how this affected the market."  *Id.* at 81.

market volatility events on the XIV Notes, hatched and implemented their manipulative scheme to public investors' detriment. As opposed to *ATSI*, on which Defendants rely, XIV pricing was thereby "rigged by manipulators" and divorced from "the natural interplay of supply and demand." *ATSI*, 493 F.3d at 100. And the fact that Defendants issued new XIV Notes while contemporaneously buying back previously issued notes is in no way inconsistent, *see* Opp. at 16, as Credit Suisse bought back XIV Notes precisely to lend them out at an increasingly high volume at reduced lending rates. PTAC ¶ 146. At the same time, Credit Suisse issued millions of additional XIV Notes, which placed further pressure on VIX futures' liquidity. PTAC ¶¶ 155-160. Defendants thus flooded the XIV Notes market while outsourcing Credit Suisse's own risk exposure. These allegations are critical parts of Defendants' manipulative scheme.

The PTAC also establishes that Defendants knew or recklessly disregarded that their manipulative scheme, including third-party trading, would lead to the collapse of XIV Notes. Defendants incorrectly claim that the only evidence that they were aware of XIV borrowers' incentives concerns a single chat between Credit Suisse and a hedge fund looking to short XIV. Opp. at 13 n.20. That chat, however, puts the lie to Credit Suisse's claim that a firewall separated its Flow Desk and Prime Brokerage, and shows that Credit Suisse had direct insight into its borrowers and their incentives. The PTAC, however, also includes additional allegations that Credit Suisse knew its borrowers' incentives, which it created and juiced. *See, e.g.*, ¶ 145 (citing internal discussions of steps to "incentivize more lending/less creation").

Faced with powerful evidence of wrongdoing, Defendants then resort to mischaracterizing the applicable law.[5] But the Second Circuit drew a distinction between "short selling or other

---

[5] The PTAC not only specifies the numbers of XIV Notes re-purchased, lent, and swapped, but cites to evidence of Defendants' knowledge regarding counterparties' hedging activity and its inevitable effect, which Defendants used to force XIV Notes' redemption for a pittance. *See, e.g.*,

hedging activity [that] is not, by itself, manipulative," and *this* case, where "Credit Suisse flooded the market with millions of additional XIV Notes for the very purpose of enhancing the impact of its hedging trades and collapsing the market for the notes." Order at 19.[6]

    2.    The PTAC Pleads Actionable Misstatements and Omissions in the Offering Documents

        a.    *The PTAC does not Disturb the Second Circuit's Finding that Plaintiffs Adequately Plead Misstatements and Omissions*

The Second Circuit held Plaintiffs "identified actionable misstatements or omissions in the Offering Documents." Order at 16. The PTAC, which only *increases* the specificity of Plaintiffs' allegations, does not alter that conclusion. Defendants argue that "the crux of [Plaintiffs'] claim is that Defendants failed to disclose the manipulation [of XIV]," Opp. at 19, and that the proposed amendment eliminates the manipulation allegation. Defendants' argument fails for two reasons.

First, as discussed above, the manipulation allegation is alive and well. Second, the misstatements and omissions in the Offering Documents were not restricted to the manipulation

---

PTAC ¶¶ 140-160. Accordingly, Defendants' reliance on *ATSI*, a decision by Judge Walker (who wrote the panel's opinion sustaining Plaintiffs' manipulation claim here), has no bearing where, as here, a complaint particularizes "the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI*, 493 F.3d at 102.

[6] Defendants insist *Sharette* is distinguishable because plaintiffs there alleged "private communications" between Credit Suisse and its counterparties concerning their manipulative scheme. Opp. at 15-16. But *Sharette* did not *turn on* such communications; they were merely identified as a type of information that could evince defendants' scheme. *Sharette*, 127 F. Supp. 3d at 83, 85. Moreover, the court granted summary judgment not because no such communications existed, but for a lack of "any indication that Credit Suisse conducted its transactions for anything other than legitimate economic reasons." *ECD Investor Grp. v. Credit Suisse Int'l*, No. 14-CV-8486, 2017 WL 3841872, at *26 (S.D.N.Y. Sept. 1, 2017). Here, the PTAC includes considerable evidence of Defendants' scheme and its improper purposes. *See, e.g.*, PTAC ¶¶ 140-49, 151-153, 155-158, 206-213. Moreover, Defendants scheme would only work if the counterparties were unaware of Credit Suisse's manipulation, so no such communications would be expected. *Onel* likewise is inapt, as there were no specific allegations "that the defendants knew or intended . . . that the transactions would have the cumulative effect on [the securities'] value that they ultimately did." *Onel v. Top Ships, Inc.*, 806 F. App'x 64, 68 (2d Cir. 2020).

claim.   Defendants ignore—indeed do not even factually dispute—allegations that they misrepresented and concealed that: prior volatility spikes demonstrated the impact of hedging trades; hedging contributed to a liquidity squeeze in VIX futures that depressed the value of XIV Notes further than what market volatility alone would cause; and by offering millions of notes in 2017 and 2018, Defendants knowingly or recklessly "exacerbated the risk of illiquidity in the VIX futures market."   Order at 19-20, 22-23.   Those allegations were central to the Second Circuit's sustaining the misstatement and omissions claims and, both alone and together with the failure to disclose the manipulation described above, allege actionable misstatements and omissions.

    b. *The New Misstatements and Omissions Concerning Credit Suisse's Lending Program Are Actionable*

   Credit Suisse failed to disclose that it was: (1) lending of XIV Notes on a massive scale—up to **90% of its inventory**; (2) **actively encouraging** third parties to short XIV by encouraging them to borrow rather than buy XIV; and (3) **aware** that these secret actions would create market conditions that would destroy XIV at the next volatility spike.   PTAC ¶¶ 146; 281.   These are actionable omissions.

   Defendants argue that the failure to disclose their lending program was not material because "the information [Plaintiffs] claim Defendants knew and concealed was widely known in the market," and the Offering Documents "clearly disclosed that Credit Suisse would be lending XIV Notes to short-sellers."   Opp. at 20-21.   The evidence demonstrates that Credit Suisse was aware that the undisclosed massive lending of XIV meant that a big enough volatility spike would be "untenable" for those trying to hedge XIV, as it spent the entire fall of 2017 getting its own exposure to XIV as low as possible due to this concern.   PTAC ¶ 260.   While the public may have understood that volatility spikes and some lending occasionally happened, it did not know, and Credit Suisse never told them, that the undisclosed massive lending of XIV meant that a big enough

volatility spike would be "untenable" for those trying to hedge XIV.  Further, the language Defendants rely on, that Credit Suisse's ETNs "*may*" be lent, is hardly a "clear disclosure" that adequately informed investors that Credit Suisse had *already* deliberately unbalanced the market by lending almost all of its XIV inventory to short sellers and incentivized borrowing over purchasing XIV, knowing it would crash the market with the next volatility spike.  Such risk disclosures do not shield from liability someone, like Defendants, "who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

3.   The Flatline Value Amendments Are Not Futile Because They Fill the Exact Requirements Identified by the Second Circuit

The Second Circuit held that, to adequately allege that Defendants failed to disclose that XIV's Intraday Indicative Value ("IIV") was not updating, Defendants had to be "monitor[ing] the VIX Futures Index and compar[ing] it to the values of its underlying inputs—*i.e.*, the real-time prices for VIX futures contracts[,]" Order at 30, as that would "set forth facts raising a strong inference that [Defendants] knew that the [IIV] had flatlined." *Id.* at 31.

The PTAC meets these requirements exactly, as it now "point[s] to . . . 'specific reports or statements' showing that [Defendants] could access this data [and that it] monitored the [IIV]." *Id.*  In particular, Plaintiffs now allege specific evidence demonstrating that Credit Suisse had developed an "independent internal calculation for the intraday and closing indicative values for" XIV.  PTAC ¶ 235 ("[Credit Suisse's Paul] Somma represented in his email that these indicative value calculations . . . would be an internal calculation to be used as an '***internal check***' by Credit Suisse[]") (emphasis added).[7]  This independent calculation tool was widely available within

---

[7] While the Second Circuit thought that it was unlikely Defendants would separately calculate the IIV, the evidence alleged in the PTAC demonstrates that Defendants did, in fact, do so. *Id.* ¶¶ 235-

8

Credit Suisse.  *See id.* ¶ 237 (independent calculation was "to be published to Credit Suisse's market data server" and would "continuously and independently calculate, in real time, the real value of XIV"); *id.* ¶ 238 ("Aurmont also confirmed that the internal unofficial data was available in real-time and to individuals within Credit Suisse, including himself.").  Plaintiffs also adequately allege that Credit Suisse and its traders were actively ***comparing*** the published IIV with their own internal calculations, including on February 5, 2018.  *See id.* ¶ 239 (trader Melih Arslan monitored the differential between the IIV and the market price of XIV when buying back XIV); *id.* ¶ 240 (Aurmont personally was watching the February 5, 2018, spike in real time on his computer).

Defendants claim that "the PTAC still fails to provide any basis to infer that Credit Suisse monitored the accuracy of the VIX Futures Index[.]"  Opp. at 28.  But that is exactly what the depositions of Somma, Aurmont, Arslan, and Montefiore confirm.  PTAC ¶¶ 235-242.  Consequently, the Flatline claims are also not futile.

> ### 4.   There Is No Basis to Disturb the Second Circuit's Conclusion that Plaintiffs Adequately Plead Scienter for Their Securities Fraud Claims

Previously, the Second Circuit concluded that Plaintiffs adequately pled scienter for their securities fraud claims.  *See* Order at 20-28.  None of Defendants' recycled arguments here alter that analysis.  First, Defendants argue that the PTAC does not allege conscious misbehavior or recklessness, but the main allegations the Second Circuit relied upon to find the pleadings adequate

---

42.  Moreover, Defendants claim that an independent internal calculation of the IIV "clearly is not" the same as "calculating and utilizing a redundant pricing index for VIX futures contracts," Opp. at 28-29, but this is wrong.  Credit Suisse *was* independently calculating the IIV—not based on the VIX Futures Index, but on the underlying values of the contracts—otherwise it would have failed in its purpose as an "internal check."  Defendants do not assert otherwise, and Somma included in his email the "2 S&P VIX Futures indices that underlie[d] [the] ETNs," which explained how the indices were calculated, to assist with independently calculating those indices.

remain untouched in the PTAC.  Opp. at 22-23;[8] *see* ECF No. 305-2 (PTAC redline).  As the Second Circuit found, Plaintiffs plead scienter under a conscious misbehavior and recklessness theory because: (1) given Defendants' knowledge of the effect of prior volatility spikes on XIV prices, Credit Suisse "recognized the danger of illiquidity in the VIX futures market and identified alternative ways to protect itself"; (2) "Credit Suisse knowingly or recklessly exacerbated the liquidity squeeze it had already observed . . . by increasing the number of XIV Notes" in order to "destroy the value of XIV[] during the next volatility spike"; and (3) Defendants made public misrepresentations "regarding the expected impact of [the bank's] hedging and the basis for Credit Suisse's decision to declare an Acceleration Event."  Order at 21-23.

That discovery has shown Credit Suisse itself engaged in only *some* of the hedging that led XIV to collapse, while revealing that Credit Suisse knowingly pulled levers to shed its own risk and cause its counterparties to engage in such hedging, does not change the scienter analysis.  This is a non-starter for two separate reasons.  First, Defendants entirely overlook that *Plaintiffs still allege—and Defendants concede—that Credit Suisse traded in VIX futures on February 5, 2018.*  Second, the Second Circuit never even suggested that the exact *method* of Defendants' manipulation was determinative of its decision to revive Plaintiffs' claims.  Rather, the Second Circuit rightfully focused on *whether a knowing or reckless manipulation occurred*.  With the benefit of discovery, Plaintiffs now confirm that it did, and explain in particularized detail how: in

---

[8] Defendants argue that the SEC's decision not to prosecute Credit Suisse weighs against scienter. Not so.  First, the Second Circuit did not rely on the SEC's investigation in reaching its conclusion that scienter was adequately pled; rather, "the SEC's decision to investigate Credit Suisse" served as only a minor "piece of the puzzle when taking a 'holistic' view."  Order at 23, 24 n.58.  Second, Plaintiffs' investigation was far broader in scope than that conducted by the SEC, and the majority of the additional facts alleged in the PTAC came from documents not produced to the SEC and from testimony from individuals not deposed by the SEC.  *See* PTAC ¶¶ 64, 69, 82-85, 89, 93, 100-101, 128-132, 135-139, 141-144, 145-148, 154, 237-240.

addition to trading VIX futures on February 5, Credit Suisse "soaked the XIV market in gasoline" by lending Notes to short sellers, encouraging borrowing of Notes, requiring that swap counterparties hedge with VIX futures, and issuing millions of Notes in January 2018 to set the table for a VIX futures liquidity crisis.  PTAC ¶ 207, 146, 152.

Defendants' argument that the PTAC does not allege motive and opportunity to defraud similarly fails.  Opp. at 23-25.  As the Second Circuit determined: (1) "the structure of the XIV Notes, which would allow Credit Suisse to profit if the value of the notes collapsed, provided both motive and opportunity for Credit Suisse to manipulate the market,"[9] and "Credit Suisse's effort . . . to more than double the volume of XIV Notes outstanding enhanced the opportunity for manipulative acts in the days leading up to the market's collapse"; and (2) "Thiam was under significant pressure to shift Credit Suisse . . . away from volatile assets like XIV Notes."  Order at 26.  These allegations remain unaltered, *see* ECF No. 305-2, and did not rely, as Defendants suggest, Opp. at 23, on the particular amount of profits the bank reaped on February 5.[10]

---

[9] Defendants suggest that Plaintiffs may have "violate[d] Rule 11" by alleging that Credit Suisse "had a profit motive" to destroy XIV. This is outrageous and false.  ***Defendants admit*** to making over $11 million in profit from the February 5 XIV price drop, Opp. at 5, a calculation Plaintiffs believe understates Credit Suisse's profits (as it includes profits and losses from non-XIV VIX ETNs).  Moreover, Defendants do not dispute that they saved hundreds of millions of dollars and got out of an increasingly untenable position by shutting down XIV and forcing redemptions via accelerations.  PTAC ¶¶ 210, 260 ("We called it because hedging it for CS would have become untenable over time[.]").

[10] Defendants wholly fail to address two other allegations regarding Credit Suisse's benefits from the XIV crash.  First, Defendants generated millions in revenue through lending fees.  PTAC ¶ 141 (Arslan describing lending as "a profitable part of the XIV business" which "did not have any risk holding to us. It was basically making money on inventory . . . .").  Second, because XIV crashed out through an ***event*** acceleration (*i.e.*, XIV's value dropping by 80% in a day) rather than an ***optional*** acceleration, Credit Suisse avoided tens of millions in fees to VelocityShares.  PTAC ¶ 83. Also, Defendants are wrong that the Second Circuit rejected the argument that they lacked motive to defraud only because "it was required to accept as true the allegation that Credit Suisse was not fully hedged before February 5, 2018."  Opp. at 23.  The panel found Defendants' motive and opportunity "[e]ven assuming that Credit Suisse had fully hedged its position."  Order at 27.

Third, Defendants' claim that the Individual Defendants' scienter is based only on allegations that information "should have been escalated" to them fails.  Defendants Thiam and Mathers knew the effect a volatility spike would have on the VIX futures market and in turn XIV Notes' prices; Thiam falsely claimed that Defendants accelerated the XIV Notes because they "stopped trading"; and Thiam was motivated to "quickly eliminate [Credit Suisse's] exposure [to XIV Notes] through the alleged manipulative scheme" and reap $10.2 million in bonus compensation.  Order at 23-28.  *See also* PTAC ¶¶ 84, 85, 101, 141, 143, 145, 146, 260, 290 (senior executives Michael Ebert and Brian Chin knew of and encouraged scheme); *id.* ¶ 117 (Mathers received XIV risk analysis reports through membership on risk committee).

### 5.   The Prospectus Disclosures Did Not Disclose or Permit Securities Fraud

Defendants argue, again, that certain broad, speculative disclosures in the January 29 Supplement shield them from liability.  Opp. at 16-17.  The Second Circuit rejected these arguments previously, and they still fail.  *See* Order at 33 ("Credit Suisse disputes these claims and asserts that the Offering Documents contained full and robust disclosures of the very risks that came to pass.  Although we acknowledge that many risks were disclosed, . . . the Offering Documents contain actionable misrepresentations or omissions.").  Defendants do not point to any new disclosures. Consequently, this argument is foreclosed by the Second Circuit's decision.

### C.   Plaintiffs Have Demonstrated Good Cause to Amend

Defendants argue that good cause has not been demonstrated because Plaintiffs should have moved to amend by "mid-2021."  Defendants argue that on June 30, 2021, Credit Suisse produced two spreadsheets that included the number of XIV Notes in inventory, available for

---

Moreover, Credit Suisse was not fully hedged on February 5. Opp. at 4-5 (Credit Suisse "traded … VIX futures contracts between 4:00pm and 4:15pm on February 5, 2018[.]").

lending and that had been lent as of February 5, 2018, and that such information was sufficient to have put Plaintiffs on notice of their claims. Opp. at 7 & n.7.[11] This argument fails.

First, those documents were produced together with more than 1.2 **million** pages of other documents (the proverbial needle in a haystack), and Defendants did not even complete their document production until **late-October 2022**. Second, the documents that Defendants identify did not reveal Defendants' lending scheme or scienter.[12] It was not until late-October 2022, when Defendants produced a document acknowledging the "likely event of a XIV knock out" and discussing how Credit Suisse could utilize various tools to accelerate the XIV Notes in the event of such a knockout, and Plaintiffs took various depositions between January and April 2023, that Plaintiffs learned of Defendants' knowledge and planning for the XIV crash upon even a minor volatility spike, let alone that Defendants orchestrated a detailed plan to avoid the risks and costs associated with such a crash by lending XIV to short sellers. *See, generally*, PTAC ¶¶ 140-154.

---

[11] Defendants also falsely and improperly claim Plaintiffs had learned that the "lynchpin allegation[]" that Credit Suisse profited from the redemption of XIV Notes was false during a July 2021 presentation to Plaintiffs' counsel that Defendants made "in an effort to promote transparency[.]" Opp. at 4. But that presentation, made by Defendants' counsel before discovery began in earnest (Defendants having only produced the sparse SEC documents), was not made by Defendants to promote transparency; it was made in the context of settlement negotiations. Relying on Defendants' counsel's representations about what the documents in a case show without being able to independently review them would be foolish in the extreme—especially as the documents showed that Credit Suisse **did** profit from the redemption of XIV Notes. *See supra* at 11 & 11 n.9. Moreover, that presentation was improper for Defendants to even reference here, and the Court should disregard it. Fed. R. Evid. 408; *Grewal v. Cuneo Gilbert & LaDuca LLP*, No. 13-CV-6836, 2017 WL 1215752, at *16 (S.D.N.Y. Mar. 31, 2017), *aff'd*, 803 F. App'x 457 (2d Cir. 2020) (refusing to consider references to settlement offers and negotiations).

[12] The vast majority of evidence Plaintiffs rely on in the PTAC regarding the lending scheme were documents produced by Defendants between May and October 2022 (XIV-Lit-000402393, XIV-Lit-000402938, XIV-Lit-000409270 produced in May 2022; XIV-Lit-000611984, XIV-Lit-001054453, XIV-Lit-001054748, XIV-Lit-000827405 produced in June 2022; XIV-Lit-001224881 produced in October 2022) and testimony obtained during the depositions of Arslan, Mayer, Ebert, and Borin, all of which occurred between January and April 2023.

Nor were Plaintiffs dilatory in seeking such information.  Plaintiffs specifically requested information on Defendants' lending of XIV Notes in their initial Requests for Production served in October 2021, Mot. at 7, and they requested on at least six occasions missing information pertaining to Credit Suisse's lending of XIV Notes, starting on April 19 and continuing through May 11, 2023.  It was Defendants who dragged their feet for months.  And, despite Plaintiffs' noticing depositions before Defendants had even completed their document production, Defendants delayed providing dates for witness depositions for months. *See, e.g.*, ECF Nos. 214, 236.  Only during these depositions did Plaintiffs learn that Credit Suisse's witnesses could not testify regarding critical aspects of Credit Suisse's lending of XIV Notes due to a purported "firewall" between the Flow Desk and Prime Brokerage, PTAC ¶ 150, necessitating a Rule 30(b)(6) deposition that was granted by the Court over Defendants' objection and taken on April 19, 2023. ECF No. 252.  As such, there can be no claim of "undue delay, given that the amendment was proposed only after discovery revealed additional relevant facts[.]" *Friedl*, 210 F.3d at 88.  And, regardless, as is typical in securities fraud class actions, the CMP set the deadline for the amendment of the pleadings ***after*** the conclusion of fact discovery.  ECF No. 259 at 2.

Apparently recognizing that Plaintiffs could not have amended before the end of fact discovery (nor, under the CMO, were they required), Defendants argue that they were somehow caught "off guard" by Plaintiffs' lending scheme allegations and would be "prejudiced" by the amendment. But Defendants were not only the recipients of Plaintiffs' repeated requests for information pertaining to Credit Suisse's lending of XIV Notes, they defended numerous depositions in which documents regarding Credit Suisse's lending of XIV Notes were marked as exhibits and the subject of substantial questioning. *See* Mot. at 7-12.  Although, beginning in late-March 2022, Defendants objected to certain of Plaintiffs' requests for lending information, they

acquiesced to it for months prior to that and had a fair opportunity to defend against the expanded allegations. That is all that is required.[13] *Id*. at 6; *see, e.g.*, *Browning Debenture Holders' Comm. v. DASA Corp.*, 560 F.2d 1078, 1086 (2d Cir. 1977); *NextG Networks of New York, Inc. v. City of New York*, No. 03CIV9672RMBJCF, 2006 WL 8456389, at *2 (S.D.N.Y. Dec. 5, 2006).

Finally, Defendants completely ignore the new Flatline allegations. The documents supporting those allegations were produced only between April and May 2022, and the relevant testimony obtained only during the depositions that occurred between January and February 2023. So too for Defendants Mathers's and Thiam's failures to even review the prospectus and registration statements prior to signing—which Plaintiffs could not have known until their depositions in January and March 2023—another fact Defendants ignore.

For all these reasons, Plaintiffs have demonstrated good cause to amend the complaint.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be granted.

Dated: June 20, 2023                                        Respectfully submitted,


                                                           */s/ Michael B. Eisenkraft*
                                                           Michael B. Eisenkraft
                                                           Laura H. Posner
                                                           **COHEN MILSTEIN SELLERS
                                                             & TOLL PLLC**
                                                           88 Pine Street
                                                           14th Floor

---

[13] Defendants now claim to need "extensive third-party discovery to defend themselves," including "unmasking" additional information in the CBOE data and serving third party subpoenas on certain market participants. Opp. at 10-11. Plaintiffs already did this work, over Defendants' objection. ECF Nos. 288, 292. Regardless, even if a proposed amendment would necessitate additional discovery (which it does not here), that is not a sufficient basis for denying leave to amend. *See Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 174 (S.D.N.Y. 2014) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008)).

New York, NY 10005
Tel.: (212) 838-7797
Fax: (212) 838-7745
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com

Steven J. Toll (*pro hac vice*)
Brendan Schneiderman (*pro hac vice*)
1100 New York Ave. N.W., Fifth Floor
Washington, D.C. 20005
Tel.: (202) 408-3640
Fax: (202) 408-4699
stoll@cohenmilstein.com
bschneiderman@cohenmilstein.com

Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Tel. (312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
Nicholas I. Porritt
Adam M. Apton
55 Broadway, 4th Floor
Suite #427
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
ek@zlk.com
nporritt@zlk.com
aapton@zlk.com

**LEVI & KORSINSKY, LLP**
Alexander A. Krot III (*pro hac vice*)
1101 Vermont Ave, NW
Suite 700
Washington, DC 20005
Tel: (202) 524-4290
Fax: (212) 363-7171
akrot@zlk.com

*Counsel for Lead Plaintiffs and Co-Lead
Counsel for the Classes*

16

**SLARSKEY LLC**
Adam Hollander
767 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 658-0661
ahollander@slarskey.com

*Counsel for the Sudheera Tripuraneni Trust*
*U/A DTD 11/16/2015 and Proposed Class*
*Counsel for the Manipulation Class*

**BRONSTEIN, GEWIRTZ &**
**GROSSMAN,**
**LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel. (212) 697-6484
peretz@bgandg.com

*Additional Counsel for Apollo Asset Limited*

17