# COHENMILSTEIN

Cohen Milstein Sellers & Toll PLLC
88 Pine Street, 14th Floor
New York, NY 10005
cohenmilstein.com

Michael Eisenkraft
**O:** 212.838.7797
**D:** 212.838.7893
meisenkraft@cohenmilstein.com

December 20, 2024

<u>**VIA ECF**</u>

The Honorable Analisa Torres
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

   Re: *Set Capital LLC, et al., v. Credit Suisse Group AG, et al.*, No. 18-CV-02268
     (AT) (SN)

Dear Judge Torres:

   We write to follow up on our previous letter, dated October 31, 2024, informing the Court of Defendants' surprise production of hundreds of Bloomberg chats in the above-captioned matter (ECF No. 353-001, "Plaintiffs' Letter").

## <u>Procedural Background</u>

   On April 28, 2023, Plaintiffs moved for leave to amend their complaint to conform to the evidence adduced in discovery, which Defendants opposed.  *See* ECF Nos. 284 (the "Motion"), 310.  Plaintiffs' amendments cite to and discuss documentary and testimonial evidence adduced during discovery showing that Credit Suisse knowingly or recklessly caused the XIV market to be filled with short sellers, including through its loans of XIV Notes (¶ 207[1]) (the "Lending Allegations").  Plaintiffs' amendments further detail how Credit Suisse's traders expressly modeled for and discussed the likelihood of a knockout of XIV during the next inevitable liquidity spike (¶ 82) (the "Crash Risk Allegations"), and then actively monitored the price of XIV when that liquidity spike ultimately occurred during the Flatline Event (¶¶ 235-42) (the "Flatline Allegations").

---

   [1] Each citation denoted by "¶ ##" is to the proposed amended complaint (ECF No. 305-001, the "PTAC") and references new facts adduced during discovery that support Plaintiffs' amended claims.

COHENMILSTEIN

December 20, 2024
Page 2

While the PTAC is in large part coextensive with Plaintiffs' original complaint—as the Defendants and causes of action remain unchanged—it appropriately adds to and refines Plaintiffs' allegations to reflect information learned in discovery that was not known when Plaintiffs filed their earlier pleadings. Specifically, in discovery, Plaintiffs learned that the method by which Defendants manipulated the market for XIV was different than originally understood from the publicly available information available to Plaintiffs at the time they filed the Consolidated Class Action Complaint.[2] Rather than buying futures contracts themselves, Defendants primarily used intermediaries to achieve the same result. Defendants intentionally flooded the XIV market by aggressively loaning XIV Notes to short sellers at low rates, knowing that when the market inevitably spiked, the short sellers would "either be incentivized to trigger an XIV collapse or would need to hedge their short positions, either of which they could accomplish by driving up the price of VIX futures, thereby drawing down the price of XIV Notes." ¶ 7. The PTAC seeks to conform the allegations to the evidence, so that the pleadings accurately reflect the factual record, and to ensure that Defendants do not claim surprise at trial.

**Defendants Learned of Unproduced Documents While Briefing Their Response, But Deliberately Hid Their Existence from Plaintiffs and the Court**

On January 2, 2024, Magistrate Judge Netburn denied Plaintiffs' Motion. ECF No. 333. On January 30, 2024, Plaintiffs objected to that order (ECF No. 337, the "Objection"), and on February 29, 2024, Defendants responded (ECF No. 338, the "Objection Response"). At the heart of their opposition to the Motion and the Objection Response, Defendants wrongly claimed that Plaintiffs had unnecessarily delayed in amending their allegations and that Defendants would be unduly prejudiced if forced to defend Plaintiffs' new allegations without additional discovery. *See, e.g.*, Objection Response at 15 ("Plaintiffs waited too long to pursue their new theory[.]"). As Plaintiffs explained in their briefing, Defendants' claim of undue delay is unavailing. *See* ECF No. 315 ("Motion Reply") at 14 ("[T]here can be no claim of 'undue delay, given that the amendment was proposed only after discovery revealed additional relevant facts[.]'") (quoting *Friedl v. City of New York*, 210 F.3d 79, 88 (2d Cir. 2000)); Objection at 13 ("[W]here *Defendants* caused the very delay of which they now complain, they cannot establish prejudice as a matter of law.") (emphasis in original).

When Defendants filed their Objection Response, they already knew about hundreds of potentially relevant internal messages that they had failed to produce. But Defendants concealed that information from Plaintiffs and the Court for 8 months. It was not until October 17, 2024, when Plaintiffs' Objection was fully briefed and pending before the District Court, that defense

---

[2] Pursuant to the PSLRA, discovery was automatically stayed at the time Plaintiffs filed the Consolidated Class Action Complaint. *See* 15 U.S.C. §78u-4(b)(3)(B).

COHENMILSTEIN

December 20, 2024
Page 3

counsel belatedly notified Plaintiffs (but not the Court) that its "client was informed by its vendor Bloomberg of an issue with Bloomberg's data systems that could have impacted prior collections of chat messages hosted by Bloomberg." Plaintiffs' Letter at 1. Defense counsel further explained that it identified what it characterized as "a small amount of responsive documents that were not previously produced that [they] are producing today." Plaintiffs' Letter at 1. That purportedly "small amount" was 813 pages of relevant and responsive documents, produced two-and-a-half years after the substantial completion deadline for document production and one-and-a-half years after the end of fact discovery.

Upon review of that production, Plaintiffs determined that the late-produced documents contained "highly relevant communications that go directly to the allegations in Plaintiffs' proposed amended complaint, currently pending before the Court." Plaintiffs' Letter at 1.

On November 4, 2024, Plaintiffs met and conferred with Defendants to better understand the timing of Defendants' production and how it impacted the pending Objection. During that meeting, Plaintiffs' counsel requested a detailed explanation of when Defendants came to learn that they possibly possessed responsive documents "that had not been previously produced." ECF No. 354 at 2 ("Response Letter"). Having not heard back from Defendants, on November 22, 2024, Plaintiffs requested, again, information regarding "an exact timeline and explanation as to why these documents were not produced previously[.]" Eisenkraft Decl. Ex. B at 1. Finally, on November 26, Defendants provided Plaintiffs with a letter purportedly explaining their delinquent production.

In their letter, Defendants, for the first time, revealed that "*[i]n late February 2024*," *i.e.*, after Plaintiffs filed the Objection but on or before the date Defendants filed their Objection Response, "our client determined that the reported issue could have impacted collections in this matter" Eisenkraft Decl. Ex. A at 2 (emphasis added). Defendants did not disclose this to the Court or Plaintiffs at the time. Defendants then revealed that, after Credit Suisse collected and transferred its Bloomberg data to its e-discovery vendor and de-duplicated that data against the data already collected in this matter, re-running the previously agreed-to search terms produced "*approximately 3,593 chats* to be reviewed for responsiveness and privilege." *Id.* (emphasis added).[3] Again, Defendants did not disclose this to the Court or Plaintiffs at the time. Of those, defense counsel "identified 116 Bloomberg chats that were potentially responsive to Plaintiffs'

---

[3] Defendants have informed Plaintiffs that no documents were withheld on the basis of privilege.

COHEN MILSTEIN

December 20, 2024
Page 4

discovery requests in this matter, and that were not previously produced," which Defendants failed to produce until October 17, 2024. *Id.*[4]

The timing of that series of events is particularly notable, given the briefing that was occurring in this matter at the same time. In Plaintiffs' Objection, filed on January 30, 2024, Plaintiffs addressed Defendants' unfounded claims of delay and prejudice. Plaintiffs discussed at length how Defendants—not Plaintiffs—had delayed discovery, such that Plaintiffs were not positioned to file their motion to amend until near the end of discovery.[5] *See id.* at 13-14. Plaintiffs noted that Defendants took a full year to provide the relevant documents pertaining to Credit Suisse's lending of XIV Notes; took months to schedule depositions;[6] and moved to quash Plaintiffs' discovery requests (which called for production of the very discovery that Defendants claim they would need to defend against Plaintiffs' amended allegations).[7] Objection at 13-14. Thus, Plaintiffs argued that "Defendants should not benefit from successfully delaying discovery into their lending practices." *Id.* at 14.

**On February 29, 2024** (*i.e.*, *on the same day or after* Credit Suisse learned that it may possess relevant, responsive Bloomberg chats that it had not yet produced), Defendants filed their Objection Response. Defendants failed to disclose—either to Plaintiffs or to the Court—that their document production was likely still not complete. To the contrary, Defendants forcefully argued that the Court should deny the Motion because Defendants would be prejudiced by *Plaintiffs'* delay and the additional time potentially necessary to conduct additional, targeted discovery. *See, e.g.*, Objection Response at 15 ("Plaintiffs' principal argument is that Defendants had the temerity to object to discovery requests . . . But Defendants were well within their rights to object, and their objections do not change the fact that Plaintiffs waited too long to pursue their new theory[.]"). In other words, at the same time Defendants were arguing that Plaintiffs' delay prejudiced them to such an extent that they should not be permitted to amend their complaint to conform to the evidence, Defendants were themselves actively concealing their own document production

---

[4] Defense counsel did not specify when the 3,593 chats were identified or when that number was reduced to the 116 unprivileged responsive documents ultimately produced.

[5] Plaintiffs maintain that the Motion was timely filed under the Court's scheduling order. *See id.* at 14.

[6] To take just one example, it took four-and-a-half months, from October 18, 2022, to March 2023 to schedule the deposition of a single witness, Defendant and former Credit Suisse CEO Tidjane Thiam. ECF No. 236 at 3 n.2.

[7] The Court granted Plaintiffs' discovery requests over Defendants' objections. *See, e.g.*, ECF No. 252 (granting motion to compel Rule 30(b)(6) deposition); ECF No. 257 (granting motion to compel third-party production).

COHEN MILSTEIN

December 20, 2024
Page 5

delinquencies, which they did not rectify for months and which, if revealed at the time, would have supported reopening discovery.

In other words, for *eight months*—while a relevant motion was pending before this Court—Defendants *failed to disclose* that they *knew* of a potential deficiency with respect to their production of documents in this case, *while arguing to the Court that the time for additional discovery was long past*.

### Defendants Misstate the Significance of the New Documents

On November 4, 2024, Defendants claimed to the Court that "the October 17, 2024 production has [no] impact on any pending motion." Response Letter at 1 n.1. In that letter, Defendants raised a host of inapposite arguments.

*The documents would have been material in discovery.*

Defendants assert that the 813 pages of newly produced communications at issue is a small proportion of the total documents produced in this case. The quantum of documents is irrelevant; even a single smoking-gun document can change the direction of a case. Defendants' position is that Plaintiffs are not entitled to any opportunity to investigate this new evidence, whether by asking key deponents[8] new questions, deposing new witnesses altogether, or otherwise. Defendants are wrong, and depriving Plaintiffs of additional discovery would unfairly prejudice Plaintiffs. *See, e.g.*, *Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*, No. 16-CV-01267, 2018 WL 3407709, at *3 (Torres, J.) (S.D.N.Y. Jan. 12, 2018) (finding prejudice where "[t]he late production prevents Defendant from inquiring at a deposition or otherwise investigating the evidence."); *Tescher v. Experian Info. Sols., Inc.*, No. 21-CV-02266 (PMH), 2024 WL 3759082, at *5 (S.D.N.Y. Aug. 12, 2024) ("Defendant was, because of Plaintiff's belated production, unable to take the deposition of Ms. Gollaher to test the statements made in her declaration. That Defendant had the opportunity to participate in the deposition of another PHH employee as a Rule 30(b)(6) witness does not cure the prejudice it suffered.").

Below is a non-exhaustive discussion of the ways Plaintiffs would have made use of the improperly withheld material to prosecute their case had it been produced during the discovery period or had the discovery period been reopened:

---

[8] Plaintiffs referred to Leonardo Mayer and Melih Arslan (discussed below) as "key witnesses" in the Objection (*see* Objection at 10 n.11) and cite to their deposition testimony on eighteen occasions in the PTAC. *See* ¶¶ 69; 84; 89; 101; 141-44; 146; 148; 153-54; 239.

**COHEN**MILSTEIN

December 20, 2024
Page 6

 *As to the Lending Allegations*, Plaintiffs allege that Credit Suisse bought back and then aggressively lent out XIV Notes, which Defendants knew would flood the market with short sellers who would financially benefit from XIV crashing.  PTAC ¶¶ 146-49; 158-60.  One of Defendants' main factual responses to these allegations has been that a "firewall separated its Flow Desk and Prime Brokerage" such that Credit Suisse had no "insight into its borrowers and their incentives."  Motion Reply at 5.  Plaintiffs specifically probed this claim in depositions, and adduced some evidence it at best overstates the effectiveness of any purported ethical wall.  Eisenkraft Decl. Ex. C at 138:17-18 (noting Mayer telling a hedge fund employee that he can "███████████████████ ██████████████").  Defendants' belated production features more evidence that the "firewall" between the two desks was a fiction.  *See, e.g.*, Eisenkraft Decl. Ex. D (apparent Deutsche Bank trader reaching out to Mayer to discuss redemption of XIV Notes).

 During discovery, Plaintiffs also probed Defendants' understanding of the relationship between lending rates and demand for borrowing XIV Notes, as lowering lending rates was Defendants' primary way of incentivizing third parties to borrow and short XIV Notes.  *See, e.g.*, Eisenkraft Decl. Ex. C at 76:11-16 (███████████████████████████████████████████ ██████████████████████████████████████████████).  In one of the late-produced documents, Mayer talks at length with Montefiore about how the lending rates Credit Suisse set impacted demand for inverse VIX notes.  That document bears directly on Credit Suisse's knowledge that adjusting the XIV lending rate would incentivize more XIV Note borrowing from short sellers.  Eisenkraft Decl. Ex. E.  Other late-produced documents include Mayer discussing Credit Suisse's "████████████" certain VIX-related instruments.  *E.g.*, Eisenkraft Decl. Ex. F.  Plaintiffs would have introduced those documents and asked about them and related topics in the depositions of Mayer and others.

 *As to the Crash Risk Allegations*, Plaintiffs allege that Defendants knew from prior market volatility spikes that a drop in the S&P 500 would drive XIV Notes to zero, PTAC ¶ 140, and Plaintiffs expressly raised those allegations and introduced relevant documents on the issue in the depositions of Mayer and Arslan.  *See, e.g.*, Eisenkraft Decl. Ex. G (███████████████████████ ████████████████████████████); Ex. C (███████████████████████████████████ ███████████████████████████).  The quantification of how much S&P movement would knock out XIV bears directly on how risky of an investment XIV was, how VIX Futures trading could trigger such a knockout, and who at Credit Suisse knew or should have known about those risks.  Moreover, Plaintiffs specifically probed whether anyone inside Credit Suisse was concerned about lending out XIV Notes that might eventually expire worthless.  *See* Eisenkraft Decl. Ex. H at 122:4-18 (████████████████████████████████████████████████

COHEN MILSTEIN

December 20, 2024
Page 7

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████).[9]

      In one of the belatedly produced documents, derivatives trader Raymond Han—whom Plaintiffs did not depose—noted that XIV would knock out if "spx sells off 15% in one day[.]" ECF No. 354-002 at 3. In another, Raymond Han and Credit Suisse options trader Andrew Mullen discuss the same. That exchange is especially notable because Mullen appears actively concerned about the likelihood that XIV is going to crash out. ECF No. 354-003 at 4 ("Problem with xiv seems like if vols return to historical levels u get craemed [*sic*]."). These documents would have been used in the depositions of at least Mayer and Arslan, and would have prompted Plaintiffs to depose Mullen and perhaps Han.

      *As to the Flatline Allegations*, during discovery, Plaintiffs sought to bolster their allegations that "Credit Suisse had developed an 'independent internal calculation for the intraday and closing indicative values for'" XIV. Motion Reply at 8. During depositions, Plaintiffs asked, at length, about the tendencies of Credit Suisse personnel to monitor XIV's price in real-time. This is because, if Plaintiffs monitored XIV's price in real time, it is reasonable to infer—as the Court must at this stage—that they would have been aware of the erroneous flatline value because they would see, in real time, the disjunction between the flatline and the accurate fluctuating price of XIV. *See, e.g.*, Eisenkraft Decl. Ex. C at 18:13-19:10 (asking if Mayer would use the most accurate information available to answer questions for his supervisors, and if he had access to a Bloomberg terminal); Eisenkraft Decl. Ex. H at 26:5-28:12; 133:6-13 (asking same of Arslan); Eisenkraft Decl. Ex. I at 14:18-15:18 (███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

---

[9] Defendants insist that Credit Suisse's knowledge that movement in the S&P would crash out XIV is "not new" but rather a "feature of [XIV], and Credit Suisse's alleged awareness of the extent and likelihood of volatility returning to historical levels, is one of such bases for the Operative Complaint (not the Proposed Amended Complaint)[.]" Response Letter at 3. But, as Plaintiffs argued in their motion to amend, "[i]t was not until late-October 2022, when Defendants produced a document acknowledging the 'likely event of a XIV knock out' and discussing how Credit Suisse could utilize various tools to accelerate the XIV Notes in the event of such a knockout, and Plaintiffs took various depositions between January and April 2023, that Plaintiffs learned of Defendants' knowledge and planning for the XIV crash upon even a minor volatility spike, let alone that Defendants orchestrated a detailed plan to avoid the risks and costs associated with such a crash by lending XIV to short sellers." Motion Reply at 13.

COHEN MILSTEIN

December 20, 2024
Page 8

█████████████████████████████████████████████████████████████
███████).

Among the late-produced documents is a January 26, 2018, chat—just days before the crash of XIV—in which a Credit Suisse analyst notes for Rob Montefiore, whom Plaintiffs deposed,[10] that it was a "███████████████████████████████████████████████████" Eisenkraft Decl. Ex. K. In another, on February 5, 2018, **the day of the XIV crash**, an individual who Defendants requested not be named (*see* Response Letter at 3 n.2) notes for Arslan that "XIV is crazy … [G]oing to 0[.]" ECF No. 354-001 at 3. Had Plaintiffs been in possession of these documents during discovery, they would have introduced them and inquired about the timing of Montefiore's and Arslan's real-time knowledge of the XIV crash on February 5. Additionally, Plaintiffs would have deposed the unnamed individual specifically to get an understanding of his monitoring of XIV on that day.[11]

### Defendants' Delinquent Production Undermines Their Opposition to the Motion.

Defendants argue that "[e]ven accepting Plaintiffs' assertion that some fraction of the 116 recently produced Bloomberg chat messages 'support' Plaintiffs' proposed new theory, this observation is wholly irrelevant to Magistrate Judge Netburn's rulings with respect to the delay, burden, and prejudice associated with Plaintiffs' wholesale change of theories in this case at the last hour." Response Letter at 2. Putting aside the fact that there is no "wholesale change of theories" in the PTAC (*see* Objection at 4 ("The underlying theory sustained by the Second Circuit—that Defendants knowingly turbocharged the VIX futures market to enable Credit Suisse to pull the trigger and destroy XIV on the next volatility spike—is unchanged.")), Defendants' argument carries no water.

---

[10] In his deposition, Montefiore repeatedly testified that he was not directly involved in the "███████████████████████████████████████████" Eisenkraft Decl. J at 67:18-21. This document undercuts that testimony, and Plaintiffs would have asked Montefiore about that discrepancy at his deposition if the document had been timely produced.

[11] Defendants hyperfocus on the timestamp of that message to argue that it "says nothing about what anyone knew … on the afternoon of February 5, 2018." Response Letter at 3 (emphasis omitted). That argument is overstated. Defendants themselves acknowledge that the message was sent only a few hours after the flatline event. The argument is also improper, as (1) it is for Plaintiffs, not Defendants unilaterally, to determine what documents are probative of their claims; and (2) at this stage, it is Plaintiffs, not Defendants, who are entitled to having factual inferences drawn in their favor. But Plaintiffs have been deprived of the opportunity to determine what, if any, probative value the document has, because they saw it for the first time after discovery closed.

COHENMILSTEIN

December 20, 2024
Page 9

Defendants' belated production is emblematic of their conduct throughout this case: stonewalling Plaintiffs' attempts to develop a complete, accurate, relevant record while falsely claiming that Plaintiffs have caused undue delay that supposedly warrants denial of Plaintiffs' motion to amend:

- Plaintiffs specifically requested information on Defendants' lending of XIV Notes as early as their initial Requests for Production, served in October 2021, but Defendants did not produce documents acknowledging the "likely event of a XIV knock out" or how Credit Suisse could utilize various tools to accelerate the XIV Notes in the event of such a knockout until late-October 2022—a full year later. Motion Reply at 13.

- Plaintiffs attempted to schedule depositions as early as November 2022,[12] but Defendants delayed scheduling many depositions until between January and April 2023. Objection at 10 n.11.

- The vast majority of the evidence cited in the PTAC comprises documents produced between May and October 2022, and testimony adduced in depositions between January and April 2023. Plaintiffs did not learn about Defendants' knowledge and planning for the XIV crash upon even a minor volatility spike, or that Defendants orchestrated a detailed plan to avoid the risks and costs (to Credit Suisse) associated with such a crash by lending XIV to short sellers, until those depositions. Motion Reply at 13 n.12.

- Following those depositions, Plaintiffs requested on at least six occasions missing information pertaining to Credit Suisse's lending of XIV Notes, starting on April 19 and continuing through May 11, 2023. *Id.* at 14.

- On February 13, 2023, after weeks of negotiation following Defendants' objection to Plaintiffs' request for a Rule 30(b)(6) deposition, Plaintiffs moved for one. ECF No. 236. The Court granted that request on March 1, 2023. ECF No. 252. Plaintiffs began attempting to schedule the deposition just days later, and the deposition took place on April 19, 2023. Motion Reply at 14. ***Just nine days later, Plaintiffs filed their motion to amend the pleadings.*** *See generally* Motion.

---

[12] In an effort to prosecute their case as quickly as possible, Plaintiffs noticed these depositions before Defendants had even completed their document production.

COHEN MILSTEIN

December 20, 2024
Page 10


        This belated production is the latest data point showing that Plaintiffs are not the source of any undue delay, and that Defendants' disingenuous claims of prejudice from post-cutoff discovery lack merit.  Plaintiffs should not be punished for the delays caused by Defendants and Plaintiffs' motion to conform the complaint to the evidence should be granted.

                                Respectfully submitted,

                                */s/ Michael Eisenkraft*
                                Michael Eisenkraft

                                *Counsel for Lead Plaintiffs*



cc: All Counsel of Record (via ECF)