UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SET CAPITAL LLC, et al., Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>             -against-<br><br>CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS,<br><br>                   Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __2/11/2025___

18 Civ. 2268 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Lead Plaintiffs, Set Capital LLC, Stefan Jager, Aleksandr Gamburg, and Apollo Asset Limited,[1] bring this class action on behalf of themselves and purchasers, acquirers, sellers, and redeemers of VelocityShares Inverse VIX Short Term Exchange Traded Notes ("XIV Notes" or "notes") against Defendants, Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse International (together, "Credit Suisse"), Credit Suisse CEO Tidjane Thiam, and CFO David Mathers,[2] alleging that Defendants executed a complex fraud to collapse the market for XIV Notes and asserting claims under §§ 9, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 promulgated thereunder, and §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"). Am. Compl. at 1, ¶¶ 23–24, 26–35, 270–93, 306–23, ECF No. 190.

By order dated March 16, 2023 (the "First Order"), the Court granted Lead Plaintiffs' motion to certify their proposed Securities Act Class but denied certification of their proposed

---

[1] In December 2022, the Court granted Nikolay Drozhzhinov's request to withdraw as a lead plaintiff. ECF No. 224.

[2] In July 2021, Lead Plaintiffs voluntarily dismissed all claims against Janus Henderson Group PLC, Janus Index & Calculation Services LLC, and Janus Distributors LLC without prejudice. ECF No. 160.

Misrepresentation Class and Manipulation Class (together, the "Exchange Act Classes") without prejudice to renewal.  *See generally* First Order, ECF No. 260.  Lead Plaintiffs then renewed their motion for certification of the Exchange Act Classes, which the Court again denied without prejudice by order dated March 1, 2024 (the "Second Order").  *See generally* Second Order, ECF No. 339.

Before the Court is Lead Plaintiffs' third motion to certify the Exchange Act Classes. Mot., ECF No. 344.  For the reasons stated below, the motion is GRANTED in part and DENIED in part.

## BACKGROUND[3]

I.   Factual Background

   A.  XIV Notes

This case arises out of the collapse of XIV Notes, a derivative financial product issued by Credit Suisse that increased in value when market volatility fell and decreased in value when market volatility rose.  Am. Compl. ¶¶ 2, 56.  XIV Notes were Exchange Traded Notes ("ETNs").  *Id.* ¶ 2.  In purchasing an ETN, investors pay money to the institution sponsoring the ETN in return for a payment when the note matures, the amount of which is derived from a market index.  *Id.* ¶ 55.  In the case of XIV Notes, their value was derived from the S&P 500 VIX Short-Term Futures Index ("VIX Futures Index"), an index that aggregates the value of

---

[3] The Court presumes familiarity with the facts and procedural history of this action, which have been set forth in previous decisions in this case, *see, e.g.*, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 69–75 (2d Cir. 2021), and restates only key factual and procedural details here.  The facts in this section are taken from the amended complaint and are accepted as true for purposes of a motion to certify a class.  *See Shabazz v. Morgan Funding Corp.*, 269 F.R.D. 245, 249 (S.D.N.Y. 2010).

VIX futures contracts,[4] which in turn track expected market volatility.  *Id.* ¶¶ 2, 55–56.  This means that when the market expects higher volatility, the VIX Futures Index increases; when the market expects lower volatility, the VIX Futures Index decreases.  *Id.* ¶ 2, 51.

To allow investors to profit from low market volatility, the value of XIV Notes was inverse to the VIX Futures Index.  *Id.* ¶ 2, 56.  This inverse relationship between XIV Notes and the VIX Futures Index meant that as market volatility declined and the VIX Futures Index thus decreased, XIV Notes increased in value by an equivalent amount; as market volatility rose and the VIX Futures Index increased, XIV Notes dropped in value by an equivalent amount.  *Id.*

Credit Suisse issued XIV Notes on three occasions: in 2010, when it issued 9,018,880 notes; in 2017, when it issued 5,000,000 notes; and on January 29, 2018, when it issued another 16,275,000 notes.  *Id.* ¶¶ 61, 63.  The value of XIV Notes increased dramatically over this period.  *Id.* ¶ 62.  Because Credit Suisse's potential liability proportionately increased with the value of XIV Notes, it routinely offset, or "hedged," its exposure by taking short positions[5] on VIX futures contracts.  *Id.* ¶¶ 65–66.  This meant that a decrease in the VIX Futures Index would increase Credit Suisse's obligation to VIX noteholders but would also allow Credit Suisse to profit from its short positions on VIX futures contracts, offsetting the higher redemption values of XIV Notes.  *Id.* ¶ 66.

---

[4] A futures contract is an agreement to buy or sell a particular commodity or financial instrument on a later date at a predetermined price. Am. Compl. at ii.

[5] A short position "is created when a trader sells a security first with the intention of repurchasing it or covering it later at a lower price.  A trader may decide to short a security when they believe that the price of that security is likely to decrease in the near future."  James Chen, *Short Position: Meaning, Overview, and Example*, Investopedia (updated May 29, 2024), https://www.investopedia.com/terms/s/short.asp/.

B.  Prior Episodes of Market Volatility

Although the value of XIV Notes increased on average from 2010 to 2018, three episodes of high market volatility caused the VIX Futures Index to spike and the value of XIV Notes to temporarily drop.  *Id.* ¶ 69.  During these episodes of high market volatility, Credit Suisse and other ETN issuers bought large quantities of VIX futures contracts after market close to continue hedging their positions.  *Id.* ¶¶ 66–69.  Each time they did so, there was insufficient liquidity in the VIX futures contracts market; that is, not enough VIX futures contracts to meet the high hedging demand from Credit Suisse and the other ETN issuers.  *Id.* ¶ 69.  These post-market-close hedging activities contributed to a liquidity squeeze that made the price of VIX futures contracts soar even higher, which in turn caused the value of XIV Notes to temporarily plummet.  *Id.* ¶¶ 69–74.

C.  January 2018 XIV Notes

As stated above, Credit Suisse issued 16,275,000 XIV Notes on January 29, 2018.  *Id.* ¶ 63.  It did so pursuant to a registration statement, prospectus, prospectus supplement, and pricing supplement (together, the "Offering Documents"), each of which was filed with the Securities and Exchange Commission.  *Id.* ¶¶ 216, 296.  The Offering Documents set forth, *inter alia*, disclosures concerning the risks of investing in the notes and Credit Suisse's intent to hedge its exposure to the notes.  *See id.* ¶¶ 299–305.  For example, the Offering Documents stated that although Credit Suisse had "no reason to believe that [its] hedging activities [would] have a material impact on the level of the [VIX Futures] Index, there [could] be no assurance that the level of the [VIX Futures] Index [would] not be affected."  *Id.* ¶ 304.

The Offering Documents also advised investors of Credit Suisse's right to accelerate the notes under certain circumstances—that is, to force XIV noteholders to redeem their notes.  *Id.*

4

¶¶ 73, 137.  As relevant here, Credit Suisse could accelerate redemption of the notes if a predefined "acceleration event" occurred, including if the notes' "intraday indicative value" dropped eighty percent or more from the previous day's "closing indicative value."[6]  *Id.* ¶ 73.  In that case, Credit Suisse would pay XIV noteholders based on the notes' closing indicative value on the day Credit Suisse declared the acceleration event.  *Id.* ¶¶ 137, 142.

### D.  February 5, 2018 Events

On February 5, 2018, the S&P 500 Index dropped 4.1 percent.  *Id.* ¶ 159.  This increase in market volatility caused the VIX Futures Index to spike, decreasing the value of XIV Notes.  *Id.* ¶¶ 160–61.  Over the course of regular market trading on February 5, the intraday indicative value of XIV Notes dropped from approximately $108.37 to $72.59.  *Id.* ¶¶ 157, 160–61.  In response, Credit Suisse purchased over 105,000 VIX futures contracts from approximately 4:00 p.m., the close of regular market trading, to 4:15 p.m.  *Id.* ¶¶ 8, 162, 164–65.  As with the prior episodes of high market volatility, these purchases contributed to a liquidity squeeze that caused the VIX Futures Index to skyrocket and the value of XIV Notes to plummet.  *Id.* ¶ 9.  By 4:09 p.m., the value of XIV Notes had dropped to approximately $20.  *Id.*

The next day, Credit Suisse declared an acceleration event based on the notes' drop in value and ultimately redeemed the notes at $5.99 per note.  *Id.* ¶¶ 14, 199, 201.  Lead Plaintiffs estimate that Credit Suisse made between $475 million and $542 million in profits by redeeming the notes at that price, resulting in approximately $1.8 billion in losses to investors.  *Id.* ¶¶ 197, 210.

---

[6] The notes' intraday and closing indicative values were derived from the inverse of the VIX Futures Index.  Am. Compl. ¶ 140.  The intraday indicative value was published every 15 seconds on each trading day, while the closing indicative value was published at the end of each trading day.  *Id.* ¶ 143.

E.  Lead Plaintiffs' Allegations

As relevant here, Lead Plaintiffs allege that, after observing the prior episodes of high market volatility, Credit Suisse had discerned its ability to drive down the value of XIV Notes by purchasing VIX futures contracts after market close.  *Id.* ¶¶ 111, 114–16.  Then, Lead Plaintiffs allege, Credit Suisse misrepresented or omitted its knowledge that the next episode of high market volatility would allow it to manipulate the market to profit at investors' expense.  *Id.* ¶¶ 111, 114–16, 228, 257.  Lead Plaintiffs also allege that Credit Suisse did, in fact, manipulate the market by issuing millions of XIV Notes, collapsing their value through its own hedge trading on February 5, and accelerating the notes' redemption—all at a substantial loss to investors.  *Id.* ¶¶ 155–170, 277.

II.   Procedural Background

A.  First Order

On July 1, 2022, Lead Plaintiffs moved to certify three subclasses:

(1) The Misrepresentation Class, defined as: "[A]ll persons and entities that purchased or acquired . . . [XIV Notes] between January 29, 2018[,] and February 5, 2018, . . . and who were damaged thereby;"

(2) The Manipulation Class, defined as: "[A]ll persons and entities that sold or redeemed . . . XIV Notes on or after February 5, 2018 . . . and who were damaged thereby;" and

(3) The Securities Act Class, defined as: "[A]ll persons and entities that purchased or acquired XIV Notes pursuant to or traceable to Credit Suisse's Offering Documents and who were damaged thereby."

ECF No. 179 at 1; ECF No. 178.  For the three proposed classes, Lead Plaintiffs also moved to appoint themselves as class representatives and the firms Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein") and Levi & Korsinsky, LLP as class counsel.  *See* ECF No. 179 at 1, 6.

On March 16, 2023, the Court certified the Securities Act Class but denied certification of the Exchange Act Classes. *See generally* First Order. The Court found that Lead Plaintiffs' theories of liability for the Exchange Act Classes "are in direct conflict with each other." *Id.* at 24. It noted that under the out-of-pocket damages methodology set forth by Plaintiff's expert, Joshua Mitts, "the total sum of out-of-pocket damages will be attributable *either* to the alleged artificial inflation from Defendants' misrepresentations *or* the alleged deflation from Defendants' manipulative conduct." *Id.* (emphasis added). Because the "methodology does not allow for double recovery," damages "calculated for a member of the proposed Misrepresentation Class are higher if the price decline in XIV Notes is attributed to the corrective disclosures (or the materialization of the risk) of Defendants' misrepresentations, whereas damages calculated for the proposed Manipulation Class are higher if the price decline in XIV Notes is attributed to Defendants' manipulative conduct." *Id.* at 24–25.

In light of this, the Court concluded that there is a "fundamental conflict" between the Exchange Act Classes: Members of the Manipulation Class are motivated to argue "that there were in fact no alleged misstatements or omissions concerning the risk of Credit Suisse's trading," whereas members of the Misrepresentation Class are incentivized to argue that there was in fact no manipulation. *Id.* at 25–26. Lead Plaintiffs, who were members of both Exchange Act Classes, could not meet the typicality and adequacy requirements for the classes because they did not "have the same 'incentive to prove all the elements of the cause of action' that members of only one of the classes would have." *Id.* at 26 (quoting *Houser v. Pritzker*, 28 F. Supp. 3d 222, 245 (S.D.N.Y. 2014)).

Accordingly, the Court denied certification of the Exchange Act Classes "without prejudice to refiling by alternative class representatives and counsel." *Id.*

7

B.  Second Order

In May 2023, Lead Plaintiffs renewed their motion to certify the Exchange Act Classes.
ECF Nos. 299–300.  They argued that their identification of a separate class representative, the
Sudheera Tripuraneni Trust U/A DTD 11/16/2015 (the "Trust"), and separate counsel, Slarskey,
LLC ("Slarskey"), for the Manipulation Class "obviate[d] the Court's stated concerns regarding
adequacy and typicality."  ECF No. 300 at 1, 4, 10.

The Court disagreed.  *See generally* Second Order.  It noted that, although the Trust is a
member of only the Manipulation Class and is positioned to represent the interests of that class,
Lead Plaintiffs were still members of both Exchange Act Classes.  *Id.* at 11–12.  Therefore, even
if they did not formally represent the Manipulation Class, Lead Plaintiffs were "functionally
indifferent to whether damages are allocated to Defendants' alleged inflationary
misrepresentations or deflationary manipulations."  *Id.* at 12.  The Court determined that this
conflict made Lead Plaintiffs "inadequate advocates for one group of claimants: those holding
only misrepresentation claims."  *Id.*  This is because although Lead Plaintiffs could sacrifice
their misrepresentation claims in exchange for more favorable compensation on their
manipulation claims, no such option is available to misrepresentation-only plaintiffs.  *Id.*

Although the Court acknowledged "that the number of misrepresentation-only plaintiffs
may be few, and that many—if not most—of the plaintiffs will fall into both Exchange Act
Classes," it recognized that it "must 'ask independently whether the interests of *all* class
members [are] adequately represented.'"  *Id.* (emphasis added) (quoting *In re Literary Works in
Elec. Databases Copyright Litig.*, 654 F.3d 242, 254 (2d Cir. 2011)).  In sum, the Court
concluded that "[w]ithout a lead plaintiff to represent and advocate for the
misrepresentation-only claimants," the adequacy standard could not be met.  *Id.*

8

Accordingly, the Court denied Lead Plaintiffs' renewed motion for class certification, giving them the option to refile with alternative class representation or "provide evidence to support their statement that the pool of misrepresentation-only plaintiffs is *de minimis*, if they exist at all."[7]  *Id.* at 12–13 (citation omitted).

Now before the Court is Lead Plaintiffs' third motion to certify the Exchange Act Classes.  *See generally* Mot.  For the following reasons, the motion is GRANTED in part and DENIED in part.

## DISCUSSION

I.  <u>Legal Standard</u>

To certify a class under Rule 23(b)(3), a district court must determine that the proposed class meets the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3).  *See Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017).  Lead Plaintiffs must establish each of Rule 23's requirements by a preponderance of the evidence.  *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008).  The members of the proposed class must also be ascertainable "by reference to objective criteria."  *Katz v. Pro. Billing Collections, LLC*, No. 20 Civ. 3043, 2021 WL 2418387, at *2 (S.D.N.Y. June 14, 2021) (citation omitted).

A.  Numerosity

A proposed class meets the numerosity requirement if "joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  It is not necessary that Lead Plaintiffs provide evidence of the exact size of the proposed class, nor the identity of all class members; rather, the

---

[7] In their Reply Brief dated July 17, 2023, Lead Plaintiffs represented that the pool of misrepresentation-only plaintiffs is "*de minimis*, if they exist at all."  ECF No. 321 at 3 n.2.

Court must make a factual finding as to the approximate size of the class and determine whether it meets the legal standard governing numerosity. *Robinson v. N.Y.C. Transit Auth.*, No. 19 Civ. 1404, 2020 WL 5814189, at *4 (S.D.N.Y. Sept. 30, 2020). A proposed class with more than forty members presumably satisfies the numerosity requirement. *Id.* (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). In securities actions involving "publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 84 (S.D.N.Y. 2007) (citation omitted).

### B. Commonality

To satisfy commonality, Lead Plaintiffs must demonstrate the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This requirement is satisfied when a class-wide proceeding is capable of "generat[ing] common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis omitted) (citation omitted). "The commonality requirement of Rule 23(a)(2) has been applied permissively by courts in the context of securities fraud litigation." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y. 1999).

### C. Typicality

The typicality requirement "is satisfied when the lead plaintiffs' claims arise from the same series of events and find support in the same legal theories as the claims of all of the remaining class members." *Houser*, 28 F. Supp. 3d at 245; *see also* Fed. R. Civ. P. 23(a)(3) (requiring that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class"). Although Lead Plaintiffs' claims need not be "identical" to class members' claims, Lead Plaintiffs must "have the incentive to prove all the elements of the cause

of action which would be presented by the individual members of the class were they initiating individualized actions." *Houser*, 28 F. Supp. 3d at 245 (citation omitted).

### D.  Adequacy

To satisfy the adequacy requirement, (1) "there should be no conflict between the interests of the class and the named plaintiffs nor should there be collusion among the litigants;" and (2) "the parties' attorneys must be qualified, experienced, and generally able to conduct the proposed litigation." *Id.* at 248 (cleaned up) (citation omitted).  "In order to defeat a motion for certification, any conflicts between the class representative and members of the putative class must be 'fundamental.'" *Ligon v. City of New York*, 288 F.R.D. 72, 80 (S.D.N.Y. 2013) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

### E.  Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  The predominance requirement "ensures that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (alteration adopted) (citation omitted).  This requirement is met "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).  "[T]he predominance requirement calls only for predominance, not exclusivity, of common questions." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d

430, 462 (S.D.N.Y. 2018) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)).

Courts applying Rule 23(b)(3) "must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (cleaned up) (citation omitted). This assessment is "more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case." *In re LIBOR*, 299 F. Supp. 3d at 462 (cleaned up) (citation omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).

F. Superiority

Rule 23(b)(3) also requires that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining whether the superiority requirement is met, courts consider the following factors: (1) "the interest of the class members in maintaining separate actions;" (2) "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the difficulties likely to be encountered in the management of a class action." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) (quoting Fed. R. Civ. P. 23(b)(3)).

G. Ascertainability

Finally, to certify a class, a court must determine that the members of the proposed class are ascertainable. *See Katz*, 2021 WL 2418387, at *2. This requirement is met when a proposed class can "be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).

II.   Analysis

A. Misrepresentation Class

Lead Plaintiffs do not offer alternative class representation for the Misrepresentation Class. Rather, they (1) amend the definitions of the Exchange Act Classes and (2) submit a supplemental declaration from Mitts that they argue establishes that there are no misrepresentation-only plaintiffs. Pls. Mem. at 2, ECF No. 345.

First, Lead Plaintiffs amend the definitions of the Exchange Act Classes to provide exact times delineating the class periods:

> (1) The <u>Misrepresentation Class</u>, now defined as: "[A]ll persons and entities that purchased or acquired [XIV] Notes between January 29, 2018, *and 4:15 PM Eastern Time* on February 5, 2018, inclusive . . ., and who were damaged thereby;" and
>
> (2) The <u>Manipulation Class</u>, now defined as: "[A]ll persons and entities that sold or redeemed the [XIV] Notes *on or after 4:15 PM Eastern Time* on February 5, 2018 . . . and who were damaged thereby."

*Id.* at 6 (emphases added).

Second, Lead Plaintiffs submit a declaration from Mitts in which he concludes that "all members of the Misrepresentation Class are members of the Manipulation Class." Mitts Decl. ¶ 6, ECF No. 346-6. To arrive at this conclusion, Mitts states that there are two "possibilities by which members of the Misrepresentation Class might not also be members of the Manipulation Class." *Id.* ¶ 22. "The first possibility is that a purchaser might have acquired XIV Notes *after*

13

the conclusion of Defendants' manipulative acts or conduct, but before the truth regarding Defendants' alleged misrepresentations and omissions was revealed." *Id.* (emphasis in original). Mitts then concludes, and Defendants do not dispute, that "there are no such class members" because the amended definition of the Misrepresentation Class "does not include individuals or entities that purchased XIV Notes after 4:15 [p.m.] on February 5, 2018—the conclusion of Defendants' allegedly manipulative acts and conduct." *Id.*

According to Mitts, the second possibility is if "the truth regarding Defendants' alleged misrepresentations and omissions was revealed *before* Defendants' allegedly manipulative acts occurred." *Id.* ¶ 23 (emphasis in original). "If that were the case, a hypothetical purchaser of XIV Notes between January 29, 2018[,] and 4:15 [p.m.] Eastern Time on February 5, 2018, inclusive, may have been damaged by revelation of the truth prior to Defendants' allegedly manipulative acts," which Mitts states occurred "just before" 4:15 p.m. *Id.* ¶¶ 6, 7, 23. That hypothetical purchaser would be a member of only the Misrepresentation Class. *Id.* ¶ 23. Mitts concludes, however, that "there is no evidence to indicate that the truth regarding Defendants' alleged misrepresentation and omissions concerning XIV Notes was revealed prior to Defendants' allegedly manipulative acts." *Id.* In support of this conclusion, he states only that he "ha[s] searched SEC filings, analyst reports, and news publications during the 3:45 [p.m.]– 4:15 [p.m.] window on February 5, 2018, for disclosures that might have revealed the truth regarding Defendants' alleged misrepresentations and omissions concerning XIV Notes before Defendants' manipulative acts or conduct took place," and has not identified any. *Id.* ¶ 11. Mitts concludes that, based on his search, the truth "was revealed simultaneously with Defendants' allegedly manipulative acts just before 4:15 [p.m.] on February 5, 2018." *Id.* ¶ 6.

Lead Plaintiffs argue that the "factual question" of when the "truth of Defendants'

misrepresentations was revealed through Defendants' manipulative conduct" is inappropriate for resolution at this stage.  ECF No. 350 at 10.  Yet, in an attempt to prove that there are no misrepresentation-only claimants, Lead Plaintiffs ask the Court to decide the very question they claim is inappropriate for resolution at class certification.  In any event, the Court need not decide whether there *are* any misrepresentation-only claimants, but only whether it is persuaded by Lead Plaintiffs' claim that there are *none*.  The Court is not so persuaded.

Mitts' statement that he has "not identified any SEC filings, analyst reports or news publications . . . that might have revealed the truth regarding Defendants' alleged misrepresentations and omissions" and his conclusion that the truth was, therefore, "revealed simultaneously with Defendants' allegedly manipulative acts just before 4:15 [p.m.]" are insufficient to establish that there are no misrepresentation-only claimants.  Mitts states that there are no misrepresentation-only claimants because "[a] purchaser or acquirer of XIV Notes who both bought and sold XIV Notes before 4:15 [p.m.] on February 5 would not be a member of either the Manipulation Class or the Misrepresentation Class, since they would not have been damaged under either theory."  Mitts Decl. ¶ 13 n.8.  But this is inconsistent with the theory of liability that Lead Plaintiffs have advanced throughout this case—that investors suffered losses, and were therefore damaged, when the truth was revealed to the market.  Moreover, Lead Plaintiffs have consistently represented that the truth was revealed to the market through Defendants' manipulative acts and in the form of a decline in the value of XIV Notes.  *See, e.g.*, Am. Compl. ¶ 259 ("When the truth about XIV was revealed to the market, the price of XIV declined significantly.  This decline removed the inflation from the price of XIV securities, causing real economic loss to investors who had purchased XIV notes during the Class Period."); Mitts Rebuttal Report ¶ 6, ECF No. 230-4 ("Plaintiffs alleged that the materialization of the risk

15

regarding Credit Suisse's activities—that is, the creation of a liquidity squeeze in the VIX futures markets that would inflate the value of VIX futures, thereby wiping out the value of XIV and triggering an Acceleration Event—was revealed to the market, removing the inflation from the price of XIV securities, and causing real economic loss to investors who had purchased XIV notes during the Class Period.").

Indeed, Lead Plaintiffs allege that Credit Suisse's hedge trading began after market close and, by 4:09 p.m., had caused the value of XIV Notes to drop to approximately $20. Am. Compl. ¶ 9. Therefore, even under Lead Plaintiffs' amended definition of the Misrepresentation Class, investors who purchased or acquired XIV Notes between January 29 and 4:15 p.m. on February 5, and sold the notes after 4:00 p.m. but before 4:15 p.m. on February 5, would claim that they suffered losses as part of the Misrepresentation Class but, because they did not sell after 4:15 p.m., not as part of the Manipulation Class. For the reasons stated in the Court's Second Order, Lead Plaintiffs cannot adequately represent these misrepresentation-only claimants.

In its First Order, the Court recognized a "fundamental conflict between the Misrepresentation Class and the Manipulation Class" that "extend[ed] beyond damages calculations to the classes' theories of liability." First Order at 26. In its Second Order, the Court explained that this fundamental conflict made Lead Plaintiffs inadequate advocates for claimants holding only misrepresentation claims. Second Order at 12. And, although "misrepresentation-only plaintiffs may be few," the Court emphasized its duty to "ask independently whether the interests of *all* class members [are] adequately represented." *Id.* (emphasis added) (quoting *In re Literary Works*, 654 F.3d at 254). For the third time, the Court cannot answer this question in the affirmative.

Lead Plaintiffs fail to propose a Misrepresentation Class that can be certified. Because

this is their third attempt at class certification, Lead Plaintiffs' motion to certify the Misrepresentation Class is denied with prejudice. *See, e.g.*, *Sanchez v. N.Y. Kimchi Catering, Corp.*, No. 16 Civ. 7784, 2018 WL 2383145, at *5 (S.D.N.Y. May 24, 2018); *Calvo v. City of New York*, No. 14 Civ. 7246, 2018 WL 1633565, at *9 (S.D.N.Y. Apr. 2, 2018).

  B. Manipulation Class

  Lead Plaintiffs next move to certify the Manipulation Class, defined as "all persons and entities that sold or redeemed XIV Notes on or after 4:15 [p.m.] Eastern Time on February 5, 2018 . . . and who were damaged thereby." Pls. Mem. at 2. Lead Plaintiffs also move to appoint the Trust as class representative and Slarskey as class counsel for the Manipulation Class. *Id.* at 2. Defendants do not challenge, and the Court previously found, that the proposed Manipulation Class satisfies many of Rule 23's requirements, including numerosity, commonality, and superiority. *See* First Order at 22.

  The Court determines that the proposed Manipulation Class satisfies the requirements of Rule 23(a). First, based on the millions of XIV Notes issued by Credit Suisse, class members likely number in at least the thousands. *See* Am. Compl. ¶ 196. The numerosity requirement is, therefore, satisfied. *See In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 43 (S.D.N.Y. 2012). Second, the commonality requirement is satisfied because there are questions common to all class members, such as "whether the price of XIV Notes w[as] artificial during the [class period]," "whether manipulation occurred," and "whether damages exist." ECF No. 179 at 12; *see Gruber v. Gilbertson*, No. 16 Civ. 9727, 2019 WL 4439415, at *3 (S.D.N.Y. Sept. 17, 2019); *see also* First Order at 23. Third, the Trust's claims are typical because they "arise from the same series of events and find support in the same legal theories as the claims of all of the remaining class members." *Houser*, 28 F. Supp. 3d at 245. Specifically, the Trust and the remaining class

members all allege that Defendants' manipulative conduct deflated the value of XIV Notes.  Pls. Mem. at 13.

Fourth, Defendants argue that the adequacy requirement is not satisfied because the Trust is not "independent" from Lead Plaintiffs' counsel, Cohen Milstein, and "lacks basic knowledge about [this] litigation."  ECF No. 317 at 15.  Specifically, Defendants contend that, from 2018 to 2022, "the Trust regularly sought and received legal advice from Cohen Milstein," and that the Trust retained Slarskey "based [on] a referral from Cohen Milstein."  *Id.* at 9, 16.

A "key element in the determination of whether a [class representative's] interests are antagonistic to those of other members of the class is the relationship between the class representative and class counsel."  *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 155 (S.D.N.Y. 2010).  A plaintiff "is an inadequate representative where there is a close personal relationship between [the] plaintiff and class counsel."  *Gross v. GFI Grp., Inc.*, No. 14 Civ. 9438, 2017 WL 3668844, at *2 (S.D.N.Y. Aug. 23, 2017) (citation omitted).  "In such situations, the concern is that a class representative who is closely associated with [a] class attorney would allow settlement on terms less favorable to the interests of absent class members."  *Id.* (citation omitted).  The "touchstone for denial of class action status in cases involving relationships between class representatives and class counsel is that the plaintiff might have an interest in the legal fees that the attorney might ultimately seek."  *Id.* at *3 (quoting *Fischer v. Int'l Tel. & Tel. Corp.*, 72 F.R.D. 170, 173 (E.D.N.Y. 1976)).  By contrast, "hypothetical conflict[s] of interest," without more, are "too diaphanous to bar certification" on adequacy grounds.  *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 309 (S.D.N.Y. 2004).

That the Trust "sought and received legal advice from Cohen Milstein" from 2018 to 2022 and retained Slarskey "based [on] a referral from Cohen Milstein," without more, does not

compel the conclusion that there is a close personal relationship between the Trust and Cohen Milstein such that the Trust would agree to a settlement less favorable to the interests of absent class members. *Cf. In re IMAX*, 272 F.R.D. at 155–56 (denying certification when class representative and class counsel had been neighbors and friends for more than twenty years, class counsel had been class representative's client for seven years, and class representative received at least $10,000 a year in fees from class counsel); *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193, 199 (S.D.N.Y. 2015) (denying certification when class representative's "longtime family attorney and cousin by marriage" had an agreement with class counsel to receive 5% of any attorneys' fees). Nor do Defendants suggest that the Trust may have an interest in the legal fees that Cohen Milstein might seek. *See Gross*, 2017 WL 3668844, at *2. Additionally, Defendants' claim that the Trust "lacks basic knowledge about [this] litigation" is contradicted by the record, which reflects the Trust's understanding of this action and the events underlying it. *See* ECF No. 321 at 9–11; ECF No. 322-1 at 51:23–54:3, 203:18–204:13, 211:4– 212:6, 256:7–258:18, 279:7–280:18.

The adequacy requirement is satisfied because the Trust's interests align with those of the proposed Manipulation Class. *See Floyd v. City of New York*, 283 F.R.D. 153, 161 (S.D.N.Y. 2012). Because the Trust purchased its XIV Notes before January 29, 2018, and sold them on February 6, 2018, the Trust is a member of only the Manipulation Class. Pls. Mem. at 13; *see also* Second Order at 11 ("[T]he Trust is only a member of the Manipulation Class, and is positioned to represent the interests of that class."). As stated above, the Trust's claims and the proposed class' claims arise from the same misconduct and involve the same legal theories. Therefore, the Court concludes that the Trust will fairly and adequately protect the interests of the proposed Manipulation Class.

The Court next turns to the superiority and predominance requirements of Rule 23(b)(3). Defendants do not dispute superiority or offer any alternative means of adjudicating this action. The Court finds that a class action is superior to other methods of adjudicating this controversy because "the alternatives are either no recourse for thousands of stockholders or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 239 (S.D.N.Y. 2015) (citation omitted); *see also* First Order at 20.

As to predominance, Defendants argue that Lead Plaintiffs "are not entitled to a presumption of reliance and, without the presumption, individualized issues predominate over common issues." ECF No. 317 at 17. "Class certification is available . . . if [Lead Plaintiffs] can establish a class-wide presumption of reliance through the 'fraud on the market' theory." *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 177 (S.D.N.Y. 2012) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 241–42 (1988)). "The fraud on the market theory is based on the premise that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 394–95 (S.D.N.Y. 2010) (quoting *Basic*, 485 U.S. at 246).

Although "the fraud on the market theory has been used primarily for claims alleging false or misleading statements under Rule 10b-5(b), several courts have held that the presumption can also apply to claims of market manipulation." *Id.* at 394 (collecting cases). Indeed, "[t]he fraud on the market theory is especially applicable in the market manipulation context" because "[m]arket manipulation schemes which are intended to distort the price of a security, if successful, necessarily defraud investors who purchase the security in reliance on the

market's integrity." *Scone Invs., L.P. v. Am. Third Mkt. Corp.*, No. 97 Civ. 3802, 1998 WL

205338, at \*5 (S.D.N.Y. Apr. 28, 1998).  "Absent the fraud on the market theory, the parties

injured by such manipulative schemes could not plead the necessary element of reliance."  *Id.*

      "The presumption of reliance created by the fraud on the market theory can be rebutted

by '[a]ny showing that severs the link between the alleged misrepresentation and either the price

received (or paid) by the plaintiff, or [their] decision to trade at a fair market price.'"  *In re*

*Merrill Lynch*, 704 F. Supp. 2d at 394 (quoting *Basic*, 485 U.S. at 246).  "When information

'credibly enter[s] the market and dissipate[s] the effects of the misstatements,' for example, the

plaintiff has 'no direct or indirect connection with the fraud.'"  *Id.* (quoting *Basic*, 485 U.S. at

248–49); *see Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("A defendant may

rebut the presumption that its misrepresentations have affected the market price of its stock by

showing that the truth of the matter was already known.").  This is known as the "truth on the

market" doctrine.  *See In re Merrill Lynch*, 704 F. Supp. 2d at 394.  Under that doctrine, "a

misrepresentation is immaterial if the information is already known to the market because the

misrepresentation cannot then defraud the market."  *Id.* (quoting *Ganino*, 228 F.3d at 167).

      Conceding that the proposed Manipulation Class qualifies for the fraud on the market

presumption of reliance here, Defendants argue that they have rebutted the presumption because

information credibly entered the market and dissipated the effects of the misstatements.  ECF

No. 317 at 19 (citing *In re Merrill Lynch*, 704 F. Supp. 2d at 394).  Specifically, Defendants

contend that "the allegedly concealed facts were actually in the market" because Credit Suisse

disclosed that it would be issuing additional XIV Notes and that it could hedge its exposure by

buying VIX futures contracts, and there were articles suggesting that a volatility spike was

possible.  *Id.* at 19–20.

21

Defendants' truth on the market defense "is inappropriate on a motion for class certification." *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15 Civ. 1249, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017); *see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013) (stating that, although a defendant can rebut the fraud on the market presumption of reliance "by demonstrating that news of the truth credibly entered the market and dissipated the effects of prior misstatements," proof of that sort "is a matter for trial (and presumably also for a summary judgment motion)" (cleaned up) (citation omitted)). Defendants' argument, therefore, is best deferred for a ruling on the merits. *See In re Virtus Inv. Partners*, 2017 WL 2062985, at *5.

Defendants also argue that even if Lead Plaintiffs could demonstrate that they are entitled to a presumption of reliance, "individual questions of investor knowledge of publicly available information concerning the alleged misconduct would predominate over class-wide issues in the Manipulation Class." ECF No. 199 at 27–28. The Court rejected this argument in its First Order, where it concluded that "contrary to Defendants' contention, news stories and other publicly available information raise 'issues of knowledge, actual or constructive, subject to generalized proof,' and apply to the whole class." First Order at 21 (quoting *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 529 (S.D.N.Y. 2018)). Accordingly, the Court finds that questions of law and fact common to all class members predominate over any individualized questions.

Next, as to ascertainability, the Court asks only whether the class can be "defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 264. Under that standard, the proposed Manipulation Class, defined as all persons and entities that sold or redeemed the XIV Notes on or after 4:15 p.m. Eastern Time on February

5, 2018, and who were damaged thereby, satisfies the ascertainability requirement.

Lastly, Rule 23(c)(1)(B) requires a court certifying a class to appoint class counsel under Rule 23(g). Rule 23(g)(1)(A) requires a court to consider: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Trust's counsel, Slarskey, satisfies these criteria. Since joining this action, Slarskey has diligently reviewed pleadings and publicly available information in order to represent the interests of the Manipulation Class, and has had multiple discussions with Lead Counsel regarding the status of this action. ECF No. 300 at 18. Slarskey has extensive experience representing investors in securities class actions and complex commercial litigation matters. *See* ECF No. 346-5. And, its preparation of filings demonstrates that it has committed sufficient resources to the litigation. Therefore, Slarskey is able to fairly and adequately represent the interests of the proposed Manipulation Class.

Accordingly, Lead Plaintiffs' motions to certify the Manipulation Class, to appoint the Trust as representative of the Manipulation Class, and to appoint Slarskey as class counsel for the Manipulation Class are granted.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs' motions are GRANTED in part and DENIED in part. Specifically:

1. Lead Plaintiffs' motion to certify the Misrepresentation Class is DENIED with prejudice.

2. Lead Plaintiffs' motion to certify the Manipulation Class is GRANTED.

3. Lead Plaintiffs' motion to appoint the Trust as representative of the

Manipulation Class is GRANTED.

4. Lead Plaintiffs' motion to appoint Slarskey as class counsel for the Manipulation Class is GRANTED.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 344.

SO ORDERED.

Dated: February 11, 2025
         New York, New York

_____
ANALISA TORRES
United States District Judge