```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/5/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SET CAPITAL LLC, et al., Individually and on Behalf of All Others Similarly Situated,

                Plaintiffs,

-against-

CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS,

                Defendants.

18 Civ. 2268 (AT) (SN)

**ORDER**

ANALISA TORRES, District Judge:

    Lead Plaintiffs, Set Capital LLC, Stefan Jager, Aleksandr Gamburg, and Apollo Asset Limited,[1] bring this class action on behalf of themselves and purchasers, acquirers, sellers, and redeemers of VelocityShares Inverse VIX Short Term Exchange Traded Notes ("XIV Notes" or "Notes") against Defendants, Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse International (together, "Credit Suisse"), former Credit Suisse CEO Tidjane Thiam, and former CFO David R. Mathers,[2] alleging that Defendants executed a complex fraud to collapse the market for XIV Notes and asserting claims under §§ 9, 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, Rule 10b-5 promulgated thereunder, and §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a *et seq.* Operative Compl. at 1, ¶¶ 23–24, 26–35, 270–93, 306–23, ECF No. 190.

    Lead Plaintiffs move for an order permitting them to file a third amended complaint. ECF Nos. 283–84. Pursuant to an order of reference, ECF No. 11, the Honorable Sarah Netburn

---

[1] In December 2022, the Court granted Nikolay Drozhzhinov's request to withdraw as a lead plaintiff. ECF No. 224.

[2] In July 2021, Lead Plaintiffs voluntarily dismissed all claims against Janus Henderson Group PLC, Janus Index & Calculation Services LLC, and Janus Distributors LLC without prejudice. ECF No. 160.

issued an opinion and order (the "O&O") denying the motion, O&O at 12, ECF No. 333. Before the Court are Lead Plaintiffs' timely objections to the O&O. Objs., ECF No. 337; *see also* Resp., ECF No. 338; ECF Nos. 353–54, 360, 365–66. For the reasons stated below, the objections are overruled.

## BACKGROUND

This securities class action has a complex factual and procedural background. The Court presumes familiarity with the facts and procedural history of the action, which have been set forth in previous decisions, *see, e.g.*, *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 69–75 (2d Cir. 2021), and summarizes only those details relevant to this order.

I.     Factual Background

XIV Notes were exchange-traded notes ("ETNs") issued by Credit Suisse that increased in value when market volatility fell and decreased in value when market volatility rose. Operative Compl. ¶¶ 2, 56. In purchasing ETNs, investors pay money to the institution issuing the ETNs in return for a payment when the notes mature, the amount of which is derived from a market index. *Id*. ¶ 55. In the case of XIV Notes, their value was derived from the S&P 500 VIX Short-Term Futures Index (the "VIX Futures Index" or "Index"), an index that aggregates the value of VIX futures contracts,[3] which in turn track expected market volatility. *Id*. ¶¶ 2, 55–56. This means that when the market expects higher volatility, the VIX Futures Index increases; when the market expects lower volatility, the Index decreases. *Id*. ¶ 2, 51.

To allow investors to profit from low market volatility, the value of XIV Notes was inverse to the VIX Futures Index. *Id*. ¶ 2, 56. This inverse relationship between the Notes and

---

[3] A futures contract is an agreement to buy or sell a particular financial instrument on a later date at a predetermined price. Operative Compl. at ii.

2

the Index meant that as market volatility declined and the Index decreased, the Notes increased in value by an equivalent degree; as market volatility rose and the Index increased, the Notes dropped in value by an equivalent degree. *Id*.

Between 2010 and 2018, Credit Suisse issued more than 30 million XIV Notes. *Id*. ¶¶ 61, 63. The value of the Notes increased dramatically over this period. *Id*. ¶ 62. Because Credit Suisse's potential liability proportionately increased with the value of XIV Notes, it routinely offset, or "hedged," its exposure by taking short positions[4] on VIX futures contracts. *Id*. ¶¶ 65–66. This meant that a decrease in the VIX Futures Index would increase Credit Suisse's obligation to noteholders but would also allow Credit Suisse to profit from its short positions on VIX futures contracts, offsetting the higher redemption values of the Notes. *Id*. ¶ 66.

Although the value of XIV Notes increased on average from 2010 to 2018, three episodes of high market volatility caused the VIX Futures Index to spike and the value of XIV Notes to temporarily drop. *Id*. ¶ 69. During these episodes of high market volatility, Credit Suisse and other ETN issuers bought large quantities of VIX futures contracts after market close to continue hedging their positions. *Id*. ¶¶ 66–69. Each time they did so, there was insufficient liquidity in the VIX futures contracts market; that is, not enough VIX futures contracts to meet the high hedging demand from Credit Suisse and other ETN issuers. *Id*. ¶ 69. These post-market-close hedging activities contributed to a liquidity squeeze that made the price of VIX futures contracts soar even higher, which in turn caused the value of XIV Notes to temporarily plummet. *Id*. ¶¶ 69–74.

---

[4] A short position "is created when a trader sells a security first with the intention of repurchasing it or covering it later at a lower price. A trader may decide to short a security when they believe that the price of that security is likely to decrease in the near future." James Chen, *Short Position: Meaning, Overview, and Example*, Investopedia (updated May 29, 2024), https://www.investopedia.com/terms/s/short.asp/.

3

In January 2018, Credit Suisse issued over 16 million XIV Notes. *Id.* ¶ 63. It did so pursuant to a registration statement, prospectus, prospectus supplement, and pricing supplement (together, the "Offering Documents"). *Id.* ¶¶ 216, 296. The Offering Documents disclosed certain risks associated with investing in XIV Notes and Credit Suisse's intent to hedge its exposure to the Notes. *See id.* ¶¶ 299–305. The Offering Documents also advised investors of Credit Suisse's right to accelerate the Notes under certain circumstances; that is, to force XIV noteholders to redeem their Notes. *Id.* ¶¶ 73, 137. Credit Suisse could accelerate redemption of the Notes if a predefined "acceleration event" occurred, including if the Notes' "intraday indicative value" dropped eighty percent or more from the previous day's "closing indicative value." *Id.* ¶ 73. Janus Index & Calculation Services LLC ("JIC"), a calculation agent, was responsible for calculating and disseminating the intraday and closing indicative values. *Id.* ¶¶ 130, 132, 135. JIC computed the Notes' intraday indicative value using an automated formula based on the inverse of the VIX Futures Index and was required to publish this value every fifteen seconds on each trading day. *Id.* ¶¶ 140, 143. Investors trading their Notes in the secondary market relied on the Notes' intraday indicative value. *Id.* ¶ 135. The closing indicative value was also based on the inverse of the Index but was published only at the end of each trading day. *Id.* ¶¶ 140, 143. In the case of an acceleration event, Credit Suisse would pay noteholders based on the Notes' closing indicative value on the day Credit Suisse declared the acceleration event. *Id.* ¶¶ 137, 142.

On February 5, 2018, the S&P 500 Index dropped 4.1 percent. *Id.* ¶ 159. This increase in market volatility caused the VIX Futures Index to spike, decreasing the value of XIV Notes. *Id.* ¶¶ 160–61. Over the course of market trading on February 5, the intraday indicative value of the Notes dropped from approximately $108.37 to $72.59. *Id.* ¶¶ 157, 160–61. In response,

4

Credit Suisse purchased over 100,000 VIX futures contracts after market close. *Id.* ¶¶ 8, 162, 164–65. As with the prior episodes of high market volatility, these purchases contributed to a liquidity squeeze that caused the VIX Futures Index to skyrocket and the value of XIV Notes to plummet. *Id.* ¶ 9. By 4:09 p.m., the value of the Notes had dropped to $27. *Id.* ¶ 174.

From 4:09 p.m. to 5:09 p.m., the Notes' intraday indicative value was not updated every fifteen seconds and did not reflect the Notes' accurate value. *Id.* ¶¶ 174–77. Instead, the intraday indicative value updated sporadically, valuing the Notes at about $27 (the "Flatline Value"). *Id.* In reality, the Notes' value continued to drop, and it was not until 5:09 p.m. that the correct intraday indicative value of $4.22 was disseminated. *Id.* ¶ 174. During this hour, under the mistaken belief that an acceleration event had not occurred, investors purchased more than $700 million in XIV Notes at inflated prices. *Id.* ¶¶ 11, 193.

The next day, Credit Suisse declared an acceleration event based on the Notes' drop in value and ultimately redeemed the Notes at $5.99 per note. *Id.* ¶¶ 14, 199, 201. Lead Plaintiffs estimate that Credit Suisse made between $475 million and $542 million in profits by redeeming the Notes at that price, resulting in approximately $1.8 billion in losses to investors. *Id.* ¶¶ 197, 210.

## II. Procedural Background

### A. The Consolidated Class Action Complaint

This action was commenced in March 2018. *See generally* ECF No. 1. In August of that year, Lead Plaintiffs filed a consolidated class action complaint (the "CCAC"). CCAC, ECF No. 82. In the CCAC, Lead Plaintiffs allege that Credit Suisse (1) plotted a manipulative scheme to crash the XIV Note market (the "manipulation claim"); (2) misstated or omitted its knowledge and intent to engage in the manipulative scheme (the "misrepresentation claim"); and (3) failed

to correct the Flatline Value on February 5 (the "Flatline Value claim"), all in violation of securities laws. *See generally id.*

Lead Plaintiffs' manipulation claim stems from Credit Suisse's hedging activity. Specifically, the CCAC alleges that, after observing prior episodes of high market volatility, Credit Suisse discerned its ability to drive down the value of XIV Notes by purchasing VIX futures contracts after market close; that Credit Suisse then issued millions of Notes knowing that the next episode of high market volatility would allow it to manipulate the market and profit at investors' expense; and that Credit Suisse did, in fact, manipulate the market by collapsing the value of the Notes on February 5 through its own hedge trading—all at a substantial loss to investors. *See, e.g.*, CCAC ¶ 15 (alleging that Credit Suisse "protected itself through its hedging activities"); *id.* ¶ 218 (alleging that "Defendants planned to profit from their hedging and trading activity"); *id.* ¶ 225 (alleging that Credit Suisse concealed the effect of its hedging transactions); *id.* ¶ 227 (alleging that "Credit Suisse . . . knew that, during the next VIX volatility spike, [its] hedging activities would" materially impact XIV Notes); *id.* ¶ 228 (alleging that Defendants "misrepresented and failed to disclose the . . . adverse effects of Credit Suisse's hedging activities").

In November 2018, Defendants moved to dismiss the CCAC for failure to state a claim. ECF Nos. 101, 105. Pursuant to an order of reference, ECF No. 113, Judge Netburn issued a report (the "R&R") recommending that the CCAC be dismissed in its entirety, R&R at 2, ECF No. 124. The Court adopted the R&R in full and dismissed the CCAC in September 2019. ECF No. 135. Lead Plaintiffs appealed the Court's order. ECF No. 139.

B. The Second Circuit's Decision

On appeal, the Second Circuit affirmed in part and vacated and remanded in part. ECF No. 143. As relevant here, the Second Circuit vacated the Court's dismissal of the manipulation and misrepresentation claims and affirmed the Court's dismissal of the Flatline Value claim. *See generally id.*

Critical to the Second Circuit's vacatur of the manipulation claim dismissal was the fact that the claim focuses on Credit Suisse's hedging activity. The court explained that "the [CCAC] alleges more than routine hedging activity: It alleges that Credit Suisse flooded the market with millions of additional XIV Notes for the very purpose of enhancing the impact of its hedging trades and collapsing the market for the [N]otes." *Id.* at 19–20; *see id.* at 21 ("[T]he [CCAC] plausibly alleges that Credit Suisse . . . knew that, on days when market volatility increased, Credit Suisse's hedging trades would cause a spike in the price for VIX futures contracts and an equally significant drop in the price for XIV Notes."); *id.* at 22–23 ("[T]he [CCAC] invites a reasonable inference that Credit Suisse increased the volume of XIV Notes for a manipulative purpose—specifically, to ensure that Credit Suisse's hedging trades would destroy the value of XIV Notes during the next volatility spike so that Credit Suisse could profit by declaring an Acceleration Event.").

In affirming the Court's dismissal of the Flatline Value claim, the Second Circuit held that Lead Plaintiffs failed to allege scienter. *Id.* at 29. First, the court noted that the CCAC does not allege that Credit Suisse had a motive or opportunity to falsify the Flatline Value. *Id.* at 29–30. The court then stated that the CCAC also fails to allege scienter based on strong circumstantial evidence of conscious misbehavior or recklessness on Credit Suisse's part. *Id.* at 30. In coming to this conclusion, the Second Circuit rejected Lead Plaintiffs' argument that

7

Credit Suisse was required to monitor the VIX Futures Index and compare it to the value of its underlying inputs, *i.e.*, the real-time prices for VIX futures contracts, which would then have allowed Credit Suisse to observe the Flatline Value. *Id*. The court explained, first, that Credit Suisse was "under no obligation to calculate or monitor the intraday indicative value" because JIC, not Credit Suisse, was responsible for computing and disseminating the value. *Id*. at 30–31. Second, as to JIC, the court stated that the CCAC does not plausibly allege that JIC knew that the intraday indicative value had flatlined because JIC calculated the value using an automated formula based on the Index, and the CCAC did not point to specific reports or statements that JIC had access to real-time pricing data for VIX futures contracts or that it monitored the Index for accuracy. *Id*. at 31. The Second Circuit explained that because JIC asserted in the Offering Document that it would rely on the VIX Futures Index, not the VIX futures contracts themselves, "[i]t would be unreasonable to infer that, despite this plain effort to reduce JIC's administrative burden, JIC nonetheless devoted resources to calculating a redundant pricing index for VIX futures contracts." *Id*.

    C. Post-Remand Proceedings

Upon remand, the parties engaged in discovery before Judge Netburn for over a year. *See* ECF Nos. 166 (July 2021 case management plan), 175 (April 2022 first amended case management plan), 188 (August 2022 second amended case management plan). In August 2022, Lead Plaintiffs filed their amended CCAC (the "Operative Complaint"). *See generally* Operative Compl. Again, the Operative Complaint's manipulation claim centers solely on Credit Suisse's hedging activity. *See, e.g.*, *id*. ¶¶ 15, 218, 220, 225.

From August 2022 to April 2023, the parties continued to engage in discovery. *See* ECF Nos. 219 (December 2022 third amended case management plan), 259 (March 2023 fourth

amended case management plan). In April 2023, Judge Netburn extended, for the fifth and last time, the deadline for fact discovery to April 19, 2023. *See* ECF No. 269 at 1. On April 28, Lead Plaintiffs filed their motion to amend the Operative Complaint. ECF No. 283.

First, Lead Plaintiffs move to add a new theory of liability regarding how Credit Suisse manipulated the market—not just through its own hedging but also through its lending practices and the acts of third parties (the "proposed lending allegations"). *See generally* Proposed Third Amended Complaint ("PTAC"), ECF No. 287-2. Specifically, Lead Plaintiffs seek to add allegations that Credit Suisse devised a plan to lend XIV Notes to XIV short-sellers that Credit Suisse knew would collapse the market for the Notes during the next volatility spike; that Credit Suisse then engaged in "a ferocious effort . . . [to] immediately lend out as much XIV as possible;" that Credit Suisse had "direct insight into who [the short-sellers] were, and what their incentives were;" and that, as planned, the short-sellers destroyed the value of XIV Notes on February 5 through their hedging activity. *Id*. ¶¶ 140–160. Lead Plaintiffs also move to allege that Credit Suisse obscured its plan to lend XIV Notes to short-sellers on a massive scale knowing that the short-sellers would destroy the market for XIV Notes during the next volatility spike. *See, e.g.*, *id*. ¶¶ 146, 281. In other words, Lead Plaintiffs now want to allege not only that Credit Suisse collapsed XIV Notes through its own hedging activity, but also that Credit Suisse "pack[ed] the market full of short-sellers it knew would collapse [XIV Notes] at the [next] volatility spike." *Id*. ¶ 160.

Second, Lead Plaintiffs move to, in their words, "add[] evidence sufficient to revive" the Flatline Value claim (the "proposed Flatline Value allegations"). ECF No. 285 at 2. Specifically, Lead Plaintiffs want to add allegations that Credit Suisse traders computed an independent calculation of the Notes' intraday indicative value by calculating the Notes' net

9

asset value; that the traders used this calculation as an "internal check;" that the traders regularly used this calculation for "trading and pricing, including on February 5;" and that the traders also "had access to Bloomberg terminals which also calculated a continuous and accurate market price for XIV [Notes] and which [the traders] continuously monitored." PTAC ¶¶ 235–242.

   D. The O&O

In January 2024, Judge Netburn issued the O&O denying Lead Plaintiffs leave to amend. O&O at 12. First, Judge Netburn concluded that the proposed lending allegations will cause Defendants undue prejudice. O&O at 6. She explained that Lead Plaintiffs seek to "redirect the focus of the manipulation to the acts of third parties" by alleging "that Credit Suisse engaged in *lending* practices to third-party borrowers, knowing that *those third parties* would need to hedge their investments at such great volume and would do so at the next volatility spike to the detriment of the value of" XIV Notes. *Id*. at 7 (emphases in original). Judge Netburn determined that undertaking a defense to this new third-party theory would "consume months of additional discovery and cost hundreds of thousands of dollars" because Defendants "would want to identify approximately 100 market players and obtain third-party document and deposition discovery relating to their market positions, incentives, trading and hedging strategies, knowledge about a potential liquidity crunch, and trading and hedging activities on February 5." *Id*.

Judge Netburn also reasoned that "it is unduly prejudicial to Defendants to face a significantly new theory of liability after it has argued for years—to [Lead] Plaintiffs and the [Second Circuit]—that the original theory was built on a house of cards." *Id*. at 7–8. She recounted that, in July 2021, Defendants produced discovery materials seeking to establish that Lead Plaintiffs' manipulation theory, which focuses on Credit Suisse's own hedging, is incorrect

10

because, according to Defendants, "Credit Suisse was fully hedged by the close of business on February 4."[5] *Id*. at 8. Lead Plaintiffs, however, pressed forward with their manipulation claim and waited until about November 2022 to explore Credit Suisse's lending practices. *Id*. Judge Netburn concluded that, although the parties dispute whether Defendants "could have predicted the direction [Lead] Plaintiffs are now heading, it is unreasonable to place the burden on a defendant in a securities fraud case to guess at the theory of liability." *Id*.

Next, Judge Netburn turned to the proposed Flatline Value allegations, finding that they do not remedy the deficiencies identified by the Second Circuit and are thus futile. *Id*. at 9–10. She explained that Lead Plaintiffs' allegations that Credit Suisse traders maintained an internal calculation of the Notes' intraday indicative value fell short of pleading that "Defendants monitored the *VIX Futures Index* for accuracy or that Defendants created a redundant internal *VIX Futures Index*." *Id*. at 9 (emphases in original).

## DISCUSSION

I. Legal Standards

   A. Rule 72

Federal Rule of Civil Procedure 72(a) governs a district judge's review of a magistrate judge's order on nondispositive matters. Under the Rule, a district court "may adopt the magistrate judge's findings and conclusions as long as the factual and legal bases supporting the ruling are not clearly erroneous or contrary to law." *Pegoraro v. Marrero*, 281 F.R.D. 122, 125 (S.D.N.Y. 2012); *see* Fed. R. Civ. P. 72(a). A motion to amend the complaint is nondispositive and is thus reviewed under the clearly erroneous or contrary-to-law standards.[6] *See Xie v.*

---

[5] The Court expresses no opinion on the merits of Lead Plaintiffs' claims.

[6] Lead Plaintiffs argue that certain of the O&O's conclusions should be reviewed *de novo* because they foreclose potential claims. *See* Objs. at 6, 15–17. Not so. "[T]he weight of authority within this Circuit classifies a motion to amend a pleading as non-dispositive." *Trombetta v. Novocin*, No. 18 Civ. 993, 2021 WL 6052198, at *6 (S.D.N.Y.

11

*JPMorgan Chase Short-Term Disability Plan*, No. 15 Civ. 4546, 2018 WL 501605, at *1 (S.D.N.Y. Jan. 19, 2018).

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). A finding is contrary to law when it "fails to apply or misapplies relevant statutes, case law or rules of procedure." *Winfield v. City of New York*, No. 15 Civ. 5236, 2017 WL 5054727, at *2 (S.D.N.Y. Nov. 2, 2017) (citation omitted).

    B.  Rule 15

Under Federal Rule of Civil Procedure 15, a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts, however, have "discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).

In deciding whether undue prejudice exists, courts evaluate, *inter alia*, whether the amendment would (1) "require the opponent to expend significant additional resources to conduct discovery and prepare for trial" or (2) "significantly delay the resolution of the dispute." *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 454 (S.D.N.Y. 2016) (citation omitted). "[P]rejudice occurs if the opposing party would experience undue difficulty in defending a lawsuit because of a change in tactics or theories on the part of the movant," and "court[s] [are] more likely to find an amendment prejudicial if discovery has closed." *Id*. at 454–55 (citations

---

Dec. 21, 2021) (citation omitted) (collecting cases); *see Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007) (classifying "a motion to amend the complaint" as a "nondispositive motion[]"). Accordingly, courts in this District "have consistently applied the 'clearly erroneous' standard to evaluate the denial of leave to amend by a magistrate judge, regardless of whether the denial foreclosed potential claims." *Xie v. JPMorgan Chase Short-Term Disability Plan*, No. 15 Civ. 4546, 2018 WL 501605, at *1 (S.D.N.Y. Jan. 19, 2018) (collecting cases).

omitted). The nonmovant "bears the burden of demonstrating that substantial prejudice would result were the proposed amendment to be granted." *Id*. at 454 (citation omitted).

Additionally, leave to amend need not be granted when "the proposed amendment would be futile." *Id*. at 456 (alteration adopted) (citation omitted). "To determine whether a proposed pleading is futile, courts analyze whether it would withstand a motion to dismiss." *Id*. "Accordingly, the plaintiff must plead sufficient facts to state a claim to relief that is plausible on its face." *Id*. (citation omitted).

II. Lead Plaintiffs' Objections

A. Proposed Lending Allegations

First, Lead Plaintiffs object to the O&O's conclusion that the proposed lending allegations will unduly prejudice Defendants, arguing that the O&O is based on an erroneous understanding of the allegations and that any additional discovery would be modest.[7] *See* Objs. at 7–14.

The O&O's finding that the proposed lending allegations will cause undue prejudice to Defendants is neither clearly erroneous nor contrary to law. Although Lead Plaintiffs frame the allegations as merely "add[ing] factual detail" to their manipulation claim, Objs. at 1, 7–11, the allegations comprise a new theory of liability. For more than four years, Lead Plaintiffs have argued to this Court and before the Second Circuit that Credit Suisse crafted a manipulative scheme to crash the Notes through its own hedging activity. The proposed lending allegations shift the focus of liability from Credit Suisse's hedging practices to its lending practices and

---

[7] Lead Plaintiffs also argue that "denying leave to amend on the basis that [Lead] Plaintiffs should have relied on Defendants' claims [that the original manipulation theory is incorrect is] erroneous and contrary to law." Objs. at 13. This argument mischaracterizes the O&O, which denied leave to amend not because Lead Plaintiffs should have relied on Defendants' claims, but because the amendments would require Defendants to expend significant additional resources for discovery and delay resolution of this action. *See* O&O at 6–9.

13

third-party hedging by claiming that Credit Suisse "intentionally pumped [the market] full of [XIV] short-sellers" that "would see to it that XIV [Notes were] pushed to the point of collapse." PTAC ¶ 151. These allegations don't just "add factual detail" to the alleged manipulative scheme; they add a different claim. *See Agerbrink*, 155 F. Supp. 3d at 454–55.

Clinging to the argument that the proposed lending allegations add mere detail, Lead Plaintiffs contend that "additional discovery would be modest" because discovery regarding the short-sellers' identities or intent is irrelevant to the claims against Credit Suisse, and they further state that Lead Plaintiffs "do not object to conducting additional relevant discovery." Objs. at 7–10. First, that Lead Plaintiffs consent to additional discovery is irrelevant. *See Agerbrink*, 155 F. Supp. 3d at 454 (stating that the Court's inquiry is whether the opponent, not the movant, would be required to expend significant additional resources to conduct discovery). Second, it is not for Lead Plaintiffs to determine the scope of the discovery that Defendants would require to defend the allegations against them. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17 Civ. 4576, 2022 WL 2162992, at *3 (S.D.N.Y. May 31, 2022) ("Under the Federal Rules of Civil Procedure, however, it is not generally up to one party to determine what discovery another party needs." (quotation marks omitted)). Because the proposed lending allegations shift the focus to the acts of third parties, the Court agrees with the O&O that Defendants would be entitled to mount a defense based on the trading behavior and intent of those third parties. *See* O&O at 7. Such defense would require reopening discovery, consume months of additional litigation, and cost hundreds of thousands of dollars. *Id*. (stating that Defendants would want to, *inter alia*, "identify approximately 100 market players and obtain third-party document and deposition discovery relating to their market positions, incentives, trading and hedging strategies,

knowledge about a potential liquidity crunch, and trading and hedging activities on February 5"); *cf. Agerbrink*, 155 F. Supp. 3d at 454–55.

Lead Plaintiffs concede that they began exploring Credit Suisse's lending practices as early as October 2021. Objs. at 9–10. Yet they waited a year and a half to seek leave to amend. In the interim, they conducted extensive discovery, amended the CCAC, and moved to certify three proposed classes, all while relying only on their original manipulation theory. Now, Lead Plaintiffs move to add a new theory of liability five years after this action was filed and more than a year after they began exploring the proposed lending allegations. The Court, therefore, agrees with the O&O that it is unduly prejudicial to "require [Defendants] to spend years of time and millions of dollars defending against one claim, only to face an entirely new one."[8] O&O at 8.

      B.  Proposed Flatline Value Allegations

Next, Lead Plaintiffs object to the O&O's denial of leave to file the proposed Flatline Value allegations on futility grounds, arguing that the PTAC "pleads precisely [the] facts" that the Second Circuit found lacking. Objs. at 18.

As described above, in dismissing the Flatline Value claim under Rule 12(b)(6), the Second Circuit concluded that the CCAC did not plausibly allege the following: that Credit Suisse had a motive or opportunity to falsify the Flatline Value; that Credit Suisse was under an obligation to calculate or monitor the intraday indicative value; or that, instead of relying on the VIX Futures Index, Defendants monitored the Index's pricing data and calculated a redundant

---

[8] Lead Plaintiffs object to the O&O's exclusion of their proposed allegations concerning Credit Suisse's misrepresentation of its lending practices, arguing that the allegations implicate no additional discovery. Objs. at 15–17. Lead Plaintiffs' effort to differentiate between market manipulation and misrepresentation in this context fails. Their allegations that Credit Suisse misrepresented its lending practices rest on the premise that Credit Suisse had reason to believe that lending to other short-sellers would eventually crash the market for XIV Notes. For the reasons stated above, this new theory of liability will unduly prejudice Defendants.

15

pricing index for VIX futures contracts in order to verify the accuracy of the Index. *See* ECF No. 143 at 29–32.

In their proposed Flatline Value allegations, Lead Plaintiffs do not allege that Credit Suisse had a motive or opportunity to falsify the Flatline Value, or that it was under an obligation to calculate or monitor the intraday indicative value. Instead, Lead Plaintiffs allege that certain Credit Suisse traders independently computed the Notes' intraday indicative value by calculating the Notes' net asset value and that traders also had access to Bloomberg terminals that calculated a continuous and accurate price for XIV Notes. *See* PTAC ¶¶ 235–242. Lead Plaintiffs, however, do not address the deficiencies identified by the Second Circuit: They still fail to allege that Credit Suisse monitored the VIX Futures Index's pricing data and calculated a redundant pricing index for VIX futures contracts to verify the accuracy of the Index. Accordingly, the O&O's conclusion that the proposed Flatline Value allegations are futile because they do not plead that Credit Suisse "monitored the *VIX Futures Index* for accuracy" or "created a redundant internal *VIX Futures Index*" is neither clearly erroneous nor contrary to law. *See* O&O at 9.[9]

---

[9] The parties filed supplemental briefing addressing the impact of Defendants' late production of certain discovery materials on Lead Plaintiffs' objections to the O&O. *See* ECF Nos. 353–54, 360, 365–66. In October 2024, after document production and fact discovery had closed, Defendants produced responsive documents that they had not previously produced due to an inadvertent administrative issue with Bloomberg's data systems. ECF No. 360 at 3. Although Lead Plaintiffs argue that these new documents support the proposed allegations, *id*. at 6–8, they fail to address how the documents bear on the O&O's findings of undue prejudice and futility. Accordingly, the parties' supplemental submissions do not change the Court's analysis.

**CONCLUSION**

For the reasons stated above, Lead Plaintiffs' objections to the O&O are OVERRULED.

SO ORDERED.

Dated: May 5, 2025
 New York, New York

_____
ANALISA TORRES
United States District Judge