**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SET CAPITAL LLC, et al.,

        Plaintiffs,

     v.

CREDIT SUISSE GROUP AG, et al.,

        Defendants.

1:18-cv-02268 (AT) (SN)

**ORAL ARGUMENT**
**REQUESTED**

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED THIRD**
**AMENDED CLASS ACTION COMPLAINT**

**CAHILL GORDON & REINDEL LLP**
Herbert S. Washer
Tammy L. Roy
Edward N. Moss
Ivan Torres
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
Facsimile: (212) 269-5420
hwasher@cahill.com
troy@cahill.com
emoss@cahill.com
itorres@cahill.com

*Attorneys for Credit Suisse Group AG,*
*Credit Suisse AG, Credit Suisse*
*International, Tidjane Thiam, and David*
*R. Mathers*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

LEGAL STANDARD............................................................................................................... 3

THE ALLEGATIONS OF THE THIRD AMENDED COMPLAINT........................................... 4

ARGUMENT ......................................................................................................................... 7

I.      PLAINTIFFS NO LONGER PLEAD A REQUISITE WRONGFUL ACT ...................... 7

        A.      Plaintiffs Do Not Plead an Actionable Misstatement ............................................ 8

        B.      Plaintiffs Do Not Plead a Manipulative Act .......................................................... 12

II.     PLAINTIFFS NO LONGER ADEQUATELY PLEAD SCIENTER ............................... 13

        A.      Plaintiffs Do Not Plead Motive and Opportunity .................................................. 13

        B.      Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness........................ 17

III.    PLAINTIFFS FAIL TO ADEQUATELY ALLEGE LOSS CAUSATION..................... 18

IV.     PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROLLING PERSON
        LIABILITY ................................................................................................................. 23

CONCLUSION...................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*Abramson* v. *NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)...................................................................................................19

*In re American Realty Cap. Props., Inc. Litig.*,
2016 WL 11110435 (S.D.N.Y. Aug. 5, 2016).........................................................................23

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)..................................................................................................................3

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)............................................................................................12, 13, 18

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007).............................................................................................................3, 22

*Blackmoss Invs. Inc.* v. *ACA Cap. Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ...........................................................................18

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
750 F.3d 227 (2d Cir. 2014).....................................................................................................19

*Cent. States, Se. and Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*,
543 F. App'x 72 (2d Cir. 2013) ...........................................................................................20, 21

*In re Duane Reade Inc. Sec. Litig.*,
2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff* v.
*Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004)...............................................................15

*Dura Pharms., Inc.* v. *Broudo*,
544 U.S. 336 (2005).................................................................................................................18

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)......................................................................................................15

*In re Fannie Mae 2008 Sec. Litig.*,
742 F. Supp. 2d 382 (S.D.N.Y. 2010).......................................................................................21

*Gamma Traders - I LLC* v. *Merrill Lynch Commodities, Inc.*,
41 F.4th 71 (2d Cir. 2022) .......................................................................................................22

*Ganino* v. *Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)......................................................................................................15

*Garnett* v. *RLX Tech. Inc.*,
    632 F. Supp. 3d 574 (S.D.N.Y. 2022), *aff'd sub nom. Tseng* v. *De Vries*, 2023
    WL 8073087 (2d Cir. Nov. 21, 2023).......................................................................................11

*Gomez* v. *Credit Suisse AG*,
    2023 WL 2744415 (S.D.N.Y. Mar. 31, 2023), *aff'd*, 2024 WL 506240 (2d Cir.
    Feb. 9, 2024) ............................................................................................................................11

*Healthcare Fin. Grp., Inc.* v. *Bank Leumi USA*,
    669 F. Supp. 2d 344 (S.D.N.Y. 2009)......................................................................................21

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005)................................................................................16, 17

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)................................................................................................13, 16

*Lentell* v. *Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)................................................................................................19, 21

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................................................................21

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    758 F. Supp. 2d 264 (S.D.N.Y. 2010)................................................................................19, 20

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)......................................................................................16

*Monroe Cnty. Emps. Ret. Sys.* v. *YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014)........................................................................................10

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)........................................................................................................8

*Olkey* v. *Hyperion 1999 Term Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996)......................................................................................................10, 11

*Onel* v. *Top Ships, Inc.*,
    806 F. App'x 64 (2d Cir. 2020) ................................................................................................13

*In re ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013)........................................................................................................10

*Rice as Tr. of Richard E. and Melinda Rice Revocable Fam. Tr. 5/9/90* v.
    *Intercept Pharms., Inc.*,
    2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) .....................................................................15, 16

iii

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)..................................................................................23

*Ross* v. *Lloyds Banking Grp., PLC*,
    546 F. App'x 5 (2d Cir. 2013) ..............................................................................23

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000)....................................................................................15

*Salim* v. *Mobile Telesystems PJSC*,
    2022 WL 966903 (2d Cir. Mar. 31, 2022) ...........................................................13

*Salvani* v. *ADVFN PLC*,
    50 F. Supp. 3d 459 (S.D.N.Y. 2014), *aff'd sub nom. Salvani* v.
    *InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015) .......................................13

*Salvani* v. *InvestorsHub.com, Inc.*,
    628 F. App'x 784 (2d Cir. 2015) .............................................................................8

*Set Cap. LLC* v. *Credit Suisse Grp. AG*,
    2019 WL 3940641 (S.D.N.Y. Aug. 16, 2019)................................................... *passim*

*Set Cap. LLC* v. *Credit Suisse Grp. AG*,
    2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019)................................................... *passim*

*Set Cap. LLC* v. *Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)................................................................................ *passim*

*Sharette* v. *Credit Suisse Int'l.*,
    237 F. Supp. 3d 60 (S.D.N.Y. 2015)....................................................................16

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)......................................................................................8

*South Cherry St., LLC* v. *Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)....................................................................................15

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).............................................................................................13

*Tera Grp.* v. *Citigroup, Inc.*,
    2023 WL 5211252 (S.D.N.Y. Aug. 14, 2023), *aff'd*, 2024 WL 4501967 (2d
    Cir. Oct. 16, 2024) .................................................................................................7

*U.S. Bank Nat'l Ass'n as Tr. to Bank of Am., N.A.* v. *KeyBank, Nat'l Ass'n*,
    2023 WL 2745210 (S.D.N.Y. Mar. 31, 2023) .....................................................22

*Wilson* v. *Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011)............................................................................10, 13

*Xu* v. *Direxion Shares ETF Tr.*,
    2023 WL 5509151 (S.D.N.Y. Aug. 25, 2023)..............................................................8

**Statutes**

15 U.S.C. § 78u-4 ................................................................................................................3

**Other Authorities**

Fed. R. Civ. P. 9(b) .............................................................................................................3

Fed. R. Civ. P. 12(b) ...........................................................................................................1

Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International (together, "Credit Suisse"), Tidjane Thiam, and David R. Mathers (together with Thiam, the "Individual Defendants") (collectively, the "Defendants") respectfully submit this memorandum in support of their motion to dismiss Plaintiffs' Consolidated Third Amended Class Action Complaint (the "Complaint" or the "TAC") (ECF No. 389) pursuant to Federal Rule of Civil Procedure 12(b).[1]

## PRELIMINARY STATEMENT

Over six years ago, this Court dismissed Plaintiffs' entire case for failure to state a claim, properly concluding that Plaintiffs had not pleaded any plausible theory that could lead to recovery. Several years later, the Second Circuit reversed that decision based on certain allegations that Defendants have long maintained are false, but that the Second Circuit felt compelled to credit. After years of burdensome discovery, Plaintiffs now concede the falsity of these key allegations and have removed them from the Third Amended Complaint. What remains, however, does not plead a plausible claim and, as a result, this case should be dismissed again with prejudice.

In overturning this Court's dismissal, the Second Circuit relied on Plaintiffs' allegations that Credit Suisse engaged in a scheme to "create[] conditions in which it knew that its hedging trades would destroy the value of XIV Notes during the next volatility spike" and then "executed on [this] alleged scheme" by purchasing "***more than 105,000 VIX futures contracts***" during a volatility spike on February 5, 2018, thereby "***caus[ing]*** the price of XIV Notes to plummet by more than 96 percent," and resulting in "***hundreds of millions of dollars***" in profits to Credit Suisse. *Set Cap. LLC* v. *Credit Suisse Grp. AG*, 996 F.3d 64, 68, 77 (2d Cir. 2021). The Second

---

[1] Unless otherwise noted, emphasis is added and internal citations and quotations are omitted.

Circuit held that "[i]f proven at trial, this alleged conduct was manipulative under [Second Circuit] precedents." *Id.* at 77.

As discovery has confirmed, and Plaintiffs now concede, the fundamental allegations on which the Second Circuit relied in finding an alleged manipulative scheme are false. Credit Suisse did not create conditions in which it knew that its hedging trades would materially impact, let alone "destroy," the value of XIV Notes during the next volatility spike. Credit Suisse did not purchase "more than 105,000 VIX futures contracts" on February 5, 2018 or any other meaningful amount of VIX futures contracts that could have caused the price of XIV Notes to plummet. And Credit Suisse did not earn "hundreds of millions of dollars" in connection with its XIV-related positions.

Rather, as Plaintiffs' TAC now pleads, on February 5, 2018, Credit Suisse simply adjusted its pre-existing hedging position by purchasing "thousands" of VIX futures contracts—a mere fraction of the roughly 105,000 VIX futures contracts that Plaintiffs originally pled Credit Suisse had purchased. And, as Plaintiffs now acknowledge in the TAC, Credit Suisse made only an incidental profit of "millions" of dollars on its hedges—not the "hundreds of millions of dollars" that Plaintiffs originally pled that Credit Suisse had made. There is nothing manipulative, misleading or artificial about trading in order to rebalance a hedge consistent with public disclosures, and it is simply implausible to allege that the senior-most executives of one of the largest banks in the world hatched a criminal scheme to destroy Credit Suisse's own product in order to earn a few million dollars.

As the Second Circuit has recognized repeatedly—including in this case—"[d]eception is the gravamen of a claim for market manipulation, and the market is not misled when a transaction's terms are fully disclosed." *Set Cap.*, 996 F.3d at 76–77. Here, the fact that Credit Suisse would engage in limited daily hedging, and that such hedging could result in profit for Credit Suisse, was

fully disclosed to investors in the XIV offering materials.  Thus, the TAC now pleads that, on February 5, 2018—a day of unprecedented market activity—Credit Suisse traded in a manner that was entirely consistent with its public disclosures.  In other words, stripped of the now-admittedly inaccurate allegations of Plaintiffs' prior pleadings, the TAC pleads that Credit Suisse traded exactly as it told investors it would.  Such allegations do not state a claim under the federal securities laws.  Because Plaintiffs no longer plausibly plead a claim for misrepresentation or manipulation, the TAC should be dismissed with prejudice.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  If the plaintiffs' allegations "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).

Federal securities fraud claims must also satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and of the Private Securities Litigation Reform Act ("PSLRA").  Rule 9(b) requires Plaintiffs to set forth "with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b).  The PSLRA similarly compels Plaintiffs to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  With regard to scienter, the PSLRA also requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).

3

**THE ALLEGATIONS OF THE THIRD AMENDED COMPLAINT**

Plaintiffs' Third Amended Complaint includes changes that materially weaken Plaintiffs' claims:

*First*, the TAC no longer pleads that Credit Suisse drove down the price of XIV Notes by purchasing "more than 105,000 VIX futures contracts" during the volatility spike on February 5, 2018; rather, it alleges Credit Suisse purchased "thousands" of these contracts during that time period.  (TAC ¶¶ 8, 160, 162).  These much more limited purchases are entirely consistent with Credit Suisse's disclosed practice of rebalancing pre-existing hedges to account for daily price movements.

In every iteration of Plaintiffs' complaints, Plaintiffs have acknowledged—as disclosed in the relevant offering documents—that Credit Suisse hedged its exposure on the XIV notes by purchasing VIX futures contracts.  As this Court described it:

> [The] 'rise in the XIV notes' value affected Credit Suisse's outstanding obligations to note holders.  To hedge that obligation, Credit Suisse took a short position on the VIX futures underlying that Index.  Thus, when the VIX Futures Index fell, Credit Suisse made money from its short positions, which offset the ensuing higher prices for XIV notes—and thus higher redemption values—Credit Suisse was required to pay to investors seeking to redeem their notes.  To maintain a balanced position, Credit Suisse adjusted its VIX futures portfolio at the end of each trading day.

*Set Cap. LLC* v. *Credit Suisse Grp. AG*, 2019 WL 3940641, at *3 (S.D.N.Y. Aug. 16, 2019) ("*XIV I*"), *report and recommendation adopted*, 2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019), *aff'd in part, vacated in part*, 996 F.3d 64 (2d Cir. 2021).

Plaintiffs' prior complaints, however, falsely alleged that Credit Suisse's hedging trades on February 5, 2018 were markedly different from the daily re-balancing that Credit Suisse had disclosed it would undertake.  Specifically, Plaintiffs previously alleged that Credit Suisse purchased approximately 105,000 VIX futures contracts on February 5, 2018 during the period of 4:00–4:15 p.m., which Plaintiffs alleged was "roughly one quarter of the entire VIX futures

4

market[.]" (ECF No. 190 ("SAC") ¶¶ 8, 164). Plaintiffs alleged that this enormous volume of trading activity "caused the price of XIV Notes to plummet by more than 96 percent" and constituted an intentional act designed to manipulate the price of XIV notes. *Set Cap.*, 996 F.3d at 77.

With the TAC, Plaintiffs now acknowledge that Credit Suisse's hedging trades on February 5, 2018 were much more limited, involving "thousands" of VIX futures contracts during the relevant time period. (TAC ¶¶ 8, 160, 162). In other words, rather than alleging Credit Suisse's trading activity represented roughly 25% of the entire VIX futures market, Plaintiffs now allege that Credit Suisse's activity represented a mere fraction of that market.[2]

*Second*, the Third Amended Complaint no longer pleads that Credit Suisse earned "hundreds of millions of dollars" as a result of the purported scheme. (SAC ¶¶ 1,15, 109, 162, 166, 210, 251); *see also id.* ¶ 195 (previously alleging that a "very conservative estimate" of Credit Suisse's supposed profits from the alleged scheme was $475 million). The TAC now recognizes, as it must, that Credit Suisse made only "millions" on its XIV-related positions—again, a mere fraction of what Plaintiffs previously alleged. (TAC ¶¶ 1, 15, 107, 153, 160, 164, 207, 248).

*Third*, consistent with these significant changes, Plaintiffs no longer allege that Credit Suisse "dr[ove] up the price of VIX futures and intentionally destroy[ed] the value of XIV." (SAC ¶ 8). Acknowledging that Credit Suisse did not trade anywhere close to the 105,474 VIX futures contracts previously alleged, Plaintiffs allege only that Credit Suisse's purchase of "thousands" of

---

[2] Although discovery is now complete, and Plaintiffs know, and could have alleged, the exact number of VIX futures contracts Credit Suisse traded during the relevant time period, the TAC only vaguely alleges that Credit Suisse traded "thousands" of VIX futures contracts. (TAC ¶¶ 8, 160, 162). But, to put this in context, even if "thousands" meant 10,000, that would amount to approximately only 2% of the VIX futures market.

VIX futures contracts, purportedly "contribut[ed] to the destruction of the value of XIV." (TAC ¶ 8).

These changes dramatically affect the viability of Plaintiffs' claims. Indeed, the TAC's factual allegations concerning Credit Suisse's alleged conduct on February 5, 2018 can only plausibly be described as Credit Suisse "adjust[ing] its VIX futures portfolio at the end of each trading day" to "maintain a balanced position," just as this Court previously recognized. *XIV I*, 2019 WL 3940641, at *3. The possibility of this more limited trading activity, driven by the need to adjust its pre-existing hedges on a daily basis, was fully disclosed to investors through the offering materials, and therefore cannot form the basis of a securities law claim.

For example, in the Offering Documents,[3] Credit Suisse disclosed that it "expect[ed] to hedge [its] obligations under the ETNs through one or more of [its] affiliates," that "[t]he trading activity associated with [its] hedging transactions will contribute to the trading volume of the underlying futures contracts," and that this activity "may adversely affect the market price of such underlying futures contracts[.]" (Roy Decl. Ex. A (Pricing Supplement, dated Jan. 29, 2018 ("Pricing Supplement" or "PS")) at PS-13, PS-16–PS-17). Credit Suisse further explained that its hedging might affect the VIX Futures Index: "Although we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying Index, there can be no assurance that the level of the applicable underlying Index will not be affected." (*Id.* at PS-50); *see also XIV I*, 2019 WL 3940641, at *5 ("The January

---

[3] The Offering Documents are incorporated by reference and may be considered on this motion. *XIV I*, 2019 WL 3940641, at *2 n.1 ("The January Supplement is referenced and quoted extensively in the Complaint," and is "therefore, deemed to be integral to the complaint" and can be considered on a motion to dismiss).

Supplement . . . comprehensively disclosed Credit Suisse's intention to engage in trading designed to offset its own exposure to the XIV notes[.]").

**ARGUMENT**

The Second Circuit revived this case because it credited key allegations Plaintiffs now acknowledge were false.  With those allegations gone, this Court must now consider the legal sufficiency of what remains in the Third Amended Complaint.  *See Tera Grp*. v. *Citigroup, Inc*., 2023 WL 5211252, at *8 (S.D.N.Y. Aug. 14, 2023) (granting motion to dismiss amended complaint), *aff'd*, 2024 WL 4501967, at *5 (2d Cir. Oct. 16, 2024) (affirming dismissal).

In a recent analogous case, the District Court found—and the Second Circuit affirmed—that, after false allegations were dropped from an amended complaint, the remaining allegations no longer stated a plausible claim and required dismissal.  *See, e.g., Tera Grp*., 2023 WL 5211252, at *7 (holding that "[s]tripped of [the original] factual allegations, the Amended Complaint [was] largely conclusory" as to required element of claim); *Tera Grp*., 2024 WL 4501967, at *4 (affirming dismissal of amended complaint that "omits or substantially revises" allegations that were "once a strong factor in favor of [plaintiff's] conspiracy claim" and no longer "plausibly suggest" the coordination required to state a claim).

The same is true here.  Stripped of Plaintiffs' prior false allegations, the TAC simply no longer plausibly pleads the required elements of Plaintiffs' claims.  The TAC should be dismissed in its entirety with prejudice.

## I.      PLAINTIFFS NO LONGER PLEAD A REQUISITE WRONGFUL ACT

Plaintiffs assert claims for the alleged violation of Sections 9(a), 9(f), and 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder (TAC Counts 1–2, 5–6), and

7

Section 11 of the Securities Act (TAC Count 7).  Each of these claims requires Plaintiffs to plead either a manipulative act or a misstatement or omission.[4]  Plaintiffs fail to do so.

### A.    Plaintiffs Do Not Plead an Actionable Misstatement

With respect to Plaintiffs' prior complaint, this Court and Magistrate Judge Netburn found that the Offering Documents "accurately disclosed every risk that allegedly caused Plaintiffs' investment losses." *XIV I*, 2019 WL 3940641, at *12.  Magistrate Judge Netburn found that the Offering Documents "specifically warned that hedging necessary for rebalance at the end of each trading day would contribute to the trading volume of the underlying futures contracts and may adversely affect the market price of such underlying futures contracts and in turn the level of the applicable underlying Index." *Id.*  As she further found, "that is the exact risk that materialized on February 5, 2018," requiring dismissal of each of Plaintiffs' claims of misstatements and omissions.  *Id.*  This Court agreed with Magistrate Judge Netburn's report and recommendation and overruled each of Plaintiffs' objections to it.  In short, the Court found that "[t]here cannot be a material misstatement or omission" where a defendant's statements "explicitly disclosed the very

---

[4] *See, e.g.*, *Singh* v. *Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) ("To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: '(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . (5) economic loss; and (6) loss causation.'"); *Salvani* v. *InvestorsHub.com, Inc.*, 628 F. App'x 784, 786 (2d Cir. 2015) (Section 9(a)(4) requires a "(1) misstatement or omission (2) of material fact (3) made with scienter (4) for the purpose of inducing a sale or purchase of a security (5) on which the plaintiff relied (6) that affected plaintiff's purchase or selling price.") (summary order); *Xu* v. *Direxion Shares ETF Tr.*, 2023 WL 5509151, at *6 (S.D.N.Y. Aug. 25, 2023) ("Section 9(f) creates a private right of action for violations of Section 9(a)."); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010) ("Section 11 of the Securities Act prohibits materially misleading statements or omissions in registration statements filed with the SEC.").

liquidity risks about which [Plaintiffs] claim to have been misled." *Set Cap.*, 2019 WL 4673433, at *4.

On appeal, the Second Circuit overturned, finding that Plaintiffs had adequately alleged two potentially actionable misstatements. *First*, the Second Circuit found that Plaintiffs had adequately alleged that "the Offering Documents misrepresented Credit Suisse's knowledge and intent when they warned that Credit Suisse's hedging activity 'could' or 'may' impact prices of XIV Notes but affirmed that Credit Suisse had 'no reason to believe' that it would." *Set Cap.*, 996 F.3d at 86. *Second*, the Second Circuit found that the complaint adequately alleged that Offering Documents omitted material facts in stating that Credit Suisse's hedging trades "may present" a conflict of interest. *Id.*

The Second Circuit found that Plaintiffs had adequately alleged that both statements were potentially misleading because they omitted the alleged fact that Credit Suisse was planning to trigger, and then did in fact trigger, an Acceleration Event by buying up an enormous number of VIX futures contracts during the next (allegedly inevitable) volatility event. *Id.* at 85–86 (accepting allegation that Credit Suisse knew with "virtual certainty that, upon the next volatility spike, [Credit Suisse's] hedging activity would significantly depress the value of XIV Notes" and failed to "disclos[e] its intent to capitalize on this dynamic and trigger an Acceleration Event"). As the Second Circuit explained, "disclosing the risk [that] a future event *might* occur" is not the same as "disclosing actual knowledge that the event *will* occur," or that Defendants were intentionally planning to trigger such an event. *Id.* at 85 (emphasis in original).

With the TAC, the underlying premise of that theory—that Credit Suisse planned to engage in an enormous number of VIX futures trades that it <u>knew</u> would destroy the value of XIV Notes— is now gone. Credit Suisse is not alleged to have "triggered" anything, or to have engaged in

extraordinary hedging activity.  Rather, it is alleged only to have purchased a limited number of VIX futures contracts sufficient to rebalance its hedge, as it publicly disclosed it would.  Indeed, Plaintiffs no longer allege that Credit Suisse's purchases "***intentionally destroy[ed]*** the value of XIV." (SAC ¶ 8).  Instead, at best, the TAC alleges that Credit Suisse's purchases "***contribut[ed] to*** the destruction of the value of XIV," with its modest rebalancing purchases.  (TAC ¶ 8).  But, even accepting as true that Credit Suisse's limited purchases "contributed to" a price increase in VIX futures contracts (as all trading activity has some market impact), and a corresponding decline in XIV, this was a fully disclosed risk.

A misrepresentation claim cannot lie where the allegedly omitted risk that came to pass was fully disclosed.  *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("[T]he market is not misled when a transaction's terms are fully disclosed."); *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (holding that where offering documents "warn[ed] of the exact risk that later materialized," a misrepresentation claim "will not lie as a matter of law"); *Olkey* v. *Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal of misrepresentation claim where the "prospectuses warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed"); *Monroe Cnty. Emps. Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 355 (S.D.N.Y. 2014) (finding no actionable omission where the underlying facts "were either fully disclosed or matters of public knowledge").

Here, the Offering Documents warned of the events that Plaintiffs now claim tie Credit Suisse's conduct to Plaintiffs' purported losses, *i.e.*, the potential that Credit Suisse's rebalancing hedging trades could impact the price of VIX futures and, in turn, the XIV product:

> We expect to hedge our obligations under the ETNs through one or more of our affiliates . . . . [T]his hedging activity may result in our or our affiliates' ***receipt of***

> *a profit, even if the market value of the ETNs declines* . . . . There may be *conflicts of interest between you [and Credit Suisse]* . . . .[5]

> [Credit Suisse] expect[s] to hedge [its] obligations relating to the ETNs by purchasing or selling short the underlying futures . . . . *Any of these hedging activities may adversely affect . . . the market value of your ETNs* . . . .[6]

> It is possible that *we . . . could receive substantial returns with respect to these hedging activities while the value of your ETNs decline or become zero*.[7]

The Second Circuit found these disclosures potentially misleading by omission, because they did not include a disclosure informing investors that Credit Suisse intended to, and then did in fact, trigger a crash of the XIV product by buying up over 105,000 VIX futures over a very short window. *Set Cap.*, 996 F.3d at 84–86 (finding "the Offering Documents misrepresented Credit Suisse's knowledge and its intent to engage in manipulative acts"). With those false allegations now stripped from this case, the TAC rests merely on fully disclosed activity and risks. *Gomez* v. *Credit Suisse AG*, 2023 WL 2744415, at *9-11 (S.D.N.Y. Mar. 31, 2023) (dismissing Section 10(b) claims where allegedly undisclosed risk was not a virtual certainty, therefore cautionary language in disclosures was adequate), *aff'd*, 2024 WL 506240 (2d Cir. Feb. 9, 2024); *Garnett* v. *RLX Tech. Inc.*, 632 F. Supp. 3d 574, 602–07 (S.D.N.Y. 2022) (dismissing Section 11 claim on same grounds), *aff'd sub nom. Tseng* v. *De Vries*, 2023 WL 8073087 (2d Cir. Nov. 21, 2023). As this Court previously found, fully disclosed risks do not state a claim under the federal securities laws. *XIV I*, 2019 WL 3940641, at *12 (finding that "the Offering Documents accurately disclosed every risk that allegedly caused Plaintiffs' investment losses"); *Set Cap.*, 2019 WL 4673433, at *1 (adopting the report and recommendation of Magistrate Judge Netburn).

---

[5] Roy Decl. Ex. A (Pricing Supplement) at PS-13.

[6] *Id.* at PS-24.

[7] *Id.*

### B.    Plaintiffs Do Not Plead a Manipulative Act

For similar reasons, Plaintiffs do not plead a manipulative act.  To plead a manipulative act, "some misrepresentation or nondisclosure is required."  *Set Cap.*, 996 F.3d at 77.  As this Court found on the prior motion to dismiss, the misrepresentation or nondisclosure underlying Plaintiffs' manipulation claim "was Credit Suisse's purported concealment of its plan to use [the effects of its hedging] to manipulate the markets."  *Set Cap.*, 2019 WL 4673433, at *4.  The Second Circuit agreed, finding that it would be "manipulative under [Second Circuit] precedent" if Plaintiffs could prove, as they then pled, that Credit Suisse "created conditions in which it knew that its hedging trades would destroy the value of XIV Notes during the next volatility spike," and then "[w]hen that spike occurred days later on February 5, 2018, ***Credit Suisse executed on the alleged scheme*** " by purchasing ***"more than 105,000 VIX futures contracts***[.]"  *Set Cap.*, 996 F.3d at 77.

In its first motion to dismiss, Credit Suisse argued—as the Second Circuit has repeatedly recognized—that "routine hedging activity" "is not, by itself, manipulative."  *Id.*  The Second Circuit held it could not accept that argument here where, it found, Plaintiffs had not alleged "routine hedging activity" but instead had alleged that "through just 15 minutes of its own trading" Credit Suisse "executed [***more than 105,000***] hedging trades on February 5"—"amount[ing] to roughly ***one-fourth of the entire VIX futures market***."  *Id.* at 69, 73, 78.  Again, these allegations no longer appear in the TAC.  Rather, Plaintiffs acknowledge that Credit Suisse traded only "thousands" (TAC ¶ 162)—a volume consistent with the routine adjustment of pre-existing hedges as disclosed in the offering materials.

To state a claim for market manipulation, Plaintiffs were required to plead "manipulative acts," *i.e.*, practices "intended to mislead investors by artificially affecting market activity."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 99–100 (2d Cir. 2007); *see also Set Cap.*, 996

F.3d at 76. Credit Suisse's limited and disclosed hedging activity is not manipulative under Second Circuit precedent. *Wilson*, 671 F.3d at 130 ("[T]he market is not misled when a transaction's terms are fully disclosed."); *Onel* v. *Top Ships*, Inc., 806 F. App'x 64, 66 (2d Cir. 2020) (affirming dismissal of market manipulation claims where "each of the complained-of transactions was fully disclosed to the market").

## II.    PLAINTIFFS NO LONGER ADEQUATELY PLEAD SCIENTER

Most of Plaintiffs' claims also require a showing of scienter.[8]  To adequately allege scienter, a plaintiff must show either (1) that each defendant had both motive and an opportunity to commit fraud or (2) that there is strong circumstantial evidence of conscious misbehavior or recklessness. *See, e.g.*, *ATSI*, 493 F.3d at 99; *Set Cap.*, 996 F.3d at 78. This requirement is met only where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). In the absence of motive and opportunity, the strength of the circumstantial allegations of conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). Plaintiffs' revised allegations do not come close to meeting this heavy pleading burden.

### A.    Plaintiffs Do Not Plead Motive and Opportunity

Plaintiffs' prior complaint alleged a scheme that purportedly allowed Credit Suisse to "earn[] hundreds of millions of dollars in profit at [its] investors' expense." *Set Cap.*, 996 F.3d at 68–69. From the outset, Credit Suisse has argued that these purported "motive and opportunity" allegations did not and could not plausibly plead scienter. This is even more apparent now that

---

[8] *See, e.g.*, *Salim* v. *Mobile Telesystems PJSC*, 2022 WL 966903, at *1 (2d Cir. Mar. 31, 2022) (scienter is a required element of Section 10(b) claims); *Salvani* v. *ADVFN PLC*, 50 F. Supp. 3d 459, 476 (S.D.N.Y. 2014) (scienter is a required element of Section 9(a) claims), *aff'd sub nom. Salvani* v. *InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015).

Plaintiffs have been forced to dramatically scale back their profit allegations from "hundreds of millions of dollars in [purported] profit" to mere "millions." Plaintiffs' newly-limited allegations fail for multiple reasons.

First, the factual allegations here cannot support Plaintiffs' conclusory claim that Credit Suisse was financially incentivized to push down the value of XIV. Of course, this Court found this to be true from the outset of this case—holding that Plaintiffs' motive and opportunity allegations against the Defendants were implausible for multiple reasons. *XIV I*, 2019 WL 3940641, at *15–16, *15 n.7. As Defendants have long argued, since Credit Suisse hedged its XIV exposure—as disclosed in the offering materials—Credit Suisse was not in a position to earn any significant amount based on the fluctuation of the value of XIV Notes.

The Second Circuit found that argument inconsistent with Plaintiffs' allegations of Credit Suisse's allegedly large purchases of VIX futures contracts on February 5, 2018. Specifically, the Second Circuit held:

> While the district court credited this argument [that Credit Suisse was fully hedged], we find it unpersuasive. Viewed in the light most favorable to Set Capital, the complaint does not allege that Credit Suisse had "fully" hedged its position. Rather, it alleges that Credit Suisse had the *right* to obtain alternative hedging instruments but did not significantly hedge its position until February 5, 2018, when it purchased 105,000 VIX futures contracts and caused the value of the XIV Notes to collapse.

*Set Cap.*, 996 F.3d at 80 (emphasis in original). Again, the allegations of enormous hedging trades on February 5, 2018 have been stricken from the TAC and it is now conceded (and pled) that Credit Suisse purchased only a mere fraction of that amount. Such modest alleged trading activity confirms that Credit Suisse was—as it disclosed—hedging its XIV exposure all along, leaving it with no actual motive or incentive to move the market in any direction. With these critical allegations withdrawn, it is simply not plausible to allege that Credit Suisse, and its most senior

14

executives, hatched an elaborate plot to destroy its own product, all for the purpose of generating a few million dollars in profit.

Second, even if Credit Suisse did stand to profit (and it did not), generic allegations of profit motive, without more, are not enough to support a finding of motive and opportunity. (ECF No. 102 (Def.'s Memorandum of Law in Support of Motion to Dismiss) at 18–20); *see also South Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("[I]n attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as the desire to . . . sustain the appearance of corporate profitability . . . ."); *Ganino* v. *Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("General allegations that the defendants acted in their economic self-interest are not enough."); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (holding that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation" are insufficient to plead scienter).

This is particularly true here, where Plaintiffs' revised allegations of "millions" of dollars in profit cannot plausibly be alleged to have incentivized a large institution of Credit Suisse's then size. *See, e.g.*, *Rothman* v. *Gregor*, 220 F.3d 81, 94 (2d Cir. 2000) (finding that a $1.6 million profit was not unusual so as to support a finding of scienter, both as an absolute amount of profit and as a percentage of defendant's shares); *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *9 (S.D.N.Y. Nov. 25, 2003) (crediting defendants' argument that "the $4.7 million spent during the second quarter was too small an amount to be the impetus for fraud given that the Company expected to spend close to $50 million during 2002 on capital expenditures"), *aff'd sub nom. Nadoff* v. *Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *Rice as Tr. of Richard E. and*

15

*Melinda Rice Revocable Fam. Tr. 5/9/90* v. *Intercept Pharms., Inc.*, 2022 WL 837114, at \*20 (S.D.N.Y. Mar. 21, 2022) (a profit of $4 million "in context [was] not a sum sufficient to give rise to an inference of scienter").

Third, Plaintiffs' allegations of a scheme to intentionally drive down the price of the XIV product ignore the very real possibility that such a scheme could have caused Credit Suisse substantial losses. As this Court previously held, another "logical hole[]" in Plaintiffs' allegations is that because Credit Suisse allegedly hedged its obligations through "a short exposure to VIX futures contracts," it "stood to *lose* a significant sum of money when the value of the VIX futures rose." *XIV I*, 2019 WL 3940641, at \*15 n.7 (emphasis in original) (citing *Sharette* v. *Credit Suisse Int'l.*, 237 F. Supp. 3d 60, 70 (S.D.N.Y. 2015) ("[A] short sale exposes the investor to potentially *unlimited downside risk* because there is theoretically no limit to how high the price of a shorted stock can rise . . . .")).

In the TAC, Plaintiffs continue to acknowledge that Credit Suisse hedged its XIV exposure by taking "short positions in VIX Futures." (TAC ¶ 64). Thus, for example, if the price of XIV Notes declined to zero, Credit Suisse would save on the amount it would need to pay to redeem the Notes (as Plaintiffs focus on), but Credit Suisse would also face unbalanced and unlimited exposure on its short VIX futures positions (a point Plaintiffs ignore). An alleged scheme to intentionally push the price of XIV down would pose significant risk to Credit Suisse. That a sophisticated financial institution would take on that risk defies economic reason. A scheme that "defies economic reason . . . does not yield a reasonable inference of fraudulent intent." *See Kalnit*, 264 F.3d at 140–41; *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 205 n.7 (S.D.N.Y. 2020) (finding scienter lacking where alleged scheme to depress the company's own stock for potential future financial interest "made no economic sense"); *In re JP Morgan Chase Sec. Litig.*, 363 F.

16

Supp. 2d 595, 621 (S.D.N.Y. 2005) (finding scienter allegations implausible where bank was alleged to have exposed itself to considerable risk "in furtherance of a fraud that garnered tens of millions").

For each of these reasons, the TAC does not plead a plausible factual basis to support any claim that Defendants had the "motive and opportunity" to manipulate the XIV market.

### B.    Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness

The Second Circuit held that Plaintiffs' prior complaint alleged scienter, finding that the complaint's allegations of "circumstantial evidence of conscious misbehavior or recklessness . . . ***when viewed holistically and together with the allegations of motive and opportunity***, supports a strong inference of scienter." *Set Cap.*, 996 F.3d at 78.  In other words, the Court did not find that Plaintiffs' allegations of alleged conscious misbehavior or recklessness were sufficient on their own to plead scienter; rather, Plaintiffs' motive and opportunity allegations were integral to the Court's analysis.  Since those motive and opportunity allegations are no longer viable for the reasons stated above, by the Second Circuit's prior reasoning, Plaintiffs' remaining allegations of purported conscious misbehavior or recklessness necessarily fall short in meeting the high standard of pleading scienter.

Moreover, the allegations that speak directly to this second prong of scienter have also been substantially diminished by Plaintiffs' recent amendments.  Most notably, the Second Circuit's decision on "conscious misbehavior or recklessness" rested heavily on its view that this Court should not have credited Credit Suisse's argument that Credit Suisse was fully hedged.  *See id.* at 80 (holding that the prior complaint did "not allege that Credit Suisse had 'fully' hedged its position" but rather alleged that Credit Suisse "did not significantly hedge its position until February 5, 2018, when it purchased 105,000 VIX futures contracts and caused the value of the XIV Notes to collapse").  With Plaintiffs' revised allegations of only limited purchases of VIX

17

futures contracts, the premise of the Second Circuit's reasoning is now gone and this Court was in fact justified in crediting Credit Suisse's argument that the disclosed routine hedging of its XIV exposure renders Plaintiffs' theory of scienter implausible.

The Second Circuit's decision also rested on the alleged "supporting evidence of conscious misbehavior or recklessness" of Credit Suisse's alleged misleading statements, "minimiz[ing] the expected impact of its hedging trades by stating that its hedging activity 'could affect' the value of the VIX Futures Index while at the same time affirming that it had 'no reason to believe' that any impact would be 'material.'" *Id.* at 79. Again, for the reasons set forth above, Plaintiffs no longer allege a purported inconsistency between Credit Suisse's disclosures of what it "could" or "may" do, and its actual hedging activity. In short, Credit Suisse's ***accurate*** descriptions of its hedging trades can no longer "bolster the inference of manipulative intent." *Id.* at 81.

The TAC pleads neither "motive and opportunity" nor "conscious misbehavior or recklessness," and Plaintiffs' scienter-based claims therefore fail to state a claim for this reason as well.

## III. PLAINTIFFS FAIL TO ADEQUATELY ALLEGE LOSS CAUSATION

Each of Plaintiffs' claims also require the element of loss causation[9]—that is, a "causal connection between the [alleged material misrepresentation or manipulation] and the loss." *Dura Pharms., Inc.* v. *Broudo,* 544 U.S. 336, 342 (2005); *see also id.* at 347–48 (explaining that private

---

[9] A plaintiff alleging Section 10(b) claims "is required to prove . . . . the proximate causal link between the alleged misconduct and the plaintiff's economic harm." *ATSI*, 493 F.3d at 106; *Set Cap.*, 996 F.3d at 82 (articulating the elements of claims under § 9(a) and § 10(b) as identical). While the issue of loss causation is generally an affirmative defense to Section 11 claims, such claims may properly be dismissed on a Rule 12(b) motion if a defendant can prove that it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue. *Blackmoss Invs. Inc.* v. *ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *11 (S.D.N.Y. Jan. 14, 2010) ("[N]egative causation defense may be considered on a dismissal motion where the absence of loss causation is apparent on the face of the complaint.").

securities actions are not a "partial downside insurance policy"). To plead loss causation, a plaintiff may allege either that (i) "the market reacted negatively to a corrective disclosure of the fraud"; or (ii) "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014); *see also Abramson* v. *NewLink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (same). Plaintiffs have not plead either.

First, as with their prior iterations, Plaintiffs' TAC does not even attempt to plead loss causation through a purported corrective disclosure. Indeed, Plaintiffs have previously confirmed that their pleading "alleges a materialization of the risk, ***not a corrective disclosure***." (ECF No. 221 (Lead Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Exclude Professor Joshua Mitts), at 26). This aspect of their complaint has not changed.

Second, the amendments to the TAC leave Plaintiffs without any adequate allegation of materialization of risk. Specifically, the TAC lacks any plausible basis to allege that it was Credit Suisse's conduct that caused Plaintiffs' purported losses. The only alleged conduct of Credit Suisse on February 5, 2018 is its purchase of "thousands" of VIX futures contracts, in connection with its hedging rebalance on that day. But, as explained above, even to the extent that Credit Suisse's hedging activity "contributed to" a price decline, as Plaintiffs now allege, this was a fully disclosed risk. *See* pp. 8–11, *supra*. Where the risk that allegedly materialized was fully disclosed, loss causation fails as a matter of law. *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (explaining that establishing loss causation "require[s] both that the loss be foreseeable and that the loss be caused by the materialization of the ***concealed*** risk"); *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 758 F. Supp. 2d 264, 279–80 (S.D.N.Y. 2010) (finding loss

19

causation was not pled as to misstatement and market manipulation claims where the "risks that materialized were not . . . *concealed*" from the plaintiff).

Moreover, Plaintiffs' attempt to plead loss causation here fails because Plaintiffs' own statements in this case concede that their alleged losses were caused by acts *other than* the alleged activity of the Defendants. Indeed, every version of Plaintiffs' complaints (including the TAC) has pled that Plaintiffs' losses were effectively caused by broader market-wide volatility.[10] Far from being the materialization of some undisclosed risk, the fact that the value of XIV Notes dropped in the face of market-wide volatility was exactly how the product was designed to work: "by purchasing an XIV note, an investor would profit when the market's volatility expectations fell and, conversely, would lose money when the market's volatility expectations rose." *XIV I*, 2019 WL 3940641, at *2.

Plaintiffs' acknowledgment of other market-wide causes dooms their claims. Where a plaintiff fails to allege some basis to attribute its purported loss to the conduct of the defendant, and not broader market forces, it has not met its burden to plead loss causation. *See, e.g., Cent. States, Se. and Sw. Areas Pension Fund* v. *Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74, 76 (2d Cir. 2013) (where "plaintiff's stock purchases and losses coincided with a marketwide phenomenon," "the prospect that the plaintiff's loss was caused by the fraud decreases," and

---

[10] *See, e.g.*, TAC ¶ 157 ("On this day, the stock market pulled back, with the S&P 500 dropping 4.1% 'amid concerns about rising bond yields and higher inflation,' reinforced by the January 2018 U.S. jobs report 'that prompted worries the Federal Reserve w[ould] raise rates at a faster pace than expected' in 2018."); *id.* ¶¶ 158–59 ("As the stock market dropped, the VIX Index spiked. The SPVXSP, which tracked the return on first- and second-month VIX futures contracts, also rose sharply . . . XIV's Intraday Indicative Value, the XIVIV, which inversely tracked the SPVXSP, dropped precipitously during the day."); *id.* ¶ 163 ("[T]ransaction data show a spike in trading volume in February and March VIX futures contracts to 167,377 VIX futures contracts, or roughly one third of the entire February and March VIX futures market, just before 4:15 p.m. on February 5 . . . *[T]he trading volume in the February and March VIX futures contracts during aftermarket trading on February 5 was more than 167 times the usual volume of trades.*") (emphasis in original).

because plaintiff "[did] not plausibly allege a causal connection between the drop of the share price and the information revealed in the corrective disclosures," its securities fraud claims were properly dismissed); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 587 (S.D.N.Y. 2014) (dismissing plaintiffs' claim where "[t]he number of dots the Court must connect to produce an adequate theory of loss causation are too numerous and attenuated to succeed"); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 397 (S.D.N.Y. 2010) (to survive a motion to dismiss, a plaintiff must allege either: "(i) facts sufficient to support an inference that it was a defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss," or (ii) "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to ... [the defendant's fraud]"); *Healthcare Fin. Grp., Inc.* v. *Bank Leumi USA*, 669 F. Supp. 2d 344, 349 (S.D.N.Y. 2009) (plaintiff "failed to allege that the purported misrepresentations and omissions caused the loss complained of here" when market factors also contributed to the losses). *See also Lentell*, 396 F.3d at 174 ("[W]hen the plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the [alleged] fraud decreases . . . .").

Plaintiffs' other recent admissions in this case only further confirm that their alleged losses were **not** proximately caused by any action of the Defendants. Specifically, Plaintiffs repeatedly alleged in their failed motion to amend, and prior proposed amended complaint, that **third parties**—not Credit Suisse—traded the vast majority of VIX futures on the afternoon of February 5, 2018. *See, e.g.,* ECF 305-1 (Proposed Third Amended Complaint) ¶¶ 4 (alleging various "Volatility Securities holders" caused large price movements in VIX futures), 8 (alleging that the

21

"vast majority of VIX futures" traded on the afternoon of February 5, 2018 were traded by six third-party entities).[11]

For each of these reasons, the TAC offers no plausible basis in which one could infer that it was Credit Suisse's routine hedging activity "rather than other salient factors" that caused Plaintiffs' losses. Again, the dramatic changes to the TAC serve only to highlight this failing. While one might have been able to infer some connection between Credit Suisse's conduct and a drop in market value of XIV Notes where Credit Suisse was alleged to have traded "roughly one quarter" of the VIX futures market (SAC ¶ 8), the TAC falls far short now that Plaintiffs plead that Credit Suisse traded merely "thousands" of VIX futures contracts during the relevant time period (TAC ¶¶ 8, 160, 162), and have admitted that the largest participants in the VIX futures market on the afternoon of February 5, 2018 did not include Credit Suisse. (ECF 305-1 (Proposed Third Amended Complaint) ¶ 8).

The TAC's allegations concerning Credit Suisse's limited market activity do not, as they must, "nudge[] [Plaintiffs'] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see also Gamma Traders - I LLC* v. *Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 79 (2d Cir. 2022) (affirming dismissal of market manipulation claim under the Commodity Exchange Act and finding loss causation was not pled where defendants' "tiny share of the overall activity in [the] market" did not "make it plausible — rather than merely speculative" that defendants' trading caused plaintiff's losses). Because Plaintiffs have not provided a plausible causal

---

[11] Plaintiffs' statements and proposed allegations constitute judicial admissions. *See U.S. Bank Nat'l Ass'n as Tr. to Bank of Am., N.A.* v. *KeyBank, Nat'l Ass'n*, 2023 WL 2745210, at *9 (S.D.N.Y. Mar. 31, 2023) (finding statements of fact made by plaintiff in connection with its motion for leave to amend constitute "'judicial admission[s]' that bind[] plaintiff throughout the course of this action").

connection between any alleged act by Credit Suisse and Plaintiffs' purported losses, their claims should be dismissed for this reason as well.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM FOR CONTROLLING PERSON LIABILITY

Plaintiffs' control person claims also fail.  As discussed above, Plaintiffs have failed to adequately plead a primary violation of the alleged securities laws.  As a result, their control person claims must be dismissed as a matter of law.  *Rombach* v. *Chang*, 355 F.3d 164, 178 (2d Cir. 2004) (affirming dismissal of Section 20(a) claims because "the district court properly dismissed the primary securities claims against the individual defendants, [therefore] these secondary claims must also be dismissed").

Plaintiffs' control claims also fail for the additional reason that they have not alleged "culpable participation" with particularity as to either Individual Defendant, as required by courts in this District for Section 20(a) claims.  *See, e.g.*, *In re American Realty Cap. Props., Inc. Litig.*, 2016 WL 11110435, at *4 (S.D.N.Y. Aug. 5, 2016) ("[M]ost courts have held that the PSLRA's heightened pleading requirements apply to the culpable participation element, which means . . . that the plaintiff must plead with particularity facts giving rise to a strong inference of the requisite state of mind."); *see also Ross* v. *Lloyds Banking Grp., PLC*, 546 F. App'x 5, 12 (2d Cir. 2013) (to establish a Section 20(a) claim, "a plaintiff must show . . . that the [controlling person] was, in some meaningful sense, a culpable participant") (summary order).  Plaintiffs summarily allege that the Individual Defendants "participated" in the alleged manipulation because of "their positions as officers of Credit Suisse."  (TAC ¶¶ 277, 288).  But they offer no factual allegations connecting the Individual Defendants to the operation of the XIV product, to Credit Suisse's hedging activities, or to any purportedly false or misleading statement.  For this reason as well, Plaintiffs' control person claims fail.

23

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Third

Amended Complaint in full with prejudice.

Dated: March 19, 2026                              Respectfully submitted,

                                                  /s/ Herbert S. Washer
                                                  **CAHILL GORDON & REINDEL LLP**
                                                  Herbert S. Washer
                                                  Tammy L. Roy
                                                  Edward N. Moss
                                                  Ivan Torres
                                                  32 Old Slip
                                                  New York, New York 10005
                                                  Telephone: (212) 701-3000
                                                  Facsimile: (212) 269-5420
                                                  hwasher@cahill.com
                                                  troy@cahill.com
                                                  emoss@cahill.com
                                                  itorres@cahill.com

                                                  *Attorneys for Credit Suisse Group*
                                                  *AG, Credit Suisse AG, Credit Suisse*
                                                  *International, Tidjane Thiam, and*
                                                  *David R. Mathers*

## WORD COUNT CERTIFICATION

I, Herbert S. Washer, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c).  According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 7,687 words in the document.

/s/ Herbert S. Washer
Herbert S. Washer
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, New York 10005
hwasher@cahill.com
Telephone: (212) 701-3000

*Attorney for Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam, and David R. Mathers*

25