**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SET CAPITAL LLC, et al., Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | Case No.: 1:18-cv-02268-AT-SN |
| v. | **MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT** |
| CREDIT SUISSE GROUP AG, CREDIT SUISSE AG, CREDIT SUISSE INTERNATIONAL, TIDJANE THIAM, DAVID R. MATHERS, JANUS HENDERSON GROUP PLC, JANUS INDEX & CALCULATION SERVICES LLC, and JANUS DISTRIBUTORS LLC d/b/a JANUS HENDERSON DISTRIBUTORS, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND AND PROCEDURAL HISTORY ......................................................... 2

III.   ARGUMENT .................................................................................................... 4

       A.    Defendants' Motion should be denied under the law-of-the-case doctrine. ........... 4

             1.   Plaintiffs' amendment does not alter the Second Circuit's analysis. .......... 5

             2.   The core facts upon which the Second Circuit relied remain in the
                  TAC. ................................................................................................ 7

       B.    Consistent with the Second Circuit's ruling, the TAC adequately alleges
             Defendants made materially false and misleading statements and
             omissions. .......................................................................................... 8

       C.    Consistent with the Second Circuit's ruling, the TAC adequately alleges
             Defendants' improper manipulation. .................................................... 12

       D.    Consistent with the Second Circuit's ruling, the TAC adequately alleges
             Defendants' scienter. ......................................................................... 15

       E.    The TAC adequately alleges loss causation. ........................................ 19

             1.   The TAC adequately alleges loss causation under Section 10(b) of
                  the Exchange Act. ......................................................................... 19

             2.   Defendants cannot establish as a matter of law the affirmative
                  defense of negative causation under Section 11. ................................. 25

IV.    CONCLUSION ............................................................................................... 27

**TABLE OF AUTHORITIES**

**Cases**                                                                                               **Pages**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)................................................................................. 12, 14, 15

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009) ............................................................................. 26

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
    543 F. App'x 72 (2d Cir. 2013) ....................................................................................... 22

*Dolphin & Bradbury, Inc. v. SEC*,
    512 F.3d 634 (D.C. Cir. 2008) ........................................................................................ 24

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)......................................................................................................... 19

*ECD Inv. Grp. v. Credit Suisse Int'l.*,
    2017 WL 3841872 (S.D.N.Y. Sept. 1, 2017).................................................................. 12

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003)...................................................................................... 21, 25

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013) ............................................................................. 25

*FHFA v. Nomura Holding Am., Inc.*,
    2015 WL 685159 (S.D.N.Y. Feb. 18, 2015).............................................................. 25, 27

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
    41 F.4th 71 (2d Cir. 2022) .............................................................................................. 23

*Garnett v. RLX Tech. Inc.*,
    632 F. Supp. 3d 574 (S.D.N.Y. 2022) ............................................................................. 17

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
    643 F. Supp. 2d 562 (S.D.N.Y. 2009) ............................................................................. 25

*Gimpel v. The Hain Celestial Grp., Inc.*,
    156 F.4th 121, 151 (2d Cir. 2025) .................................................................................. 19

*Gomez v. Credit Suisse AG*,
    2023 WL 2744415 (S.D.N.Y. Mar. 31, 2023) .......................................................... 16, 17

*Harrington Glob. Opp. Fund, Ltd. v. CIBC World Mkts. Corp.*,
    2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023)................................................................ 13

*Healthcare Fin. Grp., Inc. v. Bank Leumi USA*,
    669 F. Supp. 2d 344 (S.D.N.Y. 2009) ........................................................................ 22

*Jennings v. City of N.Y.*,
    2023 WL 8462739, at *4 (S.D.N.Y. Nov. 22, 2023) ........................................................ 5

Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,
    797 F.3d 160 (2d Cir. 2015)....................................................................... 19, 21, 24, 25

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014) ......................................................................... 22

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010).................................................................................... 25

*Neary v. Wu*,
    753 F. App'x 82 (2d Cir. 2019) ................................................................................ 5

*Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*,
    2023 WL 9102400 (S.D.N.Y. Dec. 29, 2023) ................................................................ 13

*Oberlander v. Coinbase Glob. Inc.*,
    2024 WL 1478773 (2d Cir. Apr. 5, 2024) ...................................................................... 21

*Olkey v. Hyperion 1999 Term. Tr., Inc.*,
    98 F.3d 2 (2d Cir. 1996)....................................................................................... 11

*Onel v. Top Ships, Inc.*,
    806 F. App'x 64 (2d Cir. 2020) ............................................................................... 14

*Phunware, Inc. v. UBS Sec.*,
    2024 WL 1465244 (S.D.N.Y. Apr. 4, 2024).................................................................... 12

*In re ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013).................................................................................... 11

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)............................................................................... *passim*

*Sharette v. Credit Suisse Int'l*,
    127 F. Supp. 3d 60 (S.D.N.Y. 2015) ........................................................................... 12

*Tera v. Citigroup, Inc.*,
    2023 WL 5211252 (S.D.N.Y. Aug. 14, 2023).................................................................... 5

*U.S. Bank Nat'l Ass'n as Tr. to Bank of Am., N.A. v. KeyBank, Nat'l Ass'n*,
    2023 WL 2745210 (S.D.N.Y. Mar. 31, 2023) .................................................................. 21

iii

*Wilson v. Merrill Lynch & Co.*
   671 F.3d 120 (2d Cir.2011) ..................................................................................... 11, 14, 15

*Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644–45 (S.D.N.Y. 2017) ...................... 25

**Rules**

Fed. R. Civ. P. 8 .......................................................................................................... 19

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 21, 25

Fed. R. Civ. P. 23(f) ...................................................................................................... 4

Plaintiffs submit this memorandum of law in opposition to Defendants' Motion to Dismiss Plaintiffs' Consolidated Third Amended Class Action Complaint (ECF 392-394) ("Motion").[1]

## I.    INTRODUCTION

The Second Circuit already held that the core allegations in this case adequately allege claims and should be sustained. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 73-74 (2d Cir. 2021). The complaint the Second Circuit considered when it reversed this Court's earlier dismissal alleged that Defendants knowingly or recklessly made misrepresentations and omissions to investors, including in the Offering Documents for the XIV Notes, and manipulated the market for XIV Notes, cheating investors out of nearly $2 billion in value. Plaintiffs' TAC maintains those core allegations, based on and consistent with evidence developed in discovery—which validated the core of Plaintiffs' theory and allegations.

The TAC alleges that based on three prior volatility spikes Defendants knew a future volatility event threatened a VIX futures liquidity crisis that could cause the collapse of XIV Notes' prices; with that knowledge, Defendants issued millions of additional XIV Notes before February 2018, accruing millions in revenue and intentionally or recklessly exacerbating the negative impact of a future liquidity crisis; Defendants failed to warn investors that those Notes were a ticking time bomb; when the next volatility spike occurred on February 5, 2018, Credit Suisse bought VIX futures contracts, exacerbating the liquidity crisis which decimated XIV's value; and Credit Suisse then called an Acceleration Event, cementing investors' losses while locking in its own substantial profits.

---

[1] Unless otherwise indicated, defined terms retain the meanings assigned in Plaintiffs' Consolidated Third Amended Class Action Complaint (ECF 383) ("TAC"). "Defs.' Br." refers to Defendants' brief in support of the Motion (ECF 393); "Redlined TAC" refers to the redlined version of the TAC showing changes to Plaintiffs' Amended Consolidated Class Action Complaint (ECF 383-1); and all emphasis is added unless stated otherwise.

In contrast to earlier pleadings, the TAC does not allege that Credit Suisse itself purchased virtually all of the hedges that day, alleging instead that Credit Suisse purchased only some. Plaintiffs previously sought to plead, consistent with the discovery record, that Defendants orchestrated the liquidity crisis in VIX futures, supplementing their own hedging by loaning XIV Notes to short-seller counterparties they knew and planned would necessarily purchase the remaining hedges. The Court, however, denied Plaintiffs' application to amend to include those facts.[2]

Defendants suggest that Plaintiffs' revisions in the TAC are somehow fatal to the well-pled claims the Second Circuit already decided should be sustained. Defendants mischaracterize the Report & Recommendation recommending dismissal of Plaintiffs' previous complaint (ECF 124) ("R&R") and the Court's ruling adopting the R&R (ECF 135).[3] Defendants also critically ignore the Second Circuit's reasoning when it vacated and reversed those decisions on the very issues for which Defendants cite them now.

Defendants' Motion should be denied.

## II.    BACKGROUND AND PROCEDURAL HISTORY

Discovery validated the material part of Plaintiffs' original theory and allegations, while

---

[2] In ECF 305-2 ("PTAC"), Plaintiffs also alleged facts to support the "Flatline Value" claim that this Court previously dismissed. When the Second Circuit reversed, it stated that Plaintiffs could adequately plead scienter for that claim with evidence Defendants monitored the VIX Futures Index and compared it to real-time prices for VIX futures contracts. *Set Cap.*, 996 F.3d at 83. The PTAC alleged specific evidence that Credit Suisse did so. PTAC ¶¶ 235-242. When the Court denied leave to amend, it prevented Plaintiffs from including in the TAC those new allegations in support of the Flatline Value claim. Defendants repeatedly reference the PTAC. *See* Defs.' Br. 21, 22.

[3] Although those opinions discussed Plaintiffs' Consolidated Class Action Complaint (ECF 82) ("FAC"), a substantively similar complaint with minor administrative changes, the Amended Consolidated Class Action Complaint (ECF 190) ("SAC"), was the operative complaint prior to the TAC.

2

clarifying certain factual details of Defendants' misconduct. The TAC alleges, based on and consistent with evidence adduced in discovery, that through misrepresentations and market manipulation, Defendants defrauded investors out of nearly $2 billion in value in XIV Notes. These allegations align with the Second Circuit's decision reversing dismissal, and should be sustained. *Compare* TAC ¶ 200 *with Set Cap.*, 996 F.3d at 73-74.

The TAC still alleges that three prior volatility spikes alerted Defendants to a VIX futures liquidity crisis that imperiled the sustainability of XIV Notes. *Compare* TAC ¶ 67 *with Set Cap.*, 996 F.3d at 77-78. It maintains that, despite those red flags, Defendants issued millions of additional XIV Notes—exceeding internal risk limits—before February 2018, while receiving millions in revenue through management fees. *Compare* TAC ¶¶ 109-114 *with Set Cap.*, 996 F.3d at 77-78. It maintains that Defendants failed to adequately warn investors, offering only boilerplate disclosures from years prior that hedging "could" or "may" affect XIV's price. *Compare, e.g.*, TAC ¶ 215 *with Set Cap.*, 996 F.3d at 79. It maintains that, when the next volatility spike occurred on February 5, 2018, Credit Suisse bought VIX futures contracts, exacerbating the liquidity crisis which decimated XIV's value. *Compare* TAC ¶ 160 *with Set Cap.*, 996 F.3d at 80. And it maintains that, in the aftermath, Credit Suisse called an Acceleration Event (but obfuscated why), which cemented investors' losses, locked in its own profits, and triggered an SEC investigation. *Compare* TAC ¶¶ 196-99, 201 *with Set Cap.*, 996 F.3d at 79. On those same facts, the Second Circuit reversed dismissal of Plaintiffs' FAC. *See Set Cap.*, 996 F.3d at 86-87.

In other words, discovery confirmed Plaintiffs' original understanding of XIV's life cycle, although one amendment was necessary: on February 5, in addition to Credit Suisse trading on its own behalf, much of the trading that ran up VIX futures pricing was done by third parties using

3

shares intentionally lent by Credit Suisse for the same goal of causing a liquidity event.[4] Discovery showed that in the leadup to that day, Credit Suisse intentionally lent XIV Notes to short sellers whom Defendants *knew* shared Defendants' goal of seeing XIV implode, and whose trading Defendants *knew* and even modelled would create the liquidity squeeze necessary to do so.[5]

At the close of fact discovery, Plaintiffs sought to amend their pleadings to add these facts and conform the pleadings to the discovery record. Because that application was denied, Plaintiffs included information in the TAC concerning Defendants' own trading activity on February 5, but were barred from adding or amending allegations about Defendants' aggressively lending Notes as part of the final step of Defendants' scheme.

The volume of Defendants' trading on February 5 is the only change to the TAC's factual allegations—and is a detail *expressly* disregarded by the Second Circuit. Yet Defendants argue that it is enough for this post-discovery, eight-year-old securities class action, with two certified classes,[6] to be dismissed. Defendants are wrong.

## III.    ARGUMENT

### A.  Defendants' Motion should be denied under the law-of-the-case doctrine.

Because the TAC pleads all of the facts relevant to the Second Circuit's reversal of this Court's earlier dismissal, the Second Circuit's ruling governs and Defendants' Motion—which raises the same arguments as earlier—should be denied. *See Neary v. Wu*, 753 F. App'x 82, 83–

---

[4] Contrary to Defendants' suggestion, the original complaint never alleged that Credit Suisse did *all* of the trading in VIX futures on the afternoon of February 5. *See, e.g.*, SAC ¶ 116 (Credit Suisse could "contribute to a spike" in VIX futures).

[5] *See* Declaration of Nicholas I. Porritt dated May 1, 2026 ("Porritt Decl.") ¶¶ 55-57 & Exs. 5 & 24.

[6] The Court certified Lead Plaintiffs as class representatives for the Securities Act Class, and additional Plaintiff the Trust as class representative for the Manipulation Class. The Second Circuit declined to revisit those determinations when it denied Defendants' Rule 23(f) petition.

84 (2d Cir. 2019) ("The district court was correct to reject Dr. Wu's second motion to dismiss that raised substantially the same arguments as the first. . . . This second motion was precluded by the 'law of the case' doctrine[.]"); *Jennings v. City of N.Y.*, 2023 WL 8462739, at \*4 (S.D.N.Y. Nov. 22, 2023) ("Defendants raise the same arguments for dismissal of these claims as in the First MTD. . . . [The] law of the case requires denial of the Motion[.]").[7]

In its decision reversing this Court, the Second Circuit held that the then-operative complaint plausibly alleged a manipulative act, "identified actionable misstatements or omissions in the Offering Documents," and raised a strong inference of scienter as to both. *Set Cap.*, 996 F.3d at 75-76. Those conclusions likewise apply to the TAC, and Defendants' renewed arguments fail as a matter of law.

### 1.    Plaintiffs' amendment does not alter the Second Circuit's analysis.

Defendants claim the fact that Credit Suisse traded less on February 5 than was initially pled is some sort of bombshell warranting dismissal. *See* Defs.' Br. 4-7. But ***the Second Circuit already considered and rejected that possibility.*** In its opinion (which binds this Court), the Second Circuit rejected Defendants' contention that limited hedging activity would not support scienter, holding that "***[e]ven assuming that Credit Suisse had fully hedged its position***," ***Plaintiffs' theory was still actionable*** because Defendants had "double[d] the volume of XIV Notes in the market," could "use its hedging trades to depress prices for XIV Notes," and enjoyed "favorable redemption rights" which allowed them to "profit at investors' expense," creating a

---

[7] *Tera v. Citigroup, Inc.*, 2023 WL 5211252 (S.D.N.Y. Aug. 14, 2023), is inapt, as there was no binding law-of-the-case appellate authority there. *Id*. at \*4. Further, the allegations removed from the second *Tera* complaint were indisputably critical to the court's denial of the first motion. *See, e.g.*, *id*. at \*7 ("Tera has withdrawn its ***strongest allegations***"; "Tera has dropped the part of this allegation that the Court ***previously found most compelling***"), Here, the Second Circuit did not rely on any of the allegations that have changed.

"perfect storm." *Set Cap.*, 996 F.3d at 81.

Similarly, the Second Circuit held that allegations of Credit Suisse's profits from "higher levels of volatility which benefited [its] derivatives business" "bolster[ed] the inference of manipulative intent" adequately pled in connection with other "stronger allegations"—namely, Credit Suisse's knowledge of prior volatility spikes and issuance of millions of Notes prior to February 5. *Set Cap.*, 966 F.3d at 80-81. The Circuit rejected Defendants' argument that the bank "fully hedged its position" such that "the magnitude of the alleged fraud was necessarily *de minimis*" and did not evidence scienter. *Id*. And the Second Circuit further rejected the argument that Credit Suisse's **purportedly limited hedging** could not support scienter, "disagree[ing] . . . with Credit Suisse's renewed assertion that its hedging made it economically impossible for the bank to profit." *Id*. **Defendants strategically omit these key portions of the Second Circuit's decision from their brief**.

The allegations that the Second Circuit held adequately stated claims, however, remain in the TAC: that three volatility spikes made Defendants aware of liquidity issues that threatened to crater XIV Notes' price, but they hid those issues from investors (TAC ¶¶ 61-82; *Set Cap.*, 966 F.3d at 80); Credit Suisse issued millions of Notes prior to February 2018, "further exacerbat[ing] future liquidity issues" (TAC ¶¶ 109-14; *Set Cap.*, 966 F.3d at 81-82); Credit Suisse could (and did) impact XIV's price with its own hedging trades on February 5 (TAC ¶¶ 153-168; *Set Cap.*, 966 F.3d at 81); and Credit Suisse used its favorable redemption rights to "lock in" its profits (TAC ¶¶ 196-199; *Set Cap.*, 966 F.3d at 79). Further, the TAC still alleges that Defendants profited handsomely from their scheme by forcing XIV redemptions for pennies on the dollar and through

6

management fees Credit Suisse charged in the leadup to the XIV crash.[8] TAC ¶ 57; *Set Cap.*, 966 F.3d at 80-81.

Defendants' argument fails for additional reasons. First, discovery established that Plaintiffs were **correct** that Defendants played a critical role in trading on February 5—to make their scheme less risky for the bank (and to reap even more profits), Defendants lent Notes to short sellers who Defendants knew and modelled would buy up VIX futures that afternoon (crashing XIV out of existence), rather than doing all the hedging themselves. *See* PTAC ¶ 207. Second, Plaintiffs still allege that **Defendants themselves** meaningfully traded on February 5.[9] *See* TAC ¶¶ 153-68 (on February 5, Credit Suisse "seized the opportunity" by buying up thousands of VIX futures contracts, "reducing their supply" and "driving up the price of the contracts");  Redlined TAC ¶¶ 153-168.[10] The Second Circuit's hypothetical was **more** conservative than what the TAC alleges: Defendants' trading was not *de minimis*; rather, Credit Suisse traded thousands of VIX futures on February 5, which drove up the price of VIX futures.

### 2. The core facts upon which the Second Circuit relied remain in the TAC.

As referenced above, in its analysis of both the manipulation and misrepresentation claims,

---

[8] Plaintiffs also sought to allege Defendants profited via management fees charged to short sellers to whom they lent Notes. PTAC ¶¶ 141, 152. Although that allegation was barred from the TAC by the Court, Defendants **concede** they profited from the collapse. Defs.' Br. 2.

[9] Defendants claim Plaintiffs' allegation that Credit Suisse only "contributed" to the VIX futures squeeze departs from past pleading (Defs.' Br. 5), but the SAC also alleged that Credit Suisse was a *part*—not all—of the February 5 VIX futures trading. SAC ¶ 116.

[10] Defendants' claim that Plaintiffs "no longer allege" Credit Suisse "dr[ove] up the price of VIX futures and intentionally destroy[ed] the value of XIV" (Defs.' Br. 10) is wrong. *See* TAC ¶¶ 8 (Credit Suisse intentionally contributed to XIV's "destruction"), 89 (Defendants knew they could profit by "destroying XIV"), 109 (issuing Notes "exacerbate[d]" the VIX futures hedging problem and "contribut[ed] to XIV's ultimate destruction"), 115-123 (CEO Thiam was incentivized to destroy XIV).

the Second Circuit focused on two key facts: first, that three prior volatility spikes demonstrated to Credit Suisse the impact of hedging trades on VIX futures (and, therefore, XIV) prices; second, that Defendants issued millions of XIV Notes in the leadup to February 2018, which "exacerbated the risk of illiquidity in the VIX futures market." *See, e.g.*, *Set Cap.*, 996 F.3d at 77-79 (noting Defendants' observing the impact of hedging trades during the three prior volatility spikes as basis for scienter), 79 (Credit Suisse's "increasing the number of XIV Notes outstanding" supported the inference that Defendants "knowingly or recklessly exacerbated the liquidity squeeze it had already observed").

Again, ***these allegations remain untouched in the TAC***. *See, e.g.*, TAC ¶¶ 61-82 (recounting three volatility spikes which made Defendants aware of liquidity issues, but which they withheld from investors); 109-14 (Credit Suisse issued millions more Notes in January 2018, "further exacerbat[ing] future liquidity issues"); *see also* Redlined TAC ¶¶ 61-82; 109-114.

The other key allegations that the Second Circuit relied on also remain.

**B. Consistent with the Second Circuit's ruling, the TAC adequately alleges Defendants made materially false and misleading statements and omissions.**

When the Second Circuit reversed this Court's earlier dismissal, it revived Plaintiffs' claim that Defendants "misled investors by repeatedly warning of 'risks' they knew were certain to occur"—over Defendants' objections that they had disclosed XIV's riskiness to the market (which they repeat here). *Set Cap.*, 996 F.3d at 84-86.

Invoking the prior volatility spikes and issuance of millions of Notes referenced above (*see Set Cap.*, 996 F.3d at 85-86), the Second Circuit determined that while warnings that hedging activity "could" or "may" impact prices "could have possibly sufficed when Credit Suisse first issued XIV Notes," they were rendered meaningless when—"despite three episodes of market volatility putting to rest any uncertainty as to the price-impact of Credit Suisse's hedging"—the

8

warnings were left untouched. *Set Cap.*, 996 F.3d at 86. As explained above, while the Second Circuit referenced "Credit Suisse's hedging", the matter of *who* was doing the trading was immaterial to its analysis. What the Second Circuit focused on were the facts that (i) Defendants knew the impact of hedging from prior spikes; and (ii) by issuing millions of Notes in the leadup to February 2018, Credit Suisse had primed the VIX futures market to explode, both of which are untouched in the TAC. *See* TAC ¶¶ 61-82; Redlined TAC ¶¶ 61-82.

Additionally, the Second Circuit found Defendants misled investors by saying Credit Suisse's hedging trades "may present" a conflict of interest because Credit Suisse had "structured the market for XIV Notes to ensure that the next volatility spike would allow it to profit at its own investors' expense." *Set Cap.*, 996 F.3d at 86. This allegation remains. *See* TAC ¶ 216; Redlined TAC ¶ 216.[11] ***Nothing*** in the Second Circuit's analysis turned on the volume of Notes Credit Suisse held or traded on February 5, 2018, the ***only fact*** that has changed in the TAC. Accordingly, the Second Circuit's misrepresentation analysis must also be left undisturbed.

Defendants' new motion claims Credit Suisse traded on February 5 in exactly the manner it told the market it would. *See, e.g.*, Defs.' Br. 2 (trading was "consistent with public disclosures"); 4 (purchases "entirely consistent" with disclosures); 10 (conscious destruction of XIV was a "fully disclosed risk"). ***But Defendants already made—and lost—that exact argument*** for reasons unrelated to the amount of trading Credit Suisse did on February 5. *Set Cap.*, 996 F.3d at 85-86.

For example, in their latest motion, Defendants argue that Credit Suisse disclosed to investors that it "expect[ed] to hedge [its] obligations under the ETNs through one or more of [its] affiliates," that "[t]he trading activity associated with [its] hedging transactions will contribute to

---

[11] The Second Circuit imported its scienter analysis for the manipulation claim to find that scienter was adequately alleged for the Exchange Act misrepresentation claim, too. *Set Cap.*, 996 F.3d at 86.

the trading volume of the underlying futures contracts," and that this activity "may adversely affect the market price of such underlying futures contracts[.]'" Defs.' Br. 6. But Defendants presented identical arguments the last time around. *See* ECF 102 at 2.[12]

As explained above, when the Second Circuit rejected Defendants' argument last time around, it ***did not rely at all*** on the volume of trading Credit Suisse did on February 5. Rather, the Second Circuit rejected Defendants' argument that its trades were "done openly" because Credit Suisse's "flood[ing] the market with millions of additional XIV Notes"—***not*** its trades on February 5—amounted to "more than routine hedging activity." *Set Cap.*, 996 F.3d at 77-78; *see also id.* at 85 (Defendants' misstatements actionable ***even though*** "many risks were disclosed").[13] ***This core allegation is unchanged.*** *Supra* § III(A).

Defendants invoke sleight of hand to argue otherwise, claiming "[t]he Second Circuit found these disclosures potentially misleading…because they did not include a disclosure informing investors that Credit Suisse intended to, and then did in fact, trigger a crash of the XIV product by buying up over 105,000 VIX futures over a very short window." Defs.' Br. 11. But the pages of the Second Circuit opinion Defendants cite ***do not even mention*** the 105,000 futures. Further, as explained above, in the *two* times in the entirety of the Second Circuit's analysis where that number is mentioned,[14] it is not described as an outcome-determinative fact.[15] Despite this, Defendants

---

[12] Similarly, Defendants invoke page 13 of the XIV Pricing Supplement (*see* Defs.' Br. 10-11), but they referred to that same page in the first go-round as well. *See* ECF 102 at 6-7.

[13] The Second Circuit sustained Plaintiffs' claims even while acknowledging Credit Suisse's warnings that XIV was intended for "sophisticated investors to manage daily trading risks" and that investors who held the Notes long term could lose all or much of their investment. *Set Cap.*, 996 F.3d at 85.

[14] Defendants refer to that number eleven times in their brief.

[15] In the first instance, the Second Circuit included that detail along with a host of other allegations to conclude Credit Suisse's conduct "was manipulative under our precedents." *See Set Cap.*, 996

boldly claim this inconsequential change somehow converts Defendants' behavior into "fully disclosed activity." Defs.' Br. 11.[16]

The new cases Defendants offer do not alter this analysis. *See* Defs.' Br. 10 (citing *Wilson & Monroe*). First, both *Wilson* and *Monroe* were decided before Defendants' original motion to dismiss, and consequently are authority that would have been considered by the Second Circuit in its decision to the extent they were relevant.

Second, they are easily distinguishable. In *Wilson*, the Second Circuit found the omissions about which plaintiffs complained were contradicted by other allegations in the complaint and that, in the alternative, a disclosure that a company "may routinely" do something was perfectly consistent with plaintiff's allegation that they "always" did it. *See Wilson v. Merrill Lynch & Co.* 671 F.3d 120 at 132-34 (2d Cir.2011) (what plaintiff "faults [defendant] for not disclosing…is difficult to reconcile with what is alleged"). That is different from here, where Plaintiffs' internally consistent theory (already embraced by the Second Circuit) is that Defendants knew that XIV was a ticking time bomb, but misled investors with years-old, boilerplate half-truths before detonating a VIX futures liquidity crisis through a massive issuance of Notes. Similarly, in *Monroe*, the court adopted defendants' disclosure theory after finding plaintiffs had conceded—***or not even***

---

F.3d at 77 (noting prior volatility spikes, issuances of millions of Notes, and Acceleration Event). In the second, after describing the "central facts" that supported an inference of scienter (among which the magnitude of Credit Suisse's February 5 trading was not included), the panel cited the number of Notes traded to respond to Defendants' argument that Credit Suisse had "fully" hedged its position. *Id*. at 80.

[16] Defendants repeat already-rejected caselaw in addition to already-rejected factual arguments. *Compare* Defs.' Br. 10 (citing *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) and *Olkey v. Hyperion 1999 Term. Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (regarding adequacy of risk disclosures)) *with* ECF 102 at 10 (same). The Second Circuit did not invoke who did the trading on February 5—or in what volume—when it dispensed with these authorities.

*challenged*—the adequacy of certain disclosures. *Monroe* at 355-56.[17]

### C. Consistent with the Second Circuit's ruling, the TAC adequately alleges Defendants' improper manipulation.

To state a claim for market manipulation under Section 10(b), a plaintiff must plausibly allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *Set Cap.*, 996 F.3d at 76. "[A] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *see also Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 78 (S.D.N.Y. 2015) ("plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.").[18]

All that is required is to allege, "to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Id*. Because "[a] claim of manipulation . . . can involve facts solely within the defendant's knowledge . . . the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *Id*. *See also, e.g.*, *Phunware, Inc. v. UBS Sec.*, 2024 WL 1465244, at *6-8 (S.D.N.Y. Apr. 4, 2024) (same); *Nw. Biotherapeutics, Inc. v. Canaccord Genuity LLC*, 2023 WL 9102400, at *18

---

[17] The adequacy of Plaintiffs' allegations regarding material misrepresentations and omissions in the Offering Documents, as the Second Circuit concluded, is sufficient to deny Defendants' Motion with regard to Plaintiffs' Securities Act claims. Scienter is not an element of those claims, and negative causation is an affirmative defense that is not properly considered at the pleading stage. *See* § III.E.2.

[18] *Sharette* was subsequently cited in *ECD Inv. Grp. v. Credit Suisse Int'l.*, 2017 WL 3841872, at *1 (S.D.N.Y. Sept. 1, 2017) (Netburn, M.J.).

(S.D.N.Y. Dec. 29, 2023) (sustaining manipulation claim and "distinguish[ing] between legitimate market activity and manipulation" based on "anomalous" alleged market behavior where "Plaintiff's theory of the case . . . focuses on Defendants' control over the high-speed trading algorithms and Defendants' responsibility to monitor such algorithms"); *Harrington Glob. Opp. Fund, Ltd. v. CIBC World Mkts. Corp.*, 2023 WL 6316252, at *6 (S.D.N.Y. Sept. 28, 2023) (sustaining manipulation claim where market maker's activity "functioned to manipulate the market" to drive down securities' prices).

As the Second Circuit discussed in this case, market manipulation is conduct "intended to mislead investors by artificially affecting market activity" or "controlling or artificially affecting the price of securities." *Set Cap.*, 996 F.3d at 76. Applying that standard, the Second Circuit held that Plaintiffs adequately alleged market manipulation based on allegations, among others, that Defendants knowingly or recklessly "exacerbate[d] the risk of illiquidity in the VIX futures market and create[d] conditions" that led the XIV Notes program to collapse. *Set Cap.*, 996 F.3d at 77. The Circuit rejected Defendants' arguments, recycled here, that Plaintiffs failed to allege manipulative acts or scienter. Instead, the Circuit held manipulation adequately pled based on allegations that Defendants "manipulated the market by issuing millions of additional XIV Notes knowing or recklessly disregarding the virtual certainty that their own hedging activity would trigger a liquidity squeeze in VIX futures contracts, destroy the value of XIV Notes, and allow Credit Suisse to accelerate and redeem the notes at a substantial loss to investors while locking in a profit for its own account." *Id*. That decision did not state or rely on the specific volume of Credit Suisse's hedging, as Defendants misleadingly suggest (*see* Defs.' Br. 12), but rather that "Credit Suisse executed its hedging trades on February 5 for a manipulative purpose." *Id*. at 78.

Those and related allegations remain and, thus, adequately state a manipulation claim. The

13

TAC still alleges, among other things, that: (1) Defendants knew from prior market volatility spikes that relatively small drops in the S&P would have an outsized negative impact on the prices of XIV Notes (¶¶ 67-82); (2) after an extended period of low volatility, Credit Suisse issued millions more XIV Notes on January 29, 2018, generating substantial revenues while planning to profit from an imminent VIX spike (¶¶ 109-114); (3) Defendant Thiam's restructuring plan incentivized Defendants' destruction of the XIV Notes program, which would enable the bank to profit by scaling back its investment banking activity while also generating profits to quell investor dissatisfaction (¶¶ 115-123); (4) when the VIX spiked on February 5, 2018, and XIV began losing value at an unprecedented rate, Credit Suisse traded VIX futures to hedge its own position, exacerbating the liquidity crisis (¶¶ 153-168, 192-195); and (5) as they planned, once the VIX spiked and XIV crashed, Credit Suisse announced an Acceleration Event and forced out XIV investors for pennies on the dollar (*id.* ¶¶ 196-199). These critical facts were not "fully disclosed," as in *Wilson*, 671 F.3d at 130, 135, where the Second Circuit affirmed dismissal of a manipulation claim because defendants "explicitly disclosed the very liquidity risks about which [plaintiffs] claim to have been misled." And as opposed to *Onel v. Top Ships, Inc.*, 806 F. App'x 64, 68 (2d Cir. 2020), the TAC expressly alleges that Defendants misrepresented and concealed "that the transactions would have the cumulative effect on [the securities'] value that they ultimately did."

The TAC accordingly alleges that Defendants, after observing the effect of previous market volatility events on the XIV Notes, hatched and implemented their manipulative scheme to public investors' detriment. As opposed to *ATSI*, on which Defendants rely, Defendants manipulated XIV pricing, including through their own hedging and by issuing millions of additional XIV Notes to foment and exacerbate a VIX futures liquidity squeeze, such that the market was "rigged by manipulators" and divorced from "the natural interplay of supply and demand." *ATSI*, 493 F.3d at

14

100. The nature of Defendants' market activity was far from "routine" as they suggest (Defs.' Br. 12), which raises a fact question that cannot properly be resolved on the pleadings. Further, the Second Circuit already considered applicable case law, including *ATSI* and *Wilson*, and held that these allegations adequately plead "a plausible claim of liability for market manipulation." *Set Cap.*, 996 F.3d at 76-82.

### D. Consistent with the Second Circuit's ruling, the TAC adequately alleges Defendants' scienter.

All of the key facts on which the Second Circuit found conscious misbehavior or recklessness adequately pled remain in this case. *Supra* p. 3; *infra* pp. 17-18 (recounting past volatility spikes; issuance of new Notes; breaching internal risk limits; misleading statements to investors; economic impact of collapse and SEC investigation). Similarly, the key facts on which the Second Circuit found motive and opportunity pled remain as well. *Infra* pp. 18-19 (structure of Notes, pressure on Thiam, and $10.2 million bonus for divesting from XIV incentivized scheme).[19]

Defendants again offer no basis for disturbing these findings. First, their critique of the motive and opportunity allegations as inactionable, "generic allegations of profit motive" is a textbook violation of the law-of-the-case doctrine: these allegations are exactly as they were when the Second Circuit sustained them the first time, and thus Defendants' re-litigation of their adequacy is meritless, redundant, and improper.

Second, Defendants' quibbling that they profited by "mere" millions, rather than hundreds of millions (Defs.' Br. 2) is irrelevant—the exact magnitude was of no moment to the Second

---

[19] While it is not based on anything stated in the Second Circuit opinion (indeed, the Second Circuit held scienter adequately pled based on both recklessness and motive and opportunity), Defendants' claim that Plaintiffs' motive and opportunity allegations were "integral" to the Second Circuit analysis does not matter where, as here, the allegations underlying that analysis remain untouched.

15

Circuit.[20]

Third, Defendants' argument that they actually stood to lose a "significant sum of money" when the value of the VIX futures rose is incoherent. Defs.' Br. 16-17. For one, Defendants try to have it both ways, as they spend the rest of their brief arguing that they were nearly fully hedged prior to February 5—accordingly, a one-paragraph argument that they were actually "significantly" exposed is entitled to no weight. For another, Defendants' downside "exposure"— the possibility that VIX futures could skyrocket, making Credit Suisse's short positions negative in value—was not at risk of being "locked in" by an Acceleration Event.[21] This, of course, is different from the *upside* Credit Suisse enjoyed on February 5 as still alleged in the TAC: the XIV Notes going to zero, allowing Credit Suisse to redeem them for pennies on the dollar. TAC ¶¶ 6-7, 11, 18, 79, 90, 107, 112, 114, 164, 195. While investors would have preferred and expected Credit Suisse to allow XIV to rebound just like VIX futures did, instead, Defendants unilaterally called an Acceleration Event, thereby locking in investors' losses. *See Set Cap.*, 996 F.3d at 77 (Credit Suisse "declared an Acceleration Event to lock in its profit").[22]

Finally, Defendants' legal authorities are easily distinguished. In *Gomez v. Credit Suisse AG*, plaintiff failed to allege defendants "did anything to impact supply and demand" of the note in question or "contend that there have been any prior instances where suspending [or] delisting

---

[20] Defendants' comparison of their millions of dollars of profit to "Credit Suisse's then size" (Defs.' Br. 15-16) is nowhere to be found in the Second Circuit's scienter analysis (or elsewhere). Besides, Defendants' accounting also ignores the millions they reaped in management fees from the Notes that were destined to implode. *See, e.g.*, TAC ¶ 57 (estimating over $25 million in fees). Notably, the allegations Plaintiffs sought to include in their amended complaint included an additional motive: profit generated through daily management fees charged to short sellers who borrowed XIV Notes. *See, e.g.*, PTAC ¶¶ 141, 152.

[21] Although VIX futures did skyrocket in price, that spike has since dissipated multiple times over.

[22] Discovery established Defendants recognized and expressly discussed the asymmetry of this opportunity. *See* Porritt Decl. ¶¶ 20-22 & Exs. 2, 4-7.

[the note] led to a price premium or a short squeeze." 2023 WL 2744415, at *9-10 (S.D.N.Y. Mar. 31, 2023). Here, Plaintiffs allege—as they did before the Second Circuit—that Defendants dramatically affected the supply of Notes by issuing millions of Notes and, as discovery confirmed,[23] knew about **three prior** liquidity squeezes that illustrated precisely how to orchestrate the XIV collapse.

Similarly, *Garnett v. RLX Tech. Inc.* held that an American e-cigarette company could not have known it was "inevitable" that Chinese regulators would regulate e-cigarettes as they did tobacco. 632 F. Supp. 3d 574, 602 (S.D.N.Y. 2022). The *Garnett* court also called the statements which allegedly established the "inevitability" of the regulatory changes as merely "descri[ptions], in broad terms, [of] ideas then under consideration and . . . were preliminary and precatory." *Garnett* at 602. Such a fact pattern sheds no light on whether Credit Suisse—the issuer of XIV, who studied multiple VIX futures liquidity crises, issued millions of additional Notes at the start of 2018, lent Notes to short sellers,[24] and unilaterally controlled whether and when to call an Acceleration Event—could be said to have known XIV's crash was inevitable.

In its knowing or reckless disregard analysis, the Second Circuit also credited the complaint's allegations in part because Credit Suisse's expansion of XIV Notes "breached internal risk limits and thus required approval by CARMC," which "invites a reasonable inference that Credit Suisse increased the volume of XIV Notes for a manipulative purpose." The Second Circuit also discussed Credit Suisse's unilateral power to call an Acceleration Event—which it ultimately exercised. *See, e.g.*, *Set Cap.*, 996 F.3d at 77 (noting Credit Suisse "declared an Acceleration Event to lock in its profit"). Those allegations remain. *See* TAC ¶¶ 196-199 (Credit Suisse announces

---

[23] *See* Porritt Decl. ¶¶ 14-26, 33-36, 59-62 & Exs. 1-9, 14, 25.

[24] *See* Porritt Decl. ¶¶ 43-55 & Exs. 2, 5, 17, 18, 20.

17

Acceleration Event, "Locking In Their Profits").

The Second Circuit noted that Defendants' misleading statements regarding the expected impact of hedging on the value of XIV Notes and the basis for Credit Suisse's decision to declare an Acceleration Event further evidenced a culpable mindset. *See Set Cap.*, 996 F.3d at 79 (citing Defendants' statements that it had "no reason to believe" its hedging activity "could affect" prices and that Credit Suisse accelerated XIV because the Notes had "stopped trading" when they had not). The Second Circuit also noted the "massive economic impact of the alleged manipulation, as well as the SEC's decision to investigate . . . strengthened the inference" of scienter. *Id*. These allegations remain. *See* TAC ¶¶ 91-108 (January 2018 issuance breached internal risk limits, which Defendants knew); 223-25 (alleging Defendants' statement of "no reason to believe" hedging activity could affect VIX Futures Index was false and misleading); 200-11 (alleging Thiam misled investors by saying XIV was accelerated because it had "stopped trading"); *id.* (collapse caused nearly $2 billion in losses); 201 (SEC investigation). *See also* Redlined TAC ¶¶ 196-99; 91-108; 223-25; 200-11; 201.

Separately, the Second Circuit found the complaint adequately alleged motive and opportunity, given three considerations. First, "the structure of the XIV Notes . . . would allow Credit Suisse to profit if the value of the notes collapsed[.]" *Set Cap.*, 996 F.3d at 81. Second, "[CEO] Thiam was under significant pressure to shift Credit Suisse's investment arm away from volatile assets like XIV Notes." Third, Thiam was awarded a $10.2 million bonus for successfully shifting Credit Suisse away from such assets. ***These allegations remain untouched, too.*** TAC ¶¶ 192-95 (Credit Suisse scored millions in profit with the collapse of XIV); 115-23 (Thiam and others under pressure to divest from XIV); 209 (Thiam bonus); *see also* Redlined TAC ¶¶ 192-95; 115-23, 209. The Second Circuit concluded that, "on balance, these allegations support a strong

18

inference of scienter when viewed together with the evidence of conscious misbehavior or recklessness." *Set Cap.*, 996 F.3d at 81.

None of this analysis turned on the number of trades or amount of profit Credit Suisse made on February 5, 2018—and each of these facts remains in the TAC. Accordingly, the TAC leaves the Second Circuit's manipulation analysis undisturbed. Defendants offer this Court no reason to disturb the Second Circuit's scienter conclusions.

### E.  The TAC adequately alleges loss causation.

For loss causation, "there is no heightened pleading standard." *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 151 (2d Cir. 2025) (*citing Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005)). "A short and plain statement in accordance with Rule 8 . . . is sufficient." *Id.* The complaint "must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). Plaintiffs more than meet that burden by alleging a causal link between facts that were misrepresented or hidden by Defendants and the collapse of XIV Notes' price.[25]

#### 1.    The TAC adequately alleges loss causation under Section 10(b) of the Exchange Act.

##### a.    Plaintiffs adequately allege loss causation for Defendants' manipulative scheme.

The Second Circuit already held that Plaintiffs plausibly alleged Credit Suisse's manipulative scheme. *Set Cap.*, 996 F.3d at 77–82. The TAC advances this theory supported information adduced in discovery. Credit Suisse and its affiliates "purposefully grew" the XIV

---

[25] Defendants also raised a loss causation argument on their last go-round. ECF 102 at 23-26. That argument, too, is precluded by the law-of-the-case doctrine.

market, issuing 16,275,000 additional Notes on January 29, 2018,[26] knowing that the volume of resulting hedging obligations would, during the next volatility spike, create and exacerbate a liquidity squeeze in VIX futures that would destroy XIV's value and allow Credit Suisse to declare an Acceleration Event. The Acceleration Event, in turn, would, lock in millions of dollars in profit to Credit Suisse while investors were left with Notes worth only $5.99 each. *See* TAC ¶¶ 1, 6–9, 61–82, 156–170, 192–199. These allegations adequately plead loss causation: the concealed scheme materialized on February 5, 2018, removing the artificial inflation from XIV Notes and causing foreseeable losses to investors. TAC ¶¶ 254, 256, 259.

Defendants argue that because the TAC, informed by discovery, alleges that Credit Suisse purchased "thousands" rather than "105,000" VIX futures contracts, the causation theory underlying the Second Circuit's reversal should no longer be credited. Defs.' Br. 20–22. That argument fundamentally misreads both the TAC and the Circuit's *Set Capital* decision.[27]

The Second Circuit credited the manipulation theory and held loss causation adequately pled because of the *totality* of Credit Suisse's scheme, including the deliberate growth of the XIV market to a scale at which hedging obligations would create a liquidity squeeze, the systematic concealment of that design in the Offering Documents, and the execution of that scheme on February 5, 2018. *Set Cap.*, 996 F.3d at 77–82. Nothing in discovery discredited those core allegations. Rather, discovery showed, and the TAC alleges, that Credit Suisse traded in the same VIX futures market in which overall volume reached 167 times the normal level (TAC ¶ 163),

---

[26] *See also Set Cap.*, 966 F.3d at 77 (noting 5 million Notes issued on June 30, 2017); TAC ¶ 61 (same).

[27] Defendants also critique that the TAC alleges that Defendants traded "thousands" of VIX futures on February 5, rather than alleging a specific number of trades (*see* Defs.' Br. n.2), but omit that they expressly agreed to that language, as recognized in this Court's May 21, 2025, Order. *See* ECF 377 (joint letter recognizing "the parties have consented" to proposed amendments).

contributing to a VIX spike of approximately 100%—far beyond the 15% to 25% historically expected from a 4% decline in the S&P 500 (TAC ¶ 168). Meanwhile, Credit Suisse reported a 30% surge in equity sales and trading revenue for Q1 2018 "due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business." TAC ¶¶ 16, 192.

Defendants question whether Credit Suisse's specific trades, as opposed to overall market conditions, were the proximate cause of the liquidity squeeze. Defs.' Br. 19-23. That is precisely the type of fact-intensive inquiry that "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *see also Loreley*, 797 F.3d at 189 ("The requirement, if any, to plead *a* causal link does not place on [p]laintiffs a further pleading obligation to rule out other contributing factors or alternative causal explanations.").

Defendants contend that Plaintiffs' proposed (and rejected) PTAC—which alleged that six third parties "traded the vast majority of VIX futures" on February 5, 2018—constitutes a binding judicial admission absolving Credit Suisse of liability. Defs.' Br. 21–22. That argument fails both legally and factually. A superseded pleading—say nothing of a rejected one—ceases to be a judicial admission. *Oberlander v. Coinbase Glob. Inc.*, 2024 WL 1478773, at *3 (2d Cir. Apr. 5, 2024). Defendants seek to have it both ways, contending that the Court ignore facts adduced in discovery while deciding fact-intensive loss causation issues on the basis of allegations in a complaint that was never operative. That argument fails.

Defendants' cited case does not hold or even suggest that a proposed pleading creates some binding admission. *See U.S. Bank Nat'l Ass'n as Tr. to Bank of Am., N.A. v. KeyBank, Nat'l Ass'n*, 2023 WL 2745210, at *9 (S.D.N.Y. Mar. 31, 2023) (statements in support of successful motion

21

for leave to amend were considered judicial admissions for the purposes of the motion to dismiss subsequent amendment). Further, the allegations in the PTAC speak only to the *relative trading volume* of various market participants in the VIX futures market on February 5, 2018—at most one factor bearing on the manipulation/scheme theory—and have no bearing on loss causation under the misstatement theory. Under that theory, the causal chain runs directly from Credit Suisse's false representations in the January Supplement to the foreseeable materialization of the liquidity risk those statements concealed, independent of how many contracts any third party may have traded that afternoon.

Unlike the cases on which Defendants rely, in each of which the plaintiff's alleged loss was indistinguishable from what general market forces would have independently produced, the TAC alleges a specific, quantifiable deviation from ordinary market behavior. Although a historical 4% decline in the S&P 500 would have been expected to produce a VIX futures spike of only 15% to 25%, the spike on February 5, 2018 reached nearly 100%, with Credit Suisse's own scheme—deliberately growing the XIV market to a scale at which its hedging obligations would create an artificial liquidity squeeze—foreseeably and proximately leading to the Acceleration Event that destroyed investors' principal. *See Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 74, 76 (2d Cir. 2013); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 587 (S.D.N.Y. 2014); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 397 (S.D.N.Y. 2010); *Healthcare Fin. Grp., Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 349 (S.D.N.Y. 2009). Evidence developed in discovery shows that Credit Suisse knew that such an event would occur, but nevertheless continued to sell and expand the market for XIV Notes. The resultant crash, as predicted by Credit Suisse, was a foreseeable consequence from its Defendants' manipulative misconduct.

22

*Gamma Traders* is similarly inapposite. That case addressed a Commodity Exchange Act claim in which the defendant's proportionate share of trading in a commodity market was genuinely *de minimis*—a pure market-share question—whereas here Credit Suisse's liability for the scheme does not turn on how many VIX futures contracts it purchased relative to other market participants. Rather, here, Credit Suisse's liability flows from the scheme it deliberately designed, executed, and benefited from: Credit Suisse alone controlled the structure and scale of the XIV market, alone issued the 16,275,000 additional XIV Notes on January 29, 2018, knowing that hedging obligations would create a liquidity squeeze during the next volatility spike, and alone reaped $490 million in trading gains when that spike materialized. Market share is an irrelevant factor here. *Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 79 (2d Cir. 2022). Further, in *Gamma Traders*, the plaintiff failed to allege "that its trades occurred so close in time to Defendants' spoofing as to permit us to infer . . . that the market prices were artificial when Gamma traded." *Id*. at 80. Here, Defendants' manipulative conduct occurred contemporaneously with investors' purchases of XIV Notes.

### b.    Plaintiffs adequately allege loss causation for the misstatements and omissions in the Offering Documents.

The Second Circuit also held that the Offering Documents contained actionable misrepresentations and omissions, and specifically identified Credit Suisse's "no reason to believe" statement as one that "misrepresented Credit Suisse's knowledge and intent." *Set Cap.*, 996 F.3d at 85–86. Plaintiffs "allege that the [Credit Suisse] Defendants made materially false and/or misleading statements and omissions in the Prospectus . . . that caused a foreseeable loss when this concealed risk materialized on February 5, 2018, causing the removal of the artificial inflation in the values of XIV notes and causing economic harm to XIV investors." *See* TAC ¶¶ 155–170, 191–199, 254, 259. Such allegations adequately and straightforwardly allege loss-

23

causation for those misstatements: Credit Suisse made false and misleading statements in the January Supplement, including that it had "no reason to believe" its hedging would have a material impact on XIV (TAC ¶ 223) and that the conflict of interest between Credit Suisse and investors only "may" exist (TAC ¶ 216). In truth, Credit Suisse knew that the next VIX spike would trigger a catastrophic liquidity squeeze and an Acceleration Event. TAC ¶¶ 224–225.

As the Second Circuit recognized, there is a "critical distinction between disclosing the risk a future event might occur and disclosing actual knowledge that the event will occur"—particularly where that distinction holds "enormous significance" for investors. *Set Cap.*, 996 F.3d at 85 (quoting *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008)). The TAC alleges that type kind of misrepresentation: disclosures that *sounded* in contingency ("may," "could," "no reason to believe"), but that Credit Suisse knew reflected virtual certainties, based on three prior VIX spikes in 2011, 2015, and 2016, each of which had been escalated directly to CEO Thiam and CFO Mathers under Credit Suisse's internal risk protocols. TAC ¶¶ 61–82, 242–243. And the risk that materialized on February 5, 2018, was the concealed known risk, establishing the required "causal link between the loss and the alleged misrepresentations." *Loreley*, 797 F.3d at 187.

Defendants argue that XIV's decline "coincides with a market wide phenomenon" and that Plaintiffs' losses were caused by a "spike in market-wide volatility." Defs.' Br. 20–21. Defendants are wrong, and they mischaracterize the allegations. Although a market-wide 4% drop in the S&P 500 would have been expected to cause VIX futures to spike by only 15% to 25% (*id.* ¶ 168), VIX futures spiked by nearly 100%, with the difference due to Credit Suisse's misconduct. *See* TAC ¶¶ 162–170. Plaintiffs do not allege that market-wide volatility caused their losses, but rather that "it was only because of Credit Suisse's engineered liquidity crisis in the VIX futures market that XIV's value dropped 96%, triggering an Acceleration Event." *See id.*

24

At the pleading stage, Plaintiffs need only provide "some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley*, 797 F.3d at 187. The TAC meets that bar. Although Defendants are correct that "if the loss was caused by an intervening event, . . . the chain of causation will not have been established[,]" they overlook that this "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap.*, 343 F.3d at 197.

### 2.   Defendants cannot establish as a matter of law the affirmative defense of negative causation under Section 11.

Regarding Plaintiffs' Section 11 claims, there is no requirement to plead loss causation. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). Instead, "Defendants bear the burden of demonstrating" negative causation by establishing "that something other than the alleged omissions or misstatements at issue caused plaintiffs' loss." *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 523 (S.D.N.Y. 2013). The negative-causation defense may properly be considered on the pleadings only where the absence of loss causation is apparent on the face of the complaint. *Id.*

The negative-causation defense is "unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6)." *Morgan Stanley*, 592 F.3d at 359 n.7; *see also In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009). It is "difficult (if not impossible) for the defendants to sustain their burden of showing loss causation without persuasive expert testimony." *FHFA v. Nomura Holding Am., Inc.*, 2015 WL 685159, at *4 (S.D.N.Y. Feb. 18, 2015). Defendants fail to satisfy that burden because they "have not offered" any "alternative explanation regarding what may have caused the alleged loss in this case." *Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 644–45 (S.D.N.Y. 2017).

25

Nothing "apparent on the face of the complaint" establishes that investors' losses were caused by something other than Defendants' fraud. To the contrary, Class members purchased XIV Notes pursuant to the January Supplement—at prices between $104 and $135 per note— based on misrepresentations that Credit Suisse had "no reason to believe" hedging would have a material impact on XIV, and Defendants' failures to disclose that XIV was designed to fail during the next VIX spike, was too large for the VIX futures market on which its value was based, and there were liquidity issues during end-of-day hedging after a VIX spike. TAC ¶¶ 61-82, 213, 223– 225. Within seven days, XIV collapsed by 96% and was ultimately redeemed at $5.99 per note. *Id*. ¶¶ 1, 198. That the very risks Credit Suisse falsely disclaimed then materialized—as Credit Suisse knew they would—does not establish negative causation; it is the causal link itself.

Defendants ask the Court to accept their version of disputed facts regarding the cause of XIV's collapse. But a negative-causation defense "will not succeed at the pleading stage unless, even after accepting all of Plaintiffs' well-pleaded allegations as true, 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418 (S.D.N.Y. 2009). The TAC pleads ample facts supporting Plaintiffs' claims. Defendants' argument is, in substance, a merits challenge to the adequacy of the January Supplement's disclosures—a question going to *falsity*, not to loss causation—dressed up as a negative-causation defense. Whether Defendants' disclosures were legally adequate is the substantive question reserved for the trier of fact, and cannot support dismissal at the pleading stage.

Tellingly, despite the "years of burdensome discovery" that Defendants bemoan (Defs.' Br. 1), they put nothing forward—no expert analysis, alternative causation theory, or disaggregation of investor losses—to establish anything other than their own fraud that caused the

losses to investors who purchased XIV Notes pursuant to the January Supplement. *See Nomura*, 2015 WL 685159, at \*4 (cautioning that carrying the negative-causation burden without persuasive expert testimony is "difficult (if not impossible)"). Defendants have not met their burden, and their Section 11 loss causation argument should be rejected.[28]

## IV.    CONCLUSION

For the reasons discussed above, Plaintiffs' TAC should be sustained, and Defendants' Motion denied.

Dated: May 1, 2026                                    Respectfully submitted,


                                                      /s/ *Michael B. Eisenkraft*
                                                      Michael B. Eisenkraft
                                                      Laura H. Posner
                                                      Brendan Schneiderman (*pro hac vice*)
                                                      **COHEN MILSTEIN SELLERS
                                                        & TOLL PLLC**
                                                      88 Pine Street
                                                      14th Floor
                                                      New York, NY 10005
                                                      Tel.: (212) 838-7797
                                                      Fax: (212) 838-7745
                                                      meisenkraft@cohenmilstein.com
                                                      lposner@cohenmilstein.com
                                                      bschneiderman@cohenmilstein.com

                                                      Steven J. Toll (*pro hac vice*)
                                                      1100 New York Ave. N.W., Fifth Floor
                                                      Washington, D.C. 20005
                                                      Tel.: (202) 408-3640
                                                      Fax: (202) 408-4699
                                                      stoll@cohenmilstein.com

---

[28] Because Plaintiffs have adequately pled actionable primary violations of the Exchange Act and Securities Act, their control person claim should also be revived. Defendants' secondary argument, that Plaintiffs' control person claims lack the requisite particularity, repeats their earlier motion, and thus is improper under the law-of-the-case doctrine. *See* ECF 102 at 26 (arguing the "total absence of any particularized allegations of culpable conduct").

Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Tel. (312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
Nicholas I. Porritt
Adam M. Apton
33 Whitehall Street, 17th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
ek@zlk.com
nporritt@zlk.com
aapton@zlk.com

Alexander A. Krot III
1101 Vermont Avenue, NW
Suite 800
Washington, D.C. 20005
Tel: (202) 524-4290
Fax: (212) 363-7171
akrot@zlk.com
(*admitted pro hac vice*)

*Counsel for Lead Plaintiffs and Co-Lead
Class Counsel for the Securities Act Class*

**BRONSTEIN, GEWIRTZ &
GROSSMAN,
LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel. (212) 697-6484
peretz@bgandg.com

28

*Additional Counsel for Apollo Asset Limited*

and-

*/s/ Adam Hollander*
**SLARSKEY LLC**
Adam Hollander
767 Third Avenue, 14th Floor
New York, NY 10017
Tel: (212) 658-0661
ahollander@slarskey.com

*Counsel for the Sudheera Tripuraneni Trust U/A DTD 11/16/2015 and Class Counsel for the Manipulation Class*